# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CALEB PADILLA, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, LARRY CASH, and THOMAS J. AARON,<br><br>      Defendants. | Case No.: 3:19-cv-00461<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Eli J. Richardson<br><br>Hon. Barbara D. Holmes<br><br>CLASS ACTION<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs Arun Bhattacharya and Michael Gaviria ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) the review and analysis of regulatory filings made by Community Health Systems, Inc. ("Community Health" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) the review and analysis of press releases and media reports issued by and disseminated by Community Health; (c) the review of other publicly available information concerning Community Health; and (d) interviews with knowledgeable former employees of Community Health.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that acquired the securities of Community Health between February 21, 2017 and February 27, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. This is a straight-forward case of securities fraud. During the Class Period, Community Health understated its provision for bad debts and overstated its operating revenue and Adjusted EBITDA. This was done to avoid triggering defaults on the Company's credit facilities. Instead of coming clean to investors by restating their financial results, Defendants used a revision in the accounting guidelines as a pretext to clean up their books. Defendants were motivated to do this specifically because the Company's debt covenants had a provision excluding the impact of expenses attributable to "changes in accounting principles." When the true financial condition of the Company was disclosed to the public, Community Health lost over a hundred million dollars of market capitalization.

3. Community Health is a chain of general acute care hospitals created by the roll-up of numerous hospital groups. It serves patients that are covered by private insurance, Medicaid,

Medicare, and those who have no insurance whatsoever. Community Health calls this latter group "self-pay," though in fact it was unlikely, for example, that an uninsured patient seeking service in an emergency room would pay at all. In fact, the Company admits that its bad debt is largely the result of uninsured emergency room and walk-in visits, because its policy is to verify insurance for all *planned* visits but "[i]nsurance coverage is not verified in advance of procedures for walk-in and emergency room patients."

4. During the Class Period, Community Health used particularly opaque accounting, especially in relation to its "bad debt," which is a deduction netted from revenue, and a related item on its balance sheet called "allowance for doubtful accounts," which is a deduction netted from accounts receivable. "Bad debt" was so important to Community Health's performance that it was the second item that management discussed in the introductory section of each quarterly filing. According to the Company, the "bad debt" issue lies almost entirely with uninsured "self-pay" patients, because it "collect[s] substantially all of our third-party insured receivables, which include receivables from governmental agencies." This is unsurprising as hospitals often deal with patients that are not able to pay their exorbitant costs.

5. For third-party payor patients, Defendants understated the bad debt associated with the "uncontractualized" or patient portion (co-pay and deductible) of those invoices by declining to assess the probability of collection from those patients. While Defendants, by their own admission, possessed the data that would allow them to make such determinations, they simply chose not to do so.

6. Throughout the Class Period, Defendants repeatedly misrepresented these metrics to mask growing problems with aged receivables from uninsured "self-pay" patients, debts related to co-pays and deductibles from insured patients, and disputed payments from third-party payors. As a result, Community Health inflated its operating results, including performance metrics that could trigger defaults on the Company's credit facilities. Therefore, Defendants' Class Period statements were false and misleading because they failed to disclose to investors: (1) that the

Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had declined to assess the probability of collection from insured patients of receivables relating to the co-pays or deductibles owed by those patients; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; (6) that Defendants' Sarbanes Oxley Act certifications were false; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7. Defendants' ability to hide Community Health's bad debt became more difficult as revenue dropped in Q2 and Q3 2017. Even worse, an accounting change would have to be implemented no later than Q1 2018 called ASC 606, which would force transparency in the way the Company reported revenue received directly from its patients. Defendants knew that rule change would force them to disclose the truth no later than the publication of audited year-end financials, so they attempted to condition the market by slowly revealing a growing "bad debt" problem. First, for Q2 2017, they attempted to offset the effect of declining revenue by boosting the provision for "bad debt" from 13.2% of revenue to 14.1% of revenue, quarter over quarter.[1] Even this early partial disclosure had a devastating effect on Community Health's share price, sending it down $1.23 per share, more than 14.5%, to close at $7.23 per share on July 27, 2017, on unusually heavy trading volume.

8. When revenue dropped again in Q3 2017, reported on November 1, 2017, the Company again nudged up its bad debt expense from 14.1% to 15.4% of revenue, quarter over

---

[1] The Company reported revenue net of discounts and contractual adjustments. All revenue figures cited in this Complaint, and percentages derived therefrom, accordingly relate to revenue net of discounts and contractual adjustments.

quarter. The market understood the disclosure to reflect a growing bad debt problem, and sent shares reeling to close down $1.36 per share, or approximately 23.1%, on November 1 and 2, 2017, on unusually heavy trading volume.

9.     After the market closed on February 27, 2018, the end of the Class Period, Defendants announced Community Health's Q4 and full year 2018 results, revealing that Community Health ramped "bad debt" expense (for the third time in as many quarters) to more than $1 billion in the quarter, amounting to a whopping 25% of revenues, including a $591 million charge it called a "change in estimates" allegedly resulting from a change in accounting rules it claimed forced them to review data they previously declined to use. Of this $591 million charge, Community Health attributed $197 million to an increase in contractual adjustments, and attributed exactly double that figure ($394 million) to an increase in its bad-debt allowance.

10.    The Company blamed the charge on a change to ASC 606, the new revenue recognition standard. However, a knowledgeable former employee of Community Health expressly characterized the Company's actions as a "restatement," meaning the revision of previous financial statements to correct an error.

11.    Although Defendants claimed that the increase in bad debt expense was the result of the change to ASC 606, professional investors saw through this and understood that the massive bad debt charge was too large to be tied to the new accounting policy. For example, J.P. Morgan warned that the charge should properly be viewed as either a closet correction of deficient reserves or the creation of a new "cookie jar" reserve to enable future misstatements. *See* ¶ 155.

12.    When pressed by analysts on the Q4 2017 earnings conference call, Defendants Community Health and Chief Financial Officer Thomas J. Aaron ("Aaron") admitted that the charge related to "self-pay" receivables that the Company had (improperly) kept on its books (even though collection of those accounts was generally not probable), and to "anticipated denials" from third-party payors. As a result of this final disclosure/materialization of the concealed risk, Community Health shares plummeted $1.06 per share, more than 17%, to close at $5.12 per share

on February 28, 2018, on unusually heavy trading volume.

13.     As a result of Defendants' wrongful acts and omissions, Community Health's stock declined precipitously, shedding over a hundred million dollars in market capitalization over the Class Period and causing Plaintiffs and other Class members to suffer substantial losses.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District, and the Individual Defendants (as that term is defined below) reside in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Plaintiffs, as set forth in their previously-filed certifications, incorporated by reference herein, purchased Community Health securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. *See* ECF Nos. 33-3 & 39-2.

19. Defendant Community Health is incorporated under the laws of Delaware with its principal executive offices located in Franklin, Tennessee. Community Health's stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "CYH."

20. Defendant Wayne T. Smith ("Smith") was the Chief Executive Officer and Chairman of the Board of Directors of the Company at all relevant times. Defendant Smith signed the Company's 2016 annual report, first quarter 2017 quarterly report, second quarter 2017 quarterly report, third quarter 2017 quarterly report, and 2017 annual report.

21. Defendant Larry Cash ("Cash") was the Chief Financial Officer of the Company from September 1997 to May 2017. Defendant Cash signed the Company's 2016 annual report and first quarter 2017 quarterly report.

22. Defendant Thomas J. Aaron ("Aaron") was the Chief Financial Officer of the Company between May 2017 and December 31, 2019. Defendant Aaron signed the Company's second quarter 2017 quarterly report, third quarter 2017 quarterly report, and 2017 annual report.

23. Defendants Smith, Cash, and Aaron (collectively the "Individual Defendants"), were each personally involved in and possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and investors. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, and because the Individual Defendants themselves made the misleading representations to investors, the Individual Defendants knew that the adverse facts specified herein had been omitted from the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24. Community Health and the Individual Defendants are collectively referred to herein

as "Defendants."

<center>**SUBSTANTIVE ALLEGATIONS**</center>

<center>**Background**</center>

25.     Community Health is one of the largest publicly-traded hospital companies in the United States and bills itself as a "leading operator of general acute care hospitals and outpatient facilities in communities across the country."  As of December 31, 2016, the Company's affiliates owned or leased 155 hospitals in twenty-one states, with an aggregate of 26,222 licensed beds.

26.     Community Health generates its revenue via a variety of general and specialized hospital healthcare services and outpatient services to patients, including general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric, and rehabilitation services to patients with private insurance, Medicare, Medicaid, and uninsured patients, which Community Health refers to as "self-pay."

**A.      Community Health Incurs Crushing Debt as It Rapidly Expands**

27.     Between 2007 and 2014, Community Health grew rapidly via acquisition.  This string of acquisitions was financed through debt, putting the Company in a precarious financial situation in which it had to adhere to strict financial-ratio covenants in order to prevent default.

28.     On July 25, 2007, Community Health acquired Triad Hospitals, Inc. for $6.836 billion, which included the assumption of $1.686 billion in indebtedness.

29.     Then, on January 27, 2014, Community Health acquired Health Management Associates, Inc. ("HMA") for approximately $7.3 billion, which included the assumption of $3.8 billion in indebtedness.  According to Confidential Witness ("CW") 1,[2] HMA had a significant amount of bad debt on its books at the time of the acquisition.  After the acquisition, CW 1 observed

---

[2] CW 1 was employed by Community Health as a director of finance, physician services from December 30, 2013 to December 2017.  In that position, CW 1 managed the financial reporting for thirty-five (35) clinics, identified "underperforming" physicians, and compiled and presented financials to the hospital's C-suite.

that Community Health began to have problems integrating its revenue with HMA, including difficulty collecting payments that HMA was owed, and that HMA's hospitals were struggling to generate cash flow due to a combination of its poor collection of receivables and contractual guarantees that the hospital had with its physicians.

30. The $7.3 billion HMA acquisition exacerbated Community Health's already over-leveraged balance sheet and weak cash flow by significantly increasing the amount of debt that Community Health owed to its creditors and adding several struggling hospitals to the Company.

31. Community Health was saddled with so much external debt from its Triad and HMA acquisitions that by the end of 2016 (immediately prior to the Class Period), the Company had the highest external debt-to-EBITDA ratio among the large investor-owned hospital companies:[3]

| Stock Symbol | Hospital Chain | External Debt-to-EBITDA Ratio |
|---|---|---|
| CYH | Community Health Systems | 7.719x |
| HCA | HCA Holdings | 3.845x |
| THC | Tenet Healthcare | 5.952x |
| LPNT | LifePoint Health | 4.038x |
| UHS | Universal Health Services | 2.436x |

32. On October 22, 2015, Community Health lost 33% of its value when it pre-announced third-quarter earnings that were well below expectations, and attributable to, among other factors, a deterioration in payor mix.[4] This included an increase in the percentage of self-payors, who are more likely to default on payments.

33. On April 29, 2016, Community Health announced the completion of its spin-off of thirty-eight hospitals to form Quorum Health Corporation ("Quorum"). The spin-off severely

---

[3] EBITDA, or "earnings before interest, taxes, depreciation, and amortization," is a measure of a company's overall financial performance and is used as an alternative to simple earnings or net income in some circumstances.

[4] "Payor," in healthcare terminology, is one who makes a payment.

underperformed expectations, and investors complained that Community Health used proceeds from the deal to pay down its own debt.

**B.      Pre-Class Period Financial Difficulties**

34.      On February 21, 2017, Community Health reported its 2016 annual net loss attributable to shareholders of $1.7 billion, and quarterly EBITDA of $564 million, beating analysts' average estimate of $529 million by 6.6%.[5]

35.      The very next day, February 22, 2017, Community Health announced that one of its Directors and its longtime CFO, Defendant Cash, was resigning effective May 16, 2017.[6] The retirement announcement did not specify why Cash was resigning, or whether the resignation was the result of any disagreement with the Company with respect to its financial and auditing policies, operations, or practices. *Id.* Cash's resignation coincided with the commencement of Defendants' scheme (detailed below) to conceal its revenue misstatements in the second, third, and fourth quarters of 2017 by holding out its revisions as a change in accounting principles, not a restatement of revenue. In the same announcement, the Company announced that Defendant Aaron had been appointed Executive Vice President and Chief Financial Officer. *Id.* Prior to joining Community Health in 2016, Defendant Aaron spent thirty-two years at Deloitte & Touche LLP ("Deloitte"), Community Health's independent auditor, and retired as Managing Partner of its Tennessee office. As recently as 2013, Defendant Aaron led Deloitte's audit team for Community Health, and was therefore in a unique position to influence how much auditor scrutiny the Company received.

36.      In 2017, Community Health sold thirty hospitals. These divestitures were intended to provide Community Health with additional cash to pay down its external debt. However, many

---

[5] *See* John Lauerman, Bloomberg, *Community Health Soars by Record 40% After Earnings Beat* (Feb. 21, 2017).

[6] *See* BusinessWire, *Community Health Systems Announces Retirement of Chief Financial Officer* (Feb. 22, 2017), *available at*:
https://www.businesswire.com/news/home/20170222006483/en.

of the divested hospitals were considered to be among the best in the Company's portfolio. As one banker put it, "[i]t's almost like they're burning the furniture".[7] An investor said that Community Health was "selling off the fine china" to meet debt payments.[8]

37.     And, as Zacks Equity Research noted, Community Health's divestitures were linked to:

> a downward trend in its top line since 2016 on lower admissions, stemming from decreasing number of hospitals as a result of frequent divestitures. In both 2016 and 2017, revenues declined by 5.1% and 16.7%, respectively. Rapid sale of units might have further induced reduction in the bed count and patient admissions. Besides these, the company bore the brunt of falling payer rates and increased bad debt.[9]

38.     Despite the Company's external debt woes and decimated market capitalization, Defendant Smith, Community Health's CEO since 1997, not only remained in his position throughout the Class Period, but was highest earner among hospital executives and reaped more than $1 million in bonuses between 2015 and 2017 even while Community Health's stock price tanked. Smith's base salary of $1.6 million remained unchanged between 2015 and the end of the Class Period in February 2018.

### C.     Community Health's Lack of Internal Controls Over Receivables

39.     Internally, the Company had difficulty keeping track of payments. CW 2, who worked at Community Health between March 2016 and December 2017, reported that Community Health repeatedly attempted to automate whatever they could in the process of billing the payors,

---

[7] Bob Herman, "The Collapse of Community Health Systems." *Axios* (Aug. 15, 2017), https://www.axios.com/the-collapse-of-community-health-systems-1513304786-f5a411e6-e0dd-401b-af65-9dc81be4be80.html

[8] *Id.*

[9] https://www.zacks.com/stock/news/296441/why-did-community-health-stock-sink-more-than-50-in-a-year

and then hired people to clean up the mess created by automation.[10]

40.     CW 2's entire job, by CW 2's own description, was to identify claims on which Community Health had been overpaid or underpaid.

41.     CW 2 stated that the Company's code-based, automated contractual allowance system, HMS Medhost,[11] would often generate bills that underpaid claims worth tens of thousands of dollars.  Making things worse, the automated nature of HMS Medhost meant that a code-based error could repeat itself hundreds of times before being discovered.

42.     When underpayments to Community Health came to light, CW 2 was tasked with seeking recoupment from payors, who would sometimes refuse, triggering the involvement of the Company's attorneys.

43.     CW 2 explained that contractual automation errors happened all the time, and nearly always required updates to similar claims in HMS Medhost in order to prevent the multiplication of similar errors going forward.

44.     According to CW 2, even where billing was not automated, the Company would nonetheless often come up short.  CW 2 attested to the fact that patients with no insurance would actually speak with the billing department and would then agree on a fee for the service and payment terms, on an *ad hoc* basis.

**D.     Defendants Find a Path Around Crippling Debt Covenants**

45.     At all relevant times, Community Health was constrained by covenants in a $1 billion credit facility that it maintained and used for financing the acquisition of HMA, as well as refinancing existing indebtedness.  Community Health was required to satisfy these covenants in

[10] CW 2 was based at the Company's Antioch, Tennessee; Brentwood, Tennessee; and Nashville, Tennessee locations and reported to Manager Sandy Henry, who in turn reported to Director Katie Waffen.

[11] A "contractual" is the difference between the charge that appears on a patient's bill and the amount each in-network insurance company pays.

order to avoid default. Specifically, the credit facility provided that Community Health was required to keep its "secured net leverage ratio" below a maximum level and its "interest coverage ratio" above a minimum level. Community Health's "secured net leverage ratio" was defined in the Third Amended and Restated Credit Agreement as the ratio of (a) Community Health's Total Secured Debt less cash and cash equivalents to (b) Community Health's "Consolidated EBITDA."[12] Community Health's "interest coverage ratio" was defined in its 2016 10-K as the "ratio of consolidated EBITDA, as defined in the Credit Facility, to consolidated interest expense for the period."

46. Thus, in order to avoid defaulting on its credit facility, Community Health had to manage its consolidated EBITDA.

47. Despite the importance of Consolidated EBITDA, Community Health refused to report the metric to investors or explain how it calculated Consolidated EBITDA. However, in an October 25, 2016 correspondence with the SEC, Community Health conceded that Consolidated EBITDA was used to determine whether the Company was in compliance with covenant calculations:

> *Under the Credit Facility, the secured net leverage ratio is calculated as the ratio of total secured debt, less unrestricted cash and cash equivalents, to consolidated EBITDA, as defined, and the interest coverage ratio is the ratio of consolidated EBITDA, as defined, to consolidated interest expense for the period.*[13]

48. On November 9, 2016, the SEC requested that Community Health "revise" its

---

[12] In its 2016 10-K, Community Health indicated that it calculated "Consolidated EBITDA" as "a trailing 12-month calculation that begins with net income attributable to us, with certain pro forma adjustments to consider the impact of material acquisitions or divestitures, and adjustments for interest, taxes, depreciation and amortization, net income attributable to noncontrolling interests, stock compensation expense, restricting costs, and the financial impact of other non-cash or non-recurring items recorded during any such 12-month period."

[13] *See* Correspondence from Community Health Systems, Inc. to the SEC, dated Oct. 25, 2016, *available* *at*: https://www.sec.gov/Archives/edgar/data/1108109/000119312516746866/filename1.htm.

disclosure of Consolidated EBIDTA in order "to present it as it is calculated in [Community Health's] covenant agreement."[14]

49.  The Company refused to report the Consolidated EBITDA calculations transparently as requested by the SEC.  In response to the request, the Company conceded that Consolidated EBITDA was "a key component in the determination of our compliance with some of the covenants under our senior secured credit facility *(including our ability to service debt and incur capital expenditures)*" but stated that it would instead disclose only Adjusted EBITDA to investors.[15] (Emphasis added.)

50.  While Defendants evaded the SEC's questions regarding their Consolidated EBIDTA metric, their Third Amended and Restated Credit Agreement, dated January 27, 2014, provides the following definition that specifically excludes impacts from accounting-principle changes:

> "Consolidated Net Income" shall mean, for any period, ***the net income or loss*** ((i) excluding extraordinary gains and losses, and gains and losses arising from the proposed or actual disposition of material assets and (ii) ***excluding the cumulative effect of changes in accounting principles***) of Parent, the Borrower and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; . . ."

> "Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period . . . ." (emphasis added).[16]

51.  Thus, Defendants negotiated before the start of the Class Period the ability to exclude from debt covenant measurements any charge it could attribute to "changes in accounting principles," such as the shift from ASC 605 to ASC 606.

---

[14] *See* Correspondence from the SEC to Community Health Systems, Inc., dated Nov. 9, 2016, *available* *at*: https://www.sec.gov/Archives/edgar/data/1108109/000000000016100321/filename1.pdf.

[15] *See* https://www.sec.gov/Archives/edgar/data/1108109/000119312516776582/filename1.htm

[16] https://www.sec.gov/Archives/edgar/data/1108109/000119312514022855/d663459dex102.htm at 12, 15.

52.     Just prior to the Class Period, the Company renegotiated with its lenders to avoid triggering a default by exceeding the then-specified maximum secured net leverage ratio.  On December 5, 2016, Community Health entered into an amendment with its lenders retrospectively for Q4 2016 and for all of 2017 (but not 2018 or beyond), in exchange for which it had to enter into "certain additional covenants…for the benefit of [the lenders]." *See* Form 8-K filed December 6, 2016.  The amendment provided that Community Health maintain the following maximum secured net leverage ratio levels:

| Period | Maximum Secured Net Leverage Ratio |
|---|---|
| 1/1/2016 – 9/30/2016 | 4.25:1 |
| 10/1/2016-12/31/2017 | 4.5:1 |
| 1/1/2018 and onwards | 4.0:1 |

The amendment also required Community Health to maintain an interest coverage ratio above 2:1 throughout 2017, and above 2.25:1 in 2018 and beyond.

   **E.     Relevant Accounting Policies and Principles**

      **1.     GAAP Requirements Generally**

53.     Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured.  GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

54.     The SEC requires that public companies present financial statements in accordance with GAAP.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

55.     Regulation S-X requires that interim financial statements must also comply with

GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. § 210.10-01(a).

56.     At all relevant times, Community Health's Code of Conduct provided that: "[o]ur consolidated financial statements are certified by our officers as being true and materially accurate and not misleading and are presented to the public and the federal government in accordance with generally accepted accounting principles and all Securities and Exchange Commission rules and regulations."[17]

### 2.     Relevant Accounting Rules and Regulations Governing Receivables and Allowance for Doubtful Accounts

57.     The conceptual framework for financial accounting and reporting rules is set forth in the Statement of Financial Accounting Concepts ("FASCON") promulgated by the FASB. FASCON 6 describes the "matching principle" of accounting that is otherwise referred to as "accrual accounting." Pursuant to FASCON 6, "matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time." *See* FASCON 6, ¶146.

58.     GAAP requires public filers to utilize accrual-based accounting even for sales not effectuated through the immediate exchange of cash.  Where a company has made a sale but not received cash for that sale, an accounts receivable asset is recorded.  The accounts receivable asset is maintained on an entity's books and records until the amount is either (a) received in cash or equivalent payment, or (b) deemed to be uncollectible.  ASC 310, Receivables, prescribes that an entity record as a reserve (known as a contra-asset account) an allowance for doubtful accounts in

---

[17] http://www.chs.net/wp-content/uploads/Code-of-Conduct-2019-2020.pdf

the amount it determines will more likely than not remain uncollected.

59.     GAAP requires that receivables be measured periodically to ensure that the amounts at which they are being carried on an entity's balance sheet are commensurate with and reflective of the extent to which such receivables are expected to be collected because, as the guidance provides, "[t]he conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a contingency exists." *See* ASC 310-10-35-7.

60.     ASC 450 defines a contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur." *See* ASC 450-20-20.  With respect to receivables, the concepts outlined in ASC 450 (and outlined above) influence how and when an entity must record losses (in the form of a period expense) with respect to loans or other receivable amounts that will not be collected.

61.     ASC 310 states, specifically, the following with respect to how and when to adjust the balance of a receivable to reflect the collectability of (or, to the contrary, the expected losses from) such receivable:

> [GAAP] requires recognition of a loss when both of the following conditions are met:
>
> a.  Information available before the financial statements are issued or are available to be issued . . . indicates that it is probable that an asset has been impaired at the date of the financial statements.
>
> b.  The amount of the loss can be reasonably estimated.
>
> *See* ASC 310-10-35-8.

62.     Additionally, the guidance at ASC 310-10-35-9 provides that:

> Losses from uncollectible receivables shall be accrued when both of the preceding conditions are met. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

63.     Thus, GAAP requires that entities like Community Health, which carry significant receivables, must reflect such assets at their proper carrying value, and must regularly and methodologically assess the collectability of its receivables at each reporting date.  Under GAAP and ASC 310-10-35-41 specifically, an entity must deduct credit losses directly from the allowance when the entity becomes aware that a balance is no longer collectible.

64.     The same treatment is applicable to similar scenarios subsequent to the adoption of the new revenue recognition standard (ASC 606).  According to ASC 606-10-55-108, if an entity realizes that a "customer's financial condition declines" and fails to "make[] . . . payments," the entity may "account[] for any impairment of the existing receivable in accordance with Topic 310 on receivables."   At a public meeting of the FASB/IASB Joint Transition Resource Group for Revenue Recognition (ASC 606) on January 26, 2015, the staff stated, "***The new revenue standard does not change the accounting for receivables***. An entity accounts for a receivable in accordance with Topic 310, Receivables." (Emphasis added.)

### 3.     For Periods Beginning Before December 15, 2017, ASC 605 Permitted Recognition of Gross Revenues

65.     Until January 1, 2018, Community Health recognized revenue under ASC 605. Under ASC 605, revenue is recognized if (a) persuasive evidence of an arrangement existed, (b) delivery had occurred, (c) the vendor's fee was fixed or determinable, and (d) collectability was probable.

66.     Community Health's gross service revenue (*i.e.*, revenue recognized at Community's full established rates) was substantially greater than the revenue that Community Health actually expected to collect.  Accordingly, Community Health reported a figure called "net operating revenue," or gross service revenue less deductions from revenue. Community Health's specific deductions from revenue consisted of the sum of its contractual adjustments and discounts. *See* ASC 954-605-45-2.

67.     These adjustments and discounts are substantial.  For example, in the year ending

2016 (and including 2015 and 2014), Community Health reported the following revenue figures:

| Revenue Account | 2016 | 2015 | 2014 |
|---|---|---|---|
| Total Revenue | $122.675B | $120.864B | $108.761B |
| Contractual Allowances | $98.2B | $95.3B | $84.4B |
| Discounts | $3.2B | $3.0B | $2.8B |
| Net Operating Revenue | $21.275B | $22.564B | $21.561B |

68.    Thus, in the periods leading up to the Class Period, even though Community Health's Total Revenue increased by 12.8%, its net operating revenue *decreased*.

69.    Net operating revenue also functions as a component of "Adjusted EBITDA" a non-GAAP metric which Community Health discloses in its annual and quarterly financial reports.

70.    During the Class Period, Community Health (i) subtracted its expenses from its net operating revenue to arrive at its "net income" and (ii) calculated its Adjusted EBITDA by starting with its standard EBITDA—its net income less interest, income taxes, depreciation and amortization—and then:

> . . . add[ing] back net income attributable to noncontrolling interests and [] exclud[ing] the effect of discontinued operations, loss from early extinguishment of debt, impairment and (gain) loss on sale of business, gain on sale of investments in unconsolidated affiliates, acquisition and integration expenses from the acquisition of HMA, expense incurred related to the spin-off of QHC, expense incurred related to the sale of a majority ownership interest in our home care division, expense related to government and other legal settlements and related costs, and (income) expense from fair value adjustments on the CVR agreement liability accounted for at fair value related to the HMA legal proceedings, and related legal expenses.

*See* 2016 10-K at 13.

71.    As a result, bad debt impacted Community Health's Adjusted EBITDA as well as its net operating income.

72.    Pursuant to ASC 954-605, a healthcare provider (such as Community Health) reported top-line revenue using the amount it billed for a given service, even if it did not expect to collect that amount.

73.    For example, if a healthcare provider billed an uninsured patient $100, and it

expected that the patient would pay $10, it could still record $100 as top-line revenue, together with a $90 contra-revenue line item for "bad [*i.e.*, uncollectible] debt."

### 4. For Periods Beginning After December 15, 2017, ASC 606 Superseded ASC 605 on a Prospective Basis Only

74.    On May 28, 2014, the FASB announced Accounting Standard Update ("ASU") 2014-09, titled *Revenue from Contracts with Customers (Topic 606)*.  Once it was declared effective, the FASB intended for the new topic (or "ASC 606") to supersede the principles set forth in ASC 605 that applied to revenue recognition of for-profit entities.  ASC 606 was not created for the benefit of the healthcare providers themselves, but was designed to help investors and other stakeholders compare companies across industries, including healthcare, as well as to align U.S. accounting standards with international ones.[18]

75.    Public companies such as Community Health were required to adopt ASC 606 for periods beginning after December 15, 2017 (*i.e.*, for the *2018* reporting year).  Companies could, under certain circumstances, adopt ASC 606 early, but Community Health did not do so.

76.    In its 2016 10-K, Community Health stated that:

We expect to adopt [ASC 606] on January 1, 2018 and are currently developing our plan for adoption and the impact on our revenue recognition policies, procedures and control framework and the resulting impact on our consolidated financial position, results of operations and cash flows. An implementation group for [ASC 606] has been established with an implementation plan to transition to the new standard and determine its impact during 2017.[19]

77.    Community Health confirmed in its 2017 Form 10-K that it adopted this standard "on January 1, 2018."

---

[18] Tara Bannow, *New bad debt accounting standards likely to remake community benefit reporting*, Modern Healthcare (Mar. 17, 2018), *available at*: https://www.modernhealthcare.com/article/20180317/NEWS/180319904/new-bad-debt-accounting-standards-likely-to-remake-community-benefit-reporting.

[19] https://www.sec.gov/Archives/edgar/data/1108109/000119312517050460/d309772d10k.htm at 92.

78.     Critically, ASC 606 narrows (relative to ASC 605) what healthcare providers are able to report as bad debt. The "core principle" of ASC 606 "is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." See ASC 606-10-05-3.

79.     ASC 606's "core principle" was a significant departure from ASC 605, which had allowed entities to report a gross revenue number, an "operating revenue" number (gross revenue less contractual allowances and discounts), and a "net revenue" figure, which subtracted what the entity considered to be bad debt from the operating revenue figure. Because an entity had discretion under ASC 605 to determine what was considered bad debt, ASC 605 accounting could be abused to inflate net operating revenue by understating the provision for bad debt.

80.     Unlike ASC 605, ASC 606 only allows entities to recognize revenue to the extent the entity expects to be entitled to the recognized amount, and does not allow an entity to recognize revenue until it can determine the amount of revenue it expects to collect. If the entity's expected revenue cannot be determined at the outset of the contract formation, then the entity is required to predict the amount of recognized revenue by determining the expected amount (through "the sum of probability-weighted amounts in a range of possible consideration amounts" or by selecting "the single most likely amount in a range of possible consideration amounts"). Thus, while ASC Topic 606 provides a different method from ASC 605 for reporting the amount of revenue that an entity expected to actually collect, the net results should be similar (at least for entities that had not abused ASC 605 by understating the provision for bad debt).

81.     Under ASC 606, bad debt expense is no longer broken out as a separate line item on the face of a healthcare company's income statement. A company recognizing revenue under ASC 606 would only record a "bad debt expense" if some later, unforeseen event occurred (such as a bankruptcy) that rendered uncollectible previously-recognized revenue. In such a case, any amount of bad debt expense recognized after an entity adopts the standard should be presented as

an operating expense.  For example, in the scenario discussed above, *see* ¶ 73, if the healthcare provider expected to receive $10 out of a $100 invoice based on its historical experience, instead of recording $100 in revenue and $90 in bad debt (as it would under ASC 605), it would record only $10 in revenue and no bad debt.  If the patient ended up paying even less than the $10 expected due to an unanticipated event like a bankruptcy or loss of employment, only that difference would be recorded as bad debt.  Conversely, if the patient pays more than the expected $10, the additional amount is recorded as revenue at the time of receipt.

82.     ASC 606 applies only to annual reporting periods (including interim periods therein) beginning after December 15, 2017.  But under both ASC 605 and ASC 606, both before and after December 15, 2017, Community Health was required to consider whether the amount of revenue it was recording reflected the amounts both to which it was entitled and for which it could reasonably assure collectability.  Accordingly, for healthcare providers with "self-pay" patients, the switch from ASC 605 to ASC 606 generally resulted in a significant reduction in what was previously reported as revenue, with a corresponding reduction in bad debt.  Even though the "gross revenue" and "bad debt" figures were different between ASC 605 and 606, the "net operating revenues" (i.e., gross revenue less contractual adjustments, discounts, and bad debts) should have been the same.

83.     ASC 606 also requires entities to expand their disclosures about revenue from contracts with customers in their interim and annual financial statements. Public entities are required to provide qualitative and quantitative information about: (1) contracts with customers, (2) significant judgments made in applying the standard; and (3) assets recognized from the costs to obtain or fulfill a contract.

**F.     Relevant Internal Control Standards**

84.     Management plays a critical role in the operation and growth of a company, such as establishing the internal control environment within which employees function.  The Committee of Sponsoring Organizations of the Treadway Commission Report ("COSO Report") defines

internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary. Community Health indicates in its 2016 10-K and 2017 10-K that its management evaluates internal controls according to the standards of the COSO Report.

85.    Generally accepted auditing standards ("GAAS") outline the responsibilities of an auditor of an entity's financial statements (among other things), but also explains that management is responsible for the preparation of those financial statements. It states, in relevant part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***.

Auditing Standard ("AS") 1001.03 (emphasis added).

86.    Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

87.    The term "reliable," as used in the COSO Report, requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. The requirement of reliable financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data,

such as earnings releases, derived from these financial statements.

88.     Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP.  Internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

89.     The COSO Report recognizes that the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment.  "In any organization, 'the buck stops' with the chief executive.  He or she has ultimate ownership responsibility for the internal control system …. The influence of the CEO on an entire organization cannot be overstated."  COSO Report, Chapter 8, p. 84.  The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

### G.     Accounting Standards Governing Restatements

90.     The FASB "defines a restatement as a revision of a previously issued financial statement to correct an error.  The determination of whether a prior period error will result in a

restatement hinges on materiality."[20]  Defendants should have acknowledged (via a formal restatement) their correction of their material understatement of bad debt during the Class Period, rather than mischaracterizing the understatement as a change in estimate arising from a change in accounting principle from ASC 605 to ASC 606.

91.    The determination regarding whether a financial reporting item is material to a reporting entity's financial statements depends upon whether its omission or misstatement would impact the decision-making of a user of such financial statements.  *See* FASCON 8, para. QC11.

92.    There are two major categories of restatements.  First, a "***Big R restatement***" is when a company restates previously issued financial statements to correct material errors in prior financial statements.  Second, "***Little r restatements***" are when "there are occasions when an error is discovered that was not material to prior period financial statements.  Such an error, while immaterial to each individual year, could accumulate over time to a material amount."  When this occurs:

> ***If the error accumulates to the point that making an all-at-once adjustment to fix the accumulation of past year errors in the present year alone could materially misstate the current year's financials, the company would adjust or "restate" the prior period information in the current period financial statement.*** This is sometimes referred to as a ***Little r restatement.***

> ***In a Little r restatement, the company would still need to disclose the correction in the footnotes of the current period financial statements*** (i.e., the financial statements that reflect the correction), but would not have to amend prior Form 10-K filings. Little r restatements also do not require the independent auditor to modify its opinion because the prior period financial statements were not materially misstated. Little r restatements are not material to the prior period financial statements, ***but investors should understand the nature of the error and the related correction. In some instances, the company may determine that, while not material, the little r restatement resulted from deficiencies in internal controls***

---

[20] Ernst & Young LLP, *Financial restatements: understanding differences and significance*," EY Center for Board Matters (May 2015) at 1, *available at*: https://www.ey.com/Publication/vwLUAssets/EY-financial-restatements-understanding-differences-and-significance/$FILE/EY-financial-restatements-understanding-differences-and-significance-cover.pdf.

*that could have resulted in a larger restatement and thus also disclose a material weakness in internal control over financial reporting.*[21]

93.     GAAP rules governing the circumstances under which an entity should or must correct and/or amend previously issued financial statements, are reflected primarily in ASC 250, Accounting Changes and Error Corrections. An "Error in Previously Issued Financial Statements" is defined as:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or **oversight or misuse of facts that existed at the time the financial statements were prepared**. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

*See* ASC 250-10-20, *Glossary* (emphasis added).

94.     To the extent that the previous methodologies misused or contained oversights of facts which existing as of or during those prior periods, any amounts recorded as a one-time charge or "catch-up" must be recorded as a correction of "errors in previously issued financial statements," and not merely a prospective "change in estimate."

95.     GAAP guidance for changes in estimates and accounting principles, as well as for corrections of errors, are provided within the same GAAP section – ASC 250, Accounting Changes and Error Corrections.  Under ASC 250, error corrections are separate and distinct from such accounting changes and the financial reporting requirements for errors are significantly different than for accounting changes.

96.     GAAP defines an "Accounting Change" as "[a] change in an accounting principle, an accounting estimate, or the reporting entity. ***The correction of an error in previously issued financial statements is not an accounting change***."  *See* ASC 250-10-20, *Glossary* (emphasis added).

---

[21] *Id.* at 1-2 (emphasis added).

97.     GAAP defines a "Change in Accounting Principle" as:

A change from one generally accepted accounting principle to another generally accepted accounting principle when there are two or more generally accepted accounting principles that apply or **when the accounting principle formerly used is no longer generally accepted**. A change in the method of applying an accounting principle also is considered a change in accounting principle.

ASC 250-10-20, *Glossary* (emphasis added).

98.     GAAP defines a "Change in Accounting Estimate" as:

A change that has the effect of adjusting the carrying amount of an existing asset or liability or altering the subsequent accounting for existing or future assets or liabilities. **A change in accounting estimate is a necessary consequence of the assessment, in conjunction with the periodic presentation of financial statements, of the present status and expected future benefits and obligations associated with assets and liabilities. Changes in accounting estimates result from new information.** Examples of items for which estimates are necessary are uncollectible receivables, inventory obsolescence, service lives and salvage values of depreciable assets, and warranty obligations.

ASC 250-10-20, *Glossary* (emphasis added).

99.     If previously-issued financial statements are found to be materially misstated, GAAP requires prompt correction. Such corrective measures include an entity's need to determine the appropriate steps and timing for providing notice that the materially-misstated financial statements should no longer be relied upon.

<div align="center">

**Defendants Issued Materially False and Misleading
Statements During the Class Period**

</div>

**A.      February 20, 2017 8-K**

100.     The Class Period begins on February 21, 2017. On that day, the Company announced its fourth quarter and full year 2016 financial results in a press release filed on Form 8-K. For the fourth quarter of 2016, the Company reported that its:

- Net operating revenues totaled $4.469 billion;

- Adjusted EBITDA was $564 million; and

<div align="center">

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
26

</div>

- Provision for bad debt was $678 million.

For the full year 2016, the Company reported that its:

- Net operating revenues totaled $18.438 billion;

- Adjusted EBITDA was $2.225 billion; and

- Provision for bad debt was $2.837 billion.

101. The above statements identified in ¶ 100 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations revenue receivable from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**B.    Q4 2016 Earnings Call**

102. On February 21, 2017, the Defendants held a conference call with investors and analysts (the "Q4 2016 Earnings Call"). During the Q4 2016 Earnings Call, Defendants Smith and Community Health stated that "***EBITDA of $564 million for the fourth quarter was within our guidance***" (emphasis added). Also during the Q4 2016 Earnings Call, Defendants Cash and Community Health stated, with respect to the Company's credit facility and related covenants:

> On December 5, we completed amendment with revolving credit facility term loan Ag lenders of the credit agreement to modify our financial covenants and enhance certain credit features through December 2017. With the amendment, the maximum

security net leverage ratio is 4.5 during the fourth quarter of 2017, and the minimum interest coverage is 2.0 for each of the four quarters of 2017. We were in compliance with both these covenants on December 31 with secured ratio of 3.96 and an interest rate coverage of 2.43. ***EBITDA cushion on the senior net leverage ratio was 12%, and the cushion on interest coverage is 18%.*** [Emphasis added.]

103.    The above statements identified in ¶ 102 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

104.    Defendant Smith also stated in the Q4 2016 Earnings Call that "***we expect one result of our divestiture were [sic] to be a stronger, sustainable group of hospitals in markets where we can invest and grow***." (Emphasis added).  This statement was materially false and misleading because the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger.

**C.      2016 10-K**

105.    Also on February 21, 2017, the Company filed its 2016 10-K, which falsely claimed that Community Health had the ability to "estimate the allowance for doubtful accounts" at the time of payment:

The Company estimates the allowance for doubtful accounts by reserving a percentage of all self-pay accounts receivable without regard to aging category,

based on collection history, adjusted for expected recoveries and any anticipated changes in trends. *[Community Health's] ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of [its] net accounts receivable as [it] believe[s] that substantially all of the risk exists at the point in time such accounts are identified as self-pay.* For all other non-self-pay payor categories, [it] reserve[s] an estimated amount on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge. These amounts represent an immaterial percentage of [its] outstanding accounts receivable. The percentage used to reserve for all self-pay accounts is based on the Company's collection history. *The Company collects substantially all of its third-party insured receivables, which include receivables from governmental agencies.*[22]

The 2016 10-K also affirmed the previously reported financial results, and stated that *"[o]ur provision for bad debts decreased to $2.8 billion, or 13.3% of operating revenues (before the provision for bad debts) for the year ended December 31, 2016*, from $3.1 billion, or 13.9% of operating revenues (before the provision for bad debts) for the year ended December 31, 2015." (Emphasis added.)

106.     The above statements identified in ¶ 105 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenue receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed; (5) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (6) that, as a result, the Company had overstated its net operating

---

[22] https://www.sec.gov/Archives/edgar/data/1108109/000119312517050460/d309772d10k.htm

revenue, EBITDA, and financial results; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

107.   The 2016 10-K contained Defendants Smith and Cash's signed certifications under the Sarbanes Oxley Act of 2002. Pursuant to their Sarbanes Oxley certifications, Smith and Cash affirmed that the Company's financial statements fairly presented all material aspects of its financial condition and results of operations, and that the Company's disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

108.   The above statements identified in ¶ 107 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure that the Company excluded from its "bad debt" calculations revenue receivable from "self-pay" patients, especially aged receivables, for which collection was not probable; and (2) that the Company's disclosure controls and procedures were not effective, and did not provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."

**D.     February 23, 2017 RBC Capital Markets Health Care Conference**

109.   On February 23, 2017, Defendants Cash and Aaron spoke at the RBC Capital Markets Health Care Conference, where Defendant Cash had the following exchange with analyst Frank Morgan, managing director of health care services equity research at RBC Capital Markets, regarding Community Health's credit facility:

**<Q - Frank Morgan>**: …. I know you recently got some covenant – some changes in your covenant structures, you're feeling good there now?

**<A - W. Larry Cash>**: Yeah. *We're in good shape* and we did it with – anybody who wants a little bit of cushion, we got a fair amount of debt and *we've got a little*

*bit of cushion for 2017. We're in good shape.* At the end of December, we'll be in good shape in the quarters this year and then we should be in good shape going into 2018 on the covenants we have. And then there'd be some refinancing activities along the way. [Emphasis added.]

110.     The above statements identified in ¶ 109 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company would have defaulted in 2016 absent the referenced covenant changes; and (2) that the Company was not "in good shape" but instead either would be in default or close to default even with the covenant changes if it recorded the full amount of its "bad debt" expense.

111.     Analysts and investors reacted favorably to Defendants' claims regarding Community Health's fourth quarter and full year 2016 results. On March 2, 2017, Wolf Research wrote that "*CYH shares are up sharply after the company reported 4Q adjusted EBITDA of $564M above previous WR/Consensus estimates of $487M/$530M* . . . . We are revising our estimates to reflect the higher earnings baseline exiting 2016 . . . . our PT improves to $8 from $5 previously." (Emphasis added.)

## E.     May 1, 2017 8-K

112.     On May 1, 2017, the Company announced its first quarter 2017 financial results in a press release filed on Form 8-K.  Specifically, the Company reported that its:

- Net operating revenues totaled $4.486 billion;

- Adjusted EBITDA was $527 million; and

- Provision for bad debt was $682 million.

113.     The above statements identified in ¶ 112 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had

excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**F.     2017 Q1 10-Q**

114.    On May 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2017, which noted the adoption of a new accounting standard that would impact its provision for bad debts, stating, in relevant part:

> In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, which outlines a single comprehensive model for recognizing revenue and supersedes most existing revenue recognition guidance, including guidance specific to the healthcare industry. . . . ***The Company expects to adopt this ASU on January 1, 2018 and is currently developing its plan for adoption and the impact on its revenue recognition policies, procedures and control framework and the resulting impact on its consolidated financial position, results of operations and cash flows***. The Company has established an implementation group for this ASU with an implementation plan to transition to the new standard and determine its impact during 2017. . . .
>
> Additionally, ***the adoption of the new accounting standard will impact the presentation on the Company's statement of operations for a significant component of its provision for bad debts. After adoption of the new standard, the majority of what is currently classified as the provision for bad debts will be reflected as an implicit price concession as defined in the standard and therefore an adjustment to net patient revenue. The Company will continue to evaluate certain changes in collectability on its self-pay patient accounts receivable resulting from certain credit and collection issues not assessed at the date of service, including bankruptcy, and recognize such amounts in the provision for bad debts included in operating expenses on the statement of operations.*** The Company plans to elect to apply the full retrospective approach upon adoption. ***The Company cannot reasonably estimate at this time the quantitative impact that the adoption of this accounting standard will have on the financial statements of the***

*Company.*

(Emphasis added.)

115.    The 2017 Q1 10-Q repeated the same false Q1 2017 financial results identified in paragraph 112 above, and further stated that:

> We estimate the allowance for doubtful accounts by reserving a percentage of all self-pay accounts receivable without regard to aging category, based on collection history, adjusted for expected recoveries and any anticipated changes in trends. Our ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of our net accounts receivable as we believe that substantially all of the risk exists at the point in time such accounts are identified as self-pay. For all other non-self-pay payor categories, we reserve an estimated amount based on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge. These amounts represent an immaterial percentage of our outstanding accounts receivable. The percentage used to reserve for all self-pay accounts is based on our collection history. ***We believe that we collect substantially all of our third-party insured receivables***, which include receivables from governmental agencies.

116.    The above statements identified in ¶ 115 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed; (5) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (6) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially

misleading and/or lacked a reasonable basis.

117. The Form 10-Q also contained required Sarbanes Oxley certifications, signed by Defendants Smith and Cash, substantially identical to the certifications contained in ¶ 107 above, which were materially false and misleading when made because they failed to disclose to investors: (1) that the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure; and (2) that the Company's disclosure controls and procedures were not effective, and did not provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."

### G. Q1 2017 Earnings Call

118. On May 2, 2017, the Defendants held a conference call with investors and analysts (the "Q1 2017 Earnings Call"). During the Q1 2017 Earnings Call, Defendant Smith stated that "*[w]e're working to not only improve our debt-EBITDA ratio, but also working to reduce the overall amount of our debt*." (Emphasis added). During the same call, Defendant Cash stated that "*[o]ur EBITDA cushion on the senior secured ratio was 11% and our EBITDA cushion on our interest coverage was 16%.*" (Emphasis added). Defendant Cash further stated that "adjusted EBITDA of $527 million was in line with our expectations." Also on the call, Defendant Cash stated, with respect to one of the primary drivers of the Company's bad debt, that "the improvement in AR days more than offset third-party [settlements]…."

119. The above statements identified in ¶ 118 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3)

that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

120.    Defendant Smith also said, regarding Defendants' hospital divestitures: "*[o]ur current divestiture plan will also allow us to move to a portfolio of hospitals that are better positioned in our markets with better volume growth, higher EBITDA margin, improved cash flow*." (Emphasis added).  This statement was materially false and misleading because the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger.

121.    As a result of these misrepresentations and omissions, Community Health was able to report EBITDA results that impressed analysts.  An analyst report by SunTrust Robinson Humphrey on May 1, 2017 stated that "[w]e maintain our Hold rating following a solid quarter marked by an EBITDA beat, rebounding volumes and additional steps to rationalize the portfolio."

122.    Likewise, a Wells Fargo analyst report from the same day stated that Community Health "reported good 1Q17 results with EBITDA of $527 million vs. consensus of $523 million. This is the second consecutive quarter that Community had results at or above expectations after a number of quarters with disappointing results."

### Defendants Continue to Make Misrepresentations as the Truth Slowly Emerges

#### A.    July 26, 2017 8-K

123.    On July 26, 2017, the Company announced preliminary financial and operating results for second quarter of 2017, including Adjusted EBITDA of $435 million, which was impacted by the Company's "bad debt" provision.

124.    Analysts reacted unfavorably to the news: a July 26, 2017 analyst report from SunTrust Robinson Humphrey was downcast in comparison to the first quarter of 2017 (*see* ¶ 121,

above), noting that "the ongoing portfolio posted sluggish trends. Full-year Adjusted EBITDA and same-hospital expectations were cut given 2Q results . . . ." On the same day, a KeyBanc analyst wrote that "we view the preannouncement as a clear negative that has shifted the focus back to raising cash to pay down debt."

125.    Importantly, Community Health's use of "catch-up" charges during this period caused bad debt-to-net revenue ratio to swell from 13.2% in the first quarter to 14.1% in the second quarter. The sudden increase in reported bad debt depressed net operating revenue, leading to the "sluggish trends" cited by analysts.

126.    Investor reaction was also negative: the Company's share price fell $1.23 per share, more than 14.5%, to close at $7.23 per share on July 27, 2017, on unusually heavy trading volume.

127.    However, the Company was able to limit the decline because when calculating Adjusted EBITDA for the pre-announcement, it did not include the full extent of the Company's "bad debt" expense, instead taking only an incremental "catch up" charge.  Moreover, while the pre-announcement constituted a partial materialization of the risks concealed by Defendants' misrepresentations, Defendants continued to conceal from investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

    **B.    August 1, 2017 8-K**

128.    On August 1, 2017, the Company announced second quarter 2017 financial results

in a press release filed on Form 8-K.  Specifically, the Company reported that its –

- Net operating revenues totaled $4.144 billion;
- Adjusted EBITDA was $435 million; and
- Provision for bad debt was $679 million.

129.    The above statements identified in ¶ 128 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**C.    2017 Q2 10-Q**

130.    On August 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2017 which affirmed the previously reported financial results, and further stated in the "Management's Discussion and Analysis" section that: "[o]ur net operating revenues for the three months ended June 30, 2017 decreased $446 million to approximately $4.1 billion …. *Our provision for bad debts decreased $21 million to $679 million, or 14.1% of operating revenues (before the provision for bad debts) for the three months ended June 30, 2017* …." (Emphasis added.)

131.    The 2017 Q2 10-Q also stated that:

The Company estimates the allowance for doubtful accounts by reserving a

percentage of all self-pay accounts receivable without regard to aging category, based on collection history, adjusted for expected recoveries and any anticipated changes in trends. The Company's ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of net accounts receivable as the Company believes that substantially all of the risk exists at the point in time such accounts are identified as self-pay. For all other non-self-pay payor categories, the Company reserves an estimated amount on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge. These amounts represent an immaterial percentage of the outstanding accounts receivable. The percentage used to reserve for all self-pay accounts is based on the Company's collection history. ***The Company collects substantially all of its third-party insured receivables***….

132.    The above statements identified in ¶¶ 130-31 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed; (5) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (6) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

133.    The Form 10-Q also contained Sarbanes Oxley certifications, signed by Defendants Smith and Aaron, substantially identical to the certifications contained in ¶ 107 above, which were materially false and misleading when made because they failed to disclose to investors: (1) that

the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure; and (2) that the Company's disclosure controls and procedures were not effective, and did not provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."

**D.      Q2 2017 2017 Earnings Call**

134.    On August 2, 2017, Defendants held a conference call with investors and analysts (the "Q2 2017 Earnings Call").   During the Q2 2017 Earnings Call, Defendants Smith and Community Health stated, with respect to Community Health's sell-off of hospitals, that:

> Now, I'd like to provide an update on our divestiture plan. *As you're aware, we have announced plans to shift our portfolio to a smaller group of hospitals that are better positioned in their respective markets with better demographics and volume growth, higher EBITDA margin and improved cash flow generation profile*. This will also allow us to direct future investments and corporate resources to our most attractive markets in regional networks . . . .

This statement was materially false and misleading because the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger.

135.    Defendants Aaron and Community Health further stated that "[a]s of June 30, 2017, our EBITDA cushion on our secured net leverage ratio is 15% and our EBITDA cushion on our interest coverage ratio is 26%."   These statements were materially false and misleading because they were derived from artificially inflated Consolidated EBITDA figures, as a result of: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables; (2) excluding from "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, as the Company had assumed for purposes of calculating bad debt.   As a result, the

Company did not have the "EBITDA cushion" it touted to investors.

136. In addition, speaking to one of the primary drivers of the Company's bad debt, Defendants Aaron and Community Health stated that "[i]mprovement in AR days *more than offset the changes in third-party settlements*." (Emphasis added). This statement was materially false and misleading because they failed to disclose to investors the understatement of bad debt due to: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables, was not probable; (2) excluding from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding the impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients, was not probable, as the Company had assumed for purposes of calculating bad debt.

137. While Community Health did not overtly disclose the it had begun to post "catch-up" charges in the second quarter of 2017, an analyst from Leerink took notice of the fact that "*[n]et revenue was guided down but not as much as the sequential uptick in bad debt ratio*." This Leerink report from August 1, 2017 advised further that "[m]ore color is needed on the drivers of the revenue guidance and the bad debt outlook for the remainder of the year."

138. In response to the Company's second quarter 10-Q, Cantor Fitzgerald lowered their price target by more than 10% while observing that "CYH is not easy to value because of its enormous debt . . . ."

**E. November 1, 2017 8-K**

139. On November 1, 2017, the Company announced third quarter 2017 financial results in a press release filed on Form 8-K. Specifically, the Company reported that its:

- Net operating revenues totaled $3.666 billion;

- Adjusted EBITDA was $331 million; and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
40

- Provision for bad debt increased to $667 million.

140. As in the second quarter of 2017, Community Health's use of "catch-up" charges during the third quarter caused its bad debt-to-net revenue ratio to increase, this time to 15.4%:

| | Q1-16 | Q2-16 | Q3-16 | Q4-16 | Q1-17 | Q2-17 | Q3-17 | as reported Q4-17 | Adj. Q4-17 |
|---|---|---|---|---|---|---|---|---|---|
| Operating revenues (net of CA&D) | 5,754 | 5,290 | 5,084 | 5,147 | 5,168 | 4,823 | 4,333 | 4,076 | 4,273 |
| Provision for bad debts | 755 | 700 | 704 | 678 | 682 | 679 | 667 | 1,017 | 623 |
| Net operating revenues | 4,999 | 4,590 | 4,380 | 4,469 | 4,486 | 4,144 | 3,666 | 3,059 | 3,650 |
| Same-store y/y Net operating revenues | 2.2% | 1.2% | 1.2% | 0.5% | 0.7% | -0.7% | -1.5% | 1.8% | |
| Bad debt / Operating revenues (net of CA&D) | 13.1% | 13.2% | 13.8% | 13.2% | 13.2% | 14.1% | 15.4% | 25.0% | 14.6% |
| | | | | | charge to increase contractual allowances | | | 197 | |
| | | | | | charge to ncrease the allowance for doub | | | 394 | |

141. These increasing provisions, or "catch-up" charges were partial disclosures and/or materializations of the risks concealed by Defendants' misrepresentations, and an attempt to rid part of the Company's massive bad debt overhang before the Company had to report audited financial results in accordance with ASC 606.

142. A November 1, 2017 analyst report from Oppenheimer & Co. gauged market sentiment and found that "investors remain concerned with the company's ability to pay down its debt levels." On the same day, J.P. Morgan noted that "Bad Debt of 15.4% was 170/140bps higher than JPM/consensus estimates, as self-pay mix increased 70bps y/y to 13.3% of net revenue."

143. In response to these dismal results and Defendant Aaron's admission on the Q3 2017 Earnings Call that they were caused in part by "increased bad debt," Community Health stock fell $1.36 per share over the next two days, or approximately 23.1%, to close at $4.54 on November 2, 2017, on unusually heavy trading volume.

144. However, Defendants continued to conceal the most damaging information, which stemmed the amount of price decline. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of

patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its EBITDA; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### F. 2017 Q3 10-Q

145. On November 2, 2017, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2017, which affirmed the previously reported financial results described in ¶¶ 139-40 above.

146. In the "Management's Discussion and Analysis" section of its Form 10-Q for the third quarter of 2017, the Company stated that: "*[o]ur net operating revenues for the nine months ended September 30, 2017 decreased $1.7 billion . . . . Our provision for bad debts decreased $131 million to $2.0 billion, or 14.2% of operating revenues (before the provision for bad debts) for the nine months ended September 30, 2017* …." (Emphasis added.)

147. In addition, Defendants stated that:

> The Company estimates the allowance for doubtful accounts by reserving a percentage of all self-pay accounts receivable without regard to aging category, based on collection history, adjusted for expected recoveries and any anticipated changes in trends. The Company's ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of net accounts receivable as the Company believes that substantially all of the risk exists at the point in time such accounts are identified as self-pay. For all other non-self-pay payor categories, the Company reserves an estimated amount on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge. These amounts represent an immaterial percentage of the outstanding accounts receivable. The percentage used to reserve for all self-pay accounts is based on the Company's collection history. *The Company collects substantially all of its third-party insured receivables* ….

148. The above statements identified in ¶¶ 145-47 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations,

and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed; (5) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (6) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

149. The Form 10-Q also contained required Sarbanes Oxley certifications, signed by Defendants Smith and Aaron, substantially identical to the certifications contained in ¶ 107 above, which were materially false and misleading when made because they failed to disclose to investors: (1) that the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure; and (2) that the Company's disclosure controls and procedures were not effective, and did not provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."

### G. Q3 2017 Earnings Call

150. November 2, 2017, Defendants held a conference call with investors and analysts (the "Q3 2017 Earnings Call"). During the Q3 2017 Earnings Call, Defendants Aaron and Community Health stated that "our EBITDA cushion on our secured net leverage ratio is 15%, and our EBITDA cushion on our interest coverage ratio is 29%." These statements were materially

false and misleading because they were derived from artificially inflated Consolidated EBITDA figures, as a result of: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables, was not probable; (2) excluding from "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding the impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients, was not probable, as the Company had assumed for purposes of calculating bad debt. As a result, the Company did not have the "EBITDA cushion" it touted to investors.

151. On the Q3 2017 Earnings Call, Defendant Aaron acknowledged that "consolidated net revenue was below our expectations from a combination of lower-than-expected volumes, payer rates, *along with increased bad debt*." (Emphasis added.)

**H.     2017 Form 10-K**

152. On February 28, 2018, in its Form 10-K as of and for the year ended December 31, 2017, the Company made the following disclosures regarding charges that reduced net income for that period:

> Our net operating revenues for the year ended December 31, 2017 decreased $3.0 billion to approximately $15.4 billion compared to approximately $18.4 billion for the year ended December 31, 2016 primarily as a result of our divestitures completed during 2017 and 2016. On a same-store basis, net operating revenues for the year ended December 31, 2017 increased $33 million. Our provision for bad debts increased to $3.0 billion, or 16.6% of operating revenues (before the provision for bad debts) for the year ended December 31, 2017, from $2.8 billion, or 13.3% of operating revenues (before the provision for bad debts) for the year ended December 31, 2016. *As required by generally accepted accounting principles, we adopted the new revenue recognition accounting standards in ASU 2014-09 on January 1, 2018. In connection with the adoption of this ASU, during the fourth quarter of 2017, we completed an extensive analysis of our patient revenues and patient accounts receivable and developed new accounting processes and methodologies. This analysis also included an evaluation of patient accounts receivable retained after the divestiture of 30 hospitals throughout 2017, and*

*certain other revenues. Based on the information obtained, the financial results discussed below include a change in estimate recorded by us during the three months and year ended December 31, 2017 related to an increase in contractual allowances and the provision for bad debts of approximately $591 million.* [Emphasis added.]

153.    Community Health introduced these charges with an explanation that described processes revolving around the Company's consideration and pending implementation of ASU 2014-09 (ASC 606), which was adopted January 1, 2018 (i.e., after the period covered by the 2017 Form 10-K).  The notes to the financial statements assert that, as part of the purported ongoing consideration of the impact of ASC 606, Community Health created new accounting processes and methodologies for estimating contractual allowances and bad debt, resulting in a "change in estimate" for purposes of how each of those accounts/amounts were determined, and associated charges to those accounts in the fourth quarter of 2017.

154.    On February 27, 2018, the Company announced its fourth quarter and full year 2017 financial results in a press release filed on Form 8-K, which included a $591 million increase in contractual allowances ($197 million) and bad debt provision ($394 million). Specifically, the Company stated:

> As required by generally accepted accounting principles, the Company adopted the new revenue recognition accounting standard on January 1, 2018. In connection with this adoption, during the fourth quarter of 2017, the Company completed an extensive analysis of its patient revenues and patient accounts receivable and developed new accounting processes and methodologies. This analysis also included an evaluation of patient accounts receivable retained after the 2017 divestitures of 30 hospitals, and certain other revenues. *Based on the information obtained related to the aforementioned adoption, the financial results discussed below include a change in estimate recorded by the Company during the three months and year ended December 31, 2017 to increase contractual allowances and the provision for bad debts by approximately $591 million*.

155.    The market saw through Defendants' attempt to characterize the $591 million charge as an adjustment to ASC 606, instead recognizing it for what it was – financial chicanery. In an alert issued on February 27, 2018, J.P. Morgan analysts pointed out that the $591 million

charge had instantly written off a third of Community Health's EBIDTA. The J.P. Morgan analysts expressed "skepticism" of the official explanation "[g]iven the magnitude of the charge and CYH's write-off history":

> Generally *we view receivable ($394m) and contractual ($197m) charges as either (1) implicit acknowledgement of historic EBITDA/EPS overstatement* or (2) *as an opportunity to pad reserves to draw upon for future period earnings (cookie jar).* CYH attributes the charge to (3) new revenue recognition standards for 2018 (requiring more extensive reserving of self-pay and plausible commercial denials at date of service) – as we understand their explanation, merely accelerating write-offs of historic A/R such that 2018 bad debt won't be overstated (by continuing to write-off trailing A/R while simultaneously accelerating the write-down of 2018 revenues). [Emphasis added.]

156.    The following day, Cantor Fitzgerald echoed J.P. Morgan's (and the market's) skepticism. After explaining that "CYH [had] changed its estimates for contractual allowances and bad debt, producing another $591 million charge", the analysts drew a distinction between the Company's claim that "that these charges do not bear on its 2018 outlook" and the fact that "*they represent major revisions of historical results* that, judging from today's stock price action, the market fears might herald future problems." (Emphasis added.)

157.    On February 28, 2018, Defendants held a conference call with investors and analysts (the "Q4 2017 Earnings Call"). During the Q4 2017 Earnings Call, Defendant Aaron stated that:

> [W]e adopted the new revenue recognition accounting standard on January 1, 2018, as required by generally accepted accounting principles. This new standard impacts our revenue and receivables estimates by moving to a model that recognizes revenue, only to the point that it is probable but a significant reversal in the amount of revenue will not occur and requiring that revenue recognized be disaggregated into categories that depict how the nature, amount of timing, and uncertainty in revenue and cash flows are impacted by economic factors.
>
> *In anticipation of adopting the new standard, during the three months ended December 31, 2017, we completed an extensive analysis of our patient revenue and receivable transactions. We developed and tested new programming that enabled us to extract and disaggregate data in accordance with the standard and finalized new accounting processes and methodologies. This analysis resulted in a change in estimate we recorded in the fourth quarter to increase*

**contractual allowances by approximately $197 million and the provision for bad debt by approximately $394 million for a total of $591 million**.

158.     In response to an analyst question regarding the size of Community Health's write-down, Defendant Aaron admitted that the write-down related to "self-pay" that the Company had "kept on its books" as well as problems with third-party denials that the Company already anticipated, not anything truly related to a change in accounting:

> **So when you compare the size of the adjustments, it's going to depend on how filers would have historically set their reserves.** We've had higher days. **We kept our self-pay on our books**. Internally, we pursued those and gone after those for collection. So moving to this new method, it is a more conservative method. We had to anticipate with the new standard, we felt things that might impact the collectability and make sure that the amounts we set up were more conservative. **So that included for – if you take a look at third-party payments, anticipated denials using our history on the transactions to anticipate denials from third-party payers, any audits that may come out from third-party payers and also our self-pay**.
>
> **So we did run the model backwards**, as I mentioned, and to several prior years to see the impact of that. **And if you think about going from a standard where you were maybe less conservative to one that's more conservative, really when we look at ours, it did not have an impact**. And if you think about it, it probably has an impact when the size of your balance sheet is growing through acquisitions and potentially receivables that come on board from a large acquisition. We've had a couple of very large ones. (Emphasis added.)

159.     An analyst then asked Defendant Aaron whether "the collectability [of] the $591 million is unchanged because of the accounting change or do you think that $591 million is actually going to be less as those receivables run out over the long term?" In response, Defendant Aaron admitted that ASC 606 did not affect collectability for the bad debt Community Health had restated:

> **[W]hatever we were going to recover on our receivables is unchanged by the accounting. That's merely how we report it financially.** And I think I went through, we had a method that historically we were booking exactly to what our historical experience had been and what the new standard. **We felt that that was requiring a more conservative amount that you set those on your books. And so, that was the adjustment.**

160.    Defendant Aaron further suggested that had Community Health actually undertaken an early adoption of ASC 606 in 2016, it would have used the occasion to clear its books of bad debt, just as it did in 2017:

> *Had we adopted that in 2016, we would have knocked our carried receivables down in that year, and we would have them down again in this year, so you would not have the impact of that. That's where we're going to be in 2018.* (Emphasis added).

Thus, as Defendants conceded, uncollectable receivables were inflated throughout the Class Period.

161.    In addition, and in stark contrast to the Company's Class Period claims that it collected substantially all third-party receivables, Defendant Aaron admitted that other than 10% of the $197 million write-down for contractual allowances:

> …. the rest would be for receivables. And so historically – and this – again, this could vary by filer, but historically we've looked at those. We've successfully defended ourselves with denials. And under the standard, *we just have to anticipate what the future denial activity is going to be from payers and how we think we're going to outcome to a point where we don't think our estimate is going to be short*. And so, that is a new to be short. And so, that is a new component where would you proactively think about what future denials are going to come in as one example on that.

162.    Defendant Aaron did not claim to have any new data that would aid in "anticipat[ing] what the future denial activity is going to be …." Rather, Defendant Aaron acknowledged that the Company had no basis, during the Class Period, to claim that it understood the collectability of third-party receivables.

163.    Defendants were motivated to mischaracterize the massive $591 million charge as due to a change in accounting by the exception in the calculation of its debt covenants, *see* ¶ 50, and thereby avoid triggering a default.  Defendant Aaron, after speculating that ASC 606 would not affect the Company's revenue on a go-forward basis, emphasized to analysts that "*this change in estimate is excluded from our calculation of adjusted EBITDA and excluded from our*

*calculation of financial covenants and our credit facility*."

164.    Labeling the $591 million charge as related to a change in accounting (and thereby outside the scope of the secured net leverage ratio covenant of its credit facility) was the only way that Community Health was able to avoid triggering a default.  For example, if the Company took the $591 million charge as an expense in the fourth quarter 2017, it would have had to report to its lenders a secured net leverage ratio far higher than the threshold for default under Community Health's credit facility.

165.    Similarly, if Community Heath took the $591 million charge as an expense in the fourth quarter 2017, it would have had to report to its lenders an interest coverage ratio of 1.37, lower than the 2.00 threshold (below which the Company could not fall) for default under Community Health's credit facility.

166.    By midday on February 28, with Community Health's stock price in free fall, a commentator at the investor blog *The Motley Fool* wrote that the decline "was mainly caused by a $591 million jump in allowances for bad debts."[23]

167.    Ultimately, on the news that the Company had taken this charge related to existing "self-pay" debt it "kept on the books" and already anticipated third-party denials, the Company's share price fell $1.06 per share, more than 17%, to close at $5.12 per share on February 28, 2018, on unusually heavy trading volume.

168.    Even former employees confirm that the $591 million charge was a stealth restatement, correcting errors in earlier financial statements. CW 3[24] used the term "restatement" to describe the $591 million charge and explained that the Company utilized ASC 606 for the

---

[23] Brian Feroldi, *Why Community Health Systems is Sinking Today*, The Motley Fool (Feb. 28, 2018), *available at*: https://www.fool.com/investing/2018/02/28/why-community-health-systems-is-sinking.aspx.

[24] CW 3 worked as a vice-president, finance – Division 1 for Community Health from March 2003 to May 2018, was based in Nashville, Tennessee and reported to the president of Division 1.

express purpose of restating the Company's financials.

169. CW 4 corroborated CW 3's explanation.[25] CW 4 stated that Community Health's February 27, 2018 announcement of a $591 million increase to contractual allowances and bad debt provision was the result of an error or change to the accounting around the goodwill and synergies they thought they would receive from HMA, which Community Health acquired more than four years earlier, in 2014.

170. CW 4 stated that Community Health's February 27, 2018 announcement of a $591 million increase to contractual allowances and bad debt provision was the result of an error or change to the accounting around the goodwill and synergies they thought they would receive from HMA, which Community Health acquired more than four years earlier, in 2014.

171. The actions described by CW3 and CW 4 are prohibited by the express terms of ASC 606, which instructs that:

> A public business entity, a not-for-profit entity that has issued, or is a conduit bond obligor for, securities that are traded, listed, or quoted on an exchange or an over-the-counter market, and an employee benefit plan that files or furnishes financial statements with or to the Securities and Exchange Commission **shall apply the pending content that links to this paragraph for annual reporting periods beginning after December 15, 2017**, including interim reporting periods within that reporting period . . . [*see* 606-10-65-1.]

172. The Company has never proffered a remotely plausible explanation for the write-down. The $591 million charge alone is more than 88% of Community Health's bad debt provision for the previous quarter.

173. In fact, during the Q4 2017 Earnings Call, Defendant Aaron refused to answer Citi analyst Ralph Giacobbe's direct question, in regard to the $591 million charge, "*[s]o over what period of time I guess was it*? Can you tell us what was there for 2017? Anything around sort of it

---

[25] CW 4 worked as a financial analyst for Community Health from March 2018 to September 2018. Prior to that, CW 4 served as a treasury analyst for the Company from June 2016 to September 2018. CW 4 was based in Franklin, Tennessee at the Community Health's corporate headquarters.

being from recently acquired versus legacy?" (Emphasis added).

174.  Had the Company formally acknowledged its restatement, it would have been required to provide investors with a full explanation of the error(s), the nature of any related correction, and its actual proximity to triggering default under loan covenants.

## ADDITIONAL SCIENTER ALLEGATIONS

175.  The Company and Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the Company's understatement of bad debt and overstatement of EBITDA; and/or (b) their receipt of information reflecting that lacked adequate internal and financial controls; and/or (c) their intentional or reckless issuance of materially false or misleading statements; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and his reckless failure to do so.  The Company and Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

176.  The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated.  The Individual Defendants acted knowingly or in a reckless manner as to constitute a fraud upon Plaintiffs and the Class.

### A.  The Company's Executives Were Actively Involved in Financial Planning and Were Aware of Community Health's True Condition

177.  In correspondence with the SEC, the Company admitted that its executives, including the Company's CFO were actively involved in the budgeting process.  As the Company's correspondence explained:

> The Company's budgeting process is a "top down" budgeting process, under which consolidated net revenue, EBITDA and EPS targets are developed by the CFO with ultimate approval from the CODM ["Chief Operating Decision Maker"] based on historical and projected operating performance.  After these consolidated targets are determined, the CFO works with the COO to establish target net revenue and

EBITDA goals for each of the divisions. These division targets typically represent stretch goals and the sum of the division targets total an amount that is greater than the consolidated budget. Each division president is then responsible for allocating the division level target to the hospitals within that division. The hospitals will ultimately prepare detailed budgets, at the departmental level, that sum to the total of the division goal. Division leadership reviews and approves the hospital level budgets.

With respect to capital spending, a consolidated budget is established for the Company and individual projects are then evaluated and prioritized based upon factors including patient safety, return on investment, market-based competition and availability of funding. Capital allocation is made across the organization on an as-needed basis and is not controlled or limited by the financial performance at the division level. The CODM must approve all individual capital projects that exceed $1 million, giving the CODM sufficient authority over significant capital expenditure made for the total hospital group, regardless of division.[26]

178.    A "CFO [that] works with the COO to establish target net revenue and EBITDA goals for each of the divisions" is thereby aware of the actual amounts of net revenue, bad debt and EBITDA for the Company, and the Company's ability to meet such goals. Likewise, Community Health later informed the SEC that Defendant Smith "the Company's CEO" is "its chief operating decision maker" tasked with "assess[ing] performance of the hospital segment,"[27] indicating that he too was made aware of the true financial condition of the bad debts impairing the performance of the hospital segment.

179.    A confidential witness, CW 5,[28] who managed the charge master for more than 220

---

[26] *See* Correspondence from Community Health Systems, Inc. to the SEC, dated Aug. 11, 2016, *available at*: https://www.sec.gov/Archives/edgar/data/1108109/000119312516679098/filename1.htm.

[27] *See* Correspondence from Community Health Systems, Inc. to the SEC, dated Nov. 23, 2016, *available at* https://www.sec.gov/Archives/edgar/data/1108109/000119312516776582/filename1.htm.

[28] CW 5 worked as a director CBO, revenue cycle analysis for Community Health Systems from September 2017 to March 2019. Before that, CW 5 served as a manager, revenue cycle analysis from July 2014 to September 2017. CW 5 was based at the central business office in Franklin,

Tax Identification Numbers (TIN) across 29 states and two separate companies, stated that corporate pulled reports from the revenue cycle system, and it was reported up to management via accounting and finance personnel, confirming the Individual Defendants' access to information that they excluded from "bad debt" calculations.

180.    The Company's revenue and bad debt were of core importance to the Company and the market.  The Company touted these figures in their financial announcements, and Individual Defendants spoke to these figures in SEC filings, in prepared remarks, and in response to analyst and investor questions in earnings conference calls.  All knew that acquiring payment for services performed was vital to the success of the Company.  As CW 5 confirmed, it was widely known that collections represented the biggest challenge to the Company.

181.    The Individual Defendants were aware of the details of the Company's collection efforts, bad debt, net revenue, and EBITDA, as the Company's financial future relied on them, and the Company's executives discussed this information in press releases and on conference calls with analysts and investors; or if the Company's CEO and CFOs was unaware, they acted in a deliberately reckless manner to ignore the adverse information alleged herein.  However, the most reasonable inference is that the Individual Defendants were aware that the Company's bad debt provision was understated.

182.    The Company and Individual Defendants were also aware of the terms of the loan covenants, as evidenced by: (a) the fact that the Company is a party to such agreements and charged with knowledge thereof; (b) the fact that Individual Defendants spoke to investors about the loan covenants and claimed to understand the "EBITDA cushion" related thereto; and (c) the fact that Defendant Cash is a signatory to the Form 8-K filed on December 6, 2016, disclosing the December 5, 2016 amendment to covenant ratios.  Therefore, each Defendant understood the loan

---

Tennessee and reported to Vice President, Physician Business Services Pat Wright

covenants and was incentivized to postpone recognition of bad debt expense until such expense could be characterized as a "change in accounting" not subject to the covenant calculation.

### B.    The SEC Was Already Investigating HMA for Similar Conduct

183.    Community Health had acquired HMA prior to the Class Period.  However, HMA became subject of an SEC investigation, which is ongoing, that is related to accounts receivable, billing write-downs, contractual adjustments, reserves for doubtful accounts, accounts receivable aging, and recording of revenue. As the Company explained in February 2017:

> On April 25, 2013, HMA received a subpoena from the SEC, issued pursuant to an investigation, requesting documents related to accounts receivable, billing write-downs, contractual adjustments, reserves for doubtful accounts, and accounts receivable aging, and revenue from Medicare, Medicaid and from privately insured or uninsured patients. On June 5, 2013, HMA received a supplemental subpoena from the SEC which requests additional financial reports. Subsequent subpoenas have been directed to us, our accountants, the former accountants for HMA and certain individuals. On July 17, 2014, we received an additional subpoena from the SEC seeking numerous categories of documents relating to the financial statement adjustments taken in the fourth quarter of 2013 in the areas described above. This investigation is ongoing and we are unable to determine the potential impact, if any, of this investigation.

184.    The fact that its largest acquisition was facing an SEC investigation at the time of Defendants' conduct supports an inference that Defendants were aware of the fraud here since it necessarily brought the issues to their attention.  If the Individual Defendants intentionally failed to investigate the situation at Community Health after learning of the investigation into HMA, this would constitute severely reckless conduct.

### C.    Defendants Were Uniquely Motivated to Preserve Artificial Executive Compensation Not Available at Peer Companies

185.    Throughout the Class Period, Individual Defendants enjoyed and were uniquely motivated to keep an exorbitant level of compensation paid to them by Community Health which was far more than they could obtain at competing healthcare companies:

| Defendant | Year | Base salary | Total Compensation |
|-----------|------|-------------|--------------------|
| Smith | 2016 | $1.6 million | $5.77 million |
| | 2017 | $1.6 million | $4.95 million |
| Cash | 2016 | $850,000 | $2.77 million |
| | 2017 (partial) | $294,080 | $1.13 million |
| Aaron | 2017 | $646,875 | $1.75 million |

*See* Community Health DEF 14-A, filed April 5, 2018 (certain figures rounded to two decimal points). Moreover, the Individual Defendants' incentive compensation was tied to Community Health's reported Adjusted EBITDA, which provided them further incentive to understate the Company's bad debts.

## CLASS ACTION ALLEGATIONS

186. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Community Health securities between February 20, 2017 and February 27, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

187. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Community Health's common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Community Health securities were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Community Health or its

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

189.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

190.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Community Health; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

191.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

192.     Plaintiffs and other Class members are entitled to a presumption of reliance under the fraud-on-the-market doctrine because: (i) the market for Community Health's securities was open, well-developed and efficient throughout the Class Period; (ii) Defendants'

misrepresentations and omissions, as alleged herein, were public and material; and (iii) Plaintiffs and other Class members purchased Community Health shares after material misrepresentations and/or omissions were made, and before the truth was fully revealed and/or the risks concealed by Defendants' misrepresentations and omissions fully materialized.

193. During the Class Period, the market for Community Health's securities was generally efficient for the following reasons, among others:

(a) Community Health shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Community Health filed periodic public reports with the SEC that were published on EDGAR and made available to investors;

(c) Community Health regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Community Health was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

194. As a result of the foregoing, the market for Community Health's securities promptly digested current information regarding Community Health from all publicly available sources and reflected such information in Community Health's share price. Under these circumstances, all purchasers of Community Health's securities during the Class Period suffered similar injury through their purchase of Community Health's securities at artificially inflated prices and a presumption of reliance applies.

195. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are primarily grounded on material omissions. Because this action primarily involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.

## NO SAFE HARBOR

196. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Community Health who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

197. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

198. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

and other members of the Class to purchase Community Health's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

199. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Community Health's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

200. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Community Health's financial well-being and prospects, as specified herein.

201. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Community Health's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Community Health and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

202. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

203.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Community Health's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

204.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Community Health's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the

integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Community Health's securities during the Class Period at artificially high prices and were damaged thereby.

205.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Community Health was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Community Health securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

206.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

207.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

208.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

209.    Individual Defendants acted as controlling persons of Community Health within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

210.    In particular, Defendant Smith signed the Company's 2016 annual report, first quarter of 2017 quarterly report, second quarter 2017 quarterly report, third quarter 2017 quarterly report, and 2017 quarterly report; Defendant Cash signed the Company's 2016 annual report and first quarter of 2017 quarterly report; and Defendant Aaron signed the Company's third quarter 2017 quarterly report and 2017 quarterly report.  For each of these filings, the respective Individual Defendants had the ability to require truthful disclosures by withholding signature until such disclosure was made.  The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

211.    Community Health informed the SEC that Defendant Smith, "the Company's CEO," is "its chief operating decision maker" tasked with "assess[ing] performance of the hospital segment."[29]

212.    Community Health further informed the SEC with regard to Defendant Cash  (as well as its CEO, Defendant Smith) that "[t]he Company's budgeting process is a 'top down' budgeting process, under which consolidated net revenue, EBITDA and EPS targets are developed

_____

[29] *See* https://www.sec.gov/Archives/edgar/data/1108109/000119312516776582/filename1.htm.

by the CFO with ultimate approval from the [CEO.]"[30]

213. Community Health's Amended and Restated Audit and Compliance Committee Charter mandates that the Committee will—

> Review with the Chief Financial Officer . . . annual audited financial statements and quarterly financial statements, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operation" prior to their release to the public.[31]

214. As set forth above, Community Health violated Section 10(b) and Rule 10b-5 by its acts and omissions. Smith was, at all relevant times, a controlling person of Community Health and liable pursuant to Section 20(a) of the Exchange Act for its violations of the Exchange Act. Cash and Aaron were, during such times as each served as CFO of Community Health, a controlling person of Community Health and liable pursuant to Section 20(a) of the Exchange Act for its violations of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

---

[30] *See* https://www.sec.gov/Archives/edgar/data/1108109/000119312516679098/filename1.htm.

[31] *See* Community Health Sys., Inc., *Amended and Restated Audit and Compliance Committee Charter*, *available at*: http://www.chs.net/wp-content/uploads/AC.Charter.2019-0220.pdf, at ¶12.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 21, 2020

Respectfully submitted,

*/s/ J. Gerard Stranch, IV*

**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
J. Gerard Stranch, IV (BPR #023045)
Benjamin A. Gastel (BPR #28699)
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gerards@bsjfirm.com
beng@bsjfirm.com
*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (admitted *Pro Hac Vice*)
Robert V. Prongay (admitted *Pro Hac Vice*)
Casey E. Sadler (admitted *Pro Hac Vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
csadler@glancylaw.com
*Co-Lead Counsel*

**POMERANTZ LLP**
Joshua B. Silverman (admitted *Pro Hac Vice*)
Louis C. Ludwig (admitted *Pro Hac Vice*)
Jared M. Schneider (admitted *Pro Hac Vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
jbsilverman@pomlaw.com
lcludwig@pomlaw.com
jschneider@pomlaw.com
*Co-Lead Counsel*

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January, 2020, I electronically filed the foregoing documents using the Court's CM/ECF system, and a copy of this filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. The following counsel will receive service via the Court's CM/ECF system at the email addresses listed below:

Steven A. Riley
Milton S. McGee, III
Riley Wamock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
sriley@rwjplc.com
tmcgee@rwjplc.com

J. Alexander Hood, II
Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com
Email: jalieberman@pomlaw.com

Paul Kent Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com
Email: robert@bramlettlawoffices.com

Gregory M. Nespole
Levi & Korsinsky, LLP
55 Broadway

10th Floor
New York, NY 10006
(212) 363-7500
Fax: (212) 363-7171
Email: gnespole@zlk.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com

Charles H. Linehan
Lesley F. Portnoy
Pavithra Rajesh
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
(310) 201-9150
Fax: (310) 201-9160
Email: clinehan@glancylaw.com
Email: lportnoy@glancylaw.com
Email: prajesh@glancylaw.com

Howard G. Smith
Law Offices of Howard G. Smith
3070 Bristol Pike
Suite 112
Bensalem, PA 19020
(215) 638-4847
Fax: (215) 638-4867
Email: hsmith@howardsmithlaw.com

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV