UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CALEB PADILLA, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>COMMUNITY HEALTH SYSTEMS, INC. WAYNE T. SMITH, LARRY CASH, and THOMAS J. AARON,<br><br>        Defendants. | Case No. 3:19-cv-00461<br><br><br>Judge Eli J. Richardson<br>Magistrate Judge Barbara D. Holmes |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF <u>THE FEDERAL SECURITIES LAWS</u>**

Steven A. Riley (BPR #006258)
Milton S. McGee, III (BPR #024150)
Carson W. King (BPR #034305)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
615-320-3700 (Telephone)
615-320-3737 (Facsimile)
sriley@rwjplc.com
tmcgee@rwjplc.com
cking@rwjplc.com

*Attorneys for Defendants*

1

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. STATEMENT OF FACTS .................................................................................... 4

    A. CHSI's Accounting Methodology Under ASC 605. ........................................ 5

    B. Adoption of ASC 606. .................................................................................... 8

    C. CHSI's Financial Statements Comply with GAAP. ....................................... 13

III. STANDARD OF REVIEW UNDER THE PSLRA ............................................ 13

IV. ARGUMENT ....................................................................................................... 14

    A. Plaintiffs Have Failed to Plead With Particularity Facts Sufficient to Establish a Material Misrepresentation or Omission. ...................................... 15

        1. The Amended Complaint does not sufficiently plead facts to infer that CHSI's accounting estimates of uncollectible revenue lacked any reasonable basis. ................ 16

        2. CHSI fully disclosed the risks related to uncollectible revenue. ................................. 21

        3. Subjective statements of opinion and puffery, and characterizations of CHSI's business by management, are not actionable. ................................ 21

    B. Plaintiffs Have Not Raised a Strong Inference of Scienter. ............................ 22

        1. Plaintiffs' speculative motive and presumed access to information arguments do not raise a strong inference of scienter. ........................................ 25

        2. Plaintiffs' remaining scienter allegations do not raise any compelling inference of scienter. ................................................................. 29

    C. The Accounting Estimates Were Forward-Looking and Accompanied by Sufficient Cautionary Language. ................................................................... 34

    D. Plaintiffs Have Failed to State a Section 20(a) Claim Against the Individual Defendants. ................................................................................... 35

V. CONCLUSION .................................................................................................... 35

Case 3:19-cv-00461    Document 66    Filed 03/23/20    Page 2 of 44 PageID #: 518

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abrams v. Baker Hughes, Inc.*
292 F.3d 424 (5th Cir. 2002) ...........................................................................................26

*Alaska Elec. Pension Fund v. Adecco S.A.*
434 F. Supp. 2d 815 (S.D. Cal. 2006)...............................................................................18

*Albert Fadem Trust v. American Electric Power Company, Inc.*
334 F. Supp. 2d 985 (S.D. Ohio 2004) .............................................................................35

*Am. Town Ctr. v. Hall 83 Assocs.*
912 F.2d 104 (6th Cir. 1990) ...........................................................................................14

*Barr v. Matria Healthcare, Inc.*
324 F. Supp. 2d 1369 (N.D. Ga. 2004) .............................................................................18

*Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*
No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375 (S.D. Ohio, Mar. 25, 2009)......................18, 24

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007)........................................................................................................13

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*
No. 1:09-cv-1185-WSD, 2010 U.S. Dist. LEXIS 94569 (N.D. Ga., Sept. 10, 2010) ...................17

*Brown v. Earthboard Sports USA, Inc.*
481 F.3d 901 (6th Cir. 2007) ...........................................................................................14

*Ciresi v. Citicorp.*
782 F. Supp. 819 (S.D.N.Y. 1991) ...................................................................................17

*Cozzarelli v. Inspire Pharm., Inc.*
549 F.3d 618 (4th Cir. 2008) ...........................................................................................31

*DiLeo v. Ernst & Young*
901 F.2d 624 (7th Cir. 1990) ...............................................................................17, 19, 30

*Directv, Inc. v. Treesh*
487 F.3d 471 (6th Cir. 2007) ...........................................................................................13

*Doshi v. General Cable Corp.*
823 F.3d 1032 (6th Cir. 2016) .........................................................................................23

*Frank v. Dana Corp.*
646 F.3d 954 (6th Cir. 2011) ........................................................................................23, 31, 32

*Freed v. Universal Health Servs.*
No. 04-1233, 2005 U.S. Dist. LEXIS 7789 (E.D. Pa., May 3, 2005)................................18, 19, 20

*Gissin v. Endres*
739 F. Supp. 2d 488 (S.D.N.Y. 2010)..............................................................................22

*Goldstein v. MCI WorldCom*
340 F.3d 238 (5th Cir. 2003) ........................................................................................27

*Gregory v. Shelby County*
220 F.3d 433 (6th Cir. 2000) ........................................................................................13

*Harris v. Ivax Corp.*
182 F.3d 799 (11th Cir. 1999) ......................................................................................34

*Helwig v. Vencor, Inc.*
251 F.3d 540 (6th Cir. 2001) ....................................................................................24, 34

*Horizon Asset Mgmt. v. H&R Block, Inc.*
580 F.3d 755 (8th Cir. 2009) ........................................................................................32

*In re Advanta Corp. Sec. Litig.*
180 F.3d 525 (3d Cir. 1999)..........................................................................................27

*In re Aetna, Inc. Sec. Litig.*
617 F.3d 272 (3d Cir. 2010)..........................................................................................22

*In re AirGate PCS, Inc. Sec. Litig.*
389 F. Supp. 2d 1360 (N.D. Ga. 2005) ..........................................................................18

*In re Am. Serv. Grp., Inc.*
No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn., Mar. 31, 2009) ...................31, 32, 34

*In re BearingPoint, Inc. Sec. Litig.*
525 F. Supp. 2d 759 (E.D. Va. 2007) ............................................................................32

*In re Cirrus Logic Sec. Litig.*
946 F. Supp. 1446 (N.D. Cal. 1996) ........................................................................16, 17, 18

*In re Comshare Inc. Sec. Litig.*
183 F.3d 542 (6th Cir. 1999) ....................................................................................20, 23, 28

iii

*In re EveryWare Glob., Inc. Sec. Litig.*
175 F. Supp. 3d 837 (S.D. Ohio 2016) ........................................................................................20

*In re Ferro Corp. Sec. Litig.*
Nos. 1:04CV1440, 1:04CV1589, 2007 U.S. Dist. LEXIS 42191 (N.D. Ohio, June 11, 2007).....29

*In re First Union Corp. Sec. Litig.*
128 F. Supp. 2d 871 (W.D.N.C. 2001) ........................................................................................17

*In re Hutchinson Tech., Inc., Sec. Litig.*
536 F.3d 952 (8th Cir. 2008) ......................................................................................................31

*In re Kindred Healthcare, Inc. Sec. Litig.*
299 F. Supp. 2d 724 (W.D. Ky. 2004).........................................................................................34

*In re Omnicare, Inc. Sec. Litig.*
769 F.3d 455 (6th Cir. 2014) .................................................................................................14, 15

*In re Royal Appliance Sec. Litig.*
No. 94-3284, 1995 U.S. App. LEXIS 24626 (6th Cir., Aug. 15, 1995) .......................................34

*In re SCB Comput. Tech., Inc.*
149 F. Supp. 2d 334 (W.D. Tenn. 2001).................................................................................29, 30

*In re Silicon Graphics Inc. Sec. Litig.*
183 F.3d 970 (9th Cir. 1999) ......................................................................................................27

*In re Sprint Corp. Sec. Litig.*
232 F. Supp. 2d 1193 (D. Kan. 2002)..........................................................................................20

*In re VeriFone Sec. Litig.*
11 F.3d 865 (9th Cir. 1993) ........................................................................................................16

*In re Worlds of Wonder Sec. Litig.*
35 F.3d 1407 (9th Cir. 1994) .................................................................................................16, 18

*In re Yum! Brands, Inc. Sec. Litig.*
73 F. Supp. 3d 846 (W.D. Ky. 2014)...........................................................................................14

*Ind. State Dist. Council v. Omnicare, Inc.*
719 F.3d 498 (6th Cir. 2013) ......................................................................................................31

*Jackson v. City of Columbus*
194 F.3d 737 (6th Cir. 1999) ........................................................................................................6

Case 3:19-cv-00461    Document 66    Filed 03/23/20    Page 5 of 44 PageID #: 521

*Konkol v. Diebold*
590 F.3d 390 (6th Cir. 2009) .........................................................................................26, 27, 35

*La. Sch. Emples. Ret. Sys. v. Ernst & Young, LLP*
622 F.3d 471 (6th Cir. 2010) .......................................................................................................24

*Ley v. Visteon Corp.*
543 F.3d 801 (6th Cir. 2008) ...........................................................................................25, 28, 29, 32

*Lovelace v. Software Spectrum, Inc.*
78 F.3d 1015 (5th Cir. 1996) ......................................................................................................17

*Markman v. Whole Foods Mkt., Inc.*
No. 1:15-CV-681-LY, 2016 U.S. Dist. LEXIS 188833 (W.D. Tex., Aug. 19, 2016) ..................32

*Mathews v. Centex Telemanagement*
No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal., June 9, 1994)............................18

*Miller v. Champion Enters., Inc.*
346 F.3d 660 (6th Cir. 2003) .............................................................................................15, 34, 35

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*
929 F. Supp. 2d 740 (M.D. Tenn. 2013)......................................................................................31

*PR Diamonds, Inc. v. Chandler*
364 F.3d 671 (6th Cir. 2004) .......................................................................................25, 26, 28, 30, 31

*Rieckborn v. Jefferies LLC*
81 F. Supp. 3d 902 (N.D. Cal. 2015) ..........................................................................................18

*Rockefeller Ctr. Props. Sec. Litig. v. Rockefeller*
311 F.3d 198 (3d Cir. 2002)........................................................................................................19

*Rosenzweig v. Azurix Corp.*
332 F.3d 854 (5th Cir. 2003) ......................................................................................................22

*Shapiro v. UJB Fin. Corp.*
964 F.2d 272 (3d Cir. 1992)........................................................................................................18

*Stevelman v. Alias Research Inc.*
174 F.3d 79 (2d Cir. 1999)..........................................................................................................20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*
531 F.3d 190 (2nd Cir. 2008) ......................................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
551 U.S. 308 (2017)..................................................................................................................23, 27

*Thor Power Tool Co. v. Commissioner*
439 U.S. 522 (1979)..................................................................................................................17, 18

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*
342 F.3d 634 (6th Cir. 2003) ...........................................................................................................16

*Waterford Twp. Gen. Emples. Ret. Sys. v. SunTrust Banks, Inc.*
No. 1:09-CV-617-TWT, 2010 U.S. Dist. LEXIS 85755 (N.D. Ga., Aug. 19, 2010) ....................27

*Zucco Partners, LLC v. Digimarc Corp.*
552 F.3d 981 (9th Cir. 2009) ...........................................................................................................32

*Zwick Partners, LP v. Quorum Health Corp.*
No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942 (M.D. Tenn., Apr. 19, 2018) ..........................33

**Statutes**                                                                                                           **Page(s)**

15 U.S.C. § 78u–4…………………………..…………………………………………………....14, 15, 23

15 U.S.C. § 78u–5…………………………………………………………………………………..15

**Rules**                                                                                                              **Page(s)**

Fed. R. Civ. P. 9(b)…………………………………………………………………..…14, 15

Fed. R. Civ. P. 12(b)(6)………………………………………………………………………….13

Case 3:19-cv-00461    Document 66    Filed 03/23/20    Page 7 of 44 PageID #: 523

## I.  INTRODUCTION

Plaintiffs ask the Court to do something remarkable: allow this securities case to proceed based solely on Plaintiffs' speculation that CHSI's[1] estimates of its uncollectible revenue during the Class Period were falsely and materially understated. Plaintiffs do not plead when and to what level CHSI should have increased its estimated uncollectible revenue during the Class Period or why the estimates made by the Company were unreasonable in light of the Company's historical experience in collecting revenue. Indeed, Plaintiffs do not even challenge the sufficiency of CHSI's methodology for estimating uncollectible revenue during the Class Period. Nor do Plaintiffs plead facts sufficient to show that CHSI's estimates for uncollectible revenue lacked any reasonable basis at the time the estimates were made.

Instead, Plaintiffs seize upon two facts: (1) CHSI increased its estimate of uncollectible revenue by $591 million in the fourth quarter of 2017, and (2) the Company's stock price fell. Then, with only that as support, Plaintiffs ask the Court to assume that all of the Company's prior estimates of uncollectible revenue during the Class Period must have been materially false and that Defendants knew it. Both assumptions are factually wrong. Importantly for this Motion, the law does not permit an action to proceed on such assumptions.

What really happened is quite unremarkable when compared to the scenario Plaintiffs ask the Court to imagine. CHSI changed its estimate of uncollectible revenue in the fourth quarter of 2017 as a result of its mandatory implementation of a "historic" change in GAAP accounting principles detailed by a new rule known as ASC 606. ASC 606 dramatically altered the way in which U.S. industries (including the health care industry) must account for revenues. As CHSI

---

[1] "CHSI" or the "Company" means Defendant Community Health System, Inc. "Defendants" mean CHSI, Wayne T. Smith, Larry Cash, and Thomas J. Aaron.

fully disclosed during the Class Period, implementing ASC 606 required the Company to invest substantial time and effort in developing new accounting systems capable of tracking and reporting patient and payor data at much more granular levels than required before. Using the information provided by the new systems and methodologies as well as additional information available as of the fourth quarter, the Company undertook a detailed evaluation of its estimate of uncollectible revenue in accordance with the new requirements of ASC 606. On February 27, 2018, the Company issued its audited 2017 financial results, and, among other things, these results included an increase of $591 million to its estimate of revenue unlikely to be collected ("uncollectible revenue"). On the balance sheet, the "bad debt" for self-pay patients as a percentage of gross self-pay receivables increased by three percent (i.e., from 89% to 92%) from 2016 to 2017. As for the income statement, the $591 million charge represented only a 0.6 percent increase in the estimated uncollectible revenue for the year 2017.

The Amended Complaint fails to state a viable claim of securities fraud for at least four specific reasons. First, as described above, it fails to plead facts sufficient to show that the Defendants made any misrepresentation. CHSI changed its estimate of uncollectible revenue in the fourth quarter of 2017 as a result of its mandatory implementation of ASC 606. The resulting revision in its year-end estimate is not evidence that the Company misrepresented a prior estimate, let alone committed fraud. Courts consistently hold that a change to an estimate cannot, by itself, establish an actionable misrepresentation. And courts never presume fraud, especially in securities cases, which is why Congress enacted strict and heightened pleading requirements to protect companies from precisely this type of speculative claim.

Second, the Amended Complaint also fails to plead facts sufficient to establish the element of scienter. Once again, Plaintiffs construct their claim on speculation, asking the Court to *assume*

that the Defendants: (a) must have known their prior estimates were materially false, and, therefore, (b) collectively harbored a specific intent to delay correcting the estimates, (c) for the specific purposes of avoiding defaulting on the Company's credit facility and to protect the Individual Defendants' jobs. Plaintiffs build their case from whole cloth, piling speculation atop presumptions, but without factual support as the law requires.

Plaintiffs speculate that "proper" estimates of uncollectible revenue at earlier points during the Class Period would have triggered default under the Company's loan covenants. Yet, Plaintiffs do not allege what the estimates of uncollectible revenue *should have been* or on what dates an estimate should have been raised. Thus, as a matter of simple logic, Plaintiffs lack any well-pled factual basis for their conclusion that the Company would have defaulted on its loan covenants had it disclosed "proper" estimates earlier in the Class Period. What one can easily glean from the facts, even as pled in the Amended Complaint, however, is that the Company's change in accounting estimate satisfied both its independent auditors and its lenders as being in conformity with GAAP and the applicable credit agreements. Courts in similar cases have rejected attempts to manufacture scienter from the same sort of conclusory allegations on which these Plaintiffs depend.

Third, the Amended Complaint also fails as a matter of law because the Company's estimates of future uncollectible revenue are inherently forward looking and protected by the safe harbor. Moreover, the Company accompanied its disclosures of these forward-looking statements with detailed and sufficient cautionary language. Plaintiffs' claims all concern alleged inaccuracies in these forward-looking estimates of uncollectible revenue and are thus barred under controlling law.

Fourth, because the Amended Complaint fails to state any claim of securities fraud against the Company, the claims against the Individual Defendants also fail as a matter of law.

For each of these reasons, the Amended Complaint fails to state any claim upon which relief can be granted, and Defendants respectfully request that the Court dismiss the Amended Complaint.

## II.    STATEMENT OF FACTS

CHSI is a publicly traded Delaware holding company, and its indirect subsidiaries operate general acute care hospitals and outpatient facilities in communities across the country. For the year 2017, CHSI earned $112 billion in gross revenue and $15.353 billion in net operating revenue with patient gross accounts receivable of approximately $18.6 billion as of December 31, 2017.

Patients accessing the Company's services generally fall into three categories: (1) those with private insurance; (2) patients covered by Medicare or Medicaid; and (3) self-pay patients. This case concerns CHSI's estimates of the revenue that would ultimately remain uncollected from: (a) self-pay patients ("bad debt expense"); and (b) insurance companies, Medicare, and Medicaid ("contractual allowances"), due to contractual adjustments and claim denials.[2] As Plaintiffs concede, these estimates are contingent upon future events and involve inherent uncertainty. (Am. Compl. ¶¶ 59-60). That inherent uncertainty is exacerbated by the nature of the Company's accounts receivable. There are millions of individual accounts receivable, and some of them, particularly for self-pay patients, may be paid over periods as long as ten years. There are also substantial differences in payment arrangements among individual insurance companies and

---

[2] For ease of reference, bad debt expense and contractual allowances are collectively referred to herein as "uncollectible revenue."

various state governments, which leads to numerous differences in contractual allowances and claims denials.[3]

### A.    CHSI's Accounting Methodology Under ASC 605.

At all relevant times, the Company's financial statements complied with U.S. Generally Accepted Accounting Principles ("GAAP"). Prior to January 1, 2018, GAAP required the Company to estimate its uncollectible revenue consistent with Accounting Standards Codification ("ASC") 605, which was the applicable rule promulgated by the Financial Accounting Standards Board ("FASB").[4] The Company based its methodology for estimating those uncollectible amounts upon its historical collection rates. Plaintiffs concede that this methodology complied with GAAP. Indeed, it was a common methodology used by healthcare providers to estimate their uncollectible revenue. As part of its annual audit, the Company's independent auditor rigorously tested the methodology and opined that the Company's financial statements were fairly presented.

Under ASC 605, healthcare providers recorded their gross billings while simultaneously recording estimates for revenue that, based on their reasonable judgment, would prove uncollectible. (Am. Compl. ¶¶ 72-73). Consistent with GAAP, the Company recorded an estimate

---

[3] *See, e.g*, Exh. B, 2017 10-K at 8 (noting 1.6 million adjusted patient admissions), 82 (noting that the Company is reimbursed by Medicare and Medicaid and is also reimbursed by non-governmental payors using a variety of payment methodologies). All references to Exhibits refer to exhibits to the Declaration of Steven A. Riley. These Exhibits are considered part of the pleadings, and the Court may take judicial notice of these documents. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) ("Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. Courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.")

[4] FASB is the independent organization that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles. *See "About the FASB," available at* https://www.fasb.org/facts/index.shtml (last visited February 24, 2020).

for contractual allowances as an adjustment to gross revenue to arrive at operating revenue and recorded the estimate for bad debt as an expense on the income statement with a corresponding credit to the allowance for doubtful accounts on the balance sheet.[5]

CHSI's public disclosures described to investors in substantial detail its GAAP-compliant methodology for calculating its estimated uncollectible revenue. For instance, CHSI explained that its accounting policies for "Third-party Reimbursement" (i.e. contractual allowances) and "Allowance for Doubtful Accounts" are "Critical Accounting Policies."[6] "Critical accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions."[7] Indeed, CHSI devoted nearly three pages in its 2016 10-K to a discussion of contractual allowances and bad debt calculations, methodology, and material risks related to potential uncollectability of these allowances and accounts.[8]

To calculate estimated contractual allowances, CHSI utilized "payors' historical paid claims data."[9] The "key assumption" identified in the process was "estimated contractual reimbursement percentage," which was based on "payor classification and historical paid claims data."[10] The Company reported adjustments to previous reimbursement estimates as contractual allowance adjustments in the period in which they became reasonably certain.[11]

---

[5] *See, e.g.*, Exh. A, 2016 10-K at 85-87.
[6] Exh. A, 2016 10-K at 84-87; Exh. B, 2017 10-K at 82-85.
[7] Exh. A, 2016 10-K at 85; Exh. B, 2017 10-K at 82.
[8] Exh. A, 2016 10-K at 84-87.
[9] *Id.* at 85.
[10] *Id.*
[11] *Id.*

To calculate its estimated bad debt expense and related allowance for doubtful accounts, CHSI reserved a percentage of all self-pay accounts receivable based on collection history, adjusted for expected recoveries and any anticipated changes in trends.[12] For other non-self-pay payor categories, CHSI reserved an estimated amount based on historical collection rates for uncontractualized portions.[13] Both of CHSI's methodologies for estimating contractual allowances and allowance for doubtful accounts complied with U.S. GAAP, as Plaintiffs concede. (*See* Am. Compl. ¶¶ 53-83, 90-99). The Company's independent auditor, Deloitte & Touche LLP ("Deloitte"), following a thorough audit, opined that CHSI's financial statements were fairly presented in accordance with GAAP.

CHSI modified its estimate for uncollectible revenue from time to time as it acquired new information. For example, CHSI increased its bad debt expense estimate by $169 million in the fourth quarter of 2015 as a result of a change in actual collection experience.[14]

Among substantial other risk disclosures and cautionary language, CHSI cautioned investors: "Due to the complexities involved in these estimates, actual payments we receive could be different from the amounts we estimate and record."[15] In the "Forward-Looking Statements" section of the various disclosures, CHSI identified risks and uncertainties that could cause actual results to be materially different from any future results expressed or implied, including "increases in the amount and risk of collectability of patient accounts receivable . . . including co-pays and deductibles" and "changes in U.S. GAAP."[16] The various SEC filings, parts of which Plaintiffs

---

[12] *Id.*

[13] *Id.*

[14] *See* Exh. A, 2016 10-K at 107.

[15] Exh. A, 2016 10-K at 85; Exh. B, 2017 10-K at 82-83.

[16] Exh. A, 2016 10-K at 94; Exh. B, 2017 10-K at 92-94.

7

discuss in the Amended Complaint, were replete with warnings regarding the uncertainties involving accounting estimates, including the critical estimates for contractual allowances and bad debt expense.[17] Plaintiffs, of course, do not mention these portions of the disclosures.

### B. Adoption of ASC 606.

Effective January 1, 2018, FASB mandated the implementation of ASC 606 in place of ASC 605. This new accounting principle detailed under ASC 606, as Plaintiffs concede, called for a "significant departure" from ASC 605. (Am. Compl. ¶¶ 79-81). The American Institute for Certified Public Accountants described it as a "historic, game-changing" new standard. Throughout the Class Period, industry guidance regarding implementation of ASC 606 continued to develop and was not finalized until the end of 2017.[18]

FASB assessed that "[p]revious revenue recognition guidance in U.S. GAAP comprised broad revenue recognition concepts together with numerous revenue requirements for particular industries or transactions, which sometimes resulted in different accounting for economically similar transactions."[19] ASC 606 "supersed[ed] the revenue recognition requirements in Topic 605

---

[17] Exh. A, 2016 10-K at 39-40 ("If we experience growth in self-pay volume and revenues, or if we experience deterioration in the collectability of patient responsibility accounts, our financial condition or results of operations could be adversely affected"), 84-87, 93-95, 103 ("Use of Estimates"), 106-107 ("Collections are impacted by the economic ability of patients to pay and the effectiveness of the Company's collection efforts . . . The Company also continually reviews its overall reserve adequacy by monitoring historical cash collections as a percentage of trailing net revenue less provision for bad debts, as well as by analyzing current period net revenue and admissions by payor classification, aged accounts receivable by payor, days revenue outstanding, the composition of self-pay receivables between pure self-pay patients and the patient responsibility portion of third-party insured receivables and the impact of recent acquisitions and dispositions."); Exh. C, 2017 Q1 10-Q at 6, 12, 65-67, 73-75; Exh. D, 2017 Q2 10-Q at 6, 12, 76-78, 84-85; Exh. E, 2017 Q3 10-Q at 6, 13, 79-81, 87-89.

[18] *See* Exh. C, Q-1 10-Q at 71; Exh. D, Q2 10-Q at 82; Exh. E, Q-3 10-Q at 8.

[19] Exh. F, ASU 2014-09, at 1.

. . . and most industry specific guidance."[20] Indeed, ASU 2014-09, the Accounting Standards Update that introduced ASC 606, is over 500 pages in length.[21]

ASC 606 required health care companies to perform a detailed, five-step granular process to (1) identify individual contracts, (2) identify performance obligations in the contracts, (3) identify transaction prices for each contract, (4) allocate performance obligations to transaction price in each contract, and (5) recognize revenue only when the entity satisfies the specific performance obligation.[22] "An entity should include in the transaction price some or all of an estimate of variable consideration [i.e. estimated revenue] only to the extent it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved."[23] In sum, this new standard implemented broad, sweeping changes and required companies across all industries to perform significant analyses and adjustments to their previous GAAP-compliant accounting practices.

Throughout the Class Period, CHSI explained to investors the upcoming change.[24] For instance, at the end of the first quarter 2017, the Company told investors:

> We expect to adopt this ASU on January 1, 2018 and are currently developing our plan for adoption and the impact on our revenue recognition policies, procedures and control framework and the resulting impact on our consolidated financial position, results of operations and cash flows. The Company has established an implementation group for this ASU with an implementation plan to transition to the new standard and determine its impact during 2017. A significant element of executing this plan is the process of reviewing sources of revenue and evaluating the patient account population . . . The Company is also in the process of assessing

---

[20] *Id.* at 2.

[21] *Id.* ASU 2014-09 devotes six pages to "Health Care Entities – Receivables." *Id.* at 360-65.

[22] *Id.* at 2.

[23] *Id.* at 3.

[24] Exh. A, 2016 10-K at 91-92, 109; Exh. C, Q1 10-Q at 8, 71; Exh. D, Q2 10-Q at 8, 82; Exh. E, Q3 10-Q at 8, 85; *see also* Am. Compl. ¶ 114.

the impact of the new standard on various reimbursement programs . . . Moreover, industry guidance is continuing to develop around this issue, and any conclusions in the final industry guidance that is inconsistent with the Company's application could result in changes to the Company's expectations regarding the impact that this new accounting standard could have on the Company's financial statements.[25]

For the first and second quarters of 2017, CHSI cautioned, "We cannot reasonably estimate at this time the quantitative impact that the adoption of this accounting standard could have on our financial statements."[26] By the third quarter of 2017, CHSI warned, "[I]t is possible that as a result of the evaluation process to adopt this ASU, a material adjustment could be made to reduce the amount of net patient accounts receivable on the consolidated statements of financial position of the Company."[27]

CHSI filed its 2017 10-K in February 2018 and disclosed, among many financial metrics, decreased same hospital patient admissions of approximately 2% from 2016 to 2017, relatively flat same hospital revenues, decreased cash flows, and the change to its estimate of uncollectible revenue.[28] CHSI's fulsome disclosure about the work it had done to adopt and comply with ASC 606 continued through the issuance of its 2017 10-K:

> In connection with the adoption of this ASU, during the fourth quarter of 2017, we completed an extensive analysis of our patient revenues and patient accounts receivable and developed new accounting processes and methodologies. This analysis also included an evaluation of patient accounts receivable retained after the divestiture of 30 hospitals throughout 2017, and certain other revenues. Based on the information obtained, the financial results discussed below include a change in estimate recorded by us during the three months and year ended December 31, 2017 related to an increase in contractual allowances and the provision for bad debts of approximately $591 million.
> . . .
>
> Throughout 2017 and culminating with the financial close process at December 31, 2017, the Company developed new accounting methodologies and processes to

---

[25] Exh. C, Q1 10-Q at 8, 71; *see also* Exh. A, 2016 10-K at 91-92.
[26] Exh. C, Q1 10-Q at 71; Exh. D, Q2 10-Q at 82.
[27] Exh. E, Q3 10-Q at 8.
[28] *See* Exh. B, 2017 10-K at 8-9, 60.

10

implement ASU 2014-09, the new accounting standard for revenue recognition that was adopted effective January 1, 2018. By implementing new data extraction techniques and updated hindsight information on historical collection data, the Company was able to better estimate the net amount after contractual allowances owed by the third-party payor and what will be owed by the patient based on historical experience. Such updated information included portfolio-level data related to historical collection amounts on an individual hospital and patient level that previously had not been readily available. Using this information the Company created a new accounting process by which it can estimate contractual allowances on a per patient basis. In addition to this new accounting methodology, the Company also revised its methods of estimating contractual allowances to (1) expand the hindsight period over which the Company analyzes payors' historical paid claims data to estimate contractual allowances, (2) expand the basis for payor denied claims to refine the hindsight reserve for such denials, and (3) adjust the contractual allowances for certain categories of commercial payors using more precise historical experience based on recent patterns of account reimbursement. Additionally, the Company evaluated the estimated collection of those amounts due from the patient as part of the Company's estimate of the allowance for doubtful accounts. This analysis also included an evaluation of patient accounts receivable retained after the divestiture of 30 hospitals throughout 2017, and certain other revenues. Based on these new accounting processes and methodologies, the Company recorded a change in estimate during the three months ended December 31, 2017 to increase contractual allowances by approximately $197 million, and to record additional provision for bad debts and increase the allowance for doubtful accounts by $394 million. The total impact of the change in estimate recorded during the three months ended December 31, 2017 was a decrease to net operating revenues of $591 million.[29]

In the Q4 2017 public earnings call with investors, Defendant Thomas Aaron, CHSI's chief financial officer, explained that "historically, we were booking exactly to what our historical experience had been."[30] He affirmed that CHSI's old method followed GAAP,[31] and that the Company consistently presented receivables under both the old and new methods in compliance with GAAP. Mr. Aaron also explained that the Company modeled the new revenue recognition method against recent prior years and found that the method did not materially impact those recent

---

[29] Exh. B, 2017 10-K at 59, 104; *see also* Exh. B at 9-10.
[30] Exh. G, Q4 Earnings Call at 9.
[31] *Id.* at 8.

prior years.[32] Mr. Aaron went on to explain that the Company did not expect the application of the new accounting processes or the adoption of the new revenue recognition standard to impact a number of the Company's future financial metrics, such as net revenue, EBITDA, earnings or cash flow.[33] That, of course, directly contradicts Plaintiffs' incorrect assertion in the Amended Complaint that Mr. Aaron somehow conceded that prior periods were misstated in response to a question from a financial analyst during that earnings call. The financial analyst asked Mr. Aaron a question about the Company's adjusted run rate, which is a non-GAAP financial metric akin to adjusted EBITDA. Consistent with his remarks earlier in the earnings call, Mr. Aaron noted that the Company's adjusted EBIDTA would not have been materially impacted if the new accounting standard had been mandated and implemented in earlier years:

> No, it does not impact our adjusted run rate. . . . [H]ad we adopted [the new standard] in 2016, we would have knocked our carried receivables down in that year. And we would have them down again in this year, so you would not have the impact of that. That's where we're going to be in 2018. They've been adjusted on the balance sheet for the new standard. They're going to be – at the end of '18, they're going to be consistently presented, just like we were consistently presenting our old method. And that's why I mentioned we did run it backwards to see [if] it impacted our run rate.[34]

Mr. Aaron simply explained further that the Company's implementation of the new accounting standard did not materially impact that particular financial metric.

CHSI recorded approximately $96.6 billion in contractual allowances and bad debt expense on the income statement for the year 2017.[35] Accordingly, the $591 million change increased total estimated uncollectible revenue by only 0.6% for the year. In 2016 and 2017 respectively, CHSI

---

[32] *Id.* at 6.
[33] *Id.*
[34] *Id.* at 12.
[35] Exh. B, 2017 10-K at 97, 103.

reserved 89% and 92% of its gross self-pay receivables as its allowance for doubtful accounts on the balance sheet.[36]

### C. CHSI's Financial Statements Comply with GAAP.

Finally, CHSI's independent, external auditor, Deloitte, rigorously tested both of the Company's 2016 and 2017 year-end financial statements and opined that CHSI's financial statements "present[ed] fairly, in all material respects, the financial position of Community Health Systems, Inc. . . . in conformity with accounting principles generally accepted in the United States of America."[37] Deloitte's rigorous audit encompassed CHSI's estimates of uncollectible revenue and also included testing of CHSI's internal controls over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB). Upon completion of its audit, Deloitte issued a clean, "unqualified opinion."[38] Deloitte's opinion thus included the Company's work regarding its uncollectible revenue in the fourth quarter 2017 and its change in estimate resulting from its adoption of ASC 606.

### III. STANDARD OF REVIEW UNDER THE PSLRA

A motion to dismiss a complaint pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted. The Court "need not accept as true legal conclusions or unwarranted factual inferences." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). The claimant must allege underlying facts that provide "plausible grounds" for relief and "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Further, to satisfy Federal Rule of Civil Procedure

---

[36] *Id.* at 87; Exh. B, 2017 10-K at 85.
[37] Exh. A, 2016 10-K at 97; Exh. B, 2017 10-K at 96.
[38] *Id.* An "unqualified opinion" is an independent auditor's clean opinion, as opposed to a "qualified opinion," "adverse opinion," or "disclaimer of opinion."

13

9(b), a plaintiff must, "at a minimum, allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied." *Am. Town Ctr. v. Hall 83 Assocs.*, 912 F.2d 104, 109 (6th Cir. 1990) (internal quotations omitted).

Moreover, "a securities fraud claim must meet the more exacting pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA'), 15 U.S.C. § 78u–4." *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 858 (W.D. Ky. 2014). Congress enacted the PSLRA to stem the proliferation of meritless securities class action lawsuits. H.R. Conf. Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. The Sixth Circuit has described the PSLRA's heightened pleading requirements as an "elephant-sized boulder" aimed at preventing meritless claims. *In re Omnicare, Inc. Sec. Litig*., 769 F.3d 455, 461 (6th Cir. 2014).

## IV.    ARGUMENT

Plaintiffs fail to plead specific facts sufficient to establish the elements of a federal securities fraud action pursuant to Rule 10b-5 and Section 10(b), which are: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation." 15 U.S.C. § 78u-4; *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007).

Specifically, Plaintiffs fail to plead facts sufficient to support their allegation that CHSI's accounting estimates lacked a reasonable basis or were materially misstated. They have not pled the amount of any alleged misstatement of estimated uncollectible revenue, the facts or data allegedly available to management to conclude that the estimates were unreasonable at the time they were made, or any other facts sufficient to show a material misrepresentation during the Class Period. Second, Plaintiffs do not allege facts sufficient to create the requisite strong inference of scienter but merely speculate, without factual support, that the Company would have violated its

debt covenants if some unspecified amount had been added to the Company's estimate of uncollectible revenue at some unidentified time during the Class Period. Moreover, the alleged false statements are forward-looking and accompanied by meaningful cautionary language, thus they are protected by the PSLRA's safe harbor. Finally, because Plaintiffs have failed to state any claims for securities fraud against the Company, they have also failed to state any claims against the Individual Defendants. Accordingly, the Amended Complaint fails as a matter of law.

### A. Plaintiffs Have Failed to Plead With Particularity Facts Sufficient to Establish a Material Misrepresentation or Omission.

The Amended Complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with factual particularity. 15 U.S.C. § 78u-4(b)(1)(B); *see also* Fed. R. Civ. P. 9(b). "When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading," but "[w]hen an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *In re Omnicare*, 769 F.3d at 470 (quotation marks and citations omitted).[39]

Plaintiffs' allegations of false or materially misleading statements are found in paragraphs 100, 102, 105, 107, 109, 112, 115, 117, 118, 130, 133, 136, 145-46, 149, and 150 of the Amended Complaint. All of Plaintiffs allegations focus on CHSI's estimates for uncollectible revenue and

---

[39] The PSLRA also immunizes "forward-looking" statements unless a plaintiff can demonstrate that they are (1) material, (2) not accompanied by meaningful cautionary statements, and (3) made with actual knowledge that the prediction is false. *See* 15 U.S.C. § 78u-5(c) (2006); *see also Miller v. Champion Enters., Inc*., 346 F.3d 660, 672 (6th Cir. 2003).

simply claim, without more, that the Company's estimates for uncollectible revenue were materially understated and unreasonable.

There is no dispute that CHSI changed its estimates for uncollectible revenue in the fourth quarter of 2017 in connection with the GAAP-required implementation of ASC 606. Other than the mere fact that CHSI changed its year-end estimate, Plaintiffs have not alleged a single fact to suggest that the Company materially misstated these estimates in previous periods. Plaintiffs also fail to connect the alleged misstatement of uncollectible revenue to the Individual Defendants, as required by the Sixth Circuit. *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 643 (6th Cir. 2003).

     1.     The Amended Complaint does not sufficiently plead facts to infer that CHSI's accounting estimates of uncollectible revenue lacked any reasonable basis.

Under both legal precedent and GAAP, accounting estimates such as reserves for uncollectible revenue are evaluated under a standard of reasonableness, not perfection, with due regard given to the inherently uncertain and forward-looking nature of such estimates. "A company's determination of [] reserves, like other types of forecasts, is considered fraudulent only if plaintiffs can show that the company lacked a reasonable basis for the determination." *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1460 (N.D. Cal. 1996) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993)); *see also* ASC 310. The *In re Cirrus Logic* court detailed several points that are pertinent to this case:

16

As a preliminary matter, it should be noted that GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management.[40] Even at the pleading stage, the Ninth Circuit has held that plaintiffs must set forth facts explaining why the allegedly fraudulent accounting decision "is not merely the difference between two permissible judgments," because flexible accounting concepts "do not always (or perhaps ever) yield a single correct figure."
. . .

Under GAAP, management is responsible for establishing a process for preparing accounting estimates, although the process need not be documented or formally applied. Indeed, GAAP approves of the use of subjective criteria in determining financial estimates.

. . . Estimates are based on subjective as well as objective factors and, as a result, judgment is required to estimate an amount at the date of the financial statements. Management's judgment is normally based on its knowledge and experience about past and current events and its assumptions about conditions it expects to exist and courses of action it expects to take.

946 F. Supp. at 1457, 1460 (citations omitted).

Regarding accounting estimates, "routine changes of the estimate are 'necessary consequences of periodic presentations of financial statements.'" *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001). "As many courts have noted, estimates are particularly untenable bases for fraud cases." *Id.* (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).[41] Simply put, allegations that actual results differ from what was estimated

---

[40] Citing *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979); s*ee also Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) (citation omitted) (GAAP "is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any variety of acceptable accounting procedures when that accountant prepares a financial statement.'").

[41] *See also Belmont Holdings Corp. v. Sun Tr. Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 U.S. Dist. LEXIS 94569, at *18-19 (N.D. Ga., Sept. 10, 2010) ("[w]hether SunTrust had adequate reserves for its predicted loan losses generally is not a matter of objective fact, but rather a statement of SunTrust's opinion regarding what portion of its loan portfolio would be uncollectible"); *Ciresi v. Citicorp.*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("[T]he claim that the defendants did not plan their loan reserves properly is essentially a claim that defendants

or that estimates later require adjustment do not support securities fraud claims.[42] Rather, "[P]laintiff must prove that the accounting practices were so deficient that no reasonable accountant would have made the same decision." *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. at 1460 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1426).

Indeed, the Supreme Court, as well as courts within the Sixth Circuit, apply the same deferential principles in lawsuits challenging a company's estimates. *See Thor Power Tool Co.*, 439 U.S. at 544; *Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*, No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375, at *48 (S.D. Ohio, Mar. 25, 2009). Likewise, other district courts have addressed conclusory and speculative pleading of falsity regarding reserves for doubtful accounts and dismissed it as inadequate. *Freed v. Universal Health Servs.*, No. 04-1233, 2005 U.S. Dist. LEXIS 7789, at *25-27 (E.D. Pa., May 3, 2005); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 923 (N.D. Cal. 2015); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 824-25 (S.D. Cal. 2006); *In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1376-78 (N.D. Ga. 2005).

The *Freed* case is instructive. There, plaintiffs alleged that the company, an owner of acute care hospitals, decreased bad debt reserves during the class period during a time when payor mixes shifted and co-pay charges and deductibles were steadily rising. *Freed*, 2005 U.S. Dist. LEXIS 7789 at *4-5. At the end of the class period, the company announced that its provision for doubtful

---

mismanaged the company. If well-pled, allegations of mismanagement are not actionable under section 10(b) of the federal securities laws."), *aff'd*, 956 F.2d 1161 (2d Cir. 1992).

[42] *See, e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) ("[I]t is not a violation of the securities laws to simply fail to provide adequate loan loss reserves [or] properly collateralize or secure a loan portfolio."); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1384 (N.D. Ga. 2004) ("Failure to establish adequate reserves . . . is insufficient to establish securities fraud."); *Mathews v. Centex Telemanagement*, No. C-92-1837-CAL, 1994 U.S. Dist. LEXIS 7895, at *15 (N.D. Cal., June 9, 1994) ("Reserves for bad debts are essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made.").

accounts increased due to an increase in uninsured and self-pay patients. *Id.* at *8. Plaintiffs alleged that defendants were aware that bad debt exposure was increasing and concealed true bad debt during the class period. *Id.* at *9-10. Plaintiffs likewise alleged that the company should have restated prior periods. *Id*. at *24. The *Freed* court noted that to survive a motion to dismiss under the PSLRA, the complaint must plead "details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." *Id*. at *26. The *Freed* court then dismissed that amended complaint for failing to meet those standards.

This case parallels *Freed* in important ways. Like *Freed*, Plaintiffs here did not plead with any particularity facts sufficient to show that CHSI's estimates for uncollectible revenue lacked any reasonable basis at the time the estimates were made. Plaintiffs likewise have not pled when the estimates should have been revised, or by how much. Nor do Plaintiffs allege what facts were known or readily available to management during the Class Period to conclude that uncollectible revenue was underestimated. Plaintiffs provide no particularized support for their claim that financial statements for certain unspecified periods should be restated by an unspecified amount. Plaintiffs simply have not pled the "who, what, when, where and how" of the events at issue. *See Rockefeller Ctr. Props. Sec. Litig. v. Rockefeller*, 311 F.3d 198, 217 (3d Cir. 2002); *DiLeo*, 901 F.2d at 627 (noting that the complaint did not give examples of problem loans that should have been caught and did not explain how defendants should have recognized that reserves were inadequate). No wonder, as there was no misrepresentation.

But the facts of this case weigh even more in favor of dismissal than those in *Freed*. The increase in uncollectible revenue Plaintiffs seize upon was driven by the Company's mandated

19

Case 3:19-cv-00461    Document 66    Filed 03/23/20    Page 26 of 44 PageID #: 542

change from one GAAP-compliant methodology for making accounting estimates to another GAAP-complaint methodology. That mandatory change in GAAP principles required the Company to change its systems and processes for estimating uncollectible revenue. And Plaintiffs here do not (and cannot) allege that either of CHSI's methodologies for estimating uncollectible revenue were not GAAP compliant. *See also In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 871-72 (S.D. Ohio 2016) (noting that the complaint did not even allege a failure to follow GAAP when company calculated its factory manufacturing variance based on historical experience and accounted for a change in estimate when it identified a deviation from historical experience). CHSI did not retroactively restate its prior financial results because there was no error in prior statements. It simply had been required to change to a new methodology which resulted in the Company acquiring new information. CHSI's independent auditor concurred in CHSI's judgment and issued clean, unqualified audit opinions during the relevant time period.

Faced with these undisputed facts, Plaintiffs are left only to speculate: the increase in estimated uncollectible revenue that CHSI recognized in late 2017 in connection with the adoption of ASC 606 must mean that CHSI's older estimates of uncollectible revenue under ASC 605 were materially *and* fraudulently understated. Such *ipso facto* speculation is unwarranted and legally unavailing. "[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)); *see also In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1224-25 (D. Kan. 2002) ("'[t]he mere fact that [a company] increased its reserves for doubtful accounts in [one period] does not, by itself, call into question the accuracy of the [earlier period reserves].").

2.        CHSI fully disclosed the risks related to uncollectible revenue.

CHSI provided fulsome, meaningful cautionary language and disclosed the risks related to potential future uncollectability of revenues.[43] The Company identified its accounting policies for Third-Party Reimbursements and Allowance for Doubtful Accounts as Critical Accounting Policies.[44] CHSI informed investors that these estimates involved uncertainty and that actual results could differ from what was estimated.[45] CHSI also fully disclosed its methodology for calculating these estimates.[46] The Company disclosed to investors that its adoption of ASC 606 could impact its financial statements.[47]

In sum, CHSI provided a reasonable, GAAP-compliant estimate for uncollectible revenue based on its historical experience for all periods, it fully disclosed its methodology for calculating these estimates, and it cautioned investors that actual results could differ. It provided expansive disclosure of its adoption of ASC 606 including the implementation of new processes and methodologies to comply with the new, historic change in GAAP. And CHSI detailed its change in estimate in the fourth quarter 2017 based upon new information available with the implementation of those new processes and methodologies.

3.        Subjective statements of opinion and puffery, and characterizations of CHSI's business by management, are not actionable.

Statements contained in Paragraphs 104, 109, 115, 118, 120, 131, 134 and 147 of the Amended Complaint pertaining to CHSI's calculation of uncollectible revenue are non-actionable statements of opinion. While CHSI's management absolutely believed they were true, statements

---

[43] *See* pages 7-8 *supra*.
[44] Exh. A, 2016 10-K at 84-87; Exh. B, 2017 10-K at 82-85.
[45] Exh. A, 2016 10-K at 94; Exh. B, 2017 10-K at 93.
[46] *See, e.g.*, Exh. A, 2016 10-K at 84-87.
[47] Exh. C, Q1 10-Q at 8, 71; *see also* Exh. A, 2016 10-K at 91-92.

21

such as "we expect one result of our divestiture were [sic] to be a stronger, sustainable group of hospitals in markets where we can invest and grow," "[w]e're in good shape," "[w]e're working to not only improve our debt-EBITDA ratio, but also working to reduce the overall amount of debt," etc., are nothing more than immaterial statements of optimism, opinion, and subjective characterizations and analyses, and are understood by investors as mere "puffery." *See In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 283 (3d Cir. 2010); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) ("generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010) (executive's statement that "[t]he company continues to maintain a strong balance sheet" was non-actionable puffery).[48]

## B.     Plaintiffs Have Not Raised a Strong Inference of Scienter.

The Amended Complaint comes nowhere close to pleading facts sufficient to establish scienter. Indeed, Plaintiffs construct their entire theory of "scienter" out of just one fact: at all points during the Class Period, the Company had debt agreements that included financial covenants. From this one fact, Plaintiffs speculate that (a) "proper" disclosures of uncollectible revenue earlier in the Class Period would have violated those covenants, (b) the Defendants must have known this and, therefore, (c) must have conspired to suppress the truth until they could hide it amid a fortuitous change in accounting principles. But for the very same reasons Plaintiffs' mere conclusions and speculation fail to establish any "misrepresentations," they also fail to establish scienter.

---

[48] Plaintiffs also speculate that the Company's internal controls were lacking. (Am. Compl ¶¶ 39-44). The company's independent auditor, however, opined that it "maintained, in all material respects, effective internal control over financial reporting." *See* Exh. A., 2016 10-K at 174; Exh. B, 2017 10-K at 176.

The law is clear; to plead scienter under the rigors of the PSLRA requires far more than conclusory allegations and speculation. Instead, Plaintiffs must "state with particularity facts giving rise to a *strong* inference that Defendants acted with the required state of mind" in violating the securities laws "with respect to *each* act or omission alleged." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2017).[49] The requisite "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. Unlike traditional pleading standards, this requires courts to consider "plausible opposing inferences," *id.* at 323, and review "all the allegations holistically[,]" *id.* at 326.

Furthermore, when Plaintiffs attempt to base allegations of securities fraud on "soft information" like predictions or accounting estimates, courts strictly enforce these heightened requirements for pleading scienter.[50] Courts require plaintiffs to plead with particular specificity

---

[49] Scienter is defined as a "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citations omitted). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (citations omitted). Recklessness requires more than negligence and is "akin to conscious disregard." *Id.* (citation omitted). The danger "must at least be so obvious that any reasonable man would have known of it." *In re Comshare Inc. Sec. Litig.*, 183 F.3d at 550.

[50] Courts in the Sixth Circuit generally apply a "non-exhaustive list of nine factors" in considering whether a plaintiff has adequately pled scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high

23

the foundational facts–the who, what, when, where and how. "A complaint alleging accounting irregularities fails to raise a strong inference of scienter if it allege[s] no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." *La. Sch. Emples. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 481 (6th Cir. 2010) (internal quotations omitted); *see also Beaver Cty. Ret. Bd.*, 2009 U.S. Dist. LEXIS 31375 at *60-61 ("Therefore, although it construes all inferences in Plaintiff's favor, the Court finds that the nonculpable explanation for Defendants' bad debt accounting is more plausible than Plaintiff's explanation that Defendants engaged in accounting errors with an intent to deceive or with recklessness.").

In this case, Plaintiffs' main scienter allegations rest entirely on the assumption that the Defendants must have known the Company's estimates of uncollectible revenue were *much too low* during the entire Class Period. How exactly did the Defendants come to know this? Were there specific reports that clearly showed it? The Amended Complaint certainly does not identify any. Were there confidential informants who allegedly told the Individual Defendants the estimate was much too low, or who claim to have witnessed the Individual Defendants' private confessions or to have been privy to some diabolical plan? Not in this case. Well, how much higher should the estimates have been, and at what points during the Class Period? For instance, what was the "proper" estimate of uncollectible revenue in the fourth quarter of 2016? The Amended Complaint does not say. So, then, how would Defendants know that disclosing the "proper" estimate of

---

degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). These factors are not a checklist to be pled with mere conclusions.

uncollectible revenue in that quarter would have caused a default under the Company's loan covenants? Again, the Amended Complaint is silent.

Likewise, Plaintiffs allege – with no factual support – that the increase in estimated uncollectible revenue the Company recorded in late 2017 should have instead resulted in a restatement of the Company's prior financial statements. What periods should have been restated? By how much? What about the Company's independent auditor concurring in the Company's judgment that the change in estimate brought about by its adoption of ASC 606 did not call for a restatement? The Amended Complaint is again silent.

Courts never presume fraud. Yet, at bottom, the Amended Complaint *presumes* fraud from just a change in accounting estimate and credit agreements that contained financial covenants. The PSLRA requires much more than this to maintain a claim for securities fraud. *See Ley v. Visteon Corp.*, 543 F.3d 801, 813 (6th Cir. 2008); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689-90 (6th Cir. 2004).

      1.      Plaintiffs' speculative motive and presumed access to information arguments do not raise a strong inference of scienter.

Perhaps recognizing that they lack sufficient facts to plead scienter, Plaintiffs attempt to plead a case of presumed scienter with general allegations of access to information paired with a speculated motive. Plaintiffs allege that the Individual Defendants were high ranking officers who were actively involved in financial planning and generally would have access to information. Unable to plead facts showing knowledge, or even that Defendants received specific information or reports that their estimates of uncollectible revenue were too low at any point during the Class Period, Plaintiffs must settle for allegations that the Individual Defendants generally involved themselves in financial matters and, due to their positions, presumably had access to information. (*See* Am. Compl. ¶¶ 177-182). From there, Plaintiffs simply dream up a theory of motive.

25

Defendants, as the story goes, somehow became convinced that the Company would violate its credit agreements if it disclosed accurate estimates during the Class Period, and so waited until the fourth quarter of 2017 to disclose the accurate estimate. Of course, Plaintiffs pled no specific facts to show that any of the Defendants actually harbored such a motive. It is a bald theory, nothing more.[51]

It is telling that the Company's lenders do not agree with Plaintiffs' theory. The lenders have never claimed that the covenants were triggered or should have been triggered. Unlike Plaintiffs' imagined world, which requires the Court to indulge the unsupportable notion that the Company's lenders (and its auditor) were either fooled by or complicit in the alleged fraud, in the real world there is no dispute that the Company never, in fact, violated its loan covenants. Moreover, none of the well-pleaded facts in the Amended Complaint show any concern for default on the part of the Company's lenders. Plaintiffs' fictional tale is factually baseless.

Plaintiffs' "presumed access" theory of scienter fares no better. An important position and mere access to information are insufficient to establish scienter. *See Konkol v. Diebold*, 590 F.3d 390, 397 (6th Cir. 2009) (quoting *PR Diamonds, Inc.*, 364 F.3d at 688); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2nd Cir. 2008) (upholding dismissal of securities fraud claim where scienter allegations rested on "senior executives … [having] access to 'collection data'"); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware

---

[51] Plaintiffs also have not alleged any facts to show that CHSI would have violated its debt covenants if the Company had taken portions of the charge earlier in the Class Period. For example, Paragraph 164 of the Amended Complaint makes only a conclusory allegation that the secured net leverage ratio would have been higher than the threshold for default. Further, the Amended Complaint neither alleges at what points CHSI should have taken the charge and in what amounts, nor analyzes EBITDA at those points in time to determine whether any debt covenant would have been violated.

of the misstatement based on their positions within the company.") (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). Moreover, allegations that an executive was particularly well-informed do not elevate otherwise inadequate claims to the level required by the PSLRA. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003) (holding that allegations that an executive was a "hands-on CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity.").

Where, as here, the reserves at issue involve complicated estimates and aggregations based on a large amount of data and qualitative judgments, one cannot reasonably infer knowledge of fraud simply based on the fact that one or more Defendants had access to some or all of the underlying data.[52] To state a claim, Plaintiffs must at a minimum allege what reports were available, how they were presented and used, and why, looking at such information, the fact that the Company's reserves were allegedly understated would have been obvious. *See, e.g., Konkol*, 590 F.3d at 397-98 ("The standard from *Tellabs* requires specific facts that those reports were known to Defendants and reflected the revenue-recognition scheme in such a way that it would have been obvious [the company] was improperly inflating its revenue.").

---

[52] *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (holding that a complaint relying on defendants' receipt of three different types of internal reports did not adequately plead scienter, and noting that "[w]e would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."); *Waterford Twp. Gen. Emples. Ret. Sys. v. SunTrust Banks, Inc.,* No. 1:09-CV-617-TWT, 2010 U.S. Dist. LEXIS 85755, at *10 (N.D. Ga. Aug. 19, 2010) ("The Plaintiff argues that this creates a strong inference of scienter because Wells and Chancy should have realized upon reviewing these reports that nonperforming loans were being transferred to in-process accounts near the second and third quarters. However, access to information, even when accompanied by a duty to monitor that information, is not enough to create a strong inference of scienter.").

The Sixth Circuit has squarely held that speculative allegations of motive and access to information cannot plug gaping holes in a securities fraud claim. "The bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter." *PR Diamonds, Inc.*, 364 F.3d at 689-90 (quoting *In re Comshare,* 183 F.3d at 551). The plaintiffs in *Ley* and in *PR Diamonds* made the same sort of allegations as the Plaintiffs in this case. In *Ley*, plaintiffs alleged that the "[d]efendants' motive was . . . to avoid defaulting on existing notes." *Ley*, 543 F.3d at 813. The court held that the plaintiff failed to allege any particularized facts to support a strong inference of scienter. *Id.* Similarly, in *PR Diamonds*, plaintiffs alleged that improper accounting practices helped the defendants to mask deteriorating operating results and forestall default under certain financial covenants. *PR Diamonds, Inc*., 364 F.3d at 689. The court found this argument insufficient to raise a strong inference of scienter and upheld dismissal of the claims. *Id.* Just as in *Ley* and *PR Diamonds*, Plaintiffs in this case have failed sufficiently to plead the element of scienter.

Notably lacking from the Amended Complaint are any allegations of insider trading or other allegations to suggest that the Individual Defendants profited from the alleged overstatement of earnings and inflated share prices during the Class Period. *See PR Diamonds, Inc.*, 364 F.3d at 691 ("The Complaint includes no allegations that the Individual Defendants ever took advantage of Intrenet's purportedly inflated stock prices by selling shares during the Class Period . . . courts have explained that the absence of inside sales dulls allegations of fraudulent motive."). In fact, the proxy statement filed with the SEC noted that CHSI "did not meet several of its financial expectations in 2017," which "resulted in the annual cash incentive compensation and total compensation paid to [CHSI's] named officers for 2017 being significantly less than the target cash incentive award and target total compensation that could have been earned if the Company

28

had achieved its financial goals. . . . In addition, our Chief Executive Officer and former Chief Financial Officer (who retired in May 2017) did not receive any increase in their base salary for 2016 or 2017."[53] The Individual Defendants suffered financially due to CHSI's performance. These facts strongly negate any inference of scienter.

In sum, Plaintiffs' speculative motivation and presumed access to information arguments fail as a matter of law.

>2. Plaintiffs' remaining scienter allegations do not raise any compelling inference of scienter.

The remaining allegations in the Amended Complaint likewise fail to create a strong inference of scienter. These allegations include: (a) the size of the change in accounting estimate; (b) a SEC subpoena sent to a company acquired by CHSI that did not result in any adverse findings; (c) the fact that the Individual Defendants earned a salary and didn't work gratuitously; (d) the retirement of Larry Cash; (e) Sarbanes-Oxley Certifications; and (f) statements of "confidential witnesses."

>a. The size of a change in estimate cannot establish scienter.

First, the size of the change in estimate does not raise an inference of scienter. In *Ley*, the Sixth Circuit noted that allowing an inference of scienter based on the magnitude of alleged fraud "would eviscerate the principle that accounting errors alone cannot justify a finding of scienter." *Ley*, 543 F.3d at 816; *see also In re Ferro Corp. Sec. Litig.*, Nos. 1:04CV1440, 1:04CV1589, 2007 U.S. Dist. LEXIS 42191, at *52 (N.D. Ohio, June 11, 2007) (size of restatement not considered in measuring sufficiency of scienter allegations, as "to infer scienter from the magnitude of the errors would require hindsight, speculation, and conjecture."); *In re SCB Comput. Tech., Inc.*, 149 F.

---

[53] Exh. H, April 5, 2018 Proxy Statement at 34-36, 42.

Supp. 2d 334, 353 (W.D. Tenn. 2001) ("[T]he magnitude of the financial restatement, without more, fails to indicate that the earlier financial statements were made with an intentional or reckless state of mind at the time they were made."); *see also DiLeo v. Ernst & Young*, 901 F.2d at 627 (Four billion dollars is a big number, but even a large column of big numbers need not add up to fraud. . . . If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud").

These principles apply with even greater force here, where there has been no restatement but merely a change in estimate, and the Company's independent auditors tested and concurred in the Company's judgment. Moreover, there is certainly no basis to infer scienter from a change in estimate that amounted to a mere 0.6 percent increase in total estimated uncollectible revenue on the income statement and contributed to just a three percent year over year increase in the allowance for doubtful accounts (from 89% to 92% of gross self-pay receivables) on the balance sheet.[54] This is particularly true in a year that included the far more plausible explanation of both a historic, game changing new accounting standard for revenue recognition and the divestiture of 30 hospitals. In this case, there are no properly pled facts from which to infer a prior accounting error that required restatement, in contradiction to the clean audit opinion of the Company's auditors. There are no properly pled facts to raise a strong inference of the required mental state.[55]

---

[54] Exh. B, 2017 10-K at 85, 97, 103.

[55] *See PR Diamonds, Inc.*, 364 F.3d at 683-84 (plaintiffs must plead specific facts and "persuade us that the most plausible conclusion to draw is that the Individual Defendants must or should have known about the problems and nevertheless knowingly or recklessly made the allegedly misleading public statements.").

b. An SEC investigation resulting in no adverse findings does not raise an inference of scienter.

Plaintiffs allege that subpoenas issued by the SEC in 2013 (four years before the Class Period) to HMA (a company CHSI acquired) somehow creates an inference of scienter in Defendants in this case. Plaintiffs speculate, "*If* the Individual Defendants intentionally failed to investigate the situation at Community Health after learning of the investigation into HMA, this would constitute severely reckless conduct." (Am. Compl. ¶¶ 183-84) (emphasis added). Plaintiffs do not allege that there were any adverse findings by the SEC, because there were none. "Courts take the view that an SEC investigation that has not resulted in charges or any finding of wrongdoing cannot support an inference of scienter." *Frank*, 649 F. Supp. 2d at 742; *see also Ind. State Dist. Council v. Omnicare, Inc.*, 719 F.3d 498, 508 (6th Cir. 2013); *In re Hutchinson Tech., Inc., Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false and it does not render Fortun's statements that Hutchinson was 'well-positioned' material nor does it add an inference of scienter.").

c. Executives receiving salaries does not raise an inference of scienter.

Plaintiffs allege no particularized or unique facts related to individual salaries and bonuses to create an inference of scienter. Plaintiffs only allege that the Individual Defendants received salaries and bonuses. (*See* Am. Compl ¶¶ 185-86). Motivations to protect one's position or maintain and/or increase compensation are common to all executives and cannot establish scienter. *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 628 (4th Cir. 2008); *PR Diamonds, Inc.*, 364 F.3d at 690; *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 786 (M.D. Tenn. 2013); *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 U.S. Dist. LEXIS

28237, at *156-57 (M.D. Tenn., Mar. 30, 2009). These allegations do nothing to satisfy Plaintiffs' burden to plead facts showing a strong inference of scienter.

> d. The retirement of Larry Cash does not raise a strong inference of scienter.

The retirement of a single executive is not evidence of scienter. *Frank*, 649 F. Supp. 2d at 745; *see also In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007) (resignation of nine of the top twenty-two executives did not support a strong inference of scienter). Further, the sixty-eight-year-old Mr. Cash explained his decision to retire but continue to be a consultant, as he was looking forward to being a husband, dad, papa, and grandpa.[56]

> e. Individual Sarbanes-Oxley Certifications do nothing to strengthen the inference of scienter.

Individual Sarbanes-Oxley certifications "do nothing to strengthen the inference of scienter." *Markman v. Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 U.S. Dist. LEXIS 188833, at *36 (W.D. Tex. Aug. 19, 2016). Here, when Plaintiffs fail to allege any facts to suggest that the Individual Defendants had reason to know or suspect accounting irregularities, the certifications are not probative of scienter as a matter of law. *See Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 765 (8th Cir. 2009); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009); *Ley*, 540 F.3d 376 at 386; *In re Am. Serv. Grp., Inc.*, 2009 U.S. Dist. LEXIS 28237 at *145.

> f. Plaintiffs' alleged statements from confidential witnesses do not raise a strong inference of scienter.

Finally, the Confidential Witness statements in the Amended Complaint add nothing of substance and clearly do not establish scienter. The Amended Complaint cites statements from

---

[56] Exh. I, February 23, 2017 RBC Capital Markets Healthcare Conference at 3-4.

five confidential witnesses in Paragraph 29, 39-44, 168-170 and 179-180. Plaintiffs do not allege that any of the confidential witnesses actually communicated with the Individual Defendants or was privy to the Individual Defendants' knowledge. This flaw alone is fatal.

> Confidential sources cannot be used to merely parrot conclusory allegations contained in the complaint. . . . The complaint must allege that the confidential witnesses were in a position to establish the basis of personal knowledge of the alleged misconduct and they must establish that the defendants were aware of the misconduct. Even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants or else that the witness was privy to the individual defendants' knowledge.

*Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 U.S. Dist. LEXIS 97942, at *14-15 (M.D. Tenn., Apr. 19, 2018) (citations omitted).

Further, the alleged statements are nothing more than vague and general assertions that do not establish a prior material misstatement or an inference of knowledge or recklessness. Statements that "HMA had a significant amount of bad debt on its books," that "Community Health repeatedly attempted to automate whatever they could," that one former employee used the word "restatement," or that "corporate pulled reports from the revenue cycle system, and it was reported up to management via accounting and finance personnel" establish absolutely nothing and have no relevance or bearing upon a securities fraud claim.[57] From these benign statements, the Court could more properly infer that Plaintiffs underwent substantial efforts and investigation to uncover evidence of scienter but found none.

---

[57] The statement in Paragraph 170 actually appears to relate to the impairment charge of $1.76 billion to goodwill that CHSI took in the 2017 10-K, a charge that is not even the subject of this lawsuit.

**C. The Accounting Estimates Were Forward-Looking and Accompanied by Sufficient Cautionary Language.**

Because reserves are estimates, they are necessarily forward-looking. Indeed, whether or not the reserves for uncollectible revenue were too low (or too high) can only be determined in the future after the Company either collects or fails to collect its receivables. *See Miller*, 346 F.3d at 677 (statements describing estimates "imply projections . . . falling squarely within the definition of 'forward-looking statements' found in [the safe harbor]."); *Helwig*, 251 F.3d at 564 ("Statements of opinion or forward-looking statements such as projections, **estimates** or forecasts") (emphasis added); *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance"); *In re Am. Serv. Grp., Inc.*, 2009 U.S. Dist. LEXIS 28237 at *105-06 (statements about reserves are forward looking statements and protected by the PSLRA because they are necessarily predictions about the future) (discussing soft information).

For this reason, courts commonly view a company's reserves as forward-looking statements falling within both the protections of the safe harbor and the judicial "bespeaks caution" doctrines. *See, e.g.*, *In re Royal Appliance Sec. Litig.*, No. 94-3284, 1995 U.S. App. LEXIS 24626, at *8 (6th Cir., Aug. 15, 1995); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) ("The amount [a company] keeps in reserves to cover liability claims is necessarily a prediction about its future claims. Assertions about the adequacy of [defendant's] reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.").

Here, as discussed *supra*, CHSI specifically tailored cautionary statements towards the estimates for uncollectible revenue. When forward-looking statements are accompanied by

sufficient cautionary language, the statements are protected, regardless of the defendant's state of mind. *Miller*, 346 F.3d at 672. Further, even if the forward-looking statements were not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is required – recklessness is not sufficient. *Id.* Plaintiffs have not pled any facts sufficient to show such knowledge.

**D.     Plaintiffs Have Failed to State a Section 20(a) Claim Against the Individual Defendants.**

Without a primary violation by CHSI or the Individual Defendants of the securities laws, there can be no secondary violation by the Individual Defendants as controlling persons under Section 20(a). *See Albert Fadem Trust v. American Electric Power Company, Inc.*, 334 F. Supp. 2d 985, 1005 (S.D. Ohio 2004). A control person liability claim pursuant to Section 20(a) is contingent upon the plaintiff's ability to establish an "underlying violation of Section 10(b) and Rule 10b-5." *Konkol*, 590 F.3d at 396. Accordingly, because Plaintiffs have not adequately pled a violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 under the PSLRA, Plaintiffs have, in turn, failed to state a claim against the Individual Defendants under Section 20(a) of the Exchange Act.

## V.     CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

35

Respectfully submitted,

 /s/ Steven A. Riley
Steven A. Riley (BPR #006258)
Milton S. McGee, III (BPR #024150)
Carson W. King (BPR #034305)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
615-320-3700 (Telephone)
615-320-3737 (Facsimile)
sriley@rwjplc.com
tmcgee@rwjplc.com
cking@rwjplc.com

*Attorneys for Defendants*

36

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF filing system upon:

J. Gerard Stranch, IV
Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
Casey E. Sadler
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Howard G. Smith
Law Offices of Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020

Gregory M. Nespole
Levi & Korsinsky, LLP
55 Broadway, 10th Floor
New York, NY 10006

Paul Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215

J. Alexander Hood
Jeremy Lieberman
Pomerantz, LLP
600 Third Avenue, 20th Floor
New York, NY 10016

Louis C. Ludwig
Jared Schneider
Joshua B. Silverman
Pomerantz, LLP
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603

Jerry Martin
Barrett Johnson Martin & Garrison, LLC
Phillips Plaza
414 Union St., Suite 900
Nashville, TN 37219

This the 23rd day of March, 2020.

s/ Steven A. Riley

37