# EXHIBIT B

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the year ended December 31, 2017

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

*Commission file number 001-15925*

# COMMUNITY HEALTH SYSTEMS, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3893191** |
| *(State of incorporation)* | *(IRS Employer Identification No.)* |
| **4000 Meridian Boulevard** | **37067** |
| **Franklin, Tennessee** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code:**

**(615) 465-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |
| Contingent Value Rights | The Nasdaq Stock Market LLC |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☑   NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐   NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☑   NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the Form 10-K or any amendment to the Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | |
|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | Smaller reporting company ☐ |
| Non-accelerated filer ☐   (Do not check if a smaller reporting company) | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). YES ☐   NO ☑

The aggregate market value of the voting stock held by non-affiliates of the Registrant was $796,301,699. Market value is determined by reference to the closing price on June 30, 2017 of the Registrant's Common Stock as reported by the New York Stock Exchange. The Registrant does not (and did not at June 30, 2017) have any non-voting common stock outstanding. As of February 27, 2018, there were 114,627,148 shares of common stock, par value $.01 per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required for Part III of this annual report is incorporated by reference to portions of the Registrant's definitive proxy statement for its 2018 annual meeting of stockholders to be filed with the Securities and Exchange Commission within 120 days after the end of the Registrant's fiscal year ended December 31, 2017.

# TABLE OF CONTENTS
## COMMUNITY HEALTH SYSTEMS, INC.
### Year ended December 31, 2017

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 42 |
| Item 2. | Properties | 42 |
| Item 3. | Legal Proceedings | 46 |
| Item 4. | Mine Safety Disclosures | 52 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6. | Selected Financial Data | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 94 |
| Item 8. | Financial Statements and Supplementary Data | 95 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 174 |
| Item 9A. | Controls and Procedures | 174 |
| Item 9B. | Other Information | 174 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 178 |
| Item 11. | Executive Compensation | 180 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 180 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 180 |
| Item 14. | Principal Accountant Fees and Services | 180 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 181 |
| Item 16. | Form 10-K Summary | 195 |

**Item 1. *Business of Community Health Systems, Inc.***

**Overview of Our Company**

We are one of the largest publicly-traded hospital companies in the United States and a leading operator of general acute care hospitals and outpatient facilities in communities across the country. We were originally founded in 1986 and were reincorporated in 1996 as a Delaware corporation. We provide healthcare services through the hospitals that we own and operate and affiliated businesses in non-urban and selected urban markets throughout the United States. As of December 31, 2017, we owned or leased 125 hospitals included in continuing operations, with an aggregate of 20,850 licensed beds, comprised of 123 general acute care hospitals and two stand-alone rehabilitation or psychiatric hospitals. These hospitals are geographically diversified across 19 states, with the majority of our hospitals located in regional networks or in close geographic proximity to one or more of our other hospitals. We also owned or leased two hospitals included in discontinued operations at December 31, 2017. We generate revenues by providing a broad range of general and specialized hospital healthcare services and outpatient services to patients in the communities in which we are located. Services provided through our hospitals and affiliated businesses include general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric and rehabilitation services. We also provide additional outpatient services at urgent care centers, occupational medicine clinics, imaging centers, cancer centers and ambulatory surgery centers. An integral part of providing these services is our network of affiliated physicians at our hospitals and affiliated businesses. As of December 31, 2017, we employed approximately 2,000 physicians and an additional 1,000 licensed healthcare practitioners. Through our management and operation of these businesses, we provide standardization and centralization of operations across key business areas; strategic assistance to expand and improve services and facilities; implementation of patient safety and quality of care improvement programs and assistance in the recruitment of additional physicians and licensed healthcare practitioners to the markets in which our hospitals are located. In a number of our markets, we have partnered with local physicians or not-for-profit providers, or both, in the ownership of our facilities. The financial information for our reportable segments is presented in Note 15 of the Notes to our Consolidated Financial Statements included under Part II, Item 8 of this Annual Report on Form 10-K, or Form 10-K.

We have been implementing a portfolio rationalization and deleveraging strategy by divesting hospitals and non-hospital businesses that are attractive to strategic and other buyers. Generally, these businesses are not in one of our strategically beneficial service areas, are less complementary to our business strategy and/or have lower operating margins. More recently, in connection with our announced divestiture initiative, strategic buyers have made offers to buy certain of our assets. Through consideration of these offers we have divested or may divest hospitals and non-hospital businesses when we find such offers to be attractive and in line with our operating strategy. In 2017, we divested 30 hospitals included in continuing operations for total net proceeds of approximately $1.7 billion.

Additionally, as part of our portfolio rationalization strategy, on April 29, 2016, we completed a spin-off of 38 hospitals and Quorum Health Resources, LLC, or QHR (our former subsidiary through which we provided management advisory and consulting services to non-affiliated general acute care hospitals located throughout the United States), into Quorum Health Corporation, or QHC, and distributed, on a pro rata basis, all of the shares of QHC common stock to our stockholders of record as of April 22, 2016. In recognition of the spin-off, we recorded a non-cash dividend of approximately $713 million during the year ended December 31, 2016, representing the net assets of QHC distributed to our stockholders. Financial and statistical data reported in this Form 10-K include QHC operating results through the spin-off date. Same-store operating results and statistical data exclude information for the hospitals divested in the spin-off of QHC in the year ended December 31, 2016, and for the comparable period in 2015. In connection with the spin-off, we entered into a separation and distribution agreement as well as certain ancillary agreements with QHC on April 29, 2016.

Throughout this Form 10-K, we refer to Community Health Systems, Inc., or the Parent Company, and its consolidated subsidiaries in a simplified manner and on a collective basis, using words like "we," "our," "us" and the "Company." This drafting style is suggested by the Securities and Exchange Commission, or SEC, and is not

1

meant to indicate that the publicly-traded Parent Company or any particular subsidiary of the Parent Company owns or operates any asset, business or property. The hospitals, operations and businesses described in this filing are owned and operated, and management services provided, by distinct and indirect subsidiaries of Community Health Systems, Inc.

**Available Information**

Our website address is www.chs.net and the investor relations section of our website is located at www.chs.net/investor-relations. We make available free of charge, through the investor relations section of our website, annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K as well as amendments to those reports, as soon as reasonably practical after they are filed with, or furnished to, the SEC. Our filings are also available to the public at the website maintained by the SEC, www.sec.gov.

We also make available free of charge, through the investor relations section of our website, our By-laws, our Governance Guidelines, our Code of Conduct and the charters of our Audit and Compliance Committee, Compensation Committee and Governance and Nominating Committee.

We have included the Chief Executive Officer and the Chief Financial Officer certifications regarding the public disclosure required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 as Exhibits 31.1, 31.2, 32.1 and 32.2 to this Form 10-K.

**Our Business Strategy**

Our objective is to provide safe, high-quality healthcare for our patients and the communities we serve. We are committed to efficient, cost effective and profitable operations that seek to ensure sustainable health systems and deliver long-term shareholder value. Our efforts are focused around the following key strategies, which are designed to help us achieve our objectives:

- Become a market leader and increase market share in the communities we serve;

- Increase productivity and operating efficiencies to enhance profitability;

- Continuously improve patient safety and quality of care; and

- Optimize our portfolio through select divestitures of non-core assets while investing in markets with the best opportunities for growth.

*Become a market leader and increase market share in the communities we serve*

We operate across diverse markets that range from sole community providers to large regional networks. We are able to leverage our significant scale and standardized systems to provide cost-effective services and best practices for our affiliate operations. Each of our markets develops and executes a strategic plan with short and long-term goals, based on their unique opportunities and the needs of their respective communities. As an organization, we also have implemented a number of strategic initiatives designed to improve market position, expand services to our patients, and capture a greater share of healthcare spending in our markets. These include:

- Strengthening regional networks and local market operations;

- Expanding patient access points, health services and infrastructure;

- Recruiting and/or employing additional primary care physicians and specialists; and

- Developing a more consumer-centric experience and facilitating connections between episodes of care.

2

*Strengthening Regional Networks and Local Market Operations.* We believe opportunities exist in select markets to create healthcare networks consisting of multiple hospitals and corresponding outpatient services. Regional networks are able to expand the breadth of services provided for our patients, develop centers of excellence for key services, deliver care in an organized and efficient way across the network, improve alignment with physicians and other providers, and make services more attractive to managed care and other payers. Currently, 92 of our hospitals operate in 25 regional networks.

We also operate healthcare systems that are built around a single acute-care hospital. In these markets, we are focused on supporting the hospital with physician practices, outpatient services, clinical collaborations and partnerships that offer our patients health services across the continuum of care. These hospitals and their related outpatient services may operate in competitive markets or as sole community providers.

*Expanding Patient Access Points, Health Services and Infrastructure.* When expanding services – in both the acute and non-acute care settings – our approach is data-driven and strategic to ensure our investments are responsive to community and patient needs and produce sound financial results. While we continue to provide health services across a broad spectrum, we have focused our attention and resources on service lines we believe have the greatest potential for growth, including primary care, emergency medicine, orthopedics, neuroscience, cardiovascular care, surgical services and behavioral health. As the shift to delivering health services in outpatient settings accelerates, we continue to expand our care offerings beyond hospital walls to include more outpatient access through primary care practices, urgent care centers, free-standing emergency departments, ambulatory surgery centers, imaging and diagnostic centers, retail clinics and direct-to-consumer virtual health visits.

We believe expanding our patient access footprint can attract new patients and increase patient retention, as well as our ability to connect patients from one episode of care to the next appropriate care setting. We also believe our investments will enhance our long-term growth and generate increased revenue, earnings, and operating margins by providing a solid return on investment.

*Recruiting and/or Employing Additional Primary Care Physicians and Specialists.* The physician-patient relationship is the foundation on which all healthcare services are built. Understanding this, we continuously assess our communities to identify service gaps and practice opportunities in order to recruit an optimal mix of primary care physicians and specialists. We analyze demographic data and referral trends and employ recruiters at the corporate level to support local hospital administrators in their physician recruitment efforts. In some markets, we employ physicians, often acquiring their practices at the onset of the arrangement. However, most physicians in our communities and on our medical staffs remain in private practice and are not our employees.

We work hard to develop positive, collaborative relationships with physicians. In 2017, we initiated the formation of fifteen Medicare Shared Savings Program Accountable Care Organizations which include approximately 4,000 employed and independent physicians in our communities. We look forward to realizing the benefits of these Accountable Care Organizations, including opportunities to strengthen quality, deepen clinical collaboration and demonstrate performance under a reimbursement system moving toward more value-based incentives and payments.

*Developing a More Consumer-Centric Experience and Facilitating Connections between Episodes of Care.* Consumers continue to take a more active role in healthcare decision-making, especially as they assume increasing responsibility for the cost of their healthcare. The rise in consumerism is pointing to customer expectations that have not always been prioritized in the healthcare setting. We are working on ways to create more enduring relationships with our patients by providing services that help people navigate their healthcare journeys and enable more seamless connections across episodes in our healthcare systems, hospitals, and physician practices. Some of these initiatives include:

- A centralized and proprietary transfer center offering services to connect emergency department and hospitalized patients requiring transfer to facilities that can best meet their needs;

3

- Centralized patient scheduling call centers and online scheduling to ease appointment scheduling;

- Patient navigation and next appointment scheduling from existing points of care;

- Availability of virtual health for certain services provided in the hospital and for direct-to-consumer, on-demand virtual visits with physicians;

- Digital marketing and consumer engagement campaigns; and

- Technology enabled initiatives that support connected healthcare experiences, such as patient portals, text message appointment reminders, gaps-in-care campaigns and post-discharge surveys.

### *Increase productivity and operating efficiencies to enhance profitability*

Our hospital management teams are supported by experienced corporate leaders who have significant industry knowledge and a proven track record of success. Local hospitals benefit from centralized clinical, operational, financial and regulatory expertise that encompasses nearly every aspect of our business. Additionally, we are able to leverage deep and meaningful data sources to facilitate informed decision-making and drive operational improvements across the enterprise in areas such as drug and supply procurement, workforce optimization and staffing and emergency department and operating room performance.

Standard policies and procedures in areas ranging from physician practice management to patient accounting to construction and facilities management help to facilitate best practices, reduce variation and improve operating results. The following areas highlight some of our standardized and centralized platforms.

*Billing and Collections.* We have adopted standard policies and procedures with respect to billing and collections. We have automated various components of the collection cycle, including statements and collection letters, to help facilitate timely and accurate progression of our accounts through the collection cycle. We have consolidated local billing and collection functions into six centralized business offices and have completed the transition of our hospital billing departments to this new infrastructure. We are now realizing the benefits of lower patient denials, higher underpayment recoveries and reduced operating expenses.

*Physician Support.* We support newly recruited physicians to facilitate a smooth and effective entrance into our communities. Newly recruited physicians participate in orientation that covers matters related to starting up a new practice or joining an established practice. For employed physicians, we utilize software solutions that monitor and help optimize their practice performance against industry standard benchmarks and best practices. We also have implemented programs to improve physician workflow, reduce physician turnover, optimize staffing at physician clinics and standardize onboarding processes.

*Procurement and Materials Management.* We have standardized and centralized supply chain operations to improve procurement of the medical supplies, equipment and pharmaceuticals used in our hospitals. We have an ownership interest in and participation agreement with HealthTrust Purchasing Group, L.P., or HealthTrust, a group purchasing organization, or GPO, which benefits members through scaled pricing. HealthTrust contracts with certain vendors who supply a substantial portion of our medical supplies, equipment and pharmaceuticals.

*Case and Resource Management.* The primary goal of our case management program is to deliver safe, high-quality care in an efficient and cost effective manner. The program focuses on:

- Appropriate management of length of stay consistent with national standards and benchmarks;

- Reducing unnecessary utilization;

- Developing and implementing operational best practices;

4

- Discharge planning; and

- Compliance with applicable regulatory standards.

Our case management program integrates the functions of utilization review, discharge planning, assessment of medical necessity and resource management. Patients are assessed upon presentation to the hospital and throughout their course of care with ongoing reviews. Industry standard criteria are utilized in patient assessments and discharge plans are adjusted according to patient needs. Cases are monitored to prevent delays in service or unnecessary utilization of resources. When a patient is ready for discharge, a case manager works with the patient's attending physician to evaluate and coordinate the patient's needs for continued care in the post-acute setting. Each hospital has the support of a physician advisor to act as a liaison to the medical staff and assist with all the activities of the program.

*Other Initiatives.* Numerous other initiatives have been standardized or centralized and leverage data to reduce costs and increase productivity. For example, we have improved staff scheduling and efficiency by implementing standardized time keeping systems and we have implemented initiatives to reduce unnecessary overtime and guide temporary staffing that aligns with patient admissions and acuity. We have created a centralized team and implemented standard processes for payroll processing and management of accounts payable. Likewise, we have leveraged data and expertise to optimize our performance in clinical and operating areas such as emergency room, pharmacy, laboratory, imaging and skilled nursing services and health information management. Each time we implement a new process initiative, we work to identify and communicate best practices and we monitor progress and performance improvement throughout the organization.

### Continuously Improve Patient Safety and Quality of Care

We maintain quality assurance programs to monitor, support and advance quality of care standards and to meet Medicare and Medicaid accreditation and regulatory requirements. We maintain an emphasis on patient safety and clinical outcomes and we are continuously focused on ways to improve patient, physician and employee satisfaction. We believe that a focus on continuous improvement yields the best results for patients, reduces risk and liability, and creates value for the people and communities we serve.

We have developed and implemented programs to support and monitor patient safety and quality of care that include:

- Standardized data and benchmarks to monitor clinical outcomes, hospital performance and quality improvement efforts;

- Recommended policies and procedures based on medical and scientific evidence;

- Training with evidence-based tools for improving patient safety and quality of care and patient, physician and employee satisfaction;

- Leveraging technology and information sharing around evidence-based clinical best practices;

- Training programs for hospital management and clinical staff regarding regulatory and reporting requirements; and

- Implementation of specific leadership methods and error-prevention tools to create safer care environments for patients and staff.

We have operated a Patient Safety Organization, or PSO, since 2011. Our PSO is listed by the U.S. Department of Health and Human Services, or HHS, Agency for Healthcare Research and Quality. We believe our PSO has assisted, and will continue to assist us, in improving patient safety at our hospitals. The PSO has been recertified through 2018.

5

*Optimize our portfolio through select divestitures of non-core assets while investing in markets with the best opportunities for growth*

We have been reshaping our portfolio through the divestiture of non-core hospital and non-hospital assets to strategic and other buyers. In 2018, we intend to divest additional hospitals in select markets. Generally, these divestitures are less complementary to our business strategies and and/or have lower operating margins. We have used proceeds from divestitures to reduce debt.

By divesting non-core assets, we are able to more sharply channel our resources and capital investments into strategic markets where we have the best ability to increase access and patient care, enhance our service lines, form successful joint ventures, produce growth and increase market share. As an example, we acquired 40 physician practices in 2017.

Our portfolio optimization efforts have included several transactions to date. In 2016, we spun-off 38 hospitals to Quorum Health Corporation, and we divested two additional hospitals, sold an 80% ownership interest in our home care division, and divested our equity investment in two hospital joint ventures with Universal Health Services, Inc., or UHS, in Las Vegas, Nevada. In 2017, we divested an additional 30 hospitals in single and multi-hospital transactions.

**Industry Overview**

According to the Centers for Medicare & Medicaid Services, or CMS, national healthcare expenditures grew 4.3% in 2016 to $3.3 trillion and are projected to have grown 4.6% in 2017 to nearly $3.5 trillion. The CMS projections, published in February of 2018, indicate that total U.S. healthcare spending is expected to grow by 5.3% in 2018, and at an average annual rate of 5.6% for 2018 through 2026. CMS anticipates that total U.S. healthcare annual expenditures will reach $5.7 trillion by 2026, accounting for approximately 19.7% of the total U.S. gross domestic product. Healthcare spending is expected to be largely influenced by changes in economic conditions and demographics, as well as by increasing prices for medical goods and services. The CMS projections are constructed using a current-law framework. They are typically published once per year, and are not updated to reflect interim changes. For example, the projections do not take into account the possibility of further modifications to, or repeal of, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, collectively, the Affordable Care Act. CMS expects that the recent elimination of the financial penalties associated with the individual mandate, which takes effect January 1, 2019, will result in only a small reduction to insurance coverage trends.

Hospital services, the market within the healthcare industry in which we primarily operate, is the largest single category of healthcare expenditures. In 2017, hospital care expenditures are projected to have grown 4.6%, amounting to over $1.1 trillion. CMS estimates that the hospital services category will amount to nearly $1.2 trillion in 2018 and projects growth in this category at an average of 5.6% annually from 2018 through 2025.

*U.S. Hospital Industry.* The U.S. hospital industry is broadly defined to include acute care, rehabilitation and psychiatric facilities that are either public (government owned and operated), not-for-profit private (religious or secular), or for-profit institutions (investor owned). According to the American Hospital Association, there are approximately 4,800 community hospitals in the U.S., which are not-for-profit owned, investor owned, or state or local government owned. Of these hospitals, nearly 40% are located in non-urban communities. We believe that a majority of these hospitals are owned by not-for-profit or governmental entities. These facilities offer a broad range of healthcare services, including internal medicine, general surgery, cardiology, oncology, orthopedics, OB/GYN and emergency services. In addition, hospitals offer other ancillary services, including psychiatric, diagnostic, rehabilitation, home care and outpatient surgery services.

*Factors Affecting Performance.* Among the many factors that can influence a hospital's financial and operating performance are:

- facility size and location;

6

- facility ownership structure (e.g., tax-exempt or investor owned);

- a facility's ability to participate in GPOs, such as HealthTrust; and

- facility payor mix.

Patients needing the most complex care are more often served by the larger and/or more specialized urban hospitals. We believe opportunities exist in selected urban markets to create networks between urban hospitals and non-urban hospitals in order to expand the breadth of services offered in the non-urban hospitals while improving physician alignment in those markets and making them more attractive to managed care organizations.

**Hospital Industry Trends**

*Demographic Trends.* According to the U.S. Census Bureau, in 2015, there were approximately 48 million Americans aged 65 or older in the U.S. comprising approximately 14.9% of the total U.S. population. By the year 2030, the number of Americans aged 65 or older is expected to climb to 72 million, or 19.3% of the total population. Due to the increasing life expectancy of Americans, the number of people aged 85 years and older is also expected to increase from 6 million in 2015 to 9 million by the year 2030. This increase in life expectancy will increase demand for healthcare services and, as importantly, the demand for innovative, more sophisticated means of delivering those services. Hospitals, as the largest category of care in the healthcare market, will be among those impacted most directly by this increase in demand. Based on data compiled for us, the populations of the service areas where our hospitals are located grew 4.6% from 2011 to 2016 and are expected to grow by 4.3% from 2016 to 2021. The number of people aged 65 or older in these service areas grew by 17.7% from 2011 to 2016 and is expected to grow by 17.4% from 2016 to 2021. People aged 65 or older comprised 17.1% of the total population in our service areas in 2016, yet they could comprise 19.3% of the total population in our service areas by 2021.

*Consolidation.* In addition to our own acquisitions in recent years, consolidation activity in the hospital industry, primarily through mergers and acquisitions involving both for-profit and not-for-profit hospital systems, is continuing. Reasons for this activity include:

- ample supply of available capital;

- valuation levels;

- financial performance issues, including challenges associated with changes in reimbursement and collectability of self-pay revenue;

- the desire to enhance the local availability of healthcare in the community;

- the need and ability to recruit primary care physicians and specialists;

- the need to achieve general economies of scale and to gain access to standardized and centralized functions, including favorable supply agreements and access to malpractice coverage;

- changes to healthcare payment models that emphasize cost-effective delivery of service and quality of outcomes for the entire episode of care; and

- regulatory changes.

The payor industry is also consolidating and acquiring health services providers in an effort to offer more expansive, competitive programs.

*Trends in Payment for Healthcare Services.* As discussed in more detail in the Government Regulation section of this Form 10-K, the impact of healthcare reform legislation, combined with the growing financial and

7

economic pressures on the healthcare industry, has resulted in challenges to traditional reimbursement trends. For example, the Affordable Care Act has encouraged the adoption of new payment models that emphasize cost effective delivery of care and quality of outcomes. Although health insurance coverage has expanded, patients may face higher deductibles and increased co-payment requirements, which may result in greater write-offs of uncollectible amounts from those patients.

*Shift to Outpatient Services.* Because of the growing availability of stand-alone outpatient healthcare facilities and the increase in the services that can be provided at these locations, many individuals are seeking a broader range of services at outpatient facilities. This trend has contributed to an increase in outpatient services while inhibiting the growth of inpatient admissions. However, recent changes to Medicare policy affecting the reimbursement methodology for certain items and services provided by off-campus provider-based hospital departments have generally resulted in reduced payment rates for hospital outpatient settings.

**Selected Operating Data**

The following table sets forth operating statistics for each of the years presented for our hospitals that are included in our continuing operations. Statistics for 2017 include a full year of operations for 125 hospitals and partial periods for 30 hospitals divested during the year reflecting the operations of these hospitals prior to divestiture. Statistics for 2016 include a full year of operations for 152 hospitals and partial periods for three hospitals acquired during the year reflecting the operations of these hospitals following the completion of the acquisition. Statistics for 2015 include a full year of operations for 194 hospitals. Statistics for hospitals included in discontinued operations are excluded from all periods presented.

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2017** | | **2016** | | **2015** | |
| | (Dollars in millions) | | | | | |
| **Consolidated Data** | | | | | | |
| Number of hospitals (at end of period) | | 125 | | 155 | | 194 |
| Licensed beds (at end of period)(1) | | 20,850 | | 26,222 | | 29,853 |
| Beds in service (at end of period)(2) | | 18,457 | | 23,229 | | 26,312 |
| Admissions(3) | | 738,036 | | 857,412 | | 940,292 |
| Adjusted admissions(4) | | 1,596,739 | | 1,867,348 | | 2,038,103 |
| Patient days(5) | | 3,296,469 | | 3,832,104 | | 4,175,214 |
| Average length of stay (days)(6) | | 4.5 | | 4.5 | | 4.4 |
| Occupancy rate (beds in service)(7) | | 43.3 % | | 43.1 % | | 43.3 % |
| Net operating revenues | $ | 15,353 | $ | 18,438 | $ | 19,437 |
| Net inpatient revenues as a % of net patient revenues before provision for bad debts (8) | | 43.4 % | | 43.2 % | | 42.8 % |
| Net outpatient revenues as a % of net patient revenues before provision for bad debts (8) | | 56.6 % | | 56.8 % | | 57.2 % |
| Net (loss) income attributable to Community Health Systems Inc. stockholders | $ | (2,459) | $ | (1,721) | $ | 158 |
| Net (loss) income attributable to Community Health Systems Inc. stockholders as a % of net operating revenues | | (16.0)% | | (9.3)% | | 0.8 % |
| Adjusted EBITDA(9) | $ | 1,703 | $ | 2,225 | $ | 2,670 |
| Adjusted EBITDA as a % of net operating revenues(9) | | 11.1 % | | 12.1 % | | 13.7 % |
| **Liquidity Data** | | | | | | |
| Net cash flows provided by operating activities | $ | 773 | $ | 1,137 | $ | 921 |
| Net cash flows provided by operating activities as a % of net operating revenues | | 5.0 % | | 6.2 % | | 4.7 % |
| Net cash flows provided by (used in) investing activities | $ | 1,069 | $ | 630 | $ | (1,051) |
| Net cash flows used in financing activities | $ | (1,517) | $ | (1,713) | $ | (195) |

8

| | Year Ended December 31, | | (Decrease) |
|---|---|---|---|
| | **2017** | **2016** | **Increase** |
| | **(Dollars in millions)** | | |
| **Same-Store Data(10)** | | | |
| Admissions(3) | 659,681 | 672,375 | (1.9)% |
| Adjusted admissions(4) | 1,421,816 | 1,446,502 | (1.7)% |
| Patient days(5) | 2,937,290 | 2,990,760 | |
| Average length of stay (days)(6) | 4.5 | 4.4 | |
| Occupancy rate (beds in service)(7) | 43.4 % | 43.8 % | |
| Net operating revenues | $ 14,142 | $ 14,110 | 0.2 % |
| Income from operations | $ 920 | $ 1,152 | (20.1)% |
| Income from operations as a % of net operating revenues | 6.5 % | 8.2 % | |
| Depreciation and amortization | $ 762 | $ 865 | |
| Equity in earnings of unconsolidated affiliates | $ (15) | $ (13) | |

(1) Licensed beds are the number of beds for which the appropriate state agency licenses a facility regardless of whether the beds are actually available for patient use.

(2) Beds in service are the number of beds that are readily available for patient use.

(3) Admissions represent the number of patients admitted for inpatient treatment.

(4) Adjusted admissions is a general measure of combined inpatient and outpatient volume. We computed adjusted admissions by multiplying admissions by gross patient revenues and then dividing that number by gross inpatient revenues.

(5) Patient days represent the total number of days of care provided to inpatients.

(6) Average length of stay (days) represents the average number of days inpatients stay in our hospitals.

(7) We calculated occupancy rate percentages by dividing the average daily number of inpatients by the weighted-average number of beds in service.

(8) This calculation excludes the change in estimate related to net patient revenue to increase contractual allowances recorded during the three months ended December 31, 2017.

(9) EBITDA is a non-GAAP financial measure which consists of net (loss) income attributable to Community Health Systems, Inc. before interest, income taxes, and depreciation and amortization. Adjusted EBITDA, also a non-GAAP financial measure, is EBITDA adjusted to add back net income attributable to noncontrolling interests and to exclude the effect of discontinued operations, loss from early extinguishment of debt, impairment and (gain) loss on sale of businesses, gain on sale of investments in unconsolidated affiliates, acquisition and integration expenses from the acquisition of HMA, expense incurred related to the spin-off of QHC, expense incurred related to the sale of a majority ownership interest in the Company's home care division, (income) expense related to government and other legal settlements and related costs, expense related to employee termination benefits and other restructuring charges, and (income) expense from fair value adjustments on the CVR agreement liability accounted for at fair value related to the HMA legal proceedings, and related legal expenses, and the overall impact of the change in estimate related to net patient revenue recorded in the fourth quarter of 2017 resulting from the increase in contractual allowances and the provision for bad debts. During the three months ended December 31, 2017, the Company increased contractual allowances and the provision for bad debts after completing an extensive analysis of the Company's patient revenues and patient accounts receivable that was initiated as part of the development of new accounting processes and methodologies to adopt the new accounting standard on revenue recognition as required by generally accepted accounting principles on January 1, 2018. This analysis included an

9

evaluation during the fourth quarter of 2017 of the Company's patient accounts receivable retained after the divestiture of 30 hospitals during 2017 and additional allowances recorded on such accounts receivable based on updated estimates of future collections, and certain other revenues. The full impact of this change in estimate is included in the reported results of operations for the three months and year ended December 31, 2017. These changes in estimate are not expected to have a material impact on the recognition of revenue on a prospective basis. The Company has included this adjustment in the calculation of Adjusted EBITDA based on its belief that these changes in estimate are consistent with the intended purpose of Adjusted EBITDA in assessing the Company's operational performance and compare the Company's performance between periods. The Company has from time to time sold noncontrolling interests in certain of its subsidiaries or acquired subsidiaries with existing noncontrolling interest ownership positions. The Company believes that it is useful to present Adjusted EBITDA because it adds back the portion of EBITDA attributable to these third-party interests and clarifies for investors the Company's portion of EBITDA generated by continuing operations. The Company reports Adjusted EBITDA as a measure of financial performance. Adjusted EBITDA is a key measure used by management to assess the operating performance of the Company's hospital operations and to make decisions on the allocation of resources. Adjusted EBITDA is also used to evaluate the performance of the Company's executive management team and is one of the primary targets used to determine short-term cash incentive compensation. In addition, management utilizes Adjusted EBITDA in assessing the Company's consolidated results of operations and operational performance and in comparing the Company's results of operations between periods. The Company believes it is useful to provide investors and other users of the Company's financial statements this performance measure to align with how management assesses the Company's results of operations. Adjusted EBITDA also is comparable to a similar metric called Consolidated EBITDA, as defined in the Company's senior secured credit facility, which is a key component in the determination of the Company's compliance with some of the covenants under the Company's senior secured credit facility (including the Company's ability to service debt and incur capital expenditures), and is used to determine the interest rate and commitment fee payable under the senior secured credit facility (although Adjusted EBITDA does not include all of the adjustments described in the senior secured credit facility). For further discussion of Consolidated EBITDA and how that measure is utilized in the calculation of our debt covenants, see the Capital Resources section of Part II, Item 7 of this Form 10-K.

Adjusted EBITDA is not a measurement of financial performance under U.S. generally accepted accounting principles, or GAAP. It should not be considered in isolation or as a substitute for net income, operating income, or any other performance measure calculated in accordance with U.S. GAAP. The items excluded from Adjusted EBITDA are significant components in understanding and evaluating financial performance. We believe such adjustments are appropriate as the magnitude and frequency of such items can vary significantly and are not related to the assessment of normal operating performance. Additionally, our calculation of Adjusted EBITDA may not be comparable to similarly titled measures reported by other companies.

The following table reflects the reconciliation of Adjusted EBITDA, as defined, to net (loss) income attributable to Community Health Systems, Inc. stockholders as derived directly from our Consolidated Financial Statements for the years ended December 31, 2017, 2016 and 2015 (in millions):

|  | Year Ended December 31, | | |
|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net (loss) income attributable to Community Health Systems, Inc. stockholders | $ (2,459) | $ (1,721) | $ 158 |
| Adjustments: |  |  |  |
| (Benefit from) provision for income taxes | (449) | (104) | 116 |
| Depreciation and amortization | 861 | 1,100 | 1,172 |
| Net income attributable to noncontrolling interests | 63 | 95 | 101 |
| Loss from discontinued operations | 12 | 15 | 36 |

10

Case 3:19-cv-00461    Document 67-2    Filed 03/23/20    Page 13 of 53 PageID #: 793

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Interest expense, net | 931 | 962 | 973 |
| Loss from early extinguishment of debt | 40 | 30 | 16 |
| Impairment and (gain) loss on sale of businesses, net | 2,123 | 1,919 | 68 |
| Change in estimate for contractual allowances and provision for bad debts | 591 | - | - |
| Gain on sale of investments in unconsolidated affiliates | - | (94) | - |
| Expenses related to the acquisition and integration of HMA | - | - | 1 |
| (Income) expense from government and other legal settlements and related costs | (31) | 16 | 4 |
| Expense (income) from fair value adjustments and legal expenses related to cases covered by the CVR | 6 | (6) | 8 |
| Expense related to the sale of a majority interest in home care division | 1 | 1 | - |
| Expense related to the spin-off of QHC | - | 12 | 17 |
| Expense related to employee termination benefits and other restructuring charges | 14 | - | - |
| Adjusted EBITDA | $ 1,703 | $ 2,225 | $ 2,670 |

(10) Same-store operating results and statistical data exclude information for the hospitals divested in the spin-off of QHC in the year ended December 31, 2016 and the comparable period in 2015. In addition, same-store data excludes discontinued operations in the periods presented. Same-store operating results also exclude the overall impact of the change in estimate related to net patient receivables recorded in the fourth quarter of 2017. For all hospitals owned throughout both periods, the same-store operating results and statistical data reflects the indicated periods.

**Sources of Revenue**

We receive payment for healthcare services provided by our hospitals from:

- the federal Medicare program,

- state Medicaid or similar programs,

- healthcare insurance carriers, health maintenance organizations or "HMOs," preferred provider organizations or "PPOs," and other managed care programs, and

- patients directly.

The following table presents the approximate percentages of operating revenues, net of contractual allowances and discounts (but before provision for bad debts), by payor source for the periods indicated. The data for the years presented are not strictly comparable due to the effect that hospital acquisitions and divestitures have had on these statistics.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Medicare | 22.8 % | 23.9 % | 24.1 % |
| Medicaid | 10.3 | 10.5 | 11.2 |
| Managed Care and other third-party payors | 54.3 | 53.4 | 52.4 |
| Self-pay | 12.6 | 12.2 | 12.3 |
| Total | 100.0 % | 100.0 % | 100.0 % |

11

As reflected above, we receive a substantial portion of our revenues from the Medicare and Medicaid programs. Included in Managed Care and other third-party payors is operating revenues from insurance companies with which we have insurance provider contracts, Medicare managed care, insurance companies for which we do not have insurance provider contracts, workers' compensation carriers and non-patient service revenue, such as rental income and cafeteria sales. There is considerable uncertainty regarding the future of the Affordable Care Act, and it is unclear whether the trend of increased health insurance coverage will continue. In addition, as part of the tax reform legislation which was enacted in December 2017, Congress eliminated the financial penalty for individuals that fail to maintain health insurance coverage associated with the individual mandate, effective January 1, 2019, which may result in fewer individuals electing to purchase health insurance coverage. In addition, several private health insurers have withdrawn from or limited their participation in the health insurance exchanges established pursuant to the Affordable Care Act, which may threaten the long-term viability of those marketplaces. Legislation or regulation resulting from repeal, replacement or further amendment of the Affordable Care Act may result in payment reductions under the Medicare or Medicaid programs that could negatively impact our business.

Medicare is a federal program that provides medical insurance benefits to persons age 65 and over, some disabled persons, and persons with end-stage renal disease. Medicaid is a federal-state funded program, administered by the states, that provides medical benefits to individuals who would otherwise be unable to afford healthcare. All of our hospitals are certified as providers of Medicare and Medicaid services. Amounts received under the Medicare and Medicaid programs are generally significantly less than a hospital's customary charges for the services provided. Further, the Affordable Care Act imposes significant reductions in amounts the government pays healthcare providers and Medicare managed care plans. Since a substantial portion of our revenue comes from patients under Medicare and Medicaid programs, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in these programs. The trend toward increased enrollment in Medicare managed care may adversely affect our operating revenue.

In addition to government programs, we are paid by private payors, which include insurance companies, HMOs, PPOs, other managed care companies and employers, and by patients directly. Blue Cross payors are included in the "Managed Care and other third-party payors" line in the above table. Patients are generally not responsible for any difference between customary hospital charges and amounts paid for hospital services by Medicare and Medicaid programs, insurance companies, HMOs, PPOs and other managed care companies, but are responsible for services not covered by these programs or plans, as well as for deductibles and co-insurance obligations of their coverage. The amount of these deductibles and co-insurance obligations has increased in recent years. Collection of amounts due from individuals is typically more difficult than collection of amounts due from government or business payors.

To further reduce their healthcare costs, an increasing number of insurance companies, HMOs, PPOs and other managed care companies negotiate discounted fee structures or fixed amounts for hospital services performed, rather than paying healthcare providers the amounts billed, and utilize structures such as narrow networks that restrict the providers that enrollees may utilize. Increasing consolidation within the payor industry, including vertical integration efforts involving payors and healthcare providers, and cost-reduction strategies by large employer groups and their affiliates may intensify competitive pressure. We negotiate discounts with managed care companies, which are typically smaller than discounts under government programs. If an increased number of insurance companies, HMOs, PPOs and other managed care companies succeed in negotiating discounted fee structures or fixed amounts or if we are unable to participate in managed care networks serving our markets, our results of operations may be negatively affected. There can be no assurance that we will retain our existing reimbursement arrangements or that these third-party payors will not attempt to further reduce the rates they pay for our services. For more information on the payment programs on which our revenues depend, see "Payment" on page 19.

As of December 31, 2017, Florida, Texas, Pennsylvania and Indiana represented our only areas of significant geographic concentration. Operating revenues, net of contractual allowances and discounts (but before the

12

provision for bad debts), generated by our hospitals in Florida (which became an area of geographic concentration in 2014 as a result of the HMA merger), as a percentage of consolidated operating revenues, were 14.8% in 2017, 14.1% in 2016 and 13.6% in 2015. Operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), generated by our hospitals in Texas, as a percentage of consolidated operating revenues, were 12.1% in 2017, 11.4% in 2016 and 11.1% in 2015. Operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), generated by our hospitals in Pennsylvania, as a percentage of consolidated operating revenues, were 9.2% in 2017, 11.2% in 2016 and 10.6% in 2015. Operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), generated by our hospitals in Indiana, as a percentage of consolidated operating revenues, were 9.9% in 2017, 8.6% in 2016 and 7.3% in 2015.

Hospital revenues depend upon inpatient occupancy levels, the volume of outpatient procedures and the charges or negotiated payment rates for hospital services provided. Charges and payment rates for routine inpatient services vary significantly depending on the type of service performed and the geographic location of the hospital. In recent years, we have experienced a significant increase in revenue received from outpatient services. We attribute this increase to:

- advances in technology, which have permitted us to provide more services on an outpatient basis and

- pressure from Medicare and Medicaid programs, insurance companies and managed care plans to reduce the length and number of inpatient hospital stays and to reduce costs by having services provided on an outpatient rather than on an inpatient basis.

Healthcare facility operations are also subject to certain seasonal fluctuations, including decreases in patient utilization during holiday periods and increases in colder weather months.

**Government Regulation**

*Overview.* The healthcare industry is required to comply with extensive government regulation at the federal, state and local levels. If we fail to comply with applicable laws and regulations, we may be subject to criminal penalties and civil sanctions, our hospitals could lose their licenses and we could lose our ability to participate in Medicare, Medicaid and other government programs. Hospitals must meet requirements to be certified as hospitals and qualified to participate in government programs, including those relating to the adequacy of medical care, equipment, personnel, operating policies and procedures; billing and coding for services; properly handling overpayments; classifications of levels of care provided; preparing and filing of cost reports; relationships with referral sources and referral recipients; maintenance of adequate records; hospital use; rate-setting; building codes; environmental protection; and privacy and security.

Hospitals are subject to periodic inspection by federal, state and local authorities to determine their compliance with applicable regulations and requirements necessary for licensing and certification. All of our hospitals are licensed under appropriate state laws and are qualified to participate in Medicare and Medicaid programs. In addition, most of our hospitals are accredited by The Joint Commission. This accreditation indicates that a hospital satisfies the applicable health and administrative standards to participate in Medicare and Medicaid programs.

Government regulations may change. If that happens, we may have to make changes to our facilities, equipment, personnel and services so that our hospitals remain certified as hospitals and qualified to participate in these programs. We believe that our hospitals are in substantial compliance with current federal, state and local regulations and standards. We cannot be certain that governmental officials responsible for enforcing these laws or whistleblowers will not assert that we are in violation of them or that such statutes or regulations will be interpreted by the courts in a manner consistent with our interpretation.

*Healthcare Reform.* Over the last decade, the U.S. Congress and certain state legislatures have introduced and passed a large number of proposals and legislation designed to make major changes in the healthcare system,

13

including changes intended to increase access to health insurance. The most prominent of these recent efforts, the Affordable Care Act, affects how healthcare services are covered, delivered, and reimbursed. The Affordable Care Act mandates that substantially all U.S. citizens maintain health insurance coverage and increases health insurance coverage through a combination of public program expansion and private sector health insurance reforms. However, the future of the Affordable Care Act is uncertain, as the presidential administration and certain members of Congress have stated their intent to repeal or make significant changes to the Affordable Care Act, its implementation or interpretation. In 2017, as part of the tax reform legislation which was enacted in December 2017, Congress eliminated the financial penalty for individuals that fail to maintain health insurance coverage associated with the individual mandate, effective January 2019, which may impact the number of individuals who elect to purchase health insurance. In addition, a presidential executive order has been signed that directs agencies to minimize "economic and regulatory burdens" of the Affordable Care Act.

We believe that the Affordable Care Act has had a positive impact on net operating revenues and income from continuing operations as the result of the expansion of private sector and Medicaid coverage that has occurred. However, other provisions of the Affordable Care Act, such as requirements related to employee health insurance coverage, have increased our operating costs. In addition, the Affordable Care Act has made changes to Medicare and Medicaid reimbursement that could adversely impact the reimbursement we receive under these programs. These changes include reductions to the Medicare annual market basket update for federal fiscal years 2010 through 2019, a productivity offset to the Medicare market basket update, and reductions to the Medicare and Medicaid disproportionate share hospital payments.

Substantial uncertainty remains regarding the ongoing net effect of the Affordable Care Act due to the possibility of repeal or significant changes to the law, clarifications and modifications resulting from executive orders, the rule-making process, the outcome of court challenges and the development of agency guidance, whether and how many states ultimately decide to expand Medicaid coverage and on what terms, the number of individuals who elect to purchase health insurance coverage and budgetary issues at federal and state levels. The impact on the healthcare industry and timing of any potential repeal of or changes to the Affordable Care Act and any alternative provisions is unknown. It is difficult to predict the nature and success of future financial or delivery system reforms.

*Fraud and Abuse Laws.* Participation in the Medicare and Medicaid programs is heavily regulated by federal statute and regulation. If a hospital fails to comply substantially with the requirements for participating in the programs, the hospital's participation may be terminated and/or civil or criminal penalties may be imposed. For example, a hospital may lose its ability to participate in the Medicare program if it engages in any of the following acts:

- making claims to Medicare for services not provided or misrepresenting actual services provided in order to obtain higher payments;

- paying money to induce the referral of patients where services are reimbursable under a federal health program; or

- paying money to limit or reduce the services provided to Medicare beneficiaries.

Any person or entity that knowingly and willfully defrauds or attempts to defraud a healthcare benefit program, including private healthcare plans, may be subject to fines, imprisonment or both. Additionally, any person or entity that knowingly and willfully falsifies or conceals a material fact or makes any material false or fraudulent statements in connection with the delivery or payment of healthcare services by a healthcare benefit plan is subject to a fine, imprisonment or both.

A section of the Social Security Act, known as the "Anti-Kickback Statute" prohibits some business practices and relationships under Medicare, Medicaid and other federal healthcare programs. These practices include the payment, receipt, offer, or solicitation of remuneration of any kind in exchange for items or services that are reimbursed under most federal or state healthcare programs.

14

The Office of Inspector General of the Department of Health and Human Services, or OIG, is responsible for identifying and investigating fraud and abuse activities in federal healthcare programs. As part of its duties, the OIG provides guidance to healthcare providers by identifying types of activities that could violate the Anti-Kickback Statute. The OIG also publishes regulations outlining activities and business relationships that would be deemed not to violate the Anti-Kickback Statute. These regulations are known as "safe harbor" regulations. The failure of a particular activity to comply with the safe harbor regulations does not necessarily mean that the activity violates the Anti-Kickback Statute; however, such failure may lead to increased scrutiny by government enforcement authorities.

The OIG has identified the following incentive arrangements as potential violations of the Anti-Kickback Statute:

- payment of any incentive by the hospital when a physician refers a patient to the hospital;

- use of free or significantly discounted office space or equipment for physicians in facilities usually located close to the hospital;

- provision of free or significantly discounted billing, nursing, or other staff services;

- free training for a physician's office staff, including management and laboratory techniques (but excluding compliance training);

- guarantees which provide that, if the physician's income fails to reach a predetermined level, the hospital will pay any portion of the remainder;

- low-interest or interest-free loans, or loans which may be forgiven if a physician refers patients to the hospital;

- payment of the costs of a physician's travel and expenses for conferences;

- payment of services which require few, if any, substantive duties by the physician, or payment for services in excess of the fair market value of the services rendered;

- coverage on the hospital's group health insurance plans at an inappropriately low cost to the physician;

- purchasing goods or services from physicians at prices in excess of their fair market value;

- rental of space in physician offices, at other than fair market value; or

- physician-owned entities (often referred to as physician-owned distributorships, or PODS) that derive revenue from selling, or arranging for the sale of, implantable medical devices ordered by their physician-owners for use on procedures that physician-owners perform on their own patients at hospitals or ASCs.

We have a variety of financial relationships with physicians who refer patients to our hospitals. Physicians own interests in a number of our facilities. Physicians may also own our stock. We also have contracts with physicians providing for a variety of financial arrangements, including employment contracts, leases, management agreements and professional service agreements. We provide financial incentives to recruit physicians to relocate to communities served by our hospitals. These incentives include relocation, reimbursement for certain direct expenses, income guarantees and, in some cases, loans. Although we strive to comply with the Anti-Kickback Statute, taking into account available guidance including the "safe harbor" regulations, we cannot assure you that regulatory authorities will not determine otherwise. If that happens, we could be subject to criminal and civil penalties and/or exclusion from participating in Medicare, Medicaid, or other government healthcare programs. Civil monetary penalties are increased annually based on updates to the consumer price index and were recently increased under the Bipartisan Budget Act of 2018.

15

The Social Security Act also includes a provision commonly known as the "Stark Law." This law prohibits physicians from referring Medicare and Medicaid patients to healthcare entities in which they or any of their immediate family members have ownership interests or other financial arrangements. These types of referrals are commonly known as "self referrals." Sanctions for violating the Stark Law include denial of payment, civil monetary penalties that are increased annually based on updates to the consumer price index, and exclusion from federal healthcare programs.

There are ownership and compensation arrangement exceptions to the self-referral prohibition. One exception, known as the "whole hospital" exception, allows a physician to make a referral to a hospital if the physician owns an interest in the entire hospital, as opposed to an ownership interest in a department of the hospital. Another exception allows a physician to refer patients to a healthcare entity in which the physician has an ownership interest if the entity is located in a rural area, as defined in the statute. There are also exceptions for many of the customary financial arrangements between physicians and providers, including employment contracts, leases and recruitment agreements. From time to time, the federal government has issued regulations that interpret the provisions included in the Stark Law.

The Affordable Care Act narrowed the "whole hospital" exception to the Stark Law. The Affordable Care Act permitted existing physician investments in a whole hospital to continue under a "grandfather" clause if the arrangement satisfies certain requirements and restrictions, but physicians are prohibited, from the time the Affordable Care Act became effective, from increasing the aggregate percentage of their ownership in the hospital. The Affordable Care Act also restricts the ability of existing physician-owned hospitals to expand the capacity of their aggregate licensed beds, operating rooms and procedure rooms. The whole hospital exception also contains additional public disclosure requirements.

In addition to the restrictions and disclosure requirements applicable to physician-owned hospitals under the Stark Law, CMS regulations require physician-owned hospitals and their physician owners to disclose certain ownership information to patients. Physician-owned hospitals must disclose their physician ownership in writing to patients and must make a list of their physician owners available upon request. Additionally, each physician owner who is a member of a physician-owned hospital's medical staff must agree, as a condition of continued medical staff membership or admitting privileges, to disclose in writing to all patients whom they refer to the hospital their (or an immediate family member's) ownership interest in the hospital. A hospital is considered to be physician-owned if any physician, or an immediate family member of a physician, holds debt, stock or other types of investment in the hospital or in any owner of the hospital, excluding physician ownership through publicly-traded securities that meet certain conditions. If a hospital fails to comply with these regulations, the hospital could lose its Medicare provider agreement and be unable to participate in Medicare.

Evolving interpretations of current, or the adoption of new, federal or state laws or regulations could affect many of the arrangements entered into by each of our hospitals. In addition, law enforcement authorities, including the OIG, the courts and Congress have in recent years increased scrutiny of arrangements between healthcare providers and potential referral sources to ensure that the arrangements are not designed as a mechanism to improperly pay for patient referrals and/or other business. Investigators also have demonstrated a willingness to look behind the formalities of a business transaction to determine the underlying purpose of payments between healthcare providers and potential referral sources.

Many states in which we operate have also adopted laws that prohibit payments to physicians in exchange for referrals similar to the federal Anti-Kickback Statute or that otherwise prohibit fraud and abuse activities. Many states have also passed self-referral legislation similar to the Stark Law, prohibiting the referral of patients to entities with which the physician has a financial relationship. Often these state laws are broad in scope and may apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties, as well as loss of licensure. Little precedent exists for the interpretation or enforcement of these state laws.

Our operations could be adversely affected by the failure of our arrangements to comply with the Anti-Kickback Statute, the Stark Law, billing laws and regulations, current state laws or other legislation or

16

regulations in these areas adopted in the future. We are unable to predict whether other legislation or regulations at the federal or state level in any of these areas will be adopted, what form such legislation or regulations may take or how they may affect our operations. We are continuing to enter into new financial arrangements with physicians and other providers in a manner structured to comply in all material respects with these laws. We strive to comply with applicable fraud and abuse laws. We cannot assure you, however, that governmental officials responsible for enforcing these laws or whistleblowers will not assert that we are in violation of them or that such statutes or regulations ultimately will be interpreted by the courts in a manner consistent with our interpretation.

*Federal False Claims Act and Similar State Laws.* Another significant enforcement mechanism used within the healthcare industry is the federal False Claims Act, or FCA, which can be used to prosecute Medicare and other government program fraud involving issues such as coding errors, billing for service not provided and submitting false cost reports. Further, the FCA covers payments involving federal funds in connection with the health insurance exchanges created under the Affordable Care Act, if those payments involve any federal funds. Liability under the FCA often arises when an entity knowingly submits a false claim for reimbursement to the federal government. The FCA broadly defines the term "knowingly." Although simple negligence will not give rise to liability under the FCA, submitting a claim with reckless disregard to its truth or falsity may constitute "knowingly" submitting a false claim and result in liability. Among the many other potential bases for liability under the FCA is the knowing and improper failure to report and refund amounts owed to the government within 60 days of identifying an overpayment. An overpayment is deemed to be identified when a person has, or should have through reasonable diligence, determined that an overpayment was received and quantified the overpayment. Submission of a claim for an item or service generated in violation of the Anti-Kickback Statute constitutes a false or fraudulent claim under the FCA. In some cases, whistleblowers, the federal government and courts have taken the position that providers who allegedly have violated other statutes, such as the Stark Law, have thereby submitted false claims under the FCA.

When a defendant is determined by a court of law to be liable under the FCA, the defendant must pay three times the actual damages sustained by the government, plus substantial civil penalties for each separate false claim. These civil monetary penalties are adjusted annually based on updates to the consumer price index. Settlements entered into prior to litigation usually involve a less severe calculation of damages. The FCA also contains "qui tam," or whistleblower provisions, which allow private individuals to bring actions on behalf of the government alleging that the defendant has defrauded the federal government. If the government intervenes in the action and prevails, the party filing the initial complaint may share in any settlement or judgment. If the government does not intervene in the action, the whistleblower plaintiff may pursue the action independently and may receive a larger share of any settlement or judgment. When a private party brings a qui tam action under the FCA, the defendant generally will not be made aware of the lawsuit until the government commences its own investigation or determines whether it will intervene. Every entity that receives at least $5 million annually in Medicaid payments must have written policies for all employees, contractors and agents providing detailed information about false claims, false statements and whistleblower protections under certain federal laws, including the FCA, and similar state laws.

A number of states, including states in which we operate, have adopted their own false claims provisions as well as their own whistleblower provisions whereby a private party may file a civil lawsuit in state court. Federal law provides an incentive to states to enact false claims laws that are comparable to the FCA. From time to time, companies in the healthcare industry, including ours, may be subject to actions under the FCA or similar state laws.

*Corporate Practice of Medicine; Fee-Splitting.* Some states have laws that prohibit unlicensed persons or business entities, including corporations, from employing physicians. Some states also have adopted laws that prohibit direct or indirect payments to, or entering into fee-splitting arrangements with, physicians and unlicensed persons or business entities. Possible sanctions for violations of these restrictions include loss of a physician's license, civil and criminal penalties and rescission of business arrangements. These laws vary from

17

state to state, are often vague and have seldom been interpreted by the courts or regulatory agencies. We structure our arrangements with healthcare providers to comply with the relevant state law. However, we cannot provide assurance that governmental officials responsible for enforcing these laws will not assert that we, or transactions in which we are involved, are in violation of these laws. These laws may also be interpreted by the courts in a manner inconsistent with our interpretations.

*Emergency Medical Treatment and Active Labor Act.* The Emergency Medical Treatment and Active Labor Act imposes requirements as to the care that must be provided to anyone who comes to facilities providing emergency medical services seeking care before they may be transferred to another facility or otherwise denied care. Sanctions for failing to fulfill these requirements include exclusion from participation in Medicare and Medicaid programs and civil money penalties, which are increased annually based on updates to the consumer price index. In addition, the law creates private civil remedies that enable an individual who suffers personal harm as a direct result of a violation of the law to sue the offending hospital for damages and equitable relief. A medical facility that suffers a financial loss as a direct result of another participating hospital's violation of the law also has a similar right. Although we believe that our practices are in compliance with the law, we can give no assurance that governmental officials responsible for enforcing the law will not assert we are in violation of this law.

*Conversion Legislation.* Many states, including some where we have hospitals and others where we may in the future acquire hospitals, have adopted legislation regarding the sale or other disposition of hospitals operated by not-for-profit entities. In other states that do not have specific legislation, the attorneys general have demonstrated an interest in these transactions under their general obligations to protect charitable assets from waste. These legislative and administrative efforts primarily focus on the appropriate valuation of the assets divested and the use of the proceeds of the sale by the not-for-profit seller. While these reviews and, in some instances, approval processes can add additional time to the closing of a hospital acquisition, we have not had any significant difficulties or delays in completing the process. There can be no assurance, however, that future actions on the state level will not seriously delay or even prevent our ability to acquire hospitals. If these activities are widespread, they could limit our ability to acquire hospitals.

*Certificates of Need.* The construction of new facilities, the acquisition of existing facilities and the addition of new services at our facilities may be subject to state laws that require prior approval by state regulatory agencies. These CON laws generally require that a state agency determine the public need and give approval prior to the construction or acquisition of facilities or the addition of new services. As of December 31, 2017, we operated 71 hospitals in 11 states that have adopted CON laws for acute care facilities. If we fail to obtain necessary state approval, we will not be able to expand our facilities, complete acquisitions or add new services in these states. Violation of these state laws may result in the imposition of civil sanctions or the revocation of a hospital's licenses.

*HIPAA Administrative Simplification and Privacy and Security Requirements.* The Health Insurance Portability and Accountability Act of 1996, or HIPAA, requires the use of uniform electronic data transmission standards for healthcare claims and payment transactions submitted or received electronically. These provisions are intended to encourage electronic commerce in the healthcare industry. HHS has established electronic data transmission standards and code sets that all healthcare providers must use when submitting or receiving certain healthcare transactions electronically. In addition, HIPAA requires that each provider use a National Provider Identifier. The Affordable Care Act requires the HHS to adopt standards for additional electronic transactions and to establish operating rules to promote uniformity in the implementation of each standardized electronic transaction.

As required by HIPAA, HHS has issued privacy and security regulations that extensively regulate the use and disclosure of individually identifiable health-related information and require covered entities, including health plans and most healthcare providers, to implement administrative, physical and technical practices to protect the security of individually identifiable health information that is electronically maintained or transmitted. Business associates (entities that handle identifiable health-related information on behalf of covered entities) are subject to

18

direct liability for violation of applicable provisions of the regulations. In addition, a covered entity may be subject to penalties as a result of a business associate violating HIPAA, if the business associate is found to be an agent of the covered entity. We have developed and utilize a HIPAA compliance plan as part of our effort to comply with HIPAA privacy and security requirements. The privacy regulations and security regulations have and will continue to impose significant costs on us in order to comply with these standards.

Covered entities must report breaches of unsecured protected health information to affected individuals without unreasonable delay, but not to exceed 60 days of discovery of the breach by the covered entity or its agents. Notification must also be made to HHS and, in certain situations involving large breaches, to the media. HHS is required to publish on its website a list of all covered entities that report a breach involving more than 500 individuals. All non-permitted uses or disclosures of unsecured protected health information are presumed to be breaches unless the covered entity or business associate establishes that there is a low probability the information has been compromised. Various state laws and regulations may also require us to notify affected individuals in the event of a data breach involving individually identifiable information.

Violations of the HIPAA privacy and security regulations may result in criminal penalties and in substantial civil penalties per violation. The civil penalties are adjusted annually based on updates to the consumer price index. HHS is required to perform compliance audits. In addition to enforcement by HHS, state attorneys general are authorized to bring civil actions seeking either injunction or damages in response to violations of HIPAA privacy and security regulations that threaten the privacy of state residents. HHS may resolve HIPAA violations through informal means, such as allowing a covered entity to implement a corrective action plan, but HHS has the discretion to move directly to impose monetary penalties and is required to impose penalties for violations resulting from willful neglect. Our facilities also are subject to any federal or state privacy-related laws that are more restrictive than the privacy regulations issued under HIPAA. These laws vary and could impose additional penalties. For example, the Federal Trade Commission uses its consumer protection authority to initiate enforcement actions in response to data breaches.

**Payment**

*Medicare.* Under the Medicare program, we are paid for inpatient and outpatient services performed by our hospitals.

Payments for inpatient acute services are generally made pursuant to a prospective payment system, commonly known as "PPS." Under PPS, our hospitals are paid a predetermined amount for each hospital discharge based on the patient's diagnosis. Specifically, each discharge is assigned to a diagnosis-related group, commonly known as a "DRG," based upon the patient's condition and treatment during the relevant inpatient stay. Each DRG is assigned a payment rate using 100% of the national average cost per case and 100% of the severity-adjusted DRG weights. DRG payments are based on national averages and not on charges or costs specific to a hospital. Severity-adjusted DRGs more accurately reflect the costs a hospital incurs for caring for a patient and account more fully for the severity of each patient's condition. However, DRG payments are adjusted by a predetermined geographic adjustment factor assigned to the geographic area in which the hospital is located. While a hospital generally does not receive payment in addition to a DRG payment, hospitals may qualify for an "outlier" payment when the relevant patient's treatment costs are extraordinarily high and exceed a specified regulatory threshold.

The DRG payment rates are adjusted by an update factor on October 1 of each year, the beginning of the federal fiscal year. The index used to adjust the DRG payment rates, known as the "market basket index," gives consideration to the inflation experienced by hospitals in purchasing goods and services. DRG payment rates were increased by the "market basket index" update of 2.7% for each of federal fiscal years 2017 and 2018, subject to certain reductions. For federal fiscal year 2017, the market basket update was reduced by 1.5% for documentation and coding, 0.3% for the multi-factor productivity adjustment, and 0.75% in accordance with the Affordable Care Act. There was a positive 0.8% adjustment to the market basket update remove the effects of prior adjustments intended to offset projected spending increases associated with admission and medical review

19

criteria for inpatient services commonly known as the "two midnight rule." Under the rule, services to Medicare beneficiaries are only payable as inpatient hospital services when there is a reasonable expectation that the hospital care is medically necessary and will be required across two midnights, absent unusual circumstances. For federal fiscal year 2018, the market basket update was positively adjusted by 0.46% in accordance with the 21st Century Cures Act, and reduced by 0.6% for the multi-factor productivity adjustment, reduced 0.75% in accordance with the Affordable Care Act, and reduced by 0.6% to remove the effects of prior adjustments related to the two midnight rule. A 25% reduction to the market basket index occurs if patient quality data is not submitted, and a reduction of 75% of the market basket index update occurs for hospitals that fail to demonstrate meaningful use of certified electronic health records, or EHR, technology without receiving a hardship exception. Future legislation may decrease the rate of increase for DRG payments or even decrease such payment rates, but we are unable to predict the amount of any reduction or the effect that any reduction will have on us.

The DRG payment rates are also adjusted to promote value-based purchasing, linking payments to quality and efficiency. First, hospitals that meet or exceed certain quality performance standards will receive greater reimbursement under CMS's value-based purchasing program, while hospitals that do not satisfy certain quality performance standards will receive reduced Medicare inpatient hospital payments. The amount collected from the reductions is pooled and used to fund the payments that reward hospitals based on a set of quality measures that have been linked to improved clinical processes of care and patient satisfaction. CMS scores each hospital on its achievement relative to other hospitals and improvement relative to that hospital's own past performance. Second, hospitals experiencing "excess readmissions" for conditions designated by CMS within 30 days from the patient's date of discharge will receive inpatient payments reduced by an amount determined by comparing that hospital's readmission performance to a risk-adjusted national average. Third, the 25% of hospitals with the worst national risk-adjusted hospital acquired condition, or HAC, rates in the previous year will have their total inpatient operating Medicare payments reduced by 1%. HHS has indicated that it will increase its efforts to promote, develop and use alternative payment models such as Accountable Care Organizations, or ACOs, and bundled payment arrangements.

In addition, hospitals may qualify for Medicare disproportionate share payments when their percentage of low income patients exceeds specified regulatory thresholds. A majority of our hospitals qualify to receive Medicare disproportionate share payments. CMS also distributes a prospectively determined amount to Medicare disproportionate share hospitals based on a hospital's relative share of uncompensated care. These uncompensated care payments are drawn from pool that is funded by the 75% reduction in disproportionate share payments that was made pursuant to the Affordable Care Act. The uncompensated care pool is further reduced each year by a formula that reflects reductions in the U.S. uninsured population that is under 65 years of age. Thus, the greater the level of coverage for the uninsured, the more the Medicare uncompensated care pool will be reduced. Each eligible hospital is paid, out of the uncompensated care pool, an amount based upon its estimated cost of providing uncompensated care. These Medicare disproportionate share and uncompensated care payments as a percentage of operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), remained consistent at 1.0% for both of the years ended December 31, 2017 and 2016. Hospitals may also qualify for Medicaid disproportionate share payments when they qualify under the state established guidelines. These Medicaid disproportionate share payments as a percentage of operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), remained consistent at 0.3% for both of the years ended December 31, 2017 and 2016. The Affordable Care Act also provided for reductions to the Medicaid disproportionate share payments, but Congress has delayed the implementation of those reductions until 2020.

We also receive Medicare reimbursement for hospital outpatient services through a PPS. Services paid under the hospital outpatient PPS are grouped into ambulatory payment classifications. APC payment rates are generally determined by applying a conversion factor, which CMS updates annually using a market basket. For calendar year 2017, CMS estimated an increase in hospital outpatient PPS payments of 1.7%. This was based on a market basket increase of 2.7%, with a 0.75% downward adjustment in accordance with the Affordable Care Act, a 0.3% downward productivity adjustment and other payment adjustments. For calendar year 2018, CMS

estimated an increase in hospital outpatient PPS payments of 1.4%. This reflects a market basket increase of 2.7%, with a 0.75% downward adjustment in accordance with the Affordable Care Act, a positive 0.6% productivity adjustment, and other policy changes. An additional 2.0% reduction to the market basket update applies to hospitals that do not submit required patient quality data. We are complying with this data submission requirement.

The Medicare reimbursement discussed above was reduced beginning in 2013 due to the Budget Control Act of 2011 that required across-the-board spending cuts to the federal budget, also known as sequestration. These sequestration cuts included reductions in payments for Medicare and other federally funded healthcare programs, including TRICARE. These reductions have been extended through 2027.

Payment under the Medicare program for physician services is based upon the Medicare Physician Fee Schedule, or MPFS, under which CMS has assigned a national relative value unit, or RVU, to most medical procedures and services that reflects the resources required to provide the services relative to all other services. Each RVU is calculated based on a combination of the time and intensity of work required, overhead expense attributable to the service, and malpractice insurance expense. These elements are each modified by a geographic adjustment factor to account for local practice costs and are then aggregated. MACRA provides for a 0.5% update to the MPFS for calendar year 2018. MACRA also requires the establishment of the Quality Payment Program, or QPP, a payment methodology intended to reward high-quality patient care. Beginning in 2017, physicians and certain other healthcare clinicians are required to participate in one of two QPP tracks. Under both tracks, performance data collected in 2017 will affect Medicare payments in 2019, and performance data collected in 2018 will affect Medicare payments in 2020. CMS expects to transition increasing financial risk to providers as QPP evolves. Under the Advanced Alternative Payment Model, or Advanced APM, track, incentive payments are available based on participation in specific innovative payment models approved by CMS. Providers may earn a Medicare incentive payment and will be exempt from the reporting requirements and payment adjustments imposed under the Merit-Based Incentive Payment System, or MIPS, if the provider has sufficient participation in an Advanced APM. Alternatively, providers may participate in the MIPS track, under which physicians will receive performance-based payment incentives or payment reductions based on their performance with respect to clinical quality, resource use, clinical improvement activities, and meaningful use of electronic health records, or EHR. MIPS consolidates components of certain previously established physician incentive programs.

*Medicaid.* Most state Medicaid payments are made under a PPS or under programs which negotiate payment levels with individual hospitals. Medicaid is funded jointly by state and federal government. The federal government and many states are considering various strategies to reduce Medicaid expenditures. Currently, several states utilize supplemental reimbursement programs intended to offset a portion of the costs to providers associated with providing care to Medicaid and indigent patients. These programs are designed with input from CMS and may be funded with a combination of state and federal resources, including, in certain instances, fees or taxes levied on the healthcare providers. Many states currently operate, or have applied to CMS to operate, Medicaid programs under waivers to standard Medicaid program requirements. CMS has indicated that it intends to increase state flexibility in the administration of Medicaid programs, including allowing states to condition enrollment on work or other community engagement. We can provide no assurance that changes to Medicaid programs or reductions to Medicaid funding will not have a material adverse effect on our consolidated results of operations.

*TRICARE.* TRICARE is the Department of Defense's healthcare program for members of the armed forces. For inpatient services, TRICARE generally reimburses hospitals based on a DRG system modeled on the Medicare inpatient PPS. For outpatient services, TRICARE reimburses hospitals based on a PPS that is similar to that utilized for services furnished to Medicare beneficiaries.

*Annual Cost Reports.* Hospitals participating in the Medicare and some Medicaid programs, whether paid on a reasonable cost basis or under a PPS, are required to meet specified financial reporting requirements. Federal

21

and, where applicable, state regulations require submission of annual cost reports identifying medical costs and expenses associated with the services provided by each hospital to Medicare beneficiaries and Medicaid recipients.

Annual cost reports required under the Medicare and some Medicaid programs are subject to routine governmental audits. These audits may result in adjustments to the amounts ultimately determined to be due to us under these reimbursement programs. Finalization of these audits often takes several years. Providers can appeal any final determination made in connection with an audit. DRG outlier payments have been and continue to be the subject of CMS audit and adjustment. The OIG is also actively engaged in audits and investigations into alleged abuses of the DRG outlier payment system.

*Commercial Insurance and Managed Care Companies.* Our hospitals provide services to individuals covered by private healthcare insurance or by health plans administered by managed care companies. These payors pay our hospitals or in some cases reimburse their policyholders based upon the hospital's established charges and the coverage provided in the insurance policy. They try to limit the costs of hospital services by negotiating discounts, including PPS, which would reduce payments by commercial insurers or health plans to our hospitals. Commercial insurers and managed care companies also seek to reduce payments to hospitals by establishing payment rules that in effect re-characterize the services ordered by physicians. For example, some payors vigorously review each patient's length of stay in the hospital and recharacterize as outpatient all inpatient stays of less than a particular duration (e.g., 24 hours). Reductions in payments for services provided by our hospitals to individuals covered by these payors could adversely affect us.

Under the Managed Medicare program, also known as Medicare Part C, or Medicare Advantage, the federal government contracts with private health plans to provide members with Medicare benefits. The plans may choose to offer supplemental benefits and impose higher premiums and cost-sharing obligations. Similarly, managed Medicaid programs enable states to contract with private entities to handle program responsibilities like care management and claims adjudication. Enrollment in Managed Medicare and managed Medicaid programs has increased in recent years as the federal and state governments seek to control healthcare costs.

*Medicare Administrative Contractors.* CMS competitively bids the Medicare fiscal intermediary and Medicare carrier functions to Medicare Administrative Contractors, or MACs, in 12 jurisdictions. Each MAC is geographically assigned and serves both Part A and Part B providers within a given jurisdiction. Chain providers had the option of having all hospitals use one home office MAC, and we chose to do so. However, CMS has not converted all of our hospitals to one MAC and currently does not have an established date to accomplish the conversion. CMS periodically re-solicits bids, and the MAC servicing a geographic area can change as a result of the bid competition. MAC transition periods can impact claims processing functions and the resulting cash flow.

*Medicare Integrity.* CMS contracts with third parties to promote the integrity of the Medicare program through review of quality concerns and detection of improper payments. Quality Improvement Organizations, or QIOs, for example, are groups of physicians and other healthcare quality experts which work on behalf of CMS to ensure that Medicare pays only for goods and services that are reasonable and necessary and that are provided in the most appropriate setting. Under the Recovery Audit Contractor, or RAC, program, CMS contracts with RACs nationwide to conduct post-payment reviews to detect and correct improper payments in the Medicare program, as required by statute. RACs review claims submitted to Medicare for billing compliance, including correct coding and medical necessity. Compensation for RACs is on a contingency basis and based upon the amount of overpayments and underpayments identified, if any. CMS limits the number of claims that RACs may audit by limiting the number of records that RACs may request from hospitals based on each provider's claim denial rate for the previous year.

The RAC program's scope also includes Medicaid claims. States may coordinate with Medicaid RACs regarding recoupment of overpayments and refer suspected fraud and abuse to appropriate law enforcement agencies. Under the Medicaid Integrity Program, CMS employs private contractors, referred to as Medicaid Integrity Contractors, or MICs, to perform reviews and post-payment audits of Medicaid claims and identify

22

overpayments. MICs are assigned to five geographic jurisdictions. Besides MICs, several other contractors and state Medicaid agencies have increased their review activities.

We maintain policies and procedures to respond to the RAC requests and payment denials. Payment recoveries resulting from RAC reviews and denials are appealable, and we pursue reversal of adverse determinations at appropriate appeal levels. Currently, there are significant delays in the assignment of new Medicare appeals to Administrative Law Judges. According to the Office of Medicare Hearings and Appeals, the average processing time in fiscal year 2017 was approximately three years. HHS has finalized rules intended to streamline the process and improve efficiency, but has also stressed the need for additional funding. Thus, we may experience significant delays in appealing any RAC payment denials. To ease the backlog of appeals, CMS has announced two new settlement initiatives. Depending upon the growth of RAC programs and our success in appealing claims in future periods, our cash flows and results of operations could be negatively impacted.

*Accountable Care Organizations.* With the aim of reducing healthcare costs by improving quality and operational efficiency, ACOs are gaining traction in both the public and private sectors. An ACO is a network of providers and suppliers (including hospitals, physicians and other designated professionals) which work together to invest in infrastructure and redesign delivery processes to achieve high quality and efficient delivery of services. ACOs are intended to produce savings as a result of improved quality and operational efficiency. Pursuant to the Affordable Care Act, HHS established a Medicare Shared Savings Program that seeks to promote accountability and coordination of care through the creation of ACOs. Medicare-approved ACOs that achieve quality performance standards established by HHS are eligible to share in a portion of the amounts saved by the Medicare program. HHS has significant discretion to determine key elements of ACO programs. Certain waivers are available from fraud and abuse laws for ACOs.

*Bundled Payment Initiatives.* The CMS Innovation Center is responsible for establishing demonstration projects and other initiatives in order to identify, develop, test and encourage the adoption of new methods of delivering and paying for healthcare that create savings under the Medicare and Medicaid programs, while maintaining or improving quality of care. For example, providers participating in bundled payment initiatives accept accountability for costs and quality of care by agreeing to receive one payment for services provided to Medicare patients for certain medical conditions or episodes of care. By rewarding providers for increasing quality and reducing costs and penalizing providers if costs exceed a certain amount, bundled payment models are intended to lead to higher quality, more coordinated care at a lower cost to the Medicare program. The CMS Innovation Center has implemented a voluntary bundled payment program known as the Bundled Payment for Care Improvement, or BPCI, initiative. We are participating in BPCI initiatives in four of our markets. Participation in bundled payment programs is generally voluntary, but CMS requires hospitals located in certain geographic areas to participate in bundling programs for specified orthopedic procedures. CMS has indicated that it is developing more bundled payment models. We expect value-based purchasing programs, including models that condition reimbursement on patient outcome measures, to become more common with both governmental and non-governmental payors.

## Supply Contracts

We purchase items, primarily medical supplies, medical equipment and pharmaceuticals, under an agreement with HealthTrust, a GPO in which we are a noncontrolling partner. As of December 31, 2017, we had a 19.7% ownership interest in HealthTrust. By participating in this organization, we are able to procure items at competitively priced rates for our hospitals. There can be no assurance that our arrangement with HealthTrust will continue to provide the discounts that we have historically received.

## Competition

The hospital industry is highly competitive. The competition among hospitals and other healthcare providers for patients has intensified as patients have become more conscious of rising costs and quality of care in the healthcare decision-making process. Certain of our hospitals are located in non-urban service areas in which we

are the sole provider of general acute care health services. Those hospitals in non-urban service areas face no direct competition because there are no other hospitals in their primary service areas. However, these hospitals face competition from hospitals outside of their primary service area, including hospitals in urban areas that provide more complex services. Patients in those service areas may travel to these other hospitals for a variety of reasons, including the need for services we do not offer or physician referrals. Patients who are required to seek services from these other hospitals may subsequently shift their preferences to those hospitals for services we do provide. Our other hospitals in selected urban service areas may face competition from hospitals that are more established than our hospitals. Certain of these competing facilities offer services, including extensive medical research and medical education programs, which are not offered by our facilities. In addition, in certain markets where we operate, there are large teaching hospitals that provide highly specialized facilities, equipment and services that may not be available at our hospitals. We also face competition from other specialized care providers, including outpatient surgery, orthopedic, oncology and diagnostic centers. Some competitors are implementing physician alignment strategies, such as employing physicians, acquiring physician practice groups, and participating in ACOs, or other clinical integration models. Cost-reduction strategies by large employer groups and their affiliates may increase this competition. We believe that we will continue to face increased competition in outpatient service models that become more integrated through acquisitions or partnerships between physicians, specialized care providers, and managed care payors.

In most markets in which we are not the sole provider of general acute care health services, our primary competitor is a not-for-profit hospital. These hospitals are owned by tax-supported governmental agencies or not-for-profit entities supported by endowments and charitable contributions. These hospitals do not pay income or property taxes, and can make capital expenditures without paying sales tax. These financial advantages may better position such hospitals to maintain more modern and technologically upgraded facilities and equipment and offer services more specialized than those available at our hospitals. Recent consolidations of not-for-profit hospitals may intensify competitive pressures.

The number and quality of the physicians on a hospital's staff is an important factor in a hospital's competitive position. Physicians decide whether a patient is admitted to the hospital and the procedures to be performed. Admitting physicians may be on the medical staffs of other hospitals in addition to those of our hospitals. We attempt to attract our physicians' patients to our hospitals by offering quality services and facilities, convenient locations and state-of-the-art equipment. In addition, CMS publicizes on its Hospital Compare website data that hospitals submit in connection with Medicare reimbursement claims, including performance data related to quality measures and patient satisfaction surveys. Federal law provides for the future expansion of the number of quality measures that must be reported. Additional quality measures and other future trends toward clinical transparency may have a potential impact on our competitive position and patient volumes in ways that we are unable to predict. In addition, hospitals must either make public a list of their standard charges, or their policies for allowing the public to view a list of these charges in response to an inquiry.

**Compliance Program**

We take an operations team approach to compliance and utilize corporate experts for program design efforts and facility leaders for employee-level implementation. We believe compliance is another area that demonstrates our utilization of standardization and centralization techniques and initiatives which yield efficiencies and consistency throughout our facilities. We recognize that our compliance with applicable laws and regulations depends on individual employee actions as well as company operations. Our approach focuses on integrating compliance responsibilities with operational functions. This approach is intended to reinforce our company-wide commitment to operate strictly in accordance with the laws and regulations that govern our business.

Our company-wide compliance program has been in place since 1997. Currently, the program's elements include leadership, management and oversight at the highest levels, a Code of Conduct, risk area specific policies and procedures, employee education and training, an internal system for reporting concerns, auditing and monitoring programs and a means for enforcing the program's policies.

24

The compliance program continues to be expanded and developed to meet the industry's expectations and our needs. Specific written policies, procedures, training and educational materials and programs, as well as auditing and monitoring activities, have been prepared and implemented to address the functional and operational aspects of our business. Included within these functional areas are materials and activities for business sub-units, including laboratory, radiology, pharmacy, emergency, surgery, observation, home care, skilled nursing and clinics. Specific areas identified through regulatory interpretation and enforcement activities have also been addressed in our program. Claims preparation and submission, including coding, billing and cost reports, comprise the bulk of these areas. Financial arrangements with physicians and other referral sources, including compliance with the federal anti-kickback statute and the Stark Law, emergency department treatment and transfer requirements and other patient disposition issues, are also the focus of policy and training, standardized documentation requirements and review and audit. Another focus of the program is the interpretation and implementation of the HIPAA standards for privacy and security.

We have a Code of Conduct which applies to all directors, officers, employees and consultants, and a confidential disclosure program to enhance the statement of ethical responsibility expected of our employees and business associates who work in the accounting, financial reporting and asset management areas of our Company. Our Code of Conduct is posted on our website at www.chs.net/company-overview/code-of-conduct.

*Corporate Integrity Agreement*

On August 4, 2014, we announced that we had entered into a civil settlement with the U.S. Department of Justice, other federal agencies and identified relators that concluded previously announced investigations and litigation related to short stay admissions through emergency departments at certain of our affiliated hospitals. See the "Legal Proceedings" discussion in Part II, Item 1 of our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2014 for further discussion of the background of this matter and details of the settlement. In addition to the amounts paid in the settlement, we executed a five-year Corporate Integrity Agreement, or CIA, with the OIG that has been incorporated into our existing and comprehensive compliance program.

The compliance measures and reporting and auditing requirements contained in the CIA include:

- continuing the duties and activities of our Corporate Compliance Officer, Corporate Compliance Work Group, and Facility Compliance Officers and committees;

- maintaining our written Code of Conduct, which sets forth our commitment to full compliance with all statutes, regulations, and guidelines applicable to federal healthcare programs;

- maintaining our written policies and procedures addressing the operation of our Compliance Program, including adherence to medical necessity and admissions standards for inpatient hospital stays;

- continuing our general compliance training;

- providing specific training for appropriate personnel on billing, case management and clinical documentation;

- engaging an independent third party to perform an annual review of our compliance with the CIA;

- continuing our Confidential Disclosure Program and hotline to enable employees or others to disclose issues or questions regarding possible inappropriate policies or behavior;

- enhancing our screening program to ensure that we do not hire or engage employees or contractors who are ineligible persons for federal healthcare programs;

- reporting any material deficiency which resulted in an overpayment to us by a federal healthcare program; and

25

- submitting annual reports to the OIG which describe in detail the operations of our corporate Compliance Program for the past year.

Material, uncorrected violations of the CIA could lead to our suspension or disbarment from participation in Medicare, Medicaid and other federal and state healthcare programs and repayment obligations. In addition, we are subject to possible civil penalties for failure to substantially comply with the terms of the CIA, including stipulated penalties ranging from $1,000 to $2,500 per day. We are also subject to a stipulated penalty of $50,000 for each false certification made by us or on our behalf in connection with reports required under the CIA. The CIA increases the amount of information we must provide to the federal government regarding our healthcare practices and our compliance with federal regulations. The reports we provide in connection with the CIA could result in greater scrutiny by regulatory authorities. We believe our existing Compliance Program addresses compliance with the operational terms of the CIA.

**Employees and Medical Staff**

At December 31, 2017, we had approximately 95,000 employees, including approximately 18,000 part-time employees. References herein to "employees" refer to employees of our affiliates. We are subject to various state and federal laws that regulate wages, hours, benefits and other terms and conditions relating to employment. At December 31, 2017, certain employees at 11 of our hospitals are represented by various labor unions. It is likely that union organizing efforts will take place at additional hospitals in the future. We consider our employee relations to be good and have not experienced work stoppages that have materially, adversely affected our business or results of operations. Our hospitals, like most hospitals, have experienced rising labor costs. In some markets, nurse and medical support personnel availability has become a significant operating issue to healthcare providers. To address this challenge, we have implemented several initiatives to improve retention, recruiting, compensation programs and productivity.

Our hospitals are staffed by licensed physicians, including both employed physicians and physicians who are not employees of our hospitals. Some physicians provide services in our hospitals under contracts, which generally describe a term of service, provide and establish the duties and obligations of such physicians, require the maintenance of certain performance criteria and fix compensation for such services. Any licensed physician may apply to be accepted to the medical staff of any of our hospitals, but the hospital's medical staff and the appropriate governing board of the hospital, in accordance with established credentialing criteria, must approve acceptance to the staff. Members of the medical staffs of our hospitals often also serve on the medical staffs of other hospitals and may terminate their affiliation with one of our hospitals at any time.

We may be required to continue to enhance wages and benefits to recruit and retain nurses and other medical support personnel or to hire more expensive temporary or contract personnel. As a result, our labor costs could increase. We also depend on the available labor pool of semi-skilled and unskilled employees in each of the markets in which we operate. Certain proposed changes in federal labor laws and the National Labor Relations Board's pending modification of its election procedures could increase the likelihood of employee unionization attempts. To the extent a significant portion of our employee base unionizes, our costs could increase significantly. In addition, the states in which we operate could adopt mandatory nurse-staffing ratios or could reduce mandatory nurse-staffing ratios already in place. State-mandated nurse-staffing ratios could significantly affect labor costs, and have an adverse impact on revenues if we are required to limit patient admissions in order to meet the required ratios.

**Professional Liability Claims**

As part of our business of owning and operating hospitals, we are subject to legal actions alleging liability on our part. To cover claims arising out of the operations of hospitals, we maintain professional malpractice liability insurance and general liability insurance on a claims made basis in excess of those amounts for which we are self-insured, in amounts we believe to be sufficient for our operations. We also maintain umbrella liability coverage for claims which, due to their nature or amount, are not covered by our other insurance policies.

26

Case 3:19-cv-00461   Document 67-2   Filed 03/23/20   Page 29 of 53 PageID #: 809

However, our insurance coverage does not cover all claims against us or may not continue to be available at a reasonable cost for us to maintain adequate levels of insurance. For a further discussion of our insurance coverage, see our discussion of professional liability claims in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of this Form 10-K.

**Environmental Matters**

We are subject to various federal, state and local laws and regulations governing the use, discharge and disposal of hazardous materials, including medical and pharmaceutical waste products. We do not currently expect compliance with these laws and regulations to have a material adverse effect on us. It is possible, however, that environmental issues may arise in the future which we cannot now predict.

We are insured for damages of personal property or environmental injury arising out of environmental impairment for both above ground and underground storage tank issues under one insurance policy for all of our hospitals. Our policy coverage is $5 million per occurrence with a $100,000 deductible and a $20 million annual aggregate. This policy also provides pollution legal liability coverage.

**Item 1A.** *Risk Factors*

*Our business faces a variety of risks. If any of the events or circumstances described in any of the following risk factors occurs, our business, results of operations or financial condition could be materially and adversely affected, and our actual results may differ materially from those predicted in any forward-looking statements we make in any public disclosures. Additional factors that could affect our business, results of operations and financial condition are discussed elsewhere in this Report (including in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of this Form 10-K). Additional risks or uncertainties not presently known to us, or that we currently deem immaterial, also may adversely affect our business, results of operations and financial condition.*

**Our level of indebtedness could adversely affect our ability to refinance existing indebtedness or raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting our obligations under the agreements related to our indebtedness.**

We have a significant amount of indebtedness, which is more fully described in the Liquidity and Capital Resources section of "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of this Form 10-K and Note 7 of the Notes to Consolidated Financial Statements included under Part II, Item 8 of this Form 10-K. As of December 31, 2017, we had approximately $7.5 billion aggregate principal amount of senior secured indebtedness outstanding, and approximately $6.4 billion of senior unsecured indebtedness outstanding.

Our substantial leverage could have important consequences, including the following:

- it may limit our ability to refinance existing indebtedness or obtain additional debt or equity financing for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes;

- a substantial portion of our cash flows from operations will be dedicated to the payment of principal and interest on our indebtedness and will not be available for other purposes, including to fund our operations, capital expenditures, financial obligations and future business opportunities;

- some of our borrowings, including borrowings under our credit facility, accrue interest at variable rates, exposing us to the risk of increased interest rates;

- it may limit our ability to make strategic acquisitions or cause us to make nonstrategic divestitures;

27

- it may limit our ability to adjust to changing market conditions and place us at a competitive disadvantage compared to our competitors that are less highly leveraged; and

- it may increase our vulnerability in connection with adverse changes in general economic, industry or competitive conditions or government regulations or other adverse developments.

***We may not be able to generate sufficient cash to service all of our indebtedness, and we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.***

Our ability to make scheduled payments on or to refinance our indebtedness depends on our financial and operating performance, which is subject to prevailing economic and competitive conditions and to financial, business, regulatory and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness.

In addition, we are a holding company with no direct operations. Our principal assets are the equity interests we hold in our operating subsidiaries. As a result, we are dependent upon dividends and other payments from our subsidiaries to generate the funds necessary to meet our outstanding debt service and other obligations. Our subsidiaries may not generate sufficient cash from operations to enable us to make principal and interest payments on our indebtedness. In addition, any payments of dividends, distributions, loans or advances to us by our subsidiaries are subject to certain legal and contractual restrictions, including under our credit facility and indentures.

We may find it necessary or prudent to refinance certain of our outstanding indebtedness, the terms of which may not be favorable to us. Our ability to refinance our indebtedness on favorable terms, or at all, is directly affected by the then current general economic and financial conditions. In addition, our ability to incur secured indebtedness (which would generally enable us to achieve better pricing than the incurrence of unsecured indebtedness) depends in part on the value of our assets, which depends, in turn, on the strength of our cash flows and results of operations, and on economic and market conditions and other factors.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and may be forced to reduce or delay capital expenditures, sell assets or operations, seek additional capital or restructure or refinance our indebtedness. We cannot assure you that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled debt service obligations or that these actions would be permitted under the terms of our existing or future debt agreements, including our credit facility and the indentures governing our outstanding notes. For example, our credit facility and the indentures governing our outstanding notes restrict our ability to dispose of assets and use the proceeds from any dispositions. We may not be able to consummate those dispositions and any proceeds we receive may not be adequate to meet any debt service obligations then due.

***Restrictive covenants in the agreements governing our indebtedness may adversely affect us.***

Our credit facility and the indentures governing our outstanding notes contain various covenants that limit our ability to take certain actions, including our ability to:

- incur, assume or guarantee additional indebtedness;

- issue redeemable stock and preferred stock;

- repurchase capital stock;

- make restricted payments, including paying dividends and making certain loans, acquisitions and investments;

28

- redeem debt that is subordinated in right of payment to our outstanding notes;

- create liens;

- sell or otherwise dispose of assets, including capital stock of subsidiaries;

- impair the security interests;

- enter into agreements that restrict dividends and certain other payments from subsidiaries;

- merge, consolidate, sell or otherwise dispose of substantially all our assets;

- enter into transactions with affiliates; and

- guarantee certain obligations.

In addition, our credit facility contains restrictive covenants and requires us to maintain specified financial ratios and satisfy other financial condition tests. Our ability to meet these restrictive covenants and financial ratios and tests may be affected by events beyond our control, and we cannot assure you that we will meet those tests.

A breach of any of these covenants could result in a default under our credit facility and the indentures governing our outstanding notes. Upon the occurrence of an event of default under our credit facility or any of the indentures governing our outstanding notes, all amounts outstanding under our credit facility or the applicable indenture may become immediately due and payable and all commitments under the credit facility to extend further credit may be terminated.

***Our variable rate indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly.***

Our borrowings under our credit facility are at variable rates of interest and expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same, and our net income would decrease. Our interest expense, net, for the year ended December 31, 2017 was $931 million. For the year ended December 31, 2017, a fluctuation in interest rates of 1% on our variable rate debt that is not hedged by interest rate swaps would have resulted in a fluctuation in our interest expense of approximately $27 million.

***If we are unable to make payments on our indebtedness, we could be in default under the terms of the agreements governing our indebtedness.***

If we are unable to generate sufficient cash flow and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we otherwise fail to comply with the various covenants, including financial and operating covenants, in the instruments governing our indebtedness, including covenants in the indentures governing our outstanding notes and our credit facility, we could be in default under the terms of the agreements governing our indebtedness, including our credit facility and the indentures governing our outstanding notes. In the event of any default, the holders of this indebtedness could elect to declare all the funds borrowed to be immediately due and payable, together with accrued and unpaid interest; the lenders under our credit facility could elect to terminate their commitments under the credit facility, cease making further loans and direct the collateral agent to institute foreclosure proceedings against our assets; and we could be forced into bankruptcy or liquidation. If our operating performance declines, we may in the future need to obtain waivers from the required lenders under our credit facility to avoid being in default. If we breach our covenants under our credit facility and seek a waiver, we may not be able to obtain a waiver from the required lenders. If this occurs, we would be in default under our credit facility, the lenders could exercise their rights, as described above, and we could be forced into bankruptcy or liquidation.

29

*We have a substantial amount of indebtedness that will mature and become due in the near future.*

As further described in the Liquidity and Capital Resources section of "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of this Form 10-K and Note 7 of the Notes to Consolidated Financial Statements included under Part II, Item 8 of this Form 10-K, we have a substantial amount of indebtedness scheduled to mature in the near future. As a result, we may not have sufficient cash to repay all amounts owing on our outstanding notes, our credit facility (or any of the various term and revolving loans outstanding thereunder) and our receivables facility at the applicable maturity date. Given that each series of outstanding notes, our credit facility and our receivables facility will mature in close proximity to each other, there can be no assurance that we will have the ability to borrow or otherwise raise the amounts necessary to repay all such amounts. Our ability to refinance our indebtedness on favorable terms, or at all, is dependent on (among other things) conditions in the credit and capital markets which are beyond our control.

*Despite current indebtedness levels, we may still be able to incur substantially more debt. This could further exacerbate the risks described above.*

We and our subsidiaries have the ability to incur substantial additional indebtedness in the future, subject to restrictions contained in our credit facility and the indentures governing our outstanding notes. Our credit facility as well as a separate receivables facility provide for commitments and borrowings of up to approximately $4.4 billion in the aggregate, of which approximately $3.5 billion was outstanding as of December 31, 2017. Our credit facility also gives us the ability to provide for one or more additional tranches of term loans and increases in our revolving credit facility in the aggregate principal amount of up to the greater of (x) $1.5 billion (only $1.0 billion of which is effectively available) and (y) an amount such that our senior secured net leverage ratio would not exceed 4.0:1.0 without the consent of the existing lenders if specified criteria are satisfied. If additional indebtedness is added to our current debt levels, the related risks that we currently face related to indebtedness as noted above could increase.

*If we are unable to continue to complete divestitures as previously disclosed, our results of operations and financial condition could be adversely affected.*

We have been implementing a portfolio rationalization and deleveraging strategy by divesting hospitals and non-hospital businesses that are attractive to strategic and other buyers. Generally, these businesses are not in one of our strategically beneficial service areas, are less complementary to our business strategy and/or have lower operating margins. In addition, in connection with our announced divestiture initiative, strategic and other buyers have made offers to buy certain of our assets. Through consideration of these offers we have divested or may divest hospitals and non-hospital businesses when we find such offers to be attractive and in line with our operating strategy. However, there is no assurance that these contemplated divestitures will be completed, will be completed within our contemplated timeframe, or will be completed on terms favorable to us or on terms sufficient to allow us to achieve our deleveraging strategy. Additionally, the results of operations for these hospitals we plan to divest and the potential gains or losses on the sales of those businesses may adversely affect our profitability. Moreover, we may incur asset impairment charges related to divestitures that reduce our profitability.

In addition, after entering into a definitive agreement, we may be subject to the satisfaction of pre-closing conditions as well as necessary regulatory and governmental approvals, which, if not satisfied or obtained, may prevent us from completing the sale. Divestitures may also involve continued financial exposure related to the divested business, such as through indemnities or retained obligations, that present risk to us.

30

Our planned divestiture activities may present financial, managerial, and operational risks. Those risks include diversion of management attention from improving existing operations; additional restructuring charges and the related impact from separating personnel, renegotiating contracts, and restructuring financial and other systems; adverse effects on existing business relationships with patients and third-party payors; and the potential that the collectability of any patient accounts receivable retained from any divested hospital may be adversely impacted. Any of these factors could adversely affect our financial condition and results of operations.

*We are the subject of various legal, regulatory and governmental proceedings that, if resolved unfavorably, could have an adverse effect on us, and we may be subject to other loss contingencies, both known and unknown.*

We are a party to various legal, regulatory and governmental proceedings and other related matters. Those proceedings include, among other things, government investigations. In addition, we are and may become subject to other loss contingencies, both known and unknown, which may relate to past, present and future facts, events, circumstances and occurrences. Should an unfavorable outcome occur in connection with our legal, regulatory or governmental proceedings or other loss contingencies, or if we become subject to any such loss contingencies in the future, there could be an adverse impact on our financial position, results of operations and liquidity. Moreover, costs associated with HMA's legal proceedings and other loss contingencies may be greater than expected, and could exceed the amount of any reduction in payment under the contingent value rights, or CVRs, issued in the HMA merger to HMA stockholders.

In particular, government investigations, as well as qui tam lawsuits, may lead to significant fines, penalties, damages payments or other sanctions, including exclusion from government healthcare programs. Settlements of lawsuits involving Medicare and Medicaid issues routinely require both monetary payments and corporate integrity agreements, each of which could have an adverse effect on our business, financial condition, results of operations and/or cash flows.

*The impact of past acquisitions, as well as potential future acquisitions, could have a negative effect on our operations.*

Our business strategy has historically included growth by acquisitions. However, not-for-profit hospital systems and other for-profit hospital companies generally attempt to acquire the same type of hospitals as we do. LifePoint Health, Inc. is a principal competitor for acquisitions. Other competitors include HCA Holdings, Inc., or HCA, UHS, other non-public, for profit hospitals and local market hospitals. Some of the competitors for our acquisitions have greater financial resources than we have. Furthermore, some hospitals are sold through an auction process, which may result in higher purchase prices than we believe are reasonable. Therefore, we may not be able to acquire additional hospitals on terms favorable to us.

In addition, many of the hospitals we have acquired have had lower operating margins than we do and operating losses incurred prior to the time we acquired them. Hospitals acquired in the future may have similar financial performance issues. In the past, we have experienced delays in improving the operating margins or effectively integrating the operations of certain acquired hospitals, including some hospitals acquired in connection with the HMA merger. In the future, if we are unable to improve the operating margins of acquired hospitals, operate them profitably, or effectively integrate their operations, our results of operations and business may be adversely affected.

Moreover, hospitals that we have acquired, or in the future could acquire, may have unknown or contingent liabilities, including liabilities associated with ongoing legal proceedings or for failure to comply with healthcare laws and regulations. Although we generally seek indemnification from sellers covering these matters, we may nevertheless have material liabilities for past activities of acquired hospitals.

31

*State efforts to regulate the construction, acquisition or expansion of healthcare facilities could limit our ability to build or acquire additional healthcare facilities, renovate our facilities or expand the breadth of services we offer.*

Some states in which we operate require a CON or other prior approval for the construction or acquisition of healthcare facilities, capital expenditures exceeding a prescribed amount, changes in bed capacity or services and some other matters. In evaluating a proposal, these states consider the need for additional or expanded healthcare facilities or services. If we are not able to obtain required CONs or other prior approvals, we will not be able to acquire, operate, replace or expand our facilities or expand the breadth of services we offer. Furthermore, if a CON or other prior approval upon which we relied to invest in construction of a replacement or expanded facility were to be revoked or lost through an appeal process, we may not be able to recover the value of our investment.

*State efforts to regulate the sale of hospitals operated by municipal or not-for-profit entities could prevent us from acquiring these types of hospitals.*

Many states have adopted legislation regarding the sale or other disposition of hospitals operated by municipal or not-for-profit entities. In some states that do not have specific legislation, the attorneys general have demonstrated an interest in these transactions under their general obligation to protect the use of charitable assets. These legislative and administrative efforts focus primarily on the appropriate valuation of the assets divested and the use of the proceeds of the sale by the non-profit seller. While these review and, in some instances, approval processes can add additional time to the closing of a hospital acquisition, we have not had any significant difficulties or delays in completing acquisitions. However, future state actions could delay or even prevent our ability to acquire hospitals once we return to our acquisition strategy.

*If we are unable to effectively compete for patients, local residents could use other hospitals and healthcare providers.*

The healthcare industry is highly competitive among hospitals and other healthcare providers for patients, affiliations with physicians and acquisitions. However, the majority of our hospitals are located in non-urban service areas where we believe we are the sole provider of general acute care health services. As a result, the most significant competition our hospitals face comes from hospitals outside of our primary service areas, typically hospitals in urban areas that provide more complex services. Patients in our primary service areas may travel to other hospitals because of physician referrals or their need for services we do not offer, among other reasons. Patients who receive services from these other hospitals may subsequently shift their preferences to those hospitals for the services we provide. Other healthcare providers, including outpatient surgery, orthopedic, oncology and diagnostic centers, also compete for patients. Our hospitals, our competitors, and other healthcare industry participants are increasingly implementing physician alignment strategies, such as acquiring physician practice groups, employing physicians and participating in ACOs or other clinical integration models, which may impact our competitive position. In addition, increasing consolidation within the payor industry, vertical integration efforts involving payors and healthcare providers, and cost-reduction strategies by large employer groups and their affiliates may impact our ability to contract with payors on favorable terms and otherwise affect our competitive position.

At December 31, 2017, 56 of our hospitals competed with more than one other hospital in their respective primary service areas. In most markets in which we are not the sole provider of general acute care health services, our primary competitor is a municipal or not-for-profit hospital. These hospitals are owned by tax-supported governmental agencies or not-for-profit entities supported by endowments and charitable contributions. They do not pay income or property taxes, and can make capital expenditures without paying sales tax. These financial advantages may better position these hospitals to maintain more modern and technologically upgraded facilities and equipment and offer services more specialized than those available at our hospitals. If our competitors are better able to attract patients with these offerings, we may experience an overall decline in patient volume.

32

Trends toward clinical transparency and value-based purchasing may have an unanticipated impact on our competitive position and patient volumes. The CMS Hospital Compare website makes available to the public certain data that hospitals submit in connection with Medicare reimbursement claims, including performance data related to quality measures and patient satisfaction surveys. Further, every hospital must establish and update annually a public listing of the hospital's standard charges for items and services or publish its policies for allowing the public to view a list of these charges in response to an inquiry. If any of our hospitals achieve poor results (or results that are lower than our competitors) on these quality measures or on patient satisfaction surveys, or if our standard charges are higher than our competitors, we may attract fewer patients.

We expect these competitive trends to continue. If we are unable to compete effectively with other hospitals and other healthcare providers, local residents may seek healthcare services at providers other than our hospitals and affiliated businesses.

### *The failure to obtain our medical supplies at favorable prices could cause our operating results to decline.*

We have a participation agreement with HealthTrust, a GPO. The current term of this agreement expires in January 2019, with automatic renewal terms of one year unless either party terminates by giving notice of non-renewal. GPOs attempt to obtain favorable pricing on medical supplies with manufacturers and vendors, sometimes by negotiating exclusive supply arrangements in exchange for discounts. To the extent these exclusive supply arrangements are challenged or deemed unenforceable, we could incur higher costs for our medical supplies obtained through HealthTrust. Further, costs of supplies and drugs may continue to increase due to market pressure from pharmaceutical companies and new product releases. Higher costs could continue to adversely impact our operating results. Also, there can be no assurance that our arrangement with HealthTrust will provide the discounts we expect to achieve.

### *If the fair value of our reporting units declines, a material non-cash charge to earnings from impairment of our goodwill could result.*

At December 31, 2017, we had approximately $4.7 billion of goodwill. We expect to recover the carrying value of this goodwill through our future cash flows. On an ongoing basis, under U.S. GAAP, we evaluate, based on the fair value of our reporting units, whether the carrying value of our goodwill is impaired when events or changes in circumstances indicate that such carrying value may not be recoverable. U.S. GAAP requires us to test goodwill for impairment at least annually.

During the three months ended December 31, 2017, in connection with the preparation of the financial statements included in this Form 10-K, we identified certain indicators of impairment and performed an interim goodwill impairment evaluation as of November 30, 2017. Those indicators were primarily a further decline in our market capitalization and fair value of our long-term debt during November 2017. We performed an estimated calculation of fair value in step one of the impairment test, which indicated that the carrying value of our hospital operations reporting unit exceeded its fair value. As further discussed in the footnotes to the consolidated financial statements, during the three months ended December 31, 2017 we early adopted the accounting guidance in ASU 2017-04, which eliminates the step two calculation to determine the implied value of goodwill, and instead requires an impairment of goodwill equal to the difference between the carrying value and estimated fair value of the reporting unit determined in step one. As a result of this evaluation and the early adoption of ASU 2017-04, we recorded a non-cash impairment charge of $1.419 billion to goodwill during the three months ended December 31, 2017.

In addition, during the three months ended June 30, 2016, we identified certain indicators of impairment requiring an interim goodwill impairment evaluation. Those indicators were primarily the decline in our market capitalization and fair value of long-term debt during the three months ended June 30, 2016, and a decline in our projected future earnings. We performed an estimated calculation of fair value in step one of the impairment test at June 30, 2016, which indicated that the carrying value of our hospital operations reporting unit exceeded its fair value, which calculation was updated during the three months ended September 30, 2016. In addition, a step

33

two calculation was performed to determine the implied value of goodwill in a hypothetical purchase price allocation. Based on these analyses, we recorded a non-cash impairment charge of $1.395 billion to goodwill during the year ended December 31, 2016 based on the fair value and resulting implied goodwill at that time.

The testing of goodwill for impairment requires us to make significant estimates about our future performance and cash flows, as well as other assumptions related to our cost of capital and other factors impacting our fair value models. These estimates can be affected by various factors, including changes in economic, industry or other market assumptions, changes in our business operations, estimates of future revenue and expenses, estimated marked multiples, expected capital expenditures, potential changes in our stock price and market capitalization, and the fair value of our long-term debt. Changes in these factors, or changes in our actual performance compared with our estimates of future projections, could affect our calculation of the fair value of our reporting units, which could result in a material impairment charge to goodwill and a material non-cash charge to earnings during the period in which the impairment is determined.

***A significant decline in operating results or other indicators of impairment at one or more of our facilities could result in a material, non-cash charge to earnings to impair the value of long-lived assets.***

Our operations are capital intensive and require significant investment in long-lived assets, such as property, equipment and other long-lived intangible assets, including capitalized internal-use software. If one of our facilities experiences declining operating results or is adversely impacted by one or more of these risk factors, we may not be able to recover the carrying value of those assets through our future operating cash flows. On an ongoing basis, we evaluate whether changes in future undiscounted cash flows reflect an impairment in the fair value of our long-lived assets. Additionally, as we continue to rationalize our portfolio of hospitals, we evaluate whether a hospital or a group of hospitals is impaired based on an analysis of the selling price from a definitive agreement compared to the carrying value of the net assets being sold. If the carrying value of our long-lived assets is impaired, we may incur a material non-cash charge to earnings.

***We are unable to predict the ultimate impact of health reform initiatives, including the Affordable Care Act, and our business may be adversely affected if the Affordable Care Act is repealed entirely or if provisions benefitting our operations are significantly modified.***

In recent years, the U.S. Congress and certain state legislatures have introduced and passed a large number of proposals and legislation designed to make major changes in the healthcare system, including changes intended to increase access to health insurance. The most prominent of these efforts, the Affordable Care Act, affects how healthcare services are covered, delivered, and reimbursed. The Affordable Care Act mandates that substantially all U.S. citizens maintain health insurance coverage, expands health insurance coverage through a combination of public program expansion and private sector health insurance reforms, reduces Medicare reimbursement to hospitals, and promotes value-based purchasing. However, in December 2017, tax reform legislation was enacted that eliminates the financial penalty for individuals that fail to maintain insurance coverage associated with the individual mandate, effective January 2019. We are unable to determine the impact of this change, but it could have an adverse effect on us.

Further, efforts by the presidential administration and certain members of Congress to repeal or make significant changes to the Affordable Care Act, its implementation and/or its interpretation have cast considerable uncertainty on the future of the law. For example, a presidential executive order has been signed that directs agencies to minimize "economic and regulatory burdens" of the Affordable Care Act. In addition, CMS administrators have indicated that they intend to grant states additional flexibility in the administration of state Medicaid programs, including by expanding the scope of waivers under which states may impose different eligibility or enrollment restrictions or otherwise implement programs that vary from federal standards. There is uncertainty regarding whether, when, and how the Affordable Care Act will be further changed, what alternative provisions, if any, will be enacted, the timing of enactment and implementation of alternative provisions, the impact of alternative provisions on providers as well as other healthcare industry participants, and how the law will be interpreted and implemented. Changes by Congress or government agencies could eliminate or alter

34

provisions beneficial to us while leaving in place provisions reducing our reimbursement. Government efforts to repeal or change the Affordable Care Act or implement other reform initiatives may have an adverse effect on our business, results of operations, cash flow, capital resources and liquidity. Other industry participants, such as private payors and large employer groups and their affiliates, may also introduce financial or delivery system reforms. We are unable to predict the nature and success of such initiatives.

***If reimbursement rates paid by federal or state healthcare programs or commercial payors are reduced, if we are unable to maintain favorable contract terms with payors or comply with our payor contract obligations, if insured individuals move to insurance plans with greater coverage exclusions or narrower networks, or if insurance coverage is otherwise restricted or reduced, our net operating revenues may decline.***

In 2017, 33.1% of our operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), came from the Medicare and Medicaid programs. However, as federal healthcare expenditures continue to increase and state governments continue to face budgetary shortfalls, federal and state governments have made, and continue to make, significant changes in the Medicare and Medicaid programs. These changes include reductions in reimbursement levels and to supplemental payment programs, like disproportionate share hospital programs, as well as new or modified demonstration projects authorized pursuant to Medicaid waivers. Some of these changes have decreased, or could decrease, the amount of money we receive for our services relating to these programs.

In addition, government and commercial payors as well as other third parties from whom we receive payment for our services attempt to control healthcare costs by, for example, requiring hospitals to discount payments for their services in exchange for exclusive or preferred participation in their benefit plans, restricting coverage through utilization review, reducing coverage of inpatient services and shifting care to outpatient settings, requiring prior authorizations, and implementing alternative payment models. The ability of commercial payors to control healthcare costs using these measures may be enhanced by the increasing consolidation of insurance and managed care companies and vertical integration of health insurers with healthcare providers.

In 2017, 54.3% of our operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), came from commercial payors. Our contracts with payors require us to comply with a number of terms related to the provision of services and billing for services. If we are unable to negotiate increased reimbursement rates, maintain existing rates or other favorable contract terms, effectively respond to payor cost controls or comply with the terms of our payor contracts, the payments we receive for our services may be reduced or we may be involved in disputes with payors and experience payment denials, both prospectively and retroactively. In addition, individuals have been increasingly enrolling in high-deductible health plans, which tend to have lower reimbursement rates for providers along with higher co-pays and deductibles due from the patient in comparison to traditional health plans. These plans, sometimes referred to as consumer-directed plans, may even exclude our hospitals and employed physicians from coverage.

***The demand for services provided by our hospitals can be impacted by factors beyond our control.***

Our admissions and adjusted admissions as well as acuity trends may be impacted by factors beyond our control. For example, seasonal fluctuations in the severity of influenza and other critical illnesses, unplanned shutdowns or unavailability of our facilities due to weather or other unforeseen events, decreases in trends in high acuity service offerings, changes in competition from outside service providers, turnover in physicians affiliated with our hospitals, or changes in medical technology can have an impact on the demand for services at our hospitals. The impact of these or other factors beyond our control could have an adverse effect on our business, financial position and results of operations.

***We may be adversely affected by consolidation among health insurers and other industry participants.***

In recent years, a number of health insurers have merged or increased efforts to consolidate with other non-governmental payors. Insurers are also increasingly pursuing alignment initiatives with healthcare providers.

Consolidation within the health insurance industry may result in insurers having increased negotiating leverage and competitive advantages, such as greater access to performance and pricing data. Our ability to negotiate prices and favorable terms with health insurers in certain markets could be affected negatively as a result of this consolidation. Also, the shift toward value-based payment models could be accelerated if larger insurers, including those engaging in consolidation activities, find these models to be financially beneficial. We cannot predict whether we will be able to negotiate favorable terms with payors and otherwise respond effectively to the impact of increased consolidation in the payor industry or vertical integration efforts.

***If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations.***

The healthcare industry is governed by laws and regulations at the federal, state and local government levels. These laws and regulations include standards addressing, among other issues, the adequacy of medical care, equipment, personnel, operating policies and procedures; billing and coding for services; properly handling overpayments; classification of levels of care provided; preparing and filing of cost reports; relationships with referral sources and referral recipients; maintenance of adequate records; compliance with building codes; environmental protection; privacy and security; debt collection; and communications with patients and consumers. Examples of these laws include, but are not limited to, HIPAA, the Stark Law, the federal anti-kickback statute, the FCA, the Emergency Medical Treatment and Active Labor Act and similar state laws. If we fail to comply with applicable laws and regulations we could suffer civil sanctions and criminal penalties, including the loss of our operating licenses and our ability to participate in the Medicare, Medicaid and other federal and state healthcare programs.

In addition, there are heightened coordinated civil and criminal enforcement efforts by both federal and state government agencies relating to the healthcare industry, including the hospital segment. Recent enforcement actions have focused on financial arrangements between hospitals and physicians, billing for services without adequately documenting medical necessity and billing for services outside the coverage guidelines for such services. Specific to our hospitals, we have received inquiries and subpoenas from various governmental agencies regarding these and other matters, and we are also subject to various claims and lawsuits relating to such matters. For a further discussion of these matters, see "Legal Proceedings" in Part I, Item 3 of this Form 10-K.

In the future, evolving interpretations or enforcement of these laws and regulations could subject our current practices to allegations of impropriety or illegality or could require us to make changes in our facilities, equipment, personnel, services, capital expenditure programs and operating expenses.

***Certain changes in federal tax laws could have an adverse effect on our business, cash flow, results of operations and financial position.***

On December 22, 2017, the federal government passed comprehensive Federal tax reform through the enactment of the Tax Cuts and Jobs Act of 2017, or the Tax Act. The Tax Act makes changes to the corporate tax rate and business-related deductions, among others, that will generally be effective for taxable years beginning after December 31, 2017. These changes could have an adverse impact on the value of our deferred tax assets, which would result in significant charges in the current or future taxable years and increase our future tax expense. We are continuing to evaluate the Tax Act and its requirements, as well as its application to our business and its impact on our effective tax rate. At this stage, it is unclear how many states will incorporate these federal law changes, or portions thereof, into their tax codes. Due to the timing of the enactment and the complexity involved in applying the provisions of the Tax Act, the SEC issued Staff Accounting Bulletin No. 118, which provides registrants a measurement period to report the impact of the Tax Act. To the extent we were able to determine a reasonable estimate of the effects of the Tax Act, we recorded provisional amounts in our financial statements for the year ended December 31, 2017. As we complete our analysis of the Tax Act, collect and prepare necessary data, and interpret any additional guidance from standard-setting bodies, we may make adjustments to provisional amounts that we have recorded that may materially impact our provision for income taxes in the period in which the adjustments are made.

36

*We could be subject to substantial uninsured liabilities or increased insurance costs as a result of significant legal actions.*

Physicians, hospitals and other healthcare providers have become subject to an increasing number of legal actions alleging malpractice, product liability, or related legal theories. Even in states that have imposed caps on damages, litigants are seeking recoveries under new theories of liability that might not be subject to the caps on damages. Many of these actions involve large claims and significant defense costs. To protect us from the cost of these claims, we maintain claims made professional malpractice liability insurance and general liability insurance coverage in excess of those amounts for which we are self-insured. This insurance coverage is in amounts that we believe to be sufficient for our operations; however, our insurance coverage may not continue to be available at a reasonable cost for us to maintain adequate levels of insurance. Additionally, our insurance coverage does not cover all claims against us, such as fines, penalties, or other damage and legal expense payments resulting from qui tam lawsuits. We cannot predict the outcome of current or future legal actions against us or the effect that judgments or settlements in such matters may have on us or on our insurance costs. Additionally, all professional and general liability insurance we purchase is subject to policy limitations. If the aggregate limit of any of our professional and general liability policies is exhausted, in whole or in part, it could deplete or reduce the limits available to pay any other material claims applicable to that policy period. Furthermore, one or more of our insurance carriers could become insolvent and unable to fulfill its or their obligations to defend, pay or reimburse us when those obligations become due. In that case, or if payments of claims exceed our estimates or are not covered by our insurance, it could have an adverse effect on our business, financial condition or results of operations.

*We could be subject to increased monetary penalties and/or other sanctions, including exclusion from federal healthcare programs, if we fail to comply with the terms of the Corporate Integrity Agreement.*

On August 4, 2014, we announced that we had entered into a civil settlement with the U.S. Department of Justice, other federal agencies and identified relators that concluded previously announced investigations and litigation related to short stay admissions through emergency departments at certain of our affiliated hospitals. See our discussion of this matter under the section "Business of Community Health Systems, Inc." in Part I, Item 1 of this Form 10-K and "Legal Proceedings" in Part II, Item 1 of our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2014 for further discussion of the background of this matter and details of the settlement. In addition to the amounts paid in the settlement, we executed the CIA with the OIG that has been incorporated into our existing and comprehensive compliance program.

Material, uncorrected violations of the CIA could lead to our suspension or disbarment from participation in Medicare, Medicaid and other federal and state healthcare programs and repayment obligations. In addition, we are subject to possible civil penalties for failure to substantially comply with the terms of the CIA, including stipulated penalties ranging between $1,000 to $2,500 per day. We are also subject to a stipulated penalty of $50,000 for each false certification made by us or on our behalf, pursuant to the reporting provisions of the CIA. The CIA increases the amount of information we must provide to the federal government regarding our healthcare practices and our compliance with federal regulations. The reports we provide in connection with the CIA could result in greater scrutiny by regulatory authorities.

*If we experience growth in self-pay volume and revenues or if we experience deterioration in the collectability of patient responsibility accounts, our financial condition or results of operations could be adversely affected.*

Our primary collection risks relate to uninsured patients and outstanding patient balances for which the primary insurance payor has paid some but not all of the outstanding balance, with the remaining outstanding balance (generally deductibles and co-payments) owed by the patient. Collections are impacted by the economic ability of patients to pay and the effectiveness of our collection efforts. Significant changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage may affect our collection of accounts receivable and are considered in our estimates of accounts receivable collectability.

37

Efforts to repeal or revise the Affordable Care Act have cast considerable uncertainty on the future of the law and its effects on the size of the uninsured population. For example, as part of the Tax Act adopted in 2017, Congress eliminated, effective January 1, 2019, the financial penalty associated with the Affordable Care Act's mandate that individuals enroll in an insurance plan, which may impact the number of individuals who elect to purchase health insurance. In addition, the number and identity of states that choose to expand or otherwise modify Medicaid programs, and the terms of those changes, continues to evolve. These variables, among others, make it difficult to predict the number of uninsured individuals and what percentage of our total revenue will be comprised of self-pay revenues.

Moreover, we may still be adversely affected by the growth in patient responsibility accounts as a result of increases in the adoption of plan structures, including health savings accounts, narrow networks and tiered networks, which shift greater responsibility for care to individuals through greater exclusions and copayment and deductible amounts. Further, our ability to collect patient responsibility accounts may be limited by statutory, regulatory and investigatory initiatives, including private lawsuits directed at hospital charges and collection practices for uninsured and underinsured patients. In addition, a deterioration of economic conditions in the United States could potentially lead to higher levels of uninsured patients, result in higher levels of patients covered by lower paying government programs, result in fiscal uncertainties at both government payors and private insurers and/or limit the economic ability of patients to make payments for which they are responsible. If we experience growth in self-pay volume or deterioration in collectability of patient responsibility accounts, our financial condition or results of operations could be adversely affected.

***Many of the non-urban communities in which we operate continue to face challenging economic conditions, and the failure of certain employers, or the closure of certain manufacturing and other facilities in our markets, could have a disproportionate impact on our hospitals.***

Many of the non-urban communities in which we operate continue to face challenging economic conditions, including higher levels of unemployment than other regions of the United States. In addition, the economies in the non-urban communities in which our hospitals primarily operate are often dependent on a small number of large employers, especially manufacturing or similar facilities. These employers often provide income and health insurance for a disproportionately large number of community residents who may depend on our hospitals for care. The failure of one or more large employers, or the closure or substantial reduction in the number of individuals employed at manufacturing or other facilities located in or near many of the non-urban communities in which our hospitals primarily operate, could cause affected employees to move elsewhere for employment or lose insurance coverage that was otherwise available to them. When patients are experiencing personal financial difficulties or have concerns about general economic conditions, they may:

- delay or forgo elective procedures;

- purchase a high-deductible insurance plan or no insurance at all, which increases a hospital's dependence on self-pay revenue; or

- choose to seek care in emergency rooms.

The occurrence of these events may cause a reduction in our revenues and adversely impact our results of operations.

***If there are delays in regulatory updates by governmental entities to federal and state healthcare programs, we may experience increased volatility in our operating results as such delays may result in a timing difference between when such program revenues are earned and when they become known or estimable for purposes of accounting recognition.***

We derive a significant amount of our net operating revenues from governmental healthcare programs, primarily Medicare and Medicaid. The reimbursements due to us from those programs are subject to legislative

38

and regulatory changes that can have a significant impact on our operating results. When delays occur in the implementation of regulations or passage of legislation, there is the potential for material increases or decreases in operating revenues to be recognized in periods subsequent to when such related services were performed, resulting in the potential for an adverse effect on our consolidated financial position and consolidated results of operations.

***If our adoption and utilization of electronic health record systems fails to satisfy HHS standards, our consolidated results of operations could be adversely affected.***

Under the Health Information Technology for Economic and Clinical Health Act, or HITECH, and other laws, HHS has established Medicare and Medicaid incentive programs to encourage hospitals and healthcare professionals to adopt EHR technology. Eligible hospitals can receive Medicaid incentive payments for their adoption and meaningful use of certified EHR technology; Medicare incentive payments are no longer available. Eligible hospitals that fail to demonstrate meaningful use of certified EHR technology and have not applied and qualified for a hardship exception are subject to reduced reimbursement from Medicare. Eligible healthcare professionals are also subject to positive or negative payment adjustments based, in part, on their use of EHR technology. Thus, if our hospitals and employed professionals are unable to properly adopt, maintain, and utilize certified EHR systems, we will not be eligible to receive incentive payments (to the extent incentive payments remain available), and we could be subject to penalties and lawsuits that may have an adverse effect on our consolidated financial position and consolidated results of operations.

***Our operations could be significantly impacted by interruptions or restrictions in access to our information systems.***

Our operations depend heavily on effective information systems to process clinical, operational and financial information. Information systems require an ongoing commitment of significant resources to maintain and enhance existing systems and to develop new systems in order to keep pace with continual changes in information technology. We also sometimes rely on third-party providers of financial, clinical, patient accounting and network information services and, as a result, we face operational challenges in maintaining multiple provider platforms and facilitating the interface of such systems with one another. We rely on these third-party providers to have appropriate controls to protect confidential information. We do not control the information systems of third-party providers, and in some cases we may have difficulty accessing information archived on third-party systems.

Our networks and information systems are also subject to disruption due to events such as a major earthquake, fire, telecommunications failure, ransomware or terrorist attacks or other catastrophic events. If the information systems on which we rely fail or are interrupted or if our access to these systems is limited in the future, it could have an adverse effect on our business, financial condition or results of operations.

***A cyber-attack or security breach could result in the compromise of our facilities, confidential data or critical data systems and give rise to potential harm to patients, remediation and other expenses, expose us to liability under HIPAA, consumer protection laws, common law or other theories, subject us to litigation and federal and state governmental inquiries, damage our reputation, and otherwise be disruptive to our business.***

We rely extensively on our computer systems to manage clinical and financial data, communicate with our patients, payors, vendors and other third parties and summarize and analyze operating results. We have made significant investments in technology to protect our systems and information from cybersecurity risks. During the second quarter of 2014, our computer network was the target of an external, criminal cyber-attack in which the attacker successfully copied and transferred certain data outside the Company. This data included certain non-medical patient identification data (such as patient names, addresses, birthdates, telephone numbers and social security numbers) considered protected under HIPAA, but did not include patient credit card, medical or clinical information. The remediation efforts in response to the attack have been substantial, including continued development and enhancement of our controls, processes and practices designed to protect our systems,

39

computers, software, data and networks from attack, damage or unauthorized access. Also in connection with the cyber-attack, we have been subject to multiple purported class action lawsuits and may be subject to additional litigation, potential governmental inquiries and potential reputation damages.

In spite of our security measures, there can be no assurance that we will not be subject to additional cyber-attacks or security breaches in the future. Such attacks or breaches could impact the integrity, availability or privacy of protected health information or other data subject to privacy laws or disrupt our information technology systems, devices or business, including our ability to provide various healthcare services. Additionally, growing cyber-security threats related to the use of ransomware and other malicious software threaten the access and utilization of critical information technology and data. As a result, cybersecurity and the continued development and enhancement of our controls, process and practices designed to protect our information systems from attack, damage or unauthorized access remain a priority for us. Our ability to recover from a ransomware or other cyber-attack is dependent on these practices, including successful backup systems and other recovery procedures. As cyber-threats continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information security vulnerabilities. If we are subject to cyber-attacks or security breaches in the future, this could result in harm to patients; business interruptions and delays; the loss, misappropriation, corruption or unauthorized access of data; litigation and potential liability under privacy, security and consumer protection laws or other applicable laws; reputational damage and federal and state governmental inquiries, any of which could have an adverse effect on our business, financial condition or results of operations.

### *A pandemic, epidemic or outbreak of an infectious disease in the markets in which we operate or that otherwise impacts our facilities could adversely impact our business.*

If a pandemic, epidemic, outbreak of an infectious disease or other public health crisis were to affect our markets, our business could be adversely affected. Such a crisis could diminish the public trust in healthcare facilities, especially hospitals that fail to accurately or timely diagnose, or that are treating (or have treated) patients affected by contagious diseases. If any of our facilities were involved in treating patients for such a contagious disease, other patients might cancel elective procedures or fail to seek needed care at our facilities. Further, a pandemic might adversely impact our business by causing a temporary shutdown or diversion of patients, by disrupting or delaying production and delivery of materials and products in the supply chain or by causing staffing shortages in our facilities. Although we have disaster plans in place and operate pursuant to infectious disease protocols, the potential impact of a pandemic, epidemic or outbreak of an infectious disease with respect to our markets or our facilities is difficult to predict and could adversely impact our business.

### *Our performance depends on our ability to recruit and retain quality physicians.*

The success of our healthcare facilities depends in part on the number and quality of the physicians on the medical staffs of our healthcare facilities, our ability to employ quality physicians, the admitting and utilization practices of employed and independent physicians, maintaining good relations with those physicians and controlling costs related to the employment of physicians. Although we employ some physicians, physicians are often not employees at our healthcare facilities at which they practice. In many of the markets we serve, many physicians have admitting privileges at other healthcare facilities in addition to our healthcare facilities. Such physicians may terminate their affiliation with or employment by our healthcare facilities at any time. In addition, we may face increased challenges in this area as the physician population reaches retirement age, especially if there is a shortage of physicians willing and able to provide comparable services. Moreover, if we are unable to provide adequate support personnel or technologically advanced equipment and facilities that meet the needs of those physicians and their patients, they may be discouraged from referring patients to our facilities, admissions may decrease and our operating performance may decline.

40

*Our labor costs could be adversely affected by competition for staffing, the shortage of experienced nurses and labor union activity.*

In addition to our physicians, the operations of our healthcare facilities are dependent on the efforts, abilities and experience of our management and medical support personnel, such as nurses, pharmacists and lab technicians. We compete with other healthcare providers in recruiting and retaining qualified management and support personnel responsible for the daily operations of our healthcare facilities, including nurses and other non-physician healthcare professionals. In some markets, the availability of nurses and other medical support personnel has been a significant operating issue to healthcare providers. We may be required to continue to enhance wages and benefits to recruit and retain nurses and other medical support personnel or to hire more expensive temporary or contract personnel. In addition, the states in which we operate could adopt mandatory nurse-staffing ratios or could reduce mandatory nurse-staffing ratios already in place. State-mandated nurse-staffing ratios could significantly affect labor costs and have an adverse impact on revenues if we are required to limit admissions in order to meet the required ratios.

Increased or ongoing labor union activity is another factor that could adversely affect our labor costs or otherwise adversely impact us. To the extent a significant portion of our employee base unionizes, our labor costs could increase significantly. In addition, when negotiating collective bargaining agreements with unions, whether such agreements are renewals or first contracts, there is the possibility that strikes could occur during the negotiation process, and our continued operation during any strikes could increase our labor costs and otherwise adversely impact us.

If our labor costs increase, we may not be able to raise rates to offset these increased costs. Because a significant percentage of our revenues consists of fixed, prospective payments, our ability to pass along increased labor costs is constrained. In the event we are not entirely effective at recruiting and retaining qualified management, nurses and other medical support personnel, or in controlling labor costs, this could have an adverse effect on our results of operations.

*The industry trend towards value-based purchasing may negatively impact our revenues.*

The trend toward value-based purchasing of healthcare services is gaining momentum across the healthcare industry among both government and commercial payors. Generally, value-based purchasing initiatives tie payment to the quality and efficiency of care. For example, hospital payments may be negatively impacted by the occurrence of HACs. The 25% of hospitals with the worst national risk-adjusted HAC rates for all hospitals in the previous year receive a 1% reduction in their total Medicare payments. Medicare does not reimburse for care related to HACs. In addition, federal funds may not be used under the Medicaid program to reimburse providers for services provided to treat HACs. Hospitals that experience excess readmissions for designated conditions receive reduced payments for all inpatient discharges. HHS also reduces Medicare inpatient hospital payments for all discharges by a required percentage and pools the amount collected from these reductions to fund payments to reward hospitals that meet or exceed certain quality performance standards. Further, Medicare and Medicaid require hospitals to report certain quality data to receive full reimbursement updates.

HHS has indicated that it is particularly focused on tying Medicare payments to quality or value through alternative payment models, which generally aim to make providers attentive to the quality and cost of care they deliver to patients. Examples of alternative payment models include ACOs and bundled payment arrangements. Generally, participation in bundled payment programs is voluntary, but CMS requires hospitals located in certain geographic areas to participate in programs for specified orthopedic procedures. CMS has indicated that it is developing more bundled payment models, although it is unclear whether these and other alternative payment models will successfully coordinate care and reduce costs or whether they will decrease aggregate reimbursement. Several of the nation's largest commercial payors have also expressed an intent to increase reliance on value-based reimbursement arrangements. Further, many large commercial payors require hospitals to report quality data, and several commercial payors do not reimburse hospitals for certain preventable adverse events.

41

We expect value-based purchasing programs, including programs that condition reimbursement on patient outcome measures, to become more common and to involve a higher percentage of reimbursement amounts. We are unable at this time to predict how this trend will affect our results of operations, but it could negatively impact our revenues or our cost of operations, or both.

***Our revenues are somewhat concentrated in a small number of states which will make us particularly sensitive to regulatory and economic changes in those states.***

Our revenues are particularly sensitive to regulatory and economic changes in states in which we generate a significant portion of our revenues, including Florida, Pennsylvania, Texas, Indiana and Tennessee. Accordingly, any change in the current demographic, economic, competitive or regulatory conditions in these states could have an adverse effect on our business, financial condition or results of operations. Changes to the Medicaid programs in these states could also have an adverse effect on our business, financial condition, results of operations or cash flows. In December 2017, CMS announced that it will phase out federal matching funds for Designated State Health Programs under waivers granted pursuant to section 1115 of the Social Security Act. Currently the Texas Healthcare Transformation and Quality Improvement Program, or the Texas Waiver Program, which provides funding for uncompensated care and delivery system reform initiatives, is operated under such a waiver. In December 2017, CMS approved an extension of this waiver through September 30, 2022. In addition, effective October 1, 2019, CMS will require Texas to revise the disbursement methodology for uncompensated care pool funding to align with federal policies. Texas will not receive any federal financial participation for uncompensated care pool payments for the demonstration years after October 1, 2019, until CMS approves an Uncompensated Care Protocol Addendum. We cannot predict whether the Texas Waiver Program will be further extended or changed or guarantee that revenues recognized from the program will not decrease.

In addition, some of our hospitals in Florida, Texas and other areas along the Gulf Coast are located in hurricane-prone areas. In the past, hurricanes have had a disruptive effect on the operations of our hospitals in Florida, Texas and other coastal states and the patient populations in those states. Our business activities could be harmed by a particularly active hurricane season or even a single storm, and the property insurance we obtain may not be adequate to cover losses from future hurricanes or other natural disasters.

### Item 1B. *Unresolved Staff Comments*

None

### Item 2. *Properties*

### Corporate Headquarters

We own our corporate headquarters building located in Franklin, Tennessee.

### Hospitals

Our hospitals are general care hospitals offering a wide range of inpatient and outpatient medical services. These services generally include general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric and rehabilitation services. In addition, some of our hospitals provide skilled nursing and home care services based on individual community needs.

42

Case 3:19-cv-00461    Document 67-2    Filed 03/23/20    Page 45 of 53 PageID #: 825

For each of our hospitals owned or leased as of December 31, 2017, the following table shows its location, the date of its acquisition or lease inception and the number of licensed beds:

| Hospital | City | Licensed Beds(1) | Date of Acquisition/Lease Inception | Ownership Type |
|---|---|---|---|---|
| *Alabama* | | | | |
| South Baldwin Regional Medical Center | Foley | 112 | June, 2000 | Leased |
| Grandview Medical Center | Birmingham | 372 | July, 2007 | Owned |
| Flowers Hospital | Dothan | 235 | July, 2007 | Owned |
| Medical Center Enterprise | Enterprise | 131 | July, 2007 | Owned |
| Gadsden Regional Medical Center | Gadsden | 346 | July, 2007 | Owned |
| Crestwood Medical Center | Huntsville | 180 | July, 2007 | Owned |
| | | | | |
| *Alaska* | | | | |
| Mat-Su Regional Medical Center | Palmer | 74 | July, 2007 | Owned |
| | | | | |
| *Arizona* | | | | |
| Western Arizona Regional Medical Center | Bullhead City | 139 | July, 2000 | Owned |
| Northwest Medical Center | Tucson | 300 | July, 2007 | Owned |
| Oro Valley Hospital | Oro Valley | 146 | July, 2007 | Owned |
| | | | | |
| *Arkansas* | | | | |
| Northwest Health System | | | | |
|    Northwest Medical Center - Bentonville | Bentonville | 128 | July, 2007 | Owned |
|    Northwest Medical Center - Springdale | Springdale | 222 | July, 2007 | Owned |
|    Willow Creek Women's Hospital | Johnson | 64 | July, 2007 | Owned |
|    Northwest Health Physician's Specialty Hospital | Fayetteville | 20 | April, 2016 | Leased |
|    Siloam Springs Regional Hospital | Siloam Springs | 73 | February, 2009 | Owned |
| Medical Center of South Arkansas | El Dorado | 166 | April, 2009 | Leased |
| | | | | |
| Sparks Regional Medical Center | Fort Smith | 492 | January, 2014 | Owned |
| Sparks Medical Center - Van Buren | Van Buren | 103 | January, 2014 | Leased |
| | | | | |
| *Florida* | | | | |
| Lake Wales Medical Center | Lake Wales | 160 | December, 2002 | Owned |
| North Okaloosa Medical Center | Crestview | 110 | March, 1996 | Owned |
| Bayfront Health Brooksville | Brooksville | 120 | January, 2014 | Leased |
| Bayfront Health Dade City | Dade City | 120 | January, 2014 | Owned |
| Bayfront Health Port Charlotte | Port Charlotte | 254 | January, 2014 | Owned |
| Bayfront Health Punta Gorda | Punta Gorda | 208 | January, 2014 | Owned |
| Bayfront Health St. Petersburg | St. Petersburg | 480 | January, 2014 | Leased |
| Bayfront Health Spring Hill | Spring Hill | 124 | January, 2014 | Leased |
| Heart of Florida Regional Medical Center | Davenport | 193 | January, 2014 | Owned |
| Lower Keys Medical Center | Key West | 167 | January, 2014 | Leased |
| Physicians Regional Healthcare System - Collier | Naples | 100 | January, 2014 | Owned |
| Physicians Regional Healthcare System - Pine Ridge | Naples | 101 | January, 2014 | Owned |
| Santa Rosa Medical Center | Milton | 129 | January, 2014 | Leased |
| Seven Rivers Regional Medical Center | Crystal River | 128 | January, 2014 | Owned |
| Shands Lake Shore Regional Medical Center | Lake City | 99 | January, 2014 | Leased |
| Shands Live Oak Regional Medical Center | Live Oak | 25 | January, 2014 | Owned |
| Shands Starke Regional Medical Center | Starke | 49 | January, 2014 | Owned |
| St. Cloud Regional Medical Center | St. Cloud | 84 | January, 2014 | Owned |

43

| Hospital | City | Licensed Beds(1) | Date of Acquisition/Lease Inception | Ownership Type |
|---|---|---|---|---|
| Venice Regional Bayfront Health | Venice | 312 | January, 2014 | Owned |
| Munroe Regional Medical Center | Ocala | 421 | April, 2014 | Leased |
| *Georgia* | | | | |
| East Georgia Regional Medical Center | Statesboro | 149 | January, 2014 | Owned |
| *Indiana* | | | | |
| Porter Hospital | Valparaiso | 301 | May, 2007 | Owned |
| Lutheran Health Network | | | | |
|    Bluffton Regional Medical Center | Bluffton | 79 | July, 2007 | Owned |
|    Dupont Hospital | Fort Wayne | 131 | July, 2007 | Owned |
|    Lutheran Hospital | Fort Wayne | 396 | July, 2007 | Owned |
|    Lutheran Musculoskeletal Center | Fort Wayne | 39 | July, 2007 | Owned |
|    Lutheran Rehabilitation Hospital (rehabilitation) | Fort Wayne | 36 | July, 2007 | Owned |
|    St. Joseph's Hospital | Fort Wayne | 191 | July, 2007 | Owned |
|    Dukes Memorial Hospital | Peru | 25 | July, 2007 | Owned |
|    Kosciusko Community Hospital | Warsaw | 72 | July, 2007 | Owned |
| La Porte Hospital | La Porte | 227 | March, 2016 | Owned |
| Starke Hospital | Knox | 53 | March, 2016 | Leased |
| *Louisiana* | | | | |
| Byrd Regional Hospital | Leesville | 60 | October, 1994 | Owned |
| Northern Louisiana Medical Center | Ruston | 165 | April, 2007 | Owned |
| *Mississippi* | | | | |
| Merit Health Wesley | Hattiesburg | 211 | July, 2007 | Owned |
| Merit Health River Region | Vicksburg | 361 | July, 2007 | Owned |
| Merit Health Biloxi | Biloxi | 198 | January, 2014 | Leased |
| Merit Health Central | Jackson | 319 | January, 2014 | Leased |
| Merit Health Rankin | Brandon | 134 | January, 2014 | Leased |
| Merit Health Madison | Canton | 67 | January, 2014 | Owned |
| Merit Health River Oaks | Flowood | 160 | January, 2014 | Owned |
| Merit Health Woman's Hospital | Flowood | 109 | January, 2014 | Owned |
| Merit Health Natchez | Natchez | 179 | October, 2014 | Owned |
| *Missouri* | | | | |
| Moberly Regional Medical Center | Moberly | 100 | November, 1993 | Owned |
| Northeast Regional Medical Center | Kirksville | 93 | December, 2000 | Leased |
| Poplar Bluff Regional Medical Center | Poplar Bluff | 440 | January, 2014 | Owned |
| Twin Rivers Regional Medical Center | Kennett | 116 | January, 2014 | Owned |
| *New Jersey* | | | | |
| Memorial Hospital of Salem County (2) | Salem | 126 | September, 2002 | Owned |
| *New Mexico* | | | | |
| Eastern New Mexico Medical Center | Roswell | 162 | April, 1998 | Owned |
| Carlsbad Medical Center | Carlsbad | 115 | July, 2007 | Owned |
| Lea Regional Medical Center | Hobbs | 202 | July, 2007 | Owned |
| Mountain View Regional Medical Center | Las Cruces | 168 | July, 2007 | Owned |

44

| Hospital | City | Licensed Beds(1) | Date of Acquisition/Lease Inception | Ownership Type |
|---|---|---|---|---|
| *North Carolina* | | | | |
| Lake Norman Regional Medical Center | Mooresville | 123 | January, 2014 | Owned |
| Davis Regional Medical Center | Statesville | 130 | January, 2014 | Owned |
| | | | | |
| *Oklahoma* | | | | |
| AllianceHealth Ponca City | Ponca City | 140 | May, 2006 | Owned |
| AllianceHealth Deaconess | Oklahoma City | 238 | July, 2007 | Owned |
| AllianceHealth Woodward | Woodward | 87 | July, 2007 | Leased |
| AllianceHealth Clinton | Clinton | 56 | January, 2014 | Leased |
| AllianceHealth Madill | Madill | 25 | January, 2014 | Leased |
| AllianceHealth Durant | Durant | 148 | January, 2014 | Owned |
| AllianceHealth Midwest | Midwest City | 255 | January, 2014 | Leased |
| AllianceHealth Seminole | Seminole | 32 | January, 2014 | Leased |
| | | | | |
| *Pennsylvania* | | | | |
| Commonwealth Health Network | | | | |
|   Berwick Hospital | Berwick | 101 | March, 1999 | Owned |
|   Wilkes-Barre General Hospital | Wilkes-Barre | 412 | April, 2009 | Owned |
|   First Hospital Wyoming Valley (psychiatric) | Wilkes-Barre | 193 | April, 2009 | Owned |
|   Regional Hospital of Scranton | Scranton | 186 | May, 2011 | Owned |
|   Tyler Memorial Hospital | Tunkhannock | 44 | May, 2011 | Owned |
|   Moses Taylor Hospital | Scranton | 213 | January, 2012 | Owned |
| | | | | |
| *South Carolina* | | | | |
| Springs Memorial Hospital | Lancaster | 225 | November, 1994 | Owned |
| Mary Black Memorial Hospital | Spartanburg | 207 | July, 2007 | Owned |
| Carolinas Hospital System | Florence | 396 | July, 2007 | Owned |
| Carolinas Hospital System - Marion | Mullins | 124 | July, 2010 | Owned |
| Chester Regional Medical Center | Chester | 82 | January, 2014 | Leased |
| Mary Black Health System - Gaffney | Gaffney | 125 | November, 2014 | Owned |
| | | | | |
| *Tennessee* | | | | |
| Tennova  - Lakeway Regional Hospital | Morristown | 135 | May, 1993 | Owned |
| Tennova - Regional Jackson | Jackson | 150 | January, 2003 | Owned |
| Tennova - Dyersburg Regional | Dyersburg | 225 | January, 2003 | Owned |
| Tennova - Volunteer Martin | Martin | 100 | January, 2003 | Owned |
| Tennova Healthcare - Shelbyville | Shelbyville | 60 | July, 2005 | Owned |
| Tennova Healthcare - Cleveland | Cleveland | 351 | October, 2005 | Owned |
| Tennova Healthcare - Clarksville | Clarksville | 270 | July, 2007 | Owned |
| Tennova Healthcare - Harton | Tullahoma | 135 | January, 2014 | Owned |
| Tennova Healthcare - Jamestown | Jamestown | 85 | January, 2014 | Owned |
| Tennova - Jefferson Memorial Hospital | Jefferson City | 58 | January, 2014 | Leased |
| Tennova - LaFollette Medical Center | LaFollette | 66 | January, 2014 | Leased |
| Tennova - Newport Medical Center | Newport | 130 | January, 2014 | Owned |
| Tennova - North Knoxville Medical Center | Powell | 108 | January, 2014 | Owned |
| Tennova - Physicians Regional Medical Center | Knoxville | 401 | January, 2014 | Owned |
| Tennova - Turkey Creek Medical Center | Knoxville | 101 | January, 2014 | Owned |
| Tennova Healthcare - Lebanon | Lebanon | 245 | January, 2014 | Owned |

45

| Hospital | City | Licensed Beds(1) | Date of Acquisition/Lease Inception | Ownership Type |
|---|---|---|---|---|
| *Texas* | | | | |
| Hill Regional Hospital | Hillsboro | 116 | October, 1994 | Leased |
| Lake Granbury Medical Center | Granbury | 73 | January, 1997 | Leased |
| Laredo Medical Center | Laredo | 326 | October, 2003 | Owned |
| Abilene Regional Medical Center | Abilene | 231 | July, 2007 | Owned |
| Brownwood Regional Medical Center | Brownwood | 188 | July, 2007 | Owned |
| College Station Medical Center | College Station | 167 | July, 2007 | Owned |
| Navarro Regional Hospital | Corsicana | 162 | July, 2007 | Owned |
| Longview Regional Medical Center | Longview | 224 | July, 2007 | Owned |
| Woodland Heights Medical Center | Lufkin | 149 | July, 2007 | Owned |
| San Angelo Community Medical Center | San Angelo | 171 | July, 2007 | Owned |
| DeTar Healthcare System | Victoria | 304 | July, 2007 | Owned |
| Cedar Park Regional Medical Center | Cedar Park | 108 | December, 2007 | Owned |
| *Virginia* | | | | |
| Southern Virginia Regional Medical Center | Emporia | 80 | March, 1999 | Owned |
| Southampton Memorial Hospital | Franklin | 105 | March, 2000 | Owned |
| Southside Regional Medical Center | Petersburg | 300 | August, 2003 | Owned |
| *West Virginia* | | | | |
| Plateau Medical Center | Oak Hill | 25 | July, 2002 | Owned |
| Greenbrier Valley Medical Center | Ronceverte | 122 | July, 2007 | Owned |
| Bluefield Regional Medical Center | Bluefield | 92 | October, 2010 | Owned |
| Williamson Memorial Hospital (2) | Williamson | 76 | January, 2014 | Owned |
| Total Licensed Beds at December 31, 2017 | | 21,052 | | |
| Total Hospitals at December 31, 2017 | | 127 | | |

(1) Licensed beds are the number of beds for which the appropriate state agency licenses a facility regardless of whether the beds are actually available for patient use.

(2) Hospital is included in discontinued operations at December 31, 2017.

The real property of substantially all of our wholly-owned hospitals is also encumbered by mortgages to support obligations under our credit facility and outstanding senior secured notes.

The following table lists the hospitals owned by joint venture entities in which we do not have a consolidating ownership interest, along with our percentage ownership interest in the joint venture entity as of December 31, 2017. Information on licensed beds was provided by the majority owner and manager of each joint venture. A subsidiary of HCA is the majority owner of Macon Healthcare LLC.

| Joint Venture | Facility Name | City | State | Licensed Beds |
|---|---|---|---|---|
| Macon Healthcare LLC | Coliseum Medical Center (38%) | Macon | GA | 250 |
| Macon Healthcare LLC | Coliseum Psychiatric Center (38%) | Macon | GA | 60 |
| Macon Healthcare LLC | Coliseum Northside Hospital (38%) | Macon | GA | 103 |

**Item 3. *Legal Proceedings***

From time to time, we receive inquiries or subpoenas from state regulators, state Medicaid Fraud Control units, fiscal intermediaries, the Centers for Medicare and Medicaid Services, the Department of Justice and other

46

government entities regarding various Medicare and Medicaid issues. In addition to the matters discussed below, we are currently responding to subpoenas and administrative demands concerning (a) certain cardiology procedures, medical records and policies at a New Mexico hospital, (b) an inquiry regarding sleep labs at two Louisiana hospitals, (c) a subpoena regarding wound care services at one of our Florida hospitals (which appears to be related to unsealed cases against Healogics, Inc.), (d) a subpoena concerning a physician relationship at one of our Texas hospitals and (e) a civil investigative demand concerning short-term Medicaid eligibility determinations processed by third party vendors at one of our Pennsylvania hospitals. In addition, we are subject to other claims and lawsuits arising in the ordinary course of our business including lawsuits and claims related to billing practices and the administration of charity care policies at our hospitals. Based on current knowledge, management does not believe that loss contingencies arising from pending legal, regulatory and governmental matters, including the matters described herein, will have a material adverse effect on the consolidated financial position or liquidity of the Company. However, in light of the inherent uncertainties involved in pending legal, regulatory and governmental matters, some of which are beyond our control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to our results of operations or cash flows for any particular reporting period. Settlements of suits involving Medicare and Medicaid issues routinely require both monetary payments as well as corporate integrity agreements. Additionally, qui tam or "whistleblower" actions initiated under the civil False Claims Act may be pending but placed under seal by the court to comply with the False Claims Act's requirements for filing such suits. In September 2014, the Criminal Division of the United States Department of Justice, or DOJ, announced that all qui tam cases will be shared with their Division to determine if a parallel criminal investigation should be opened. The Criminal Division has also frequently stated an intention to pursue corporations in criminal prosecutions. From time to time, we detect issues of non-compliance with Federal healthcare laws pertaining to claims submission and reimbursement practices and/or financial relationships with physicians. We avail ourselves of various mechanisms to address potential overpayments arising out of these issues, including repayment of claims, rebilling of claims, and participation in voluntary disclosure protocols offered by the Centers for Medicare and Medicaid Services and the Office of the Inspector General. Participating in voluntary repayments and voluntary disclosure protocols can have the potential for significant settlement obligations or even enforcement action.

The following legal proceedings are described in detail because, although they may not be required to be disclosed in this Part I, Item 3 under SEC rules, due to the nature of the business of the Company, we believe that the following discussion of these matters may provide useful information to security holders. This discussion does not include claims and lawsuits covered by medical malpractice, general liability or employment practices insurance and risk retention programs, none of which claims or lawsuits would in any event be required to be disclosed in this Part I, Item 3 under SEC rules. Certain of the matters referenced below are also discussed in Note 17 of the Notes to Consolidated Financial Statements included under Part II, Item 8 of this Form 10-K.

**Community Health Systems, Inc. Legal Proceedings**

*Shareholder Litigation*

Class Action Shareholder Federal Securities Cases. Three purported class action cases have been filed in the United States District Court for the Middle District of Tennessee; namely, Norfolk County Retirement System v. Community Health Systems, Inc., et al., filed May 9, 2011; De Zheng v. Community Health Systems, Inc., et al., filed May 12, 2011; and Minneapolis Firefighters Relief Association v. Community Health Systems, Inc., et al., filed June 21, 2011. All three seek class certification on behalf of purchasers of our common stock between July 27, 2006 and April 11, 2011 and allege that misleading statements resulted in artificially inflated prices for our common stock. In December 2011, the cases were consolidated for pretrial purposes and NYC Funds and its counsel were selected as lead plaintiffs/lead plaintiffs' counsel. In lieu of ruling on our motion to dismiss, the court permitted the plaintiffs to file a first amended consolidated class action complaint which was filed on October 5, 2015. Our motion to dismiss was filed on November 4, 2015 and oral argument took place on April 11, 2016. Our motion to dismiss was granted on June 16, 2016 and on June 27, 2016, the plaintiffs filed a

47

notice of appeal to the Sixth Circuit Court of Appeals. The matter was heard on May 3, 2017. On December 13, 2017, the Sixth Circuit reversed the trial court's dismissal of the case and remanded it to the District Court. We filed a renewed partial motion to dismiss on February 9, 2018. We believe this consolidated matter is without merit and will vigorously defend this case.

*Other Government Investigations*

Dothan, Alabama – Independent Lab Billing. On February 12, 2015, our hospital in Dothan, Alabama received a Civil Investigative Demand, or CID, from the United States Department of Justice for information concerning its status as a "covered hospital" under certain lab billing regulations. These regulations discuss permissible billing of the technical component of lab tests performed for hospital patients by an independent laboratory. The CID seeks documentation and explanation whether the hospital qualifies as a covered hospital for billing purposes under the applicable regulations. We are cooperating fully with this investigation.

St. Petersburg, Florida – On September 14, 2017, our hospital in St. Petersburg, Florida received a CID from the United States Department of Justice for information concerning its participation in the Florida Low Income Pool Program. The Low Income Pool Program, or LIP, is a funding pool to support healthcare providers that provide uncompensated care to Florida residents who are uninsured or underinsured. The CID seeks documentation related to agreements between the hospital and Pinellas County. We are cooperating fully with this investigation.

*Commercial Litigation and Other Lawsuits*

*Becker v. Community Health Systems, Inc. d/b/a Community Health Systems Professional Services Corporation d/b/a Community Health Systems d/b/a Community Health Systems PSC, Inc. d/b/a Rockwood Clinic P.S. and Rockwood Clinic, P.S. (Superior Court, Spokane, Washington).* This suit was filed on February 29, 2012, by a former chief financial officer at Rockwood Clinic in Spokane, Washington. Becker claims he was wrongfully terminated for allegedly refusing to certify a budget for Rockwood Clinic in 2012. On February 29, 2012, he also filed an administrative complaint with the Department of Labor, Occupational Safety and Health Administration alleging that he is a whistleblower under Sarbanes-Oxley, which was dismissed by the agency and was appealed to an administrative law judge for a hearing that occurred on January 19-26, 2016. In a decision dated November 9, 2016, the law judge awarded Becker approximately $1.9 million for front pay, back pay and emotional damages with attorney fees to be later determined. We have appealed the award to the Administrative Review Board and are awaiting its decision. At a hearing on July 27, 2012, the trial court dismissed Community Health Systems, Inc. from the state case and subsequently certified the state case for an interlocutory appeal of the denial to dismiss his employer and the management company. The appellate court accepted the interlocutory appeal, and it was argued on April 30, 2014. On August 14, 2014, the court denied our appeal. On October 20, 2014, we filed a petition to review the denial with the Washington Supreme Court. Our appeal was accepted and oral argument was heard on June 9, 2015. On September 15, 2015, the court denied our appeal and remanded to the trial court; a previous trial setting of September 12, 2016 has been vacated and not reset. We continue to vigorously defend these actions.

*Cyber Attack.* As previously disclosed on a Current Report on Form 8-K filed by us on August 18, 2014, our computer network was the target of an external, criminal cyber-attack that we believe occurred between April and June, 2014. We and Mandiant (a FireEye Company), the forensic expert engaged by us in connection with this matter, believe the attacker was a foreign "Advanced Persistent Threat" group who used highly sophisticated malware and technology to attack our systems. The attacker was able to bypass our security measures and successfully copy and transfer outside the Company certain non-medical patient identification data (such as patient names, addresses, birthdates, telephone numbers and social security numbers), but not including patient credit card, medical or clinical information. We worked closely with federal law enforcement authorities in connection with their investigation and possible prosecution of those determined to be responsible for this attack. Mandiant has conducted a thorough investigation of this incident and continues to advise us regarding security

48

and monitoring efforts. We have provided appropriate notification to affected patients and regulatory agencies as required by federal and state law. We have offered identity theft protection services to individuals affected by this attack.

We have incurred certain expenses to remediate and investigate this matter. In addition, multiple purported class action lawsuits have been filed against us and certain subsidiaries. These lawsuits allege that sensitive information was unprotected and inadequately encrypted by us. The plaintiffs claim breach of contract and other theories of recovery, and are seeking damages, as well as restitution for any identity theft. On February 4, 2015, the United States Judicial Panel on Multidistrict Litigation ordered the transfer of the purported class actions pending outside of the District Court for the Northern District of Alabama to the District Court for the Northern District of Alabama for coordinated or consolidated pretrial proceedings. A consolidated complaint was filed and we filed a motion to dismiss on September 21, 2015, which was partially argued on February 10, 2016. In an oral ruling from the bench, the court greatly limited the potential class by ruling only plaintiffs with specific injury resulting from the breach had standing to sue. Further, on jurisdictional grounds, the court dismissed Community Health Systems, Inc. from all non-Tennessee based cases. Finally, the court set April 15, 2016 for further argument on whether the remaining plaintiffs have sufficiently stated a cause of action to continue their cases. On April 15, 2016 in an oral ruling from the bench, the court dismissed additional claims and following this oral ruling only eight of the forty plaintiffs remained with significant limitations imposed on their ability to assert claims for damages. These oral rulings were confirmed in a written order filed on September 12, 2016. On October 20, 2016, the plaintiffs filed a renewed motion for interlocutory appeal from the motion to dismiss ruling and on February 15, 2017 this motion was denied. Plaintiffs refiled their motion for permission to seek interlocutory appeal on March 15, 2017, and that motion was also denied. At this time, we are unable to predict the outcome of this litigation or determine the potential impact, if any, that could result from this litigation, but we intend to vigorously defend these lawsuits. This matter may subject us to additional litigation, potential governmental inquiries, potential reputational damage, and additional remediation, operating and other expenses.

*Empire Health Foundation v. CHS/Community Health Systems, Inc., CHS Washington Holdings, LLC, Spokane Washington Hospital Company, LLC, Spokane Valley Washington Hospital Company, LLC.* This suit was filed on June 12, 2017 by Empire Health Foundation claiming Deaconess and Valley Hospitals failed to abide by charity care obligations allegedly existing in the 2008 Asset Purchase Agreement between Empire Health System and Company affiliates. The court granted in part and denied in part the hospitals' motion to dismiss on October 11, 2017. We believe these claims are without merit and will vigorously defend the case.

*Mounce v. CHSPSC, LLC, et al.* This case is a purported class action lawsuit filed in the United States District Court for the Western District of Arkansas and served on July 29, 2015, claiming our affiliated Arkansas hospitals violated payor contracts by allegedly improperly asserting hospital liens against third-party tortfeasors and seeking class certifications for any similarly situated plaintiffs at any affiliated Arkansas hospital. The court has certified a class. We believe these claims are without merit and will vigorously defend the case.

*Gibson v. Byrd Regional Medical Center.* This case is a purported class action lawsuit filed in the 30th Judicial District Court for the State of Louisiana and served on August 3, 2016, claiming our affiliated Leesville, Louisiana hospital violated payor contracts by allegedly improperly asserting hospital liens against third-party tortfeasors and seeking class certifications for any similarly situated plaintiffs. The court has certified a class and denied our motion for summary judgment. We have filed a motion for a new trial with respect to class certification, and that motion is pending. We believe these claims are without merit and will vigorously defend the case.

*Morrow v. Community Health Systems, Inc.* This case is a purported class action lawsuit filed on July 25, 2016, in the United States District Court, Middle District of Tennessee alleging our affiliated hospital, South Baldwin Regional Medical Center in Foley, AL, violated a payor contract by allegedly improperly asserting a hospital lien against a third-party tortfeasor and allegedly unjustly enriching the hospital. The plaintiff seeks to represent a class of similarly situated individuals at any Company affiliated hospital. Plaintiff moved to amend his complaint on June 26, 2016 to name additional defendants, which the court allowed. On October 17, 2017, the court granted

49

Community Health Systems, Inc.'s motion to dismiss the complaint on all of the plaintiff's claims save one. On October 20, 2017, the remaining defendants filed motions to dismiss, which the court granted on December 11, 2017 with respect to all claims save one. All defendants have now filed a motion for summary judgment on the plaintiff's sole remaining claim, and that motion is pending. We believe the claim is without merit and will vigorously defend the case.

*Zwick Partners, LP and Aparna Rao, individually and on behalf of all others similarly situated v. Quorum Health Corporation, Community Health Systems, Inc., Wayne T. Smith, W. Larry Cash, Thomas D. Miller, and Michael J. Culotta.* This purported class action lawsuit previously filed in the United States District Court, Middle District of Tennessee was amended on April 17, 2017 to include Community Health Systems, Inc., Wayne T. Smith and W. Larry Cash as additional defendants. The plaintiffs seek to represent a class of Quorum Health Corporation, or QHC, shareholders and allege that the failure to record a goodwill and long-lived asset impairment charge against QHC at the time of the spin-off of QHC violated federal securities laws. Motions to dismiss have been filed. We believe the claims are without merit and will vigorously defend the case.

*R2 Investments v Quorum Health Corporation; Community Health Systems, Inc.; Wayne T. Smith; W. Larry Cash; Thomas D. Miller; Michael J. Culotta; John A. Clerico; James S. Ely, III; John A. Fry; William Norris Jennings; Julia B. North; H. Mitchell Watson, Jr.; H. James Williams.* This case is pending in the Circuit Court for Williamson County, Tennessee and was served on October 26, 2017. The plaintiff alleges common law fraud and violation of Tennessee securities fraud statutes in connection with its purchase of QHC stock and QHC senior secured notes. Motions to dismiss have been filed. We believe the claims are without merit and will vigorously defend the case.

**Certain Legal Proceedings Related to HMA**

*Medicare/Medicaid Billing Lawsuits*

Beginning during the week of December 16, 2013 eleven qui tam lawsuits filed by private individuals against HMA were unsealed in various United States district courts. The United States has elected to intervene in all or part of eight of these matters; namely *U.S. ex rel. Craig Brummer v. Health Management Associates, Inc. et al. (Middle District Georgia) ("Brummer"); U.S. ex rel. Ralph D. Williams v. Health Management Associates, Inc. et al. (Middle District Georgia) ("Williams"); U.S. ex rel. Scott H. Plantz, M.D. et al. v. Health Management Associates, Inc., et al. (Northern District Illinois) ("Plantz"); U.S. ex rel. Thomas L. Mason, M.D. et al. v. Health Management Associates, Inc. et al. (Western District North Carolina) ("Mason"); U.S. ex rel. Jacqueline Meyer, et al. v. Health Management Associates, Inc., Gary Newsome et al. ("Jacqueline Meyer") (District of South Carolina); U.S. ex rel. George Miller, et al. v. Health Management Associates, Inc. (Eastern District of Pennsylvania) ("Miller"); U.S. ex rel. Bradley Nurkin v. Health Management Associates, Inc. et al. (Middle District of Florida) ("Nurkin"); and U.S. ex rel. Paul Meyer v. Health Management Associates, Inc. et al. (Southern District Florida) ("Paul Meyer").* The United States has elected to intervene with respect to allegations in these cases that certain HMA hospitals inappropriately admitted patients and then submitted reimbursement claims for treating those individuals to federal healthcare programs in violation of the False Claims Act or that certain HMA hospitals had inappropriate financial relationships with physicians which violated the Stark law, the Anti-Kickback Statute, and the False Claims Act. Certain of these complaints also allege the same actions violated various state laws which prohibit false claims. The United States has declined to intervene in three of the eleven matters, namely *U.S. ex rel. Anita France, et al. v. Health Management Associates, Inc. (Middle District Florida) ("France")* which involved allegations of wrongful billing and was settled; *U.S. ex rel. Sandra Simmons v. Health Management Associates, Inc. et al. (Eastern District Oklahoma) ("Simmons")* which alleges unnecessary surgery by an employed physician and which was settled as to all allegations except alleged wrongful termination; and *U.S. ex rel. David Napoliello, M.D. v. Health Management Associates, Inc. (Middle District Florida) ("Napoliello")* which alleges inappropriate admissions. On April 3, 2014, the Multi District Litigation Panel ordered the transfer and consolidation for pretrial proceedings of the eight intervened cases, plus the Napoliello matter, to the District of the District of Columbia under the name *In Re: Health Management Associates, Inc. Qui Tam Litigation.* On June 2, 2014, the court entered a stay of this

50