# EXHIBIT E

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2017**

**Commission file number 001-15925**

# COMMUNITY HEALTH SYSTEMS, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **13-3893191** |
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *incorporation or organization)* | *Identification Number)* |
| **4000 Meridian Boulevard** | **37067** |
| **Franklin, Tennessee** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**615-465-7000**
*(Registrant's telephone number)*

Indicate by check mark whether the registrant ( ) has filed all reports required to be filed by Section 3 or 5(d) of the Securities Exchange Act of 934 during the preceding 2 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days  Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§ 232 405 of this chapter) during the preceding 2 months (or for such shorter period that the registrant was required to submit and post such files)  Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non accelerated filer, a smaller reporting company, or an emerging growth company  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 2b 2 of the Exchange Act

| | | |
|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | Smaller reporting company ☐ |
| Non accelerated filer ☐   (Do not check if a smaller reporting company) | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 3(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 2b 2 of the Exchange Act)  Yes ☐   No ☑

As of October 26, 20 7, there were outstanding 4,727,00 shares of the Registrant's Common Stock, $0 0 par value

# Community Health Systems, Inc.

## Form 10-Q

## For the Three and Nine Months Ended September 30, 2017

**Part I.** Financial Information Page

 **Item 1.** Financial Statements:

  Condensed Consolidated Statements of Loss   Three and Nine Months Ended September 30, 20  7 and September 30, 20  6 (Unaudited) 2

  Condensed Consolidated Statements of Comprehensive Loss   Three and Nine Months Ended September 30, 20  7 and September 30, 20  6 (Unaudited) 3

  Condensed Consolidated Balance Sheets   September  30, 20  7 and December 3  , 20  6 (Unaudited) 4

  Condensed Consolidated Statements of Cash Flows   Nine Months Ended September 30, 20  7 and September 30, 20  6 (Unaudited) 5

  Notes to Condensed Consolidated Financial Statements (Unaudited) 6

 **Item 2.** Management's Discussion and Analysis of Financial Condition and Results of Operations 57

 **Item 3.** Quantitative and Qualitative Disclosures about Market Risk 89

 **Item 4.** Controls and Procedures 89

**Part II.** Other Information

 **Item 1.** Legal Proceedings 90

 **Item 1A.** Risk Factors 94

 **Item 2.** Unregistered Sales of Equity Securities and Use of Proceeds 95

 **Item 3.** Defaults Upon Senior Securities 95

 **Item 4.** Mine Safety Disclosures 95

 **Item 5.** Other Information 95

 **Item 6.** Exhibits 96

**Signatures** 97

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF LOSS**
*(In millions, except share and per share data)*
*(Unaudited)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2017** | **2016** | **2017** | **2016** |
| Ope a ng evenues (ne of con ac ual allowances and d scoun s) | $ 4,333 | $ 5,084 | $ 14,323 | $ 16,128 |
| P ov s on fo bad deb s | 667 | 704 | 2,028 | 2,159 |
| *Net operating revenues* | 3,666 | 4,380 | 12,295 | 13,969 |
| *Operating costs and expenses:* | | | | |
| Sala es and benef s | 1,724 | 2,067 | 5,704 | 6,537 |
| Suppl es | 610 | 723 | 2,056 | 2,281 |
| O he ope a ng expenses | 911 | 1,026 | 2,984 | 3,256 |
| Gove nmen and o he legal se lemen s and ela ed cos s | 1 | 10 | (32) | 10 |
| Elec on c heal h eco ds ncen ve e mbu semen | (2) | (5) | (25) | (54) |
| Ren | 93 | 109 | 306 | 340 |
| Dep ec a on and amo za on | 206 | 265 | 665 | 839 |
| Impa men and (ga n) loss on sale of bus nesses, ne | 33 | 39 | 363 | 1,695 |
| To al ope a ng cos s and expenses | 3,576 | 4,234 | 12,021 | 14,904 |
| *Income (loss) from operations* | 90 | 146 | 274 | (935) |
| In e es expense, ne | 238 | 233 | 706 | 730 |
| Loss f om ea ly ex ngu shmen of deb | 4 | - | 35 | 30 |
| Ga n on sale of nves men s n unconsol da ed aff l a es | - | - | - | (94) |
| Equ y n ea n ngs of unconsol da ed aff l a es | (5) | (4) | (13) | (38) |
| Loss f om con nu ng ope a ons befo e ncome axes | (147) | (83) | (454) | (1,563) |
| Benef f om ncome axes | (59) | (29) | (74) | (141) |
| Loss f om con nu ng ope a ons | (88) | (54) | (380) | (1,422) |
| D scon nued ope a ons, ne of axes | | | | |
| Loss f om ope a ons of en es sold o held fo sale | (1) | (2) | (4) | (4) |
| Impa men of hosp als sold o held fo sale | (1) | - | (6) | (1) |
| Loss f om d scon nued ope a ons, ne of axes | (2) | (2) | (10) | (5) |
| *Net loss* | (90) | (56) | (390) | (1,427) |
| Less Ne ncome a bu able o noncon oll ng n e es s | 20 | 23 | 56 | 73 |
| Ne loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (110) | $ (79) | $ (446) | $ (1,500) |
| *Basic loss per share attributable to Community Health Systems, Inc. common stockholders:* | | | | |
| Con nu ng ope a ons | $ (0 96) | $ (0 69) | $ (3 91) | $ (13 50) |
| D scon nued ope a ons | (0 02) | (0 02) | (0 08) | (0 05) |
| Ne loss | $ (0 98) | $ (0 71) | $ (3 99) | $ (13 55) |
| *Diluted loss per share attributable to Community Health Systems, Inc. common stockholders:* | | | | |
| Con nu ng ope a ons | $ (0 96) | $ (0 69) | $ (3 91) | $ (13 50) |
| D scon nued ope a ons | (0 02) | (0 02) | (0 08) | (0 05) |
| Ne loss | $ (0 98) | $ (0 71) | $ (3 99) | $ (13 55) |
| *Weighted-average number of shares outstanding:* | | | | |
| Bas c | 111,935,738 | 110,888,040 | 111,701,812 | 110,672,520 |
| D lu ed | 111,935,738 | 110,888,040 | 111,701,812 | 110,672,520 |

See accompany ng no es o he condensed consol da ed f nanc al s a emen s

2

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
*(In millions)*
*(Unaudited)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net oss | $ (90) | $ (56) | $ (390) | $ (1,427) |
| Ot e co p e e s ve co e ( oss), et of co e taxes | | | | |
| Net c a ge fa va ue of te est ate swaps, et of tax | 5 | 10 | 8 | (11) |
| Net c a ge fa va ue of ava ab e-fo -sa e secu t es, et of tax | 2 | (7) | 7 | (8) |
| A o t zat o a d ecog t o of u ecog zed pe s o cost co po e ts, et of tax | 1 | - | 2 | 3 |
| Ot e co p e e s ve co e ( oss) | 8 | 3 | 17 | (16) |
| Co p e e s ve oss | (82) | (53) | (373) | (1,443) |
| Less Co p e e s ve co e att butab e to o co t o g te ests | 20 | 23 | 56 | 73 |
| Co p e e s ve oss att butab e to Co u ty Hea t Syste s, I c stock o de s | $ (102) | $ (76) | $ (429) | $ (1,516) |

See accompany ng no es o he condensed consol da ed f nanc al s a emen s

3

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
*(In millions, except share data)*
*(Unaudited)*

| | | September 30, 2017 | | December 31, 2016 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| *Current assets* | | | | |
| Cash and cash equ va ents | $ | 590 | $ | 238 |
| Pat ent accounts rece vab e, net of a owance for doubtfu accounts of $3,538 and $3,773 at September 30, 2017 and December 31, 2016, respect ve y | | 2,888 | | 3,176 |
| Supp es | | 5 | | 80 |
| Prepa d ncome taxes | | 22 | | 17 |
| Prepa d expenses and taxes | | 207 | | 187 |
| Other current assets | | 526 | | 568 |
| Tota current assets | | ,678 | | ,666 |
| *Property and equipment* | | 11,552 | | 12, 22 |
| ess accumu ated deprec at on and amort zat on | | ( ,221) | | ( ,273) |
| Property and equ pment, net | | 7,331 | | 8,1 9 |
| *Goodwill* | | 6,1 8 | | 6,521 |
| *Other assets net* | | 1,578 | | 2,608 |
| *Total assets* | $ | 19,735 | $ | 21,9 |
| **LIABILITIES AND EQUITY** | | | | |
| *Current liabilities* | | | | |
| Current matur t es of ong term debt | $ | 0 | $ | 55 |
| Accounts payab e | | 850 | | 995 |
| Accrued nterest | | 238 | | 207 |
| Accrued ab t es | | 1,1 9 | | 1,230 |
| Tota current ab t es | | 2,277 | | 2,887 |
| *Long term debt* | | 13,901 | | 1 ,789 |
| *Deferred income taxes* | | 319 | | 11 |
| *Other long term liabilities* | | 1,399 | | 1,575 |
| *Total liabilities* | | 17,896 | | 19,662 |
| *Redeemable noncontrolling interests in equity of consolidated subsidiaries* | | 530 | | 55 |
| *EQUITY* | | | | |
| *Community Health Systems Inc stockholders equity* | | | | |
| Preferred stock, $ 01 par va ue per share, 100,000,000 shares author zed none ssued | | | | |
| Common stock, $ 01 par va ue per share, 300,000,000 shares author zed 11 ,658,3 1 shares ssued and outstand ng at September 30, 2017, and 113,876,580 shares ssued and outstand ng at December 31, 2016 | | 1 | | 1 |
| Add t ona pa d n cap ta | | 2,002 | | 1,975 |
| Accumu ated other comprehens ve oss | | ( 5) | | (62) |
| Accumu ated def c t | | (7 5) | | (299) |
| Tota Commun ty ea th Systems, nc stockho ders equ ty | | 1,213 | | 1,615 |
| *Noncontrolling interests in equity of consolidated subsidiaries* | | 96 | | 113 |
| *Total equity* | | 1,309 | | 1,728 |
| *Total liabilities and equity* | $ | 19,735 | $ | 21,9 |

See accompany ng notes to the condensed conso dated f nanc a statements

4

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(In millions)*
*(Unaudited)*

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| *Cash flows from operating acti ities* | | |
| Net oss | $ (390) | $ (1, 27) |
| Ad ustments to reconc e net oss to net cash prov ded by operat ng act v t es | | |
| Deprec at on and amort zat on | 665 | 839 |
| Government and other ega sett ements and re ated costs | 8 | 10 |
| Stock based compensat on expense | 20 | 36 |
| mpa rment of hosp ta s so d or he d for sa e | 6 | 1 |
| mpa rment and (ga n) oss on sa e of bus nesses, net | 363 | 1,695 |
| oss from ear y ext ngu shment of debt | 35 | 30 |
| Ga n on sa e of nvestments n unconso dated aff ates | | (9 ) |
| Other non cash expenses, net | 2 | 19 |
| Changes n operat ng assets and ab t es, net of effects of acqu s t ons and d vest tures | | |
| Pat ent accounts rece vab e | 229 | ( 0) |
| Supp es, prepa d expenses and other current assets | (37) | 6 |
| Accounts payab e, accrued ab t es and ncome taxes | (215) | (256) |
| Other | (91) | (67) |
| Net cash prov ded by operat ng act v t es | 617 | 810 |
| *Cash flows from in esting acti ities* | | |
| Acqu s t ons of fac t es and other re ated equ pment | ( ) | (122) |
| Purchases of property and equ pment | ( 28) | (561) |
| Proceeds from d spos t on of hosp ta s and other anc ary operat ons | 1,666 | 12 |
| Proceeds from sa e of property and equ pment | | 10 |
| Purchases of ava ab e for sa e secur t es | (85) | (395) |
| Proceeds from sa es of ava ab e for sa e secur t es | 133 | 386 |
| Proceeds from sa e of nvestments n unconso dated aff ates | | 03 |
| D str but on from Quorum ea th Corporat on | | 1,219 |
| ncrease n other nvestments | (95) | (201) |
| Net cash prov ded by nvest ng act v t es | 1,191 | 751 |
| *Cash flows from financing acti ities* | | |
| Repurchase of restr cted stock shares for payro tax w thho d ng requ rements | (5) | (5) |
| Deferred f nanc ng costs and other debt re ated costs | (66) | (22) |
| Proceeds from noncontro ng nvestors n o nt ventures | 5 | |
| Redempt on of noncontro ng nvestments n o nt ventures | (5) | (19) |
| D str but ons to noncontro ng nvestors n o nt ventures | (79) | (69) |
| Borrow ngs under cred t agreements | 839 | 3,929 |
| ssuance of ong term debt | 3,100 | |
| Proceeds from rece vab es fac ty | 26 | 66 |
| Repayments of ong term ndebtedness | (5,271) | (5, 92) |
| Net cash used n f nanc ng act v t es | (1, 56) | (1,612) |
| *Net change in cash and cash equi alents* | 352 | (51) |
| *Cash and cash equi alents at beginning of period* | 238 | 18 |
| Cash and cash equi alents at end of period | $ 590 | $ 133 |
| *Supplemental disclosure of cash flow information* | | |
| nterest payments | $ (630) | $ (767) |
| ncome tax payments, net of refunds | $ (5) | $ (6) |

See accompany ng notes to the condensed conso dated f nanc a statements

5

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**

## 1. BASIS OF PRESENTATION AND SIGNIFICANT ACCOUNTING POLICIES

The unaudited condensed consolidated financial statements of Community Health Systems, Inc  (the "Parent" or "Parent Company") and its subsidiaries (the "Company") as of September 30, 20  7 and December 3  , 20  6 and for the three month and nine month periods ended September 30, 20  7 and 20  6, have been prepared in accordance with accounting principles generally accepted in the United States of America ("U S  GAAP")  In the opinion of management, such information contains all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the results for such periods  All intercompany transactions and balances have been eliminated  The results of operations for the three and nine months ended September 30, 20  7, are not necessarily indicative of the results to be expected for the full fiscal year ending December 3  , 20  7  Certain information and disclosures normally included in the notes to condensed consolidated financial statements have been condensed or omitted as permitted by the rules and regulations of the Securities and Exchange Commission (the "SEC")  The Company believes the disclosures are adequate to make the information presented not misleading  The accompanying unaudited condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 3  , 20  6, contained in the Company's Annual Report on Form   0 K filed with the SEC on February 2  , 20  7 ("20  6 Form   0 K")

Noncontrolling interests in less than wholly owned consolidated subsidiaries of the Parent are presented as a component of total equity on the condensed consolidated balance sheets to distinguish between the interests of the Parent Company and the interests of the noncontrolling owners  Noncontrolling interests that are redeemable or may become redeemable at a fixed or determinable price at the option of the holder or upon the occurrence of an event outside of the control of the Company are presented in mezzanine equity on the condensed consolidated balance sheets

Throughout these notes to the condensed consolidated financial statements, Community Health Systems, Inc , and its consolidated subsidiaries are referred to on a collective basis as the "Company "  This drafting style is not meant to indicate that the publicly traded Parent or any particular subsidiary of the Parent owns or operates any asset, business, or property  The hospitals, operations and businesses described in this filing are owned and operated by distinct and indirect subsidiaries of Community Health Systems, Inc

*Allowance for Doubtful Accounts*   Accounts receivable are reduced by an allowance for amounts that could become uncollectible in the future  Substantially all of the Company's receivables are related to providing healthcare services to patients at its hospitals and affiliated businesses

The Company estimates the allowance for doubtful accounts by reserving a percentage of all self pay accounts receivable without regard to aging category, based on collection history, adjusted for expected recoveries and any anticipated changes in trends  The Company's ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of net accounts receivable as the Company believes that substantially all of the risk exists at the point in time such accounts are identified as self pay  For all other non self pay payor categories, the Company reserves an estimated amount on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge  These amounts represent an immaterial percentage of the outstanding accounts receivable  The percentage used to reserve for all self pay accounts is based on the Company's collection history  The Company collects substantially all of its third party insured receivables, which include receivables from governmental agencies

Collections are impacted by the economic ability of patients to pay and the effectiveness of the Company's collection efforts  Significant changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage could affect the Company's collection of accounts receivable and the estimates of the collectability of future accounts receivable and are considered in the Company's estimates of accounts receivable collectability  The Company also continually reviews its overall reserve adequacy by monitoring historical cash collections as a percentage of trailing net revenue less provision for bad debts, as well as by analyzing current period net revenue and admissions by payor classification, aged accounts receivable by payor, days revenue outstanding, the composition of self pay receivables between pure self pay patients and the patient responsibility portion of third party insured receivables and the impact of recent acquisitions and dispositions

6

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

Operating revenues, net of contractual allowances and discounts (but before the provision for bad debts), recognized during the three and nine months ended September 30, 20 7 and 20 6, were as follows (in millions):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Medicare | $ 96 | $ , 70 | $ 3,268 | $ 3,866 |
| Medicaid | 478 | 53 | ,538 | ,676 |
| Managed Care and other third party payors | 2,3 9 | 2,74 | 7,722 | 8,580 |
| Self pay | 575 | 642 | ,795 | 2,006 |
| Total | $ 4,333 | $ 5,084 | $ 4,323 | $ 6, 28 |

*Electronic Health Records Incentive Reimbursement.*   The federal government has implemented a number of regulations and programs designed to promote the use of electronic health records ("EHR") technology and, pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH"), established requirements for a Medicare and Medicaid incentive payments program for eligible hospitals and professionals that adopt and meaningfully use certified EHR technology  The Company utilizes a gain contingency model to recognize EHR incentive payments  Recognition occurs when the eligible hospitals adopt or demonstrate meaningful use of certified EHR technology for the applicable payment period and have available the Medicare cost report information for the relevant full cost report year used to determine the final incentive payment

Medicaid EHR incentive payments are calculated based on prior period Medicare cost report information available at the time when eligible hospitals adopt, implement, upgrade or demonstrate meaningful use of certified EHR technology  Since the information for the relevant full Medicare cost report year is available at the time of attestation, the incentive income from resolving the gain contingency is recognized when eligible hospitals adopt, implement, upgrade or demonstrate meaningful use of certified EHR technology

Medicare EHR incentive payments are calculated based on the Medicare cost report information for the full cost report year that began during the federal fiscal year in which meaningful use is demonstrated  Since the necessary information is only available at the end of the relevant full Medicare cost report year and after the cost report is settled, the incentive income from resolving the gain contingency is recognized when eligible hospitals demonstrate meaningful use of certified EHR technology and the information for the applicable full Medicare cost report year to determine the final incentive payment is available

In some instances, the Company may receive estimated Medicare EHR incentive payments prior to when the Medicare cost report information used to determine the final incentive payment is available  In these instances, recognition of the gain for EHR incentive payments is deferred until all recognition criteria described above are met

Eligibility for annual Medicare incentive payments is dependent on providers successfully attesting to the meaningful use of EHR technology  Medicaid incentive payments are available to providers in the first payment year that they adopt, implement or upgrade certified EHR technology; however, providers must demonstrate meaningful use of such technology in any subsequent payment years to qualify for additional incentive payments  Medicaid EHR incentive payments are fully funded by the federal government and administered by the states; however, the states are not required to offer EHR incentive payments to providers

The Company recognized approximately $2 million and $5 million for the three months ended September 30, 20 7 and 20 6, respectively, and $25 million and $54 million for the nine months ended September 30, 20 7 and 20 6, respectively, of incentive reimbursement for HITECH incentives from Medicare and Medicaid related to certain of the Company's hospitals and for certain of the Company's employed physicians that have demonstrated meaningful use of certified EHR technology or have completed attestations to their adoption or implementation of certified EHR technology  These incentive reimbursements are presented as a reduction of operating costs and expenses on the condensed consolidated statements of loss  The Company received cash related to the incentive reimbursement for HITECH incentives of approximately $3 million and $7 million for the three months ended September 30, 20 7 and 20 6, respectively, and approximately $39 million and $  6 million for the nine months ended September 30, 20 7 and 20 6, respectively  The Company recorded no deferred revenue in connection with the receipt of these payments for either September 30, 20 7 or September 30, 20 6

7

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

*Accounting for the Impairment or Disposal of Long Lived Assets.*   During the nine months ended September 30, 20 7, the Company recorded a total combined impairment charge and loss on disposal of approximately $363 million to reduce the carrying value of certain hospitals that have been deemed held for sale based on the difference between the carrying value of the hospital disposal groups compared to estimated fair value less costs to sell  Included in the carrying value of the hospital disposal groups at September 30, 20 7 is a net allocation of approximately $229 million of goodwill allocated from the hospital operations reporting unit goodwill based on a calculation of the disposal groups' relative fair value compared to the total reporting unit  The Company will continue to evaluate the potential for further impairment of the long lived assets of underperforming hospitals as well as evaluating offers for potential sale  Based on such analysis, additional impairment charges may be recorded in the future

*New Accounting Pronouncements.*   In May 20  4, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 20  4 09, which outlines a single comprehensive model for recognizing revenue and supersedes most existing revenue recognition guidance, including guidance specific to the healthcare industry  This ASU provides companies the option of applying a full or modified retrospective approach upon adoption  This ASU is effective for fiscal years beginning after December  5, 20  7, with early adoption permitted for annual periods beginning after December  5, 20  6  The Company expects to adopt this ASU on January  , 20  8 and is currently implementing its plan for adoption and evaluating the impact on its revenue recognition policies, procedures and control framework and the resulting impact on its consolidated financial position, results of operations and cash flows  The Company has established an implementation group for this ASU with an implementation plan to transition to the new standard and determine its impact during 20  7  A significant element of executing this plan is the process of reviewing sources of revenue and evaluating the patient account population to determine the appropriate distribution of patient accounts into portfolios with similar characteristics that, when evaluated under the new revenue standard, will result in a materially consistent revenue amount for such portfolios as if each patient account was evaluated on a contract by contract basis  The Company is currently evaluating the appropriate portfolios to apply in its analysis and is considering the impact of applying the new standard when its individual patient accounts are evaluated in those portfolios  The Company continues to assess the quantitative impact that the adoption of this accounting standard will have on the financial statements of the Company  Currently, the Company does not expect the adoption of this ASU to have a material impact on its consolidated results of operations on a prospective basis  However, it is possible that as a result of the evaluation process to adopt this ASU, a material adjustment could be made to reduce the amount of net patient accounts receivable on the consolidated statement of financial position of the Company  This potential impact is a result of the Company's preliminary observations from the application of new processes and methodologies to determine the patient portfolios and estimate the implicit price concessions and constraints on revenue required by this new accounting standard  These assessments of the impact of implementing this ASU are subject to completion of the Company's processes in adopting this new standard  The Company expects this process will be completed in the fourth quarter of 20  7 and expects to disclose the effect of implementing this ASU in its Annual Report on Form   0 K for the year ending December 3  , 20  7 ("20  7 Form   0 K")

The Company is also in the process of assessing the impact of the new standard on various reimbursement programs that represent variable consideration, including settlements with third party payors, disproportionate share payments, supplemental state Medicaid programs, bundled payment of care programs and other reimbursement programs in which the Company's hospitals participate  Due to the many different forms of calculation and reimbursement that these programs take that vary from state to state, the application of the new accounting standard could have an impact on the revenue recognized for variable consideration  Moreover, industry guidance is continuing to develop around this issue, and any conclusions in the final industry guidance that is inconsistent with the Company's application could result in changes to the Company's expectations regarding the impact that this new accounting standard could have on the Company's financial statements  For example, in July 20  7, a draft of industry guidance was issued on the application of this ASU on variable consideration resulting from settlements with third party payors, and in October 20  7, a draft of industry guidance was issued on the application of this ASU on variable consideration resulting from bundled payment of care programs and other risk sharing arrangements  The Company is evaluating whether such industry guidance will have an impact on its current accounting policies and procedures related to third party settlements  Final drafts of industry guidance on these and other reimbursement programs unique to the healthcare industry are expected later in 20  7  The Company is monitoring the development of such guidance

Additionally, the adoption of the new accounting standard will impact the presentation on the Company's statement of operations for a significant component of its provision for bad debts  After adoption of the new standard, the majority of what is currently classified as the provision for bad debts will be reflected as an implicit price concession as defined in the standard and therefore a reduction to net patient revenue  The Company will consider certain changes in collectability on its self pay patient accounts receivable resulting from certain credit and collection issues not assessed at the date of service and recognize such amounts in the provision for bad debts included in operating expenses on the statement of operations

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

Previously, the Company disclosed its intention to apply the full retrospective approach to implementing this ASU upon adoption at January , 20 8 During the last several months, as the Company has developed and implemented new processes for accumulating detailed financial information on patient revenue at the portfolio level, management concluded that the full retrospective approach to applying this ASU to prior periods would be significantly impacted by the number of hospitals that the Company has divested or spun off in recent years, and the effect of those transactions on the portfolios As a result, the Company has now decided to apply the modified retrospective approach to adopting this ASU

In January 20 6, the FASB issued ASU 20 6 0 , which amends the measurement, presentation and disclosure requirements for equity investments, other than those accounted for under the equity method or that require consolidation of the investee The ASU eliminates the classification of equity investments as available for sale with any changes in fair value of such investments recognized in other comprehensive income, and requires entities to measure equity investments at fair value, with any changes in fair value recognized in net income This ASU is effective for fiscal years beginning after December 5, 20 7, with early adoption permitted The Company expects to adopt this ASU on January , 20 8, and is currently evaluating the impact that adoption of this ASU will have on its consolidated financial position and results of operations

In February 20 6, the FASB issued ASU 20 6 02, which amends the accounting for leases, requiring lessees to recognize most leases on their balance sheet with a right of use asset and a lease liability Leases will be classified as either finance or operating leases, which will impact the expense recognition of such leases over the lease term The ASU also modifies the lease classification criteria for lessors and eliminates some of the real estate leasing guidance previously applied for certain leasing transactions This ASU is effective for fiscal years beginning after December 5, 20 8, with early adoption permitted The Company expects to adopt this ASU on January , 20 9 Because of the number of leases the Company utilizes to support its operations, the adoption of this ASU is expected to have a significant impact on the Company's consolidated financial position and results of operations Management is currently evaluating the extent of this anticipated impact on the Company's consolidated financial position and results of operations, and the quantitative and qualitative factors that will impact the Company as part of the adoption of this ASU, as well as any changes to its leasing strategy that may occur because of the changes to the accounting and recognition of leases Most recently, the Company has organized an implementation group of cross functional departmental management to ensure the completeness of its lease information, analyze the appropriate classification of current leases under the new standard, and develop new processes to execute, approve and classify leases on an ongoing basis The Company has also engaged outside experts to assist in the development of this plan, as well as the identification and selection of software tools and processes to maintain lease information critical to applying the new standard

In March 20 6, the FASB issued ASU 20 6 09, which was issued to simplify some of the accounting guidance for share based compensation Among the areas impacted by the amendments in this ASU is the accounting for income taxes related to share based payments, accounting for forfeitures, classification of awards as equity or liabilities, and classification on the statement of cash flows This ASU is effective for fiscal years beginning after December 5, 20 6 The Company adopted this ASU on January , 20 7 Because of the recent decline in the Company's stock price below the Company's stock price at the stock award grant date for outstanding share based awards, the principal impact from adopting this ASU has been a $ 6 million increase in the Company's current provision for income taxes due to the deficiency created by a difference between the actual tax deduction that will be recognized from the vesting of outstanding share based awards during the nine months ended September 30, 20 7, compared to the higher stock compensation expense previously recorded over the vesting period as determined based on the fair value of the restricted stock at the grant date

In January 20 7, the FASB issued ASU 20 7 04, which simplifies the accounting for goodwill impairment by eliminating step two from the goodwill impairment test Instead of a two step impairment model, if the carrying amount of a reporting unit exceeds its fair value as determined in step one of the impairment test, an impairment loss is measured at the amount equal to that excess, limited to the total amount of goodwill allocated to that reporting unit This ASU is effective for any interim or annual impairment tests for fiscal years beginning after December 5, 20 9, with early adoption permitted As noted in the Company's critical accounting policy discussion on goodwill, during the fourth quarter of 20 6 the Company performed its annual goodwill impairment analysis While the result of the step two valuation in that analysis did not indicate an impairment of goodwill, the initial calculation of hospital operations reporting unit fair value in the step one test indicated that the carrying amount of the hospital operations reporting unit exceeded its fair value by approximately $800 million Depending on future changes in fair value and the impact of allocated goodwill for planned divestitures, at adoption there could be a material impairment charge recorded for this excess amount The Company is evaluating whether to early adopt this ASU and what impact it will have on its consolidated financial position and results of operations

9

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

In March 20 7, the FASB issued ASU 20 7 07, which changes the presentation of the components of net periodic benefit cost for sponsors of defined benefit plans for pensions  Under the changes in this ASU, the service cost component of net periodic benefit cost will be reported in the same income statement line as other employee compensation costs arising from services during the reporting period  The other components of net periodic benefit cost will be presented separately in a line item outside of operating income  This ASU is effective for fiscal years beginning after December  5, 20 7, with early adoption permitted  The Company expects to adopt this ASU on January  , 20 8, and is currently evaluating the impact that adoption of this ASU will have on its consolidated results of operations  Since the changes required in this new ASU only change the income statement classification of the components of net periodic benefit cost, no changes are expected to income from continuing operations or net income  Currently, the Company reports all of the components of net periodic benefit cost as a component of salaries and benefits on the consolidated statement of income

In August 20 7, the FASB issued ASU 20 7  2, which was issued to amend hedge accounting recognition and disclosure requirements to improve transparency and simplify the application of hedge accounting for certain hedging instruments  The amendments in this ASU that will have an impact on the Company include simplification of the periodic hedge effectiveness assessment, elimination of the benchmark interest rate concept for interest rate swaps, and enhancement of the ability to use the critical terms match method for its cash flow hedges of forecasted interest payments  This ASU is effective for fiscal years beginning after December  5, 20 8, with early adoption permitted  The Company expects to early adopt this ASU on January  , 20 8, and is currently evaluating the impact that adoption of this ASU will have on its consolidated financial position and results of operations

**2. ACCOUNTING FOR STOCK-BASED COMPENSATION**

Stock based compensation awards have been granted under the Community Health Systems, Inc  Amended and Restated 2000 Stock Option and Award Plan, amended and restated as of March 20, 20 3 (the "2000 Plan"), and the Community Health Systems, Inc  Amended and Restated 2009 Stock Option and Award Plan, which was amended and restated as of March  6, 20 6 and approved by the Company's stockholders at the annual meeting of stockholders held on May  7, 20 6 (the "2009 Plan")

The 2000 Plan allowed for the grant of incentive stock options intended to qualify under Section 422 of the Internal Revenue Code (the "IRC"), as well as stock options which do not so qualify, stock appreciation rights, restricted stock, restricted stock units, performance based shares or units and other share awards  Prior to being amended in 2009, the 2000 Plan also allowed for the grant of phantom stock  Persons eligible to receive grants under the 2000 Plan include the Company's directors, officers, employees and consultants  All options granted under the 2000 Plan have been "nonqualified" stock options for tax purposes  Generally, vesting of these granted options occurs in one third increments on each of the first three anniversaries of the award date  Options granted prior to 2005 have a  0 year contractual term, options granted in 2005 through 2007 have an eight year contractual term and options granted in 2008 through 20  have a  0 year contractual term  The Company has not granted stock option awards under the 2000 Plan since 20   Pursuant to the amendment and restatement of the 2000 Plan dated March 20, 20 3, no further grants will be awarded under the 2000 Plan

The 2009 Plan provides for the grant of incentive stock options intended to qualify under Section 422 of the IRC and for the grant of stock options which do not so qualify, stock appreciation rights, restricted stock, restricted stock units, performance based shares or units and other share awards  Persons eligible to receive grants under the 2009 Plan include the Company's directors, officers, employees and consultants  To date, all options granted under the 2009 Plan have been "nonqualified" stock options for tax purposes  Generally, vesting of these granted options occurs in one third increments on each of the first three anniversaries of the award date  Options granted in 20  or later have a  0 year contractual term  As of September 30, 20  7, 4,040,703 shares of unissued common stock were reserved for future grants under the 2009 Plan

The exercise price of all options granted under the 2000 Plan and the 2009 Plan has been equal to the fair value of the Company's common stock on the option grant date

0

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

The following table reflects the impact of total compensation expense related to stock based equity plans on the reported operating results for the respective periods (in millions):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Effect on loss from continuing operations before income taxes | $ (6) | $ ( 0) | $ (20) | $ (36) |
| Effect on net loss | $ (4) | $ (6) | $ ( 3) | $ (2 ) |

At September 30, 20 7, $24 million of unrecognized stock based compensation expense related to outstanding unvested restricted stock and restricted s oc  ni s ( he  e ms of which a e s mma ized below) was expec ed  o be  ecognized ove  a weigh ed ave age pe iod of    mon hs The e is no expense  o be recognized related to stock options  There were no modifications to awards during the three or nine months ended September 30, 20 7 and 20 6

Options outstanding and exercisable under the 2000 Plan and the 2009 Plan as of September 30, 20 7, and changes during each of the three month periods following December 3 , 20 6, were as follows (in millions, except share and per share data):

| | Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value as of September 30, 2017 |
|---|---|---|---|---|
| Outstanding at December 3 , 20 6 | , 85,320 | $ 28 2 | | |
| Granted | | | | |
| Exercised | | | | |
| Forfeited and cancelled | ( 6,8 5) | 28 82 | | |
| Outstanding at March 3 , 20 7 | , 68,505 | 3 7 | | |
| Granted | | | | |
| Exercised | | | | |
| Forfeited and cancelled | ( 6, 68) | 36 59 | | |
| Outstanding at June 30, 20 7 | , 52,337 | 3 65 | | |
| Granted | | | | |
| Exercised | | | | |
| Forfeited and cancelled | (20, 68) | 35 73 | | |
| Outstanding at September 30, 20 7 | , 32, 69 | $ 3 56 | 2 2 years | $ |
| Exercisable at September 30, 20 7 | , 32, 69 | $ 3 56 | 2 2 years | $ |

No stock options were granted during the three or nine months ended September 30, 20 7 and 20 6  The aggregate intrinsic value (calculated as the number of in the money stock options multiplied by the difference between the Company's closing stock price on the last trading day of the reporting period ($7 68) and the exercise price of the respective stock options) in the table above represents the amount that would have been received by the option holders had all option holders exercised their options on September 30, 20 7  This amount changes based on the market value of the Company's common stock There were no options exercised during the three or nine months ended September 30, 20 7 and 20 6  The aggregate intrinsic value of options vested and expected to vest approximates that of the outstanding options

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

The Company has also awarded restricted stock under the 2000 Plan and the 2009 Plan to employees of certain subsidiaries  The restrictions on these shares generally lapse in one third increments on each of the first three anniversaries of the award date  Certain of the restricted stock awards granted to the Company's senior executives contain a performance objective that must be met in addition to any time based vesting requirements  If the performance objective is not attained, the awards will be forfeited in their entirety  For such performance based awards granted prior to 20 7, once the performance objective has been attained, restrictions will lapse in one third increments on each of the first three anniversaries of the award date  For performance based awards granted beginning in March 20 7, the performance objective is measured cumulatively over a three year period  With respect to these performance based awards granted beginning in March 20 7, if the performance criteria are met at the end of three years, then the restricted stock award will vest in full  Additionally, for these awards, based on the level of achievement for the performance criteria, the number of shares to be issued in connection with the vesting of the award can be adjusted to decrease or increase the number of shares specified in the original award  Notwithstanding the above mentioned performance objectives and vesting requirements, the restrictions with respect to restricted stock granted under the 2000 Plan and the 2009 Plan will lapse earlier in the event of death, disability or termination of employment by the Company for any reason other than for cause of the holder of the restricted stock, or change in control of the Company  Restricted stock awards subject to performance standards that have not yet been satisfied are not considered outstanding for purposes of determining earnings per share until the performance objectives have been satisfied

Restricted stock outstanding under the 2000 Plan and the 2009 Plan as of September 30, 20 7, and changes during each of the three month periods following December 3 , 20 6, were as follows:

| | Shares | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Unvested at December 3 , 20 6 | 2,969,285 | $ 29 39 |
| Granted | ,323,000 | 9 5 |
| Vested | ( ,470, 7 ) | 35 3 |
| Forfeited | (32,837) | 28 35 |
| Unvested at March 3 , 20 7 | 2,789,277 | 6 69 |
| Granted | 33,000 | 9 5 |
| Vested | ( 5,002) | 35 58 |
| Forfeited | (84,336) | 6 24 |
| Unvested at June 30, 20 7 | 2,822,939 | 6 25 |
| Granted | | |
| Vested | | |
| Forfeited | ( 00,336) | 6 90 |
| Unvested at September 30, 20 7 | 2,722,603 | 6 22 |

Restricted stock units ("RSUs") have been granted to the Company's outside directors under the 2000 Plan and the 2009 Plan  On March , 20 6, each of the Company's outside directors received a grant under the 2009 Plan of ,0 7 RSUs  On March , 20 7, each of the Company's outside directors received a grant under the 2009 Plan of 8,498 RSUs  Each of the 20 6 and 20 7 grants had a grant date fair value of approximately $ 70,000  Vesting of these RSUs occurs in one third increments on each of the first three anniversaries of the award date or upon the director's earlier cessation of service on the board, other than for cause

2

**Tab e of Contents**

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

RSUs outstanding under the 2000 Plan and the 2009 Plan as of September 30, 20 7, and changes during each of the three month periods following December 3 , 20 6, were as follows:

| | Shares | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Unvested at December 3 , 20 6 | 20,386 | $ | 22 06 |
| Granted | 0,988 | | 9 9 |
| Vested | (48,876) | | 29 95 |
| Forfeited | | | |
| Unvested at March 3 , 20 7 | 82,498 | | 3 9 |
| Granted | | | |
| Vested | ( 0,420) | | 9 97 |
| Forfeited | | | |
| Unvested at June 30, 20 7 | 72,078 | | 2 78 |
| Granted | | | |
| Vested | | | |
| Forfeited | | | |
| Unvested at September 30, 20 7 | 72,078 | | 2 78 |

## 3. COST OF REVENUE

Substantially all of the Company's operating costs and expenses are "cost of revenue" items  Operating costs that could be classified as general and administrative by the Company would include the Company's corporate office costs at its Franklin, Tennessee office, which were $42 million and $43 million for the three months ended September 30, 20 7 and 20 6, respectively, and $ 35 million and $ 46 million for the nine months ended September 30, 20 7 and 20 6, respectively  Included in these corporate office costs is stock based compensation of $6 million and $ 0 million for the three months ended September 30, 20 7 and 20 6, respectively, and $20 million and $36 million for the nine months ended September 30, 20 7 and 20 6, respectively

## 4. USE OF ESTIMATES

The preparation of financial statements in conformity with U S  GAAP requires management to make estimates and assumptions that affect the amounts reported in the condensed consolidated financial statements  Actual results could differ from these estimates under different assumptions or conditions

## 5. ACQUISITIONS AND DIVESTITURES

*Acquisitions*

The Company accounts for all transactions that represent business combinations using the acquisition method of accounting, where the identifiable assets acquired, the liabilities assumed and any noncontrolling interest in the acquired entity are recognized and measured at their fair values on the date the Company obtains control in the acquiree  Such fair values that are not finalized for reporting periods following the acquisition date are estimated and recorded as provisional amounts  Adjustments to these provisional amounts during the measurement period (defined as the date through which all information required to identify and measure the consideration transferred, the assets acquired, the liabilities assumed and any noncontrolling interests has been obtained, limited to one year from the acquisition date) are recorded as of the date of acquisition  Goodwill is determined as the excess of the fair value of the consideration conveyed in the acquisition over the fair value of the net assets acquired

Acquisition and integration expenses related to prospective and closed acquisitions included in other operating expenses on the condensed consolidated statements of loss were less than $  million and approximately $  million during the three months ended September 30, 20 7 and 20 6, respectively, and approximately $  million and $4 million during the nine months ended September 30, 20 7 and 20 6, respectively

3

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

On April  , 20  6, one or more subsidiaries of the Company completed the acquisition of an 80% interest in Physicians' Specialty Hospital (20 licensed beds), a Medicare certified specialty surgical hospital in Fayetteville, Arkansas  The total cash consideration paid for the 80% ownership interest in this joint venture was approximately $  2 million, with additional consideration of $2 million assumed in liabilities, for a total consideration of $  4 million  The value of the noncontrolling interest at acquisition was $2 million  Based upon the Company's final purchase price allocation relating to this acquisition as of September 30, 20  7, approximately $  2 million of goodwill has been recorded

On March  , 20  6, one or more subsidiaries of the Company completed the acquisition of an 80% ownership interest in a joint venture entity with Indiana University Health that includes substantially all of the assets of IU Health La Porte Hospital ("La Porte") in La Porte, Indiana (227 licensed beds) and IU Health Starke Hospital ("Starke") in Knox, Indiana (50 licensed beds), and affiliated outpatient centers and physician practices  The total cash consideration paid for the 80% ownership interest in this joint venture was approximately $96 million with additional consideration of $8 million assumed in liabilities, for a total consideration of $  04 million  The value of the noncontrolling interest at acquisition was $25 million  Based upon the Company's final purchase price allocation relating to this acquisition as of September 30, 20  7, approximately $45 million of goodwill has been recorded

*Other Acquisitions*

During the nine months ended September 30, 20  7, one or more subsidiaries of the Company paid approximately $4 million to acquire the operating assets and related businesses of certain physician practices, clinics and other ancillary businesses that operate within the communities served by the Company's affiliated hospitals  In connection with these acquisitions, during the nine months ended September 30, 20  7, the Company allocated approximately $   million of the consideration paid to property and equipment and net working capital and the remainder, approximately $3 million consisting of intangible assets that do not qualify for separate recognition, to goodwill

*Divestitures*

In April 20  4, FASB issued ASU 20  4 08, which changed the requirements for reporting discontinued operations  Under this accounting standard, a discontinued operation is a disposal that represents a strategic shift that has (or will have) a major effect on an entity's operations and financial results  Additional disclosures are required for significant components of the entity that are disposed of or are held for sale but do not qualify as discontinued operations  This ASU was adopted on January  , 20  5 and is required to be applied on a prospective basis for disposals or components initially classified as held for sale after adoption  As a result, the following divestitures occurring subsequent to the date of adoption are included in continuing operations for the nine months ended September 30, 20  7 and 20  6  Additionally, the impact of the hospitals and other assets spun off to Quorum Health Corporation ("QHC") are discussed in Note 6 below

Effective September  , 20  7, one or more subsidiaries of the Company sold Yakima Regional Medical and Cardiac Center (2  4 licensed beds) in Yakima, Washington and Toppenish Community Hospital (63 licensed beds) in Toppenish, Washington, to Regional Health for approximately $43 million in a combination of cash and a note receivable from the buyer

Effective July  , 20  7, one or more subsidiaries of the Company sold four Pennsylvania hospitals and their associated assets to subsidiaries of PinnacleHealth System for approximately $23   million in cash, which was received at closing on July 3, 20  7  Hospitals included in the transaction were Memorial Hospital of York (  00 licensed beds) in York, Pennsylvania; Lancaster Regional Medical Center (2  4 licensed beds) in Lancaster, Pennsylvania; Heart of Lancaster Regional Medical Center (  48 licensed beds) in Lititz, Pennsylvania; and Carlisle Regional Medical Center (  65 licensed beds) in Carlisle, Pennsylvania

Effective July  , 20  7, one or more subsidiaries of the Company sold Tomball Regional Medical Center (350 licensed beds) in Tomball, Texas and the associated assets to subsidiaries of HCA, and South Texas Regional Medical Center (67 licensed beds) in Jourdanton, Texas, and the associated assets to subsidiaries of HCA and Methodist Healthcare System of San Antonio, Ltd , L L P (a partnership between HCA and Methodist Healthcare Ministries) for approximately $  35 million in cash, which was received at the preliminary closing on June 30, 20  7

Effective July  , 20  7, one or more subsidiaries of the Company sold two hospitals, a clinic and their associated assets to MultiCare Health System for approximately $424 million in cash, of which $4  4 million was received at the preliminary closing on June 30, 20  7, with the remainder held in escrow  Facilities included in this transaction were Deaconess Hospital (388 licensed beds) in Spokane, Washington, Valley Hospital (  23 licensed beds) in Spokane Valley, Washington, and the multi specialty Rockwood Clinic in Spokane, Washington

4

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

On June 30, 20 7, one or more subsidiaries of the Company sold Lake Area Medical Center (88 licensed beds) in Lake Charles, Louisiana to subsidiaries of CHRISTUS Health for approximately $32 million in cash, which was received at closing on June 30, 20 7

On May , 20 7, one or more subsidiaries of the Company sold Stringfellow Memorial Hospital ( 25 licensed beds) in Anniston, Alabama, and its associated assets to The Health Care Authority of the City of Anniston for approximately $ 4 million in cash

On May , 20 7, one or more subsidiaries of the Company sold Merit Health Gilmore Memorial (95 licensed beds) in Amory, Mississippi and Merit Health Batesville ( 2 licensed beds) in Batesville, Mississippi, and the associated assets to Curae Health, Inc for approximately $32 million in a combination of cash and a note receivable from the buyer

On May , 20 7, one or more subsidiaries of the Company sold Easton Hospital ( 96 licensed beds) in Easton, Pennsylvania; Sharon Regional Health System (258 licensed beds) in Sharon, Pennsylvania; Northside Medical Center (355 licensed beds) in Youngstown, Ohio; Trumbull Memorial Hospital (3 licensed beds) in Warren, Ohio; Hillside Rehabilitation Hospital (69 licensed beds) in Warren, Ohio; Wuesthoff Health System Rockledge (298 licensed beds) in Rockledge, Florida; Wuesthoff Health System Melbourne ( 9 licensed beds) in Melbourne, Florida; and Sebastian River Medical Center ( 54 licensed beds) in Sebastian, Florida, and the associated assets to Steward Health, Inc for approximately $304 million in cash

On December 3 , 20 6, one or more subsidiaries of the Company sold an 80% majority ownership interest in the home care division to a subsidiary of Almost Family, Inc for $ 28 million In connection with the divestiture of a controlling interest in the home care division, the Company recorded a gain of approximately $9 million during the year ended December 3 , 20 6

Effective September 3, 20 6, one or more subsidiaries of the Company finalized an agreement to terminate the lease and cease operations of Alliance Health Blackwell (53 licensed beds) in Blackwell, Oklahoma, agreeing to terminate the lease with the landlord, The Blackwell Hospital Trust Authority Loss from continuing operations for the year ended December 3 , 20 6 includes an impairment charge of approximately $3 million related to the write off of certain intangible assets abandoned as part of exiting the lease to operate this hospital

Effective February , 20 6, one or more subsidiaries of the Company sold Lehigh Regional Medical Center (88 licensed beds) in Lehigh Acres, Florida, ("Lehigh") and related outpatient services to Prime Healthcare Services, Inc ("Prime") for approximately $ million in cash In connection with the divestiture of Lehigh, the Company recorded an impairment charge of approximately $4 million related to the allocated hospital reporting unit goodwill in 20 6

Effective January , 20 6, one or more subsidiaries of the Company sold Bartow Regional Medical Center (72 licensed beds) in Bartow, Florida, ("Bartow") and related outpatient services to BayCare Health Systems, Inc for approximately $60 million in cash, which was received at a preliminary closing on December 3 , 20 5 In connection with the divestiture of Bartow, the Company recorded an impairment charge of approximately $5 million related to the allocated hospital reporting unit goodwill in 20 6

The financial results included in discontinued operations for divestitures or hospitals held for sale at December 3 , 20 4, prior to the Company's adoption of ASU 20 4 08, are summarized in the table below

On May , 20 7, one or more subsidiaries of the Company sold AllianceHealth Pryor (52 licensed beds) in Pryor, Oklahoma, and its associated assets to Ardent Health Services Inc for approximately $ million in cash This hospital has been reported in the condensed consolidated statements of loss in discontinued operations

During the year ended December 3 , 20 4, the Company made the decision to sell and began actively marketing several smaller hospitals There is one hospital still included in discontinued operations resulting from the Company's decision to sell these hospitals in 20 4 that is currently being actively marked for sale In addition to this hospital, Health Management Associates, Inc ("HMA") entered into a definitive agreement to sell Williamson Memorial Hospital (76 licensed beds) located in Williamson, West Virginia prior to the HMA merger, and the Company has continued the effort to divest this facility In connection with management's decision to sell these two hospitals, the Company has classified the results of operations of such hospitals as discontinued operations in the accompanying condensed consolidated statements of loss, and classified these hospitals as held for sale in the accompanying condensed consolidated balance sheets

5

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

Net operating revenues and loss from discontinued operations for the respective periods are as follows (in millions):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Net operating revenues | $ 9 | $ 24 | $ 64 | $ 76 |
| Loss from operations of entities sold or held for sale before income taxes | $ (2) | $ (3) | $ (6) | $ (6) |
| Impairment of hospitals sold or held for sale | (2) | | (9) | (2) |
| Loss on sale, net | | | ( ) | |
| Loss from discontinued operations, before taxes | (4) | (3) | ( 6) | (8) |
| Income tax benefit | (2) | ( ) | (6) | (3) |
| Loss from discontinued operations, net of taxes | $ (2) | $ (2) | $ ( 0) | $ (5) |

As part of its ongoing evaluation of the fair value of the hospitals it is marketing for sale, the Company recorded an impairment charge on the carrying value of the long lived assets at these hospitals in discontinued operations of $6 million and $  million, net of tax, for the nine months ended September 30, 20 7 and 20 6, respectively  Interest expense was allocated to discontinued operations based on sale proceeds available for debt repayment

The following table discloses amounts included in the condensed consolidated balance sheet for the hospitals classified as held for sale as of September 30, 20 7 and December 3 , 20 6 (in millions):

| | September 30, 2017 | December 31, 2016 |
| --- | --- | --- |
| Other current assets | $ 46 | $ 7 |
| Other assets, net | 529 | 878 |
| Accrued liabilities | 46 | 8 |

***Other Hospital Closures***

During the three months ended March 3 , 20 6, the Company announced the planned closure of McNairy Regional Hospital in Selmer, Tennessee  The Company recorded an impairment charge of approximately $7 million during the three months ended March 3 , 20 6, to adjust the fair value of the supplies inventory and long lived assets of this hospital, including property and equipment and capitalized software costs, based on their estimated fair value and future utilization  McNairy Regional Hospital closed on May  9, 20 6 and no additional impairment was recorded related to the closure of this facility

6

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)   (Continued)**

### 6. SPIN-OFF OF QUORUM HEALTH CORPORATION

On April 29, 20 6, the Company completed the spin off of 38 hospitals and Quorum Health Resources, LLC into Quorum Health Corporation, an independent, publicly traded corporation  The transaction was structured to be generally tax free to the Company and its stockholders  The Company distributed, on a pro rata basis, all of the shares of QHC common stock to the Company's stockholders of record as of April 22, 20 6  These stockholders of record as of April 22, 20 6 received a distribution of one share of QHC common stock for every four shares of Company common stock held as of the record date plus cash in lieu of any fractional shares  In recognition of the spin off, the Company recorded a non cash dividend of approximately $7 3 million during the year ended December 3 , 20 6, representing the net assets of QHC distributed to the Company's stockholders  Immediately following the completion of the spin off, the Company's stockholders owned  00% of the outstanding shares of QHC common stock  Following the spin off, QHC became an independent public company with its common stock listed for trading under the symbol "QHC" on the New York Stock Exchange

In connection with the spin off, the Company and QHC entered into a separation and distribution agreement as well as certain ancillary agreements on April 29, 20 6  These agreements allocate between the Company and QHC the various assets, employees, liabilities and obligations (including investments, property and employee benefits and tax related assets and liabilities) that comprise the separate companies and govern certain relationships between, and activities of, the Company and QHC for a period of time after the spin off

The results of operations for QHC through the date of the spin off are presented in continuing operations in the condensed consolidated statements of loss as the Company has determined that the spin off of QHC does not meet the criteria as discontinued operations under ASU 20 4 08

Financial and statistical data reported in this Quarterly Report on Form  0 Q ("Form  0 Q") include QHC operating results for the three and nine months ended September 30, 20 6 (other than same store operating results and data, which exclude QHC operating results)  Summary financial results of QHC for the three and nine months ended September 30, 20 6 included in the accompanying condensed consolidated statements of loss are as follows:

| | Three Months Ended September 30, 2016 | | Nine Months Ended September 30, 2016 | |
|---|---|---|---|---|
| Loss from operations before income taxes | $ | | $ | ( 2) |
| Less: Income attributable to noncontrolling interests | | | | ( ) |
| Loss from operations before income taxes attributable to Community Health Systems, Inc stockholders | $ | | $ | ( 3) |

### 7. INCOME TAXES

The total amount of unrecognized benefit that would affect the effective tax rate, if recognized, was approximately $9 million as of September 30, 20 7  A total of approximately $3 million of interest and penalties is included in the amount of the liability for uncertain tax positions at September 30, 20 7  It is the Company's policy to recognize interest and penalties related to unrecognized benefits in its condensed consolidated statements of loss as income tax expense

It is possible the amount of unrecognized tax benefit could change in the next  2 months as a result of a lapse of the statute of limitations and settlements with taxing authorities; however, the Company does not anticipate the change will have a material impact on the Company's condensed consolidated results of operations or condensed consolidated financial position

7

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

The Company, or one of its subsidiaries, files income tax returns in the United States federal jurisdiction and various state jurisdictions  With few exceptions, the Company is no longer subject to state income tax examinations for years prior to 20 3  The Company's federal income tax returns for the 2009, 20 0, 20 4 and 20 5 tax years are currently under examination by the Internal Revenue Service  The Company believes the results of these examinations will not be material to its consolidated results of operations or consolidated financial position  The Company has extended the federal statute of limitations through June 30, 20 8 for Community Health Systems, Inc  for the tax periods ended December 3 , 2007, 2008, 2009 and 20 0, through December 3 , 20 7 for the tax periods ended December 3 , 20   and 20 2, and through September 6, 20 9 for the tax period ended December 3 , 20 4

The Company's effective tax rates were 40  % and 34 9% for the three months ended September 30, 20 7 and 20 6, respectively, and  6 3% and 9 0% for the nine months ended September 30, 20 7 and 20 6, respectively  Including the net income attributable to noncontrolling interests, which is not tax effected in the condensed consolidated statements of loss, the effective tax rate would have been 35 3% and 27 4% for the three months ended September 30, 20 7 and 20 6, respectively, and  4 5% and 8 6% for the nine months ended September 30, 20 7 and 20 6, respectively  This increase in the Company's effective tax rate for the nine months ended September 30, 20 7, when compared to the nine months ended September 30, 20 6, was primarily due to the non deductible nature of certain goodwill written off in the $363 million impairment and (gain) loss on sale of businesses for the nine months ended September 30, 20 7, and partially offset by approximately $ 6 million of tax expense recognized on the tax deficiency created by a difference between the actual tax deduction that will be recognized from the vesting of restricted stock during the nine months ended September 30, 20 7, compared to the higher stock compensation expense previously recorded over the vesting period as determined based on the fair value of the restricted stock at the grant date  This additional tax expense was a result of the adoption of ASU 20 6 09, which changed the previously required accounting for such tax deficiencies through additional paid in capital to recording such amounts as part of the tax provision in the period such restricted stock vests

Cash paid for income taxes, net of refunds received, resulted in a net refund of less than $  million and net cash paid of $2 million during the three months ended September 30, 20 7 and 20 6, respectively, and net cash paid of $5 million and $6 million during the nine months ended September 30, 20 7 and 20 6, respectively

## 8.  GOODWILL AND OTHER INTANGIBLE ASSETS

*Goodwill*

The changes in the carrying amount of goodwill for the nine months ended September 30, 20 7 are as follows (in millions):

| | | |
|---|---|---|
| Balance as of December 3 , 20 6 | $ | 6,52 |
| Goodwill acquired as part of acquisitions during current year | | 3 |
| Consideration and purchase price allocation adjustments for prior year acquisitions and other adjustments | | (24) |
| Goodwill allocated to hospitals held for sale | | (352) |
| Balance as of September 30, 20 7 | $ | 6, 48 |

Goodwill is allocated to each identified reporting unit, which is defined as an operating segment or one level below the operating segment (referred to as a component of the entity)  Management has determined that the Company's hospital operations segment meets the criteria to be classified as a single reporting unit  At September 30, 20 7, the Company had approximately $6  billion of goodwill recorded, all of which resides at its hospital operations reporting unit

Goodwill is evaluated for impairment at the same time every year and when an event occurs or circumstances change that, more likely than not, reduce the fair value of the reporting unit below its carrying value  There is a two step method for determining goodwill impairment  Step one is to compare the fair value of the reporting unit with the unit's carrying amount, including goodwill  If this test indicates the fair value is less than the carrying value, then step two is required to compare the implied fair value of the reporting unit's goodwill utilizing a hypothetical purchase price allocation with the carrying value of the reporting unit's goodwill  The Company performed its last annual goodwill evaluation during the fourth quarter of 20 6  No impairment was indicated by this evaluation  The next annual goodwill evaluation will be performed during the fourth quarter of 20 7, or sooner if the Company identifies certain indicators of impairment

8

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

While no impairment was indicated by the fourth quarter of 20 6 evaluation, the reduction in the Company's fair value and the resulting goodwill impairment charge recorded during 20 6 reduced the excess of fair value calculated in the step two analysis over the carrying value of the Company's hospital operations reporting unit to an amount less than   % of the Company's carrying value  This minimal amount in the excess fair value over carrying value of the hospital operations reporting unit increases the risk that future declines in fair value could result in goodwill impairment  The determination of fair value in the Company's goodwill impairment analysis is based on an estimate of fair value for each reporting unit utilizing known and estimated inputs at the evaluation date  Some of those inputs include, but are not limited to, the most recent price of the Company's common stock or fair value of long term debt, estimates of future revenue and expense growth, estimated market multiples, expected capital expenditures, income tax rates, and costs of invested capital  Future estimates of fair value could be adversely affected if the actual outcome of one or more of these assumptions changes materially in the future, including further decline in the Company's stock price or fair value of long term debt, lower than expected hospital volumes, or increased operating costs  Such changes impacting the calculation of fair value could result in a material impairment charge in the future

The Company estimates the fair value of the related reporting units using both a discounted cash flow model as well as a market multiple model  The cash flow forecasts are adjusted by an appropriate discount rate based on the Company's estimate of a market participant's weighted average cost of capital  These models are both based on the Company's best estimate of future revenues and operating costs and are reconciled to the Company's consolidated market capitalization, with consideration of the amount a potential acquirer would be required to pay, in the form of a control premium, in order to gain sufficient ownership to set policies, direct operations and control management decisions

During the three months ended June 30, 20 6, the Company identified certain indicators of impairment requiring an interim goodwill impairment evaluation  Those indicators were primarily the decline in the Company's market capitalization and fair value of long term debt during the three months ended June 30, 20 6, as well as a decrease in the estimated future earnings of the Company compared to the Company's most recent annual evaluation  The Company performed an estimated calculation of fair value in step one of the impairment test at June 30, 20 6, which indicated that the carrying value of its hospital operations reporting unit exceeded its fair value  An initial step two calculation was performed to determine the implied value of goodwill in a hypothetical purchase price allocation  The Company recorded an estimated non cash impairment charge of $  4 billion to goodwill at June 30, 20 6 based on these analyses, and adjusted the estimated impairment charge based on the final step two valuation of $   395 billion at September 30, 20 6  The decrease in the goodwill impairment as of September 30, 20 6, from the original estimate as of June 30, 20 6, was primarily due to lower estimated fair values of the individual hospital property and equipment assets as compared to the assumptions used in the June 30, 20 6 estimate, resulting in a higher implied goodwill amount when applied to a hypothetical purchase price allocation as required in the step two analysis  This impairment charge taken during 20 6 represents the cumulative amount of impairment recorded historically on the Company's goodwill

The determination of fair value of the Company's hospital operations reporting unit as part of its goodwill impairment measurement represents a Level 3 fair value measurement in the fair value hierarchy due to its use of internal projections and unobservable measurement inputs

These impairment charges do not have an impact on the calculation of the Company's financial covenants under the Company's Credit Facility

9

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

*Intangible Assets*

No intangible assets other than goodwill were acquired during the nine months ended September 30, 20 7 The gross carrying amount of the Company's other intangible assets subject to amortization was $ 8 million and $4 million at September 30, 20 7 and December 3 , 20 6, respectively, and the net carrying amount was $ million and $ 4 million at September 30, 20 7 and December 3 , 20 6, respectively The carrying amount of the Company's other intangible assets not subject to amortization was $80 million and $86 million at September 30, 20 7 and December 3 , 20 6, respectively Other intangible assets are included in other assets, net on the Company's condensed consolidated balance sheets Substantially all of the Company's intangible assets are contract based intangible assets related to operating licenses, management contracts, tradenames, or non compete agreements entered into in connection with prior acquisitions

The weighted average remaining amortization period for the intangible assets subject to amortization is approximately six years There are no expected residual values related to these intangible assets Amortization expense on these intangible assets was $ million and $3 million during the three months ended September 30, 20 7 and 20 6, respectively, and $3 million and $ 0 million during the nine months ended September 30, 20 7 and 20 6, respectively Amortization expense on intangible assets is estimated to be $ million for the remainder of 20 7, $3 million in 20 8, $ million in 20 9, $ million in 2020, $ million in 202 , $ million in 2022 and $3 million thereafter

The gross carrying amount of capitalized software for internal use was approximately $ 3 billion at both September 30, 20 7 and December 3 , 20 6, and the net carrying amount was approximately $472 million and $574 million at September 30, 20 7 and December 3 , 20 6, respectively The estimated amortization period for capitalized internal use software is generally three years, except for capitalized costs related to significant system conversions, which is generally eight to ten years There is no expected residual value for capitalized internal use software At September 30, 20 7, there was approximately $29 million of capitalized costs for internal use software that is currently in the development stage and will begin amortization once the software project is complete and ready for its intended use Amortization expense on capitalized internal use software was $46 million and $48 million during the three months ended September 30, 20 7 and 20 6, respectively, and $ 4 million and $ 53 million during the nine months ended September 30, 20 7 and 20 6, respectively Amortization expense on capitalized internal use software is estimated to be $4 million for the remainder of 20 7, $ 5 million in 20 8, $93 million in 20 9, $73 million in 2020, $50 million in 202 , $35 million in 2022 and $29 million thereafter

20

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

**9. EARNINGS PER SHARE**

The following table sets forth the components of the numerator and denominator for the computation of basic and diluted (loss) earnings per share for loss from continuing operations, discontinued operations and net loss attributable to Community Health Systems, Inc  common stockholders (in millions, except share data):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| **Numerator:** | | | | |
| Loss from continuing operations, net of taxes | $ (88) | $ (54) | $ (380) | $ ( ,422) |
| Less: Income from continuing operations attributable to noncontrolling interests, net of taxes | 20 | 23 | 56 | 73 |
| Loss from continuing operations attributable to Community Health Systems, Inc  common stockholders     basic and diluted | $ ( 08) | $ (77) | $ (436) | $ ( ,495) |
| | | | | |
| Loss from discontinued operations, net of taxes | $ (2) | $ (2) | $ ( 0) | $ (5) |
| Less: Loss from discontinued operations attributable to noncontrolling interests, net of taxes | | | | |
| Loss from discontinued operations attributable to Community Health Systems, Inc  common stockholders     basic and diluted | $ (2) | $ (2) | $ ( 0) | $ (5) |
| | | | | |
| **Denominator:** | | | | |
| Weighted average number of shares outstanding     basic | ,935,738 | 0,888,040 | ,70 ,8 2 | 0,672,520 |
| Effect of dilutive securities: | | | | |
| Restricted stock awards | | | | |
| Employee stock options | | | | |
| Other equity based awards | | | | |
| Weighted average number of shares outstanding     diluted | ,935,738 | 0,888,040 | ,70 ,8 2 | 0,672,520 |

The Company generated a loss from continuing operations attributable to Community Health Systems, Inc  common stockholders for the three and nine months ended September 30, 20 7 and 20 6, so the effect of dilutive securities is not considered because their effect would be antidilutive  If the Company had generated income from continuing operations, the effect of restricted stock awards on the diluted shares calculation would have been an increase of  48,768 shares and 445,732 shares during the three months ended September 30, 20 7 and 20 6, respectively, and an increase of  47,6 8 shares and 225,334 shares during the nine months ended September 30, 20 7 and 20 6, respectively

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Dilutive securities outstanding not included in the computation of earnings per share because their effect is antidilutive: | | | | |
| Employee stock options and restricted stock awards | 2,454,467 | 2,076,688 | 2,774, 7 | 2,426,700 |

2

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

## 10. STOCKHOLDERS' EQUITY

Authorized capital shares of the Company include 400,000,000 shares of capital stock consisting of 300,000,000 shares of common stock and  00,000,000 shares of preferred stock  Each of the aforementioned classes of capital stock has a par value of $0 0  per share  Shares of preferred stock, none of which were outstanding as of September 30, 20  7, may be issued in one or more series having such rights, preferences and other provisions as determined by the Board of Directors without approval by the holders of common stock

On November 6, 20  5, the Company adopted an open market repurchase program for up to   0,000,000 shares of the Company's common stock, not to exceed $300 million in repurchases  The repurchase program will expire on the earlier of November 5, 20  8, when the maximum number of shares has been repurchased, or when the maximum dollar amount has been expended  During the year ended December 3  , 20  5, the Company repurchased and retired 532,  88 shares at a weighted average price of $27 3   per share, which is the cumulative number of shares repurchased and retired under this program  No shares were repurchased under this program during the year ended December 3  , 20  6  In addition, no shares were repurchased under this program during the nine months ended September 30, 20  7

The Company is a holding company which operates through its subsidiaries  The Company's Credit Facility and the indentures governing the senior and senior secured notes contain various covenants under which the assets of the subsidiaries of the Company are subject to certain restrictions relating to, among other matters, dividends and distributions, as referenced in the paragraph below

With the exception of a special cash dividend of $0 25 per share paid by the Company in December 20  2, historically, the Company has not paid any cash dividends  Subject to certain exceptions, the Company's Credit Facility limits the ability of the Company's subsidiaries to pay dividends and make distributions to the Company, and limits the Company's ability to pay dividends and/or repurchase stock, to an amount not to exceed $200 million in the aggregate plus an additional $25 million in any particular year plus the aggregate amount of proceeds from the exercise of stock options  The indentures governing the senior and senior secured notes also restrict the Company's subsidiaries from, among other matters, paying dividends and making distributions to the Company, which thereby limits the Company's ability to pay dividends and/or repurchase stock  The non cash dividend of approximately $7  3 million recorded by the Company during the year ended December 3  , 20  6 to reflect the distribution of the net assets of QHC was a permitted transaction under the Company's Credit Facility  As of September 30, 20  7, under the most restrictive test in these agreements (and subject to certain exceptions), the Company has approximately $3  8 million remaining available with which to pay permitted dividends and/or repurchase shares of stock or its senior and senior secured notes

22

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

The following schedule presents the reconciliation of the carrying amount of total equity, equity attributable to the Company, and equity attributable to the noncontrolling interests for the nine month period ended September 30, 20 7 (in millions):

| | Redeemable Noncontroll ng Interest | Commun ty Health Systems, Inc. Stockholders | | | | | Total Stockholders' Equ ty |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Common Stock | Add t onal Pa d-In Cap tal | Accumulated Other Comprehens ve Income (Loss) | Reta ned Earn ngs (Accumulated Def c t) | Noncontroll ng Interest | |
| **Balance, December 31, 2016** | $ 554 | $ 1 | $ 1,975 | $ (62) | $ (299) | $ 113 | $ 1,728 |
| Comp ehens ve ncome | 44 | - | - | 17 | (446) | 12 | (417) |
| Con bu ons f om noncon oll ng n e es s | - | - | - | - | - | 5 | 5 |
| D s bu ons o noncon oll ng n e es s | (57) | - | - | - | - | (22) | (22) |
| Pu chase of subs d a y sha es f om noncon oll ng n e es s | (4) | - | - | - | - | - | - |
| D spos on of less- han-wholly owned en y | 2 | - | - | - | - | (10) | (10) |
| O he eclass f ca ons of noncon oll ng n e es s | 2 | - | - | - | - | (2) | (2) |
| Noncon oll ng n e es s n acqu ed en y | 1 | - | - | - | - | - | - |
| Ad us men o edemp on value of edeemable noncon oll ng n e es s | (12) | - | 12 | - | - | - | 12 |
| Cancella on of es c ed s ock fo ax w hhold ngs on ves ed sha es | - | - | (5) | - | - | - | (5) |
| Sha e-based compensa on | - | - | 20 | - | - | - | 20 |
| **Balance, September 30, 2017** | $ 530 | $ 1 | $ 2,002 | $ (45) | $ (745) | $ 96 | $ 1,309 |

The following schedule discloses the effects of changes in the Company's ownership interest in its less than wholly owned subsidiaries on Community Health Systems, Inc stockholders' equity (in millions):

| | Nine Months Ended September 30, 2017 |
| --- | --- |
| Net loss attributable to Community Health Systems, Inc stockholders | $ (446) |
| Transfers from the noncontrolling interests: | |
| Net decrease in Community Health Systems, Inc paid in capital for purchase of subsidiary partnership interests | |
| Net transfers from the noncontrolling interests | |
| Change to Community Health Systems, Inc stockholders' equity from net loss attributable to Community Health Systems, Inc stockholders and transfers to noncontrolling interests | $ (446) |

## 11. EQUITY INVESTMENTS

As of September 30, 20 7, the Company owned equity interests of 38 0% in three hospitals in Macon, Georgia, in which HCA Holdings, Inc ("HCA") owned the majority interest On December 3 , 20 6, the Company sold 80% of its ownership interest in the legal entity that owned and operated its home care agency business As part of the divestiture of its controlling interest in the home care agency business, the Company recorded an equity method investment representing its remaining 20% ownership at a fair value of $32 million

In March 2005, the Company began purchasing items, primarily medical supplies, medical equipment and pharmaceuticals, under an agreement with HealthTrust Purchasing Group, L P ("HealthTrust"), a group purchasing organization in which the Company is a noncontrolling partner As of September 30, 20 7, the Company had a 9 7% ownership interest in HealthTrust

Case 3:19-cv-00461    Document 67-8    Filed 03/23/20    Page 25 of 104 PageID #: 1213

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)    (Continued)**

The Company's investment in all of its unconsolidated affiliates was $ 73 million and $ 77 million at September 30, 20 7 and December 3 , 20 6, respectively, and is included in other assets, net in the accompanying condensed consolidated balance sheets  Included in the Company's results of operations is the Company's equity in pre tax earnings from all of its investments in unconsolidated affiliates, which was $5 million and $4 million for the three months ended September 30, 20 7 and 20 6, respectively, and $ 3 million and $38 million for the nine months ended September 30, 20 7 and 20 6, respectively

## 12. LONG-TERM DEBT

Long term debt, net of unamortized debt issuance costs and discounts or premiums, consists of the following (in millions):

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Credit Facility: | | |
| Term A Loan | $ | $        749 |
| Term F Loan | | ,445 |
| Term G Loan | ,059 | ,528 |
| Term H Loan | ,94 | 2,8 |
| Revolving credit loans | | |
| 8% Senior Notes due 20 9 | ,925 | ,925 |
| 7 $\frac{1}{8}$% Senior Notes due 2020 | ,200 | ,200 |
| 5 $\frac{1}{8}$% Senior Secured Notes due 20 8 | | 700 |
| 5 $\frac{1}{8}$% Senior Secured Notes due 202 | ,000 | ,000 |
| 6 $\frac{7}{8}$% Senior Notes due 2022 | 3,000 | 3,000 |
| 6 $\frac{1}{4}$% Senior Secured Notes due 2023 | 3, 00 | |
| Receivables Facility | 532 | 677 |
| Capital lease obligations | 308 | 328 |
| Other | 55 | 74 |
| Less: Unamortized deferred debt issuance costs and note premium | ( 79) | ( 93) |
| Total debt | 3,94 | 5,244 |
| Less: Current maturities | (40) | (455) |
| Total long term debt | $       3,90 | $      4,789 |

### *Credit Facility*

The Company's wholly owned subsidiary, CHS/Community Health Systems, Inc  ("CHS"), has senior secured financing under a credit facility with a syndicate of financial institutions led by Credit Suisse, as administrative agent and collateral agent  In connection with the HMA merger, the Company and CHS entered into a third amendment and restatement of its credit facility (the "Credit Facility"), providing for additional financing and recapitalization of certain of the Company's term loans, including (i) the replacement of the revolving credit facility with a new $  0 billion revolving facility maturing in 20 9 (the "Revolving Facility"), (ii) the addition of a new $   0 billion Term A facility due 20 9 (the "Term A Facility"), (iii) a Term D facility in an aggregate principal amount equal to approximately $4 6 billion due 202  (which included certain Term C loans that were converted into such Term D facility (collectively, the "Term D Facility")), (iv) the conversion of certain Term C loans into Term E Loans and the borrowing of new Term E Loans in an aggregate principal amount of approximately $  7 billion due 20 7 and (v) the addition of flexibility commensurate with the Company's post acquisition structure  In addition to funding a portion of the consideration in connection with the HMA merger, some of the proceeds of the Term A Facility and Term D Facility were used to refinance the outstanding $637 million existing Term A facility due 20 6 and the $60 million of Term B loans due 20 4, respectively  The Revolving Facility includes a subfacility for letters of credit

24

Case 3:19-cv-00461    Document 67-8    Filed 03/23/20    Page 26 of 104 PageID #: 1214

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

On March 9, 20 5, CHS entered into Amendment No and Incremental Term Loan Assumption Agreement to refinance the existing Term E Loans due 20 7 into Term F Loans due 20 8, in an original aggregated principal amount of $ 7 billion (the "Term F Facility") On May 8, 20 5, CHS entered into an Incremental Term Loan Assumption Agreement to provide for a new $ 6 billion incremental Term G facility due 20 9 (the "Term G Facility") and a new approximately $2 9 billion incremental Term H facility due 202 (the "Term H Facility") The proceeds of the Term G Facility and Term H Facility were used to repay the Company's existing Term D Facility in full Pursuant to a special distribution paid by QHC to the Company as part of the series of transactions to complete the spin off, the Company received approximately $ 2 billion in cash generated from the net proceeds of certain financing arrangements entered into by QHC as part of the separation On April 29, 20 6, using part of the cash generated from the QHC spin off, the Company repaid approximately $ 90 million of its Term F Facility On December 5, 20 6, CHS entered into Amendment No 2 to the Credit Facility ("Amendment No 2") to adjust financial maintenance covenants in the Credit Facility In connection with Amendment No 2, the Company agreed to certain other additional undertakings for the benefit of the lenders under the Revolving Facility and the Term A Facility

On December 30, 20 6, using the cash generated from the sale of a majority ownership in the Company's home care division and from the completion of the sale lease back transaction for ten of the Company's owned medical office buildings, the Company repaid approximately $48 million of the Term F Facility, approximately $26 million of the Term A Facility, approximately $52 million of the Term G Facility and approximately $96 million of the Term H Facility On March 6, 20 7, CHS issued $2 2 billion aggregate principal amount of 6 ¼% Senior Secured Notes due 2023 (the "6 ¼% Senior Secured Notes"), a portion of the net proceeds of which was used to repay the Company's existing Term F Facility in full On May 4, 20 7, using the cash generated from the hospital divestiture transactions completed on May , 20 7, CHS repaid approximately $39 million of the Term A Facility, approximately $75 million of the Term G Facility and approximately $ 47 million of the Term H Facility On May 2, 20 7, CHS completed a tack on offering of $900 million aggregate principal amount of 6 ¼% Senior Secured Notes, a portion of the net proceeds of which was used to repay the Company's existing Term A Facility in full The tack on offering increased the total aggregate principal amount of 6 ¼% Senior Secured Notes to $3 billion

On May 30, 20 7, CHS entered into a Loan Modification Agreement to the Credit Facility ("Loan Modification Agreement") to extend the maturity date of the Revolving Facility Following the Loan Modification Agreement, CHS has Revolving Facility commitments through January 27, 20 9 of approximately $929 million, of which a $739 million portion represents extended commitments maturing January 27, 202 In connection with the Loan Modification Agreement, the financial maintenance covenants in the Credit Facility were further adjusted and CHS agreed to certain other additional undertakings for the benefit of the extending Revolving Facility lenders

On June 30, 20 7, using a portion of the cash generated from the July , 20 7 hospital divestitures that preliminarily closed on June 30, 20 7, CHS repaid approximately $ 22 million of the Term G Facility and approximately $225 million of the Term H Facility

On July 7, 20 7, using a portion of the cash generated from the divestitures that preliminarily closed on June 30, 20 7 and that closed on July 3, 20 7, CHS repaid approximately $ 2 million of the Term G Facility and approximately $222 million of the Term H Facility

On September 29, 20 7, using a portion of the cash generated from the divestitures that preliminarily closed on September 29, 20 7 and that closed on October , 20 7, CHS repaid approximately $ 5 million of the Term G Facility and approximately $277 million of the Term H Facility

The loans under the Credit Facility bear interest on the outstanding unpaid principal amount at a rate equal to an applicable percentage plus, at CHS' option, either (a) an Alternate Base Rate (as defined) determined by reference to the greater of ( ) the Prime Rate (as defined) announced by Credit Suisse or (2) the Federal Funds Effective Rate (as defined) plus 0 50% or (3) the adjusted London Interbank Offered Rate ("LIBOR") on such day for a three month interest period commencing on the second business day after such day plus % or (b) LIBOR In addition, the margin in respect of the Revolving Facility will be subject to adjustment determined by reference to a leverage based pricing grid Loans in respect of the Revolving Facility currently accrue interest at a rate per annum equal to LIBOR plus 2 50%, in the case of LIBOR borrowings, and Alternate Base Rate plus 50%, in the case of Alternate Base Rate borrowings The Term G Loan and Term H Loan will accrue interest at a rate per annum equal to LIBOR plus 2 75% and 3 00%, respectively, in the case of LIBOR borrowings, and Alternate Base Rate plus 75% and 2 00%, respectively, in the case of Alternate Base Rate borrowings The Term G Loan and the Term H Loan are subject to a 00% LIBOR floor and a 2 00% Alternate Base Rate floor

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

Under the Term H Facility, CHS is required to make amortization payments in aggregate amounts equal to   % of the original principal amount of the Term H Facility each year  As of December 3  , 20  6, no additional amortization payments were required to be made under the Term G Facility

The term loan facility must be prepaid in an amount equal to ( )   00% of the net cash proceeds of certain asset sales and dispositions by the Company and its subsidiaries, subject to certain exceptions and reinvestment rights (provided that, in connection with the Loan Modification Agreement, CHS agreed with the extending lenders under the Revolving Facility not to exercise such reinvestment rights with respect to certain announced divestitures), (2)   00% of the net cash proceeds of issuances of certain debt obligations or receivables based financing by the Company and its subsidiaries, subject to certain exceptions, and (3) 50%, subject to reduction to a lower percentage based on the Company's leverage ratio (as defined in the Credit Facility generally as the ratio of total debt on the date of determination to the Company's EBITDA, as defined, for the four quarters most recently ended prior to such date), of excess cash flow (as defined) for any year, subject to certain exceptions  Voluntary prepayments and commitment reductions are permitted in whole or in part, without any premium or penalty, subject to minimum prepayment or reduction requirements

The borrower under the Credit Facility is CHS  All of the obligations under the Credit Facility are unconditionally guaranteed by the Company and certain of its existing and subsequently acquired or organized domestic subsidiaries  All obligations under the Credit Facility and the related guarantees are secured by a perfected first priority lien or security interest in substantially all of the assets of the Company, CHS and each subsidiary guarantor, including equity interests held by the Company, CHS or any subsidiary guarantor, but excluding, among others, the equity interests of non significant subsidiaries, syndication subsidiaries, securitization subsidiaries and joint venture subsidiaries  Such assets constitute substantially the same assets, subject to certain exceptions, that secure CHS' obligations under the 202  Senior Secured Notes (as defined below) and the 6 ¼% Senior Secured Notes

CHS has agreed to pay letter of credit fees equal to the applicable percentage then in effect with respect to LIBOR borrowings under the Revolving Facility times the maximum aggregate amount available to be drawn under all letters of credit outstanding under the subfacility for letters of credit  The issuer of any letter of credit issued under the subfacility for letters of credit will also receive a customary fronting fee and other customary processing charges  CHS is obligated to pay commitment fees of 0 50% per annum (subject to adjustment based upon the Company's leverage ratio) on the unused portion of the Revolving Facility

The Credit Facility contains customary representations and warranties, subject to limitations and exceptions, and customary covenants restricting the Company's and its subsidiaries' ability, subject to certain exceptions, to, among other things ( ) declare dividends, make distributions or redeem or repurchase capital stock, (2) prepay, redeem or repurchase other debt, (3) incur liens or grant negative pledges, (4) make loans and investments and enter into acquisitions and joint ventures, (5) incur additional indebtedness or provide certain guarantees, (6) make capital expenditures, (7) engage in mergers, acquisitions and asset sales, (8) conduct transactions with affiliates, (9) alter the nature of the Company's businesses, ( 0) grant certain guarantees with respect to physician practices, (  ) engage in sale and leaseback transactions or ( 2) change the Company's fiscal year  The Company is also required to comply with specified financial covenants (consisting of a maximum secured net leverage ratio and an interest coverage ratio) and various affirmative covenants  Under the Credit Facility, the secured net leverage ratio is calculated as the ratio of total secured debt, less unrestricted cash and cash equivalents, to consolidated EBITDA, as defined in the Credit Facility, and the interest coverage ratio is the ratio of consolidated EBITDA, as defined in the Credit Facility, to consolidated interest expense for the period  The calculation of consolidated EBITDA as defined in the Credit Facility is a trailing  2 month calculation that begins with net income attributable to the Company, with certain pro forma adjustments to consider the impact of material acquisitions or divestitures, and adjustments for interest, taxes, depreciation and amortization, net income attributable to noncontrolling interests, stock compensation expense, restructuring costs, and the financial impact of other non cash or non recurring items recorded during any such  2 month period  For the  2 month period ended September 30, 20  7, the secured net leverage ratio financial covenant in the Credit Facility limited the ratio of secured debt to EBITDA, as defined, to less than or equal to 4 50 to    00  The secured net leverage ratio financial covenant will decrease to 4 25 to    00 for the period January   , 2020 through September 30, 2020, then to 4 00 to    00 thereafter  For the   2 month period ended September 30, 20  7, the interest coverage ratio financial covenant in the Credit Facility required the ratio of consolidated EBITDA, as defined, to consolidated interest expense to be greater than or equal to    75 to    00, which will increase to 2 00 to    00 on January   , 20  8 (and for all periods thereafter)  The Company was in compliance with all such covenants at September 30, 20  7, with a secured net leverage ratio of approximately 3 80 to    00 and an interest coverage ratio of approximately 2 45 to    00

26

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

Events of default under the Credit Facility include, but are not limited to, ( ) CHS' failure to pay principal, interest, fees or other amounts under the credit agreement when due (taking into account any applicable grace period), (2) any representation or warranty proving to have been materially incorrect when made, (3) covenant defaults subject, with respect to certain covenants, to an available cure through the issuance of qualified equity for a period of 60 days after the end of the first three quarters and 00 days after a year end, (4) bankruptcy and insolvency events, (5) a cross default to certain other debt, (6) certain undischarged judgments (not paid within an applicable grace period), (7) a change of control (as defined), (8) certain ERISA related defaults and (9) the invalidity or impairment of specified security interests, guarantees or subordination provisions in favor of the administrative agent or lenders under the Credit Facility

As of September 30, 20 7, the availability for additional borrowings under the Credit Facility, subject to certain limitations as set forth in the Credit Facility, was approximately $929 million pursuant to the Revolving Facility (which amount shall reduce to $739 million on January 27, 20 9), of which $63 million is in the form of outstanding letters of credit CHS has the ability to amend the Credit Facility to provide for one or more tranches of term loans or increases in the Revolving Facility in an aggregate principal amount of up to $ 5 billion, only $ 0 billion of which is effectively available because of the Company's additional undertakings in connection with the Loan Modification Agreement As of September 30, 20 7, the weighted average interest rate under the Credit Facility, excluding swaps, was 7 2%

**8% Senior Notes due 2019**

On November 22, 20  , CHS completed a private offering of $ 0 billion aggregate principal amount of 8% Senior Notes due 20 9 (the "8% Senior Notes") The net proceeds from this issuance, together with available cash on hand, were used to finance the purchase of up to $ 0 billion aggregate principal amount of CHS' then outstanding 8 ⅞% Senior Notes due 20 5 and related fees and expenses On March 2 , 20 2, CHS completed an offering of an additional $ 0 billion aggregate principal amount of 8% Senior Notes, which were issued in a private placement (at a premium of  02 5%) The net proceeds from this issuance were used to finance the purchase of approximately $850 million aggregate principal amount of CHS' then outstanding 8 ⅞% Senior Notes due 20 5, to pay related fees and expenses and for general corporate purposes The 8% Senior Notes bear interest at 8% per annum, payable semiannually in arrears on May  5 and November  5 Interest on the 8% Senior Notes accrues from the date of original issuance Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months

CHS is entitled, at its option, to redeem all or a portion of the 8% Senior Notes upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
| --- | --- |
| November  5, 20  6 to November  4, 20  7 | 02 000 % |
| November  5, 20  7 to November  4, 20  9 | 00 000 % |

Pursuant to a registration rights agreement entered into at the time of the issuance of the 8% Senior Notes, as a result of an exchange offer made by CHS, substantially all of the 8% Senior Notes issued in November 20  and March 20 2 were exchanged in May 20 2 for new notes (the "8% Exchange Notes") having terms substantially identical in all material respects to the 8% Senior Notes (except that the 8% Exchange Notes were issued under a registration statement pursuant to the Securities Act of  933, as amended (the " 933 Act")) References to the 8% Senior Notes shall also be deemed to include the 8% Exchange Notes unless the context provides otherwise

During the year ended December 3 , 20 6, the Company repurchased approximately $75 million of aggregate principal amount of outstanding 8% Senior Notes in open market transactions

**7 ⅛% Senior Notes due 2020**

On July  8, 20 2, CHS completed a public offering of 7 ⅛% Senior Notes due 2020 (the "7 ⅛% Senior Notes") The net proceeds from this issuance were used to finance the purchase or redemption of $934 million aggregate principal amount of CHS' then outstanding 8 ⅞% Senior Notes due 20 5, to pay for consents delivered in connection with a related tender offer, to pay related fees and expenses, and for general corporate purposes The 7 ⅛% Senior Notes bear interest at 7  25% per annum, payable semiannually in arrears on July  5 and January  5 Interest on the 7 ⅛% Senior Notes accrues from the date of original issuance Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months

27

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

CHS is entitled, at its option, to redeem all or a portion of the 7 $\frac{1}{8}$% Senior Notes upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| July  5, 20  7 to July  4, 20  8 | 0  78  % |
| July  5, 20  8 to July  4, 2020 | 00 000 % |

*5 $\frac{1}{8}$% Senior Secured Notes due 2018*

On August  7, 20  2, CHS completed a public offering of 5 $\frac{1}{8}$% Senior Secured Notes due 20  8 (the "20  8 Senior Secured Notes")  The net proceeds from this issuance, together with available cash on hand, were used to finance the prepayment of $  6 billion of the then outstanding term loans due 20  4 under the Credit Facility and related fees and expenses  The 20  8 Senior Secured Notes bore interest at 5  25% per annum, payable semiannually in arrears on August  5 and February  5  The 20  8 Senior Secured Notes were secured by a first priority lien subject to a shared lien of equal priority with certain other obligations, including obligations under the Credit Facility and the 202  Senior Secured Notes, and subject to prior ranking liens permitted by the indenture governing the 20  8 Senior Secured Notes on substantially the same assets, subject to certain exceptions, that secure CHS' obligations under the Credit Facility and the 202  Senior Secured Notes

CHS was entitled, at its option, to redeem all or a portion of the 20  8 Senior Secured Notes upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| August  5, 20  7 to August  4, 20  8 | 00 000 % |

On May  6, 20  6, using part of the cash generated from the QHC spin off, the Company completed a cash tender offer for $900 million aggregate principal amount outstanding of the 20  8 Senior Secured Notes

During the nine months ended September 30, 20  7, using a portion of the net proceeds from the issuance of the 6 $\frac{1}{4}$% Senior Secured Notes, CHS completed its tender offer of $469 million of the then $700 million aggregate outstanding principal amount of the 20  8 Senior Secured Notes and thereafter redeemed the remaining $23  million aggregate principal amount of 20  8 Senior Secured Notes pursuant to a redemption notice previously given by CHS

*5 $\frac{1}{8}$% Senior Secured Notes due 2021*

On January 27, 20  4, CHS completed a private offering of $  0 billion aggregate principal amount of 5 $\frac{1}{8}$% Senior Secured Notes due 202  (the "202  Senior Secured Notes")  The net proceeds from this issuance were used to finance the HMA merger  The 202  Senior Secured Notes bear interest at 5  25% per annum, payable semiannually in arrears on February  and August  Interest on the 202  Senior Secured Notes accrues from the date of original issuance  Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months  The 202  Senior Secured Notes are secured by a first priority lien, subject to a shared lien of equal priority with certain other obligations, including obligations under the Credit Facility and the 6 $\frac{1}{4}$% Senior Secured Notes, and subject to prior ranking liens permitted by the indenture governing the 202  Senior Secured Notes, on substantially the same assets, subject to certain exceptions, that secure CHS' obligations under the Credit Facility and the 6 $\frac{1}{4}$% Senior Secured Notes

28

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

CHS is entitled, at its option, to redeem all or a portion of the 202 Senior Secured Notes upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| February , 20 7 to January 3 , 20 8 | 03 844 % |
| February , 20 8 to January 3 , 20 9 | 02 563 % |
| February , 20 9 to January 3 , 2020 | 0 28 % |
| February , 2020 to January 3 , 202 | 00 000 % |

Pursuant to a registration rights agreement entered into at the time of the issuance of the 202 Senior Secured Notes, as a result of an exchange offer made by CHS, all of the 202 Senior Secured Notes issued in January 20 4 were exchanged in October 20 4 for new notes (the "202 Exchange Notes") having terms substantially identical in all material respects to the 202 Senior Secured Notes (except that the exchange notes were issued under a registration statement pursuant to the 933 Act) References to the 202 Senior Secured Notes shall be deemed to be the 202 Exchange Notes unless the context provides otherwise

*6 7/8% Senior Notes due 2022*

On January 27, 20 4, CHS completed a private offering of $3 0 billion aggregate principal amount of 6 7/8% Senior Notes due 2022 (the "6 7/8% Senior Notes") The net proceeds from this issuance were used to finance the HMA merger The 6 7/8% Senior Notes bear interest at 6 875% per annum, payable semiannually in arrears on February and August Interest on the 6 7/8% Senior Notes accrues from the date of original issuance Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months

Prior to February , 20 8, CHS may redeem some or all of the 6 7/8% Senior Notes at a redemption price equal to 00% of the principal amount of the notes redeemed plus accrued and unpaid interest, if any, plus a "make whole" premium, as described in the indenture governing the 6 7/8% Senior Notes After February , 20 8, CHS is entitled, at its option, to redeem all or a portion of the 6 7/8% Senior Notes upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| February , 20 8 to January 3 , 20 9 | 03 438 % |
| February , 20 9 to January 3 , 2020 | 0 7 9 % |
| February , 2020 to January 3 , 2022 | 00 000 % |

Pursuant to a registration rights agreement entered into at the time of the issuance of the 6 7/8% Senior Notes, as a result of an exchange offer made by CHS, all of the 6 7/8% Senior Notes issued in January 20 4 were exchanged in October 20 4 for new notes (the "6 7/8% Exchange Notes") having terms substantially identical in all material respects to the 6 7/8% Senior Notes (except that the exchange notes were issued under a registration statement pursuant to the 933 Act) References to the 6 7/8% Senior Notes shall be deemed to be the 6 7/8% Exchange Notes unless the context provides otherwise

29

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

*6 1/4% Senior Secured Notes due 2023*

On March  6, 20 7, CHS completed a public offering of $2 2 billion aggregate principal amount of 6 1/4% Senior Secured Notes  The net proceeds from this issuance were used to finance the purchase or redemption of $700 million aggregate principal amount of CHS' then outstanding 20 8 Senior Secured Notes and related fees and expenses, and the repayment of $  445 billion of the Term F Facility  On May  2, 20 7, CHS completed a tack on offering of $900 million aggregate principal amount of 6 1/4% Senior Secured Notes, increasing the total aggregate principal amount of 6 1/4% Senior Secured Notes to $3  billion  A portion of the net proceeds from this issuance were used to finance the repayment of approximately $7 3 million aggregate principal amount of CHS' then outstanding Term A Facility and related fees and expenses  The tack on notes have identical terms, other than issue date and issue price as the 6 1/4% Senior Secured Notes issued on March  6, 20 7  The 6 1/4% Senior Secured Notes bear interest at 6 250% per annum, payable semiannually in arrears on March 3  and September 30, commencing September 30, 20 7  Interest on the 6 1/4% Senior Secured Notes accrues from the date of original issuance  Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months  The 6 1/4% Senior Secured Notes are secured by a first priority lien subject to a shared lien of equal priority with certain other obligations, including obligations under the Credit Facility and the 202  Senior Secured Notes, and subject to prior ranking liens permitted by the indenture governing the 6 1/4% Senior Secured Notes on substantially the same assets, subject to certain exceptions, that secure CHS' obligations under the Credit Facility and the 202  Senior Secured Notes

CHS is entitled, at its option, to redeem all or a portion of the 6 1/4% Senior Secured Notes at any time prior to March 3 , 2020, upon not less than 30 nor more than 60 days' notice, at a price equal to  00% of the principal amount of the 6 1/4% Senior Secured Notes redeemed plus accrued and unpaid interest, if any, plus a "make whole" premium, as described in the indenture governing the 6 1/4% Senior Secured Notes  In addition, CHS may redeem up to 40% of the aggregate principal amount of the 6 1/4% Senior Secured Notes at any time prior to March 3 , 2020 using the net proceeds from certain equity offerings at the redemption price of  06 250% of the principal amount of the 6 1/4% Senior Secured Notes redeemed, plus accrued and unpaid interest, if any

CHS may redeem some or all of the 6 1/4% Senior Secured Notes at any time on or after March 3 , 2020 upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of principal amount on the redemption date), plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| March 3  , 2020 to March 30, 202 | 03  25 % |
| March 3  , 202  to March 30, 2022 | 0  563 % |
| March 3  , 2022 to March 30, 2023 | 00 000 % |

30

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   **(Continued)**

*Receivables Facility*

On March 2 , 20 2, through certain of its subsidiaries, CHS entered into an accounts receivable loan agreement (the "Receivables Facility") with a group of lenders and banks, Credit Agricolé Corporate and Investment Bank, as a managing agent and as the administrative agent, and The Bank of Nova Scotia, as a managing agent  On March 7, 20 3, CHS and certain of its subsidiaries amended the Receivables Facility to add an additional managing agent, The Bank of Tokyo Mitsubishi UFJ, Ltd , to increase the size of the facility from $300 million to $500 million and to extend the scheduled termination date  Additional subsidiaries also agreed to participate in the Receivables Facility as of that date  On March 3 , 20 4, CHS and certain of its subsidiaries amended the Receivables Facility to increase the size of the facility from $500 million to $700 million and to extend the scheduled termination date  Additional subsidiaries also agreed to participate in the Receivables Facility as of that date  On November  8, 20 6, CHS and certain of its subsidiaries amended the Receivables Facility to extend the scheduled termination date in respect of a $450 million portion of the commitments thereunder and amend certain other provisions thereof  On June 23, 20 7, CHS and certain of its subsidiaries amended the Receivables Facility to replace a managing agent, The Bank of Tokyo Mitsubishi UFJ, Ltd  with PNC Bank, National Association, to decrease the size of the facility from $700 million to $600 million and to extend the scheduled termination date in respect of $ 50 million of the previously unextended $250 million portion to expire on November  3, 20 8, coterminous with the remaining commitments  The remaining $ 00 million was repaid with available cash on hand  The existing and future non self pay patient related accounts receivable (the "Receivables") for certain affiliated hospitals serve as collateral for the outstanding borrowings under the Receivables Facility  The interest rate on the borrowings is based on the commercial paper rate plus an applicable interest rate spread  Unless earlier terminated or subsequently extended pursuant to its terms, the Receivables Facility will expire on November  3, 20 8 in respect of the $600 million of commitments thereunder, subject to customary termination events that could cause an early termination date  CHS maintains effective control over the Receivables because, pursuant to the terms of the Receivables Facility, the Receivables are sold from certain of CHS' subsidiaries to CHS, and CHS then sells or contributes the Receivables to a special purpose entity that is wholly owned by CHS  The wholly owned special purpose entity in turn grants security interests in the Receivables in exchange for borrowings obtained from the group of third party lenders and banks of up to $600 million outstanding from time to time based on the availability of eligible Receivables and other customary factors  The wholly owned special purpose entity is not a subsidiary guarantor under the Credit Facility or CHS' outstanding notes  The group of third party lenders and banks do not have recourse to CHS or its subsidiaries beyond the assets of the wholly owned special purpose entity that collateralizes the loan  The Receivables and other assets of the wholly owned special purpose entity will be available first and foremost to satisfy the claims of the creditors of such entity  The outstanding borrowings pursuant to the Receivables Facility at September 30, 20 7 totaled $532 million on the condensed consolidated balance sheet  At September 30, 20 7, the carrying amount of Receivables included in the Receivables Facility totaled approximately $ 5 billion and is included in patient accounts receivable on the condensed consolidated balance sheet

*Loss from Early Extinguishment of Debt*

The financing and repayment transactions discussed above resulted in a loss from the early extinguishment of debt of $4 million for the three months ended September 30, 20 7, and an after tax loss of $2 million for the three months ended September 30, 20 7  In addition, the financing and repayment transactions discussed above resulted in a loss from the early extinguishment of debt of $35 million and $30 million for the nine months ended September 30, 20 7 and 20 6, respectively, and an after tax loss of $22 million and $ 9 million for the nine months ended September 30, 20 7 and 20 6, respectively

*Other Debt*

As of September 30, 20 7, other debt consisted primarily of other obligations maturing in various installments through 202

To limit the effect of changes in interest rates on a portion of the Company's long term borrowings, the Company is a party to 8 separate interest swap agreements in effect at September 30, 20 7, with an aggregate notional amount for currently effective swaps of $2 2 billion  On each of these swaps, the Company receives a variable rate of interest based on the three month LIBOR in exchange for the payment of a fixed rate of interest  The Company currently pays, on a quarterly basis, interest on the Revolving Facility at a rate per annum equal to LIBOR plus 2 50%  The Term G Loan and Term H Loan accrue interest at a rate per annum equal to LIBOR plus 2 75% and 3 00%, in the case of LIBOR borrowings, respectively, and Alternate Base Rate plus  75% and 2 00%, respectively, in the case of Alternate Base Rate Borrowings  The Term G Loan and the Term H Loan are subject to a  00% LIBOR floor and a 2 00% Alternate Base Rate floor  See Note  3 for additional information regarding these swaps

3

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

The Company paid interest of $22 million and $279 million on borrowings during the three months ended September 30, 20 7 and 20 6, respectively, and $630 million and $767 million on borrowings during the nine months ended September 30, 20 7 and 20 6, respectively

## 13. FAIR VALUE OF FINANCIAL INSTRUMENTS

The fair value of financial instruments has been estimated by the Company using available market information as of September 30, 20 7 and December 3 , 20 6, and valuation methodologies considered appropriate The estimates presented in the table below are not necessarily indicative of amounts the Company could realize in a current market exchange (in millions):

| | September 30, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Assets: | | | | |
| Cash and cash equivalents | $ 590 | $ 590 | $ 238 | $ 238 |
| Available for sale securities | 278 | 278 | 299 | 299 |
| Trading securities | 43 | 43 | 80 | 80 |
| Liabilities: | | | | |
| Contingent Value Right | 3 | 3 | | |
| Credit Facility | 2,959 | 2,988 | 6,456 | 6,370 |
| 8% Senior Notes | ,92 | ,882 | ,920 | ,6 5 |
| 7 1/8% Senior Notes | , 9 | ,079 | , 89 | 9 7 |
| 5 1/8% Senior Secured Notes due 20 8 | | | 698 | 690 |
| 5 1/8% Senior Secured Notes due 202 | 976 | ,003 | 972 | 930 |
| 6 7/8% Senior Notes | 2,940 | 2,354 | 2,932 | 2, 02 |
| 6 1/4% Senior Secured Notes | 3,060 | 3,065 | | |
| Receivables Facility and other debt | 585 | 585 | 749 | 749 |

The carrying value of the Company's long term debt in the above table is presented net of unamortized deferred debt issuance costs The estimated fair value is determined using the methodologies discussed below in accordance with accounting standards related to the determination of fair value based on the U S GAAP fair value hierarchy as discussed in Note 4 The estimated fair value for financial instruments with a fair value that does not equal its carrying value is considered a Level valuation The Company utilizes the market approach and obtains indicative pricing from the administrative agent to the Credit Facility to determine fair values or through publicly available subscription services such as Bloomberg where relevant

*Cash and cash equivalents.* The carrying amount approximates fair value due to the short term maturity of these instruments (less than three months)

*Available for sale securities.* Estimated fair value is based on closing price as quoted in public markets or other various valuation techniques

*Trading securities.* Estimated fair value is based on closing price as quoted in public markets

*Contingent Value Right* Estimated fair value is based on the closing price as quoted on the public market where the CVR is traded

*Credit Facility.* Estimated fair value is based on publicly available trading activity and supported with information from the Company's bankers regarding relevant pricing for trading activity among the Company's lending institutions

*8% Senior Notes.* Estimated fair value is based on the closing market price for these notes

*7 1/8% Senior Notes.* Estimated fair value is based on the closing market price for these notes

*5 1/8% Senior Secured Notes due 2018.* Estimated fair value is based on the closing market price for these notes

*5 1/8% Senior Secured Notes due 2021.* Estimated fair value is based on the closing market price for these notes

32

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

*6 7/8% Senior Notes.*  Estimated fair value is based on the closing market price for these notes

*6 1/4% Senior Secured Notes.*  Estimated fair value is based on the closing market price for these notes

*Receivables Facility and other debt.*  The carrying amount of the Receivables Facility and all other debt approximates fair value due to the nature of these obligations

*Interest rate swaps.* The fair value of interest rate swap agreements is the amount at which they could be settled, based on estimates calculated by the Company using a discounted cash flow analysis based on observable market inputs and validated by comparison to estimates obtained from the counterparty The Company incorporates credit valuation adjustments ("CVAs") to appropriately reflect both its own nonperformance or credit risk and the respective counterparty's nonperformance or credit risk in the fair value measurements  In adjusting the fair value of its interest rate swap agreements for the effect of nonperformance or credit risk, the Company has considered the impact of any netting features included in the agreements

The Company assesses the effectiveness of its hedge instruments on a quarterly basis  For the nine months ended September 30, 20 7 and 20 6, the Company completed an assessment of the cash flow hedge instruments and determined the hedges to be highly effective  The Company has also determined that the ineffective portion of the hedges do not have a material effect on the Company's condensed consolidated financial position, operations or cash flows The counterparties to the interest rate swap agreements expose the Company to credit risk in the event of nonperformance  However, at September 30, 20 7, all of the swap agreements entered into by the Company were in a net liability position such that the Company would be required to make the net settlement payments to the counterparties; the Company does not anticipate nonperformance by those counterparties  The Company does not hold or issue derivative financial instruments for trading purposes

Interest rate swaps consisted of the following at September 30, 20 7:

| Swap # | Notional Amount (in millions) | Fixed Interest Rate | Termination Date | Fair Value (in millions) |
|---|---|---|---|---|
| | $ 400 | 882 % | August 30, 20 9 | $ |
| 2 | 200 | 25 5 % | August 30, 20 9 | 3 |
| 3 | 200 | 26 3 % | August 30, 20 9 | 3 |
| 4 | 300 | 2 04  % | August 30, 2020 | 2 |
| 5 | 300 | 2 738 % | August 30, 2020 | 7 |
| 6 | 300 | 2 892 % | August 30, 2020 | 9 |
| 7 | 300 | 2 363 % | January 27, 202 | 5 |
| 8 | 200 | 2 368 % | January 27, 202 | 3 |

The Company is exposed to certain risks relating to its ongoing business operations  The risk managed by using derivative instruments is interest rate risk Interest rate swaps are entered into to manage interest rate fluctuation risk associated with the term loans in the Credit Facility  Companies are required to recognize all derivative instruments as either assets or liabilities at fair value in the condensed consolidated statement of financial position  The Company designates its interest rate swaps as cash flow hedges  For derivative instruments that are designated and qualify as cash flow hedges, the effective portion of the gain or loss on the derivative is reported as a component of other comprehensive income ("OCI") and reclassified into earnings in the same period or periods during which the hedged transactions affect earnings  Gains and losses on the derivative representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in current earnings

Assuming no change in September 30, 20 7 interest rates, approximately $25 million of interest expense resulting from the spread between the fixed and floating rates defined in each interest rate swap agreement will be recognized during the next  2 months  If interest rate swaps do not remain highly effective as a cash flow hedge, the derivatives' gains or losses resulting from the change in fair value reported through OCI will be reclassified into earnings

33

Case 3:19-cv-00461    Document 67-8    Filed 03/23/20    Page 35 of 104 PageID #: 1223

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

The following tabular disclosure provides the amount of pre tax (loss) gain recognized as a component of OCI during the three and nine months ended September 30, 20 7 and 20 6 (in millions):

| | Amount of Pre-Tax (Loss) Gain Recognized in OCI (Effective Portion) | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| **Derivatives in Cash Flow Hedging Relationships** | 2017 | 2016 | 2017 | 2016 |
| Interest rate swaps | $ | $ | $ (8) | $ (6 ) |

The following tabular disclosure provides the location of the effective portion of the pre tax loss reclassified from accumulated other comprehensive loss ("AOCL") into interest expense on the condensed consolidated statements of loss during the three and nine months ended September 30, 20 7 and 20 6 (in millions):

| | Amount of Pre-Tax Loss Reclassified from AOCL into Income (Effective Portion) | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| **Location of Loss Reclassified from AOCL into Income (Effective Portion)** | 2017 | 2016 | 2017 | 2016 |
| Interest expense, net | $ 7 | $ 5 | $ 24 | $ 45 |

The fair values of derivative instruments in the condensed consolidated balance sheets as of September 30, 20 7 and December 3 , 20 6 were as follows (in millions):

| | Asset Derivatives | | | | Liability Derivatives | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2017 | | December 31, 2016 | | September 30, 2017 | | December 31, 2016 | |
| | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value | Balance Sheet Location | Fair Value |
| Derivatives designated as hedging instruments | Other assets, net | $ | Other assets, net | $ | Other long term liabilities | $ 33 | Other long term liabilities | $ 49 |

### 14. FAIR VALUE

*Fair Value Hierarchy*

Fair value is a market based measurement, not an entity specific measurement Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability As a basis for considering market participant assumptions in fair value measurements, the Company utilizes the U S GAAP fair value hierarchy that distinguishes between market participant assumptions based on market data obtained from sources independent of the reporting entity (observable inputs that are classified within Levels and 2 of the hierarchy) and the reporting entity's own assumption about market participant assumptions (unobservable inputs classified within Level 3 of the hierarchy)

The inputs used to measure fair value are classified into the following fair value hierarchy:

*Level 1:* Quoted market prices in active markets for identical assets or liabilities

*Level 2:* Observable market based inputs or unobservable inputs that are corroborated by market data

*Level 3:* Unobservable inputs that are supported by little or no market activity and are significant to the fair value of the assets or liabilities Level 3 includes values determined using pricing models, discounted cash flow methodologies, or similar techniques reflecting the Company's own assumptions

34

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

In instances where the determination of the fair value hierarchy measurement is based on inputs from different levels of the fair value hierarchy, the level in the fair value hierarchy within which the entire fair value measurement falls is based on the lowest level input that is significant to the fair value measurement in its entirety The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment of factors specific to the asset or liability Transfers between levels within the fair value hierarchy are recognized by the Company on the date of the change in circumstances that requires such transfer There were no transfers between levels during the nine month periods ending September 30, 20 7 or September 30, 20 6

The following table sets forth, by level within the fair value hierarchy, the financial assets and liabilities recorded at fair value on a recurring basis as of September 30, 20 7 and December 3 , 20 6 (in millions):

| | September 30, 2017 | | Level 1 | | Level 2 | | Level 3 | |
|---|---|---|---|---|---|---|---|---|
| Available for sale securities | $ | 278 | $ | 58 | $ | 20 | $ | |
| Trading securities | | 43 | | 43 | | | | |
| Total assets | $ | 32 | $ | 20 | $ | 20 | $ | |
| | | | | | | | | |
| Contingent Value Right (CVR) | $ | 3 | $ | 3 | $ | | $ | |
| CVR related liability | | 256 | | | | | | 256 |
| Fair value of interest rate swap agreements | | 33 | | | | 33 | | |
| Total liabilities | $ | 292 | $ | 3 | $ | 33 | $ | 256 |

| | December 31, 2016 | | Level 1 | | Level 2 | | Level 3 | |
|---|---|---|---|---|---|---|---|---|
| Available for sale securities | $ | 299 | $ | 63 | $ | 36 | $ | |
| Trading securities | | 80 | | 80 | | | | |
| Total assets | $ | 379 | $ | 243 | $ | 36 | $ | |
| | | | | | | | | |
| Contingent Value Right (CVR) | $ | | $ | | $ | | $ | |
| CVR related liability | | 252 | | | | | | 252 |
| Fair value of interest rate swap agreements | | 49 | | | | 49 | | |
| Total liabilities | $ | 302 | $ | | $ | 49 | $ | 252 |

**Available-for-sale Securities**

Available for sale securities and trading securities classified as Level are measured using quoted market prices Level 2 available for sale securities primarily consisted of bonds and notes issued by the United States government and its agencies and domestic and foreign corporations The estimated fair values of these securities are determined using various valuation techniques, including a multi dimensional relational model that incorporates standard observable inputs and assumptions such as benchmark yields, reported trades, broker/dealer quotes, issuer spreads, benchmark securities, bids/offers and other pertinent reference data

**Contingent Value Right (CVR)**

The CVR represents the estimate of the fair value for the contingent consideration paid to HMA shareholders as part of the HMA merger The CVR is listed on the NASDAQ and the valuation at September 30, 20 7 is based on the quoted trading price for the CVR on the last day of the period Changes in the estimated fair value of the CVR are recorded through the condensed consolidated statements of loss

Case 3:19-cv-00461     Document 67-8     Filed 03/23/20     Page 37 of 104 PageID #: 1225

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**    **(Continued)**

**CVR-related Liability**

The CVR related legal liability represents the Company's estimate of fair value at September 30, 20 7 of the liability associated with the legal matters assumed in the HMA merger, which are included in other long term liabilities in the accompanying condensed consolidated balance sheet This liability did not include those matters previously accrued by HMA as a probable contingency, which were settled and paid during the year ended December 3 , 20 5 To develop the estimate of fair value, the Company engaged an independent third party valuation firm to measure the liability The valuation was made utilizing the Company's estimates of future outcomes for each legal case and simulating future outcomes based on the timing, probability and distribution of several scenarios using a Monte Carlo simulation model Other inputs were then utilized for discounting the liability to the measurement date The HMA legal matters underlying this fair value estimate were evaluated by management to determine the likelihood and impact of each of the potential outcomes Using that information, as well as the potential correlation and variability associated with each case, a fair value was determined for the estimated future cash outflows to conclude or settle the HMA legal matters included in the analysis, excluding legal fees (which are expensed as incurred) Because of the unobservable nature of the majority of the inputs used to value the liability, the Company has classified the fair value measurement as a Level 3 measurement in the fair value hierarchy

The fair value of the CVR related legal liability will be measured each reporting period using similar measurement techniques, updated for the assumptions and facts existing at that date for each of the underlying legal matters Changes in the fair value of the CVR related legal liability are recorded in future periods through the condensed consolidated statements of loss

**Fair Value of Interest Rate Swap Agreements**

The valuation of the Company's interest rate swap agreements is determined using market valuation techniques, including discounted cash flow analysis on the expected cash flows of each agreement This analysis reflects the contractual terms of the agreement, including the period to maturity, and uses observable market based inputs, including forward interest rate curves The fair value of interest rate swap agreements are determined by netting the discounted future fixed cash payments and the discounted expected variable cash receipts The variable cash receipts are based on the expectation of future interest rates based on observable market forward interest rate curves and the notional amount being hedged

The Company incorporates CVAs to appropriately reflect both its own nonperformance or credit risk and the respective counterparty's nonperformance or credit risk in the fair value measurements In adjusting the fair value of its interest rate swap agreements for the effect of nonperformance or credit risk, the Company has considered the impact of any netting features included in the agreements The CVA on the Company's interest rate swap agreements resulted in a decrease in the fair value of the related liability of $ million and an after tax adjustment of less than $ million to OCI at September 30, 20 7 The CVA on the Company's interest rate swap agreements resulted in a decrease in the fair value of the related liability of $3 million and an after tax adjustment of $2 million to OCI at December 3 , 20 6

The majority of the inputs used to value the Company's interest rate swap agreements, including the forward interest rate curves and market perceptions of the Company's credit risk used in the CVAs, are observable inputs available to a market participant As a result, the Company has determined that the interest rate swap valuations are classified in Level 2 of the fair value hierarchy

**15. EMPLOYEE BENEFIT PLANS**

The Company provides an unfunded Supplemental Executive Retirement Plan ("SERP") for certain members of its executive management The Company uses a December 3 measurement date for the benefit obligations and a January measurement date for its net periodic costs for the SERP Variances from actuarially assumed rates will result in increases or decreases in benefit obligations and net periodic cost in future periods Benefits expense under the SERP was $3 million for both of the three month periods ended September 30, 20 7 and 20 6, and $ 0 million and $9 million for the nine months ended September 30, 20 7 and 20 6, respectively The accrued benefit liability for the SERP totaled $ 5 million and $ 22 million at September 30, 20 7 and December 3 , 20 6, respectively, and is included in other long term liabilities on the condensed consolidated balance sheets The weighted average assumptions used in determining net periodic cost for the three and nine month periods ended September 30, 20 7 was a discount rate of 3 6% and annual salary increase of 2 0% The Company had available for sale securities in a rabbi trust generally designated to pay benefits of the SERP in the amounts of $ 26 million and $ 3 million at September 30, 20 7 and December 3 , 20 6, respectively These amounts are included in other assets, net on the condensed consolidated balance sheets

36

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

During the nine months ended September 30, 20 7, certain members of executive management of the Company that were participants in the SERP retired and met the requirements for payout of their SERP retirement benefit  The SERP payout provisions require payment to the participant in an actuarially determined lump sum amount six months after the participant retires from the Company  Such amounts have been or will be paid out of the rabbi trust during the latter half of 20 7  As required by the pension accounting rules in U S  GAAP, the Company recognized a non cash settlement loss of approximately $2 million during the three months ended September 30, 20 7, and will recognize a non cash settlement loss of approximately $4 million during the three months ending December 3 , 20 7, which represent a pro rata portion of the accumulated unrecognized actuarial loss out of accumulated other comprehensive loss

## 16. SEGMENT INFORMATION

The Company operates in one distinct operating segment, represented by hospital operations (which includes its general acute care hospitals and related healthcare entities that provide inpatient and outpatient healthcare services)

Prior to the Company's sale on December 3 , 20 6 of 80% of its ownership interest in the home care division, the Company also had an additional distinct operating segment represented by its home care agency operations (which provide in home care)  However, only the hospital operations segment met the criteria as a separate reportable segment due to the fact that the financial information for the home care agency segment did not meet the quantitative thresholds for a separate identifiable reportable segment and as such was combined into the corporate and all other reportable segment

The distribution between reportable segments of the Company's net operating revenues and loss from continuing operations before income taxes, for the three and nine months ended September 30, 20 6, prior to the sale of an 80% ownership interest in the home care division, is summarized in the following tables (in millions):

| | Three Months Ended September 30, 2016 | | Nine Months Ended September 30, 2016 | |
|---|---|---|---|---|
| Net operating revenues: | | | | |
| Hospital operations | $ | 4,3 4 | $ | 3,79 |
| Corporate and all other | | 66 | | 78 |
| Total | $ | 4,380 | $ | 3,969 |
| | | | | |
| Loss from continuing operations before income taxes: | | | | |
| Hospital operations | $ | (29) | $ | ( ,337) |
| Corporate and all other | | (54) | | (226) |
| Total | $ | (83) | $ | ( ,563) |

37

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

## 17. OTHER COMPREHENSIVE INCOME

The following tables present information about items reclassified out of accumulated other comprehensive income (loss) by component for the three and nine months ended September 30, 20 7 and 20 6 (in millions, net of tax):

| | Change in Fair Value of Interest Rate Swaps | Change in Fair Value of Available for Sale Securities | Change in Unrecognized Pension Cost Components | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance as of June 30, 20 7 | $ (28) | $ (5) | $ (20) | $ (53) |
| Other comprehensive income before reclassifications | | 2 | | 3 |
| Amounts reclassified from accumulated other comprehensive income | 4 | | | 5 |
| Net current period other comprehensive income | 5 | 2 | | 8 |
| Balance as of September 30, 20 7 | $ (23) | $ (3) | $ ( 9) | $ (45) |

| | Change in Fair Value of Interest Rate Swaps | Change in Fair Value of Available for Sale Securities | Change in Unrecognized Pension Cost Components | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance as of December 3 , 20 6 | $ (3 ) | $ ( 0) | $ (2 ) | $ (62) |
| Other comprehensive (loss) income before reclassifications | (7) | 7 | | |
| Amounts reclassified from accumulated other comprehensive income | 5 | | 2 | 7 |
| Net current period other comprehensive income | 8 | 7 | 2 | 7 |
| Balance as of September 30, 20 7 | $ (23) | $ (3) | $ ( 9) | $ (45) |

38

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

| | Change in Fair Value of Interest Rate Swaps | Change in Fair Value of Available for Sale Securities | Change in Unrecognized Pension Cost Components | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance as of June 30, 20 6 | $ (69) | $ | $ (2 ) | $ (90) |
| Other comprehensive loss before reclassifications | | (7) | | (7) |
| Amounts reclassified from accumulated other comprehensive income | 0 | | | 0 |
| Net current period other comprehensive income (loss) | 0 | (7) | | 3 |
| Balance as of September 30, 20 6 | $ (59) | $ (7) | $ (2 ) | $ (87) |

| | Change in Fair Value of Interest Rate Swaps | Change in Fair Value of Available for Sale Securities | Change in Unrecognized Pension Cost Components | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance as of December 3 , 20 5 | $ (48) | $ | $ (26) | $ (73) |
| Other comprehensive loss before reclassifications | (40) | (8) | | (48) |
| Amounts reclassified from accumulated other comprehensive income | 29 | | 3 | 32 |
| Net current period other comprehensive (loss) income | ( ) | (8) | 3 | ( 6) |
| AOCI distributed to QHC in spin off | | | 2 | 2 |
| Balance as of September 30, 20 6 | $ (59) | $ (7) | $ (2 ) | $ (87) |

39

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

The following tables present a subtotal for each significant reclassification to net loss out of AOCL and the line item affected in the accompanying condensed consolidated statements of loss for the three and nine months ended September 30, 20 7 and 20 6 (in millions):

| Details about accumulated other comprehensive (loss) income components | Amount reclassified from AOCL | | Affected line item in the statement where net (loss) income is presented |
| --- | --- | --- | --- |
| | Three Months Ended September 30, 2017 | Nine Months Ended September 30, 2017 | |
| Gains and losses on cash flow hedges | | | |
| Interest rate swaps | $ (6) | $ (24) | Interest expense, net |
| | 2 | 9 | Tax benefit |
| | $ (4) | $ ( 5) | Net of tax |
| | | | |
| Amortization of defined benefit pension items | | | |
| Prior service costs | $ | $ ( ) | Salaries and benefits |
| Actuarial losses | | ( ) | Salaries and benefits |
| Settlement losses recognized | (2) | (2) | Salaries and benefits |
| | (2) | (4) | Total before tax |
| | | 2 | Tax benefit |
| | $ ( ) | $ (2) | Net of tax |

| Details about accumulated other comprehensive (loss) income components | Amount reclassified from AOCL | | Affected line item in the statement where net (loss) income is presented |
| --- | --- | --- | --- |
| | Three Months Ended September 30, 2016 | Nine Months Ended September 30, 2016 | |
| Gains and losses on cash flow hedges | | | |
| Interest rate swaps | $ ( 5) | $ (45) | Interest expense, net |
| | 5 | 6 | Tax benefit |
| | $ ( 0) | $ (29) | Net of tax |
| | | | |
| Amortization of defined benefit pension items | | | |
| Prior service costs | $ ( ) | $ ( ) | Salaries and benefits |
| Actuarial losses | | (3) | Salaries and benefits |
| | ( ) | (4) | Total before tax |
| | | | Tax benefit |
| | $ | $ (3) | Net of tax |

## 18. CONTINGENCIES

The Company is a party to various legal, regulatory and governmental proceedings incidental to its business Based on current knowledge, management does not believe that loss contingencies arising from pending legal, regulatory and governmental matters, including the matters described herein, will have a material adverse effect on the condensed consolidated financial position or liquidity of the Company However, in light of the inherent uncertainties involved in pending legal, regulatory and governmental matters, some of which are beyond the Company's control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to the Company's results of operations or cash flows for any particular reporting period

40

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  **(Continued)**

With respect to all legal, regulatory and governmental proceedings, the Company considers the likelihood of a negative outcome  If the Company determines the likelihood of a negative outcome with respect to any such matter is probable and the amount of the loss can be reasonably estimated, the Company records an accrual for the estimated loss for the expected outcome of the matter  If the likelihood of a negative outcome with respect to material matters is reasonably possible and the Company is able to determine an estimate of the possible loss or a range of loss, whether in excess of a related accrued liability or where there is no accrued liability, the Company discloses the estimate of the possible loss or range of loss  However, the Company is unable to estimate a possible loss or range of loss in some instances based on the significant uncertainties involved in, and/or the preliminary nature of, certain legal, regulatory and governmental matters

In connection with the spin off of QHC, the Company agreed to indemnify QHC for certain liabilities relating to outcomes or events occurring prior to April 29, 20 6, the closing date of the spin off, including (i) certain claims and proceedings that were known to be outstanding at or prior to the consummation of the spin off and involved multiple facilities and (ii) certain claims, proceedings and investigations by governmental authorities or private plaintiffs related to activities occurring at or related to QHC's healthcare facilities prior to the closing date of the spin off, but only to the extent, in the case of clause (ii), that such claims are covered by insurance policies maintained by the Company, including professional liability and employer practices  In this regard, the Company continues to be responsible for HMA Legal Matters (as defined below) covered by the CVR agreement that relate to QHC's business, and any amounts payable by the Company in connection therewith will continue to reduce the amount payable by the Company in respect of the CVRs  Notwithstanding the foregoing, the Company is not required to indemnify QHC in respect of any claims or proceedings arising out of or related to the business operations of Quorum Health Resources, LLC at any time or QHC's compliance with the corporate integrity agreement  Subsequent to the spin off of QHC, the Office of the Inspector General provided the Company with written assurance that it would look solely at QHC for compliance for its facilities under the Company's Corporate Integrity Agreement; however, the Office of the Inspector General declined to enter into a separate corporate integrity agreement with QHC

HMA Legal Matters and Related CVR

The CVR agreement entitles the holder to receive a one time cash payment of up to $  00 per CVR, subject to downward adjustment based on the final resolution of certain litigation, investigations (whether formal or informal, including subpoenas), or other actions or proceedings related to HMA or its affiliates existing on or prior to July 29, 20 3 (the date of the Company's merger agreement with HMA) as more specifically provided in the CVR agreement (all such matters are referred to as the "HMA Legal Matters"), which include, but are not limited to, investigation and litigation matters as previously disclosed by HMA in public filings with the SEC and/or as described in more detail below  The adjustment reducing the ultimate amount paid to holders of the CVR is determined based on the amount of losses incurred by the Company in connection with the HMA Legal Matters as more specifically provided in the CVR agreement, which generally includes the amount paid for damages, costs, fees and expenses (including, without limitation, attorneys' fees and expenses), and all fines, penalties, settlement amounts, indemnification obligations and other liabilities (all such losses are referred to as "HMA Losses")  If the aggregate amount of HMA Losses exceeds a deductible of $  8 million, then the amount payable in respect of each CVR shall be reduced (but not below zero) by an amount equal to the quotient obtained by dividing: (a) the product of (i) all losses in excess of the deductible and (ii) 90%; by (b) the number of CVRs outstanding on the date on which final resolution of the existing litigation occurs  There are 264,544,053 CVRs outstanding as of the date hereof  If total HMA Losses (including HMA Losses that have occurred to date as noted in the table below) exceed approximately $3  2 million, then the holders of the CVRs will not be entitled to any payment in respect of the CVRs

The CVRs do not have a finite payment date  Any payments the Company makes under the CVR agreement will be payable within 60 days after the final resolution of the HMA Legal Matters  The CVRs are unsecured obligations of CHS and all payments under the CVRs will be subordinated in right of payment to the prior payment in full of all of the Company's senior obligations (as defined in the CVR agreement), which include outstanding indebtedness of the Company (subject to certain exceptions set forth in the CVR agreement) and the HMA Losses  The CVR agreement permits the Company to acquire all or some of the CVRs, whether in open market transactions, private transactions or otherwise  As of September 30, 20 7, the Company had acquired no CVRs

4

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** **(Continued)**

The following table represents the impact of legal expenses paid or incurred and settlements paid or deemed final as of September 30, 20 7 on the amounts owed to CVR holders (in millions):

|  | | | Allocation of Expenses and Settlements Paid | | |
|---|---|---|---|---|---|
|  | Total Expenses and Settlement Cost | | Deductible | Company's Responsibility at 10% | Reduction to Amount Owed to CVR Holders at 90% |
| As of December 3 , 20 6 | $ | 62 | $ 8 | $ 4 | $ 40 |
| Settlements paid | | | | | |
| Legal expenses incurred and/or paid during the nine months ended September 30, 20 7 | | | | | |
| As of September 30, 20 7 | $ | 63 | $ 8 | $ 4 | $ 4 |

Amounts owed to CVR holders are dependent on the ultimate resolution of the HMA Legal Matters and determination of HMA Losses incurred The settlement of any or all of the claims and expenses incurred on behalf of the Company in defending itself will (subject to the deductible) reduce the amounts owed to the CVR holders

Underlying the CVR agreement are a number of claims included in the HMA Legal Matters asserted against HMA The Company has recorded a liability in connection with those claims as part of the acquired assets and liabilities at the date of acquisition pursuant to the provisions of Financial Accounting Standards Board Accounting Standards Codification Topic 805 "Business Combinations " For the estimate of the Company's liabilities associated with the HMA Legal Matters that will be covered by the CVR and were not previously accrued by HMA, the Company recorded a liability of $284 million as part of the acquisition accounting for the HMA merger based on the Company's estimate of fair value of such liabilities as of the date of acquisition There was a $4 million increase in the liability during the nine months ended September 30, 20 7 and the estimated fair value of such liabilities, after consideration of amounts paid and current estimates of valuation inputs, was $256 million as of September 30, 20 7, which is recorded in other long term liabilities on the accompanying condensed consolidated balance sheet As of September 30, 20 7, there is currently no accrual recorded for the probable contingency claims underlying the CVR agreement The estimated liability for probable contingency claims underlying the CVR agreement that was previously recorded by HMA, and reflected in the purchase accounting for HMA as an acquired liability has been settled and was paid during the year ended December 3 , 20 5 In addition, although legal fees are not included in the amounts currently accrued, such legal fees are taken into account in determining HMA Losses under the CVR agreement Certain significant HMA Legal Matters underlying these liabilities are discussed in greater detail below

42

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**    (Continued)

HMA Matters Recorded at Fair Value

*Medicare/Medicaid Billing Lawsuits*

Beginning during the week of December  6, 20  3, eleven qui tam lawsuits filed by private individuals against HMA were unsealed in various United States district courts  The United States has elected to intervene in all or part of eight of these matters; namely U S  ex rel  Craig Brummer v  Health Management Associates, Inc  et al  (Middle District Georgia) ("Brummer"); U S  ex rel  Ralph D  Williams v  Health Management Associates, Inc  et al  (Middle District Georgia) ("Williams"); U S  ex rel  Scott H  Plantz, M D  et al  v  Health Management Associates, Inc , et al  (Northern District Illinois) ("Plantz"); U S  ex rel  Thomas L  Mason, M D  et al  v  Health Management Associates, Inc  et al  (Western District North Carolina) ("Mason"); U S  ex rel  Jacqueline Meyer, et al  v  Health Management Associates, Inc , Gary Newsome et al  ("Jacqueline Meyer") (District of South Carolina); U S  ex rel  George Miller, et al  v  Health Management Associates, Inc  (Eastern District of Pennsylvania) ("Miller"); U S  ex rel  Bradley Nurkin v  Health Management Associates, Inc  et al  (Middle District of Florida) ("Nurkin"); and U S  ex rel  Paul Meyer v  Health Management Associates, Inc  et al  (Southern District Florida) ("Paul Meyer")  The United States has elected to intervene with respect to allegations in these cases that certain HMA hospitals inappropriately admitted patients and then submitted reimbursement claims for treating those individuals to federal healthcare programs in violation of the False Claims Act or that certain HMA hospitals had inappropriate financial relationships with physicians which violated the Stark law, the Anti Kickback Statute, and the False Claims Act  Certain of these complaints also allege the same actions violated various state laws which prohibit false claims  The United States has declined to intervene in three of the eleven matters, namely U S  ex rel  Anita France, et al  v  Health Management Associates, Inc  (Middle District Florida) ("France") which involved allegations of wrongful billing and was settled; U S  ex rel  Sandra Simmons v  Health Management Associates, Inc  et al  (Eastern District Oklahoma) ("Simmons") which alleges unnecessary surgery by an employed physician and which was settled as to all allegations except alleged wrongful termination; and U S  ex rel  David Napoliello, M D  v  Health Management Associates, Inc  (Middle District Florida) ("Napoliello") which alleges inappropriate admissions  On April 3, 20  4, the Multi District Litigation Panel ordered the transfer and consolidation for pretrial proceedings of the eight intervened cases, plus the Napoliello matter, to the District of the District of Columbia under the name In Re: Health Management Associates, Inc  Qui Tam Litigation  On June 2, 20  4, the court entered a stay of this matter until October 6, 20  4, which was subsequently extended until February 27, 20  5, May 27, 20  5, September 25, 20  5, January 25, 20  6, May 25, 20  6, September 26, 20  6, December 27, 20  6, April 27, 20  7, August 28, 20  7 and now until December  8, 20  7  The Company intends to defend against the allegations in these matters, but also continues to cooperate with the government in the ongoing investigation of these allegations  The Company has been in discussions with the Civil Division of the United States Department of Justice ("DOJ") regarding the resolutions of these matters  During the first quarter of 20  5, the Company was informed that the Criminal Division continues to investigate former executive level employees of HMA, and continues to consider whether any HMA entities should be held criminally liable for the acts of the former HMA employees  The Company is voluntarily cooperating with these inquiries and has not been served with any subpoenas or other legal process

Other Probable Contingencies

*Becker v. Community Health Systems, Inc. d/b/a Community Health Systems Professional Services Corporation d/b/a Community Health Systems d/b/a Community Health Systems PSC, Inc. d/b/a Rockwood Clinic P.S. and Rockwood Clinic, P.S. (Superior Court, Spokane, Washington).* This suit was filed on February 29, 20  2, by a former chief financial officer at Rockwood Clinic in Spokane, Washington  Becker claims he was wrongfully terminated for allegedly refusing to certify a budget for Rockwood Clinic in 20  2  On February 29, 20  2, he also filed an administrative complaint with the Department of Labor, Occupational Safety and Health Administration alleging that he is a whistleblower under Sarbanes Oxley, which was dismissed by the agency and was appealed to an administrative law judge for a hearing that occurred on January  9 26, 20  6  In a decision dated November 9, 20  6, the law judge awarded Becker approximately $  9 million for front pay, back pay and emotional damages with attorney fees to be later determined  The Company has appealed the award to the Administrative Review Board and is awaiting its decision  At a hearing on July 27, 20  2, the trial court dismissed Community Health Systems, Inc  from the state case and subsequently certified the state case for an interlocutory appeal of the denial to dismiss his employer and the management company  The appellate court accepted the interlocutory appeal, and it was argued on April 30, 20  4  On August  4, 20  4, the court denied the Company's appeal  On October 20, 20  4, the Company filed a petition to review the denial with the Washington Supreme Court  The appeal was accepted and oral argument was heard on June 9, 20  5  On September  5, 20  5, the court denied the Company's appeal and remanded to the trial court; a previous trial setting of September  2, 20  6 has been vacated and not reset  The Company continues to vigorously defend these actions

**Tab e of Contents**

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

Summary of Recorded Amounts

The table below presents a reconciliation of the beginning and ending liability balances (in millions) during the nine months ended September 30, 20 7, with respect to the Company's fair value determination in connection with HMA Legal Matters that were not previously accrued by HMA, and the remaining contingencies of the Company in respect of which an accrual has been recorded In addition, future legal fees (which are expensed as incurred) and costs related to possible indemnification and criminal investigation matters associated with the HMA Legal Matters have not been accrued or included in the table below Furthermore, although not accrued, such costs, if incurred, will be taken into account in determining the total amount of reductions applied to the amounts owed to CVR holders

|  | CVR-Related Liability at Fair Value | Other Probable Contingencies |
|---|---|---|
| Balance as of December 3 , 20 6 | $ 252 | $ 4 |
| Expense | 4 | 3 |
| Cash payments |  | ( 4) |
| Balance as of September 30, 20 7 | $ 256 | $ 3 |

With respect to the "Other Probable Contingencies" referenced in the chart above, in accordance with applicable accounting guidance, the Company establishes a liability for litigation, regulatory and governmental matters for which, based on information currently available, the Company believes that a negative outcome is known or is probable and the amount of the loss is reasonably estimable For all such matters (whether or not discussed in this contingencies footnote), such amounts have been recorded in other accrued liabilities on the condensed consolidated balance sheet and are included in the table above in the "Other Probable Contingencies" column Due to the uncertainties and difficulty in predicting the ultimate resolution of these contingencies, the actual amount could differ from the estimated amount reflected as a liability on the condensed consolidated balance sheet

In the aggregate, attorneys' fees and other costs incurred but not included in the table above related to probable contingencies, and CVR related contingencies accounted for at fair value, totaled $ million for both the three month periods ended September 30, 20 7 and 20 6, and $2 million for both the nine month periods ended September 30, 20 7 and 20 6, and are included in other operating expenses in the accompanying condensed consolidated statements of loss

Matters for which an Outcome Cannot be Assessed

For the following legal matter, due to the uncertainties surrounding the ultimate outcome of the case, the Company cannot at this time assess what the outcome may be and is further unable to determine any estimate of loss or range of loss

Class Action Shareholder Federal Securities Cases Three purported class action cases have been filed in the United States District Court for the Middle District of Tennessee; namely, Norfolk County Retirement System v Community Health Systems, Inc , et al , filed May 9, 20 ; De Zheng v Community Health Systems, Inc , et al , filed May 2, 20 ; and Minneapolis Firefighters Relief Association v Community Health Systems, Inc , et al , filed June 2 , 20 All three seek class certification on behalf of purchasers of the Company's common stock between July 27, 2006 and April , 20 and allege that misleading statements resulted in artificially inflated prices for the Company's common stock In December 20 , the cases were consolidated for pretrial purposes and NYC Funds and its counsel were selected as lead plaintiffs/lead plaintiffs' counsel In lieu of ruling on the Company's motion to dismiss, the court permitted the plaintiffs to file a first amended consolidated class action complaint, which was filed on October 5, 20 5 The Company's motion to dismiss was filed on November 4, 20 5 and oral argument was held on April , 20 6 The Company's motion to dismiss was granted on June 6, 20 6 and on June 27, 20 6, the plaintiffs filed a notice of appeal to the Sixth Circuit Court of Appeals The matter is fully briefed, and oral argument was heard on May 3, 20 7 The Company believes this consolidated matter is without merit and will vigorously defend this case

44

Case 3:19-cv-00461   Document 67-8   Filed 03/23/20   Page 46 of 104 PageID #: 1234

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**  (Continued)

Other Matters

Shareholder Derivative Actions  Three purported shareholder derivative actions have also been filed in the United States District Court for the Middle District of Tennessee; Plumbers and Pipefitters Local Union No  630 Pension Annuity Trust Fund v  Wayne T  Smith, et al , filed May 24, 20    ; Roofers Local No   49 Pension Fund v  Wayne T  Smith, et al , filed June 2  , 20    ; and Lambert Sweat v  Wayne T  Smith, et al , filed October 5, 20      These three cases allege breach of fiduciary duty arising out of allegedly improper inpatient admission practices, mismanagement, waste and unjust enrichment  These cases have been consolidated into a single, consolidated action  The plaintiffs filed an operative amended derivative complaint in these three consolidated actions on March  5, 20 2  The Company's motion to dismiss was argued on June  3, 20 3  On September 27, 20 3, the court issued an order granting in part and denying in part the Company's motion to dismiss  This case was settled pursuant to a final order entered on January  7, 20 7  As a result of the settlement, the Company recorded a gain of approximately $40 million for the amount of settlement proceeds received, net of related legal expenses  Pursuant to the terms of the settlement, the Company is required to adopt and maintain for a specified period certain corporate governance measures  For more information, see the order and stipulation of settlement filed as Exhibit 99 2 to the 20 6 Form  0 K

**19. SUBSEQUENT EVENTS**

The Company has evaluated all material events occurring subsequent to the balance sheet date for events requiring disclosure or recognition in the condensed consolidated financial statements

Effective October   , 20 7, one or more subsidiaries of the Company sold Weatherford Regional Medical Center ( 03 licensed beds) in Weatherford, Texas, and its associated assets to subsidiaries of HCA for approximately $66 million in cash, which was received at the preliminary closing on September 29, 20 7

Effective October   , 20 7, one or more subsidiaries of the Company sold five Pennsylvania hospitals and their associated assets to subsidiaries of Reading Health System for approximately $4 8 million in cash, which was received at the preliminary closing on September 29, 20 7  Hospitals included in the transaction were Brandywine Hospital in Coatesville ( 69 licensed beds), Chestnut Hill Hospital in Philadelphia ( 48 licensed beds), Jennersville Hospital in West Grove (63 licensed beds), Phoenixville Hospital in Phoenixville ( 5  licensed beds) and Pottstown Memorial Medical Center in Pottstown (232 licensed beds)

Effective November   , 20 7, one or more subsidiaries of the Company sold Highlands Regional Medical Center ( 26 licensed beds) in Sebring, Florida, and its associated assets to subsidiaries of HCA for approximately $     million in cash

Effective November   , 20 7, one or more subsidiaries of the Company sold Merit Health Northwest Mississippi ( 8  licensed beds) in Clarksdale, Mississippi, and its associated assets to subsidiaries of Curae Health, Inc  for approximately $23 million in a combination of cash and a note receivable from the buyer

45

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

### 20. SUPPLEMENTAL CONDENSED CONSOLIDATING FINANCIAL INFORMATION

The Senior Notes due 20 9, 2020 and 2022, which are senior unsecured obligations of CHS, the 5 ⅛% Senior Secured Notes due 202 , and the 6 ¼% Senior Secured Notes due 2023 (collectively, "the Notes") are guaranteed on a senior basis by the Company and by certain of its existing and subsequently acquired or organized 00% owned domestic subsidiaries The Notes are fully and unconditionally guaranteed on a joint and several basis, with exceptions considered customary for such guarantees, limited to the release of the guarantee when a subsidiary guarantor's capital stock is sold, or a sale of all of the subsidiary guarantor's assets used in operations The following condensed consolidating financial statements present Community Health Systems, Inc (as parent guarantor), CHS (as the issuer), the subsidiary guarantors, the subsidiary non guarantors and eliminations These condensed consolidating financial statements have been prepared and presented in accordance with SEC Regulation S X Rule 3 0 "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered "

The accounting policies used in the preparation of this financial information are consistent with those elsewhere in the condensed consolidated financial statements of the Company, except as noted below:

- Intercompany receivables and payables are presented gross in the supplemental condensed consolidating balance sheets

- Cash flows from intercompany transactions are presented in cash flows from financing activities, as changes in intercompany balances with affiliates, net

- Income tax expense is allocated from the parent guarantor to the income producing operations (other guarantors and non guarantors) and the issuer through stockholders' equity As this approach represents an allocation, the income tax expense allocation is considered non cash for statement of cash flow purposes

- Interest expense, net has been presented to reflect net interest expense and interest income from outstanding long term debt and intercompany balances

The Company's intercompany activity consists primarily of daily cash transfers for purposes of cash management, the allocation of certain expenses and expenditures paid for by the Parent on behalf of its subsidiaries, and the push down of investment in its subsidiaries This activity also includes the intercompany transactions between consolidated entities as part of the Receivables Facility that is further discussed in Note 2 The Company's subsidiaries generally do not purchase services from one another; thus, the intercompany transactions do not represent revenue generating transactions All intercompany transactions eliminate in consolidation

From time to time, subsidiaries of the Company sell and/or repurchase noncontrolling interests in consolidated subsidiaries, which may change subsidiaries between guarantors and non guarantors Effective with the spin off of QHC, all subsidiaries of the Company that were part of that distribution have been removed as guarantors Amounts for prior periods have been revised to reflect the status of guarantors and non guarantors as of September 30, 20 7

46

COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)   (Continued)

**Condensed Consolidating Statement of Loss**
**Three Months Ended September 30, 2017**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ope a ng evenues (ne of con ac ual allowances and d scoun s) | $ - | $ (5) | $ 2,661 | $ 1,677 | $ - | $ 4,333 |
| P ov s on fo bad deb s | - | - | 410 | 257 | - | 667 |
| Ne ope a ng evenues | - | (5) | 2,251 | 1,420 | - | 3,666 |
| Ope a ng cos s and expenses | | | | | | |
| Sala es and benef s | - | - | 911 | 813 | - | 1,724 |
| Suppl es | - | - | 403 | 207 | - | 610 |
| O he ope a ng expenses | - | - | 614 | 297 | - | 911 |
| Gove nmen and o he legal se lemen s and ela ed cos s | - | - | 1 | - | - | 1 |
| Elec on c heal h eco ds ncen ve e mbu semen | - | - | (1) | (1) | - | (2) |
| Ren | - | - | 51 | 42 | - | 93 |
| Dep ec a on and amo za on | - | - | 129 | 77 | - | 206 |
| Impa men and (ga n) loss on sale of bus nesses, ne | - | - | 31 | 2 | - | 33 |
| To al ope a ng cos s and expenses | - | - | 2,139 | 1,437 | - | 3,576 |
| (Loss) ncome f om ope a ons | - | (5) | 112 | (17) | - | 90 |
| In e es expense, ne | - | 84 | 153 | 1 | - | 238 |
| Loss f om ea ly ex ngu shmen of deb | - | 4 | - | - | - | 4 |
| Ga n on sale of nves men s n unconsol da ed aff l a es | - | - | - | - | - | - |
| Equ y n ea n ngs of unconsol da ed aff l a es | 110 | 39 | 20 | - | (174) | (5) |
| Loss f om con nu ng ope a ons befo e ncome axes | (110) | (132) | (61) | (18) | 174 | (147) |
| Benef f om ncome axes | - | (22) | (23) | (14) | - | (59) |
| Loss f om con nu ng ope a ons | (110) | (110) | (38) | (4) | 174 | (88) |
| D scon nued ope a ons, ne of axes | | | | | | |
| Loss f om ope a ons of en es sold o held fo sale | - | - | - | (1) | - | (1) |
| Impa men of hosp als sold o held fo sale | - | - | (2) | 1 | - | (1) |
| Loss f om d scon nued ope a ons, ne of axes | - | - | (2) | - | - | (2) |
| Ne loss | (110) | (110) | (40) | (4) | 174 | (90) |
| Less Ne ncome a bu able o noncon oll ng n e es s | - | - | - | 20 | - | 20 |
| Ne loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (110) | $ (110) | $ (40) | $ (24) | $ 174 | $ (110) |

47

Tab e of Contents

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

**Condensed Consolidating Statement of Loss**
**Three Months Ended September 30, 2016**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ope a ng evenues (ne of con ac ual allowances and d scoun s) | $ - | $ (6) | $ 2,767 | $ 2,323 | $ - | $ 5,084 |
| P ov s on fo bad deb s | - | - | 393 | 311 | - | 704 |
| Ne ope a ng evenues | - | (6) | 2,374 | 2,012 | - | 4,380 |
| Ope a ng cos s and expenses | | | | | | |
| Sala es and benef s | - | - | 969 | 1,098 | - | 2,067 |
| Suppl es | - | - | 416 | 307 | - | 723 |
| O he ope a ng expenses | - | - | 615 | 411 | - | 1,026 |
| Gove nmen and o he legal se lemen s and ela ed cos s | - | - | 5 | 5 | - | 10 |
| Elec on c heal h eco ds ncen ve e mbu semen | - | - | (4) | (1) | - | (5) |
| Ren | - | - | 52 | 57 | - | 109 |
| Dep ec a on and amo za on | - | - | 157 | 108 | - | 265 |
| Impa men and (ga n) loss on sale of bus nesses, ne | - | - | 18 | 21 | - | 39 |
| To al ope a ng cos s and expenses | - | - | 2,228 | 2,006 | - | 4,234 |
| (Loss) ncome f om ope a ons | - | (6) | 146 | 6 | - | 146 |
| In e es expense, ne | - | 84 | 137 | 12 | - | 233 |
| Loss f om ea ly ex ngu shmen of deb | - | - | - | - | - | - |
| Ga n on sale of nves men s n unconsol da ed aff l a es | - | - | - | - | - | - |
| Equ y n ea n ngs of unconsol da ed aff l a es | 79 | 14 | 18 | - | (115) | (4) |
| Loss f om con nu ng ope a ons befo e ncome axes | (79) | (104) | (9) | (6) | 115 | (83) |
| (Benef f om) p ov s on fo ncome axes | - | (25) | 5 | (9) | - | (29) |
| (Loss) ncome f om con nu ng ope a ons | (79) | (79) | (14) | 3 | 115 | (54) |
| D scon nued ope a ons, ne of axes | | | | | | |
| Loss f om ope a ons of en es sold o held fo sale | - | - | (2) | - | - | (2) |
| Loss f om d scon nued ope a ons, ne of axes | - | - | (2) | - | - | (2) |
| Ne (loss) ncome | (79) | (79) | (16) | 3 | 115 | (56) |
| Less Ne ncome a bu able o noncon oll ng n e es s | - | - | - | 23 | - | 23 |
| Ne loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (79) | $ (79) | $ (16) | $ (20) | $ 115 | $ (79) |

48

COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)   (Continued)

**Condensed Consolidating Statement of Loss**
**Nine Months Ended September 30, 2017**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ope a ng evenues (ne of con ac ual allowances and d scoun s) | $ - | $ (17) | $ 8,437 | $ 5,903 | $ - | $ 14,323 |
| P ov s on fo bad deb s | - | - | 1,337 | 691 | - | 2,028 |
| Ne ope a ng evenues | - | (17) | 7,100 | 5,212 | - | 12,295 |
| Ope a ng cos s and expenses | | | | | | |
| Sala es and benef s | - | - | 2,786 | 2,918 | - | 5,704 |
| Suppl es | - | - | 1,263 | 793 | - | 2,056 |
| O he ope a ng expenses | - | - | 1,860 | 1,124 | - | 2,984 |
| Gove nmen and o he legal se lemen s and ela ed cos s | - | - | (32) | - | - | (32) |
| Elec on c heal h eco ds ncen ve e mbu semen | - | - | (12) | (13) | - | (25) |
| Ren | - | - | 155 | 151 | - | 306 |
| Dep ec a on and amo za on | - | - | 385 | 280 | - | 665 |
| Impa men and (ga n) loss on sale of bus nesses, ne | - | - | 291 | 72 | - | 363 |
| To al ope a ng cos s and expenses | - | - | 6,696 | 5,325 | - | 12,021 |
| (Loss) ncome f om ope a ons | - | (17) | 404 | (113) | - | 274 |
| In e es expense, ne | - | 241 | 448 | 17 | - | 706 |
| Loss f om ea ly ex ngu shmen of deb | - | 35 | - | - | - | 35 |
| Equ y n ea n ngs of unconsol da ed aff l a es | 446 | 210 | 105 | - | (774) | (13) |
| Loss f om con nu ng ope a ons befo e ncome axes | (446) | (503) | (149) | (130) | 774 | (454) |
| (Benef f om) p ov s on fo ncome axes | - | (57) | 56 | (73) | - | (74) |
| Loss f om con nu ng ope a ons | (446) | (446) | (205) | (57) | 774 | (380) |
| D scon nued ope a ons, ne of axes | | | | | | |
| Loss f om ope a ons of en es sold o held fo sale | - | - | (3) | (1) | - | (4) |
| Impa men of hosp als sold o held fo sale | - | - | (5) | (1) | - | (6) |
| Loss f om d scon nued ope a ons, ne of axes | - | - | (8) | (2) | - | (10) |
| Ne loss | (446) | (446) | (213) | (59) | 774 | (390) |
| Less Ne ncome a bu able o noncon oll ng n e es s | - | - | - | 56 | - | 56 |
| Ne loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (446) | $ (446) | $ (213) | $ (115) | $ 774 | $ (446) |

49

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

**Condensed Consolidating Statement of Loss**
**Nine Months Ended September 30, 2016**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ope a ng evenues (ne of con ac ual allowances and d scoun s) | $ - | $ (18) | $ 8,594 | $ 7,552 | $ - | $ 16,128 |
| P ov s on fo bad deb s | - | - | 1,349 | 810 | - | 2,159 |
| Ne ope a ng evenues | - | (18) | 7,245 | 6,742 | - | 13,969 |
| Ope a ng cos s and expenses | | | | | | |
| Sala es and benef s | - | - | 2,901 | 3,636 | - | 6,537 |
| Suppl es | - | - | 1,288 | 993 | - | 2,281 |
| O he ope a ng expenses | - | - | 1,766 | 1,490 | - | 3,256 |
| Gove nmen and o he legal se lemen s and ela ed cos s | - | - | 6 | 4 | - | 10 |
| Elec on c heal h eco ds ncen ve e mbu semen | - | - | (28) | (26) | - | (54) |
| Ren | - | - | 153 | 187 | - | 340 |
| Dep ec a on and amo za on | - | - | 477 | 362 | - | 839 |
| Impa men and (ga n) loss on sale of bus nesses, ne | - | - | 1,163 | 532 | - | 1,695 |
| To al ope a ng cos s and expenses | - | - | 7,726 | 7,178 | - | 14,904 |
| Loss f om ope a ons | - | (18) | (481) | (436) | - | (935) |
| In e es expense, ne | - | 158 | 497 | 75 | - | 730 |
| Loss f om ea ly ex ngu shmen of deb | - | 30 | - | - | - | 30 |
| Ga n on sale of nves men s n unconsol da ed aff l a es | - | - | (94) | - | - | (94) |
| Equ y n ea n ngs of unconsol da ed aff l a es | 1,500 | 1,340 | 478 | - | (3,356) | (38) |
| Loss f om con nu ng ope a ons befo e ncome axes | (1,500) | (1,546) | (1,362) | (511) | 3,356 | (1,563) |
| Benef f om ncome axes | - | (46) | (18) | (77) | - | (141) |
| Loss f om con nu ng ope a ons | (1,500) | (1,500) | (1,344) | (434) | 3,356 | (1,422) |
| D scon nued ope a ons, ne of axes | | | | | | |
| (Loss) ncome f om ope a ons of en es sold o held fo sale | - | - | (6) | 2 | - | (4) |
| Impa men of hosp als sold o held fo sale | - | - | - | (1) | - | (1) |
| (Loss) ncome f om d scon nued ope a ons, ne of axes | - | - | (6) | 1 | - | (5) |
| Ne loss | (1,500) | (1,500) | (1,350) | (433) | 3,356 | (1,427) |
| Less Ne ncome a bu able o noncon oll ng n e es s | - | - | - | 73 | - | 73 |
| Ne loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (1,500) | $ (1,500) | $ (1,350) | $ (506) | $ 3,356 | $ (1,500) |

50

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)   (Continued)**

**Condensed Consolidating Statement of Comprehensive Loss**
**Three Months Ended September 30, 2017**

| | Parent Guarantor | | Issuer | | Other Guarantors | | Non - Guarantors | | El m nat ons | | Consol dated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In m ll ons) | | | | | | | |
| Ne loss | $ | (110) | $ | (110) | $ | (40) | $ | (4) | $ | 174 | $ | (90) |
| O he comp ehens ve ncome, ne of ncome axes | | | | | | | | | | | | |
| Ne change n fa value of n e es a e swaps, ne of ax | | 5 | | 5 | | - | | - | | (5) | | 5 |
| Ne change n fa value of ava lable-fo -sale secu es, ne of ax | | 2 | | 2 | | 2 | | - | | (4) | | 2 |
| Amo za on and ecogn on of un ecogn zed pens on cos componen s, ne of ax | | 1 | | 1 | | 1 | | - | | (2) | | 1 |
| O he comp ehens ve ncome | | 8 | | 8 | | 3 | | - | | (11) | | 8 |
| Comp ehens ve loss | | (102) | | (102) | | (37) | | (4) | | 163 | | (82) |
| Less Comp ehens ve ncome a bu able o noncon oll ng n e es s | | - | | - | | - | | 20 | | - | | 20 |
| Comp ehens ve loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ | (102) | $ | (102) | $ | (37) | $ | (24) | $ | 163 | $ | (102) |

**Condensed Consolidating Statement of Comprehensive Loss**
**Three Months Ended September 30, 2016**

| | Parent Guarantor | | Issuer | | Other Guarantors | | Non - Guarantors | | El m nat ons | | Consol dated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In m ll ons) | | | | | | | |
| Ne (loss) ncome | $ | (79) | $ | (79) | $ | (16) | $ | 3 | $ | 115 | $ | (56) |
| O he comp ehens ve (loss) ncome, ne of ncome axes | | | | | | | | | | | | |
| Ne change n fa value of n e es a e swaps, ne of ax | | 10 | | 10 | | - | | - | | (10) | | 10 |
| Ne change n fa value of ava lable-fo -sale secu es, ne of ax | | (7) | | (7) | | (7) | | - | | 14 | | (7) |
| Amo za on and ecogn on of un ecogn zed pens on cos componen s, ne of ax | | - | | - | | - | | - | | - | | - |
| O he comp ehens ve ncome (loss) | | 3 | | 3 | | (7) | | - | | 4 | | 3 |
| Comp ehens ve (loss) ncome | | (76) | | (76) | | (23) | | 3 | | 119 | | (53) |
| Less Comp ehens ve ncome a bu able o noncon oll ng n e es s | | - | | - | | - | | 23 | | - | | 23 |
| Comp ehens ve loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ | (76) | $ | (76) | $ | (23) | $ | (20) | $ | 119 | $ | (76) |

Case 3:19-cv-00461     Document 67-8     Filed 03/23/20     Page 53 of 104 PageID #: 1241

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

**Condensed Consolidating Statement of Comprehensive Loss**
**Nine Months Ended September 30, 2017**

|  | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
|  | (In m ll ons) | | | | | |
| Ne loss | $ (446) | $ (446) | $ (213) | $ (59) | $ 774 | $ (390) |
| O he comp ehens ve ncome, ne of ncome axes | | | | | | |
| Ne change n fa value of n e es a e swaps, ne of ax | 8 | 8 | - | - | (8) | 8 |
| Ne change n fa value of ava lable-fo -sale secu es, ne of ax | 7 | 7 | 7 | - | (14) | 7 |
| Amo za on and ecogn on of un ecogn zed pens on cos componen s, ne of ax | 2 | 2 | 2 | - | (4) | 2 |
| O he comp ehens ve ncome | 17 | 17 | 9 | - | (26) | 17 |
| Comp ehens ve loss | (429) | (429) | (204) | (59) | 748 | (373) |
| Less Comp ehens ve ncome a bu able o noncon oll ng n e es s | - | - | - | 56 | - | 56 |
| Comp ehens ve loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (429) | $ (429) | $ (204) | $ (115) | $ 748 | $ (429) |

**Condensed Consolidating Statement of Comprehensive Loss**
**Nine Months Ended September 30, 2016**

|  | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
|  | (In m ll ons) | | | | | |
| Ne loss | $ (1,500) | $ (1,500) | $ (1,350) | $ (433) | $ 3,356 | $ (1,427) |
| O he comp ehens ve (loss) ncome, ne of ncome axes | | | | | | |
| Ne change n fa value of n e es a e swaps, ne of ax | (11) | (11) | - | - | 11 | (11) |
| Ne change n fa value of ava lable-fo -sale secu es, ne of ax | (8) | (8) | (8) | - | 16 | (8) |
| Amo za on and ecogn on of un ecogn zed pens on cos componen s, ne of ax | 3 | 3 | 3 | - | (6) | 3 |
| O he comp ehens ve loss | (16) | (16) | (5) | - | 21 | (16) |
| Comp ehens ve loss | (1,516) | (1,516) | (1,355) | (433) | 3,377 | (1,443) |
| Less Comp ehens ve ncome a bu able o noncon oll ng n e es s | - | - | - | 73 | - | 73 |
| Comp ehens ve loss a bu able o Commun y Heal h Sys ems, Inc s ockholde s | $ (1,516) | $ (1,516) | $ (1,355) | $ (506) | $ 3,377 | $ (1,516) |

52

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)   (Continued)**

**Condensed Consolidating Balance Sheet**
**September 30, 2017**

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| **ASSETS** | | | | | | |
| Cu en asse s | | | | | | |
| Cash and cash equ valen s | $        - | $        - | $      529 | $       61 | $        - | $      590 |
| Pa en accoun s ece vable, ne of allowance fo doub ful accoun s | - | - | 740 | 2,148 | - | 2,888 |
| Suppl es | - | - | 288 | 157 | - | 445 |
| P epa d ncome axes | 22 | - | - | - | - | 22 |
| P epa d expenses and axes | - | - | 155 | 52 | - | 207 |
| O he cu en asse s | - | - | 343 | 183 | - | 526 |
| To al cu en asse s | 22 | - | 2,055 | 2,601 | - | 4,678 |
| In e company ece vable | 207 | 13,511 | 4,336 | 7,033 | (25,087) | - |
| P ope y and equ pmen , ne | - | - | 4,613 | 2,718 | - | 7,331 |
| Goodw ll | - | - | 3,773 | 2,375 | - | 6,148 |
| O he asse s, ne | 15 | 25 | 1,716 | 880 | (1,058) | 1,578 |
| Ne nves men n subs d a es | 1,300 | 21,453 | 10,735 | - | (33,488) | - |
| To al asse s | $  1,544 | $ 34,989 | $ 27,228 | $ 15,607 | $ (59,633) | $ 19,735 |
| **LIABILITIES AND EQUITY** | | | | | | |
| Cu en l ab l es | | | | | | |
| Cu en ma u es of long- e m deb | $        - | $        - | $       32 | $        8 | $        - | $       40 |
| Accoun s payable | - | - | 560 | 290 | - | 850 |
| Acc ued n e es | - | 237 | - | 1 | - | 238 |
| Acc ued l ab l es | - | - | 672 | 477 | - | 1,149 |
| To al cu en l ab l es | - | 237 | 1,264 | 776 | - | 2,277 |
| Long- e m deb | - | 13,047 | 219 | 635 | - | 13,901 |
| In e company payable | - | 19,355 | 22,436 | 12,989 | (54,780) | - |
| Defe ed ncome axes | 319 | - | - | - | - | 319 |
| O he long- e m l ab l es | 12 | 1,050 | 1,026 | 369 | (1,058) | 1,399 |
| To al l ab l es | 331 | 33,689 | 24,945 | 14,769 | (55,838) | 17,896 |
| Redeemable noncon oll ng n e es s n equ y of consol da ed subs d a es | - | - | - | 530 | - | 530 |
| Equ y | | | | | | |
| Commun y Heal h Sys ems, Inc s ockholde s' equ y | | | | | | |
| Common s ock | 1 | - | - | - | - | 1 |
| Add onal pa d- n cap al | 2,002 | 507 | 867 | 572 | (1,946) | 2,002 |
| Accumula ed o he comp ehens ve loss | (45) | (45) | (17) | (5) | 67 | (45) |
| (Accumula ed def c ) e a ned ea n ngs | (745) | 838 | 1,433 | (355) | (1,916) | (745) |
| To al Commun y Heal h Sys ems, Inc s ockholde s' equ y | 1,213 | 1,300 | 2,283 | 212 | (3,795) | 1,213 |
| Noncon oll ng n e es s n equ y of consol da ed subs d a es | - | - | - | 96 | - | 96 |
| To al equ y | 1,213 | 1,300 | 2,283 | 308 | (3,795) | 1,309 |
| To al l ab l es and equ y | $  1,544 | $ 34,989 | $ 27,228 | $ 15,607 | $ (59,633) | $ 19,735 |

53

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)  (Continued)**

**Condensed Consolidating Balance Sheet**
**December 31, 2016**

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| **ASSETS** | | | | | | |
| Cu en asse s | | | | | | |
| Cash and cash equ valen s | $          - | $          - | $      171 | $        67 | $          - | $      238 |
| Pa en accoun s ece vable, ne of allowance fo doub ful accoun s | - | - | 800 | 2,376 | - | 3,176 |
| Suppl es | - | - | 270 | 210 | - | 480 |
| P epa d ncome axes | 17 | - | - | - | - | 17 |
| P epa d expenses and axes | - | - | 120 | 67 | - | 187 |
| O he cu en asse s | - | - | 216 | 352 | - | 568 |
| To al cu en asse s | 17 | - | 1,577 | 3,072 | - | 4,666 |
| In e company ece vable | 295 | 14,970 | 1,994 | 7,558 | (24,817) | - |
| P ope y and equ pmen , ne | - | - | 4,606 | 3,543 | - | 8,149 |
| Goodw ll | - | - | 3,735 | 2,786 | - | 6,521 |
| O he asse s, ne | 15 | - | 2,620 | 1,195 | (1,222) | 2,608 |
| Ne nves men n subs d a es | 1,728 | 21,383 | 9,983 | - | (33,094) | - |
| To al asse s | $   2,055 | $ 36,353 | $ 24,515 | $ 18,154 | $ (59,133) | $ 21,944 |
| **LIABILITIES AND EQUITY** | | | | | | |
| Cu en l ab l es | | | | | | |
| Cu en ma u es of long- e m deb | $          - | $      149 | $        53 | $      253 | $          - | $      455 |
| Accoun s payable | - | - | 637 | 358 | - | 995 |
| Acc ued n e es | - | 205 | 1 | 1 | - | 207 |
| Acc ued l ab l es | 17 | - | 679 | 534 | - | 1,230 |
| To al cu en l ab l es | 17 | 354 | 1,370 | 1,146 | - | 2,887 |
| Long- e m deb | - | 14,018 | 219 | 552 | - | 14,789 |
| In e company payable | - | 18,994 | 19,341 | 14,822 | (53,157) | - |
| Defe ed ncome axes | 411 | - | - | - | - | 411 |
| O he long- e m l ab l es | 12 | 1,259 | 1,094 | 432 | (1,222) | 1,575 |
| To al l ab l es | 440 | 34,625 | 22,024 | 16,952 | (54,379) | 19,662 |
| Redeemable noncon oll ng n e es s n equ y of consol da ed subs d a es | - | - | - | 554 | - | 554 |
| Equ y | | | | | | |
| Commun y Heal h Sys ems, Inc s ockholde s' equ y | | | | | | |
| Common s ock | 1 | - | - | - | - | 1 |
| Add onal pa d- n cap al | 1,975 | 675 | 948 | 825 | (2,448) | 1,975 |
| Accumula ed o he comp ehens ve loss | (62) | (62) | (23) | (8) | 93 | (62) |
| (Accumula ed def c ) e a ned ea n ngs | (299) | 1,115 | 1,566 | (282) | (2,399) | (299) |
| To al Commun y Heal h Sys ems, Inc s ockholde s' equ y | 1,615 | 1,728 | 2,491 | 535 | (4,754) | 1,615 |
| Noncon oll ng n e es s n equ y of consol da ed subs d a es | - | - | - | 113 | - | 113 |
| To al equ y | 1,615 | 1,728 | 2,491 | 648 | (4,754) | 1,728 |
| To al l ab l es and equ y | $   2,055 | $ 36,353 | $ 24,515 | $ 18,154 | $ (59,133) | $ 21,944 |

54

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)** (Continued)

**Condensed Consolidating Statement of Cash Flows**
**Nine Months Ended September 30, 2017**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ne cash (used n) p ov ded by ope a ng ac v es | $ (44) | $ (228) | $ 645 | $ 244 | $ - | $ 617 |
| | | | | | | |
| Cash flows f om nves ng ac v es | | | | | | |
| Acqu s ons of fac l es and o he ela ed equ pmen | - | - | - | (4) | - | (4) |
| Pu chases of p ope y and equ pmen | - | - | (278) | (150) | - | (428) |
| P oceeds f om d spos on of hosp als and o he anc lla y ope a ons | - | - | 593 | 1,073 | - | 1,666 |
| P oceeds f om sale of p ope y and equ pmen | - | - | 4 | - | - | 4 |
| Pu chases of ava lable-fo -sale secu es | - | - | (58) | (27) | - | (85) |
| P oceeds f om sales of ava lable-fo -sale secu es | - | - | 84 | 49 | - | 133 |
| Inc ease n o he nves men s | - | - | (73) | (22) | - | (95) |
| Ne cash p ov ded by nves ng ac v es | - | - | 272 | 919 | - | 1,191 |
| | | | | | | |
| Cash flows f om f nanc ng ac v es | | | | | | |
| Repu chase of es c ed s ock sha es fo pay oll ax w hhold ng equ emen s | (5) | - | - | - | - | (5) |
| Defe ed f nanc ng cos s and o he deb - ela ed cos s | - | (65) | - | (1) | - | (66) |
| P oceeds f om noncon oll ng nves o s n o n ven u es | - | - | - | 5 | - | 5 |
| Redemp on of noncon oll ng nves men s n o n ven u es | - | - | - | (5) | - | (5) |
| D s bu ons o noncon oll ng nves o s n o n ven u es | - | - | - | (79) | - | (79) |
| Changes n n e company balances w h aff l a es, ne | 49 | 1,414 | (525) | (938) | - | - |
| Bo ow ngs unde c ed ag eemen s | - | 795 | 27 | 17 | - | 839 |
| Issuance of long- e m deb | - | 3,100 | - | - | - | 3,100 |
| P oceeds f om ece vables fac l y | - | - | - | 26 | - | 26 |
| Repaymen s of long- e m ndeb edness | - | (5,016) | (61) | (194) | - | (5,271) |
| Ne cash p ov ded by (used n) f nanc ng ac v es | 44 | 228 | (559) | (1,169) | - | (1,456) |
| Ne change n cash and cash equ valen s | - | - | 358 | (6) | - | 352 |
| Cash and cash equ valen s a beg nn ng of pe od | - | - | 171 | 67 | - | 238 |
| Cash and cash equ valen s a end of pe od | $ - | $ - | $ 529 | $ 61 | $ - | $ 590 |

55

**COMMUNITY HEALTH SYSTEMS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**   (Continued)

**Condensed Consolidating Statement of Cash Flows**
**Nine Months Ended September 30, 2016**

| | Parent Guarantor | Issuer | Other Guarantors | Non - Guarantors | El m nat ons | Consol dated |
|---|---|---|---|---|---|---|
| | | | (In m ll ons) | | | |
| Ne  cash (used  n) p ov ded by ope a ng ac v  es | $ (13) | $ (322) | $ 479 | $ 666 | $ - | $ 810 |
| | | | | | | |
| Cash flows f om  nves ng ac v  es | | | | | | |
| Acqu s  ons of fac l  es and o he   ela ed equ pmen | - | - | (3) | (119) | - | (122) |
| Pu chases of p ope  y and equ pmen | - | - | (359) | (202) | - | (561) |
| P oceeds f om d spos  on of hosp  als and o he  anc lla y ope a ons | - | - | 13 | (1) | - | 12 |
| P oceeds f om sale of p ope  y and equ pmen | - | - | 5 | 5 | - | 10 |
| Pu chases of ava lable-fo -sale secu   es | - | - | (171) | (224) | - | (395) |
| P oceeds f om sales of ava lable-fo -sale secu    es | - | - | 157 | 229 | - | 386 |
| P oceeds f om sale of  nves men s  n unconsol da ed aff l a es | - | - | 403 | - | - | 403 |
| D s  bu on f om Quo um Heal h Co po a on | - | 1,219 | - | - | - | 1,219 |
| Inc ease  n o he   nves men s | - | - | (129) | (72) | - | (201) |
| Ne  cash p ov ded by (used  n)  nves ng ac v  es | - | 1,219 | (84) | (384) | - | 751 |
| | | | | | | |
| Cash flows f om f nanc ng ac v  es | | | | | | |
| Repu chase of  es  c ed s ock sha es fo  pay oll ax w hhold ng  equ  emen s | (5) | - | - | - | - | (5) |
| Defe  ed f nanc ng cos s and o he  deb - ela ed cos s | - | (22) | - | - | - | (22) |
| Redemp on of noncon  oll ng  nves men s  n o n ven u es | - | - | - | (19) | - | (19) |
| D s  bu ons o noncon  oll ng  nves o s  n o n ven u es | - | - | - | (69) | - | (69) |
| Changes  n  n e company balances w h aff l a es, ne | 18 | 529 | (384) | (163) | - | - |
| Bo  ow ngs unde c ed  ag eemen s | - | 3,905 | 23 | 1 | - | 3,929 |
| P oceeds f om  ece vables fac l  y | - | - | - | 66 | - | 66 |
| Repaymen s of long- e m  ndeb edness | - | (5,309) | (49) | (134) | - | (5,492) |
| Ne  cash p ov ded by (used  n) f nanc ng ac v  es | 13 | (897) | (410) | (318) | - | (1,612) |
| Ne  change  n cash and cash equ valen s | - | - | (15) | (36) | - | (51) |
| Cash and cash equ valen s a  beg nn ng of pe  od | - | - | 37 | 147 | - | 184 |
| Cash and cash equ valen s a  end of pe  od | $ - | $ - | $ 22 | $ 111 | $ - | $ 133 |

56

**Item 2.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

You should read this discussion together with our condensed consolidated financial statements and the accompanying notes included herein

Throughout this Quarterly Report on Form 0 Q, we refer to Community Health Systems, Inc , or the Parent Company, and its consolidated subsidiaries in a simplified manner and on a collective basis, using words like "we," "our," "us" and the "Company" This drafting style is suggested by the Securities and Exchange Commission, or SEC, and is not meant to indicate that the publicly traded Parent Company or any particular subsidiary of the Parent Company owns or operates any asset, business or property The hospitals, operations and businesses described in this filing are owned and operated by distinct and indirect subsidiaries of Community Health Systems, Inc

**Executive Overview**

We are one of the largest publicly traded hospital companies in the United States and a leading operator of general acute care hospitals and outpatient facilities in communities across the country We provide healthcare services through the hospitals that we own and operate and affiliated businesses in non urban and selected urban markets throughout the United States We generate revenues by providing a broad range of general and specialized hospital healthcare services and outpatient services to patients in the communities in which we are located As of September 30, 20 7, we owned or leased 33 hospitals included in continuing operations, comprised of 3 general acute care hospitals and two stand alone rehabilitation or psychiatric hospitals We also owned or leased two hospitals included in discontinued operations at September 30, 20 7 For the hospitals that we own and operate, we are paid for our services by governmental agencies, private insurers and directly by the patients we serve

We have been implementing a portfolio rationalization and deleveraging strategy by divesting hospitals and non hospital businesses that are attractive to strategic and other buyers Generally, these businesses are not in one of our strategically beneficial service areas, are less complementary to our business strategy and/or have lower operating margins In addition, in connection with our announced divestiture initiative, strategic and other buyers have made offers to buy certain of our assets Through consideration of these offers we have divested or may divest hospitals and non hospital businesses when we find such offers to be attractive and in line with our operating strategy

In furtherance of this strategy, on April 29, 20 6, we completed a spin off of 38 hospitals and Quorum Health Resources, or QHR (our subsidiary that provided management advisory and consulting services to non affiliated general acute care hospitals located throughout the United States), into Quorum Health Corporation, or QHC, and distributed, on a pro rata basis, all of the shares of QHC common stock to our stockholders of record as of April 22, 20 6 These stockholders received a distribution of one share of QHC common stock for every four shares of our common stock held as of the record date plus cash in lieu of any fractional shares The transaction was structured to be generally tax free to us and our stockholders In recognition of the spin off, we recorded a non cash dividend of approximately $7 3 million during the year ended December 3 , 20 6, representing the net assets of QHC distributed to our stockholders Immediately following the completion of the spin off, our stockholders owned 00% of the outstanding shares of QHC common stock Following the spin off, QHC became an independent public company with its common stock listed for trading under the symbol "QHC" on the New York Stock Exchange Financial and statistical data reported in this Quarterly Report on Form 0 Q include QHC operating results through the spin off date Same store operating results and statistical data exclude information for the hospitals divested in the spin off of QHC for the three and nine months ended September 30, 20 6

In connection with the spin off, we entered into a separation and distribution agreement as well as certain ancillary agreements with QHC on April 29, 20 6 These agreements allocated between QHC and us the various assets, employees, liabilities and obligations (including investments, property and employee benefits and tax related assets and liabilities) that comprise the separate companies and govern certain relationships between, and activities of, QHC and us for a period of time after the spin off

On April 29, 20 6, we sold our unconsolidated minority equity interests in Valley Health System, LLC, a joint venture with Universal Health Systems, Inc , or UHS, representing four hospitals in Las Vegas, Nevada, in which we owned a 27 5% interest, and in Summerlin Hospital Medical Center, LLC, a joint venture with UHS representing one hospital in Las Vegas, Nevada, in which we owned a 26 % interest We received $403 million in cash in return for the sale of these equity interests and recognized a gain of approximately $94 million on the sale of our investment during the year ended December 3 , 20 6

57

On December 22, 20 6, we completed the sale and leaseback of ten medical office buildings for net proceeds of $ 59 million to HCP, Inc  The buildings, with a combined total of 756, 83 square feet, are located in five states and support a wide array of diagnostic, medical and surgical services in an outpatient setting for the respective nearby hospitals  Because of our continuing involvement in these leased buildings, the transaction does not qualify for sale treatment and the related leases have been recorded as financing obligations in the accompanying condensed consolidated balance sheet

On December 3 , 20 6, we sold an 80% majority ownership interest in the home care division to a subsidiary of Almost Family, Inc  for $ 28 million

On May  , 20 7, we sold AllianceHealth Pryor (52 licensed beds) in Pryor, Oklahoma, and its associated assets to Ardent Health Services Inc  for approximately $  million in cash  This hospital has been reported in the condensed consolidated statement of operations in discontinued operations

On May  , 20 7, we sold Stringfellow Memorial Hospital ( 25 licensed beds) in Anniston, Alabama, and its associated assets to The Health Care Authority of the City of Anniston for approximately $ 4 million in cash

On May  , 20 7, we sold Merit Health Gilmore Memorial (95 licensed beds) in Amory, Mississippi and Merit Health Batesville ( 2 licensed beds) in Batesville, Mississippi, and the associated assets to Curae Health, Inc  for approximately $32 million in a combination of cash and a note receivable from the buyer

On May  , 20 7, we sold Easton Hospital ( 96 licensed beds) in Easton, Pennsylvania; Sharon Regional Health System (258 licensed beds) in Sharon, Pennsylvania; Northside Medical Center (355 licensed beds) in Youngstown, Ohio; Trumbull Memorial Hospital (3  licensed beds) in Warren, Ohio; Hillside Rehabilitation Hospital (69 licensed beds) in Warren, Ohio; Wuesthoff Health System  Rockledge (298 licensed beds) in Rockledge, Florida; Wuesthoff Health System  Melbourne ( 9 licensed beds) in Melbourne, Florida; and Sebastian River Medical Center ( 54 licensed beds) in Sebastian, Florida, and the associated assets to Steward Health, Inc  for approximately $304 million in cash

Effective June 30, 20 7, we sold Lake Area Medical Center (88 licensed beds) in Lake Charles, Louisiana to subsidiaries of CHRISTUS Health for approximately $32 million in cash, which was received at closing on June 30, 20 7

Effective July  , 20 7, we sold four Pennsylvania hospitals and their associated assets to subsidiaries of PinnacleHealth System for approximately $23  million in cash, which was received at closing on July 3, 20 7  Hospitals included in the transaction are Memorial Hospital of York ( 00 licensed beds) in York, Pennsylvania; Lancaster Regional Medical Center (2 4 licensed beds) in Lancaster, Pennsylvania; Heart of Lancaster Regional Medical Center ( 48 licensed beds) in Lititz, Pennsylvania; and Carlisle Regional Medical Center ( 65 licensed beds) in Carlisle, Pennsylvania

Effective July  , 20 7, we sold Tomball Regional Medical Center (350 licensed beds) in Tomball, Texas, and the associated assets to subsidiaries of HCA Holdings, Inc , or HCA, and South Texas Regional Medical Center (67 licensed beds) in Jourdanton, Texas, and the associated assets to subsidiaries of HCA and Methodist Healthcare System of San Antonio, Ltd , L L P (a partnership between HCA and Methodist Healthcare Ministries), for approximately $ 35 million in cash, which was received at the preliminary closing on June 30, 20 7

Effective July  , 20 7, we sold two hospitals, a clinic and their associated assets to MultiCare Health System for approximately $424 million in cash, of which $4 4 million was received at the preliminary closing on June 30, 20 7 with the remainder held in escrow  Facilities included in this transaction were Deaconess Hospital (388 licensed beds) in Spokane, Washington; Valley Hospital ( 23 licensed beds) in Spokane Valley, Washington; and the multi specialty Rockwood Clinic in Spokane, Washington

Effective September   , 20  7, we sold Yakima Regional Medical and Cardiac Center (2  4 licensed beds) in Yakima, Washington and Toppenish Community Hospital (63 licensed beds) in Toppenish, Washington, to Regional Health for approximately $43 million in a combination of cash and a note receivable from the buyer

Effective October   , 20  7, we sold five Pennsylvania hospitals and their associated assets to subsidiaries of Reading Health System for approximately $4  8 million in cash, which was received at the preliminary closing on September 29, 20  7  Hospitals included in the transaction are Brandywine Hospital in Coatesville (  69 licensed beds), Chestnut Hill Hospital in Philadelphia (  48 licensed beds), Jennersville Hospital in West Grove (63 licensed beds), Phoenixville Hospital in Phoenixville (  5   licensed beds) and Pottstown Memorial Medical Center in Pottstown (232 licensed beds)

Effective October   , 20  7, we sold Weatherford Regional Medical Center (  03 licensed beds) in Weatherford, Texas, and its associated assets to subsidiaries of HCA for approximately $66 million in cash, which was received at the preliminary closing on September 29, 20  7

Effective November   , 20  7, we sold Highlands Regional Medical Center (  26 licensed beds) in Sebring, Florida, and its associated assets to subsidiaries of HCA for approximately $    million in cash

Effective November   , 20  7, we sold Merit Health Northwest Mississippi (  8   licensed beds) in Clarksdale, Mississippi, and its associated assets to subsidiaries of Curae Health, Inc  for approximately $23 million in a combination of cash and a note receivable from the buyer

Since April   , 20  7, including the hospitals identified above, we have completed the divestiture of all of the hospitals out of the previously announced 30 hospitals currently reported in continuing operations which had been subject to definitive agreements or non binding letters of intent  These 30 hospitals represented annual net operating revenues in 20  6 of approximately $3 4 billion, and we have received gross proceeds plus working capital of approximately $  95 billion in connection with the disposition of these hospitals

In addition to the divestiture of these 30 hospitals, we continue to receive interest from acquirers for certain of our hospitals  We are pursuing these interests for sale transactions involving hospitals with a combined total of at least $2 0 billion in annual net operating revenues and combined mid single digit Adjusted EBITDA margins  These sale transactions are currently in various stages of negotiation with the potential buyers to enter into definitive agreements  There can be no assurance that these dispositions will be completed, or if they are completed, the ultimate timing of the completion of these dispositions

There may be changes from time to time in the composition of the particular hospitals in respect of which we are pursuing potential dispositions as the result of various factors, including changes in any potential buyer or the negotiations with respect to the potential sale of any such hospital  The potential dispositions noted above, as well as the dispositions that have been completed in 20  6 and 20  7 to date, are intended to further implement our portfolio rationalization and deleveraging strategy as described above  When consistent with this strategy, we intend to continue to evaluate offers from potential buyers for additional divestitures and optimize our hospital asset portfolio

Operating results and statistical data for the three and nine months ended September 30, 20  7, exclude two hospitals still owned and one hospital divested during the nine months ended September 30, 20  7, that have previously been classified as discontinued operations for accounting purposes

On March   , 20  6, we completed the acquisition of an 80% ownership interest in a joint venture with Indiana University Health that includes IU Health La Porte Hospital (227 licensed beds) in La Porte, Indiana and IU Health Starke Hospital (50 licensed beds) in Knox, Indiana, and affiliated outpatient centers and physician practices

On April   , 20  6, we completed the acquisition of 80% interest in Physicians' Specialty Hospital (20 licensed beds), a Medicare certified specialty surgical hospital in Fayetteville, Arkansas

Our net operating revenues for the three months ended September 30, 20 7 decreased $7 4 million to approximately $3 7 billion compared to approximately $4 4 billion for the three months ended September 30, 20 6 On a same store basis, net operating revenues for the three months ended September 30, 20 7 decreased $56 million Our provision for bad debts decreased $37 million to $667 million, or 5 4% of operating revenues (before the provision for bad debts) for the three months ended September 30, 20 7, from $704 million, or 3 8% of operating revenues (before the provision for bad debts) for the three months ended September 30, 20 6

We had a loss from continuing operations of $88 million during the three months ended September 30, 20 7, compared to a loss from continuing operations of $54 million for the three months ended September 30, 20 6 Loss from continuing operations for the three months ended September 30, 20 7 included the following:

- an after tax charge of $ million for government and other legal settlements, net of related legal expenses,

- an after tax charge of $2 million for the impairment of goodwill and long lived assets of hospitals sold or held for sale based on their estimated fair values,

- an after tax charge of $ million for employee termination benefits and other restructuring costs,

- an after tax charge of $2 million for loss from early extinguishment of debt, and

- an after tax income of $4 million from fair value adjustments on the CVR agreement liability accounted for at fair value related to the Health Management Associates, Inc , or HMA, legal proceedings, and related legal expenses

Additionally, during the three months ended September 30, 20 7, certain of our hospitals in Texas, Florida and Georgia were impacted by Hurricanes Harvey and Irma with disruption of services and remediation efforts that resulted in an estimated loss of net revenues, which together with incremental expenses directly related to hurricane response efforts totaled approximately $40 million on a pre tax basis This estimated impact is prior to any insurance recoveries which we may receive

Loss from continuing operations for the three months ended September 30, 20 6 included the following:

- an after tax charge of $6 million for government and other legal settlements, net of related legal expenses,

- an after tax charge of $ million for costs incurred related to the divestiture of the Home Care division, and

- an after tax charge of $32 million for the impairment of goodwill and long lived assets

60

Consolidated inpatient admissions for the three months ended September 30, 20 7, decreased  4 8%, compared to the three months ended September 30, 20  6, and consolidated adjusted admissions for the three months ended September 30, 20  7, decreased  5 5%, compared to the three months ended September 30, 20  6  Both same store inpatient admissions and adjusted admissions decreased 2 3% for the three months ended September 30, 20  7, compared to the three months ended September 30, 20  6

Our net operating revenues for the nine months ended September 30, 20  7 decreased $  7 billion to approximately $  2 3 billion compared to approximately $  4 0 billion for the nine months ended September 30, 20  6  On a same store basis, net operating revenues for the nine months ended September 30, 20  7 decreased $35 million  Our provision for bad debts decreased $  3   million to $2 0 billion, or  4 2% of operating revenues (before the provision for bad debts) for the nine months ended September 30, 20  7, from $2 2 billion, or  3 4% of operating revenues (before the provision for bad debts) for the nine months ended September 30, 20  6

We had a loss from continuing operations of $380 million during the nine months ended September 30, 20  7, compared to a loss from continuing operations of $  4 billion for the nine months ended September 30, 20  6  Loss from continuing operations for the nine months ended September 30, 20  7 included the following:

- after tax income of $2   million for government and other legal settlements, net of related legal expenses, primarily as a result of the previously announced settlement of the shareholder derivative action in January 20  7,

- an after tax charge of $320 million for the impairment of goodwill and long lived assets of hospitals sold or held for sale based on their estimated fair values,

- an after tax charge of $3 million for employee termination benefits and other restructuring costs,

- an after tax charge of $22 million for loss from early extinguishment of debt, and

- an after tax charge of $5 million from fair value adjustments on the CVR agreement liability accounted for at fair value related to the HMA legal proceedings, and related legal expenses

Loss from continuing operations for the nine months ended September 30, 20  6 included the following:

- an after tax charge of $7 million for government and other legal settlements, net of related legal expenses,

- an after tax charge of $   million from adjustments related to the HMA legal proceedings, accounted for at fair value, underlying the CVR agreement, and related legal expense,

- an after tax charge of $  5 million for the impairment of long lived assets,

- an after tax charge of $9 million related to costs incurred for the spin off of QHC,

- an after tax charge of $  9 million for loss from early extinguishment of debt,

- an after tax charge of $   million for costs incurred related to the divestiture of the Home Care division,

- an after tax charge of $  5 billion for the impairment of goodwill and long lived assets, and

- after tax income of $60 million for the gain on sale of investments in connection with the sale of our minority equity interest in Valley Health Systems, LLC and Summerlin Hospital Medical Center, LLC

Consolidated inpatient admissions for the nine months ended September 30, 20  7, decreased  2 3%, compared to the nine months ended September 30, 20  6, and consolidated adjusted admissions for the nine months ended September 30, 20  7, decreased  3 0%, compared to the nine months ended September 30, 20  6  Both same store inpatient admissions and adjusted admissions decreased   9% for the nine months ended September 30, 20  7, compared to the nine months ended September 30, 20  6

Self pay revenues represented approximately  3 3% and  2 6% of net operating revenues for the three months ended September 30, 20  7 and 20  6, respectively, and  2 6% and  2 4% for the nine months ended September 30, 20  7 and 20  6, respectively  The amount of foregone revenue related to providing charity care services as a percentage of net operating revenues was approximately 3 2% and 2 9% for the three months ended September 30, 20  7 and 20  6, respectively and 2 9% and 2 5% for the nine months ended September 30, 20  7 and 20  6, respectively  Direct and indirect costs incurred in providing charity care services as a percentage of net operating revenues was approximately 0 4% for both the three month periods ended September 30, 20  7 and 20  6, and approximately 0 4% and 0 3% for the nine months ended September 30, 20  7 and 20  6, respectively

The U S  Congress and certain state legislatures have introduced and passed a large number of proposals and legislation designed to make major changes in the healthcare system, including changes that have increased access to health insurance  The Affordable Care Act, as currently structured, mandates that substantially all U S  citizens maintain health insurance and increases health insurance coverage through a combination of public program expansion and private sector health insurance reforms

The outcome of the 20  6 federal elections cast considerable uncertainty on the future of the Affordable Care Act, and we are monitoring the legislative and executive branch efforts related to healthcare reform  These efforts include statements and executive orders from the President regarding the continued funding of cost sharing reduction payments, or subsidies, to insurers and permitting the sale of short term health insurance plans that do not meet the Affordable Care Act's minimum coverage requirements  Of critical importance to us will be the potential impact of any changes specific to the Medicaid funding and expansion provisions of the Affordable Care Act  We operate hospitals in five of the ten states that experienced the largest reductions in uninsured rates among adult residents between 20  3 and 20  5  The states with the greatest reductions in the number of uninsured adult residents have expanded Medicaid  A number of states have opted out of the Medicaid coverage expansion provisions, but could ultimately decide to expand their programs at a later date  Of the   9 states in which we operated hospitals that were included in continuing operations as of September 30, 20  7, 8 states have taken action to expand their Medicaid programs  At this time, the other     states have not, including Florida, Tennessee and Texas, where we operated a significant number of hospitals as of September 30, 20  7  Some states that have opted out are considering options such as waiver plans to operate an alternative Medicaid expansion plan  Failure to expand Medicaid or implement an effective alternative in these states will likely have a negative impact on the goal of reducing the number of uninsured individuals

The Affordable Care Act makes a number of changes to Medicare and Medicaid, such as reductions to the Medicare annual market basket update for federal fiscal years 20  0 through 20  9, a productivity offset to the Medicare market basket update, and a reduction to the Medicare and Medicaid disproportionate share hospital payments, each of which could adversely impact the reimbursement received under these programs  The Affordable Care Act also includes provisions aimed at reducing fraud, waste and abuse in the healthcare industry

We believe that the Affordable Care Act has had a positive impact on net operating revenues and income from continuing operations as the result of the expansion of private sector and Medicaid coverage that has occurred  However, legislative and executive branch efforts related to healthcare reform could result in increased prices for consumers purchasing health insurance coverage or the sale of insurance plans that contain gaps in coverage, which could destabilize insurance markets and impact the rates of uninsured or underinsured adults  Other provisions of the Affordable Care Act, such as requirements related to employee health insurance coverage and changes to Medicare and Medicaid reimbursement, have increased our operating costs or adversely impacted the reimbursement we receive

It is difficult to predict the ongoing effect of the Affordable Care Act due to executive orders and implementation changes, clarifications and modifications resulting from the rule making process, judicial interpretations resulting from court challenges to its constitutionality and interpretation, whether and how many states ultimately decide to expand Medicaid coverage, the number of uninsured who elect to purchase health insurance coverage, budgetary issues at federal and state levels, and efforts to change or repeal the statute  We may not be able to fully realize the positive impact the Affordable Care Act may otherwise have on our business, results of operations, cash flow, capital resources and liquidity  We cannot predict whether we will be able to modify certain aspects of our operations to offset any potential adverse consequences from the Affordable Care Act or the impact of any alternative provisions that may be adopted

62

Payment under the Medicare program for physician services is based upon the Medicare Physician Fee Schedule, or MPFS, under which CMS has assigned a national relative value unit, or RVU, to most medical procedures and services that reflects the resources required to provide the services relative to all other services  Each RVU is calculated based on a combination of the time and intensity of work required, overhead expense attributable to the service, and malpractice insurance expense  These elements are each modified by a geographic adjustment factor to account for local practice costs and are then aggregated  MACRA provides for a 0 5% update to the MPFS for each calendar year through 20 9  MACRA also requires the establishment of the Quality Payment Program, or QPP, a payment methodology intended to reward high quality patient care  Beginning in 20 7, physicians and certain other healthcare clinicians are required to participate in one of two QPP tracks  Under both tracks, performance data collected in 20 7 will affect Medicare payments in 20 9  CMS expects to transition increasing financial risk to providers as QPP evolves  Under the Advanced Alternative Payment Model, or Advanced APM, track, incentive payments are available based on participation in specific innovative payment models approved by CMS  Providers may earn a Medicare incentive payment and will be exempt from the reporting requirements and payment adjustments imposed under the Merit Based Incentive Payment System, or MIPS, if the provider has sufficient participation in an Advanced APM  Alternatively, providers may participate in the MIPS track, under which physicians will receive performance based payment incentives or payment reductions based on their performance with respect to clinical quality, resource use, clinical improvement activities, and meaningful use of electronic health records, or EHR  MIPS will consolidate components of certain existing physician incentive programs

The federal government has implemented a number of regulations and programs designed to promote the use of EHR technology and pursuant to the Health Information Technology for Economic and Clinical Health Act, or HITECH, established requirements for a Medicare and Medicaid incentive payments program for eligible hospitals and professionals that adopt and meaningfully use certified EHR technology  These payments are available for a maximum period of five or six years, depending on the program  Our hospital facilities have been implementing EHR technology on a facility by facility basis since 20   We recognize incentive reimbursement related to the Medicare or Medicaid incentives as we are able to implement the certified EHR technology and meet the defined "meaningful use criteria," and information from completed cost report periods is available from which to calculate the incentive reimbursement  The timing of recognizing incentive reimbursement does not correlate with the timing of recognizing operating expenses and incurring capital costs in connection with the implementation of EHR technology which may result in material period to period changes in our future results of operations

As of October  , 20 4, eligible hospitals and, as of January  , 20 5, professionals that have not demonstrated meaningful use of certified EHR technology and have not applied and qualified for a hardship exception are subject to payment adjustments  Eligible hospitals are subject to a reduced market basket update to the inpatient prospective payment system standardized amount as of 20 5 and for each subsequent fiscal year  Eligible professionals are subject to a  % per year cumulative reduction applied to the MPFS amount for covered professional services, subject to a cap of 5%  Payment adjustments for eligible professionals failing to demonstrate meaningful use will no longer be applicable beginning in 20 9, when the program is scheduled to be replaced by MIPS

Although we believe that our hospital facilities are currently in compliance with the meaningful use standards, there can be no assurance that all of our facilities will remain in compliance and therefore not be subject to the HITECH payment reductions  We recognized approximately $2 million and $5 million during the three months ended September 30, 20 7 and 20 6, respectively, and $25 million and $54 million during the nine months ended September 30, 20 7 and 20 6, respectively, for HITECH incentive reimbursements from Medicare and Medicaid related to certain of our hospitals and for certain of our employed physicians, which are presented as a reduction of operating expenses  As our hospital facilities and affiliated professionals have achieved substantial compliance with the HITECH standards and the majority have completed the maximum time period for receiving incentive payments, the amount of incentive reimbursements will continue to decline in 20 7

As a result of our current levels of cash, available borrowing capacity, long term outlook on our debt repayments, the refinancing of our term loans and our continued projection of our ability to generate cash flows, we anticipate that we will be able to invest the necessary capital in our business over the next twelve months  We believe there continues to be ample opportunity for growth in substantially all of our markets by decreasing the need for patients to travel outside their communities for healthcare services  Furthermore, we will continue to strive to improve operating efficiencies and procedures in order to improve our profitability at our hospitals

63

**Sources of Revenue**

The following table presents the approximate percentages of operating revenues, net of contractual allowances and discounts (but before provision for bad debts), by payor source for the periods indicated  The data for the periods presented are not strictly comparable due to the effect that hospital acquisitions and divestitures have had on these statistics

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2017 | 2016 |
| Medicare | 22 2 % | 23 0 % | 22 8 % | 24 0 % |
| Medicaid | 0 | 0 5 | 0 7 | 0 4 |
| Managed Care and other third party payors | 53 5 | 53 9 | 53 9 | 53 2 |
| Self pay | 3 3 | 2 6 | 2 6 | 2 4 |
| Total | 00 0 % | 00 0 % | 00 0 % | 00 0 % |

As shown above, we receive a substantial portion of our revenues from the Medicare and Medicaid programs  Included in Managed Care and other third party payors is operating revenues from insurance companies with which we have insurance provider contracts, Medicare managed care, insurance companies for which we do not have insurance provider contracts, workers' compensation carriers and non patient service revenue, such as rental income and cafeteria sales  In the future, we generally expect revenues received from the Medicare and Medicaid programs to increase due to the general aging of the population  In addition, the Affordable Care Act has increased the number of insured patients in states that have expanded Medicaid, which in turn, has reduced the percentage of revenues from self pay patients  However, taking into account the outcome of the 20 6 federal elections, it is unclear whether the trend of increased coverage will continue  Further, the Affordable Care Act, as currently structured, imposes significant reductions in amounts the government pays Medicare managed care plans  The trend toward increased enrollment in Medicare managed care may adversely affect our operating revenue growth  Other provisions in the Affordable Care Act impose minimum medical loss ratios and require insurers to meet specific benefit requirements  Furthermore, in the normal course of business, managed care programs, insurance companies and employers actively negotiate the amounts paid to hospitals  The trend toward increased enrollment in managed care may adversely affect our operating revenue growth  There can be no assurance that we will retain our existing reimbursement arrangements or that these third party payors will not attempt to further reduce the rates they pay for our services

Net operating revenues include amounts estimated by management to be reimbursable by Medicare and Medicaid under prospective payment systems and provisions of cost based reimbursement and other payment methods  In addition, we are reimbursed by non governmental payors using a variety of payment methodologies  Amounts we receive for the treatment of patients covered by Medicare, Medicaid and non governmental payors are generally less than the standard billing rates  We account for the differences between the estimated program reimbursement rates and the standard billing rates as contractual allowance adjustments, which we deduct from gross revenues to arrive at net operating revenues  Final settlements under some of these programs are subject to adjustment based on administrative review and audit by third parties  We account for adjustments to previous program reimbursement estimates as contractual allowance adjustments and report them in the periods that such adjustments become known  Contractual allowance adjustments related to final settlements and previous program reimbursement estimates impacted net operating revenues and net loss by an insignificant amount in each of the three and nine month periods ended September 30, 20 7 and 20 6

The payment rates under the Medicare program for hospital inpatient and outpatient acute care services are based on a prospective payment system, depending upon the diagnosis of a patient's condition  These rates are indexed for inflation annually, although increases have historically been less than actual inflation  On August 2, 20 7, CMS issued the final rule to increase this index by 2 7% for hospital inpatient acute care services that are reimbursed under the prospective payment system, beginning October  , 20 7  The final rule provides for a 0 6% multifactor productivity reduction and a 0 75% reduction to hospital inpatient rates implemented pursuant to the Affordable Care Act, which, together with other payment adjustments, will yield an estimated net   3% increase in reimbursement for hospitals  An additional reduction applies to hospitals that do not submit required patient quality data  We are complying with this data submission requirement  Further, CMS has indicated that Medicare disproportionate share payments and changes to additional uncompensated care payments will increase overall inpatient hospital payment rates by approximately 0 6%

64

Currently, several states utilize supplemental reimbursement programs for the purpose of providing reimbursement to providers to offset a portion of the cost of providing care to Medicaid and indigent patients  These programs are designed with input from CMS and are funded with a combination of state and federal resources, including, in certain instances, fees or taxes levied on the providers  Similar programs are also being considered by other states  The programs are generally authorized for a specified period of time and require CMS's approval to be extended  CMS has indicated that it will take into account a state's status with respect to expanding its Medicaid program in considering whether to extend these supplemental programs  We are unable to predict whether or on what terms CMS will extend the supplemental programs in the states in which we operate, including Texas  Some of these programs are scheduled to expire in 20 7  As a result of existing supplemental programs, we recognize revenue and related expenses in the period in which the fixed and determinable amounts are estimable and collection is reasonably assured  Reimbursement under these programs is reflected in net operating revenues and included as Medicaid revenue in the table above, and fees, taxes or other program related costs are reflected in other operating expenses

**Results of Operations**

Our hospitals offer a variety of services involving a broad range of inpatient and outpatient medical and surgical services  These include general acute care, emergency room, general and specialty surgery, critical care, internal medicine, obstetrics, diagnostic services, psychiatric and rehabilitation services  The strongest demand for hospital services generally occurs during January through April and the weakest demand for these services generally occurs during the summer months  Accordingly, eliminating the effects of new acquisitions and/or divestitures, our net operating revenues and earnings are historically highest during the first quarter and lowest during the third quarter

The following tables summarize, for the periods indicated, selected operating data

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Operating results, as a percentage of net operating revenues: | | | | |
| Net operating revenues | 00 0 % | 00 0 % | 00 0 % | 00 0 % |
| Operating expenses (a) | (9  0) | (89 7) | (89 4) | (88 6) |
| Depreciation and amortization | (5 6) | (6  ) | (5 4) | (6 0) |
| Impairment and (gain) loss on sale of businesses, net | (0 9) | (0 9) | (3 0) | ( 2  ) |
| Income (loss) from operations | 2 5 | 3 3 | 2 2 | (6 7) |
| Interest expense, net | (6 5) | (5 3) | (5 7) | (5 2) |
| Loss from early extinguishment of debt | (0  ) | | (0 3) | (0 3) |
| Gain on sale of investments in unconsolidated affiliates | | | | 0 7 |
| Equity in earnings of unconsolidated affiliates | 0 | 0 | 0 | 0 3 |
| Loss from continuing operations before income taxes | (4 0) | ( 9) | (3 7) | ( 2) |
| Benefit from income taxes | 6 | 0 7 | 0 6 | 0 |
| Loss from continuing operations | (2 4) | ( 2) | (3  ) | ( 02) |
| Loss from discontinued operations, net of taxes | (0  ) | | (0  ) | |
| Net loss | (2 5) | ( 2) | (3 2) | ( 02) |
| Less: Net income attributable to noncontrolling interests | (0 5) | (0 6) | (0 4) | (0 5) |
| Net loss attributable to Community Health Systems, Inc  stockholders | (3 0)% | ( 8)% | (3 6)% | ( 07)% |

65

| | Three Months Ended September 30, 2017 | Nine Months Ended September 30, 2017 |
|---|---|---|
| Percentage (decrease) increase from prior year: | | |
| Net operating revenues | ( 6 3)% | ( 2 0)% |
| Admissions | ( 4 8) | ( 2 3) |
| Adjusted admissions (b) | ( 5 5) | ( 3 0) |
| Average length of stay | | |
| Net loss attributable to Community Health Systems, Inc (c) | (39 2) | 70 3 |
| Same store percentage decrease from prior year (d): | | |
| Net operating revenues | ( 5)% | (0 3)% |
| Admissions | (2 3) | ( 9) |
| Adjusted admissions (b) | (2 3) | ( 9) |

(a) Operating expenses include salaries and benefits, supplies, other operating expenses, government and other legal settlements and related costs, electronic health records incentive reimbursement and rent

(b) Adjusted admissions is a general measure of combined inpatient and outpatient volume We computed adjusted admissions by multiplying admissions by gross patient revenues and then dividing that number by gross inpatient revenues

(c) Includes loss from discontinued operations

(d) Includes acquired hospitals to the extent we operated them in both periods and excludes our hospitals that have previously been classified as discontinued operations for accounting purposes In addition, also excludes information for the hospitals sold or closed during both the three and the nine months ended September 30, 20 7 and 20 6

**Three Months Ended September 30, 2017 Compared to Three Months Ended September 30, 2016**

Net operating revenues decreased by 6 3% to approximately $3 7 billion for the three months ended September 30, 20 7, from approximately $4 4 billion for the three months ended September 30, 20 6 Our provision for bad debts decreased by $37 million to $667 million, or 5 4% of operating revenues (before the provision for bad debts) for the three months ended September 30, 20 7, from $704 million, or 3 8% of operating revenues (before the provision for bad debts) for the three months ended September 30, 20 6 The increase in the provision for bad debt as a percentage of operating revenues (before the provision for bad debt) is primarily due to increases in self pay patient co pays and deductibles Net operating revenues from same store hospitals decreased $56 million or 5% during the three months ended September 30, 20 7, as compared to the three months ended September 30, 20 6 Non same store net operating revenues decreased $658 million during the three months ended September 30, 20 7, in comparison to the prior year period, with the decrease attributable primarily to the spin off of QHC The decrease in same store net operating revenues was attributable to the decline in inpatient admissions and adjusted admissions, which was due in part to the impact of hurricanes Harvey and Irma on certain of our hospitals in Texas, Florida and Georgia as the result of the evacuation and population disruption that occurred prior to these hurricanes as well as the aftermath and recovery efforts in communities affected by these hurricanes In addition, increases in self pay volumes and higher patient co pays and deductibles contributed to higher provision for bad debts compared to the three months ended September 30, 20 6 On a consolidated basis, inpatient admissions decreased by 4 8% and adjusted admissions decreased by 5 5% during the three months ended September 30, 20 7 as compared to the three months ended September 30, 20 6 On a same store basis, net operating revenues per adjusted admissions increased 0 8%, while both inpatient admissions and adjusted admissions decreased by 2 3% during the three months ended September 30, 20 7, compared to the three months ended September 30, 20 6 Our admissions declined primarily due to the impact of the hurricanes noted above and a decrease in obstetrics volume and an increase in observation days, and were also impacted by lower readmissions, a decrease in inpatient surgeries, and a decrease in admissions related to discontinuing certain service lines

66

Operating expenses, as a percentage of net operating revenues, increased from 96 7% during the three months ended September 30, 20 6 to 97 5% during the three months ended September 30, 20 7 Operating expenses, excluding depreciation and amortization and impairment and (gain) loss on sale of businesses, as a percentage of net operating revenues, increased from 89 7% for the three months ended September 30, 20 6 to 9 0% for the three months ended September 30, 20 7 Salaries and benefits, as a percentage of net operating revenues, decreased from 47 2% for the three months ended September 30, 20 6 to 47 0% for the three months ended September 30, 20 7 This decrease in salaries and benefits, as a percentage of net operating revenues, was primarily due to improved staffing and benefit expense management Supplies, as a percentage of net operating revenues, increased from 6 5% for the three months ended September 30, 20 6 to 6 6% for the three months ended September 30, 20 7, primarily as a result of an increase in implant costs due to an increase in surgical case mix over the prior year Other operating expenses, as a percentage of net operating revenues, increased from 23 4% for the three months ended September 30, 20 6 to 24 9% for the three months ended September 30, 20 7, primarily as a result of higher medical specialist fees, an increase in purchased services, growth in malpractice insurance and higher information systems expense Government and other legal settlements and related costs, as a percentage of net operating revenues, decreased from 0 2% for the three months ended September 30, 20 6 to less than 0 % for the three months ended September 30, 20 7 Rent, as a percentage of net operating revenues, remained consistent at 2 5% for both of the three month periods ended September 30, 20 7 and 20 6

EHR incentive reimbursements represent those incentives under HITECH for which the recognition criterion has been met We recognized approximately $2 million and $5 million of incentive reimbursements, or less than 0 % and 0 % of net operating revenues, for the three months ended September 30, 20 7 and 20 6, respectively The decrease in EHR incentive reimbursements is due to the majority of our hospitals completing the various stages of meaningful use compliance, resulting in the expected decline in reimbursement as those programs wind down We received cash payments of $3 million and $7 million for these incentives during the three months ended September 30, 20 7 and 20 6, respectively There was no deferred revenue recorded at either September 30, 20 7 or 20 6

Depreciation and amortization, as a percentage of net operating revenues, decreased from 6 % for three months ended September 30, 20 6 to 5 6% for the three months ended September 30, 20 7, primarily due to ceasing depreciation on property and equipment at hospitals held for sale

Impairment and (gain) loss on sale of businesses was $33 million for the three months ended September 30, 20 7, compared to $39 million for the three months ended September 30, 20 6 Impairment of goodwill and long lived assets for the three months ended September 30, 20 7 included impairment of approximately $33 million related to impairment of the long lived assets and reporting unit goodwill allocated to hospitals classified as held for sale during the three months ended September 30, 20 7 Impairment of goodwill and long lived assets for the three months ended September 30, 20 6 includes the write off of allocated hospital reporting unit goodwill to four hospitals that were classified as held for sale in September 20 6, and an update to the impairment estimated at June 30, 20 6 recorded for goodwill and certain long lived assets based on their then estimated fair values

Interest expense, net, increased by $5 million to $238 million for the three months ended September 30, 20 7 compared to $233 million for the three months ended September 30, 20 6, primarily due to an increase in our interest rate during the three months ended September 30, 20 7, compared to the same period in 20 6, which resulted in an increase in interest expense of $23 million This increase was partially offset by a decrease in our average outstanding debt during the three months ended September 30, 20 7, which resulted in a decrease in interest expense of $ 8 million

Loss from early extinguishment of debt of $4 million was recognized during the three months ended September 30, 20 7, resulting from costs incurred in connection with the early repayments made to certain term loans under the Credit Facility during the period utilizing a portion of hospital divestiture proceeds, as well as in connection with the amendment of the Credit Facility, as discussed further in Capital Resources

Equity in earnings of unconsolidated affiliates, as a percentage of net operating revenues, remained consistent at 0 % for both of the three month periods ended September 30, 20 7 and 20 6

The net results of the above mentioned changes resulted in the loss from continuing operations before income taxes increasing by $64 million from a loss of $83 million for the three months ended September 30, 20 6 to a loss of $ 47 million for the three months ended September 30, 20 7

The benefit for income taxes on loss from continuing operations increased from $29 million for the three months ended September 30, 20  6 to $59 million for the three months ended September 30, 20  7, primarily due to the increase in the loss from continuing operations before income taxes  Our effective tax rates were 40    % and 34 9% for the three months ended September 30, 20  7 and 20  6, respectively  The increase in our effective tax rate for the three months ended September 30, 20  7, when compared to the three months ended September 30, 20  6, was primarily due to the non deductible nature of certain goodwill written off in the $33 million impairment and (gain) loss on sale of businesses for the three months ended September 30, 20  7  Including the expense related to income attributable to noncontrolling interests, the effective tax rate for the three months ended September 30, 20  7 and 20  6 would have been 35 3% and 27 4%, respectively  In addition to the items discussed above, this increase was primarily due to a disproportionate decrease in income from continuing operations before income taxes, when compared to the decrease in net income attributable to noncontrolling interests for those same periods, which is not tax affected in our condensed consolidated financial statements

Loss from continuing operations, as a percentage of net operating revenues, increased from    2% for the three months ended September 30, 20  6 to 2 4% for the three months ended September 30, 20  7

Discontinued operations for these periods include the results of operations of certain hospitals owned or leased by us as of September 30, 20  7 and 20  6, which were classified as being held for sale or sold  The operation of these hospitals resulted in a loss, net of taxes, of $  million and $2 million during the three months ended September 30, 20  7 and 20  6, respectively  An after tax impairment charge of $  million was recorded during the three months ended September 30, 20  7, based on the difference between the estimated fair value and the carrying value of the assets held for sale  No impairment charge was recorded during the three months ended September 30, 20  6  Overall, discontinued operations consisted of a loss, net of taxes, of $2 million for both of the three month periods ended September 30, 20  7 and 20  6

Net loss, as a percentage of net operating revenues, increased from    2% for the three months ended September 30, 20  6 to 2 5% for the three months ended September 30, 20  7

Net income attributable to noncontrolling interests, as a percentage of net operating revenues, decreased from 0 6% for the three months ended September 30, 20  6 to 0 5% for the three months ended September 30, 20  7

Net loss attributable to Community Health Systems, Inc  was $    0 million for the three months ended September 30, 20  7, compared to $79 million for the three months ended September 30, 20  6  The increase in net loss attributable to Community Health Systems, Inc  was primarily due to the decline in net operating revenues and increase to other operating expenses noted above

**Nine Months Ended September 30, 2017 Compared to Nine Months Ended September 30, 2016**

Net operating revenues decreased by    2 0% to approximately $  2 3 billion for the nine months ended September 30, 20  7, from approximately $  4 0 billion for the nine months ended September 30, 20  6  Our provision for bad debts decreased by $  3   million to $2 0 billion, or    4 2% of operating revenues (before the provision for bad debts) for the nine months ended September 30, 20  7, from $2 2 billion, or    3 4% of operating revenues (before the provision for bad debts) for the nine months ended September 30, 20  6  Net operating revenues from same store hospitals decreased $35 million or 0 3% during the nine months ended September 30, 20  7, as compared to the nine months ended September 30, 20  6  Non same store net operating revenues decreased $  6 billion during the nine months ended September 30, 20  7, in comparison to the prior year period, with the decrease attributable primarily to the spin off of QHC  The decrease in same store net operating revenues was attributable to the decline in inpatient admissions and adjusted admissions  On a consolidated basis, inpatient admissions decreased by    2 3% and adjusted admissions decreased by    3 0% during the nine months ended September 30, 20  7 as compared to the nine months ended September 30, 20  6  On a same store basis, net operating revenues per adjusted admissions increased    6%, while both inpatient admissions and adjusted admissions decreased by    9% for the nine months ended September 30, 20  7, compared to the nine months ended September 30, 20  6

68

Operating expenses, as a percentage of net operating revenues, decreased from  06 7% during the nine months ended September 30, 20  6 to 97 8% during the nine months ended September 30, 20  7  Operating expenses, excluding depreciation and amortization and impairment and (gain) loss on sale of businesses, as a percentage of net operating revenues, increased from 88 6% for the nine months ended September 30, 20  6 to 89 4% for the nine months ended September 30, 20  7  Salaries and benefits, as a percentage of net operating revenues, decreased from 46 8% for the nine months ended September 30, 20  6 to 46 4% for the nine months ended September 30, 20  7  This decrease in salaries and benefits, as a percentage of net operating revenues, was primarily due to improved staffing and benefit expense management  Supplies, as a percentage of net operating revenues, increased from  6 3% for the nine months ended September 30, 20  6 to  6 7% for the nine months ended September 30, 20  7, primarily as a result of an increase in implant costs due to an increase in surgical case mix over the prior year  Other operating expenses, as a percentage of net operating revenues, increased from 23 4% for the nine months ended September 30, 20  6 to 24 3% for the nine months ended September 30, 20  7, primarily as a result of higher medical specialist fees, an increase in purchased services and higher information systems expense  Government and other legal settlements and related costs, as a percentage of net operating revenues, increased from expense of 0  % for the nine months ended September 30, 20  6 to income of 0 3% for the nine months ended September 30, 20  7 primarily as a result of the gain recorded from the previously announced settlement of the shareholder derivative action in January 20  7  Rent, as a percentage of net operating revenues, increased from 2 4% for the nine months ended September 30, 20  6 to 2 5% for the nine months ended September 30, 20  7

EHR incentive reimbursements represent those incentives under HITECH for which the recognition criterion has been met  We recognized approximately $25 million and $54 million of incentive reimbursements, or 0 2% and 0 4% of net operating revenues, for the nine months ended September 30, 20  7 and 20  6, respectively  The decrease in EHR incentive reimbursements is due to the majority of our hospitals completing the various stages of meaningful use compliance, resulting in the expected decline in reimbursement as those programs wind down  We received cash payments of $39 million and $  6 million for these incentives during the nine months ended September 30, 20  7 and 20  6, respectively  There was no deferred revenue recorded at either September 30, 20  7 or 20  6

Depreciation and amortization, as a percentage of net operating revenues, decreased from 6 0% for nine months ended September 30, 20  6 to 5 4% for the nine months ended September 30, 20  7, primarily due to ceasing depreciation on property and equipment at hospitals held for sale

Impairment and (gain) loss on sale of businesses was $363 million for the nine months ended September 30, 20  7, compared to $  7 billion for the nine months ended September 30, 20  6  Impairment of goodwill and long lived assets for the nine months ended September 30, 20  7 included impairment of approximately $363 million related to impairment of the long lived assets and reporting unit goodwill allocated to hospitals classified as held for sale during the nine months ended September 30, 20  7  Impairment of goodwill and long lived assets for the nine months ended September 30, 20  6 includes impairment of approximately $  2 million related to the reporting unit goodwill and fixed assets allocated to two hospitals sold during the three months ended March 3  , 20  6, impairment of approximately $3   million related to the reporting unit goodwill allocated to the four hospitals designated as held for sale during the three months ended September 30, 20  6, impairment of approximately $7 million related to certain long lived assets at one of our smaller hospitals permanently closed, impairment of approximately $  395 billion related to goodwill for our hospital reporting unit and $249 million related to the adjustment of the fair value of certain long lived assets at certain hospitals we intend to sell and for other underperforming hospitals

Interest expense, net, decreased by $24 million to $706 million for the nine months ended September 30, 20  7 compared to $730 million for the nine months ended September 30, 20  6, primarily due to a decrease in our average outstanding debt during the nine months ended September 30, 20  7, which resulted in a decrease in interest expense of $66 million  Additionally, a decrease in interest expense of $3 million is due to one less day of interest expense during the nine months ended September, 30 20  7 since 20  6 was a leap year, and a decrease in interest expense of $   million for the nine months ended September 30, 20  7 is a result of more interest being capitalized as compared to the same period in 20  6 because of an increase in major construction projects during the nine months ended September 30, 20  7  These decreases were partially offset by an increase in interest rates during the nine months ended September 30, 20  7, compared to the same period in 20  6, which resulted in an increase in interest expense of $46 million

Loss from early extinguishment of debt of $35 million was recognized during the nine months ended September 30, 20  7  The loss from early extinguishment of debt resulted from the repayment of certain outstanding notes and term loans under the Credit Facility as discussed further in Capital Resources  Loss from early extinguishment of debt of $30 million was recognized during the nine months ended September 30, 20  6 resulting from the repayment of certain outstanding notes and term loans under the Credit Facility

69

No gain on sale of investments in unconsolidated affiliates was recognized during the nine months ended September 30, 20 7 A gain on sale of investments in unconsolidated affiliates of $94 million was recognized during the nine months ended September 30, 20 6 resulting from the sale of our unconsolidated minority equity interests in Valley Health System LLC, a joint venture with UHS representing four hospitals in Las Vegas, Nevada, in which we owned a 27 5% interest, and in Summerlin Hospital Medical Center LLC, a joint venture with UHS representing one hospital in Las Vegas, Nevada, in which we owned a 26  % interest

Equity in earnings of unconsolidated affiliates, as a percentage of net operating revenues, decreased from 0 3% for the nine months ended September 30, 20 6 to 0  % for the nine months ended September 30, 20 7, primarily resulting from our sale in April 20 6 of our unconsolidated minority equity interests in joint ventures with UHS for five hospitals in Las Vegas, Nevada

The net results of the above mentioned changes resulted in loss from continuing operations before income taxes decreasing $     billion from loss of $  6 billion for the nine months ended September 30, 20 6 to a loss of $454 million for the nine months ended September 30, 20 7

The benefit for income taxes on income from continuing operations decreased from $  4  million for the nine months ended September 30, 20 6 to $74 million for the nine months ended September 30, 20 7, primarily due to the decrease in the loss from continuing operations before income taxes  Our effective tax rates were  6 3% and 9 0% for the nine months ended September 30, 20 7 and 20 6, respectively  The increase in our effective tax rate for the nine months ended September 30, 20 7, when compared to the nine months ended September 30, 20 6, was primarily due to the non deductible nature of certain goodwill written off in the $363 million (gain) impairment and loss on sale of businesses for the nine months ended September 30, 20 7, partially offset by approximately $  6 million of tax expense recognized on the tax deficiency created by a difference between the actual tax deduction that will be recognized from the vesting of restricted stock during the nine months ended September 30, 20 7, compared to the higher stock compensation expense previously recorded over the vesting period as determined based on the fair value of the restricted stock at the grant date  Including the expense related to income attributable to noncontrolling interests, the effective tax rate for the nine months ended September 30, 20 7 and 20 6 would have been  4 5% and 8 6%, respectively  In addition to the items discussed above, this increase was primarily due to a disproportionate increase in income from continuing operations before income taxes, when compared to the decrease in net income attributable to noncontrolling interests for those same periods, which is not tax affected in our condensed consolidated financial statements

Loss income from continuing operations, as a percentage of net operating revenues, decreased from  0 2% for the nine months ended September 30, 20 6 to 3  % for the nine months ended September 30, 20 7

Discontinued operations for these periods include the results of operations of certain hospitals owned or leased by us as of September 30, 20 7 and 20 6, which were classified as being held for sale or sold  The operation of these hospitals resulted in a loss, net of taxes, of $4 million for both the nine month periods ended September 30, 20 7 and 20 6 An after tax impairment charge of $6 million and $   million was recorded during the nine months ended September 30, 20 7 and 20 6, respectively, based on the difference between the estimated fair value and the carrying value of the assets held for sale Overall, discontinued operations consisted of a loss, net of taxes, of $  0 million and $5 million during the nine months ended September 30, 20 7 and 20 6

Net loss, as a percentage of net operating revenues, decreased from  0 2% for the nine months ended September 30, 20 6 to 3 2% for the nine months ended September 30, 20 7

Net income attributable to noncontrolling interests, as a percentage of net operating revenues decreased from 0 5% for the nine months ended September 30, 20 6 to 0 4% for the nine months ended September 30, 20 7

Net loss attributable to Community Health Systems, Inc  was $446 million for the nine months ended September 30, 20 7, compared to $  5 billion for the nine months ended September 30, 20 6 The decrease in net loss attributable to Community Health Systems, Inc  was primarily due to the impairment of goodwill and certain long lived assets based on their estimated fair values for hospitals held for sale in 20 6

70

**Liquidity and Capital Resources**

Net cash provided by operating activities decreased $ 93 million, from approximately $8 0 million for the nine months ended September 30, 20 6, to approximately $6 7 million for the nine months ended September 30, 20 7 The decrease in cash provided by operating activities was primarily the result of the loss of cash flow contributed from previously divested hospitals, a decrease in cash flow due to the timing of payroll funding compared to the prior year, a decrease in cash received from HITECH incentive reimbursement, and other changes in working capital Such decreases were offset by improvements in cash flow from patient accounts receivable collections, as well as the net cash received from the settlement proceeds, net of legal fees, of the shareholder derivative action in January 20 7 Total cash paid for interest during the nine months ended September 30, 20 7 decreased to approximately $630 million compared to $767 million for the nine months ended September 30, 20 6, which is primarily related to the decrease in the average outstanding debt balance Approximately $5 million was paid, net of refunds, for income taxes for the nine months ended September 30, 20 7, compared to approximately $6 million paid, net of refunds, for income taxes for the nine months ended September 30, 20 6 Included in net cash provided by operating activities for the nine months ended September 30, 20 7 was $39 million of cash received for HITECH incentive reimbursements, compared to $ 6 million received for the nine months ended September 30, 20 6

Net cash provided by investing activities increased $440 million, from approximately $75 million for the nine months ended September 30, 20 6 to approximately $ 2 billion for the nine months ended September 30, 20 7 The increase in cash provided by investing activities was primarily due to an increase in proceeds from the disposition of hospitals and other ancillary operations of $ 7 billion; a decrease of $ 8 million in the cash used in the acquisition of facilities and other related equipment as there were no hospital acquisitions during the nine months ended September 30, 20 7, compared to three hospitals acquired during the nine months ended September 30, 20 6; a decrease in the cash used in the purchase of property and equipment of $ 33 million, an increase in cash provided by the net impact of the purchases and sales of available for sale securities of $57 million, and a decrease in cash used for other investments (primarily from internal use software expenditures and physician recruiting costs) of $ 06 million for the nine months ended September 30, 20 7 Included in cash outflows for other investments for the nine months ended September 30, 20 7 is approximately $33 million of capital expenditures related to the purchase and implementation of certified EHR technology, including implementation of Cerner software at several hospital locations The remaining cash outflows for other investments for the nine months ended September 30, 20 7 primarily consists of purchases and development of other internal use software and payments made under non employee physician recruiting agreements of $62 million The increase in cash provided by investing activities was partially offset by a decrease in cash provided by the distribution from QHC of $ 2 billion received as part of the spin off transaction during the nine months ended September 30, 20 6, a decrease in cash provided by the April 29, 20 6 sale of our investments in unconsolidated affiliates of $403 million, related to our unconsolidated interest in two joint ventures with UHS representing five hospitals in Las Vegas, Nevada, and a decrease in the proceeds from the sale of property and equipment of $6 million We anticipate being able to fund future routine capital expenditures with cash flows generated from operations

Our net cash used in financing activities was $ 5 billion for the nine months ended September 30, 20 7, compared to $ 6 billion for the nine months ended September 30, 20 6, a decrease of approximately $ 56 million The decrease in cash used in financing activities, in comparison to the prior year period, is primarily due to the net effect of our debt repayment and refinancing activity during the year, including an increase in our long term borrowings and issuance of long term debt of $ 0 million, and a decrease in cash paid for the repayment of long term debt of $22 million Additionally, an increase in proceeds from noncontrolling investors in joint ventures of $5 million, and a reduction in cash paid for the redemption of noncontrolling investments in joint ventures of $ 4 million, were offset by an increase of $ 0 million in cash paid for distributions to noncontrolling investors in joint ventures These decreases in cash used in financing activities were partially offset by an increase in cash paid for deferred financing costs and other debt related costs of $44 million, and a decrease in the proceeds from our receivables facility of $40 million

*Capital Expenditures*

Cash expenditures for purchases of facilities were $4 million for the nine months ended September 30, 20 7, compared to $ 22 million for the nine months ended September 30, 20 6 The decrease was due to no hospital acquisitions completed during the nine months ended September 30, 20 7 compared to the acquisition of three hospitals during the nine months ended September 30, 20 6 Our expenditures for the nine months ended September 30, 20 7 were related to the purchase of physician practices and other ancillary services

7

Excluding the cost to construct replacement hospitals, our cash expenditures for routine capital for the nine months ended September 30, 20 7 totaled $422 million compared to $553 million for the nine months ended September 30, 20 6 These capital expenditures related primarily to the purchase of additional equipment, minor renovations and information systems infrastructure While none of our hospitals experienced extensive property damage from Hurricanes Harvey or Irma, we are currently evaluating the extent of repairs and capital expenditure needs to remediate the damage that was incurred We do not expect the nature or amount of such capital expenditures to have a material impact on our capital resources Costs to construct replacement hospitals totaled $6 million for the nine months ended September 30, 20 7, compared to $8 million for the nine months ended September 30, 20 6 The costs to construct replacement hospitals for the nine months ended September 30, 20 7 and 20 6 represent both planning and construction costs for the replacement hospital in York, Pennsylvania In conjunction with the sale of Memorial Hospital of York on July , 20 7, we no longer have any planned costs to construct this replacement hospital

Pursuant to a hospital purchase agreement from our March , 20 6 acquisition of La Porte Hospital and Starke Hospital, we committed to build replacement facilities in both La Porte, Indiana and Knox, Indiana Under the terms of such agreement, construction of the replacement hospital for LaPorte Hospital is required to be completed within five years of the date of acquisition, or March 202 In addition, construction of the replacement facility for Starke Hospital is required to be completed within five years of the date we enter into a new lease with Starke County, Indiana, the hospital lessor, or in the event we do not enter into a new lease with Starke County, construction shall be completed by September 30, 2026 We have not entered into a new lease with the lessor for Starke Hospital and currently anticipate completing construction of the Starke Hospital replacement facility in 2026 Construction costs, including equipment costs, for the La Porte and Starke replacement facilities are currently estimated to be approximately $ 25 million and $ 5 million, respectively

*Capital Resources*

Net working capital was approximately $2 4 billion at September 30, 20 7, compared to $ 8 billion at December 3 , 20 6 Net working capital increased by approximately $62 million between December 3 , 20 6 and September 30, 20 7 This increase is primarily due to the increase in cash received from hospital divestitures and debt refinancing activity, combined with the reclassification of current debt maturities to long term debt in conjunction with the amendment to and refinancing of a portion of our debt during the nine months ended September 30, 20 7 The additional cash at September 30, 20 7 is expected to be used in subsequent periods to repay our long term debt and for general corporate purposes

We have senior secured financing under a credit facility with a syndicate of financial institutions led by Credit Suisse, as administrative agent and collateral agent In connection with the HMA merger in 20 4, we and CHS/Community Health Systems, Inc , or CHS, entered into a third amendment and restatement of its Credit Facility, providing for additional financing and recapitalization of certain of our term loans, including (i) the replacement of the revolving credit facility with a new $ 0 billion revolving facility maturing in 20 9, or Revolving Facility, (ii) the addition of a new $ 0 billion Term A facility due 20 9, or the Term A Facility, (iii) a Term D facility in an aggregate principal amount equal to approximately $4 6 billion due 202 (which included certain Term C loans that were converted into such Term D facility (collectively, the Term D Facility)), (iv) the conversion of certain Term C loans into Term E Loans and the borrowing of new Term E Loans in an aggregate principal amount of approximately $ 7 billion due 20 7 and (v) the addition of flexibility commensurate with our post acquisition structure In addition to funding a portion of the consideration in connection with the HMA merger, some of the proceeds of the Term A Facility and Term D Facility were used to refinance the outstanding $637 million existing Term A facility due 20 6 and the $60 million of Term B loans due 20 4, respectively The Revolving Facility includes a subfacility for letters of credit

On March 9, 20 5, CHS entered into Amendment No and Incremental Term Loan Assumption Agreement to refinance the existing Term E Loans due 20 7 into Term F Loans due 20 8, in an original aggregated principal amount of $ 7 billion, or Term F Facility On May 8, 20 5, CHS entered into an Incremental Term Loan Assumption Agreement to provide for a new $ 6 billion incremental Term G facility due 20 9, or Term G Facility, and a new approximately $2 9 billion incremental Term H facility due 202 , or Term H Facility The proceeds of the Term G Facility and Term H Facility were used to repay our existing Term D Facility in full On April 29, 20 6, using part of the cash generated from the QHC spin off, we repaid approximately $ 90 million of our Term F Facility On December 5, 20 6, we entered into Amendment No 2 to the Credit Facility, or Amendment No 2, to adjust financial maintenance covenants in the Credit Facility In connection with Amendment No 2, we agreed to certain other additional undertakings for the benefit of the lenders under the Revolving Facility and the Term A Facility

Case 3:19-cv-00461   Document 67-8   Filed 03/23/20   Page 74 of 104 PageID #: 1262

On December 30, 20 6, using the cash generated from the sale of a majority ownership in our home care division and from the completion of the sale lease back transaction for ten of our medical office buildings, we repaid approximately $48 million of our Term F Facility, approximately $26 million of our Term A Facility, approximately $52 million of our Term G Facility and approximately $96 million of our Term H Facility  On March  6, 20  7, CHS issued $2 2 billion aggregate principal amount of 6 ¼% Senior Secured Notes due 2023, or 6 ¼% Senior Secured Notes, a portion of the net proceeds of which was used to repay our existing Term F Facility in full  On May 4, 20  7, using the cash generated from the hospital divestiture transactions completed on May   , 20  7, we repaid approximately $39 million of our Term A Facility, approximately $75 million of our Term G Facility and approximately $  47 million of our Term H Facility  On May   2, 20  7, CHS completed a tack on offering of $900 million aggregate principal amount of 6 ¼% Senior Secured Notes, a portion of the net proceeds of which was used to repay our existing Term A Facility in full  The tack on offering increased the total aggregate principal amount of 6 ¼% Senior Secured Notes to $3    billion

On May 30, 20  7, we entered into a Loan Modification Agreement to the Credit Facility, or Loan Modification Agreement, to extend the maturity date of the Revolving Facility  Following the Loan Modification Agreement, we have Revolving Facility commitments through January 27, 20  9 of approximately $929 million, of which a $739 million portion represents extended commitments maturing January 27, 202   In connection with the Loan Modification Agreement, the financial maintenance covenants in the Credit Facility were further adjusted and we agreed to certain other additional undertakings for the benefit of the extending Revolving Facility lenders

On June 30, 20  7, using a portion of the cash generated from the July   , 20  7 hospital divestitures that preliminarily closed on June 30, 20  7, we repaid approximately $  22 million of our Term G Facility and approximately $225 million of our Term H Facility

On July 7, 20  7, using a portion of the cash generated from the divestitures that preliminarily closed on June 30, 20  7 and that closed on July 3, 20  7, we repaid approximately $ 2   million of the Term G Facility and approximately $222 million of the Term H Facility

On September 29, 20  7, using a portion of the cash generated from the divestitures that preliminarily closed on September 29, 20  7 and that closed on October   , 20  7, we repaid approximately $ 5   million of the Term G Facility and approximately $277 million of the Term H Facility

The loans under the Credit Facility bear interest on the outstanding unpaid principal amount at a rate equal to an applicable percentage plus, at our option, either (a) an Alternate Base Rate (as defined) determined by reference to the greater of ( ) the Prime Rate (as defined) announced by Credit Suisse or (2) the Federal Funds Effective Rate (as defined) plus 0 50% or (3) the adjusted LIBOR rate on such day for a three month interest period commencing on the second business day after such day plus   % or (b) LIBOR  In addition, the margin in respect of the Revolving Facility will be subject to adjustment determined by reference to a leverage based pricing grid  Loans in respect of the Revolving Facility currently accrue interest at a rate per annum equal to LIBOR plus 2 50%, in the case of LIBOR borrowings, and Alternate Base Rate plus   50%, in the case of Alternate Base Rate borrowings  The Term G Loan and Term H Loan will accrue interest at a rate per annum equal to LIBOR plus 2 75% and 3 00%, respectively, in the case of LIBOR borrowings, and Alternate Base Rate plus   75% and 2 00%, respectively, in the case of Alternate Base Rate borrowings  The Term G Loan and the Term H Loan are subject to a   00% LIBOR floor and a 2 00% Alternate Base Rate floor

Under the Term H Facility, we are required to make amortization payments in aggregate amounts equal to   % of the original principal amount of the Term H Facility each year  As of December 3 , 20  6, no additional amortization payments were required to be made under the Term G Facility

73

The term loan facility must be prepaid in an amount equal to ( ) 00% of the net cash proceeds of certain asset sales and dispositions by us and our subsidiaries, subject to certain exceptions and reinvestment rights (provided that, in connection with the Loan Modification Agreement, we agreed with the extended lenders under the Revolving Facility not to exercise such reinvestment rights with respect to certain announced divestitures), (2) 00% of the net cash proceeds of issuances of certain debt obligations or receivables based financing by us and our subsidiaries, subject to certain exceptions, and (3) 50%, subject to reduction to a lower percentage based on our leverage ratio (as defined in the Credit Facility generally as the ratio of total debt on the date of determination to our EBITDA, as defined, for the four quarters most recently ended prior to such date), of excess cash flow (as defined) for any year, subject to certain exceptions  Voluntary prepayments and commitment reductions are permitted in whole or in part, without any premium or penalty, subject to minimum prepayment or reduction requirements

The borrower under the Credit Facility is CHS  All of our obligations under the Credit Facility are unconditionally guaranteed by Community Health Systems, Inc  and certain of its existing and subsequently acquired or organized domestic subsidiaries  All obligations under the Credit Facility and the related guarantees are secured by a perfected first priority lien or security interest in substantially all of the assets of Community Health Systems, Inc , CHS and each subsidiary guarantor, including equity interests held by us or any subsidiary guarantor, but excluding, among others, the equity interests of non significant subsidiaries, syndication subsidiaries, securitization subsidiaries and joint venture subsidiaries  Such assets constitute substantially the same assets, subject to certain exceptions, that secure CHS' obligations under its outstanding senior secured notes

We have agreed to pay letter of credit fees equal to the applicable percentage then in effect with respect to LIBOR borrowings under the Revolving Facility times the maximum aggregate amount available to be drawn under all letters of credit outstanding under the subfacility for letters of credit  The issuer of any letter of credit issued under the subfacility for letters of credit will also receive a customary fronting fee and other customary processing charges  We are obligated to pay commitment fees of 0 50% per annum (subject to adjustment based upon our leverage ratio), on the unused portion of the Revolving Facility

The Credit Facility contains customary representations and warranties, subject to limitations and exceptions, and customary covenants restricting our and our subsidiaries' ability, subject to certain exceptions, to, among other things, ( ) declare dividends, make distributions or redeem or repurchase capital stock, (2) prepay, redeem or repurchase other debt, (3) incur liens or grant negative pledges, (4) make loans and investments and enter into acquisitions and joint ventures, (5) incur additional indebtedness or provide certain guarantees, (6) make capital expenditures, (7) engage in mergers, acquisitions and asset sales, (8) conduct transactions with affiliates, (9) alter the nature of our businesses, ( 0) grant certain guarantees with respect to physician practices, (  ) engage in sale and leaseback transactions or ( 2) change our fiscal year  We and our subsidiaries are also required to comply with specified financial covenants (consisting of a maximum secured net leverage ratio and an interest coverage ratio) and various affirmative covenants  Under the Credit Facility, the secured net leverage ratio is calculated as the ratio of total secured debt, less unrestricted cash and cash equivalents, to consolidated EBITDA, as defined in the Credit Facility, and the interest coverage ratio is the ratio of consolidated EBITDA, as defined in the Credit Facility, to consolidated interest expense for the period  The calculation of consolidated EBITDA as defined in the Credit Facility is a trailing  2 month calculation that begins with net income attributable to us, with certain pro forma adjustments to consider the impact of material acquisitions or divestitures, and adjustments for interest, taxes, depreciation and amortization, net income attributable to noncontrolling interests, stock compensation expense, restructuring costs, and the financial impact of other non cash or non recurring items recorded during any such  2 month period  For the  2 month period ended September 30, 20 7, the secured net leverage ratio financial covenant in the Credit Facility limited the ratio of secured debt to EBITDA, as defined, to less than or equal to 4 50 to  00  The secured net leverage ratio financial covenant will decrease to 4 25 to  00 for the period January  , 2020 through September 30, 2020, then to 4 00 to  00 thereafter  For the  2 month period ended September 30, 20 7, the interest coverage ratio financial covenant in the Credit Facility required the ratio of consolidated EBITDA, as defined, to consolidated interest expense to be greater than or equal to  75 to  00, which will increase to 2 00 to  00 on January  , 20 8 (and for all periods thereafter)  We were in compliance with all such covenants at September 30, 20 7, with a secured net leverage ratio of approximately 3 80 to  00 and an interest coverage ratio of approximately 2 45 to  00

Events of default under the Credit Facility include, but are not limited to, ( ) our failure to pay principal, interest, fees or other amounts under the credit agreement when due (taking into account any applicable grace period), (2) any representation or warranty proving to have been materially incorrect when made, (3) covenant defaults subject, with respect to certain covenants, to an available cure through the issuance of qualified equity for a period of 60 days after the end of the first three quarters and  00 days after a year end, (4) bankruptcy and insolvency events, (5) a cross default to certain other debt, (6) certain undischarged judgments (not paid within an applicable grace period), (7) a change of control (as defined), (8) certain ERISA related defaults and (9) the invalidity or impairment of specified security interests, guarantees or subordination provisions in favor of the administrative agent or lenders under the Credit Facility

74

As of September 30, 20 7, the availability for additional borrowings under our Credit Facility, subject to certain limitations as set forth in the Credit Facility, was approximately $929 million pursuant to the Revolving Facility (which amount shall reduce to $739 million on January 27, 20 9), of which $63 million was set aside for outstanding letters of credit  We believe that these funds, along with internally generated cash and continued access to the capital markets, will be sufficient to finance future acquisitions, capital expenditures and working capital requirements during the next  2 months

On November 22, 20   , CHS completed a private offering of $  0 billion aggregate principal amount of 8% Senior Notes due 20  9  On March 2  , 20  2, CHS completed a private offering of an additional $   0 billion aggregate principal amount of 8% Senior Notes (at a premium of   02 5%)  The net proceeds from these issuances were used to finance the purchase of approximately $  85 billion aggregate principal amount of CHS' then outstanding 8 $\frac{7}{8}$% Senior Notes, to pay related fees and expenses and for general corporate purposes  During the year ended December 3  , 20  6, we repurchased approximately $75 million of the approximately $2 billion aggregate principal amount outstanding of the 8% Senior Notes due 20  9 in open market transactions

On July   8, 20  2, CHS completed a public offering of $   2 billion aggregate principal amount of 7 $\frac{1}{8}$% Senior Notes due 2020  The net proceeds of the offering were used to finance the purchase or redemption of the then outstanding $934 million principal amount plus accrued interest of the 8 $\frac{7}{8}$% Senior Notes, to pay for consents delivered in connection with a related tender offer, to pay related fees and expenses, and for general corporate purposes

On August   7, 20  2, CHS completed a public offering of $  6 billion aggregate principal amount of 5 $\frac{1}{8}$% Senior Secured Notes due 20  8, or the 20  8 Senior Secured Notes  The net proceeds of the offering, together with available cash on hand, were used to finance the prepayment of $   6 billion of the outstanding term loans due 20  4 under the Credit Facility and related fees and expenses  On May   6, 20  6, using part of the cash generated from the QHC spin off, we completed a cash tender offer for $900 million of the approximately $   6 billion aggregate principal amount outstanding of the 20  8 Senior Secured Notes

On January 27, 20  4, CHS completed a private offering of $   0 billion aggregate principal amount of 5 $\frac{1}{8}$% Senior Secured Notes due 202  , or the 202  Senior Secured Notes, and $3 0 billion aggregate principal amount of 6 $\frac{7}{8}$% Senior Notes due 2022, or the 6 $\frac{7}{8}$% Senior Notes  The net proceeds from these issuances were used to finance the HMA merger

On March   6, 20  7, CHS completed a public offering of $2 2 billion aggregate principal amount of 6 $\frac{1}{4}$% Senior Secured Notes due 2023, or the 6 $\frac{1}{4}$% Senior Secured Notes  The net proceeds from this issuance were used to finance the purchase or redemption of $700 million aggregate principal amount of the 20  8 Senior Secured Notes and related fees and expenses, and the repayment of $   445 billion of the Term F Facility  On May  2, 20  7, CHS completed a tack on offering of $900 million aggregate principal amount of 6 $\frac{1}{4}$% Senior Secured Notes, increasing the total aggregate principal amount of 6 $\frac{1}{4}$% Senior Secured Notes to $3   billion  A portion of the net proceeds from this issuance were used to finance the repayment of approximately $7  3 million aggregate principal amount of CHS' then outstanding Term A Facility and related fees and expenses  The tack on notes have identical terms, other than issue date and issue price as the 6 $\frac{1}{4}$% Senior Secured Notes issued on March   6, 20  7  The 6 $\frac{1}{4}$% Senior Secured Notes bear interest at 6 250% per annum, payable semiannually in arrears on March 3  and September 30, commencing September 30, 20  7  Interest on the 6 $\frac{1}{4}$% Senior Secured Notes accrues from the date of original issuance  Interest is calculated on the basis of a 360 day year comprised of twelve 30 day months  Both the 202  Senior Secured Notes and the 6 $\frac{1}{4}$% Senior Secured Notes are secured by a first priority lien subject to a shared lien of equal priority with certain other obligations, including obligations under the Credit Facility, and subject to prior ranking liens permitted by the indentures governing the 202  Senior Secured Notes and the 6 $\frac{1}{4}$% Senior Secured Notes on substantially the same assets, subject to certain exceptions, that secure CHS' obligations under the Credit Facility

75

On March 2 , 20 2, through certain of its subsidiaries, CHS entered into an accounts receivable loan agreement, or the Receivables Facility, with a group of lenders and banks, Credit Agricolé Corporate and Investment Bank, as a managing agent and as the administrative agent, and The Bank of Nova Scotia, as a managing agent On March 7, 20 3, CHS and certain of its subsidiaries amended the Receivables Facility to add an additional managing agent, The Bank of Tokyo Mitsubishi UFJ, Ltd , to increase the size of the facility from $300 million to $500 million and to extend the scheduled termination date Additional subsidiaries also agreed to participate in the Receivables Facility as of that date On March 3 , 20 4, CHS and certain of its subsidiaries amended the Receivables Facility to increase the size of the facility from $500 million to $700 million and to extend the scheduled termination date Additional subsidiaries also agreed to participate in the Receivables Facility as of that date On November 8, 20 6, CHS and certain of its subsidiaries amended the Receivables Facility to extend the scheduled termination date in respect of a $450 million portion of the commitments thereunder and amend certain other provisions thereof On June 23, 20 7, CHS and certain of its subsidiaries amended the Receivables Facility to replace a managing agent, The Bank of Tokyo Mitsubishi UFJ, Ltd with PNC Bank, National Association, to decrease the size of the facility from $700 million to $600 million and to extend the scheduled termination date in respect of $ 50 million of the previously unextended $250 million portion to expire on November 3, 20 8, coterminous with the remaining commitments The remaining $ 00 million was repaid with available cash on hand The existing and future non self pay patient related accounts receivable, or the Receivables, for certain affiliated hospitals serve as collateral for the outstanding borrowings under the Receivables Facility The interest rate on the borrowings is based on the commercial paper rate plus an applicable interest rate spread Unless earlier terminated or subsequently extended pursuant to its terms, the Receivables Facility will expire on November 3, 20 8 in respect of the $600 million of commitments thereunder, subject to customary termination events that could cause an early termination date CHS maintains effective control over the Receivables because, pursuant to the terms of the Receivables Facility, the Receivables are sold from certain of CHS' subsidiaries to CHS, and CHS then sells or contributes the Receivables to a special purpose entity that is wholly owned by CHS The wholly owned special purpose entity in turn grants security interests in the Receivables in exchange for borrowings obtained from the group of third party lenders and banks of up to $600 million outstanding from time to time based on the availability of eligible Receivables and other customary factors The wholly owned special purpose entity is not a subsidiary guarantor under the Credit Facility or CHS' outstanding notes The group of third party lenders and banks do not have recourse to CHS or its subsidiaries beyond the assets of the wholly owned special purpose entity that collateralizes the loan The Receivables and other assets of the wholly owned special purpose entity will be available first and foremost to satisfy the claims of the creditors of such entity The outstanding borrowings pursuant to the Receivables Facility at September 30, 20 7 totaled $532 million on the condensed consolidated balance sheet At September 30, 20 7, the carrying amount of Receivables included in the Receivables Facility totaled approximately $ 5 billion and is included in patient accounts receivable on the condensed consolidated balance sheet

As of September 30, 20 7, we are currently a party to the following interest rate swap agreements to limit the effect of changes in interest rates on approximately 62 3% of our variable rate debt On each of these swaps, we receive a variable rate of interest based on the three month LIBOR, in exchange for the payment by us of a fixed rate of interest We currently pay, on a quarterly basis, interest on the Revolving Facility at a rate per annum equal to LIBOR plus 2 50% The Term G Loan and Term H Loan accrue interest at a rate per annum equal to LIBOR plus 2 75% and 3 00%, respectively, in the case of LIBOR borrowings, and Alternate Base Rate plus 75% and 2 00%, respectively, in the case of Alternate Base Rate Borrowings The Term G Loan and the Term H Loan are subject to a 00% LIBOR floor and a 2 00% Alternate Base Rate floor

| Swap # | Notional Amount (in millions) | Fixed Interest Rate | Termination Date | Fair Value (in millions) |
|---|---|---|---|---|
| | $      400 | 882 % | August 30, 20 9 | $ |
| 2 | 200 | 2 5  5 % | August 30, 20 9 | 3 |
| 3 | 200 | 2 6  3 % | August 30, 20 9 | 3 |
| 4 | 300 | 2 04  % | August 30, 2020 | 2 |
| 5 | 300 | 2 738 % | August 30, 2020 | 7 |
| 6 | 300 | 2 892 % | August 30, 2020 | 9 |
| 7 | 300 | 2 363 % | January 27, 202 | 5 |
| 8 | 200 | 2 368 % | January 27, 202 | 3 |

76

The swaps that were in effect prior to the HMA merger remain in effect after the refinancing for the HMA merger and will continue to be used to limit the effects of changes in interest rates on portions of our amended credit facility

The Credit Facility and the indentures that govern our outstanding notes contain various covenants that limit our ability to take certain actions, including our ability to:

- incur, assume or guarantee additional indebtedness;

- issue redeemable stock and preferred stock;

- repurchase capital stock;

- make restricted payments, including paying dividends and making certain loans, acquisitions and investments;

- redeem debt that is subordinated in right of payment to our outstanding notes;

- create liens;

- sell or otherwise dispose of assets, including capital stock of subsidiaries;

- impair the security interests;

- enter into agreements that restrict dividends and certain other payments from subsidiaries;

- merge, consolidate, sell or otherwise dispose of substantially all of our assets;

- enter into transactions with affiliates; and

- guarantee certain obligations

In addition, our Credit Facility contains restrictive covenants and requires us to maintain specified financial ratios and satisfy other financial condition tests  Our ability to meet these restricted covenants and financial ratios and tests can be affected by events beyond our control, and we cannot assure you that we will meet those tests  A breach of any of these covenants could result in a default under our Credit Facility and/or the indentures that govern our outstanding notes  Upon the occurrence of an event of default under our Credit Facility or indentures that govern our outstanding notes, all amounts outstanding under our Credit Facility and the indentures that govern our outstanding notes may become immediately due and payable and all commitments under the Credit Facility to extend further credit may be terminated

We believe that internally generated cash flows, availability for additional borrowings under our Credit Facility, subject to certain limitations as set forth in the Credit Facility, of approximately $929 million (consisting of an approximately $929 million Revolving Facility (which amount shall reduce to $739 million on January 27, 20 9), of which $63 million is in the form of outstanding letters of credit) and our ability to amend the Credit Facility to provide for one or more tranches of term loans in an aggregate principal amount of up to $  5 billion (only $  0 billion of which is effectively available because of our additional undertakings in connection with the Loan Modification Agreement) and our continued access to the capital markets will be sufficient to finance acquisitions, capital expenditures, working capital requirements, and any equity or debt repurchases or other debt repayments we may elect to make through the next  2 months  In addition, we are currently required to utilize proceeds received from any dispositions of hospitals or investments to repay outstanding debt  As discussed above, the issuance of the 6 $\frac{1}{4}$% Senior Secured Notes allowed us to repay approximately $2   billion of senior secured debt maturing in 20 8 and extended debt maturities to 2023, which had a significant positive impact on our future debt service commitments

We may elect from time to time to purchase our common stock under our open market repurchase program adopted on November 6, 20 5, which authorizes us to purchase up to   0,000,000 shares of our common stock, not to exceed $300 million in repurchases (we have currently repurchased 532, 88 shares under such program, all of which shares were repurchased during the three months ended December 3  , 20 5)  In addition, as noted above, we purchased a portion of our outstanding 8% Senior Notes due 20 9 in open market transactions during 20 6, and we may continue to elect from time to time to purchase our outstanding debt in open market

77

purchases, privately negotiated transactions or otherwise  Any such equity or debt repurchases will depend upon prevailing market conditions, our liquidity requirements, contractual restrictions, applicable securities laws requirements, and other factors

On May 6, 20 5, we filed a universal automatic shelf registration statement on Form S 3ASR that will permit us, from time to time, in one or more public offerings, to offer debt securities, common stock, preferred stock, warrants, depositary shares, or any combination of such securities  The shelf registration statement will also permit our subsidiary, CHS, to offer debt securities that would be guaranteed by us, from time to time in one or more public offerings  The terms of any such future offerings would be established at the time of the offering

The ratio of earnings to fixed charges is a measure of our ability to meet our fixed obligations related to our indebtedness  The following table shows the ratio of earnings to fixed charges for the nine months ended September 30, 20 7:

| | Nine Months Ended September 30, 2017 |
|---|---|
| Ratio of earnings to fixed charges ( ) | * |

( )    Fixed charges include interest expensed and capitalized during the year plus an estimate of the interest component of rent expense  There are no shares of preferred stock outstanding  See exhibit  2 filed as part of this Report for the calculation of this ratio

*    For the nine months ended September 30, 20 7, earnings were insufficient to cover fixed charges by approximately $460 million

**Off-balance Sheet Arrangements**

In the past, we have utilized operating leases as a financing tool for obtaining the operations of specified hospitals without acquiring, through ownership, the related assets of the hospital and without a significant outlay of cash at the front end of the lease  We utilize the same operating strategies to improve operations at those hospitals held under operating leases as we do at those hospitals that we own  We have not entered into any operating leases for hospital operations since December 2000  At September 30, 20 7, we operated two hospitals under operating leases that had an immaterial impact on our consolidated operating results  The terms of the two operating leases we currently have in place expire between December 2020 and January 2028, not including lease extension options  If we allow these leases to expire, we would no longer generate revenues nor incur expenses from these hospitals

**Noncontrolling Interests**

We have sold noncontrolling interests in certain of our subsidiaries or acquired subsidiaries with existing noncontrolling interest ownership positions  As of September 30, 20 7, we have hospitals in 22 of the markets we serve, with noncontrolling physician ownership interests ranging from less than  % to 40%, including one hospital that also has a non profit entity as a partner  In addition, we have nine other hospitals with noncontrolling interests owned by non profit entities  Redeemable noncontrolling interests in equity of consolidated subsidiaries was $530 million and $554 million as of September 30, 20 7 and December 3 , 20 6, respectively, and noncontrolling interests in equity of consolidated subsidiaries was $96 million and $ 3 million as of September 30, 20 7 and December 3 , 20 6, respectively  The amount of net income attributable to noncontrolling interests was $20 million and $23 million for the three months ended September 30, 20 7 and 20 6, respectively, and $56 million and $73 million for the nine months ended September 30, 20 7 and 20 6, respectively  As a result of the change in the Stark Law "whole hospital" exception included in the Affordable Care Act, we are not permitted to introduce physician ownership at any of our hospital facilities that did not have physician ownership at the time of the adoption of the Affordable Care Act, or increase the aggregate percentage of physician ownership in any of our former or existing hospital joint ventures in excess of the aggregate physician ownership level held at the time of the adoption of the Affordable Care Act

78

**Reimbursement, Legislative and Regulatory Changes**

Ongoing legislative and regulatory efforts could reduce or otherwise adversely affect the payments we receive from Medicare and Medicaid and other payors  Within the statutory framework of the Medicare and Medicaid programs, there are substantial areas subject to administrative rulings, interpretations and discretion which may further affect payments made under those programs, and the federal and state governments might, in the future, reduce the funds available under those programs or require more stringent utilization and quality reviews of hospital facilities  Additionally, there may be a continued rise in managed care programs and additional restructuring of the financing and delivery of healthcare in the United States  These events could cause our future financial results to decline  We cannot estimate the impact of Medicare and Medicaid reimbursement changes that have been enacted or are under consideration  We cannot predict whether additional reimbursement reductions will be made or whether any such changes or other restructuring of the financing and delivery of healthcare would have a material adverse effect on our business, financial conditions, results of operations, cash flow, capital resources and liquidity

**Inflation**

The healthcare industry is labor intensive  Wages and other expenses increase during periods of inflation and when labor shortages occur in the marketplace  In addition, our suppliers pass along rising costs to us in the form of higher prices  We have implemented cost control measures, including our case and resource management program, to curb increases in operating costs and expenses  We have generally offset increases in operating costs by increasing reimbursement for services, expanding services and reducing costs in other areas  However, we cannot predict our ability to cover or offset future cost increases, particularly any increases in our cost of providing health insurance benefits to our employees

**Critical Accounting Policies**

The discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, which have been prepared in accordance with U S  GAAP  The preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities at the date of our condensed consolidated financial statements  Actual results may differ from these estimates under different assumptions or conditions

Critical accounting policies are defined as those that are reflective of significant judgments and uncertainties, and potentially result in materially different results under different assumptions and conditions  We believe that our critical accounting policies are limited to those described below

79

*Third-party Reimbursement*

Net operating revenues include amounts estimated by management to be reimbursable by Medicare and Medicaid under prospective payment systems and provisions of cost reimbursement and other payment methods  In addition, we are reimbursed by non governmental payors using a variety of payment methodologies  Amounts we receive for treatment of patients covered by these programs are generally less than the standard billing rates  Contractual allowances are automatically calculated and recorded through our internally developed "automated contractual allowance system " Within the automated system, payors' historical paid claims data are utilized to calculate the contractual allowances  This data is automatically updated on a monthly basis  All hospital contractual allowance calculations are subjected to monthly review by management to ensure reasonableness and accuracy  We account for the differences between the estimated program reimbursement rates and the standard billing rates as contractual allowance adjustments, which we deduct from gross revenues to arrive at operating revenues (net of contractual allowances and discounts)  The process of estimating contractual allowances requires us to estimate the amount expected to be received based on payor contract provisions  The key assumption in this process is the estimated contractual reimbursement percentage, which is based on payor classification and historical paid claims data  Our automated contractual allowance system does not maintain the contractual allowance at the patient account level as it estimates an average contractual allowance by payor classification  Due to the complexities involved in these estimates, actual payments we receive could be different from the amounts we estimate and record  If the actual contractual reimbursement percentage under government programs and managed care contracts differed by   % at September 30, 20  7 from our estimated reimbursement percentage, net loss for the nine months ended September 30, 20  7 would have changed by approximately $76 million, and net accounts receivable at September 30, 20  7 would have changed by $    7 million  Final settlements under some of these programs are subject to adjustment based on administrative review and audit by third parties  We account for adjustments to previous program reimbursement estimates as contractual allowance adjustments and report them in the periods that such adjustments become known  Contractual allowance adjustments related to final settlements and previous program reimbursement estimates impacted net operating revenues and net loss by an insignificant amount in each of the three month and nine month periods ended September 30, 20  7 and 20  6

*Allowance for Doubtful Accounts*

Substantially all of our accounts receivable are related to providing healthcare services to patients at our hospitals and affiliated businesses  Collection of these accounts receivable is our primary source of cash and is critical to our operating performance  Our primary collection risks relate to uninsured patients and outstanding patient balances for which the primary insurance payor has paid some but not all of the outstanding balance, with the remaining outstanding balance (generally deductibles and co payments) owed by the patient  For all procedures scheduled in advance, our policy is to verify insurance coverage prior to the date of the procedure  Insurance coverage is not verified in advance of procedures for walk in and emergency room patients

We estimate the allowance for doubtful accounts by reserving a percentage of all self pay accounts receivable without regard to aging category, based on collection history, adjusted for expected recoveries and any anticipated changes in trends  Our ability to estimate the allowance for doubtful accounts is not impacted by not utilizing an aging of our net accounts receivable as we believe that substantially all of the risk exists at the point in time such accounts are identified as self pay  For all other non self pay payor categories, we reserve an estimated amount based on historical collection rates for the uncontractualized portion of all accounts aging over 365 days from the date of discharge  These amounts represent an immaterial percentage of our outstanding accounts receivable  The percentage used to reserve for all self pay accounts is based on our collection history  We believe that we collect substantially all of our third party insured receivables, which include receivables from governmental agencies

Collections are impacted by the economic ability of patients to pay and the effectiveness of our collection efforts  Significant changes in payor mix, business office operations, economic conditions or trends in federal and state governmental healthcare coverage could affect our collection of accounts receivable and are considered in our estimates of accounts receivable collectability  If the actual collection percentage differed by   % at September 30, 20  7 from our estimated collection percentage as a result of a change in expected recoveries, net loss for the nine months ended September 30, 20  7 would have changed by $52 million, and net accounts receivable at September 30, 20  7 would have changed by $80 million  We also continually review our overall reserve adequacy by monitoring historical cash collections as a percentage of trailing net revenue less provision for bad debts, as well as by analyzing current period net revenue and admissions by payor classification, days revenue outstanding, the composition of self pay receivables between pure self pay patients and the patient responsibility portion of third party insured receivables and the impact of recent acquisitions and dispositions

80

Our policy is to write off gross accounts receivable if the balance is under $ 0 00 or when such amounts are placed with outside collection agencies  We believe this policy accurately reflects our ongoing collection efforts and is consistent with industry practices  We had approximately $4 2 billion and $3 9 billion at September 30, 20 7 and December 3 , 20 6, respectively, being pursued by various outside collection agencies  We expect to collect less than 3%, net of estimated collection fees, of the amounts being pursued by outside collection agencies  As these amounts have been written off, they are not included in our gross accounts receivable or our allowance for doubtful accounts  Collections on amounts previously written off are recognized as a reduction to bad debt expense when received  However, we take into consideration estimated collections of these future amounts written off in evaluating the reasonableness of our allowance for doubtful accounts

All of the following information is derived from our hospitals, excluding clinics, unless otherwise noted

Patient accounts receivable from our hospitals represent approximately 95% of our total consolidated accounts receivable

Days revenue outstanding, adjusted for the impact of receivables for state Medicaid supplemental payment programs, was previously reported as 63 days at December 3 , 20 6  Further adjusting to remove the impact of receivables and revenue for hospitals divested in 20 7, days revenue outstanding was 69 days at September 30, 20 7 and 66 days at December 3 , 20 6

Total gross accounts receivable (prior to allowance for contractual adjustments and doubtful accounts) was approximately $ 9 2 billion as of September 30, 20 7 and approximately $ 9 7 billion as of December 3 , 20 6  The approximate percentage of total gross accounts receivable (prior to contractual adjustments and the allowance for doubtful accounts) summarized by aging categories is as follows:

**As of September 30, 2017**

| Payor | % of Gross Receivables | | | |
|---|---|---|---|---|
| | 0 - 90 Days | 90 - 180 Days | 180 - 365 Days | Over 365 Days |
| Medicare | 4 % | % | % | % |
| Medicaid | 7 % | 2 % | % | % |
| Managed Care and Other | 23 % | 4 % | 3 % | 2 % |
| Self Pay | 8 % | 7 % | 4 % | 2 % |

**As of December 31, 2016**

| Payor | % of Gross Receivables | | | |
|---|---|---|---|---|
| | 0 - 90 Days | 90 - 180 Days | 180 - 365 Days | Over 365 Days |
| Medicare | 4 % | % | % | % |
| Medicaid | 7 % | 2 % | % | % |
| Managed Care and Other | 25 % | 4 % | 3 % | 2 % |
| Self Pay | 9 % | 6 % | 4 % | % |

The approximate percentage of total gross accounts receivable (prior to allowances for contractual adjustments and doubtful accounts) summarized by payor is as follows:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Insured receivables | 59 0 % | 59 8 % |
| Self pay receivables | 4 0 | 40 2 |
| Total | 00 0 % | 00 0 % |

The combined total at our hospitals and clinics of the allowance for doubtful accounts for self pay accounts receivable and related allowances for other self pay discounts and contractuals, as a percentage of gross self pay receivables, remained consistent at 89% at both September 30, 20 7 and December 3 , 20 6  If the receivables that have been written off, but where collections are still being pursued by outside collection agencies, were included in both the allowances and gross self pay receivables specified above, the percentage of combined allowances to total self pay receivables would have remained consistent at 93% at both September 30, 20 7 and December 3 , 20 6

8

*Goodwill and Other Intangibles*

Goodwill represents the excess of the fair value of the consideration conveyed in the acquisition over the fair value of net assets acquired  Goodwill is evaluated for impairment at the same time every year and when an event occurs or circumstances change that, more likely than not, reduce the fair value of the reporting unit below its carrying value  There is a two step method for determining goodwill impairment  Step one is to compare the fair value of the reporting unit with the unit's carrying amount, including goodwill  If this test indicates the fair value is less than the carrying value, then step two is required to compare the implied fair value of the reporting unit's goodwill with the carrying value of the reporting unit's goodwill  Our most recent annual goodwill evaluation was performed during the fourth quarter of 20 6

During the year ended December 3 , 20 6, we allocated approximately $709 million of goodwill to the spin off of QHC, including approximately $33 million of goodwill related to the former management services reporting unit and approximately $676 million of goodwill allocated from the hospital operations reporting unit based on a relative fair value calculation of the hospitals that were included in the QHC distribution  We allocated approximately $365 million of goodwill to hospitals held for sale based on a calculation of the relative fair value of those hospitals compared to the total hospital reporting unit goodwill  Additionally, we allocated approximately $46 million of goodwill related to the sale of the majority ownership interest in the home care operations reporting unit on December 3 , 20 6  At September 30, 20 7, we had approximately $6  billion of goodwill recorded, all of which resides at our hospital operations reporting unit

During the three months ended June 30, 20 6, we identified certain indicators of impairment requiring an interim goodwill impairment evaluation  Those indicators were primarily the decline in our market capitalization and fair value of long term debt during the three months ended June 30, 20 6, and a decline in our projected future earnings compared to our most recent annual evaluation  We performed an estimated calculation of fair value in step one of the impairment test at June 30, 20 6, which indicated that the carrying value of our hospital operations reporting unit exceeded its fair value  An initial step two calculation was performed to determine the implied value of goodwill in a hypothetical purchase price allocation  We recorded an estimated non cash impairment charge of $ 4 billion to goodwill at June 30, 20 6 based on these analyses, and adjusted the estimated impairment charge based on the final step two valuation of $ 395 billion at September 30, 20 6

We performed our annual goodwill evaluation during the fourth quarter of 20 6  While no impairment was indicated by this evaluation, the reduction in our fair value and the resulting goodwill impairment charge recorded during 20 6 reduced the excess of fair value calculated in the step two analysis over the carrying value of our hospital operations reporting unit to an amount less than  % of our carrying value  This minimal amount in the excess fair value over carrying value of our hospital operations reporting unit increases the risk that future declines in fair value could result in goodwill impairment  The determination of fair value in step one of our goodwill impairment analysis is based on an estimate of fair value for the hospital operations reporting unit utilizing known and estimated inputs at the evaluation date  Some of those inputs include, but are not limited to, the most recent price of our common stock or fair value of our long term debt, estimates of future revenue and expense growth, estimated market multiples, expected capital expenditures, income tax rates, and costs of invested capital  Future estimates of fair value could be adversely affected if the actual outcome of one or more of these assumptions changes materially in the future, including further decline in our stock price or fair value of our long term debt, lower than expected hospital volumes, or increased operating costs  Such changes impacting the calculation of our fair value could result in a material impairment charge in the future  The next annual goodwill evaluation will be performed during the fourth quarter of 20 7

*Impairment or Disposal of Long-Lived Assets*

Whenever events or changes in circumstances indicate that the carrying values of certain long lived assets may be impaired, we project the undiscounted cash flows expected to be generated by these assets  If the projections indicate that the reported amounts are not expected to be recovered, such amounts are reduced to their estimated fair value based on a quoted market price, if available, or an estimate based on valuation techniques available in the circumstances

82

*Professional Liability Claims*

As part of our business of owning and operating hospitals, we are subject to legal actions alleging liability on our part  We accrue for losses resulting from such liability claims, as well as loss adjustment expenses that are out of pocket and directly related to such liability claims  These direct out of pocket expenses include fees of outside counsel and experts  We do not accrue for costs that are part of our corporate overhead, such as the costs of our in house legal and risk management departments  The losses resulting from professional liability claims primarily consist of estimates for known claims, as well as estimates for incurred but not reported claims  The estimates are based on specific claim facts, our historical claim reporting and payment patterns, the nature and level of our hospital operations, and actuarially determined projections  The actuarially determined projections are based on our actual claim data, including historic reporting and payment patterns which have been gathered over approximately a 20 year period  As discussed below, since we purchase excess insurance on a claims made basis that transfers risk to third party insurers, the liability we accrue does include an amount for the losses covered by our excess insurance  We also record a receivable for the expected reimbursement of losses covered by our excess insurance  Since we believe that the amount and timing of our future claims payments are reliably determinable, we discount the amount we accrue for losses resulting from professional liability claims using the risk free interest rate corresponding to the timing of our expected payments

The net present value of the projected payments was discounted using a weighted average risk free rate of   8%,   6% and   7% in 20  6, 20  5 and 20  4, respectively  This liability is adjusted for new claims information in the period such information becomes known to us  Professional malpractice expense includes the losses resulting from professional liability claims and loss adjustment expense, as well as paid excess insurance premiums, and is presented within other operating expenses in the accompanying condensed consolidated statements of loss

Our processes for obtaining and analyzing claims and incident data are standardized across all of our hospitals and have been consistent for many years  We monitor the outcomes of the medical care services that we provide and for each reported claim, we obtain various information concerning the facts and circumstances related to that claim  In addition, we routinely monitor current key statistics and volume indicators in our assessment of utilizing historical trends  The average lag period between claim occurrence and payment of a final settlement is between three and four years, although the facts and circumstances of individual claims could result in the timing of such payments being different from this average  Since claims are paid promptly after settlement with the claimant is reached, settled claims represent approximately   0% of the total liability at the end of any period

For purposes of estimating our individual claim accruals, we utilize specific claim information, including the nature of the claim, the expected claim amount, the year in which the claim occurred and the laws of the jurisdiction in which the claim occurred  Once the case accruals for known claims are determined, information is stratified by loss layers and retentions, accident years, reported years, geography, and claims relating to the acquired HMA hospitals versus claims relating to our other hospitals  Several actuarial methods are used against this data to produce estimates of ultimate paid losses and reserves for incurred but not reported claims  Each of these methods uses our company specific historical claims data and other information  This company specific data includes information regarding our business, including historical paid losses and loss adjustment expenses, historical and current case loss reserves, actual and projected hospital statistical data, a variety of hospital census information, employed physician information, professional liability retentions for each policy year, geographic information and other data

Based on these analyses, we determine our estimate of the professional liability claims  The determination of management's estimate, including the preparation of the reserve analysis that supports such estimate, involves subjective judgment of management  Changes in reserving data or the trends and factors that influence reserving data may signal fundamental shifts in our future claim development patterns or may simply reflect single period anomalies  Even if a change reflects a fundamental shift, the full extent of the change may not become evident until years later  Moreover, since our methods and models use different types of data and we select our liability from the results of all of these methods, we typically cannot quantify the precise impact of such factors on our estimates of the liability  Due to our standardized and consistent processes for handling claims and the long history and depth of our company specific data, our methodologies have produced reliably determinable estimates of ultimate paid losses

83

We are primarily self insured for these claims; however, we obtain excess insurance that transfers the risk of loss to a third party insurer for claims in excess of our self insured retentions  Our excess insurance is underwritten on a claims made basis  For claims reported prior to June   , 2002, substantially all of our professional and general liability risks were subject to a less than $  million per occurrence self insured retention and for claims reported from June   , 2002 through June   , 2003, these self insured retentions were $2 million per occurrence  Substantially all claims reported after June   , 2003 and before June   , 2005 are self insured up to $4 million per claim  Substantially all claims reported on or after June   , 2005 and before June   , 20  4 are self insured up to $5 million per claim  Substantially all claims reported on or after June   , 20  4 are self insured up to $  0 million per claim  Management, on occasion, has selectively increased the insured risk at certain hospitals based upon insurance pricing and other factors and may continue that practice in the future  Excess insurance for all hospitals has been purchased through commercial insurance companies and generally covers us for liabilities in excess of the self insured retentions  The excess coverage consists of multiple layers of insurance, the sum of which totals up to $95 million per occurrence and in the aggregate for claims reported on or after June   , 2003, up to $  45 million per occurrence and in the aggregate for claims reported on or after January   , 2008, up to $  95 million per occurrence and in the aggregate for claims reported on or after June   , 20  0, and up to $220 million per occurrence and in the aggregate for claims reported on or after June   , 20  5  In addition, for integrated occurrence malpractice claims, there is an additional $50 million of excess coverage for claims reported on or after June   , 20  4 and an additional $75 million of excess coverage for claims reported on or after June   , 20  5  For certain policy years prior to June   , 20  4, if the first aggregate layer of excess coverage becomes fully utilized, then the self insured retention will increase to $  0 million per claim for any subsequent claims in that policy year until our total aggregate coverage is met

Effective June   , 20  4, the hospitals acquired from HMA were insured on a claims made basis as described above and through commercial insurance companies as described above for substantially all claims reported on or after June   , 20  4 except for physician related claims with an occurrence date prior to June   , 20  4  Prior to June   , 20  4, the former HMA hospitals obtained insurance coverage through a wholly owned captive insurance subsidiary and a risk retention group subsidiary which are domiciled in the Cayman Islands and South Carolina, respectively  Those insurance subsidiaries, which are collectively referred to as the "Insurance Subsidiaries," provided (i) claims made coverage to all of the former HMA hospitals and (ii) occurrence basis coverage to most of the physicians employed by the former HMA hospitals  The employed physicians not covered by the Insurance Subsidiaries generally maintained claims made policies with unrelated third party insurance companies  To mitigate the exposure of the program covering the former HMA hospitals and other healthcare facilities, the Insurance Subsidiaries bought claims made reinsurance policies from unrelated third parties for claims above self retention levels of $  0 million or $  5 million per claim, depending on the policy year

Effective January   , 2008, the former Triad hospitals were insured on a claims made basis as described above and through commercial insurance companies as described above for substantially all claims occurring on or after January   , 2002 and reported on or after January   , 2008  Substantially all losses for the former Triad hospitals in periods prior to May   ,  999 were insured through a wholly owned insurance subsidiary of HCA Holdings, Inc , or HCA, Triad's owner prior to that time, and excess loss policies maintained by HCA  HCA has agreed to indemnify the former Triad hospitals in respect of claims covered by such insurance policies arising prior to May   ,  999  From May   ,  999 through December 3  , 2006, the former Triad hospitals obtained insurance coverage on a claims incurred basis from HCA's wholly owned insurance subsidiary with excess coverage obtained from other carriers that is subject to certain deductibles  Effective for claims incurred after December 3  , 2006, Triad began insuring its claims from $  million to $5 million through its wholly owned captive insurance company, replacing the coverage provided by HCA  Substantially all claims occurring during 2007 were self insured up to $  0 million per claim

There were no significant changes in our estimate of the reserve for professional liability claims during the three and nine months ended September 30, 20  7

### Income Taxes

We must make estimates in recording provision for income taxes, including determination of deferred tax assets and deferred tax liabilities and any valuation allowances that might be required against the deferred tax assets  We believe that future income will enable us to realize certain deferred tax assets, subject to the valuation allowance we have established

The total amount of unrecognized benefit that would impact the effective tax rate, if recognized, was approximately $9 million as of September 30, 20  7  A total of approximately $3 million of interest and penalties is included in the amount of liability for uncertain tax positions at September 30, 20  7  It is our policy to recognize interest and penalties related to unrecognized benefits in our condensed consolidated statements of loss as income tax expense

84

It is possible the amount of unrecognized tax benefit could change in the next 2 months as a result of a lapse of the statute of limitations and settlements with taxing authorities; however, we do not anticipate the change will have a material impact on our condensed consolidated results of operations or condensed consolidated financial position

We, or one of our subsidiaries, file income tax returns in the United States federal jurisdiction and various state jurisdictions With few exceptions, we are no longer subject to state income tax examinations for years prior to 20 3 Our federal income tax returns for the 2009, 20 0, 20 4 and 20 5 tax years are currently under examination by the Internal Revenue Service We believe the results of these examinations will not be material to our consolidated results of operations or consolidated financial position We have extended the federal statute of limitations through June 30, 20 8 for Community Health Systems, Inc for the tax periods ended December 3 , 2007, 2008, 2009 and 20 0, through December 3 , 20 7 for the tax periods ended December 3 , 20 and 20 2, and through September 6, 20 9 for the tax period ended December 3 , 20 4

**Recent Accounting Pronouncements**

In May 20 4, the Financial Accounting Standards Board, or FASB, issued Accounting Standards Update, or ASU, 20 4 09, which outlines a single comprehensive model for recognizing revenue and supersedes most existing revenue recognition guidance, including guidance specific to the healthcare industry This ASU provides companies the option of applying a full or modified retrospective approach upon adoption This ASU is effective for fiscal years beginning after December 5, 20 7, with early adoption permitted for annual periods beginning after December 5, 20 6 We expect to adopt this ASU on January , 20 8 and are currently implementing our plan for adoption and evaluating the impact on our revenue recognition policies, procedures and control framework and the resulting impact on our consolidated financial position, results of operations and cash flows We have established an implementation group for this ASU with an implementation plan to transition to the new standard and determine its impact during 20 7 Previously, we disclosed our intention to apply the full retrospective approach to implementing this ASU upon adoption at January , 20 8 During the last several months, as we have developed and implemented new processes for accumulating detailed financial information on patient revenue at the portfolio level, management concluded that the full retrospective approach to applying this ASU to prior periods would be significantly impacted by the number of hospitals that we have divested or spun off in recent years, and the effect of those transactions on the portfolios As a result, we have now decided to apply the modified retrospective approach to adopting this ASU We continue to assess the quantitative impact that the adoption of this accounting standard will have on our financial statements Currently, we do not expect the adoption of this ASU on January , 20 8 to have a material impact on our consolidated results of operations on a prospective basis However, it is possible that as a result of the evaluation process to adopt this ASU, a material adjustment could be made to reduce the amount of net patient accounts receivable on our consolidated statement of financial position This potential impact is a result of our preliminary observations from the application of new processes and methodologies to determine the patient portfolios and estimate the implicit price concessions and constraints on revenue required by this new accounting standard These assessments of the impact of implementing this ASU are subject to completion of our processes in adopting this new standard We expect this process will be completed in the fourth quarter of 20 7 and expect to disclose the effect of implementing this new ASU in the 20 7 Form 0 K For additional information regarding our evaluation of this accounting standard and its potential impact on us, see Note to our condensed consolidated financial statements contained herein

Case 3:19-cv-00461    Document 67-8    Filed 03/23/20    Page 87 of 104 PageID #: 1275

In April 20 5, the FASB issued ASU 20  5 03, which requires debt issuance costs related to a recognized debt liability be presented in the balance sheet as a direct reduction from the carrying amount of that debt liability, consistent with the accounting for debt discounts  The ASU did not change the measurement or recognition guidance for debt issuance costs  This ASU is effective for fiscal years beginning after December 3  , 20  5  We adopted this ASU on January  , 20  6, which resulted in the reclassification of approximately $266 million of debt issuance costs from other long term assets to a reduction of the related long term debt

In November 20  5, the FASB issued ASU 20  5   7, which amended the balance sheet classification requirements for deferred income taxes to simplify their presentation in the statement of financial position  The ASU requires that deferred tax liabilities and assets be classified as noncurrent in a classified statement of financial position  This ASU is effective for fiscal years beginning after December 3  , 20  6, with early adoption permitted  We early adopted the provisions of this ASU for the presentation and classification of its deferred tax assets at December 3  , 20  5  The effect of this change primarily resulted in the current portion of deferred income taxes at December 3  , 20  5 being included in the noncurrent deferred income tax liability

In January 20  6, the FASB issued ASU 20  6 0  , which amends the measurement, presentation and disclosure requirements for equity investments, other than those accounted for under the equity method or that require consolidation of the investee  The ASU eliminates the classification of equity investments as available for sale with any changes in fair value of such investments recognized in other comprehensive income, and requires entities to measure equity investments at fair value, with any changes in fair value recognized in net income  This ASU is effective for fiscal years beginning after December  5, 20  7, with early adoption permitted  We expect to adopt this ASU on January  , 20  8, and are currently evaluating the impact that adoption of this ASU will have on our consolidated financial position and results of operations

In February 20  6, the FASB issued ASU 20  6 02, which amends the accounting for leases, requiring lessees to recognize most leases on their balance sheet with a right of use asset and a lease liability  Leases will be classified as either finance or operating leases, which will impact the expense recognition of such leases over the lease term  The ASU also modifies the lease classification criteria for lessors and eliminates some of the real estate leasing guidance previously applied for certain leasing transactions  This ASU is effective for fiscal years beginning after December  5, 20  8, with early adoption permitted  We expect to adopt this ASU on January  , 20  9  Because of the number of leases we utilize to support our operations, the adoption of this ASU is expected to have a significant impact on our consolidated financial position and results of operations  We are currently evaluating the extent of this anticipated impact on our consolidated financial position and results of operations and the quantitative and qualitative factors that will impact us as part of the adoption of this ASU, as well as any changes to our leasing strategy because of the changes to the accounting and recognition of leases  Most recently, we have organized an implementation group of cross functional departmental management to ensure the completeness of its lease information, analyze the appropriate classification of current leases under the new standard, and develop new processes to execute, approve and classify leases on an ongoing basis  We have also engaged outside experts to assist in the development of this plan, as well as the identification and selection of software tools and processes to maintain lease information critical to applying the new standard

In March 20  6, the FASB issued ASU 20  6 09, which was issued to simplify some of the accounting guidance for share based compensation  Among the areas impacted by the amendments in this ASU is the accounting for income taxes related to share based payments, accounting for forfeitures, classification of awards as equity or liabilities, and classification on the statement of cash flows  This ASU is effective for fiscal years beginning after December  5, 20  6  We adopted this ASU on January  , 20  7  Because of the recent decline in our stock price below our stock price at the stock award grant date for outstanding share based awards, the principal impact from adopting this ASU has been a $  6 million increase in our current provision for income taxes due to the deficiency created by a difference between the actual tax deduction that will be recognized from the vesting of outstanding share based awards during the nine months ended September 30, 20  7, compared to the higher stock compensation expense previously recorded over the vesting period as determined based on the fair value of the restricted stock at the grant date

In January 20  7, the FASB issued ASU 20  7 04, which simplifies the accounting for goodwill impairment by eliminating step two from the goodwill impairment test  Instead of a two step impairment model, if the carrying amount of a reporting unit exceeds its fair value as determined in step one of the impairment test, an impairment loss is measured at the amount equal to that excess, limited to the total amount of goodwill allocated to that reporting unit  This ASU is effective for any interim or annual impairment tests for fiscal years beginning after December  5, 20  9, with early adoption permitted  As noted in our critical accounting policy discussion on goodwill, during the fourth quarter of 20  6 we performed our annual goodwill impairment analysis  While the result of the step two valuation in that analysis did not indicate an impairment of goodwill, the initial calculation of hospital operations reporting unit fair value in the step one test indicated that the carrying amount of the hospital operations reporting unit exceeded its fair value by approximately $800 million  Depending on future changes in fair value and the impact of allocated goodwill for planned divestitures,

86

**Tab e of Contents**

at adoption there could be a material impairment charge recorded for this excess amount  We are evaluating whether to early adopt this ASU and what impact it will have on our consolidated financial position and results of operations

In March 20  7, the FASB issued ASU 20  7 07, which changes the presentation of the components of net periodic benefit cost for sponsors of defined benefit plans for pensions  Under the changes in this ASU, the service cost component of net periodic benefit cost will be reported in the same income statement line as other employee compensation costs arising from services during the reporting period  The other components of net periodic benefit cost will be presented separately in a line item outside of operating income  This ASU is effective for fiscal years beginning after December  5, 20  7, with early adoption permitted  We expect to adopt this ASU on January   , 20  8, and are currently evaluating the impact that adoption of this ASU will have on our consolidated results of operations  Since the changes required in this new ASU only change the income statement classification of the components of net periodic benefit cost, no changes are expected to income from continuing operations or net income  Currently, we report all of the components of net periodic benefit cost as a component of salaries and benefits on the consolidated statement of income

In August 20  7, the FASB issued ASU 20  7  2, which was issued to amend hedge accounting recognition and disclosure requirements to improve transparency and simplify the application of hedge accounting for certain hedging instruments  The amendments in this ASU that will have an impact on us include simplification of the periodic hedge effectiveness assessment, elimination of the benchmark interest rate concept for interest rate swaps, and enhancement of the ability to use the critical terms match method for its cash flow hedges of forecasted interest payments  This ASU is effective for fiscal years beginning after December  5, 20  8, with early adoption permitted  We expect to early adopt this ASU on January   , 20  8, and are currently evaluating the impact that adoption of this ASU will have on our consolidated financial position and results of operations

## FORWARD-LOOKING STATEMENTS

Some of the matters discussed in this Report include forward looking statements  Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates," "thinks," and similar expressions are forward looking statements  These statements involve known and unknown risks, uncertainties, and other factors that may cause our actual results and performance to be materially different from any future results or performance expressed or implied by these forward looking statements  These factors include the following:

- general economic and business conditions, both nationally and in the regions in which we operate,

- the impact of the potential repeal of or significant changes to the Affordable Care Act, its implementation or its interpretation, as well as changes in other federal, state or local laws or regulations affecting our business,

- the extent to which states support increases, decreases or changes in Medicaid programs, implement health insurance exchanges or alter the provision of healthcare to state residents through regulation or otherwise,

- the future and long term viability of health insurance exchanges, which may be affected by whether a sufficient number of payors participate as well as the impact of the 20  6 federal elections on the Affordable Care Act,

- risks associated with our substantial indebtedness, leverage and debt service obligations, including our ability to refinance such indebtedness on acceptable terms or to incur additional indebtedness,

- demographic changes,

- changes in, or the failure to comply with, governmental regulations,

- potential adverse impact of known and unknown government investigations, audits, and federal and state false claims act litigation and other legal proceedings,

- our ability, where appropriate, to enter into and maintain provider arrangements with payors and the terms of these arrangements, which may be further affected by the increasing consolidation of health insurers and managed care companies,

- changes in, or the failure to comply with, contract terms with payors and changes in reimbursement rates paid by federal or state healthcare programs or commercial payors,

87

Case 3:19-cv-00461    Document 67-8    Filed 03/23/20    Page 89 of 104 PageID #: 1277

- any potential additional impairments in the carrying value of goodwill, other intangible assets, or other long lived assets, or changes in the useful lives of other intangible assets,

- changes in inpatient or outpatient Medicare and Medicaid payment levels,

- the effects related to the continued implementation of the sequestration spending reductions and the potential for future deficit reduction legislation,

- increases in the amount and risk of collectability of patient accounts receivable, including decreases in collectability which may result from, among other things, self pay growth in states that have not expanded Medicaid and difficulties in recovering payments for which patients are responsible, including co pays and deductibles,

- the efforts of insurers, healthcare providers and others to contain healthcare costs, including the trend toward value based purchasing,

- our ongoing ability to demonstrate meaningful use of certified EHR technology and recognize income for the related Medicare or Medicaid incentive payments, to the extent such payments have not expired,

- increases in wages as a result of inflation or competition for highly technical positions and rising supply and drug costs due to market pressure from pharmaceutical companies and new product releases,

- liabilities and other claims asserted against us, including self insured malpractice claims,

- competition,

- our ability to attract and retain, at reasonable employment costs, qualified personnel, key management, physicians, nurses and other healthcare workers,

- trends toward treatment of patients in less acute or specialty healthcare settings, including ambulatory surgery centers or specialty hospitals,

- changes in medical or other technology,

- changes in U S GAAP,

- the availability and terms of capital to fund any additional acquisitions or replacement facilities or other capital expenditures,

- our ability to successfully make acquisitions or complete divestitures, including the disposition of hospitals and non hospital businesses pursuant to our portfolio rationalization and deleveraging strategy, our ability to complete any such acquisitions or divestitures on desired terms or at all (including to realize the anticipated amount of proceeds from contemplated dispositions), the timing of the completion of any such acquisitions or divestitures, and our ability to realize the intended benefits from any such acquisitions or divestitures,

- the impact that changes in our relationships with joint venture or syndication partners could have on effectively operating our hospitals or ancillary services or in advancing strategic opportunities,

- our ability to successfully integrate any acquired hospitals, including those of HMA, or to recognize expected synergies from acquisitions,

- the impact of seasonal severe weather conditions, including the timing and amount of insurance recoveries in relation to severe weather events such as Hurricanes Harvey and Irma,

- our ability to obtain adequate levels of general and professional liability insurance,

- timeliness of reimbursement payments received under government programs,

- effects related to outbreaks of infectious diseases,

88

- the impact of the external, criminal cyber attack suffered by us in the second quarter of 20 4, including potential reputational damage, the outcome of our investigation and any potential governmental inquiries, the outcome of litigation filed against us in connection with this cyber attack, the extent of remediation costs and additional operating or other expenses that we may continue to incur, and the impact of potential future cyber attacks or security breaches,

- any failure to comply with the terms of the Corporate Integrity Agreement,

- the concentration of our revenue in a small number of states,

- our ability to realize anticipated cost savings and other benefits from our current strategic and operational cost savings initiatives, and

- the other risk factors set forth in the Company's Annual Report on Form 0 K filed with the SEC on February 2 , 20 7, or 20 6 Form 0 K, for the year ended December 3 , 20 6 and our other public filings with the SEC

Although we believe that these forward looking statements are based upon reasonable assumptions, these assumptions are inherently subject to significant regulatory, economic and competitive uncertainties and contingencies, which are difficult or impossible to predict accurately and may be beyond our control Accordingly, we cannot give any assurance that our expectations will in fact occur and caution that actual results may differ materially from those in the forward looking statements Given these uncertainties, prospective investors are cautioned not to place undue reliance on these forward looking statements These forward looking statements are made as of the date of this filing We undertake no obligation to revise or update any forward looking statements, or to make any other forward looking statements, whether as a result of new information, future events or otherwise

**Item 3.** *Quantitative and Qualitative Disclosures about Market Risk*

We are exposed to interest rate changes, primarily as a result of our Credit Facility which bears interest based on floating rates In order to manage the volatility relating to the market risk, we entered into interest rate swap agreements described under the heading "Liquidity and Capital Resources" in Part I, Item 2 We utilize risk management procedures and controls in executing derivative financial instrument transactions We do not execute transactions or hold derivative financial instruments for trading purposes Derivative financial instruments related to interest rate sensitivity of debt obligations are used with the goal of mitigating a portion of the exposure when it is cost effective to do so As of September 30, 20 7, our approximately $2 2 billion notional amount of interest rate swap agreements outstanding represented approximately 62 3% of our variable rate debt

A % change in interest rates on variable rate debt in excess of that amount covered by interest rate swaps would have resulted in interest expense fluctuating approximately $5 million and $ 2 million for the three months ended September 30, 20 7 and 20 6, respectively, and $24 million and $37 million for the nine months ended September 30, 20 7 and 20 6, respectively

**Item 4.** *Controls and Procedures*

Our Chief Executive Officer and Chief Financial Officer, with the participation of other members of management, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 3a 5(e) and 5d 5(e)) under the Securities and Exchange Act of 934, as amended, as of the end of the period covered by this report Based on such evaluations, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective (at the reasonable assurance level) to ensure that the information required to be included in this report has been recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and to ensure that the information required to be included in this report was accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure

There have been no changes in our internal control over financial reporting during the three months ended September 30, 20 7 that have materially affected or are reasonably likely to materially affect our internal controls over financial reporting

89

**PART II OTHER INFORMATION**

**Item 1.** *Legal Proceedings*

From time to time, we receive inquiries or subpoenas from state regulators, state Medicaid Fraud Control units, fiscal intermediaries, the Centers for Medicare and Medicaid Services, the Department of Justice and other government entities regarding various Medicare and Medicaid issues  In addition to the matters discussed below, we are currently responding to subpoenas and administrative demands concerning (a) certain cardiology procedures, medical records and policies at a New Mexico hospital, (b) an inquiry regarding sleep labs at two Louisiana hospitals, (c) a subpoena regarding wound care services at one of our Florida hospitals (which appears to be related to unsealed cases against Healogics, Inc ), (d) a subpoena concerning a physician relationship at one of our Texas hospitals and (e) a civil investigative demand concerning short term Medicaid eligibility determinations processed by third party vendors at one of our Pennsylvania hospitals  In addition, we are subject to other claims and lawsuits arising in the ordinary course of our business including lawsuits and claims related to billing practices and the administration of charity care policies at our hospitals  Based on current knowledge, management does not believe that loss contingencies arising from pending legal, regulatory and governmental matters, including the matters described herein, will have a material adverse effect on the consolidated financial position or liquidity of the Company  However, in light of the inherent uncertainties involved in pending legal, regulatory and governmental matters, some of which are beyond our control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to our results of operations or cash flows for any particular reporting period  Settlements of suits involving Medicare and Medicaid issues routinely require both monetary payments as well as corporate integrity agreements  Additionally, qui tam or "whistleblower" actions initiated under the civil False Claims Act may be pending but placed under seal by the court to comply with the False Claims Act's requirements for filing such suits  In September 20  4, the Criminal Division of the United States Department of Justice, or DOJ, announced that all qui tam cases will be shared with their Division to determine if a parallel criminal investigation should be opened  The Criminal Division has also frequently stated an intention to pursue corporations in criminal prosecutions  From time to time, we detect issues of non compliance with Federal healthcare laws pertaining to claims submission and reimbursement practices and/or financial relationships with physicians  We avail ourselves of various mechanisms to address potential overpayments arising out of these issues, including repayment of claims, rebilling of claims, and participation in voluntary disclosure protocols offered by the Centers for Medicare and Medicaid Services and the Office of the Inspector General  Participating in voluntary repayments and voluntary disclosure protocols can have the potential for significant settlement obligations or even enforcement action

The following legal proceedings are described in detail because, although they may not be required to be disclosed in this Part II, Item    under SEC rules, due to the nature of the business of the Company, we believe that the following discussion of these matters may provide useful information to security holders  This discussion does not include claims and lawsuits covered by medical malpractice, general liability or employment practices insurance and risk retention programs, none of which claims or lawsuits would in any event be required to be disclosed in this Part II, Item    under SEC rules  Certain of the matters referenced below are also discussed in the Notes to Condensed Consolidated Financial Statements at Part I, Item    under Note   8 "Contingencies "

**Community Health Systems, Inc. Legal Proceedings**

*Shareholder Litigation*

Class Action Shareholder Federal Securities Cases  Three purported class action cases have been filed in the United States District Court for the Middle District of Tennessee; namely, Norfolk County Retirement System v  Community Health Systems, Inc , et al , filed May 9, 20    ; De Zheng v  Community Health Systems, Inc , et al , filed May   2, 20    ; and Minneapolis Firefighters Relief Association v  Community Health Systems, Inc , et al , filed June 2  , 20    All three seek class certification on behalf of purchasers of our common stock between July 27, 2006 and April    , 20     and allege that misleading statements resulted in artificially inflated prices for our common stock  In December 20    , the cases were consolidated for pretrial purposes and NYC Funds and its counsel were selected as lead plaintiffs/lead plaintiffs' counsel  In lieu of ruling on our motion to dismiss, the court permitted the plaintiffs to file a first amended consolidated class action complaint which was filed on October 5, 20  5  Our motion to dismiss was filed on November 4, 20  5 and oral argument took place on April    , 20  6  Our motion to dismiss was granted on June   6, 20  6 and on June 27, 20  6, the plaintiffs filed a notice of appeal to the Sixth Circuit Court of Appeals  The matter is fully briefed, and oral argument was heard on May 3, 20  7  We believe this consolidated matter is without merit and will vigorously defend this case

90

Case 3:19-cv-00461     Document 67-8     Filed 03/23/20     Page 92 of 104 PageID #: 1280

Shareholder Derivative Actions  Three purported shareholder derivative actions have also been filed in the United States District Court for the Middle District of Tennessee; Plumbers and Pipefitters Local Union No  630 Pension Annuity Trust Fund v  Wayne T  Smith, et al , filed May 24, 20    ; Roofers Local No   49 Pension Fund v  Wayne T  Smith, et al , filed June 2  , 20    ; and Lambert Sweat v  Wayne T  Smith, et al , filed October 5, 20    These three cases allege breach of fiduciary duty arising out of allegedly improper inpatient admission practices, mismanagement, waste and unjust enrichment  These cases have been consolidated into a single, consolidated action  The plaintiffs filed an operative amended derivative complaint in these three consolidated actions on March   5, 20 2  Our motion to dismiss was argued on June   3, 20 3  On September 27, 20 3, the court issued an order granting in part and denying in part our motion to dismiss  This case was settled pursuant to a final order entered on January   7, 20  7  As a result of the settlement, we recorded a gain of approximately $40 million in the three months ended March 3  , 20  7, for the amount of settlement proceeds received, net of related legal expenses  Pursuant to the terms of the settlement, we are required to adopt and maintain for a specified period certain corporate governance measures  For more information, see the order and stipulation of settlement filed as Exhibit 99 2 to the 20  6 Form   0 K

*Other Government Investigations*

Dothan, Alabama   Independent Lab Billing  On February   2, 20  5, our hospital in Dothan, Alabama received a Civil Investigative Demand, or CID, from the United States Department of Justice for information concerning its status as a "covered hospital" under certain lab billing regulations  These regulations discuss permissible billing of the technical component of lab tests performed for hospital patients by an independent laboratory  The CID seeks documentation and explanation whether the hospital qualifies as a covered hospital for billing purposes under the applicable regulations  We are cooperating fully with this investigation

St  Petersburg, Florida   On September   4, 20  7, our hospital in St  Petersburg, Florida received a CID from the United States Department of Justice for information concerning its participation in the Florida Low Income Pool Program  The Low Income Pool Program, or LIP, is a funding pool to support health care providers that provide uncompensated care to Florida residents who are uninsured or underinsured  The CID seeks documentation related to donations made by the hospital to local public benefit entities

*Commercial Litigation and Other Lawsuits*

*Becker v. Community Health Systems, Inc. d/b/a Community Health Systems Professional Services Corporation d/b/a Community Health Systems d/b/a Community Health Systems PSC, Inc. d/b/a Rockwood Clinic P.S. and Rockwood Clinic, P.S. (Superior Court, Spokane, Washington).* This suit was filed on February 29, 20  2, by a former chief financial officer at Rockwood Clinic in Spokane, Washington  Becker claims he was wrongfully terminated for allegedly refusing to certify a budget for Rockwood Clinic in 20  2  On February 29, 20  2, he also filed an administrative complaint with the Department of Labor, Occupational Safety and Health Administration alleging that he is a whistleblower under Sarbanes Oxley, which was dismissed by the agency and was appealed to an administrative law judge for a hearing that occurred on January   9 26, 20  6  In a decision dated November 9, 20  6, the law judge awarded Becker approximately $   9 million for front pay, back pay and emotional damages with attorney fees to be later determined  We have appealed the award to the Administrative Review Board and are awaiting its decision  At a hearing on July 27, 20  2, the trial court dismissed Community Health Systems, Inc  from the state case and subsequently certified the state case for an interlocutory appeal of the denial to dismiss his employer and the management company  The appellate court accepted the interlocutory appeal, and it was argued on April 30, 20  4  On August   4, 20  4, the court denied our appeal  On October 20, 20  4, we filed a petition to review the denial with the Washington Supreme Court  Our appeal was accepted and oral argument was heard on June 9, 20  5  On September   5, 20  5, the court denied our appeal and remanded to the trial court; a previous trial setting of September   2, 20  6 has been vacated and not reset  We continue to vigorously defend these actions

9

*Cyber Attack*  As previously disclosed on a Current Report on Form 8 K filed by us on August  8, 20  4, our computer network was the target of an external, criminal cyber attack that we believe occurred between April and June, 20  4  We and Mandiant (a FireEye Company), the forensic expert engaged by us in connection with this matter, believe the attacker was a foreign "Advanced Persistent Threat" group who used highly sophisticated malware and technology to attack our systems  The attacker was able to bypass our security measures and successfully copy and transfer outside the Company certain non medical patient identification data (such as patient names, addresses, birthdates, telephone numbers and social security numbers), but not including patient credit card, medical or clinical information  We worked closely with federal law enforcement authorities in connection with their investigation and possible prosecution of those determined to be responsible for this attack  Mandiant has conducted a thorough investigation of this incident and continues to advise us regarding security and monitoring efforts  We have provided appropriate notification to affected patients and regulatory agencies as required by federal and state law  We have offered identity theft protection services to individuals affected by this attack

We have incurred certain expenses to remediate and investigate this matter  In addition, multiple purported class action lawsuits have been filed against us and certain subsidiaries  These lawsuits allege that sensitive information was unprotected and inadequately encrypted by us  The plaintiffs claim breach of contract and other theories of recovery, and are seeking damages, as well as restitution for any identity theft  On February 4, 20  5, the United States Judicial Panel on Multidistrict Litigation ordered the transfer of the purported class actions pending outside of the District Court for the Northern District of Alabama to the District Court for the Northern District of Alabama for coordinated or consolidated pretrial proceedings  A consolidated complaint was filed and we filed a motion to dismiss on September 2 , 20  5, which was partially argued on February   0, 20  6  In an oral ruling from the bench, the court greatly limited the potential class by ruling only plaintiffs with specific injury resulting from the breach had standing to sue  Further, on jurisdictional grounds, the court dismissed Community Health Systems, Inc  from all non Tennessee based cases  Finally, the court set April   5, 20  6 for further argument on whether the remaining plaintiffs have sufficiently stated a cause of action to continue their cases  On April   5, 20  6 in an oral ruling from the bench, the court dismissed additional claims and following this oral ruling only eight of the forty plaintiffs remained with significant limitations imposed on their ability to assert claims for damages  These oral rulings were confirmed in a written order filed on September   2, 20  6  On October 20, 20  6, the plaintiffs filed a renewed motion for interlocutory appeal from the motion to dismiss ruling and on February   5, 20  7 this motion was denied  Plaintiffs refiled their motion for permission to seek interlocutory appeal on March   5, 20  7, and that motion was also denied  At this time, we are unable to predict the outcome of this litigation or determine the potential impact, if any, that could result from this litigation, but we intend to vigorously defend these lawsuits  This matter may subject us to additional litigation, potential governmental inquiries, potential reputational damage, and additional remediation, operating and other expenses

*Empire Health Foundation v. CHS/Community Health Systems, Inc., CHS Washington Holdings, LLC, Spokane Washington Hospital Company, LLC, Spokane Valley Washington Hospital Company, LLC.* This suit was filed on June   2, 20  7 by Empire Health Foundation claiming Deaconess and Valley Hospitals failed to abide by charity care obligations allegedly existing in the 2008 Asset Purchase Agreement between Empire Health System and Company affiliates  The complaint seeks up to $   0 million in damages  The court granted in part and denied in part the hospitals' motion to dismiss on October    , 20  7  We believe these claims are without merit and will vigorously defend the case

*Mounce v. CHSPSC, LLS, et al.* This case is a purported class action lawsuit served on July 29, 20  5, claiming our affiliated Arkansas hospitals violated payor contracts by allegedly improperly asserting hospital liens against third party tortfeasors and seeking class certifications for any similarly situated plaintiffs at any affiliated Arkansas hospital  The court has certified a class  We believe these claims are without merit and will vigorously defend the case

*Gibson v. Byrd Regional Medical Center.* This case is a purported class action lawsuit served on August 3, 20  6, claiming our affiliated Leesville, Louisiana hospital violated payor contracts by allegedly improperly asserting hospital liens against third party tortfeasors and seeking class certifications for any similarly situated plaintiffs  The court has certified a class  The hospital's motion for summary judgment is pending  We believe these claims are without merit and will vigorously defend the case

*Morrow v. Community Health Systems, Inc.* This case is a purported class action lawsuit filed on July 25, 20  6, in the United States District Court, Middle District of Tennessee alleging our affiliated hospital, South Baldwin Regional Medical Center in Foley, AL, violated a payor contract by allegedly improperly asserting a hospital lien against a third party tortfeasor and allegedly unjustly enriching the hospital  The plaintiff seeks to represent a class of similarly situated individuals at any Company affiliated hospital  Plaintiff moved to amend his complaint on June 26, 20  6 to name additional defendants, which the court allowed  On October   7, 20  7, the court granted Community Health Systems, Inc 's motion to dismiss the complaint on all of the plaintiff's claims save one  On October 20, 20  7, the remaining defendants filed motions to dismiss  We believe the claims are without merit and will vigorously defend the case

92

*Zwick Partners, LP and Aparna Rao, individually and on behalf of all others similarly situated v. Quorum Health Corporation, Community Health Systems, Inc., Wayne T. Smith, W. Larry Cash, Thomas D. Miller, and Michael J. Culotta* This purported class action lawsuit previously filed in the United States District Court, Middle District of Tennessee was amended on April 7, 20 7 to include Community Health Systems, Inc , Wayne T Smith and W Larry Cash as additional defendants The plaintiffs seek to represent a class of Quorum Health Corporation, or QHC, shareholders and allege that the failure to record a goodwill and long lived asset impairment charge against QHC at the time of the spin off of QHC violated federal securities laws Motions to dismiss have been filed We believe the claims are without merit and will vigorously defend the case

*R2 Investments v Quorum Health Corporation; Community Health Systems, Inc.; Wayne T. Smith; W. Larry Cash; Thomas D. Miller; Michael J. Culotta; John A. Clerico; James S. Ely, III; John A. Fry; William Norris Jennings; Julia B. North; H. Mitchell Watson, Jr.; H. James Williams.* This case is pending in the Circuit Court for Williamson County, Tennessee and was served on October 26, 20 7 The plaintiff alleges common law fraud and violation of Tennessee securities fraud statutes in connection with its purchase of QHC stock and QHC senior secured notes We believe the claims are without merit and will vigorously defend the case

**Certain Legal Proceedings Related to HMA**

*Medicare/Medicaid Billing Lawsuits*

Beginning during the week of December 6, 20 3 eleven qui tam lawsuits filed by private individuals against HMA were unsealed in various United States district courts The United States has elected to intervene in all or part of eight of these matters; namely *U.S. ex rel. Craig Brummer v. Health Management Associates, Inc. et al. (Middle District Georgia) ("Brummer"); U.S. ex rel. Ralph D. Williams v. Health Management Associates, Inc. et al. (Middle District Georgia) ("Williams"); U.S. ex rel. Scott H. Plantz, M.D. et al. v. Health Management Associates, Inc., et al. (Northern District Illinois) ("Plantz"); U.S. ex rel. Thomas L. Mason, M.D. et al. v. Health Management Associates, Inc. et al. (Western District North Carolina) ("Mason"); U.S. ex rel. Jacqueline Meyer, et al. v. Health Management Associates, Inc., Gary Newsome et al. ("Jacqueline Meyer") (District of South Carolina); U.S. ex rel. George Miller, et al. v. Health Management Associates, Inc. (Eastern District of Pennsylvania) ("Miller"); U.S. ex rel. Bradley Nurkin v. Health Management Associates, Inc. et al. (Middle District of Florida) ("Nurkin"); and U.S. ex rel. Paul Meyer v. Health Management Associates, Inc. et al. (Southern District Florida) ("Paul Meyer")* The United States has elected to intervene with respect to allegations in these cases that certain HMA hospitals inappropriately admitted patients and then submitted reimbursement claims for treating those individuals to federal healthcare programs in violation of the False Claims Act or that certain HMA hospitals had inappropriate financial relationships with physicians which violated the Stark law, the Anti Kickback Statute, and the False Claims Act Certain of these complaints also allege the same actions violated various state laws which prohibit false claims The United States has declined to intervene in three of the eleven matters, namely *U.S. ex rel. Anita France, et al. v. Health Management Associates, Inc. (Middle District Florida) ("France")* which involved allegations of wrongful billing and was settled; *U.S. ex rel. Sandra Simmons v. Health Management Associates, Inc. et al. (Eastern District Oklahoma) ("Simmons")* which alleges unnecessary surgery by an employed physician and which was settled as to all allegations except alleged wrongful termination; and *U.S. ex rel. David Napoliello, M.D. v. Health Management Associates, Inc. (Middle District Florida) ("Napoliello")* which alleges inappropriate admissions On April 3, 20 4, the Multi District Litigation Panel ordered the transfer and consolidation for pretrial proceedings of the eight intervened cases, plus the Napoliello matter, to the District of the District of Columbia under the name *In Re: Health Management Associates, Inc. Qui Tam Litigation* On June 2, 20 4, the court entered a stay of this matter until October 6, 20 4, which was subsequently extended until February 27, 20 5, May 27, 20 5, September 25, 20 5, January 25, 20 6, May 25, 20 6, September 26, 20 6, December 27, 20 6, April 27, 20 7, August 28, 20 7 and now until December 8, 20 7 We intend to defend against the allegations in these matters, but have also been cooperating with the government in the ongoing investigation of these allegations We have been in discussions with the Civil Division of the DOJ regarding the resolution of these matters During the first quarter of 20 5, we were informed the Criminal Division continues to investigate former executive level employees of HMA and continues to consider whether any HMA entities should be held criminally liable for the acts of the former HMA employees We are voluntarily cooperating with these inquiries and have not been served with any subpoenas or other legal process

*Qui Tam Matters Where the Government Declined Intervention*

*U.S. ex rel. Richard M. O'Keeffe, Jr., M.D. v. The River Oaks Management Company, LLC, et al. (SD Mississippi).* By order filed on February 0, 20 7, the court ordered the unsealing of this matter The unsealing revealed that on February 3, 20 7 the United States had declined to intervene in the allegations that an HMA subsidiary had an inappropriate financial relationship with the relator because his employment contract allegedly was not fair market value in violation of the Stark law, the Anti Kickback Statute and the False Claims Act On October 8, 20 7, the District Court granted the hospital's motion to dismiss the case in its entirety

93

*U.S. and the State of Mississippi ex rel. W. Blake Vanderlan, M.D. v. Jackson HMA, LLC d/b/a Central Mississippi Medical Center and Merit Health Central (SD Mississippi).* By order filed on August 3 , 20 7, the court ordered the unsealing of this matter  The unsealing revealed that on August 3 , 20 7 the United States had declined to intervene in the allegations that certain alleged EMTALA violations at the hospital resulted in a violation of the False Claims Act  The hospital's motion to dismiss is pending  We believe this matter is without merit and will vigorously defend this case

*Securities and Exchange Commission Investigations*

On April 25, 20 3, HMA received a subpoena from the SEC, issued pursuant to an investigation, requesting documents related to accounts receivable, billing write downs, contractual adjustments, reserves for doubtful accounts, and accounts receivable aging, and revenue from Medicare, Medicaid and from privately insured or uninsured patients  On June 5, 20 3, HMA received a supplemental subpoena from the SEC which requests additional financial reports  Subsequent subpoenas have been directed to us, our accountants, the former accountants for HMA and certain individuals  On July  7, 20 4, we received an additional subpoena from the SEC seeking numerous categories of documents relating to the financial statement adjustments taken in the fourth quarter of 20 3 in the areas described above  This investigation is ongoing and we are unable to determine the potential impact, if any, of this investigation

**Management of Significant Legal Proceedings**

In accordance with our governance documents, including our Governance Guidelines and the charter of the Audit and Compliance Committee, our management of significant legal proceedings is overseen by the independent members of the Board of Directors and, in particular, the Audit and Compliance Committee  The Audit and Compliance Committee is charged with oversight of compliance, regulatory and litigation matters, and enterprise risk management  Management has been instructed to refer all significant legal proceedings and allegations of financial statement fraud, error, or misstatement to the Audit and Compliance Committee for its oversight and evaluation  Consistent with New York Stock Exchange, NASDAQ and Sarbanes Oxley independence requirements, the Audit and Compliance Committee is comprised entirely of individuals who are independent of our management, and all four members of the Audit and Compliance Committee are "audit committee financial experts" as defined in the Securities Exchange Act of  934, as amended

In addition, the Audit and Compliance Committee and the other independent members of the Board of Directors oversee the functions of the voluntary compliance program, including its auditing and monitoring functions and confidential disclosure program  In recent years, the voluntary compliance program has addressed the potential for a variety of billing errors that might be the subject of audits and payment denials by the CMS Recovery Audit Contractors' permanent project, including MS DRG coding, outpatient hospital and physician coding and billing, and medical necessity for services (including a focus on hospital stays of very short duration)  Efforts by management, through the voluntary compliance program, to identify and limit risk from these government audits have included significant policy and guidance revisions, training and education, and auditing  The Board of Directors now oversees and reviews periodic reports of our compliance with the Corporate Integrity Agreement, or CIA, that we entered into with the United States Department of Health and Human Services Office of the Inspector General during 20 4

**Item 1A.  Risk Factors**

There have been no material changes with regard to the risk factors previously disclosed in our most recent annual report in the 20 6 Form  0 K

94

**Item 2. Unregistered Sale of Equity Securities and Use of Proceeds**

The following table contains information about our purchases of common stock during the three months ended September 30, 20 7

| Per od | Total Number of Shares Purchased (a) | Average Pr ce Pa d per Share | Total Number of Shares Purchased as Part of Publ cly Announced Plans or Programs(b) | Max mum Number of Shares That May Yet Be Purchased Under the Plans or Programs(b) |
|---|---|---|---|---|
| July  , 20 7 | | | | |
| July 3  , 20 7 | | $ | | 9,467,8 2 |
| August  , 20 7 | | | | |
| August 3  , 20 7 | | | | 9,467,8 2 |
| September  , 20 7 | | | | |
| September 30, 20 7 | | | | 9,467,8 2 |
| | | | | |
| Total | | $ | | 9,467,8 2 |

(a)    No shares were withheld by us to satisfy the payment of tax obligations related to the vesting of restricted stock awards

(b)    On November 9, 20 5, we announced the adoption of a new open market repurchase program for up to  0,000,000 shares of our common stock, not to exceed $300 million in repurchases  The new repurchase program will expire on the earlier of November 5, 20  8, when the maximum number of shares has been repurchased, or when the maximum dollar amount has been expended  No shares were repurchased under this program during the three months ended September 30, 20  7

With the exception of a special cash dividend of $0 25 per share paid by us in December 20 2, historically, we have not paid any cash dividends  Subject to certain exceptions, our Credit Facility limits the ability of our subsidiaries to pay dividends and make distributions to us, and limits our ability to pay dividends and/or repurchase stock, to an amount not to exceed $200 million in the aggregate plus an additional $25 million in any particular year plus the aggregate amount of proceeds from the exercise of stock options  The indentures governing our senior and senior secured notes also restrict our subsidiaries from, among other matters, paying dividends and making distributions to us, which thereby limits our ability to pay dividends and/or repurchase stock  The non cash dividend of approximately $7 3 million recorded during the year ended December 3  , 20  6 to reflect the distribution of the net assets of QHC was a permitted transaction under our Credit Facility  As of September 30, 20  7, under the most restrictive test in these agreements (and subject to certain exceptions), we have approximately $3  8 million remaining available with which to pay permitted dividends and/or repurchase shares of our stock or our senior and senior secured notes

**Item 3. Defaults Upon Senior Securities**

None

**Item 4. *Mine Safety Disclosures***

Not applicable

**Item 5. *Other Information***

None

95

**Item 6.** *Exhibits*

| No. | | Descr pt on |
|---|---|---|
| 2 * | | Computation of Ratio of Earnings to Fixed Charges |
| 3 | * | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 3 2 * | | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 32 | ** | Certification of Chief Executive Officer pursuant to  8 U S C  Section   350, adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002 |
| 32 2 | ** | Certification of Chief Financial Officer pursuant to  8 U S C  Section   350, adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002 |
| 0  INS * | | XBRL Instance Document |
| 0  SCH * | | XBRL Taxonomy Extension Schema |
| 0  CAL * | | XBRL Taxonomy Extension Calculation Linkbase |
| 0  DEF * | | XBRL Taxonomy Extension Definition Linkbase |
| 0  LAB * | | XBRL Taxonomy Extension Label Linkbase |
| 0  PRE * | | XBRL Taxonomy Extension Presentation Linkbase |

\*     Filed herewith
\*\*    Furnished herewith

96

Case 3:19-cv-00461     Document 67-8     Filed 03/23/20     Page 98 of 104 PageID #: 1286

# SIGNATURES

Pursuant to the requirements of section  3 or  5(d) of the Securities Exchange Act of  934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized

COMMUNITY HEALTH SYSTEMS, INC
(Registrant)

By: /s/   Wayne T  Smith
Wayne T  Smith
Chairman of the Board and
Chief Executive Officer
(principal executive officer)

By: /s/   Thomas J  Aaron
Thomas J  Aaron
Executive Vice President and
Chief Financial Officer
(principal financial officer)

By: /s/   Kevin J  Hammons
Kevin J  Hammons
Senior Vice President, Assistant Chief Financial
Officer and Chief Accounting Officer
(principal accounting officer)

Date: November 2, 20  7

97

Exhibit 12

**STATEMENT RE: COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES**
**(DOLLARS IN MILLIONS)**

|  | | Nine Months Ended September 30, 2017 |
|---|---|---|
| **Earnings** | | |
| Loss from continuing operations before provision for income taxes | $ | (454) |
| Income from equity investees | | ( 3) |
| Distributed income from equity investees | | 9 |
| Interest and amortization of deferred finance costs | | 706 |
| Amortization of capitalized interest | | 5 |
| Implicit rental interest expense | | 77 |
| **Total Earnings** | $ | 330 |
| | | |
| **Fixed Charges** | | |
| Interest and amortization of deferred finance costs | $ | 706 |
| Capitalized interest | | 7 |
| Implicit rental interest expense | | 77 |
| **Total Fixed Charges** | $ | 790 |
| | | |
| **Ratio of Earnings to Fixed Charges** | | * |

\* For the nine months ended September 30, 20 7, earnings were insufficient to cover fixed charges by approximately $460 million

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE**
**SARBANES-OXLEY ACT OF 2002**

I, Wayne T  Smith, certify that:

I have reviewed this quarterly report on Form   0 Q of Community Health Systems, Inc ;

2  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules   3a   5(e) and   5d   5(e)) and internal control over financial reporting (as defined in Exchange Act Rules   3a   5(f) and   5d   5(f)) for the registrant and we have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

/s/ Wayne T  Smith
_____
Wayne T  Smith
Chairman of the Board
and Chief Executive Officer

Date: November 2, 20  7

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE
SARBANES-OXLEY ACT OF 2002**

I, Thomas J Aaron, certify that:

I have reviewed this quarterly report on Form  0 Q of Community Health Systems, Inc ;

2  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules  3a  5(e) and  5d  5(e)) and internal control over financial reporting (as defined in Exchange Act Rules  3a  5(f) and  5d  5(f)) for the registrant and we have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

/s/ Thomas J  Aaron
Thomas J  Aaron
Executive Vice President and
Chief Financial Officer

Date: November 2, 20  7

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT
TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Community Health Systems, Inc (the "Company") on Form 0 Q for the period ended September 30, 20 7, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Wayne T Smith, Chairman of the Board and Chief Executive Officer of the Company, certify, pursuant to 8 U S C § 350, as adopted pursuant to § 906 of the Sarbanes Oxley Act of 2002, that:

( ) The Report fully complies with the requirements of Section 3(a) or 5(d) of the Securities Exchange Act of 934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

/s/ Wayne T Smith
Wayne T Smith
Chairman of the Board and
Chief Executive Officer

November 2, 20 7

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT
TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Community Health Systems, Inc (the "Company") on Form   0 Q for the period ended September 30, 20  7, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas J  Aaron, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to   8 U S C  §   350, as adopted pursuant to § 906 of the Sarbanes Oxley Act of 2002, that:

(  ) The Report fully complies with the requirements of Section   3(a) or   5(d) of the Securities Exchange Act of  934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company

/s/ Thomas J  Aaron
Thomas J  Aaron
Executive Vice President and
Chief Financial Officer

November 2, 20  7