# EXHIBIT H

DEF 14A 1 d499300ddef14a.htm DEF 14A

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**SCHEDULE 14A**
**PROXY STATEMENT PURSUANT TO SECTION 14(A) OF THE SECURITIES**
**EXCHANGE ACT OF 1934**

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Under §240.14a-12

# COMMUNITY HEALTH SYSTEMS, INC.

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
  1. Title of each class of securities to which transaction applies:

  2. Aggregate number of securities to which transaction applies:

  3. Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  4. Proposed maximum aggregate value of transaction:

  5. Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
  1. Amount previously paid:

  2. Form, Schedule or Registration Statement No.:

  3. Filing Party:

  4. Date Filed:

Case 3:19-cv-00461    Document 67-11    Filed 03/23/20    Page 2 of 25 PageID #: 1339



To Be Held:
Tuesday, May 15, 2018
8:00am (Central Daylight Time)
Franklin Marriott Cool Springs
700 Cool Springs Boulevard
Franklin, Tennessee

CHS Community Health Systems, Inc.

Notice of
# 2018
Annual Meeting of
Stockholders and
Proxy Statement

Case 3:19-cv-00461 Document 67-11 Filed 03/23/20 Page 3 of 25 PageID #: 1340

Table of Contents

## EXECUTIVE COMPENSATION

### Compensation Discussion and Analysis

### Introduction

As a leader in the hospital sector of the healthcare industry, one of the nation's largest and most dynamic industries, the Company must ensure that it attracts and retains the leadership and managerial talent needed to sustain its position in this rapidly changing industry. To remain competitive in the Company's financial, capital and business markets, growth in earnings and profitability are paramount objectives of the Company's strategy. We believe these strategic imperatives are fundamental points of alignment between stockholder value and the compensation of executive management. In recent years, stockholders have focused on year-over-year stock price performance as a key measure of stockholder-executive compensation alignment. Accordingly, we include total stockholder return as a component in the annual incentive compensation plans for the Company's Chief Executive Officer and Chief Financial Officer.

In 2017, the Company continued to focus on its previously disclosed portfolio rationalization and deleveraging plan. In this regard, in 2017, we completed the divestiture of all 30 of our previously announced hospital divestitures. Looking forward, the Company is focused on becoming a market leader and increasing market share in the communities it serves; increasing productivity and operating efficiencies to enhance profitability; continuously improving patient safety and quality of care; and optimizing its portfolio through additional select divestitures of non-core assets while investing in markets with the best opportunities for growth. The Company believes that these efforts will ultimately result in a stronger Company.

Despite the progress made in these areas, the Company did not meet several of its financial expectations in 2017, as initially set forth in the Company's earnings release issued in February 2017. Consistent with the Company's pay-for-performance philosophy, this resulted in the annual cash incentive compensation and total compensation paid to our named executive officers for 2017 being significantly less than the target cash incentive award and target total compensation that could have been earned if the Company had achieved all of its financial goals. In addition, as a result of the fact that, from 2014 through 2017, the Company granted its named executive officers approximately the same number of restricted shares each year (absent any change in responsibility, competitive positioning as compared to the peers, etc.), the grant date fair value of equity incentive awards made to our named executive officers in 2017 was greatly reduced as compared to the grant date fair value of the awards made in 2015 and 2016 due to the decline in our stock price since 2015.

**Executive Summary**

*Compensation Program Objectives and Best Practices*

The primary objectives of the Company's executive compensation program are to:

* Provide market competitive pay levels, compensation programs and incentive plan designs, all of which are underpinned by our strong pay for performance philosophy;

* Attract and retain seasoned professionals with demonstrated abilities to capitalize on growth opportunities in both same-store and new markets (both geographic and business line);

34

Table of Contents

* Incorporate short-term and long-term components that align the interests of executive management with stockholders while also appropriately incentivizing our executives to drive Company performance and maximize value; and

* Adhering to rigorous expense management in an environment of ethical and compliant behavior.

Our executive compensation program has been designed, reviewed and modified over time to conform to governance best practices and to respond to investor concerns regarding pay practices. For example, the Company, over the years, has implemented the following policies:

| What We Do | What We Don't Do |
|---|---|
| ✓ **Payfor Performance – A significant portion of the compensation for our NEOs is in the form of at-risk variable compensation.** | ✗ ExcessivePerquisites – Perquisites represent less than 1% of our NEOs' compensation. |
| ✓ **MultiplePerformance Metrics – Cash incentive compensation is based on multiple measures to encourage balanced initiatives.** | ✗ EmploymentAgreements – All of our NEOs are employed on an at-will basis. |
| ✓ **Long-TermPerformance Focus – Half of the long-term equity awards for our NEOs are tied to three-year financial goals (EBITDA Growth and EPS Growth)** | ✗ ExciseTax Gross-ups are not offered for any new executives covered under the Company's Change-in-Control Severance Agreements. |
| ✓ **TotalShareholder Return is a factor in the Chief Executive Officer's and Chief Financial Officer's incentive compensation.** | ✗ "Single-trigger"change-in-control cash severance payments – Company's Plan documents prohibit "single-trigger" change-in-control cash severance payments. |
| ✓ **StockOwnership Guidelines – All NEOs are subject to our stock ownership requirements.** | ✗ Pledgingor Hedging – Company policy prohibits directors, executives, and certain other employees from pledging or hedging their stock in the Company. |
| ✓ **"Clawback"Provisions – Our policy provides for the adjustment or recovery of compensation in certain circumstances.** | ✗ Repricingof underwater stock options – Company's Plan documents prohibit any repricing. |
| ✓ **AwardCaps – All of our annual cash incentive compensation plans have caps on plan formulas.** | |
| ✓ **RiskAssessment – The Compensation Committee regularly assesses the risk levels of the Company's executive compensation program.** | |
| ✓ **Usea representative and relevant peer group.** | |
| ✓ **Usean independent compensation consultant.** | |

35

Case 3:19-cv-00461     Document 67-11     Filed 03/23/20     Page 5 of 25 PageID #: 1342

Table of Contents

A more detailed discussion of these policies and actions can be found on the following pages.

Over the years, we have continued to adapt elements of the program, as appropriate, taking into account stockholder expectations and feedback in order to ensure that our executive compensation program continues to be structured in an optimal manner.

### *Key 2017 Compensation Decisions*

Our financial performance in 2017 fell below our financial targets, which significantly impacted the compensation paid to our named executive officers. Given our commitment to link pay and performance, the following compensation-related decisions were made for 2017:

*   ***Annual cash incentive compensation achieved for 2017 was significantly below target***: Annual cash incentive compensation paid to our named executive officers for 2017 was significantly less than the cash incentive award that could have been earned if the Company had achieved our targeted financial goals. For example, our Chief Executive Officer received only 21.6% of his target cash incentive award attainable for 2017.

*   ***Significant decline in grant date fair value of 2017 restricted stock awards***: From 2014 through 2017, we granted our named executive officers approximately the same number of shares of restricted stock each year (absent any change in responsibility, competitive positioning as compared to the peers, etc.). As such, the value of these awards granted to our named executive officers over this period has declined as the result of the decline in the price of our stock. As an example, the grant date fair value of the Chief Executive Officer's 2017 restricted stock award was 40% less than the grant date fair value of his 2016 restricted stock award.

*   ***No salary increases***: Our Chief Executive Officer and former Chief Financial Officer did not receive any increases in base salary for 2016 or 2017.

The chart below reflects the alignment between our Chief Executive Officer's annual compensation and the Company's actual performance. It demonstrates our belief that the compensation of our executives is aligned with our stockholders' interests.

## 2016 and 2017 Compensation
## Wayne T. Smith, Chairman and Chief Executive Officer

|  | 2016 | 2017 |
|---|---|---|
| Salary | $ 1,600,000 | $ 1,600,000 |
| Incentive Plan Compensation | 640,000 | 812,000 |
| Restricted Stock (grant date fair value) (1) | 2,314,500 | 1,378,500 |
| **Total** | **$ 4,554,500** | **$ 3,790,500** |

(1)   The closing price of the Company's stock on the respective grant dates was: $15.43 per share on March 1, 2016 and $9.19 per share on March 1, 2017. The number of shares granted was unchanged in 2017.

36

Table of Contents

Please see, *"Management's Discussion and Analysis of Financial Condition and Results of Operations"* in the Company's 2017 Annual Report on Form 10-K filed with the SEC on February 28, 2018, for more details about the Company's recent performance.

**Stockholder Outreach and Responsiveness to Feedback**

***2017 Say on Pay Results and 2016 and 2017 Stockholder Outreach Efforts and 2017 Program Changes***

At our annual meeting of stockholders in May 2017, approximately 95% of the votes cast by our stockholders, excluding broker non-votes, were voted in favor of the Company's advisory Say-on-Pay proposal with respect to the compensation of our Named Executive Officers as described in our 2017 Proxy Statement. As our Compensation Committee has continued to review our compensation practices, it is mindful of the level of support received from our stockholders with respect to this Say-on-Pay proposal.

We are committed to a continuing dialogue between stockholders and the Company to fully understand and consider stockholder concerns on executive compensation and other topics that are important to our stockholders. In this regard, following the results of the advisory vote on our Say-on-Pay proposal at our 2016 Annual Meeting, we undertook a thorough re-evaluation of our executive compensation program.

As a result of that evaluation, our Compensation Committee and management, in consultation with Mercer, proposed several changes to our executive compensation program for 2017. We consulted with stockholders that held a majority of our shares outstanding at that time and solicited their feedback on our existing executive compensation program as well as the proposed changes. Moreover, the members of our independent Compensation Committee and our other outside directors were available to speak directly with these stockholders if desired. Our Compensation Committee considered the feedback and suggestions we received in light of both market best practices and what we believe to be necessary to execute a best-in-class compensation program that successfully addresses our senior executive talent attraction and retention needs.

After considering this feedback and market perspectives, our Compensation Committee made the following changes to our executive compensation programs for 2017:

*   ***Revised annual cash incentive compensation methodology***:

    *   ***Reduced target cash incentive opportunity***: For 2017, the target cash incentive compensation bonus opportunity for each of our named executive officers was reduced. The target cash incentive bonus opportunity, absent specified performance improvements or overachievement for our Chief Executive Officer and Chief Financial Officer were reduced as follows:

37

Table of Contents

| Target Cash Incentive Opportunity* | | | |
|---|---|---|---|
| Position | Executive | 2017 | 2016 |
| CEO | Wayne T. Smith | 235%<br>*(-30 percentage points)* | 265% |
| President of Financial Services & CFO<br>*until May 15, 2017* | W. Larry Cash | 135%<br>*(-30 percentage points)* | 165% |
| EVP & CFO<br>*effective May 16, 2017* | Thomas J. Aaron | 130% | *Former CFO: 165%* |

\*      Excludes potential amounts that could be earned for overachievement of financial goals and/or non-financial strategic and operational improvement goals

- ***Additional metric***: In response to feedback received in our engagement with our stockholders, substantial progress toward the Company's previously disclosed portfolio rationalization and deleveraging plan was incorporated as a component of the non-financial performance strategic and operational improvement goals for 2017. In addition, the 2017 cash incentive bonus opportunities for our Chief Executive Officer and our Chief Financial Officer continued to include a component for relative Total Shareholder Return Percentile Rank.

\*      ***Revised long-term incentive methodology***: Our named executive officers were granted one-half of their 2017 long-term incentive awards in the form of performance-based restricted stock with three-year performance targets (rather than one-year performance targets as in prior years). The vesting of this performance-based restricted stock is based 80% on the attainment of a pre-determined level of Cumulative Same-Store Adjusted EBITDA Growth and 20% on the attainment of a pre-determined level of Cumulative Adjusted EPS during the three-year performance period. The other half of the long-term incentive awards granted to each named executive officer in 2017 was in the form of time-based restricted stock that will vest in one-third increments on each of the first three anniversaries of the grant date.

Our Compensation Committee and management, in consultation with Mercer, continue to evaluate our executive compensation program in light of stockholder feedback, governance best practices, regulatory requirements, economic and industry factors, current trends in public company pay practices, and competitive considerations. We will make changes, as applicable, that both ensure the alignment between the interests of our stockholders and our executives and reflect industry-leading executive compensation programs.

**2017 Guiding Principles and Compensation Framework**

The core goals applied by the Company in implementing its executive compensation program for 2017 were to provide a mix of compensation vehicles that generated a compensation package that is competitive with an appropriate peer group, provides for the attainment of performance and growth objectives from both a short-term and long-term perspective, aligns the interests of executive management with stockholders, and retains and attracts valuable executive talent.

The guiding principles used by the Company during 2017 included:

\*      An overall targeted mix of compensation elements that is competitive with our selected peer group companies (see below for a discussion of our peer group);

\*      Annual target incentive cash compensation that is at risk, performance-based, and tied to the attainment of the Company's growth objectives;

38

Table of Contents

* Long-term incentive awards of stock-based compensation, one-half of which are performance-based with three-year targets and, accordingly, are at risk and further align the interests of executive management with our stockholders; and

* Provision of longer range savings, retirement, and other benefits, including appropriate perquisites, to encourage the retention of the most experienced and talented executives through their most productive and valuable years of employment service.

The Company believes that the flexibility to make upward or downward adjustments as needed for individual performance, unusual market fluctuations, or extraordinary performance considerations, provides consistency and predictability to the Company's executives and alignment of interests and transparency to the Company's investors. Variations in pay levels for executives are based on factors such as internal equity, level of responsibility, individual performance, an individual's tenure in his or her current role, and Company performance.

## Components of our 2017 Executive Compensation Program

### Peer Group

In accordance with the process described above, the Company utilized a benchmark peer group in connection with determining the executive compensation for the named executive officers.

The Company regularly reviews the composition of its peer group to ensure comparability between the Company and its peer group. Following the Company's spin-off of Quorum Health Corporation in 2016, the Company's peer group was revised, taking into account the smaller size of the Company. The following changes were made:

* AmerisourceBergen Corporation was removed from the Company's 2017 peer group because it no longer fit the size criteria used by the Company to identify peers;

* Health Net, Inc. was removed following its acquisition during 2016; and

* Quest Diagnostics Incorporated was added to the Company's 2017 peer group.

39

Table of Contents

The 2017 peer group included the other four major hospital management companies. In addition, given the limited number of large, publicly-traded hospital management companies, the peer group also included 15 other companies in the healthcare facilities, healthcare services, healthcare distribution, insurance or managed care areas. The 19 companies included in the 2017 peer group analysis were:

### Peer Group Companies (for 2017 Compensation Cycle)

- Aetna Inc.
- Aflac Incorporated
- Anthem, Inc.
- Cardinal Health, Inc.
- Centene Corporation
- CIGNA Corporation
- DaVita HealthCare Partners Inc.
- HCA Holdings, Inc.
- Henry Schein, Inc.
- Humana Inc.
- Kindred Healthcare, Inc.
- LifePoint Health, Inc.
- Molina Healthcare, Inc.
- Quest Diagnostics Incorporated (added for 2017)
- Owens & Minor, Inc.
- Tenet Healthcare Corporation
- Universal Health Services, Inc.
- Unum Group
- WellCare Health Plans, Inc.

In selecting the peer group companies, consideration was given to revenue, market capitalization, enterprise value and number of employees of each company, while being sensitive to the positioning of the Company in relation to the peer group medians. The goal was to have the Company fit within the middle of the peer group (i.e., between the 25th and the 75th percentile) with respect to these metrics if possible. Based on 2016 data, the Company was near the median of this peer group in terms of revenue and enterprise value. Our Compensation Committee believes that the Company's peer group continues to align the Company with the competitive market for talent for our key executives.

#### Base Salary

Base salary, as its name implies, is the basic element of the employment relationship, designed to compensate the executive for his or her day-to-day performance of duties. The amount of base salary distinguishes individuals' level and responsibility within the organization and may also be impacted by the individual's tenure in his or her current role. Exceptional performance and contribution to the growth and greater success of the organization are rewarded through other compensation elements, and for this reason, the benchmark target for base salary for each of our executive officers is set at a market-competitive level relative to our peer group as identified above when considering each executive's role and responsibilities, as well as individual performance.

The base salaries of the Chief Executive Officer and the other named executive officers were reviewed by the Compensation Committee in early 2017 as part of its annual review. The Compensation Committee determined that there would be no change to the base salaries of the Chief Executive Officer or the then-serving Chief Financial Officer for 2017. In April 2017, Benjamin C. Fordham was promoted to Executive Vice President and General Counsel. In May 2017, upon the retirement of W. Larry Cash, Thomas J. Aaron was promoted to Executive Vice President and Chief Financial Officer. The Compensation Committee approved increases in Messrs. Aaron's and Fordham's base salaries as a result of their promotions and the corresponding changes to their roles and responsibilities. The annualized base salary for each of the named executive officers for 2017 is set forth in the table below.

40

Table of Contents

| Annualized Base Salary | | | |
|---|---|---|---|
| Position | Executive | 2017 | 2016 |
| CEO | Wayne T. Smith | $1,600,000 | $1,600,000 |
| President of Financial Services & CFO until May 15, 2017 | W. Larry Cash | $850,000 | $850,000 |
| EVP & CFO effective May 16, 2017[1] | Thomas J. Aaron | $675,000 | — |
| President & COO | Tim L. Hingtgen | $800,000 | $725,000 |
| President of Clinical Operations & CMO | Lynn T. Simon, M.D. | $550,000 | — |
| EVP & General Counsel effective April 1, 2017[1] | Benjamin C. Fordham | $550,000 | — |

1 For Messrs. Aaron and Fordham, 2017 salary reflects annualized base salary rates effective as of the date of their respective promotions. In the case of Mr. Cash, 2017 salary reflects his annualized base salary prior to his retirement in May 2017. Actual salaries received are included in the Summary Compensation Table.

### Annual Cash Incentive Compensation (EPIP)

Annual cash incentive compensation awards to the named executive officers are made pursuant to the Company's 2004 Employee Performance Incentive Plan ("EPIP"), as most recently amended and restated in February 2014 and approved by our stockholders in May 2014. Annual cash incentive compensation awards are intended to align employees' interests with the goals and strategic initiatives established by the Company and to reward employees for their contributions during the period to which the incentive award relates. Annual cash incentive compensation awards' targets are typically expressed as a percentage of the individual's base salary.

41

Case 3:19-cv-00461    Document 67-11    Filed 03/23/20    Page 11 of 25 PageID #: 1348

Table of Contents

For 2017, the Company revised its annual cash incentive compensation awards to provide for a reduced target opportunity, absent performance improvements or overachievement. Baseline target opportunities for our named executive officers were reduced relative to 2016 levels as follows:

| Target Cash Incentive Opportunity* | | | |
|---|---|---|---|
| Position | Executive | 2017 | 2016 |
| CEO | Wayne T. Smith | 235% (-30 percentage points) | 265% |
| President of Financial Services & CFO until May 15, 2017 | W. Larry Cash | 135% (-30 percentage points) | 165% |
| EVP & CFO effective May 16, 2017 | Thomas J. Aaron | 130% | Former CFO: 165% |
| President & COO | Tim L. Hingtgen | 140% (-25 percentage points) | 165% |
| President of Clinical Operations & CMO | Lynn T. Simon, M.D. | 115% (-15 percentage points) | 130% |
| EVP & General Counsel effective April 1, 2017 | Benjamin C. Fordham | 115% | Former GC: 130% |

\* Excludes potential amounts that could be earned for overachievement of financial goals and/or non-financial strategic and operational improvement goals.

Annual cash incentive compensation awards are "at risk" as they are subject to the attainment of specific goals. For each named executive officer, the performance goals for 2017 were similar to those used historically. However, in response to feedback received in our engagement with our stockholders, substantial progress toward the Company's previously disclosed portfolio rationalization and deleveraging plan was included as an additional component of the non-financial strategic and operational performance improvement goals. The individual's target plan continued to include multiple budgeted goals, and for each goal, different award amounts could be earned depending on the level at which that goal was attained, (i.e., an underachievement and overachievement opportunity).

As in prior years, the Company's financial goals were based on the attainment of key financial objectives, including, where applicable, budgeted operating performance within the range of the Company's annual guidance to investors reflected in the Company's earnings release issued in February 2017 (the "2017 Performance Objectives"). While the Company did not undertake a statistical analysis to quantify how difficult it would be to achieve the relevant targets used to determine cash incentive compensation awards, at the time the target levels were set, the Compensation Committee believed that achieving such target levels, although challenging, was possible with significant effort from the named executive officers. Accordingly, the likelihood of the named executive officers achieving their respective target levels was not known and historically, in any given year, not all of the target levels have been achieved. The Compensation Committee determined that it was appropriate to set rigorous financial targets used to determine the cash incentive compensation awards in order to motivate the named executive officers to meet the Company's business goals and to align named executive officers' interests with the goals and strategic initiatives established by the Company.

For 2017, the Company's 2017 Performance Objectives were as set forth in the tables below. Each goal target was scaled to achieve a partial award for less than targeted performance or above target award for exceptional performance as illustrated below:

42

Table of Contents

| 2017 Adjusted EBITDA* ($ millions) | | | Net Revenues** ($ millions) | | | 2017 Continuing Operations Adjusted EPS + | | |
|---|---|---|---|---|---|---|---|---|
| 2017 Adjusted EBITDA | % of Target Attained | % of Bonus Amount Linked to Adjusted EBITDA Awarded | 2017 Net Revenues | % of Target Attained | % of Bonus Amount Linked to Net Revenues Awarded | 2017 Continuing Operations Adjusted EPS | % of Target Attained | % of Bonus Amount Linked to EPS Awarded |
| $2,000 | 100% | 100% | $ 16,000 | 100% | 100% | $ 0.55 | 100% | 100% |
| $1,900 | 95% | 75% | $ 15,200 | 95% | 75% | $ 0.50 | 91% | 75% |
| $1,800 | 90% | 50% | $ 14,400 | 90% | 50% | $ 0.45 | 82% | 50% |
| <$1,800 | <90% | 0% | <$14,400 | <90% | 0% | <$ 0.45 | <82% | 0% |

**Overachievement Opportunity:** 1% of base salary for each 0.5% over the target up to the plan maximum.

**Overachievement Opportunity:** 1% of base salary for each 2% over the target up to an additional 10%, limited to the plan maximum.

**Overachievement Opportunity:** 1% of base salary for each $0.02 over the target up to an additional 20%, limited to the plan maximum.

*Linear interpolation is used for performance between the points shown in the tables.*

\* Adjusted EBITDA is a non-GAAP financial measure. For information regarding the manner in which Adjusted EBITDA is calculated from the Company's financial statements, see Annex A to this proxy statement.

\*\* In connection with determining the Company's net revenues for purposes of these cash incentive compensation awards, the $591 million change in estimate related to net patient revenues recorded in the fourth quarter of 2017 was excluded.

† Continuing Operations Adjusted EPS is a non-GAAP financial measure. For information regarding the manner in which Continuing Operations Adjusted EPS is calculated from the Company's financial statements, see Annex A to this proxy.

For 2017, the Company's financial performance in relation to its 2017 Performance Objectives was achieved as follows:

- Adjusted EBITDA — 85% of target attained; no bonus amount linked to Adjusted EBITDA awarded;

- Net Revenues — 99% of target attained; 95% of bonus amount linked to Net Revenues awarded; and

- Continuing Operations Adjusted EPS — 0% of target attained; no bonus amount linked to Continuing Operations Adjusted EPS awarded.

In addition, the 2017 cash incentive opportunities for our Chief Executive Officer and our Chief Financial Officer included a component for Total Shareholder Return Percentile Rank at or above the 30th percentile of the TSR comparison group (described below). This cash incentive opportunity for our Chief Executive Officer was in accordance with the following table:

| TSR Percentile Rank | Total Percent Opportunity (as a percentage of base salary) |
|---|---|
| Above 65th = Target | 20% |
| 50th – 65th | 15% |
| 40th – 49th | 10% |
| 30th – 39th | 5% |
| Below 30th | 0% |

"Total Shareholder Return Percentile Rank" means the relative growth of the Company's price per share of Common Stock compared to the TSR comparison group. The TSR comparison group consists of the following companies (which included the four major hospital management companies): HCA Holdings, Inc., Tenet Healthcare Corporation, Universal Health Services, Inc., Kindred Healthcare, Inc., LifePoint Health, Inc., and HealthSouth Corporation.

43

Table of Contents

For 2017, the Company's Total Shareholder Return was below the 30th percentile for Total Shareholder Return among the TSR comparison group, and accordingly neither our Chief Executive Officer nor either our current or former Chief Financial Officer earned any portion of their target cash incentive compensation allocated to this component.

The President and COO's short-term incentive compensation opportunity was also based on the attainment of Divisional Hospital EBITDA. The President of Clinical Operations and Chief Medical Officer's goal attainment was also based in part on improvements in quality, patient safety and clinic operations. The Executive Vice President and General Counsel's goal attainment was also based in part on successful progress toward resolving government investigations and shareholder litigation as well as managing department expenses.

In addition, as set forth below, in connection with the promotions of Mr. Fordham on April 1, 2017 and Mr. Aaron on May 16, 2017, and the corresponding changes to their roles and responsibilities, the Compensation Committee established revised cash incentive target percentages and/or metrics for such individuals as reflected in the chart below.

The Company's performance in 2017 resulted in below target cash incentive compensation being paid to our named executive officers for 2017. The Chief Executive Officer earned 21.6% of his target cash incentive award attainable for 2017. For each component of the non-equity incentive plan compensation, the targeted award and attained award, expressed as a percentage of base salary, for each named executive officer along with the maximum incentive award attainable, including non-financial strategic and operational performance improvements and overachievement of Company goals, are set forth in the tables below:

| | EBITDA | EPS | Net Revenues | Total Shareholder Return | Target | Performance Improvement | Over-achievement | Max. |
|---|---|---|---|---|---|---|---|---|
| **CEO (Smith)** | | | | | | | | |
| Opportunity | 160% | 30% | 25% | 20% | 235% | 30% | 35% | 300% |
| Attainment | 0% | 0% | 23.8% | 0% | 23.8% | 27% | 0% | 50.8% |
| **EVP/CFO (Aaron – May 16 through December 31, 2017)** | | | | | | | | |
| Opportunity | 80% | 20% | 15% | 15% | 130% | 20% | 25% | 175% |
| **SVP – Finance (Aaron – January 1 through May 15, 2017)** | | | | | | | | |
| Opportunity | 60% | 10% | 10% | — | 80% | 10% | 20% | 110% |

44

Table of Contents

As an inducement to Mr. Aaron to join the Company in the fall of 2016, the Compensation Committee agreed that, for 2017 only, Mr. Aaron would receive cash incentive compensation equal to a minimum of 100% of his 2017 base salary, regardless of the Company's actual outcomes. Based on the metrics set forth above for Mr. Aaron, Mr. Aaron would have received cash incentive compensation for 2017 that was less than his 2017 base salary. Mr. Aaron received cash incentive compensation of $646,875, which was 100% of his 2017 base salary. Mr. Aaron is not guaranteed a minimum level of cash incentive compensation for 2018.

| | EBITDA | EPS | Net Revenues | Division Hospital EBITDA | Target | Performance Improvement | Over-achievement | Max. |
|---|---|---|---|---|---|---|---|---|
| **President/COO (Hingtgen)** | | | | | | | | |
| Opportunity | 85% | 20% | 20% | 15% | 140% | 25% | 35% | 200% |
| Attainment | 0% | 0% | 19% | 0% | 19% | 20% | 0% | 39% |

| | EBITDA | EPS | Net Revenues | (1) | (2) | Target | Performance Improvement | Over-achievement | Max. |
|---|---|---|---|---|---|---|---|---|---|
| **President of Clinical Operations and Chief Medical Officer (Simon)** | | | | | | | | | |
| Opportunity | 70% | 10% | 10% | 10% | 15% | 115% | 10% | 25% | 150% |
| Attainment | 0% | 0% | 9.5% | 5% | 10% | 24.5% | 10% | 0% | 34.5% |

(1) Quality and Patient Safety Improvement; (2) Clinic Operations Improvement

| | EBITDA | EPS | Net Revenues | (1) | Target | Performance Improvement | Over-achievement | Max. |
|---|---|---|---|---|---|---|---|---|
| **EVP and General Counsel (Fordham – April 1 through December 31, 2017)** | | | | | | | | |
| Opportunity | 70% | 15% | 10% | 20% | 115% | 10% | 25% | 150% |
| Attainment | 0% | 0% | 9.5% | 20% | 29.5% | 10% | 0% | 39.5% |
| **SVP and Chief Litigation Counsel (Fordham – January 1 through March 31, 2017)** | | | | | | | | |
| Opportunity | 60% | 10% | — | 10% | 80% | 10% | 20% | 110% |
| Attainment | 0% | 0% | — | 10% | 10% | 10% | 0% | 20% |

(1) Successful Progress on Resolving Government Investigations and Shareholder Litigation and, from April 1 through December 31, 2017, Appropriate Department Cost Versus Budget

W. Larry Cash, our former Chief Financial Officer, did not receive any cash incentive compensation for 2017 as the result of his retirement in May 2017.

In addition to bonus compensation earned under the EPIP, both Mr. Aaron and Mr. Fordham received $25,000 in bonus compensation in 2017 for successful completion of certain strategic transactions and operational improvement plans.

### Long-Term Incentives (LTI)

Long-term incentives continue to comprise a very important part of the Company's executive compensation program. Equity awards are designed to reward the executives for their longer-term contributions to the success and growth of the Company and are directly linked to maximizing stockholder value. They also serve as a key retention tool.

45

Table of Contents

Equity-based incentive awards are made pursuant to the Company's 2009 Stock Option and Award Plan, as most recently amended and restated in March 2016 and approved by our stockholders in May 2016 (the "2009 Plan"). The Board approved the further amendment and restatement of the 2009 Plan on March 14, 2018, subject to stockholder approval at this meeting. This plan provides for a wide variety of stock-based compensation awards, including incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock, performance awards and other share-based awards. The Company has historically only made awards in the form of non-qualified stock options and restricted stock, as these types of awards are most consistently used by the Company's peer group and are thus deemed to provide the most competitive compensation element for long-term incentive compensation.

Between 2014 and 2017, we granted executives approximately the same number of restricted shares each year (absent any change in responsibility, competitive positioning as compared to the peers, etc.). As an example, our Chief Executive Officer received 150,000 restricted shares in each of 2014 through 2017 – thus, the value of restricted stock awarded to the Chief Executive Officer and other executives has been aligned with that of the gains/losses experienced by our stockholders. On their respective dates of grant, the grant date fair value of our Chief Executive Officer's 2017 restricted stock award was 40% less than the grant date fair value of the awards in 2016.

For 2017, the Company significantly revised the terms of its long-term incentive awards to its named executive officers. The Company believes that these changes make the Company's long-term incentive program better reflect current governance best practices and help to ensure that our executive management team is focused on maximizing the Company's long-term performance while continuing to assist in the retention of our valuable executive talent.

Prior to 2017, the Company granted performance-based restricted stock awards with one-year performance targets. In 2017, rather than one-year performance targets for performance-based restricted stock, our named executive officers were granted one-half of their 2017 long-term incentive awards in the form of performance-based restricted stock with three-year performance targets. The other half of the long-term incentive awards granted to each named executive officer was in the form of time-based restricted stock that vests in one-third increments on each of the first three anniversaries of the grant date. The 2017 long-term incentive awards to our named executive officers are further illustrated below:

| | Time-based Restricted Stock | Performance-based Restricted Stock |
|---|---|---|
| Weighting | 50% | 50% |
| Objectives | • Drive behaviors to create value for stockholders by linking executive compensation to stock price performance<br>• Encourage retention<br>• Result in actual share ownership (thereby supporting the Company's stock ownership guidelines) | • Align executives' interests with the interests of stockholders<br>• Reinforce the critical objective of building stockholder value over the long term<br>• Focus management attention upon the execution of our long-term business strategy |
| Performance Conditions | N/A | • 80%: Cumulative Same-Store Adjusted EBITDA Growth (as defined below)<br>• 20%: Cumulative Adjusted EPS (as defined below) |
| Vesting | Vest in three equal installments on the first, second, and third anniversaries of the grant date | Three-year performance period (January 1, 2017 through December 31, 2019). Cliff vest on third anniversary of grant date following certification of results. |
| Payout | Participant acquires unrestricted shares of common stock upon vesting | Payment made in unrestricted shares of common stock based on actual performance<br>• Payouts at 25% of target for achievement of 80% of EBITDA and/or EPS goals<br>• Maximum performance capped at 200% of target for achievement of 120% of EBITDA and/or EPS goals |

46

Table of Contents

The following table illustrates the potential vesting of the 2017 performance-based restricted stock on the third anniversary of the grant date based on various levels of achievement of Cumulative Same-Store Adjusted EBITDA Growth and Cumulative Adjusted EPS:

| Achievement % | % of Granted Shares Earned |
|---|---|
| 120% | 200% |
| 100% | 100% |
| 80% | 25% |
| < 80% | 0% |

*Linear interpolation is used for performance between the points shown in the tables.*

For purposes of determining the level of achievement for each portion of the performance-based awards, the determination of the level of achievement for Cumulative Same-Store Adjusted EBITDA Growth and Cumulative Adjusted EPS, as applicable, during the Performance Period, will be determined independently from each other and will not impact the determination of the level of achievement for the other portion of the award.

To the extent that the performance objectives are attained, the restrictions will lapse on the portion of the award subject to that performance objective on the third anniversary of the grant date, provided that the grantee continues to be employed on such date, subject to certain exceptions. To the extent that the minimum performance objective (80%) is not attained, the portion of the award subject to that performance objective will be forfeited in its entirety.

The following definitions will be used in determining achievement of the three-year performance targets:

"Adjusted EPS" for any fiscal year means earnings per share from continuing operations adjusted to exclude loss on early extinguishment of debt; impairment of goodwill and long-lived assets; expenses related to government and other legal settlements as disclosed separately in public filings; gains or losses on divestitures disclosed in public filings; the effect of changes in tax law, accounting principles or other such laws or provisions affecting the reported results; accruals for reorganization and restructuring programs; gains or losses associated with employee separation or curtailment of defined benefit pension plans as described in FASB ASC Topic 960; the effect of adverse or delayed federal, state or local governmental or regulatory action with regard to the Affordable Care Act; and other items as determined at the discretion of the Committee.

"Cumulative Adjusted EPS" over the Performance Period means the sum of each year's Adjusted Earnings Per Share during the Performance Period.

"Same-Store Adjusted EBITDA" for any fiscal year means Adjusted EBITDA as defined in the Company's Annual Report on Form 10-K, related to those hospitals to the extent the Company operated them in both comparable periods, excluding those hospitals that have been previously classified as discontinued operations for accounting purposes. In addition, Same-Store Adjusted EBITDA excludes Adjusted EBITDA from hospitals divested during the year of measurement, as well as, the comparable prior year. Same-Store Adjusted EBITDA will be adjusted to exclude the effect of adverse or delayed federal, state or local governmental or regulatory action with regard to the Affordable Care Act, and other items as determined at the discretion of the Committee.

"Same-Store Adjusted EBITDA Target" means the Cumulative Three-Year Same-Store Adjusted EBITDA Growth Target, as approved by the Compensation Committee.

47

Table of Contents

"Cumulative Same-Store Adjusted EBITDA Growth" over the Performance Period means the sum of each individual year's Same-Store Adjusted EBITDA Growth, which is a fraction, the numerator of which is the excess of (A) the Company's Same-Store Adjusted EBITDA at the end of the year less (B) the Company's Same-Store Adjusted EBITDA for the prior period, and the denominator of which is the Same-Store Adjusted EBITDA for the prior period. To the extent that the Cumulative Same-Store Adjusted EBITDA Growth exceeds or falls short of the Cumulative Same-Store Adjusted EBITDA Growth target, the amount of over achievement or underachievement will be determined based on the sum of the three-years Same-Store Adjusted EBITDA results divided by the sum of the three-year Same-Store Adjusted EBITDA targets.

We will continue to monitor market best practices and thoughtfully consider stockholder feedback in future years with respect to potential changes to our executive compensation programs.

### Promotional Awards

In addition to the annual grant of performance-based and time-based restricted stock awarded in March 2017, each of Messrs. Aaron and Fordham received an additional grant of 20,000 shares of time-based restricted stock on June 1, 2017 in conjunction with their promotions to Chief Financial Officer and General Counsel, respectively. These grants will vest in one-third increments on each of the first three anniversaries of the grant date. The Compensation Committee believes that these awards will also serve as a long-term retention device as Messrs. Aaron and Fordham must remain employed with the Company through each of the vesting dates to receive the shares vesting on each of those dates.

### Retention Award

On December 12, 2017, the Company also approved a deferred compensation cash award to Dr. Simon in the amount of $1,200,000. The award is divided into two installment payments, with 40% of the award to be paid 18 months after the date of issuance and the remaining 60% to be paid 36 months after the date of issuance. The Compensation Committee believes this award will serve as a key long-term retention device for its Chief Medical Officer as Dr. Simon must remain employed with the Company through each of the dates set forth above in order to receive the applicable cash payment. Pursuant to the terms of the award, Dr. Simon also agreed to be bound by certain non-competition and non-solicitation restrictions for a one-year period following a termination of her employment with the Company.

## Benefits

The Company's named executive officers are each eligible to participate in the Company's customary qualified benefit plans for health, dental, vision, life insurance, long-term disability and retirement savings (401(k)). The named executive officers are eligible to participate in these plans on the same basis (i.e., benefits, premium amounts and co-payment deductibles) as all other full-time employees of the Company. The Company's named executive officers also participate in or receive additional benefits described below, which are competitive with the benefits provided to executives of other companies.

### Retirement and Deferred Compensation Benefits

The Company's named executive officers also participate in executive compensation arrangements available only to specified officers of the Company and certain key employees of its subsidiaries. These plans include the Supplemental Executive Retirement Plan (the "SERP"), the Supplemental 401(k) Plan and the Deferred Compensation Plan, each of which is a non-qualified plan under the IRC. The benefits under these plans are made available to the named executive officers to encourage and reward their continued service through their most productive years.

48

Table of Contents

We believe that the provision of a retirement benefit is necessary to remain competitive with the Company's peer group, and is thus an important element for the recruitment and retention of executives. Effective January 1, 2003, while the Company's stock ownership and the Board of Directors were controlled by affiliates of Forstmann Little & Co., the Company adopted the SERP for the benefit of our officers and key employees of our subsidiaries. This plan is a non-contributory non-qualified defined benefit plan that provides for the payment of benefits from the general funds of the Company. The Compensation Committee of our Board of Directors administers this plan and all determinations and decisions made by the Compensation Committee are final, conclusive and binding upon all participants. In particular, the defined benefit provided under the SERP is intended to supplement the incentives provided by the other elements of the executive compensation program, for which the maximum provision of benefits is limited to three years.

The SERP generally provides that, when a participant retires after his or her normal retirement date (age 65), he or she will be entitled to receive a single lump-sum payment based on the actuarially-determined monthly income payment based on a monthly calculation of (i) the participant's Annual Retirement Benefit, reduced by (ii) the participant's monthly amount of Social Security old age and survivor disability insurance benefits payable to the participant commencing at his or her unreduced Social Security retirement age (the "Social Security Benefit").

For this purpose, the "Annual Retirement Benefit" means an amount equal to the sum of the participant's compensation for the highest three years out of the last five full years of service preceding the participant's termination of employment, divided by three, then multiplied by the lesser of (i) 60% or (ii) a percentage equal to 2% multiplied by the participant's years of service. Employees who have attained age 55 with at least 5 years of service and who retire prior to the normal retirement date or with fewer than 30 years of service receive a reduced benefit. Generally, named executive officers receive one year of credited service for each year of actual service. In March 2004, the then Compensation Committee of the Board of Directors, in an effort to achieve peer pay equality using a mechanism that would also maximize retention, caused the SERP to be amended to credit both Mr. Smith and Mr. Cash, the Company's former Chief Financial Officer, with two years of service for each year of actual service. This change occurred at a time when the Company was controlled by affiliates of Forstmann Little & Co. (through the ownership of greater than 46,000,000 shares of the Company's Common Stock) and all members of the Board and the Compensation Committee were nominated by Forstmann Little & Co. None of the Forstmann Little & Co. affiliates continued to serve on the Board of Directors or its committees following the sale of their position in the Company during 2004. In 2008, the Compensation Committee and the Board voted to amend the SERP to terminate this practice after 25 years of service had been credited. After reaching 25 years of credited service, Mr. Smith and Mr. Cash each received one year of credited service for each year of actual service. Mr. Smith, having reached his maximum number of 30 years of credited service and Mr. Cash, having reached his approximate maximum number of years of credited service, elected in accordance with the plan provisions to have their benefit frozen, effective in July 2014, with future increases for interest earned based on the 24-month average yield on 10-Year Treasury Bonds. Messrs. Smith and Cash will earn no additional service credit.

In the event of a change in control of the Company, all participants who have been credited with five or more years of service will be credited with an additional three years of service (not to exceed the maximum of 30 years of service) for purposes of determining the benefit. In addition, the benefit accrued by any such participant will become fully vested and be paid out as soon as administratively feasible in a single lump sum payment following such change in control. Upon such payment to all participants, the SERP will terminate.

49

Case 3:19-cv-00461   Document 67-11   Filed 03/23/20   Page 19 of 25 PageID #: 1356

Table of Contents

The Company's named executive officers are also eligible to participate in and contribute to the Company's non-qualified Deferred Compensation Plan. Employees' voluntary contributions to this plan are tax deferred, but are subject to the claims of the general creditors of the Company. A separate supplemental 401(k) plan also exists, but employees are no longer eligible to contribute additional amounts to the non-qualified Supplemental 401(k) Plan. The individual asset balances remaining in this plan are eligible for investment earnings to the named executive officers and employees. These plans do not play a significant role in the Company's executive compensation program. Effective since 2009, no Company contributions are made to the Deferred Compensation Plan and the named executive officers are limited to the matching provisions of the tax-qualified 401(k) plan.

### Perquisites

The Company provides limited perquisites to its named executive officers and operates under the belief that benefits of a personal nature or those which are not available to the other employees of the Company should be funded from the executives' personal funds. The Company believes that the supplemental benefits that it does provide to the named executive officers are reasonable when compared to the peer group and other similarly-sized companies and are appropriate additional items of compensation for these individuals.

Group-term life insurance (or a combination of group-term life insurance and individually-owned policies) is provided for each of the named executive officers in an amount equal to four times the individual's base salary.

The Company operates aircraft to facilitate the operation and management of its business. The Board of Directors has adopted a policy that requires the Chief Executive Officer to use the Company's aircraft for both his business and personal travel. From time to time, the other named executive officers are also permitted to use the Company's aircraft for their personal use. The incremental cost of personal air travel attributable to each named executive officer's personal aircraft usage has been included in the Summary Compensation table below. In addition, named executive officers are taxed on the income attributable to their personal use of company aircraft based on Internal Revenue Service guidelines and are not grossed up by the company.

### Change in Control Severance Agreements

None of the Company's executive officers have a written employment agreement with the Company or any of its subsidiaries. Since 2007, each officer of the Company, including each of the named executive officers (collectively, the "Covered Executives"), has been a party to a change in control severance agreement (a "CIC Agreement") with the Company. The CIC Agreements are considered "double trigger" agreements and require both the occurrence of a change in control of the Company _and_ a termination of employment for any cash severance benefits to become payable. The CIC Agreements provide for certain compensation and benefits in the event of termination of a Covered Executive's employment during the period following a change in control of the Company (as defined in the CIC Agreements), (A) by the Company, other than as a result of the Covered Executive's death or disability within thirty-six (36) months of the change in control or (B) by the Covered Executive, upon the happening of certain "good reason" events within twenty-four (24) months of the change in control, including (i) certain changes in the Covered Executive's title, position, responsibilities or duties, (ii) a reduction in the Covered Executive's base salary, (iii) certain changes in the Covered Executive's principal location of work, (iv) the failure of the Company to perform its obligations under or to continue in effect any material compensation or benefit plan, or (v) certain other employer actions that would cause the Covered Executive to lose the benefits of the CIC Agreement.

50

Table of Contents

The thirty-six (36) and twenty-four (24) month time periods described in the preceding sentence apply to the CIC Agreements for the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, the Presidents, the Executive Vice Presidents, Division Presidents and each Senior Vice President. For the CIC Agreements with each Vice President of the Company, the applicable time periods are twenty-four (24) and twelve (12) months, respectively. CIC Agreements entered into since 2009 do not contain any tax "gross-up" provisions.

Compensation and benefits payable under the CIC Agreements include, in the event of a qualifying termination of employment, a lump sum payment equal to the sum of (a) unpaid base pay, (b) accrued but unused paid vacation or sick pay and unreimbursed business expenses, (c) any other compensation or benefits in accordance with the terms of the Company's existing plans and programs, (d) a pro rata portion of the incentive bonus that would have been earned by the Covered Executive for the year of termination based on actual performance, and (e) a lump sum equal to the sum of three (3) times (two (2) times, in the case of each Vice President of the Company) the sum of base salary and the greater of (A) the highest incentive bonus earned during any of the three (3) fiscal years prior to the fiscal year in which the Covered Executive's termination of employment occurs or, if greater, the three fiscal years prior to the fiscal year in which a change in control occurs and (B) the target incentive bonus for the fiscal year in which the Covered Executive's termination of employment occurs assuming the performance objectives were met in full. The Covered Executives will also be entitled to continuation of certain health and welfare benefits for thirty-six (36) months following termination (twenty-four (24) months in the case of each Vice President) and reimbursement of up to $25,000 for outplacement counseling and related benefits.

In addition, the Covered Executives with agreements entered into before 2009 will be entitled to receive certain "gross up" payments to offset any excise tax imposed by Section 4999 of the IRC on any payment or distribution by the Company to or for their benefit, including under any stock option, restricted stock or other agreement, plan or program; provided, however, that if a reduction in such payments or distributions by 10% or less would cause no excise tax to be payable, then the payments and distributions to the Covered Executive will be reduced by that amount and no excise tax gross up payment will be paid. As noted above, CIC Agreements entered into since 2009 do not contain any tax "gross-up" provisions.

The Company's executive officers are employees of the Company's indirect, wholly-owned subsidiary, CHSPSC, LLC, and hold the same elected officer titles with this entity as they do with the Company.

### Termination of Service and Severance Arrangements

The Company's severance policy provides that the named executive officers are entitled to receive twenty-four (24) months of their base salary upon a qualifying termination under the severance policy. In addition, upon a termination without cause, each of the named executive officers would be entitled to receive a pro-rated portion of their cash incentive compensation for the year of termination (based on actual results, when determined) and under their restricted stock award agreements, the lapse schedule is fully accelerated. Upon termination, the named executive officers are entitled to continuation health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act by so electing and paying the then active employee premium amount. The period of this benefit is equal to the number of months of severance payment, i.e., twenty-four (24) months for the named executive officers.

As described in the preceding section, each of the named executive officers is party to a CIC Agreement, which provides for cash severance benefits only upon both a change in control of the Company and qualifying termination of employment. In the event that a named executive officer is

51

Table of Contents

entitled to receive payment pursuant to his or her CIC Agreement, that executive officer will not be eligible to participate in the Company's severance policy.

In addition to the benefits payable under the life insurance policy or the long-term disability policy described above, in the event a named executive officer dies or is permanently disabled while in the employ of the Company, vesting is fully accelerated for all grants under the Company's 2009 Plan.

## Executive Compensation Policies

### Stock Ownership Guidelines

The Community Health Systems Stock Ownership Guidelines align the interests of its directors and executive officers with the interests of stockholders and promote the Company's commitment to sound corporate governance. The guidelines apply to the Company's non-management directors and the following officers, in the indicated multiples of either an officer's base salary or a non-management director's annual cash stipends, as applicable, at the time the participant becomes subject to the guidelines:

| Position with the Company | Value of Common Stock Required |
|---|---|
| Chairman/Chief Executive Officer | 5.0x |
| Members of the Board of Directors (including executives) | 5.0x |
| Officers Named in the Proxy Statement and Executive Vice Presidents | 3.0x |
| Other Officers above Vice President | 1.5x |
| Vice Presidents | 1.0x |

Company officers and directors subject to these guidelines are expected to achieve their respective ownership levels within five (5) years of becoming subject to the guidelines (and an additional five (5) years in the event of a promotion to a higher guideline). Once achieved, ownership of the guideline amount must be maintained for as long as the individual is subject to these Stock Ownership Guidelines. Until such time as a Company officer or director satisfies the Stock Ownership Guidelines, that individual will also be required to hold, for at least one year, 100% of the shares received upon the exercise of stock options and upon the vesting of full value stock awards, including but not limited to restricted stock awards and restricted stock units, in each case net of those shares required to pay the exercise price and any taxes due upon exercise or vesting.

Stock that counts towards satisfaction of the Company's Stock Ownership Guidelines includes: (i) Common Stock held outright by the participant or his or her immediate family members living in the same household; (ii) restricted stock and restricted stock units issued and held as part of an executive officer's or director's long-term compensation, whether or not vested; (iii) Common Stock underlying vested Community Health Systems, Inc. stock options; and (iv) Common Stock acquired on stock option exercises that the participant continues to hold. The Governance and Nominating Committee of the Board of Directors reviews each participant's progress and compliance with the applicable guidelines and may grant any hardship waivers or exceptions (e.g., in the event of a divorce) as it deems necessary and appropriate.

52

Case 3:19-cv-00461    Document 67-11    Filed 03/23/20    Page 22 of 25 PageID #: 1359

Table of Contents

### Compensation "Clawback" Policy

In February 2009, the Board of Directors adopted a policy (the "Clawback Policy") requiring that, in certain circumstances, the elected officers of the Company reimburse the Company for the amount and/or value of performance-based cash, stock or equity-based awards received by such elected officers, and/or gains realized by such elected officers in connection with these awards. The circumstances triggering this recoupment require a determination by the Board, or an appropriate committee of the Board, that fraud by an elected officer materially contributed to the Company having to restate all or a portion of its financial statements. The Board or the appropriate committee is granted the right to determine, in its discretion, the action necessary to remedy the misconduct. In determining what remedies to pursue, the Board or committee will take into account all relevant factors, including consideration of fairness and equity, and may require reimbursement to the extent the value transferred to the elected officer can be reasonably attributed to the reduction in the restated financial statements and the amount of the award would have been lower than the amount actually paid, granted or realized.

In February 2017, in accordance with the terms of the Settlement Agreement, the Board of Directors revised the Clawback Policy to require that, in the event of a restatement of the Company's financial statements required under the applicable statutes, rules and regulations of the SEC, the Company will, to the extent permitted by applicable law, require the Company's Chief Executive Officer and Chief Financial Officer to reimburse the Company for any performance-based cash, stock or equity-based award paid or granted to, or gains realized (such as through the exercise of stock options or sale of equity securities) by the Chief Executive Officer and Chief Financial Officer, to the extent that the amount of such cash, stock or equity-based award or realized gain during the two (2) year period preceding the date of the restatement exceeded the amounts that would have been paid, granted or realized under the Company's financial statement(s), as restated. This requirement applies to all awards paid or granted to these individuals from the date of its adoption by the Board.

The Company intends to impose such additional recoupment obligations as are necessary to ensure continuing compliance with other applicable laws, including compliance with final SEC clawback rules to be adopted under the Dodd-Frank Act once such final rules have been adopted.

### Prohibition on Pledging and Hedging

The Company considers it inappropriate for any director or executive officer to enter into speculative transactions involving the Company's securities. Therefore, the Company's insider trading policy prohibits directors and executive officers from trading in any put or engaging in any short sale or other hedging transaction (including a short sale "against the box") or equity swap of Company securities, or trading in any call or other derivative on Company securities. The insider trading policy also prohibits any director or executive officer from pledging Company securities, including holding such securities in a margin account. On a case-by-case basis, the Trading Compliance Committee, consisting of the Chief Financial Officer and the General Counsel, may approve an exception to the prohibition on pledging Company securities as collateral for a loan (not including margin debt) where the director or executive officer clearly demonstrates the financial capacity to repay the loan without resorting to the pledged securities.

### Oversight of the Executive Compensation Program

The Compensation Committee of the Board of Directors oversees the Company's executive compensation program. Each of the Compensation Committee members is fully independent of management and has never served as an employee or officer of the Company or its subsidiaries. In addition to meeting the independence requirements of the NYSE and Nasdaq, each member of the

53

Table of Contents

Compensation Committee is an "outside director" for purposes of Section 162(m) of the Internal Revenue Code ("IRC") and is a "non-employee director" for purposes of Section 16(b) of the Exchange Act.

## Risk Assessment of Executive Compensation

The Compensation Committee, with management and the Compensation Committee's independent executive compensation consultant, Mercer, regularly assesses the risk levels of the Company's executive compensation program. As part of this assessment, the Compensation Committee reviews the Company's compensation programs for certain design features identified by the Compensation Committee and its advisors as having the potential to encourage excessive risk-taking, and considers the Company's compensation programs in light of the Company's key enterprise and business strategy risks. The Compensation Committee believes that the Company's compensation programs are designed so that they do not include compensation mix overly weighted toward annual incentives, highly leveraged short-term incentives, uncapped or "all or nothing" bonus payouts or unreasonable performance goals. The Compensation Committee also noted several design features of the Company's cash and equity incentive programs that the Compensation Committee believes reduce the likelihood of excessive risk-taking, including the use of multiple balanced performance metrics, maximum payouts at levels deemed appropriate, a carefully considered peer group to assure the Company's compensation practices are measured and appropriately competitive, multi-year vesting schedules for equity awards, and significant long-term incentives that promote longer-term goals and reward sustainable stock, financial and operating performance, especially when combined with the Company's executive stock ownership guidelines. Additionally, the Company's executive compensation "clawback" policy allows the Company to recover bonus payments and certain equity awards under certain circumstances, and compliance and ethical behaviors of the Company's executive officers are factors considered in all performance and bonus assessments. Based on its assessment, the Compensation Committee believes that the Company's compensation programs do not motivate risk-taking that could reasonably be expected to have a materially adverse effect on the Company. These principles are reviewed annually as a part of the overall enterprise risk assessment.

## Tax Considerations

Section 162(m) of the IRC limits the Company's ability to deduct certain compensation in excess of $1 million paid to the Company's Chief Executive Officer and to certain of the Company's other named executive officers. Prior to the Tax Cuts and Jobs Act ("TCJA") that was signed into law on December 22, 2017, this limitation did not apply to compensation that constituted under applicable regulations "qualified performance-based compensation." Prior to the enactment of TCJA, the Company aimed to design the performance-based compensation paid to its named executive officers so that it would satisfy the requirements for deductibility under Section 162(m), but also had determined that it would not necessarily limit executive compensation to amounts deductible under Section 162(m) if that limitation were not in the best interest of stockholders.

The TCJA repealed the "qualified performance-based compensation" exception, effective for taxable years beginning after December 31, 2017. The TCJA provides transition relief for certain contractual arrangements in place as of November 2, 2017; however, the scope of this transition relief is uncertain, and in the absence of any rulemaking at this time, the full impact of the TCJA's changes to Section 162(m) on our executive compensation program is not yet known. The Committee will continue to retain the flexibility to design and maintain the Company's executive compensation programs in a manner that the Committee believes is most beneficial to stockholders, including the payment of compensation that may not be deductible under Section 162(m).

54

Table of Contents

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders:**
The Notice and Proxy Statement and Annual Report to Stockholders are available at www.proxyvote.com.

----------------------------------------------------------------------------------

E40709-P04859

## COMMUNITY HEALTH SYSTEMS, INC.
### Annual Meeting of Stockholders
### May 15, 2018 8:00 AM
### This proxy is solicited by the Board of Directors

The undersigned hereby appoints Wayne T. Smith and Benjamin C. Fordham, and each of them, with full power of substitution and power to act alone, as proxies to vote all the shares of Common Stock which the undersigned would be entitled to vote if personally present and acting at the Annual Meeting of Stockholders of Community Health Systems, Inc. (the "Company"), to be held at the Franklin Marriott Cool Springs, 700 Cool Springs Boulevard, Franklin, Tennessee 37067 on Tuesday, May 15, 2018, at 8:00 a.m., local time, and at any adjournments or postponements thereof (the "Meeting").

**This proxy, when properly executed, will be voted in the manner directed herein. If no such direction is made, this proxy will be voted in accordance with the Board of Directors' recommendations.**

Address Changes/Comments: _____

_____

(If you noted any Address Changes/Comments above, please mark corresponding box on the reverse side.)

**Continued and to be signed on reverse side**

Case 3:19-cv-00461    Document 67-11    Filed 03/23/20    Page 25 of 25 PageID #: 1362