UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CALEB PADILLA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, LARRY CASH, and THOMAS J. AARON,<br><br>Defendants. | Case No.: 3:19-cv-00461<br><br>Hon. Eli J. Richardson<br><br>Hon. Barbara D. Holmes<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

    A.    Community Health Enters the Class Period With Precarious Finances ..................2

    B.    Community Health Suffers the Key Resignation of Its CFO ..................................3

    C.    Community Health's Lack of Internal Controls .........................................................3

    D.    The Company Manipulates Financial Reporting to Avoid Triggering Debt Covenants...................................................................................................................3

        1.    The Company's Crippling Debt Covenants....................................................3

        2.    Relevant GAAP Requirements ......................................................................5

        3.    Defendants Manipulate Community Health's Financials............................6

    E.    Defendants' Deception Is Revealed...........................................................................7

III.  ARGUMENT .........................................................................................................8

    A.    Applicable Standards Disfavor Defendants' Motion................................................8

    B.    The Complaint Alleges Actionable False and/or Misleading Statements ..............9

        1.    Defendants Claim That an Incorrect Standard Applies to Plaintiffs' Allegations of Falsity.................................................................................11

        2.    Defendants' Admissions and Community Health's Employees Confirm Plaintiffs' Allegations....................................................................12

        3.    Defendants' Misrepresentations Are Not Non-Actionable Opinions or Puffery ...................................................................................................15

        4.    Defendants' Omissions Were Material........................................................18

        5.    Defendants' Misrepresentations Are Not Protected by the Safe Harbor or Bespeaks Caution Doctrine .......................................................19

            a)    The Misrepresentations Are Not Forward-Looking Statements, but Statements of Present Conditions........................19

            b)    The Safe Harbor Does Not Protect Material Omissions................21

i

          c)      Defendants' Risk Disclosures Did Not Contain *Meaningful* Cautionary Language .......................................................................22

          d)      Defendants' Actual Knowledge of Falsity Further Renders Inapplicable the PSLRA Safe Harbor ...........................................23

   C.    The Complaint Alleges a Strong Inference of Scienter as to All Defendants ...................................................................................................24

       1.     The Complaint's Allegations Regarding Defendants' Debt Covenant Manipulation Demonstrates Scienter.......................................27

       2.     The Company's Executives Were Actively Involved with and Aware of Community Health's Core Business ...........................................30

       3.     The Magnitude of the Fraud Supports Defendants' Scienter.....................31

       4.     Post-Class Period Admissions Support a Strong Inference of Scienter .....................................................................................................32

       5.     The Individual Defendants' Review and Approval of the Company's Accounting Controls Supports a Strong Inference of Scienter .....................................................................................................33

       6.     Defendants' Competing Inference Is Not Compelling ..............................34

   D.    Plaintiffs Adequately Plead Control Person Liability...........................................35

IV.    CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ...................................................................................... 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 8

*Ashland, Inc. v. Oppenheimer & Co., Inc.*,
648 F.3d 461 (6th Cir. 2011) .................................................................................. 26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................. 9

*Bass v. Janney Montgomery Scott, Inc.*,
210 F.3d 577 (6th Cir. 2000) .................................................................................. 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 8

*Cirrus Logic Sec. Litig.*,
946 F. Supp. 1446 (N.D. Cal. 1996) ....................................................................... 12

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .................................................................................. 17

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................ 21

*Dougherty v. Esperion Therapeutics, Inc.*,
905 F.3d 971 (6th Cir. 2018) ............................................................................ 19, 20

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ............................................................................................... 11

*Fidel v. Farley*,
2001 WL 36126923 (W.D. Ky. June 27, 2001) ...................................................... 23

*Foman v. Davis*,
371 U.S. 178 (1962) ............................................................................................... 35

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ........................................................................ 9, 10, 26

Case 3:19-cv-00461    Document 69    Filed 05/22/20    Page 4 of 46 PageID #: 1378

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011)..................................................................................24, 25, 32, 34

*Freed v. Universal Health Servs.*,
2005 WL 1030195 (E.D. Pa. May 3, 2005) ............................................................. 15

*Gargiulo v. Isolagen, Inc.*,
527 F. Supp. 2d 384 (E.D. Pa. 2007) ...................................................................... 24

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ...................................................... 18

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)...................................................... 17

*Halford v. AtriCure, Inc.*,
2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ....................................................... 31

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)..................................................................... 33

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001)..................................................................... 10, 18, 25, 26

*Hoff v. Popular, Inc.*,
727 F. Supp. 2d 77 (D.P.R. 2010) ........................................................................... 24

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000).................................................................................. 28

*In re Accredo Health, Inc. Sec. Litig.*,
2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005)...................................................... 32

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009)................................................. 33, 34

*In re Ancor Commc'ns.*,
22 F. Supp. 2d 999 (D. Minn. 1998) .................................................................. 30, 31

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997).............................................................................. 12, 15

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006)............................................................... 22, 23

iv

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004) ................................................................................ 23

*In re Ferro Corp.*,
2007 WL 1691358 (N.D. Ohio June 11, 2007) ...................................................................... 32

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004) ................................................................................. 23

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................................... 12

*In re Harman Intern. Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. June 23, 2015) .................................................................................. 23

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ............................................................................ 26, 30

*In re Kindred Healthcare, Inc. Sec. Litig.*,
299 F. Supp. 2d 724 (W.D. Ky. 2004) .............................................................................. 20, 21

*In re L & L Energy, Inc.*,
2013 WL 6244654,n.5 (W.D. Wash. Dec. 3, 2013) ............................................................... 15

*In re Lason, Inc. Sec. Litig.*,
143 F. Supp. 2d 855 (E.D. Mich. 2001) ........................................................................... 20, 24

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................................... 32

*In re Miller Energy Res. Sec. Litig.*,
2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ...................................................................... 9, 24

*In re Nash Finch Co. Sec. Litig.*,
502 F. Supp. 2d 861 (D. Minn. 2007) ................................................................................... 24

*In re NUI Sec. Litig.*,
314 F. Supp. 2d 388 (D.N.J. 2004) ....................................................................................... 15

*In re Omnicare, Inc. Sec. Litig.* ("*Omnicare I*,
769 F.3d 455 (6th Cir. 2014) .......................................................................................... 10, 29

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................................... 18, 21

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000) ........................................................................21, 23, 31

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) ........................................................................34

*In re Prudential Sec. Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................22

*In re Regeneron Pharm. Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ........................................................................19, 20

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................................20, 21

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011) ........................................................................31

*In re SCB Computer Tech. Inc. Sec. Litig.*,
149 F. Supp. 2d 334 (W.D. Tenn. 2001) ........................................................................32

*In re Silver Wheaton Corp. Sec. Litig.*,
2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) ........................................................................29

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999) ........................................................................21

*In re Stone & Webster, Inc. Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005) ........................................................................20

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000) ........................................................................19, 20

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ........................................................................28

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................................24, 28

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) ........................................................................15

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013) ........................................................................18

*La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*,
  622 F.3d 471 (6th Cir. 2010)..................................................................................26

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008)..............................................................................28, 32

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)..................................................................................33

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008)..............................................................................20, 31

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012) ..................................................................21

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F.Supp. 1297 ....................................................................................................29

*Marucci v. Overland Data, Inc.*,
  1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) ..........................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...............................................................................................8, 10

*Mediacom LLC v. BellSouth Telecommunications, Inc.*,
  672 F.3d 396 (6th Cir. 2012)................................................................8, 13, 14, 15

*Miller v. Champion Enters., Inc.*,
  346 F.3d 660 (6th Cir. 2003)..................................................................................22

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................17, 18

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
  929 F. Supp. 2d 740 (M.D. Tenn. 2013) ........................................................26, 32, 34

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .........................................................................................11, 16, 17

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004)..................................................................................28

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...................................................................................23

*SEC v. Bankatlantic Bancorp, Inc.*,
   2015 WL 11142889 (S.D. Fla. Aug. 27, 2015) ................................................................ 16

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ................................................................................ 22

*Takara Trust v. Molex Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ................................................................ 21, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................ *passim*

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ................................................................................ 16

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................ 15

*Vanderbilt Univ. v. Pesak*,
   2010 WL 1406622 (M.D. Tenn. Apr. 6, 2010) ................................................................ 9

*Weiner v. Klais & Co.*,
   108 F.3d 86 (6th Cir. 1997) ................................................................................ 29

*Weiner v. Tivity Health, Inc.*,
   365 F. Supp. 3d 900 (M.D. Tenn. 2019) ................................................................ 11, 26

*Zwick Partners, LP v. Quorum Health Corp.*,
   2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ................................................................ 16

STATUTES

15 U.S.C. §78u-4(b)(1)(B) ................................................................................ 9

15 U.S.C. § 78u-5(b)(2)(A) ................................................................................ 20

15 U.S.C. § 78u-5(c)(1)(A) ................................................................................ 22

RULES

Fed. R. Civ. P. 15(a)(2) ................................................................................ 35

Fed. R. Civ. P 12(g) ................................................................................ 9

Lead Plaintiffs Arun Bhattacharya and Michael Gaviria ("Plaintiffs") respectfully submit this opposition to Defendants'[1] motion to dismiss (Dkt. Nos. 65 (the "Motion") & 66 ("Def. Br.")). As set forth herein, the Motion, seeking dismissal of the Consolidated Amended Class Action Complaint (Dkt. No. 61, the "Complaint"), should be denied in its entirety.

## I. INTRODUCTION

Plaintiffs allege a straightforward claim of securities fraud.[2] Community Health and its executives understated its provision for bad debts and overstated certain financial results to avoid triggering defaults on the Company's debt. Instead of coming clean to investors by restating their financial results, Defendants used a revision in the accounting guidelines as a pretext to clean up their books. Defendants did this by exploiting a provision in the Company's debt covenants that excluded the impact of expenses attributable to "changes in accounting principles" from required financial ratio threshold calculations. Thus, the Company was able to get its bad debt off its books without triggering a default of its debt convenants through its scheme.

While Defendants' scheme was effective in that it saved the Company from default, it caused Community Health's shareholders to suffer tens of millions of dollars in damages when the Company ultimately had to disclose the truth. At the end of the Class Period, the Company revealed that it had to ramp up its "bad debt" expense (for the third time in as many quarters) to more than $1 billion, amounting to a whopping 25% of revenues. Defendants claimed that this staggering growth in bad debt, which included a $591 million charge that the Company says was attributable to a $197 million increase in contractual adjustments and exactly double that figure ($394 million) to an increase in its bad debt allowance, was the result of the change in accounting rules. But analysts saw this for what it was: either a closet correction of deficient reserves or the creation of a new "cookie jar" reserve to enable future misstatements.

---

[1] Defendants are Community Health Systems, Inc. ("Community Health" or the "Company"), Wayne T. Smith ("Smith"), Larry Cash ("Cash") and Thomas J. Aaron ("Aaron").

[2] This is a class action on behalf of persons and entities that acquired the securities of Community Health between February 21, 2017 and February 27, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

1

Defendants do not have a reasonable defense for their conduct. Instead, they claim, improbably, that prior to the end of the Class Period, they had no idea that the Company's bad debt and contractual adjustments were overstated by over half a billion dollars. It was the "new systems and methodologies as well as additional information available," Defendants argue, that clued them in to the fact that *one-third of the Company's EBITDA* (rather than "a 0.6 percent increase in the estimated uncollectible revenue" (Def. Br. at 2)) was uncollectible. This is nonsense. Defendants always had this data—they simply turned a blind eye to it. Moreover, Defendants admit (as they must) that the accounting change did not affect the Company's historical financial results, meaning that Defendants' excuse for the overstatement fails on its own terms.

In sum, the Complaint sufficiently alleges that Defendants' omissions of present and historical fact are misleading and actionable, and were made with scienter. Therefore, the Motion must be denied in its entirety.

## II. STATEMENT OF FACTS

### A. Community Health Enters the Class Period With Precarious Finances

Community Health is one of the largest and most-leveraged public hospital companies in the United States. ¶¶25, 27. The Company acquired Trial Hospitals, Inc. ("Triad") for $6.836 billion in 2007 and Health Management Associates, Inc. ("HMA") for $7.3 billion in 2014. ¶¶28-29. Community Health funded these acquisitions principally with debt, including the assumption of $5.486 billion in indebtedness. ¶¶27-29. In addition to financial debt, cash flow at HMA was also constrained by uncollectible receivables, which it called bad patient debt. ¶29. By the end of 2016, immediately prior to the Class Period, Community Health was saddled with so much debt from its acquisitions that it had the highest external debt-to-EBITDA ratio among its peers. ¶31. Even after the acquisition, Community Health had problems integrating HMA's revenue: Confidential Witness 1—a director of finance, physician services from December 30, 2013 to December 2017—noted problems collecting HMA's receivables and generating cash flow from HMA's hospitals. ¶29. Meanwhile, Community Health held a fire sale of thirty hospitals in order to raise funds to pay

2

down its external debt. ¶36. Observers linked these divestitures to Community Health's increased incidence of internal debt, specifically bad patient debt. ¶37.

### B.     Community Health Suffers the Key Resignation of Its CFO

On February 22, 2017, one day after it reported a 2016 annual net loss of $1.7 billion, Community Health announced that one of its directors, and longtime CFO, Defendant Cash, resigned, effective May 16, 2017. ¶¶34-35. No explanation was given. ¶35. Defendant Aaron, who replaced Cash, had led the audit team at Deloitte & Touche LLP ("Deloitte") for Community Health, and was therefore in a unique position to influence how much auditor scrutiny the Company received. *Id.*

The Company richly rewarded its senior executives. For example, Community Health made its CEO, Defendant Smith, the highest earner among hospital executives by showering him with more than $1 million in bonuses between 2015 and 2017 even while its stock price tanked, on top of a $1.6 million base salary. ¶38.

### C.     Community Health's Lack of Internal Controls

Internally, Community Health had known deficiencies in the controls used to keep track of its billing and receivables. The Company's code-based, automated contractual allowance system, HMS Medhost, would often generate faulty bills resulting in tens of thousands of dollars in underpaid claims. ¶41. Even worse, a code-based error could repeat hundreds of times before being discovered. *Id.* As a result, Community Health often had to resort to manual attempts to recoup incorrectly billed amounts from payors, which often failed or devolved into legal action. ¶42. The Company also negotiated payment discounts with end patients on an *ad hoc* basis, creating further shortfalls. ¶44.

### D.     The Company Manipulates Financial Reporting to Avoid Triggering Debt Covenants

#### 1.     The Company's Crippling Debt Covenants

Throughout the Class Period, Community Health's credit facilities required the Company to maintain certain financial ratios, including "secured net leverage ratio" and "interest coverage

3

ratio," above defined thresholds. ¶45. Each depended on a Company-defined metric called "Consolidated EBITDA," a figure that the Company refused to report to investors during the Class Period. ¶¶45-47.[3] The "secured net leverage ratio" was defined as the ratio of (a) Total Secured Debt less cash and equivalents to (b) Consolidated EBITDA. *Id.* The "interest coverage ratio" was defined as the ratio of (a) Consolidated EBITDA to (b) consolidated interest expense for the period (the secured net leverage and interest coverage ratios are collectively referred to as the "Financial Ratios"). *Id.* Community Health would default if its secured net leverage ratio exceeded, or its interest coverage ratio fell below, specified thresholds. ¶¶46, 52. Thus, managing Consolidated EBITDA was critical to avoid default. ¶46.

Community Health's definition of "Consolidated EBITDA" contained a large loophole significant to this litigation. ¶¶45 n.12, 50. While bad debt expense would ordinarily be included in the calculation, thereby reducing Consolidated EBITDA, the Company was able to exclude any expense that could be characterized as related to "changes in accounting principles." ¶¶2, 50. If all else is held constant, a reduction in Consolidated EBITDA would increase the secured net leverage ratio and decrease the interest coverage ratio. As a result, the Company had a strong incentive to hide bad debt until it could fold the expense into a change in accounting. ¶¶163-64.

Applicable debt covenants required Community Health to have no more than $4.50 in net leverage for every $1 of Consolidated EBITDA and no more than $1 in interest expense for every $2 of Consolidated EBITDA it generated. ¶52. However, for 2018, they required the Company to reduce its net leverage ratio to 4:1. To boost its Consolidated EBITDA and avoid triggering a default under these debt covenants, the Company understated its bad debt expense from payors, overstated net operating revenues and EBITDA, and misrepresented the calculation of these figures

---

[3] "EBITDA" is an acronym that refers to a company's earnings before interest, taxes, depreciation, and amortization. ¶31 n.3. Community Health also reported a related figure that it styled "adjusted EBITDA," which it used in reporting its financial results and in determining its executives' incentive compensation. ¶¶2, 49, 100, 112, 123, 127, 128, 139, 185. Although it conceded that adjusted EBITDA is different from Consolidated EBITDA, the Company did not explain the difference to investors. ¶49.

4

in each of its periodic reports (*i.e.*, 10-K and 10-Q) and related filings and public statements during the Class Period. ¶¶6, 9, 100-10, 112-20, 123, 127-33, 135-36, 139, 144-48, 150.

### 2. Relevant GAAP Requirements

Prior to 2018, Generally Accepted Accounting Principles ("GAAP") allowed Community Health to recognize revenue if there was evidence of an arrangement, the Company delivered the service, its fee was fixed or determinable, and collection was probable. ¶65 (citing Accounting Standard Codification ("ASC") 605). Community Health grouped its revenue streams into three categories: private insurer (*e.g.*, Blue Cross/Blue Shield), public insurer (*e.g.*, Medicare and Medicaid), and self-pay. ¶¶3, 26. Revenue that Community Health recognized was subject to "contractual adjustment" (if the payor was a private or public insurer) or "discount" (if the patient was "self-pay"), both of which referred to an agreed reduction in price from the Company's full established rates. ¶¶7 n.1, 66. These discounts and contractual adjustments were significant; after deducting them from its gross revenue, Community Health's "net operating revenue." (its gross revenue less contractual adjustments and discounts) was only around 10% of its gross revenue. ¶66.

GAAP requires companies to report receivables at their proper carrying value. ¶¶59, 63. As a result, Community Health was required to maintain and periodically record an "allowance for doubtful accounts" to reflect receivables that it determined would remain uncollected and to regularly and methodically assess the collectibility of its receivables at each reporting date. ¶¶58, 63. If a receivable was determined to be uncollectible, GAAP required the Company to deduct an equivalent bad debt expense from its net income. ¶63. Because recording a bad debt expense is dependent upon determining that a receivable was uncollectible, the Company had discretion to choose the amount of receivables that it considered uncollectible at any given reporting period. ¶79.

By altering the amount of its uncollectible receivables, the Company could manipulate its EBITDA to serve two goals: first, a higher EBITDA would enable it to incur higher amounts of debt while staying within the Financial Ratios. ¶163. Second, the Individual Defendants' incentive compensation was tied to Community Health's EBITDA, such that a higher EBITDA (whether from more revenue or less bad debt expense) would translate to higher bonuses. ¶185.

On May 28, 2014, the Financial Accounting Standards Board ("FASB")[4] announced a new standard to recognize revenue, which was codified as ASC 606. ¶74. Where the prior framework enabled the Company to inflate its net operating revenue by understating the provision for bad debt (¶79), the new framework did not allow Community Health to recognize revenue unless and until it could determine the amount of that revenue it *actually expected* to collect. ¶80. After ASC 606's effective date, if Community Health could not determine the amount of revenue it *would* receive, it was required to *predict* its expected value. ¶80.

In other words, under the "old" system (in place until the end of 2017), Community Health reported revenue without determining whether it would actually receive the reported amount, *and then independently* expensed other debt that it no longer considered collectible. ¶¶61-63. Under the "new" system (in place for the Company after December 15, 2017), Community Health could not recognize revenue *until* it determined how much of the receivable it actually expected to collect, and then could only recognize the amount it expected to collect as revenue. ¶80. Even though the sequencing of the two standards was different, because both focus on the amount of money that is expected to be received, the "net" figures under the two standards (gross revenue less contractual adjustments, discounts, and bad debt expense) should have been approximately the same. ¶80. Critically, the FASB guided that the new standard (1) was prospective only (*i.e.*, not backwards looking) and (2) "*does not change the accounting for receivables*." ¶¶171, 64.

### 3. Defendants Manipulate Community Health's Financials

Community Health adopted ASC 606 on January 1, 2018, not before. ¶¶75-77, 114. However, because the consolidated EBITDA calculation allowed it to exclude any reductions in revenue attributable to a change in accounting principles, the Company improperly delayed recognizing the full amount of bad debt expense during the period in which it was incurred. ¶¶2, 50-51, 163-64. By this machination, Defendants were able to avoid triggering debt default during the Class Period. ¶2.

---

[4] The FASB is responsible for promulgating and codifying GAAP. *See* ¶53.

6

Additionally, even the artificially understated amounts of carried bad debt disclosed during the Class Period were not accurate and violated GAAP. Instead of correcting a past period understatement of bad debt expense by issuing a restatement (as GAAP required), Defendants reported one-time "catch-up" charges to write off Community Health's substantial and understated bad debt. ¶¶94-96. Though not reported to the market as such, these charges were understood internally to be restatements. ¶¶168-169. Even these artificially reduced charges caused Community Health's bad-debt-to-net-revenue ratio to swell from 13.2% in the first quarter to 14.1% in the second quarter. ¶¶125, 127. The sudden increase in reported bad debt depressed net operating revenue, leading to "sluggish trends" cited by analysts. *Id.* Had Community Health properly restated the full amount of bad debt, the effect would have been much worse because Defendants would have had to provide investors with a full explanation of the error(s), the nature of any related correction, and its actual proximity to triggering default under loan covenants. ¶174.

### E. Defendants' Deception Is Revealed

After the market closed on February 27, 2018, Defendants revealed that Community Health ramped bad debt expense (for the third time in as many quarters) to more than $1 billion in the quarter, amounting to a whopping 25% of revenues, including a $591 million charge it called a "change in estimates" allegedly resulting from a change in accounting rules that purportedly forced them to review data they previously declined to use. ¶¶9, 154. Of the total $591 million charge, Community Health attributed $197 million to an increase in contractual adjustments, while attributing exactly double that figure ($394 million) to an increase in its bad debt allowance.

Multiple former employees concede that this charge was a stealth restatement. Confidential Witness 3, a Vice President of Finance – 1, used the term "restatement" to describe the $591 million charge and explained that the Company utilized ASC 606 for the express purpose of restating the Company's previously reported financials. ¶168. Likewise, Confidential Witness 4, a financial analyst for the Company, admitted that the $591 million charge related to the reporting of assets and liabilities acquired more than four years earlier, in 2014, in the HMA acquisition. ¶169.

7

Analysts also understood that the Company's accounting was manipulative: J.P. Morgan warned that the $591 million charge should properly be viewed as either a closet correction of deficient reserves or the creation of a new "cookie jar" reserve to enable future misstatements, while Cantor Fitzgerald characterized the charges as "major revisions of historical results." ¶¶11, 155-156.

Even in a candid moment in the earnings call that day, Defendant Aaron admitted that the write-down related to "self-pay" that the Company had "kept on its books" as well as problems with third-party denials that the Company already anticipated, not anything truly related to the accounting change. ¶158. He also acknowledged that the Company viewed ASC 606 as a means to rid its books of bad debt, and admitted that the write-down concerned receivables. ¶¶160-161.

On the news that the Company had taken this charge related to existing "self-pay" debt it "kept on the books" and already anticipated third-party denials, the Company's share price fell $1.06 per share, more than 17%, to close at $5.12 per share on February 28, 2018, on unusually heavy trading volume. ¶167. The decline, which market observers quickly linked to a "jump in allowances for bad debts" resulted in the destruction of over a hundred million dollars in market capitalization. ¶¶2, 8, 12, 13, 125-26, 143, 166-167.

## III. ARGUMENT

### A. Applicable Standards Disfavor Defendants' Motion

To survive a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);[5] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45-47 (2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Put another way, a complaint simply must contain "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). A motion to dismiss is not the time to engage in fact finding or weigh evidence outside the pleadings. *See Mediacom LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 399 (6th Cir. 2012).

---

[5] Unless otherwise noted, citations and quotations are omitted and emphasis is added throughout.

The elements of a § 10(b) claim are: (1) a material misrepresentation or omission of fact (*i.e.*, falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564, 569 (6th Cir. 2008). Although the PSLRA raised the pleading bar, when considering a motion to dismiss a § 10(b) claim, a court is still required to "accept all factual allegations in the complaint as true." *Id.* at 570 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Thus, surviving a motion to dismiss is not the insurmountable standard that Defendants represent it to be. By their Motion, Defendants only contest two elements of Plaintiff's § 10(b) claim: falsity and scienter.[6] As to these and all required elements, the Complaint is sufficient.

**B.     The Complaint Alleges Actionable False and/or Misleading Statements**

Because the "fundamental purpose" of the Exchange Act is to implement "a philosophy of full disclosure," Defendants are liable under § 10(b) for both affirmative misstatements and material omissions. *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy."). Under Rule 9(b) and the PSLRA, plaintiffs must plead falsity with particularity, identifying the statements alleged to have been misleading and the reason(s) why the statement is misleading. 15 U.S.C. §78u-4(b)(1)(B); *Dana I*, 547 F.3d at 570 ("At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied.").[7] The statement/omission also must be material. *Basic*, 485 U.S. at 232 (materiality satisfied if there is a substantial likelihood that a reasonable investor would have viewed disclosure of an omitted fact "as having significantly altered the 'total mix' of information made available.").[8]

---

[6] Defendants waived their right to challenge the other elements of § 10(b). *See* Fed. R. Civ. P 12(g); *Vanderbilt Univ. v. Pesak*, 2010 WL 1406622, at *34 (M.D. Tenn. Apr. 6, 2010). Accordingly, non-contested elements are not addressed herein.

[7] *See also In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) (falsity/materiality alleged where complaint stated why three types of statements were false and misleading, the dates of the statements, and the defendant to whom each alleged false statement was attributed).

[8] *In re Omnicare, Inc. Sec. Litig.* ("*Omnicare I*"), 769 F.3d 455, 472 (6th Cir. 2014) ("Put another way, a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *Matrixx*, 563 U.S. at 45-47 (lack of statistical

9

The Sixth Circuit has explicitly cautioned courts to "tread lightly" with regard to falsity and materiality "at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context," and to avoid "prematurely dismissing suits[.]" *Omnicare I*, 769 F.3d at 472. "At this stage in the proceedings, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material *unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.*" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001) (emphasis in original) (overruled on other grounds by *Tellabs*[9]).

Here, Plaintiffs identify the "who, what, when, where and why" of each material misrepresentation. This is not in dispute. For each allegedly misleading statement, Plaintiffs identify the speaker; what the statement was; when and where it was made; and the reasons why it was false. *See* ¶¶100-101, 102-03, 104, 105-06, 107-08, 109-10, 112-13, 115-16, 117, 118-19, 120, 123, 127, 128-29, 130-32, 133, 134, 135, 136, 139-40, 144, 145-48, 149, 150. This satisfies the standard in this Circuit for identifying misrepresentations. *See Dana I,* 547 F.3d at 570.

Faced with this reality, Defendants simply ignore the allegations of the Complaint, an approach antithetical to the governing standard, which requires that Plaintiffs' well-pleaded claims be accepted as true. However, Defendants' self-serving assertion that "Plaintiffs have not alleged a single fact to suggest" that Defendants statements were misleading, does not make it so. *See, e.g.*, Def. Br. at 16. The Complaint more than sufficiently describes Defendants' scheme and the reasons why their statements were false. *See* ¶¶100-101, 102-03, 104, 105-06, 107-08, 109-10, 112-13, 115-16, 117, 118-19, 120, 123, 127, 128-29, 130-32, 133, 134, 135, 136, 139-40, 144, 145-48, 149, 150. Nor are Plaintiffs' claims limited to understatement of receivables, as Defendants alternatively

---

significance of study results did not preclude finding of materiality because it was "substantially likely that a reasonable investor would have viewed [the omitted] information" as an important part of the "total mix" of available information).

[9] *Helwig* required the inference of scienter to be the "most plausible" inference. 251 F.3d at 553. *Tellabs lowered* the pleading standard, requiring only that the inference of scienter be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. *See* Section III.C., *infra* (scienter standard in Sixth Circuit).

assert throughout their brief. *See, e.g.,* Def. Br. at 1, 15-16. In addition to identifying affirmative misstatements, the Complaint also pleads seven categories of material adverse facts that Defendants omitted from their Class Period statements to investors:

> (1) that the Company excluded from its "bad debt" calculations and included in revenues receivables from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed; (5) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (6) that, as a result, the Company had overstated its net operating revenue, EBITDA, and financial results; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. [*See, e.g.*, ¶6]

### 1. Defendants Claim That an Incorrect Standard Applies to Plaintiffs' Allegations of Falsity

Defendants base their argument on a falsity standard that is simply not the law in this or any other jurisdiction. The applicable standard is well-settled and fatal to Defendants' motion: once a defendant speaks upon a subject he "cannot omit material facts related to that issue so as to make [his] disclosure misleading." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019). A speaker must provide "'the whole truth' . . . literal accuracy is not enough." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

Defendants' assertion that Plaintiffs must "provide that the accounting practices were so deficient that no reasonable accountant would have made the same decision," Def. Br. at 18, misstates the law. The "reasonable accountant standard" only applies to auditors, not issuers or executives. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976) ("[W]ith respect to certain classes of defendants, Congress did create express liability predicated upon a failure to exercise reasonable care," in particular ". . . 'experts', such as accountants for misleading statements in portions of registration statements for which they are responsible"). Even if the auditor standard were to apply here, Defendants' own cited cases recognize that the reasonableness of an accounting

11

decision is a question of fact, precluding dismissal of Plaintiffs' claims. *See Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1463 (N.D. Cal. 1996) ("[T]he Court finds that there is a triable issue of fact as to whether Cirrus's reduction of the 120-day inventory reserves for the Stingray product was a reasonable accounting decision in compliance with GAAP."); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("it is a factual question whether [defendant's] accounting practices were consistent with GAAP"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) ("Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law.").[10]

### 2. Defendants' Admissions and Community Health's Employees Confirm Plaintiffs' Allegations

A plain reading of Defendants' own admissions and the analysts' reaction at the end of the Class Period confirm the falsity of Defendants' Class Period statements. At that time, Defendants admitted that they *reassessed their historical results*; determined that their *historical financial results*, particularly their receivables, were overstated; and that as a result, the Company decided to ramp its bad debt to more than $1 billion (a staggering 25% of revenues), including a $591 million charge deemed "a change in estimates." *See* ¶¶9, 152-54. Defendants do not contest that the prior estimates were inaccurate when issued. Instead, they assert that the "change in estimates" was the result of new "data extraction techniques" and "collection data," including "portfolio-level data related to historical collection amounts on an individual hospital and patient level that previously had not been readily available." Def. Br. at 11. But Defendants had this data throughout the Class Period: the Company issued bills based upon the particular services rendered to a particular patient by a particular hospital, *see, e.g.,* ¶¶3-6, and purportedly reviewed collectibility for patient-level events such as personal bankruptcies, *see, e.g.,* ¶114. Only by consciously excluding that data were

---

[10] The Sixth Circuit, in a different context (reliance), has likewise determined that reasonableness is a question for the jury. *See Bass v. Janney Montgomery Scott, Inc.,* 210 F.3d 577, 590 (6th Cir. 2000) (denying summary judgment because "the question of whether [plaintiff's] reliance was reasonable is ***beyond doubt a question of fact for a jury to decide***, and not a fit subject for judgment as a matter of law").

Defendants able to understate bad debt estimates.

Defendants' position, that this historical reassessment of the Company's financial results was mandated by future implementation of ASC 606, Def. Br. at 20,[11] shows no pleading defect. At most, it creates a triable issue of fact to be resolved by the jury. *See Mediacom*, 672 F.3d at 399 (factual disputes are not to be resolved on a motion to dismiss). As stated in the Complaint, ASC 606 only provided a new accounting treatment for recognizing *future* revenue. ¶¶77-81. The Complaint notes further that Defendant Aaron agreed that adoption of ASC 606 did not affect the collectibility of revenue recognized in prior quarters—"whatever we were going to recover on our receivables is unchanged by the accounting." ¶159. If Defendants wish to press an alternative interpretation of ASC 606, they will need to wait until trial.

Defendants' alternative explanation is at odds with prior representations. ASC 606 did not require companies to reassess historical revenue, and Community Health did not actually believe that ASC 606 had any material impact on past results. Defendants concede this when stating that "Mr. Aaron also explained that the Company modeled the new revenue recognition method against recent prior years and found that the method did not materially impact those recent prior years." Def. Br. at 11-12. Likewise, Defendant Aaron also conceded that "whatever we were going to recover on our receivables is unchanged by the accounting," ¶159, demonstrating that ASC 606 did not impact revenue recognition in prior quarters and that the Company had failed to properly reserve enough bad debt using the collectibility information that was available to them. ¶¶73-84. In fact, Defendant Aaron went even further, admitting that if the Company had adopted ASC 606 earlier, they would have used it as an excuse to clear their books of bad debt, as they ultimately did: "Had we adopted that in 2016, we would have knocked our carried receivables down in that year." ¶160. Thus, the well-pleaded facts indicate that adoption of ASC 606 was used as a tool to manipulate the timing of receivable write-downs.

Similarly, Defendant Aaron also admitted that that the write-down related to "self-pay" that

---

[11] Defendants claim that the "mandatory change in GAAP principles requested the Company to change its systems and processes for estimating uncollectiable revenue." Def. Br. at 20. While accurate as to future quarters, Defendants ignore that this irrelevant to the Company's past bad debt.

13

the Company had "kept on its books" as well as problems with third-party denials that the Company already anticipated, not anything truly related to a change in accounting. ¶158. As he explained:

> *So when you compare the size of the adjustments, it's going to depend on how filers would have historically set their reserves*. We've had higher days. *We kept our self-pay on our books. Internally, we pursued those and gone after those for collection. So moving to this new method, it is a more conservative method*. *We had to anticipate with the new standard, we felt things that might impact the collectability and make sure that the amounts we set up were more conservative.* So that included for – if you take a look at third-party payments, anticipated denials using our history on the transactions to anticipate denials from third- party payers, any audits that may come out from third-party payers and also our self-pay.

¶158. Accounts that the Company had sent to collections but still "kept on the books" caused Community Health to overstate the collectibility of "self-pay" patients. *Id.* Moreover, the accounting change did not impact whether a more "conservative method" should have been used in prior quarters; it merely impacted whether delayed write-downs would be included or excluded from crucial debt covenant calculations.[12]

Analyst reaction confirms the plausibility of Plaintiffs' alleged theory of falsity. For example, J.P. Morgan analysts expressed "skepticism" of the official explanation because, "[g]iven the magnitude of the charge and CYH's write-off history," the "charges [were] either (1) implicit acknowledgement of historic EBITDA/EPS overstatement or (2) . . . an opportunity to pad reserves to draw upon for future period earnings (cookie jar)." ¶155. Cantor Fitzgerald confirmed that the machinations "*represent major revisions of historical results.*" ¶156. Similarly, former employees viewed the February 2018 disclosure as a disguised restatement, not as a charge due to the prospective adoption of a new accounting standard. *See, e.g.*, ¶168. Investor reaction likewise reflected the gravity of Defendants' Class Period lies: the February 2018 disclosures decimated the

---

[12] In addition, Defendant Aaron admitted that 90% of the $197 million write-down for contractual allowances "would be for receivables…. And under the standard, we just have to anticipate what the future denial activity is going to be from payers and how we think we're going to outcome to a point where we don't think our estimate is going to be short." ¶161. He did not claim to have any new data that would aid in "anticipat[ing] what the future denial activity is going to be," but rather acknowledged that the Company had no basis to claim, during the Class Period, that it collected substantially all third-party receivables. *Compare* ¶162*, with* ¶¶115, 131, 145, 147 ("the Company collects substantially all of its third-party insured receivables").

Company's stock price. ¶161.

"It is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage. . . . A plaintiff is only required to allege facts and circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). That Defendants have a different interpretation of their conduct, *see* Def. Br. at 12, demonstrates that there are factual disputes and credibility determinations for a jury to resolve. *See Mediacom*, 672 F.3d at 399.

Disagreements about the "truthfulness" of statements "amount to fact-based disputes that the Court [should] not credit on a motion to dismiss." *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Likewise, a motion to dismiss cannot weigh conflicting factual interpretations. *In re L & L Energy, Inc.*, 2013 WL 6244654, at \*3 n.5 (W.D. Wash. Dec. 3, 2013) (PSLRA does "not authorize the Court to resolve disputed issues of fact when evaluating the adequacy of the pleading"). The Complaint meets the standard set forth in *Dana I* by identifying the allegedly misstatements and the reasons for falsity.[13]

### 3. Defendants' Misrepresentations Are Not Non-Actionable Opinions or Puffery

Defendants mistakenly contend that their misleading statements were opinions. Def. Br. at 21-22. As an intitial matter, many of the statements referenced are factual. For example, the present

---

[13] Defendants' claim that the Complaint must allege the exact amount that the receivables were overstated at various times is both factually and legally wrong. As an initial matter, the Complaint ***does*** quantify the overstatement. *See* ¶154 (identifying a $394 million bad debt provision to correct for overstatement of receivables/understatement of bad debt) and ¶161 (all but 10% of a $197 million "contractual allowance" was "for receivables"). Moreover, the sole case Defendants cite is the fifteen-year-old, out-of-circuit, unreported decision, *Freed v. Universal Health Servs.*, 2005 WL 1030195 (E.D. Pa. May 3, 2005). *Freed* is an outlier that is based on another case's misinterpretation of *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997). The *Burlington* court held that such allegations were sufficient, not that they were necessary, to state a claim. 114 F.3d at 1422. Other post-*Burlington* decisions in the Third Circuit have held that, like here, allegations that receivables should have been characterized as bad debt were sufficient without articulating the exact amount of the overstatement. *See, e.g.*, *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 402 (D.N.J. 2004) (rejecting that plaintiffs must allege why the stated reserves were inadequate and what were the specific amounts of allegedly undisclosed bad debt). This makes sense: if Defendants had falsely reported the amount of receivables and bad debt each quarter, then it could be impossible for Plaintiffs to granularly quantify the proper amount without discovery.

tense statement that the Company "collects substantially all of its third-party insured receivables" is factual. *See, e.g.*, ¶147. Likewise, the amount of receivables on the Company's books are statements of current fact. However, even if the Court deems all of the Company's financial statements regarding accounts receivables as opinions, which it should not, they are still actionable under *Omnicare*.

In *Omnicare*, the Supreme Court held that opinion statements are not wholly immune from liability and may be considered material misstatements under several circumstances. 575 U.S. at 188-89. A statement of opinion violates securities laws if: (1) "the opinion qualifies as an untrue statement of fact (the opinion is not sincerely held by the speaker or the opinion is embedded with material false statements)"; or (2) "the opinion has an omission of material facts which renders the opinion misleading (the speaker omitted material facts about the speaker's inquiry into or knowledge underlying the opinion and the omission rendered the opinion misleading to reasonable investors)." *SEC v. Bankatlantic Bancorp, Inc.*, 2015 WL 11142889, at *1 (S.D. Fla. Aug. 27, 2015); *accord Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018) ("An opinion statement may also become actionable if it is paired with a sufficiently material omission that makes the statement misleading"). Further, under *Omnicare*, subjective disbelief is ***not required***, as opinions "sincerely held and otherwise true as a matter of fact, may nonetheless be actionable ***if the speaker omits information whose omission makes the statement misleading to a reasonable investor***." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Thus, a defendant is liable if they "omit[] material facts about [their] inquiry into or knowledge concerning a statement . . ., and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189; *Quorum Health*, 2018 WL 2933406 at *5 ("Whether a statement is 'misleading' depends on the perspective of a reasonable investor" under *Omnicare*).

Here, Defendants' statements regarding the Company's financial results, including performance metrics that could trigger defaults on the Company's credit facilities, omitted that there were growing problems with its aged receivables from uninsured "self-pay" patients, debts related to co-pays and deductibles from insured patients, and disputed payments from third-party payors.

16

For example, the most reasonable inference an investor can draw from Defendants' statement that the Company "collects substantially all of its third-party insured receivables" is that the Company was actually collecting all of these receivables. To avoid misleading investors by the plain inference of their statements, Defendants were required to disclose that they had collectibility problems with certain types of accounts. Such omitted facts would unquestionably have been material to investors because they "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. Accordingly, the statements are actionable.

Defendants' puffery argument also lacks merit. Defendants claim that discrete segments of overall misleading statements are "immaterial statements of optimism, opinion, and subjective characterizations and analyses, and are understood by investors as mere 'puffery.'" Def. Br. at 21-22. But "puffery" protects only "loosely optimistic" statements that are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). What matters is not the particular phrase used, but the context. *Id.*; *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *18 (M.D. Tenn. Dec. 18, 2017) (rejecting puffery contentions and finding materiality to be a question for the jury). Defendants' artfully-edited snippets are not to be assessed "in a vacuum, plucking the statements out of their context to determine whether the words, taken per se, are sufficiently vague so as to constitute puffery, but rather [the court] will examine the entire statement and its circumstances to determine if it is actionable." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

When viewed in context, Defendants statements were neither "squishy" nor "untethered to anything measureable." *See* Section III.B.2., *supra*. To the contrary, each was specific to discrete accounting controls, and each was tethered to the measurement of receivables, bad debt and debt covenants. *Id.* Their clear falsity cannot be excused as mere "puffery." Moreover, just because certain statements "are predicated with indications that the speaker 'thought' or 'believed' a given statement" does not mean they are puffery. *Impax Labs.*, 36 F. Supp. 3d at 967; *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("It is disingenuous to suggest that factual

17

assertions are puffery and opinion that no reasonable investor could reasonably rely on for their truth simply because Oxford claims only to have stated that it believes in their truth.").

### 4. Defendants' Omissions Were Material

Without directly addressing materiality, Defendants repeatedly imply that their omissions were immaterial because "the $591 million charge represented only a 0.3 percent increase in the estimated uncollectible revenue for 2017." *See, e.g.*, Def. Br. at 2, 12. Determining whether a misstatement is material is not properly decided on a motion to dismiss. *Helwig*, 251 F.3d at 563 (Materiality is not grounds for dismissal "*unless* 'the alleged misstatements or omissions' *are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*.") (emphasis in original); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *4 (N.D. Ohio Aug. 18, 2014) (reasonable investor standard involves mixed questions of law/fact outside the ambit of a motion to dismiss).

Here, what Defendants attempt to obscure is that the increase to "bad debt" expense, which included the $591 million charge, at the end of the Class Period (for the third time in as many quarters) amounted to a whopping ***25% of revenues***. *See* ¶9. Thus, the charge itself constituted well more than 10% of revenues. Certainly, more than 10% of revenues is a material amount and not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig*, 251 F.3d at 563. That shares dropped 17% in reaction to end-of-Class-Period disclosure confirms the materiality of the information Defendants had previously concealed. *Marucci v. Overland Data, Inc.*, 1999 WL 1027053, at *9 (S.D. Cal. Aug. 2, 1999) ("swift and severe drop in the share price supports the materiality of Defendants' false representation"); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) ("A drop in stock price, if relevant, tends to establish materiality, *i.e.*, whether reasonable investors would consider the information to be significant or to have altered the total mix of information affecting their investment decisions.").

**5.    Defendants' Misrepresentations Are Not Protected by the Safe Harbor or Bespeaks Caution Doctrine**

Defendants argue that all of the misrepresentations alleged in the Complaint are forward-looking statements and that all of Plaintiffs' claims are therefore subject to dismissal pursuant to the PSLRA's safe harbor and the bespeaks caution doctrine. Def. Br. 34-35. The safe harbor, however, does not protect statements of present or historical fact, and it does not protect material omissions. Only some of the statements challenged in the Complaint are even debatably forward-looking, and *all* of the statements are being challenged *both* as affirmatively false misstatements *and* for being misleading due to material omissions. The safe harbor, therefore, only potentially applies to a relatively small subset of Plaintiffs' claims: those that are based on purely forward-looking statements and only to the extent that those statements are affirmatively false, rather than for omitting facts necessary to make the statements not misleading.[14]

**a)    The Misrepresentations Are Not Forward-Looking Statements, but Statements of Present Conditions**

The Sixth Circuit has held that the PSLRA safe harbor is inapplicable where "the truth or falsity of [a defendant's] statements was discernible at the time they were made." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) ("Representations of historical or current fact do not qualify for the PSLRA's safe harbor."); *In re Regeneron Pharm. Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000) ("The statutory safe harbor . . . does not insulate defendants from private securities liability based on statements that misrepresent historical/hard current facts.") (citing cases). Further, the clear language of the PSLRA expressly excludes from the safe harbor statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." *Id.* (quoting 15 U.S.C. § 78u-5(b)(2)(A)). Moreover, statements that incorporate both forward-looking elements and representations of present fact are not protected

---

[14] To the extent that the safe harbor or the bespeaks caution doctrine potentially applies to any of Plaintiffs' claims, the challenged misstatements are not protected from liability because they were not accompanied by adequate cautionary language and were made with contemporaneous actual knowledge of their falsity. *See infra* at III.B.5.c-d..

by the safe harbor with respect to their representations of present fact. *See Regeneron*, 2005 WL 225288, at *13; *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 860 (E.D. Mich. 2001) (finding that the safe-harbor did not apply to statements "based on fraudulent historical and current facts" that "were mixed with forward looking statements). [15]

Many of the misstatements alleged in the Complaint involve statements of present fact concerning the Company's financial results. *See, e.g.*, ¶101 ("Adjusted EBITDA *was* $2.225 billion . . . . Provision for bad debt was $2.837"); ¶102 ("EBITDA of $564 million for the fourth quarter was within our guidance . . . EBITDA cushion on the senior net leverage ratio *was* 12%, and the cushion on interest coverage is 18%"); ¶104 ("our provision for bad debts *decreased* to $2.8 billion, or 13.3% of operating revenues (before the provision for bad debts) for the year ended December 31, 2018"); ¶118 ("our EBITDA cushion on the senior secured ratio *was* 11% and our EBITDA cushion on our interest coverage *was* 16%.").[16] And a number of the most critical misstatements involve representations that Community Health *had historically* collected its receivables[17] or *had adequate internal controls* at the time the statement was made.[18] These statements were verifiably false when made, as Defendants' admissions make clear. Such "separable statements of fact that are not merely assumptions upon which forward-looking statements were made" are actionable. *See Dougherty*, 905 F.3d at 984.

Defendants err in their claim that any statement regarding a reserve is forward-looking. Def. Br. at 34. Defendants' cited cases actually demonstrate how the statements here are not forward-looking. For example, in *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724 (W.D. Ky. 2004), the statements regarding reserves that the Court found forward-looking did not include actual bad debt or other financial results that were verifiably false like here; instead they were vague

---

[15] *Accord In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005).

[16] It defies reason that a past tense statement that was false at the time it was made is somehow forward-looking, yet that is what Defendants are claiming.

[17] *See, e.g.*, ¶105 ("The Company collects substantially all of its third-party insured receivables").

[18] *See, e.g.*, ¶107.

statements regarding whether they believed their reserves were adequate, such as "the expectation of Kindred's management is that current reserves are adequate;" "Management believed that Kindred adequately recorded reserves for professional liability;" and the company "indicated that it was currently comfortable with its reserves." 299 F. Supp. 2d at 735-38. Thus, falsity could not be determined at the time the statements were made in that case, which makes it non-applicable to the present situation. Here, for example, the statements that "the Company *collects* substantially all of its third-party insured receivables" are verifiably false at the time they were made and are not conditional on some future event.

### b) The Safe Harbor Does Not Protect Material Omissions

"The safe harbor also does not protect material omissions." *Salix*, 2016 WL 1629341, at *9; *Molex*, 429 F. Supp. 2d at 974 ("it is axiomatic that the failure to make a statement cannot be forward-looking"); *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 690 (M.D. Tenn. 2000) ("By definition, the bespeaks caution doctrine applies only to *affirmative*, forward-looking statements") (emphasis added); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 944 (M.D. Tenn. 1999) (same). This is true, "*regardless of whether the statements thereby rendered misleading were forward-looking*." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (emphasis added); *see also In re Oxford Health Plans*, 187 F.R.D. at 141 ("[P]laintiffs . . . are not relying on the falsity of Oxford's financial projections . . . but rather the defendants' failure to disclose historical and existing material facts . . . . The safe harbor and bespeaks caution doctrines do not apply to these omissions."); *see Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) ("the PSLRA's safe harbor does not apply" to "Defendants' alleged omission of present facts").

In this case, the principal allegations of falsity are based on a failure to disclose. In particular, the Complaint alleges that each of the alleged misstatements was *both* materially false and misleading (*i.e.*, made affirmative, material misstatements) *and* omitted to state material facts necessary to make the statements not misleading (*i.e.*, made material omissions). To the extent that the Complaint's falsity allegations are based on omissions, the PSLRA's safe harbor provision and

21

the bespeaks caution doctrine are inapplicable.

c)    **Defendants' Risk Disclosures Did Not Contain *Meaningful* Cautionary Language**

Even if the safe harbor might otherwise apply to a statement in this case,[19] it cannot protect Defendants' misstatements from liability because they are not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the . . . statement . . . ." 15 U.S.C. § 78u-5(c)(1)(A); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

Defendants have the burden to show that the "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758,772 (2d Cir. 2010). Here, Defendants fail to meet this burden.

In particular, Defendants' naked warnings about "risks and uncertainties" were insufficient to place investors on notice of the known risks inherent in their investments. First, the supposed cautionary language Defendants cite was so generic that it would apply to any company that had any receivables. *See, e.g.*, Def. Br. at 7 ("Actual payments we received could be different from the amounts we estimate and record."). Of course, there are always risks that customers will not pay their bills or that rules and regulations may change. But stating as much does not make their boilerplate disclosures meaningful. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749-50 (S.D. Ohio 2006) ("The requirement for 'meaningful cautionary language' calls for 'substantive' company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.") (citing *In re Prudential Sec. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (safe harbor provision provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away")).[20]

---

[19] The safe harbor only potentially applies to Defendants' statements that are purely forward-looking statements and to the extent that the Complaint challenges those statements as affirmative misstatements, rather than statements made misleading by omission.

[20] *See also In re Harman Intern. Indus., Inc. Sec. Litig.*, 791 F.3d 90, at 103 (D.C. Cir. June 23, 2015) (to be meaningful, warnings must be "specific to the Company and tailored to the specific forward-looking statements, not mere boilerplate"); *In re FirstEnergy Corp. Sec. Litig.*, 316 F.

22

Moreover, the long list of *potential* generic risks contained in the Company's Annual Reports (*see* Dkt. No. 61-1 at 93-95) did not actually put investors on notice that these risks had already materialized. For example, these "warnings" were completely silent regarding the improper conduct alleged in the Complaint, such as Defendants' downplaying of historical bad debt through dribbled-out "catchup" charges, excluding current information from estimation controls, and manipulating the bad debt figures to avoid triggering debt covenants. *See FirstEnergy*, 316 F. Supp. 2d at 596 (no safe harbor where "[n]one of FirstEnergy's cautionary warnings intimated that the statements might be inaccurate because of the Company's failure to repair and maintain the Company's facilities"); *Cardinal Health*, 426 F. Supp. 2d at 750 (defendant must warn investors of "actual risks" in order to fall within safe harbor). Thus, they were not meaningful. *Harman*, 791 F.3d at 104 (disclaimer must be consistent with known facts to be meaningful); *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004) (no safe harbor where cautionary statement implied that development of competing software was a possibility, as opposed to an actuality); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Regardless, "whether the cautionary language that accompanied any forward-looking statements was sufficiently meaningful presents questions of fact that are inappropriate for determination on this Motion to Dismiss." *Prison Realty Sec. Litig.*, 117 F. Supp. 2d at 690. That determination is "more appropriate for summary judgment." *Fidel v. Farley*, 2001 WL 36126923, at *6 (W.D. Ky. June 27, 2001).

### d) Defendants' Actual Knowledge of Falsity Further Renders Inapplicable the PSLRA Safe Harbor

Moreover, as is the case here, if the "the maker of the statement had actual knowledge that it was false or misleading" then the statements at issue are not protected by the safe harbor. *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 95 (D.P.R. 2010); *Lason*, 143 F. Supp. 2d at 860 (misrepresentation of past or present facts not protected by safe harbor); *Gargiulo v. Isolagen, Inc.*,

---

Supp. 2d 581, 596 (N.D. Ohio 2004) (no safe harbor where "cautionary language used by the Defendants is general and gives no meaningful caution.").

23

527 F. Supp. 2d 384, 389 (E.D. Pa. 2007) (protection of safe harbor must be denied where plaintiffs allege actual knowledge of falsity because "well-pleaded allegations in the complaint [must be accepted] as true").[21] To defeat a motion to dismiss, Plaintiff need only plead – not prove – that Defendants had knowledge of the falsity and misleading nature of their statements. *Miller Energy*, 2014 WL 415730, at *15; *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("[I]f Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false and misleading, then their forward-looking statements were not protected by the safe harbor."). Indeed, as discussed above, Defendants' omissions of material facts are not protected by the PSLRA. *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) ("it is axiomatic that the failure to make a statement cannot be forward-looking"). Therefore, statements such as "due to complexities involved in these estimates, actual payments we receive could be different from the amounts we estimate and record" (Def. Br. at 7) do not protect Defendants when they *knew* at the time of the statement that the Company had, among other things, declined to assess probability of collection from certain insured patients, excluded unlikely to be paid receivables from its "bad debt" calculation, and intentionally failed to include "anticipated denials" from third-party payors.

C.      The Complaint Alleges a Strong Inference of Scienter as to All Defendants

Plaintiffs' Complaint also pleads a strong inference of scienter as to both the Company and the Individual Defendants. Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. In this Circuit, "[s]cienter may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) ("*Dana II*"), *cert. denied,* 132 S. Ct. 559 (2011). A complaint adequately pleads scienter under the PSLRA "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

[21] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("By definition, the safe-harbor provision applies to protect only 'forward-looking' statements, and not to misrepresentations of historical or current facts.").

alleged." *Tellabs*, 551 U.S. at 324. Significantly, the inference need not be a "smoking-gun," or even the "most plausible of competing inferences." *Id.* at 323-24.

To determine whether a "strong inference" of scienter has been alleged, courts apply three steps. First, as with any motion to dismiss for failure to plead a claim, courts "accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. Second, courts consider all of the allegations of the complaint holistically, as well as matters subject to judicial notice. *Id.* "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. Third, courts consider "plausible opposing inferences" from the facts alleged and matters subject to judicial notice. *Id.* at 323. Under this three-part analysis, taking the allegations as true, a complaint adequately pleads scienter "if a reasonable person would deem the inference of scienter cogent" and at least as compelling as any opposing inference. *Id.* at 324.

In *Dana II,* the Sixth Circuit made clear that courts in this Circuit may no longer approach scienter by scrutinizing individual factors in isolation, then tabulating the results:

> In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. . . . Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs,* conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.

646 F.3d at 961.[22]

Inexplicably, Defendants seek dismissal based on an abrogated approach to scienter that the Sixth Circuit has expressly rejected. Defendants claim that courts "generally apply" the nine factors in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001), *abrogated as recognized in Dana I,* and that "these factors are not a checklist to be pled with mere conclusions,"[23] but the Sixth Circuit has made clear that, "[a]fter *Tellabs* . . . the standard adopted in *Helwig* **is no longer good law**." *Dana I,*

---

[22] Moreover, the Sixth Circuit confirmed that the scienter of executives is imputed to the company. *Dana II,* 646 F.3d at 963.

[23] Def. Br. at 23 n.50.

547 F.3d at 571. To erase any doubt, the Sixth Circuit reiterated in a subsequent case that it had "eschewed *Helwig*'s checklist approach in favor of *Tellabs*'s and *Matrixx*'s entirely collective assessment." *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 469 (6th Cir. 2011); *see also In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 994 (S.D. Ohio 2008) ("[T]his Court will not consider, in isolation, whether any of the Defendants' six assertions demonstrates that the Plaintiffs have not adequately plead scienter."); *Tivity Health*, 365 F. Supp. 3d at 915 ("sorting through each allegation is time-consuming and likely unnecessary in light of *Tellabs*"); *accord N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 771 (M.D. Tenn. 2013) ("[A]fter *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency."). Defendants' brief does not mention the changed, post-*Helwig* landscape and avoids citing *Ashland* altogether.[24]

Recognizing that they could not defeat scienter under the applicable standards, Defendants invent a series of additional requirements that the law does not recognize. For example, Defendants argue that confidential witnesses must have "witnessed the Individual Defendants' private confessions" regarding the omissions or be "privy to some diabolical plan." Def. Br. at 24. Unsurprisingly, Defendants cite no cases supporting such a requirement. It is not one. Likewise, Defendants make the wholly unsupported claim that Plaintiffs must show the exact amount to the cent that the Company's financials were overstated. *Id.* Again, the law does not impose the requirement Defendants imagine, and precise quantification has nothing to do with scienter. At any rate, Plaintiffs have alleged that the misstatement here was both large—amounting to several hundred million dollars—and known to Defendants. *See* Section III.B.4. & 5.d., *supra.* Considered holistically with other allegations, the inference that Defendants were at least reckless as to the

---

[24] Defendants compound their error by relying on cases assessing under what circumstances an outside audit can be inferred to be reckless. *See, e.g.*, Def. Br. at 24 (citing *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471 (6th Cir. 2010), for the non-controversial proposition that an auditor (Ernst & Young, LLP) must be able to uncover the errors during the course of a standard audit to be held liable for an audit opinion). This case, by contrast, involves corporate insiders who knowingly withheld the truth from public investors.

26

truthfulness of their communications is both strong, and far more compelling than any other inference.[25]

<h3>1.  The Complaint's Allegations Regarding Defendants' Debt Covenant Manipulation Demonstrates Scienter</h3>

The Complaint alleges that the Defendants manipulated Community Health's financials to ensure they did not trigger a default of their debt covenants. The Company, which had a far higher debt burden than its peers (¶31), had a credit facility that required Community Health to keep its "secured net leverage ratio" below a maximum level and its "interest coverage ratio" above a minimum level, both of which related to its consolidated EBIDTA, to avoid default. ¶45. However, a loophole in debt agreements specifically excluded from these calculations expenses classified as related to accounting principle changes. ¶50. Just prior to the Class Period, the Company was barely able to avoid triggering a default by renegotiating with its lenders to exceed the then-specified maximum secured net leverage ratio and minimum interest coverage ratio. ¶52. Thus, Defendants had a strong, unique motive to avoid recognizing the bad debt expense as incurred, instead taking advantage of the loophole by delaying recognition until their end-of-Class-Period shift to a new accounting method.

Defendants' "[l]abeling the $591 million charge as related to a change in accounting (and thereby outside the scope of the secured net leverage ratio covenant of its credit facility) was the only way that Community Health was able to avoid triggering a default" because "if the Company took the $591 million charge as an expense in the fourth quarter 2017, it would have had to report to its lenders a secured net leverage ratio far higher than the threshold for default under Community Health's credit facility." ¶164. Had Defendants not manipulated their accounting to take advantage of the loophole, and instead "took the $591 million charge as an expense in the fourth quarter 2017, [Community Health] would have had to report to its lenders an interest coverage ratio of 1.37, lower than the 2.00 threshold (below which the Company could not fall) for default under Community

---

[25] In fact, the Complaint even pleads that Defendants' failure to properly restate their financial statements deprived investors of knowing the "Actual proximity to triggering default under loan covenants" during the Class Period. ¶174. Defendants should not be rewarded for their failure to properly restate their financial results.

27

Health's credit facility." ¶165.[26] In fact, Defendant Aaron had to emphasize that "*this change in estimate is excluded from our calculation of adjusted EBITDA and excluded from our calculation of financial covenants and our credit facility*" so that the market would understand that the charge was designed to avoid, and did avoid, triggering debt default. ¶163.[27]

These well-pleaded factual allegations are sufficient to demonstrate Defendants' scienter. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690-691 (6th Cir. 2004) (allegations that defendants were motivated to engage in fraud to avoid default on bank loan agreements and preserve company's continued viability were "suggestive" of scienter);[28] *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (finding scienter had been sufficiently established through plaintiffs' evidence that "Everex had a motivation to overstate its net value so as not to violate loan covenants with its principal lender CIT."); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1071-72 (N.D. Cal. 2002) (allegations that company was motivated to raise money to maintain compliance with loan covenants were "sufficiently concrete" and "particular" to raise a strong inference of scienter).[29]

Unable to avoid that their accounting scheme was designed to avoid default, Defendants claim that "the Company's lenders do not agree with Plaintiffs' theory." Def. Br. at 26. No facts before the Court support this conjecture, and their assertion to factual information beyond the four

---

[26] Defendants implicitly concede that Plaintiffs are correct that the Company would have violated their debt covenants by attempting to shift the focus to other quarters. *See* Def. Br. at 26 n.21.

[27] Scienter is further supported by the fact that each Defendant understood the loan covenants and was incentivized to postpone recognition of bad debt expense until such expense could be characterized as a "change in accounting." ¶182.

[28] Defendants cite to *PR Diamonds* and *Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008) for the proposition that avoiding defaulting on loans does not support scienter. *See* Def. Br. at 28. This is wrong. Both cases stand for the non-controversial proposition that such a motive *by itself* may not necessarily establish a strong inference of scienter, but that such "motive allegations concerning the bank loan and credit facility [are] suggestive of scienter." *Ley*, 543 F.3d at 813. Viewed holistically with other allegations as *Tellabs* requires, these robust motive allegations absolutely support a strong inference of scienter.

[29] Defendants' discussion of so-called "soft information" (Def. Br. at 23-24) is irrelevant here, because "[w]hether the opinion or 'soft information' is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action." *Vivendi*, 381 F. Supp. 2d at 182.

corners of the Complaint concedes that their arguments require factual and credibility determinations subject to discovery. *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997) ("Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss").[30]

Nor is scienter undermined by Defendants' contention that the auditors signed-off on the Company's financial statements without requiring a formal restatement. *See* Def. Br. at 30. "The fact that [the] independent auditor may have approved the accounting methods will not shield [the officers] from liability for deception such methods may have caused." *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1314 n. 13 (C.D. Cal. 1996). Indeed, "many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements." *In re Silver Wheaton Corp. Sec. Litig.,* 2019 WL 1512269, at *10 (C.D. Cal. Mar. 25, 2019) (citing cases). This is especially persuasive here, where there are serious questions regarding auditor independence that can only be assessed by the jury. The Company's CFO, Defendant Aaron, had spent thirty-two years at Deloitte, Community Health's "independent" auditor, retired as Managing Partner of its Tennessee office, and just years earlier ***led Deloitte's audit team for Community Health***. ¶35. Thus, Defendant Aaron was in a unique position to influence how much auditor scrutiny the Company received and whether the Company received a clean audit. For this additional reason, the clean audit opinion here has little significance.[31] Moreover, despite auditor sign-off, the Company internally considered the charge to be a restatement. ¶¶168-69.

In sum, the most logical inference from the fact that the Company managed its "bad debt" to take advantage of a loophole in its debt covenants is that the Defendants were aware of this scheme.

---

[30] The Company's lenders' view is improper to consider at this stage where it is not supported by a document that was referenced in the Complaint and is not subject to judicial notice procedures. *Cf. Omnicare I*, 769 F.3d at 466 (noting that a court may consider those documents "in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment.").

[31] Likewise, the Court should take with a grain of salt Defendants' touting that "The company's independent auditor . . . that [the Company] 'maintained, in all material respects, effective internal control over financial reporting.'" *See* Def. Br. at 22 n. 48.

Defendants' use of stealth "catch-up" charges, thereby concealing the full extent of the Company's bad debt position during the Class Period, also suggests active manipulation of reported debt, with the knowledge of executives who signed the financial reports. ¶¶125, 137.

### 2. The Company's Executives Were Actively Involved with and Aware of Community Health's Core Business

Community Health is chain of hospitals. ¶3. Its core practice was to issue bills much higher than payments expected, then to apply various "contractual allowances" and "discounts." ¶67 (the Company's net operating revenue was only $21.275 billion whereas total revenue was $122.675 billion). Thus, collection of revenue and the amount of "bad debt," *i.e.* likely uncollectible receivables, were the focus of investors and analysts. For example, during the Class Period, when the use of "catch-up" charges caused the Company's bad debt-to-net revenue ratio to swell from 13.2% in the first quarter to 14.1% in the second quarter, Community Health's stock price declined by more than 14.5% per share and analysts reported "sluggish trends." ¶¶125-26; *see also* ¶¶139-143 (increased bad debt led to 23.1% decline in stock during the Class Period).

Because the management of receivables was core to its operations, investor sentiment, and avoiding debt default, it would be absurd to infer that its executives were not aware of the actual amount of bad debt. Thus, where, as here, the misrepresentations and omissions involve key facts regarding the Company, courts are likely to infer that high-level executives knew the truth when making inconsistent statements to investors. *Huffy*, 577 F. Supp. 2d at 1000 (S.D. Ohio 2008) (the "more central a fact is to a company's core operations, the more likely its executive acted with scienter."); *In re Ancor Commc'ns.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("Facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.").

Additionally, one of the Company's hospitals (HMA, its largest acquisition) was already being investigated for similar improper conduct related to accounting for revenues and receivables. ¶183. Of course, the Company's executives were aware of this SEC investigation, which was included in corporate disclosures. The SEC investigation regarding HMA's revenue and receivables

(*i.e.*, the same concerns at issue here) supports a finding of scienter because it surely would have brought the issues to the Individual Defendants' attention. ¶183. If the Individual Defendants intentionally failed to investigate the situation at Community Health after learning of the investigation into HMA, this would constitute severely reckless conduct. *Id.* This further supports that Defendants acted with scienter.[32]

The Individual Defendants themselves, in fact, confirmed that they were actively involved in calculating these figures. Defendant Aaron worked "with the COO to establish target net revenue and EBITDA goals for each of the divisions" and Defendant Smith was tasked with "assess[ing] performance of the hospital segment." ¶¶177-78. Furthermore, the Individual Defendants, who were "assessing the performance" and "establishing target" financial goals for the hospitals must have had access to the financial information necessary to make these determinations. A confidential witness confirms this to be true.[33] ¶¶179-80. Thus, "defendants' knowledge of facts or access to information contradicting their public statements" further supports scienter. *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 (S.D.N.Y. 2011); *accord Prison Realty*, 117 F. Supp. 2d at 687; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.").

### 3. The Magnitude of the Fraud Supports Defendants' Scienter

Community Health's write-down was massive and incredibly material to its financial prospects. In fact, "the $591 million charge alone [was] more than 88% of Community Health's bad debt provision for the previous quarter (¶172)," and the revelation "that Community Health ramped

---

[32] Defendants claim that this fact *alone* fails to demonstrate scienter. Def. Br. at 31. This argument is irrelevant because Plaintiffs do not claim this and it ignores the holistic mandate of *Tellabs*.

[33] Defendants' attempt to discredit these confidential witnesses and claim that they have no relevance are misplaced. *See* Def. Br. at 32-33. The Complaint specifies the title, division and dates of employment for each, and demonstrates that each was in a position to have knowledge of their recollections. ¶72; *see, e.g., Tellabs,* 513 F.3d at 712 (confidential witnesses so identified can support a strong inference of scienter); *Halford v. AtriCure, Inc.,* 2010 WL 8973625, at *6-7 (S.D. Ohio Mar. 29, 2010) (applying *Tellabs* standard for confidential witnesses). Most importantly, Defendants do not challenge the veracity of the confidential witnesses' recollections.

'bad debt' expense (for the third time in as many quarters) to more than $1 billion in the quarter, amounting to a whopping 25% of revenues (¶9)" caused the Company's stock to decrease more than 17%, causing investors to lose tens of millions of dollars. ¶¶12-13.

Analysts likewise noted the magnitude of the charge. J.P. Morgan warned that the $591 million charge had instantly slashed a third of Community Health's EBIDTA and that "given the magnitude of the charge" they believed it was an "implicit acknowledgement of historic EBITDA/EPS overstatement." ¶155. Analysts at Cantor Fitzgerald likewise noted that the charge "represent[s] major revisions of historical results." ¶156. Thus, the sheer magnitude of the fraud further supports Defendants' scienter. *In re Accredo Health, Inc. Sec. Litig.*, 2005 WL 8152649, at *16 (W.D. Tenn. Apr. 11, 2005) ("the nature of the misapplication of accounting principles—in terms of number, size, timing, frequency, and context—is relevant circumstantial evidence of a defendant's state of mind."); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) (same); *Dana II*, 646 F.3d at 960 (reversing district court dismissal and holding that a strong inference of scienter was stated, in part because, when viewed holistically, the size of the false accounting statement contributed to such an inference); *Fushi Copperweld*, 929 F. Supp. 2d at 786 ("magnitude of [the] false statements are relevant to the scienter element") (citing *Dana II*, 646 F.3d at 960).[34]

#### 4. Post-Class Period Admissions Support a Strong Inference of Scienter

Given Defendants' statements immediately following the end of the Class Period, it cannot be seriously disputed that Defendants possessed actual knowledge of the misrepresented and omitted facts, thereby establishing a strong inference of scienter and satisfying the standard for

---

[34] Without any legitimate rebuttal to the massive magnitude of their fraud, Defendants resort to citing to cases that involved substantially smaller revisions than those in this case. In *Ley*, the court found that the errors at issue, which were 5% of revenues, were not "so great in magnitude to be obvious." 543 F.3d at 812. Here, the charge was more than 88% of the provision for the previous quarter, dwarfing the amount at issue in *Ley*. In *In re SCB Computer Tech. Inc. Sec. Litig.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001), the court noted that in the instant action the "revenue . . . were nowhere near the magnitude of improperly recognized revenues in other cases" in which the magnitude of the fraud supported scienter. 149 F. Supp. 2d at 351 (revenue misstatement was no more than 2.9%); *see also In re Ferro Corp.*, 2007 WL 1691358, at *18 (N.D. Ohio June 11, 2007) (alleged restatement was not "an 'in your face' amount that 'cries out' scienter.").

recklessness. *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at \*58 (M.D. Tenn. Mar. 31, 2009) ("[a] complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions"); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly"); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) ("'[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter'").

As discussed above, Defendants admitted that they reassessed their historical results; determined that their receivables were overstated; and, as a result, decided to ramp Community Health's bad debt to more than \$1 billion, including the massive, half-billion dollar charge disclosed only at the end of the Class Period. *See* ¶¶9, 152-54. At the same time, Defendants acknowledged possessing the relevant, corrective data while they misrepresented the Company's finances. ¶¶3-6, 114. Defendant Aaron, in particular, admitted that that the charge concerned "self-pay" the Company had "kept on its books" as well as problems with previously-anticipated third-party denials, and not anything truly related to a change in accounting. ¶158. Perhaps most critically, Defendant Aaron acknowledged that the Company had no basis, during the Class Period, to claim that it collected substantially all third-party receivables. ¶162. Accordingly, Defendants' own admissions support a finding of scienter.

> **5.    The Individual Defendants' Review and Approval of the Company's Accounting Controls Supports a Strong Inference of Scienter**

During the Class Period, the Individual Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that affirmed that the Company's financial statements fairly presented all material aspects of its financial condition and results of operations, affirmed that the Company's disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in

33

accordance with GAAP. ¶¶107, 117, 133, 149. These certifications, which were issued in response to requirements under SOX legislation, provide further support for the inference that defendants were reckless in disregarding the falsity the Company's financial statements. *See, e.g., Dana II*, 646 F.3d at 960-62 (false SOX certifications were relevant to scienter under holistic approach); *Am. Serv. Grp.*, 2009 WL 1348163, at *52-53 (same).

That the Individual Defendants signed such certifications attesting to the accuracy of the Company's financial statements in the face of clear, repeated accounting violations gives "rise to a plausible inference of the lack of internal review" and of "the lack of any accounting controls." *Fushi Copperweld*, 2013 WL 866943, at *37. Alternatively, if they had actually conducted the thorough review that they had sworn to investors they had completed, such an evaluation would have informed them of the improper accounting practices. *See In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("SOX certifications give rise to an inference of [a defendant]'s scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."). Either way, the false certifications support a strong inference of scienter when considered holistically in combination with the other alleged facts.

### 6. Defendants' Competing Inference Is Not Compelling

Defendants can only rebut an inference of fraud if the opposing inference is both cogent and *more* compelling than the inference of scienter established by the complaint's allegations. *Tellabs,* 551 U.S. at 522-23. Here, Defendants ask the Court to accept that it was mere coincidence that the Company's bad debt was understated by just enough to ensure compliance with debt covenants and that they conveniently just learned of this when implementing an accounting change (which was not in effect yet) that should have not impacted the historical amount of bad debt.[35] Plaintiffs find it highly unlikely that any jury would find such coincidence to be credible. At any rate, Defendants'

---

[35] Yet, when faced with the opportunity to explain himself, Defendant Aaron refused to answer an analyst's pointed question regarding the $591 million charge, "[s]o over what period of time I guess was it? Can you tell us what was there for 2017? Anything around sort of it being from recently acquired versus legacy?" ¶174. Defendant Aaron's silence speaks volumes.

34

fanciful suggestion is neither plausible nor remotely as compelling as the common sense inference ineluctably drawn from the allegations that Defendants overstated receivables and understated bad debt during the Class Period and that they delayed cleaning up the balance sheet until they could do so in a way that would take advantage of a loophole in debt covenants.

Defendants' attempt to portray themselves as victims that "suffered financially" from their own fraud is not plausible and is not a competing inference. Def. Br. at 29. That Defendants, who received some of the largest payouts in their industry, may not have received "any increase in their base salary for 2016 or 2017" does not raise an innocent competing inference for the misrepresentations alleged. Although motive is not required, *see Tellabs*, 551 U.S. at 325, the Complaint alleges both corporate motives (avoiding debt default, *supra* at III.C.1.) and personal motives (maintaining unique compensation packages that far outpaced their peers, ¶185). The fact that Defendant Smith received more than $10 million for 2016 and 2017, Defendant Cash received more than $4 million for 2016 and part of 2017, and Defendant Aaron received almost $2 million for working months of 2017 in compensation while destroying tens of millions in shareholder value provided a very real incentive to keep the truth under wraps and maintain their jobs, which a default would surely have ended.

### D. Plaintiffs Adequately Plead Control Person Liability

Defendants' sole argument against control person liability is that Plaintiffs purportedly have not pled a primary violation of § 10(b). Def. Br. at 35. As Plaintiffs adequately plead a primary violation, they state § 20(a) claims against the Individual Defendants.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion be denied in its entirety. Alternatively, if the Court grants any part of the Motion, Plaintiff requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178 (1962).

Dated: May 22, 2020

Respectfully submitted,

*/s/ J. Gerard Stranch, IV*

**BRANSTETTER, STRANCH & JENNINGS, PLLC**
J. Gerard Stranch, IV (BPR #023045)
Benjamin A. Gastel (BPR #28699)
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gerard@bsjfirm.com
beng@bsjfirm.com

*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (admitted *Pro Hac Vice*)
Robert V. Prongay (admitted *Pro Hac Vice*)
Casey E. Sadler (admitted *Pro Hac Vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
csadler@glancylaw.com

*Co-Lead Counsel*

**POMERANTZ LLP**
Joshua B. Silverman (admitted *Pro Hac Vice*)
Louis C. Ludwig (admitted *Pro Hac Vice*)
Jared M. Schneider (admitted *Pro Hac Vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
jbsilverman@pomlaw.com
lcludwig@pomlaw.com
jschneider@pomlaw.com

*Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of May, 2020, I electronically filed the foregoing documents using the Court's CM/ECF system, and a copy of this filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. The following counsel will receive service via the Court's CM/ECF system at the email addresses listed below:

Carson W. King
Hall Booth Smith, P.C. (Nashville Office)
424 Church Street
Suite 2950
Nashville, TN 37203
(615) 313-9911
Fax: (615) 313-8008
Email: cking@rwjplc.com

Steven A. Riley
Milton S. McGee, III
Riley Wamock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
sriley@rwjplc.com
tmcgee@rwjplc.com

J. Alexander Hood, II
Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com
Email: jalieberman@pomlaw.com

Paul Kent Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com
Email: robert@bramlettlawoffices.com

Gregory M. Nespole
Levi & Korsinsky, LLP
55 Broadway
10th Floor
New York, NY 10006
(212) 363-7500
Fax: (212) 363-7171
Email: gnespole@zlk.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com

Charles H. Linehan
Lesley F. Portnoy
Pavithra Rajesh
Glancy Prongay & Murray LLP
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
(310) 201-9150
Fax: (310) 201-9160
Email: clinehan@glancylaw.com
Email: lportnoy@glancylaw.com
Email: prajesh@glancylaw.com

Howard G. Smith
Law Offices of Howard G. Smith
3070 Bristol Pike
Suite 112
Bensalem, PA 19020
(215) 638-4847
Fax: (215) 638-4867
Email: hsmith@howardsmithlaw.com

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV