IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CALEB PADILLA, *individually and on behalf of all others similarly situated*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 3:19-cv-00461<br>JUDGE RICHARDSON |
| COMMUNITY HEALTH SYSTEMS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 65, "Motion"), which is accompanied by a supporting Memorandum of Law (Doc. No. 66). Plaintiffs[1] have responded. (Doc. No. 69). Defendants have replied. (Doc. No. 70). Plaintiffs also filed a Notice of Supplemental Authority (Doc. No. 76).

For the reasons discussed herein, the Court will deny Defendants' Motion.

---

[1] Despite the case currently being captioned in the singular ("Plaintiff") in the name of Caleb Padilla, the Court has appointed putative class members Arun Bhattacharya and Michael Gaviria as co-Lead Plaintiffs in this action (Doc. No. 52 at 2). Accordingly, the Court herein uses the plural term "Plaintiffs," as do the parties in their briefing on the Motion.

## BACKGROUND[2]

This putative class action[3] is grounded on alleged violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*, "Exchange Act"). Defendant Community Health Systems, Inc. ("CHS" or "the Company")[4] is one of the largest publicly traded hospital companies in the United States. (Doc. No. 61 at ¶ 25). As of December 31, 2016, Defendant CHS's affiliates owned or leased 155 hospitals in 21 states, with roughly 26,222 hospital beds. (*Id.*). Defendant CHS generates revenue from general and specialized hospital and outpatient healthcare services, such as general acute care, emergency room care, surgery, critical care, internal medicine, obstetrics, diagnostic, psychiatric, and rehabilitation. (*Id.* at ¶ 26). The patients Defendant CHS serves have private insurance, Medicare, Medicaid, or are uninsured (which Defendant CHS refers to as a "self-pay" patient). (*Id.*).

Between 2007 and 2014, Defendant CHS grew rapidly via acquisition of other companies, which it financed by debt. (*Id.* at ¶ 27). In order to avoid default, Defendant CHS had to adhere to strict financial ratio covenants. (*Id.*). In 2014, Defendant CHS acquired Health Management Associates, Inc. ("HMA") for roughly $7.3 billion, including assuming $3.8 in indebtedness. (*Id.*

---

[2] The facts set forth herein are alleged in Plaintiffs' Amended Complaint (Doc. No. 61) and are accepted as true for purposes of the Motion. To the extent that allegations referred to below are legal conclusions, however, they are not accepted as true but rather are identified as merely what Plaintiffs claim, and not what the Court is accepting as true for purposes of the Motion. At times herein, the Court exercises some discretion (guided by common sense and the apparent context at issue) in choosing language to paraphrase the allegations, but whether it does that or paraphrases by using virtually or exactly the same words used in the Amended Complaint, the Court is confident that it has accurately represented the substance of the allegations recounted herein.

[3] Plaintiffs bring the present action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) "on behalf of a class, consisting of all persons and entities that acquired Community Health securities between February 20, 2017 and February 27, 2018, inclusive, and who were damaged thereby (the 'Class')." (Doc. No. 61 at ¶ 186). The allegations set forth in the Amended Complaint in support of class certification (*Id.* at ¶¶ 186–195) are not relevant for purposes of resolving the instant Motion and will not be discussed herein.

[4] In their briefing, the parties sometimes refer to CHS as "CHSI."

at ¶ 29). This exacerbated Defendant CHS's already precarious financial position. (*Id.* at ¶¶ 29-31). In 2015, Defendant CHS lost approximately one-third of its value when its earnings were substantially below expectations, in part due to an increase in self-pay patients. (*Id.* at ¶ 32). In 2016, the spin-off of thirty-eight hospitals severely underperformed expectations. (*Id.* at ¶ 33).

The real problems started in 2017, according to the Complaint. In February 2017, Defendant CHS reported a net loss attributable to shareholders of $1.7 billion for 2016, and its fourth quarter earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $564 million, about 6.6% higher than analyst's average estimate. (*Id.* at ¶¶ 34, 100). The next day, Defendant Cash's resignation as Chief Financial Officer ("CFO") was announced, and Defendant Aaron was appointed the Executive Vice President and CFO of Defendant CHS. (*Id.* at ¶ 35). Defendant Aaron had been Defendant CHS's independent auditor at Deloitte & Touche LLP. (*Id.*). Defendant Smith, Defendant CHS's CEO, remained in his position and was the highest earner among hospital executives. (*Id.* at ¶ 38). (Plaintiffs refer to Defendants Cash, Aaron, and Smith collectively as the "Individual Defendants," (*Id.* ¶ 23), and the Court herein will do likewise). That year, Defendant CHS sold thirty hospitals in order to pay down its debt, but it faced criticism for selling some of the best hospitals in its portfolio. (*Id.* at ¶ 36).

During this time, Defendant CHS faced internal problems. A confidential witness who worked at CHS between March 2016 and December 2017 reports that Defendant CHS attempted to automate the process of billing payors, which required hiring people to fix the resulting mess. (*Id.* at ¶ 39). This confidential witness's job at CHS was to find errors in the automated system, and there were often bills with underpaid claims of tens of thousands of dollars. (*Id.* at ¶¶ 40, 41). This confidential witness also reports that self-pay patients would often speak with the billing department and agree on a fee lower than the fee at which the services were. (*Id.* at ¶ 44).

At all relevant times to this action, Defendant CHS was constrained by covenants in a $1 billion credit facility (referred to by Defendant CHS at times as its "senior secured credit facility") it maintained and used for financing the acquisition of HMA and refinancing existing indebtedness. (*Id.* at ¶ 45). Defendant CHS had to satisfy the covenants in order to avoid default: under its agreement with its creditor, Defendant CHS had to keep its "secured net leverage ratio"[5] below a maximum level and its "interest coverage ratio"[6] above a minimum level. (*Id.* at ¶ 45). Essentially, in order to avoid default, Defendant CHS had to manage its Consolidated EBITDA[7]. (*Id.* at ¶ 46).

Despite the importance of the metric represented by Consolidated EBITDA, Defendant CHS refused to report its Consolidated EBITDA to investors or explain its process for calculating its Consolidated EBITDA. (*Id.* at ¶ 47). The Securities and Exchange Commission ("SEC") requested that Defendant CHS "revise" its EBITDA disclosure to present it "as it is calculated in [the covenant agreement with CHS's senior secured credit facility]." (*Id.* at ¶ 47–48). In response, Defendant CHS stated that it would not disclose the Consolidated EBITDA and instead would disclose only the "Adjusted EBITDA"[8] to investors, all the while noting that the Consolidated

---

[5] This was defined in the Third Amended and Restated Credit Agreement as the ratio of Defendant CHS's Total Secured Debt less cash and cash equivalents to Defendant CHS's consolidated EBITDA.

[6] This was defined in its 2016 10-k as the "ratio of consolidated EBITDA, as defined in the Credit Facility, to consolidated interest expense for the period."

[7] The Court capitalizes this term when referring to this metric as defined in CHS's 2016 10-K: "a trailing 12-month calculation that begins with net income attributable to us, with certain pro forma adjustments to consider the impact of material acquisitions or divestitures, and adjustments for interest, taxes, depreciation and amortization, net income attributable to noncontrolling interests, stock compensation expense, restricting costs, and the financial impact of other non-cash or nonrecurring items recorded during any such 12-month period." (Doc. No. 61 at 13 n.12).

[8] The Complaint describes the "Adjusted EBITDA" calculation, as defined in CHS's 2016 10-K, as "starting with its standard EBITDA—its net income less interest, income taxes, depreciation and amortization—and then:

EBITDA was "a key component in the determination of our compliance with some of the covenants under our senior secured credit facility (including our ability to service debt and incur capital expenditures)." (*Id.* at ¶ 49). Defendants negotiated before the start of the Class Period[9] for the ability to exclude from the debt covenant measurements any charge CHS could attribute to "changes in accounting principles." (*Id.* at ¶¶ 50, 51). Defendant CHS also renegotiated its secured net leverage ratio levels and its required interest coverage ratio. (*Id.* at ¶ 52).

The SEC requires that Generally Accepted Accounting Principles ("GAAP") be used in the preparation of financial statements, and if they are not, then the financial statements are presumed to be misleading and inaccurate. (*Id.* at ¶¶ 53, 54). The GAAP requires that an entity with significant receivables (like Defendant CHS) must reflect its assets at their proper carrying value[10] and must regularly assess the collectability of its receivables at each reporting date. (*Id.* at

---

. . . add[ing] back net income attributable to noncontrolling interests and [] exclud[ing] the effect of discontinued operations, loss from early extinguishment of debt, impairment and (gain) loss on sale of business, gain on sale of investments in unconsolidated affiliates, acquisition and integration expenses from the acquisition of HMA, expense incurred related to the spin-off of QHC, expense incurred related to the sale of a majority ownership interest in our home care division, expense related to government and other legal settlements and related costs, and (income) expense from fair value adjustments on the CVR agreement liability accounted for at fair value related to the HMA legal proceedings, and related legal expenses.

See 2016 10-K at 13." (Doc. No. 61 at 19).

[9] The Class Period is defined as the period from February 21, 2017 to February 27, 2018. (Doc. No. 61 at ¶ 1).

[10] "Carrying value is an accounting measure of value in which the value of an asset or company is based on the figures in the respective company's balance sheet." *Carrying Value*, Investopedia, https://www.investopedia.com/terms/c/carryingvalue.asp (last visited August 15, 2021). The Court is able to take *sua sponte* judicial notice of the definitions of investment terms which are publicly available on the Investopedia website. *See e.g.*, *Terraza v. Safeway, Inc.*, 241 F.3d 1057, 1067 (N.D. Cal. 2017) ("[T]he Court takes judicial notice of the definitions of various investment terms, which are publicly available on the Investopedia website[.]"); *In re California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *3 (N.D. Cal. Apr. 13, 2020) (taking judicial notice of the Investopedia definition of "loss

¶ 63). An entity must deduct credit losses[11] directly from the allowance[12] when the entity becomes aware that a balance is no longer collectible. (*Id.*).

Until January 1, 2018, Defendant CHS recognized its revenue under ASC 605.[13] This allows revenue to be recognized if "(a) persuasive evidence of an arrangement existed, (b) delivery had occurred, (c) the vendor's fee was fixed or determinable, and (d) collectability was probable." (*Id.* at ¶ 65). Defendant CHS's gross service revenue (*i.e.*, what the revenue would be at the full established rates) was substantially greater than the revenue that Defendant CHS actually expected to collect. (*Id.* at ¶ 66). Therefore, Defendant CHS reported a figure for "net operating revenue" (gross service revenue less deductions from such revenue, *i.e.*, the sum of its contractual adjustments and discounts). (*Id.*). As a result of this accounting method, though Defendant CHS's

---

ratio"); *United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) ("The Court may take judicial notice sua sponte."); *Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 n.1 (M.D. Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website."). To provide background information, the Court herein will refer to the Investopedia website to define or explain certain terms.

[11] The Court takes the term "credit losses" to refer to "losses that a company might experience due to credit risk," such as losses from "delinquent and bad debt." *Provision for Credit Losses*, Investopedia, https://www.investopedia.com/terms/p/provision-for-credit-losses.asp (last visited August 15, 2022).

[12] "An allowance for doubtful accounts is a contra account that nets against the total receivables presented on the balance sheet to reflect only the amounts expected to be paid. The allowance for doubtful accounts estimates the percentage of accounts receivable that are expected to be uncollectible." *Allowance for Doubtful Accounts*, Investopedia, https://www.investopedia.com/terms/a/allowancefordoubtful accounts.asp (last visited August 15, 2021).

[13] An "ASC" is a particular numbered accounting standard set forth in the Accounting Standard Codification, which is the current single source of GAAP. *U.S. GAAP Codification of Accounting Standards*, Codification Topic 105: Generally Accepted Accounting Principles, A Brief History, https://accountinginfo.com/financial-accounting-standards/asc-100/105-gaap-history.htm (last visited July 18, 2022). The Court herein references the ASC by the citations provided by Plaintiffs in the Amended Complaint.

gross service revenue increased by 12.8%,[14] its net operating revenue decreased in the periods

leading up to the Class Period. (*Id.* at ¶ 68).[15]

The net operating revenue also functions as a component of "adjusted EBITDA," which is

not related to GAAP but is disclosed in Defendant CHS's annual and quarterly financial reports.

As a result, during the Class Period, Defendant CHS:

> (i) subtracted its expenses from its net operating revenue to arrive at its "net income" and (ii) calculated its Adjusted EBITDA by starting with its standard EBITDA—its net income less interest, income taxes, depreciation and amortization—and then:

>> . . . add[ing] back net income attributable to noncontrolling interests and [] exclud[ing] the effect of discontinued operations, loss from early extinguishment of debt, impairment and (gain) loss on sale of business, gain on sale of investments in unconsolidated affiliates, acquisition and integration expenses from the acquisition of HMA, expense incurred related to the spin-off of QHC, expense incurred related to the sale of a majority ownership interest in our home care division, expense related to government and other legal settlements and related costs, and (income) expense from fair value adjustments on the CVR agreement liability accounted for at fair value related to the HMA legal proceedings, and related legal expenses.

(*Id.* at ¶ 70). Considering how adjusted EBITDA is calculated, bad debt impacted Defendant

CHS's adjusted EBITDA and net operating income. (*Id.* at ¶ 71).

Pursuant to ASC 945-605, Defendant CHS reported top-line revenue using the amount it

billed for a given service, even if it did not expect to collect the full amount. (*Id.* at ¶ 72). This

meant, essentially, that if an uninsured patient was billed $100, and Defendant CHS expected the

---

[14] Paragraph 68 of the Amended Complaint seems to use the term "Total Revenue" as a synonym for gross service revenue.

[15] The Amended Complaint here alleges, more specifically, that net operating revenue was lower in 2016 than in either 2014 or 2015. On the other hand, the Amended Complaint alleges that that net operating revenue was more than $1B higher in 2015 than in 2014, so the Amended Complaint cannot be taken to allege that net operating revenue *continually* declined in the periods leading up to the Class Period.

patient would pay $10, it could still record $100 as top-line revenue, together with a $90 contra-revenue line item for bad debt. (*Id.* at ¶ 73).

For periods beginning after December 15, 2017 (*i.e.*, beginning with the 2018 reporting year), public companies like Defendant CHS were required to adopt ASC 606 (which supersedes the principles set forth in ASC 605). (*Id.* at ¶ 75).[16] ASC 606 narrows what healthcare providers can report as bad debt. (*Id.* at ¶ 78). Unlike ASC 605, ASC 606 allows entities to recognize revenue only to the extent that the entity expects to receive the recognized amount, and an entity cannot recognize revenue until it can determine how much it expects to collect. (*Id.* at ¶ 80). To use the previous example referenced in discussing ASC 605, under ASC 606, if Defendant CHS expected to receive $10 of a $100 invoice, it would record $10 (as opposed to $100) in revenue and nothing (as opposed to $90) under bad debt, and bad debt would be reported only if the patient paid less than the expected $10. (*Id.* at ¶ 81). So "for healthcare providers with 'self-pay' patients, the switch from ASC 605 to ASC 606 generally resulted in a significant reduction in what was previously reported as revenue, with a corresponding reduction in bad debt." (*Id.* at ¶ 82). However, "[e]ven though the 'gross revenue' and 'bad debt' figures were different between ASC 605 and 606, the "net operating revenues" (*i.e.*, gross revenue less contractual adjustments, discounts, and bad debts) should have been the same." (*Id.*).

Plaintiffs allege both that Defendant CHS's management was responsible for the reliability of financial statements prepared for external purposes and that Defendant CHS should have issued restatements to promptly correct them. (*Id.* at ¶¶ 84-99).

---

[16] Defendant CHS could have adopted this standard earlier, but it adopted the new standard on January 1, 2018. (Doc. No. 61 at ¶¶ 75-77).

In addition to providing the above-referenced allegations serving to provide relatively general (alleged) background information surrounding the claims, Plaintiffs point to several instances when Defendants allegedly issued materially false and misleading statements during the Class Period. The Court will briefly review each of these statements. Plaintiffs have multiple theories for why the statements were materially false and/or misleading, and these theories variously are invoked repeatedly throughout the Amended Complaint. For ease of reference, the Court below coins a respective term to refer to each such theory and (by reference to such term) notes various places in the Amended Complaint where Plaintiffs invoke each particular theory.

A. February 20, 2017 8-K[17]

The 8-K document contained the Company's statement of the specific figures for net operating revenues, Adjusted EBITDA, and provision for bad debt for both the fourth quarter of 2016 and the full year of 2016. (*Id.* at ¶ 100). Plaintiffs allege that these statements (*i.e.*, the stated figures):

> were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company excluded from its "bad debt" calculations revenue receivable from "self-pay" patients, especially aged receivables, for which collection was not probable; (2) that the Company had excluded from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) that the Company had "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) that the Company had understated its provision for bad debts and allowance for doubtful accounts; (5) that, as a result, the Company had overstated its net operating revenue,

---

[17] According to Investopedia (which strikes the undersigned as reasonably reliable on this point, which seems uncontroversial in any event), an 8-K is a report of unscheduled material events or corporate changes at a company that could be of importance to the shareholders or to the Securities and Exchange Commission (SEC). Also known as a Form 8-K, the report notifies the public of events, including acquisitions, bankruptcy, the resignation of directors, or changes in the fiscal year. *8-K (Form 8-K)*, Investopedia, https://www.investopedia.com/terms/1/8-k.asp (last visited August 15, 2021). Official information as to the purpose (and proper completion) of Form 8-K can be discerned from the online version of Form 8-K (and its accompanying instructions). *See Form 8-K*, https://www.sec.gov/files/form8-k.pdf (last visited August 15, 2022).

EBITDA, and financial results; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

(*Id.* at ¶ 101). This theory (which the Court will refer to below as the "Bad Debt Theory") is repeated at various places throughout the Complaint. As indicated, its purpose is to explain why particular statements (stated financial figures) "were materially false and/or misleading, and failed to disclose material adverse facts about the Company"; it includes a description of five things that Defendants allegedly failed to disclose to investors, plus a summary statement that these alleged failures rendered the statements at issue materially misleading and lacking in a reasonable basis. Notably, the Court appropriately accepts as true the allegation that Defendants did not disclose these five things to investors, but it does not accept as true the allegation that such non-disclosure constituted a "fail[ure]," as such allegation essentially implies a legal conclusion (which the Court does not accept as true) that the non-disclosure constituted a "fail[ure]" to comply with—*i.e.*, a violation of— applicable securities law(s).

B.  Q4 2016 Earnings Call

On February 21, 2017, Defendants had a conference call with investors ("Q4 2016 Earnings Call"), wherein Defendant Smith, speaking on behalf of Defendant CHS, stated that "EBITDA of $564 million for the fourth quarter was within our guidance." Defendants Cash and CHS also stated that (with respect to Defendant CHS's credit facility and related covenants):

On December 5, we completed amendment with revolving credit facility term loan Ag lenders of the credit agreement to modify our financial covenants and enhance certain credit features through December 2017. With the amendment, the maximum security net leverage ratio is 4.5 during the fourth quarter of 2017, and the minimum interest coverage is 2.0 for each of the four quarters of 2017. We were in compliance with both these covenants on December 31 with secured ratio of 3.96 and an interest rate coverage of 2.43. ***EBITDA cushion on the senior net leverage ratio was 12%, and the cushion on interest coverage is 18%.*** [Emphasis added.]

(*Id.* at ¶ 102). Invoking the Bad Debt Theory Plaintiffs claim that these statements were materially false and misleading. (*Id.* at ¶ 103).

Additionally, during this call, Defendant Smith stated that "we expect one result of our divestiture were [sic] to be a stronger, sustainable group of hospitals in markets where we can invest and grow." (*Id.* at ¶ 104). Plaintiffs claim that "[t]his statement was materially false and misleading because the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger." (*Id.*).

C. 2016 10-K[18]

On the same date, the Company filed its 2016 10-K. (*Id.* at ¶ 105). The 10-K stated that Defendant CHS had the ability to "estimate the allowance for doubtful accounts" at the time of payment, and it also affirmed the previously reported financial results. (*Id.*). The 10-K also stated, "The Company collects substantially all of its third-party insured receivables, which include receivables from governmental agencies." (*Id.*) Additionally, the 10-K stated that the Company's "provision for bad debts decreased to $2.8 billion, or 13.3% of operating revenues (before the provision for bad debts) for the year ended December 31, 2016, from $3.1 billion, or 13.9% of operating revenues (before the provision for bad debts) for the year ended December 31, 2015." (*Id.*). Plaintiffs claim that each of these statements was materially false and/or misleading; in so claiming, they invoke the Bad Debt Theory, plus an additional (seventh) reason: "[C]ollection of

---

[18] "A 10-K [or Form 10-K] is a comprehensive report filed annually by a publicly-traded company about its financial performance and is required by the U.S. Securities and Exchange Commission (SEC). The report contains much more detail than a company's annual report, which is sent to its shareholders before an annual meeting to elect company directors." *10-K*, Investopedia, https://www.investopedia.com/terms/1/10-k.asp (last visited August 15, 2022). Official information as to the purpose (and proper completion) of Form 10-K can be discerned from the online version of Form 10-K (and its accompanying instructions). *See Form 10-K*, https://www.sec.gov/files/form10-k.pdf (last visited August 15, 2022).

substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed." (*Id.* at ¶ 106).

The 2016 10-K contained, in addition to the statements discussed above, Defendants Smith and Cash's signed certifications under the Sarbanes Oxley Act of 2002 ("SOX"), affirming that Defendant CHS's "financial statements fairly presented all material aspects of its financial condition and results of operations, and that the Company's disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP." (*Id.* at ¶ 107).

Plaintiffs allege that the statements in these certifications "were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects." (*Id.* at ¶ 108). In an apparent effort to specify the nature of the alleged failure(s) to disclose, Plaintiffs further allege that "Defendants" (a term that Plaintiffs here do not expressly limit to Defendants Smith and Cash):

> failed to disclose to investors: (1) that the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure that the Company excluded from its "bad debt" calculations revenue receivable from "self-pay" patients, especially aged receivables, for which collection was not probable; and (2) that the Company's disclosure controls and procedures were not effective, and did not provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."[19]

(*Id.* at ¶ 108). This theory—that Defendants did not make these particular disclosures in a Sarbanes-Oxley certification signed by Defendants Smith and Cash, that Defendants thereby are

---

[19] Consistent with its above-described approach regarding the Bad Debt Theory, the Court: (i) appropriately accepts as true the allegation that Defendants did not disclose these two things to investors, but (ii) does not accept as true the allegation that such non-disclosure constituted a "fail[ure]," in the sense that it constituted (or effected) a violation of applicable securities law(s). The Court affords similar treatment to allegations of additional such "fail[ures]" referred to herein.

culpable of failing to disclose material facts about the Company, and that for this reason the statements in the certification were materially false and/or misleading—will be referred to as the "SOX Theory" below.

D. February 23, 2017 RBC Capital Markets Health Care Conference

Defendants Cash and Aaron spoke at the RBC Capital Markets Health Care Conference, where Defendant Cash had an exchange with the managing director of health care services equity research at RBC Capital Markets, regarding Defendant CHS's credit facility. (*Id.* at ¶ 109). During this exchange, Defendant Cash stated:

> *We're in good shape* and we did it with – anybody who wants a little bit of cushion, we got a fair amount of debt and *we've got a little bit of cushion for 2017. We're in good shape.* At the end of December, we'll be in good shape in the quarters this year and then we should be in good shape going into 2018 on the covenants we have. And then there'd be some refinancing activities along the way. [Emphasis added.]

(*Id.*). Plaintiffs allege that this statement was materially false and/or misleading because:

> Defendants failed to disclose to investors: (1) that the Company would have defaulted in 2016 absent the referenced covenant changes; and (2) that the Company was not "in good shape" but instead either would be in default or close to default even with the covenant changes if it recorded the full amount of its "bad debt" expense.

(*Id.* at ¶ 110). Analysts and investors reacted favorably to Defendant Cash's claims at the conference. (*Id.* at ¶ 111).

E. May 1, 2017 8-K

Defendant CHS announced its first quarter 2017 financial results in another 8-K, reporting its net operating revenues, adjusted EBITDA, and provision for bad debt. (*Id.* at ¶ 112). Invoking the Bad Debt Theory, Plaintiffs allege that these statements were materially false or misleading. (*Id.* at ¶ 113).

F.  2017 Q1 10-Q[20]

This form noted the adoption of a new accounting standard (ASC 606) that would impact the provision for bad debts and stated that "[w]e believe that we collect substantially all of our third-party insured receivables, which include receivables from governmental agencies." (*Id.* at ¶¶ 114, 115). Plaintiffs allege that this statement was materially false and/or misleading, invoking the Bad Debt Theory, and for the additional reason that it failed to disclose "that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed." (*Id.* at ¶ 116). This form also contained SOX certifications, signed by Defendants Smith and Cash, that were materially false and misleading using the SOX Theory. (*Id.* at 117).

G.  Q1 2017 Earnings Call

Defendants held a conference call with investors and analysts on May 2, 2017 ("Q1 2017 Earnings Call"), during which Defendant Smith stated that "[w]e're working to not only improve our debt-EBITDA ratio, but also working to reduce the overall amount of our debt." (*Id.* at ¶ 118). Defendant Cash stated that "[o]ur EBITDA cushion on the senior secured ratio was 11% and our EBITDA cushion on our interest coverage was 16%," "adjusted EBITDA of $527 million was in line with our expectations" and "the improvement in AR days more than offset third-party

---

[20] A Form 10-Q is "a comprehensive report of financial performance that must be submitted quarterly by all public companies to the Securities and Exchange Commission (SEC). In the 10-Q, firms are required to disclose relevant information regarding their finances as a result of their business operations. The 10-Q is generally an unaudited report." *SEC Form 10-Q Definition*, Investopedia, https://www.investopedia.com/terms/1/10q.asp (last visited August 15, 2022). Official information as to the purpose (and proper completion) of Form 10-Q can be discerned from the online version of Form 10-Q (and its accompanying instructions). *See Form 10-Q*, https://www.sec.gov/files/form10-q.pdf (last visited August 15, 2022).

[settlements]." (*Id.*). Invoking the Bad Debt Theory, Plaintiffs allege that these statements were materially false and misleading. (*Id.* at ¶ 119).

On the call, Defendant Smith also said, regarding Defendant CHS's hospital divestitures, "[o]ur current divestiture plan will also allow us to move to a portfolio of hospitals that are better positioned in our markets with better volume growth, higher EBITDA margin, [and] improved cash flow." (*Id.* at ¶ 120). Plaintiffs allege that "[t]his statement was materially false and misleading because the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger." (*Id.*).

## H. July 26, 2017 8-K

This form, announcing preliminary financial and operating results for the second quarter of 2017, included an Adjusted EBITDA of $435 million which was impacted by the Company's "bad debt" provision. (*Id.* at ¶ 123). Defendant CHS had used "catch-up" charges[21] during this period which caused bad debt-to-net revenue to increase from 13.2% in the first quarter to 14.1% in the second quarter. (*Id.* at ¶ 125). Investors reacted negatively, and Defendant CHS's share price dropped by more than 14.5%, closing at $7.23 per share on July 27, 2017, on unusually heavy trading volume. (*Id.* at ¶ 126). Plaintiffs allege that Defendant CHS limited this decline by not including the full extent of Defendant CHS's "bad debt" expense in its Adjusted EBITDA calculation, instead taking on the incremental "catch up" charge. (*Id.* at ¶ 127). Moreover, Plaintiffs allege that while the pre-announcement constituted a partial "materialization"[22] of risk, Defendants

---

[21] This was defined in the Complaint as "any amount recorded as a one-time charge" used to correct the misuse or oversight of facts which existed during prior periods. (Doc. No. 61 at ¶ 94).

[22] It is unclear what Plaintiffs mean by "materialization" in this context. The Court finds the most likely interpretation of this term here to mean the pre-announcement revealed some of what Defendant CHS had allegedly failed to disclose regarding its financial status (as described in the Bad Debt Theory).

continued to make statements (and omissions) that (under the Bad Debt Theory) Plaintiffs allege were materially false and/or misleading. (*Id.* at ¶ 127).

I. August 1, 2017 8-K

Defendant CHS announced its second quarter 2017 financial results in another 8-K, reporting its net operating revenues, adjusted EBITDA, and provision for bad debt. (*Id.* at ¶ 128). Invoking the Bad Debt Theory, Plaintiffs allege that these statements were materially false and/or misleading . (*Id.* at ¶ 129).

J. 2017 Q2 10-Q

The Company's second-quarter 2017 Form 10-Q affirmed the second quarter results and stated that, "[o]ur [Defendant CHS's] provision for bad debts decreased $21 million to $679 million, or 14.1% of operating revenues (before the provision for bad debts) for the three months ended June 30, 2017." (*Id.* at ¶ 130). It also stated, "[t]he Company collects substantially all of its third-party insured receivables." (*Id.* at ¶ 131). Plaintiffs allege that these statements were materially false and/or misleading, invoking the Bad Debt Theory and further alleging that it failed to disclose "that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, and neither the Company nor the signatories so believed." (*Id.* at ¶ 132). This 10-Q also contained SOX certifications signed by Defendants Smith and Aaron, which Plaintiffs, invoking the SOX Theory, allege were misleading. (*Id.* at ¶ 133).

K. Q2 2017 Earnings Call

On August 2, 2017, Defendants held a conference call with investors and analysts ("Q2 2017 Earnings Call") during which Defendant Smith, speaking on behalf of Defendant CHS, stated:

Now, I'd like to provide an update on our divestiture plan. *As you're aware, we have announced plans to shift our portfolio to a smaller group of hospitals that are better positioned in their respective markets with better demographics and volume growth, higher EBITDA margin and improved cash flow generation profile.* This will also allow us to direct future investments and corporate resources to our most attractive markets in regional networks. [Emphasis added.]

(*Id.* at ¶ 134). Plaintiffs allege that this statement was materially false and misleading because Defendant CHS sold many of the Company's strongest hospitals, making the remaining portfolio of hospitals weaker, rather than stronger. (*Id.*).

Defendant Aaron, speaking on behalf of Defendant CHS, further stated during this call that "[a]s of June 30, 2017, our EBITDA cushion on our secured net leverage ratio is 15% and our EBITDA cushion on our interest coverage ratio is 26%." (*Id.* at ¶ 135). Plaintiffs allege that:

These statements were materially false and misleading because they were derived from artificially inflated Consolidated EBITDA figures, as a result of: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables; (2) excluding from "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients was not probable, as the Company had assumed for purposes of calculating bad debt.

(*Id.* at ¶ 135).[23] Plaintiffs also state that Defendants Aaron and CHS, when speaking about one of the primary drivers of Defendant CHS's bad debts, stated that "[i]mprovement in AR days more than offset the changes in third-party settlements." (*Id.* at ¶ 136 (emphasis added)). Regarding this statement, Plaintiffs allege:

---

[23] It seems clear to the Court that something is missing from the point (1) here. Specifically, it seems that Plaintiffs must have intended to add, "was not probable" to the end of the phrase "(1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables"; not only did Plaintiffs add such language to the end of that phrase where it appears elsewhere in the Complaint, but the addition of that phrase (or something just like it) would be necessary to make the point Plaintiffs clearly were trying to make here.

This statement was materially false and misleading because they failed to disclose to investors the understatement of bad debt due to: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables, was not probable; (2) excluding from its "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding the impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients, was not probable, as the Company had assumed for purposes of calculating bad debt.

(*Id.*).

### L. November 1, 2017 8-K

The 8-K document contained the Company's net operating revenues, adjusted EBITDA, and provision for bad debt for the third quarter of 2017. (*Id.* at ¶ 139). Plaintiffs allege that Defendant CHS continued to use "catch up" charges during the third quarter—causing the bad debt-to-net revenue ratio to increase to 15.4%—in an attempt to get rid of part of Defendant CHS's massive bad debt overhang before reporting audited financial results in accordance with ASC 606. (*Id.* at ¶¶ 140, 141). These "dismal" third quarter results and Defendant Aaron's admission during the Q3 2017 Earnings Call that the results were caused partly by "increased bad debt" led Defendant CHS's share price to fall 23.1% ($1.36 per share) over two days. (*Id.* at ¶ 143). Invoking the Bad Debt Theory, Plaintiffs allege that Defendants continued to conceal damaging information which stymied this price decline and continued to make false and misleading statements (and omissions). (*Id.* at ¶ 144).

### M. 2017 Q3 10-Q

In the Company's third-quarter 2017 Form 10-Q, Defendant CHS stated that "[o]ur net operating revenues for the nine months ended September 30, 2017 decreased $1.7 billion . . . . Our provision for bad debts decreased $131 million to $2.0 billion, or 14.2% of operating revenues

(before the provision for bad debts) for the nine months ended September 30, 2017." (*Id.* at ¶ 146). Defendants also stated, "[t]he Company [Defendant CHS] collects substantially all of its third-party insured receivables." (*Id.* at ¶ 147).

Plaintiffs allege that these statements were materially false and/or misleading. In so alleging, Plaintiffs rely on the Bad Debt Theory and the additional assertion that these statements failed to disclose "that collection of substantially all receivables from third-party insured patients, including government insured patients, was not probable and neither the Company nor the signatories so believed." (*Id.* at ¶ 148). This form also contained SOX certifications, signed by Defendants Smith and Aaron, which Plaintiffs (invoking the SOX Theory) allege were materially false and misleading. (*Id.* at ¶ 149).

### N. Q3 2017 Earnings Call

Defendants held a conference call with investors and analysts on November 2, 2017 ( "Q3 2017 Earnings Call"), during which Defendant Aaron, speaking on behalf of Defendant CHS, stated that "our EBITDA cushion on our secured net leverage ratio is 15% and our EBITDA cushion on our interest coverage ratio is 29%." (*Id.* at ¶ 150). Plaintiffs allege that these statements were materially false and misleading because:

> [T]hey were derived from artificially inflated Consolidated EBITDA figures, as a result of: (1) excluding evidence that the Company's actual ability to collect uninsured "self-pay" receivables, especially aged receivables, was not probable; (2) excluding from "bad debt" calculations evidence that collection of amounts due from insured patients as co-pays or deductibles was not probable for large groups of patients and hospitals; (3) excluding the impact of "anticipated denials" from third-party payors that it had not reflected in its "bad debt" calculations; (4) and excluding that collection of substantially all receivables from third-party insured patients, including government insured patients, was not probable, as the Company had assumed for purposes of calculating bad debt.

(*Id.*). On the same call, Defendant Aaron also stated that "consolidated net revenue was below our expectations from a combination of lower-than-expected volumes, payer rates, along with increased bad debt." (*Id.* at ¶ 151).

O. <u>2017 Form 10-K</u>

The 2017 Form 10-K stated that Defendant CHS had conducted an analysis to develop new accounting processes and methodologies to comply with the revenue recognition accounting standards in ASC 606. (*Id.* at ¶ 152). This analysis also led to a change in estimate for the fourth quarter and year ended[24] December 31, 2017, increasing contractual allowances and provision for bad debts by approximately $591 million. (*Id.* at ¶¶ 152, 153).

On February 27, 2018, Defendant CHS announced its fourth quarter and full year 2017 financial results in an 8-K, which included the $591 million charge—$197 million for contractual allowances, $394 million for the bad debt provision—. (*Id.* at ¶ 154). Analysts expressed skepticism about characterizing the $591 million charge as an adjustment occasioned by ASC 606. (*Id.* at ¶¶ 155, 156).

On February 28, 2018, Defendants held a conference call with investors and analysts (the "Q4 2017 Earnings Call"), during which Defendant Aaron reiterated how Defendant CHS reached its $591 million change in estimate after developing new accounting processes and methodologies to comply with the new standard (ASC 606). (*Id.* at ¶ 157). When asked by an analyst about the size of the change, Defendant Aaron stated:

> ***So when you compare the size of the adjustments, it's going to depend on how filers would have historically set their reserves.*** We've had higher days. ***We kept our self-pay on our books***. Internally, we pursued those and gone after those for

---

[24] A company's 10-K functions as both its annual financial report and its financial report for the fourth quarter. The reported financials reflect both the company's fourth quarter financial position and its overall financial position for the previous year. *10-K*, Investopedia, https://www.investopedia.com/terms/1/10-k.asp (last visited August 15, 2022). This is why the 10-K is described as setting forth financial results "for the fourth quarter and year ended."

collection. So moving to this new method, it is a more conservative method. We had to anticipate with the new standard, we felt things that might impact the collectability and make sure that the amounts we set up were more conservative. *So that included for – if you take a look at third-party payments, anticipated denials using our history on the transactions to anticipate denials from third-party payers, any audits that may come out from third-party payers and also our self-pay*.

*So we did run the model backwards*, as I mentioned, and to several prior years to see the impact of that. ***And if you think about going from a standard where you were maybe less conservative to one that's more conservative, really when we look at ours, it did not have an impact***. And if you think about it, it probably has an impact when the size of your balance sheet is growing through acquisitions and potentially receivables that come on board from a large acquisition. We've had a couple of very large ones. [Emphasis added.]

(*Id.* at ¶ 158). Defendant CHS's share price fell more than 17% ($1.06 per share) due the $591 million charge. (*Id.* at ¶¶ 166, 167).

Defendant Aaron also stated that ASC 606 did not affect the collectability of Defendant CHS's bad debt. (*Id.* at 159). Plaintiffs state that Defendant Aaron further suggested that had ASC 606 been adopted in 2016, it would have been used to clear bad debt then just as it did for 2017, which amounts to a concession that uncollected receivables were inflated throughout the Class Period. (*Id.* at ¶ 160). Additionally, although Defendant CHS claimed during the Class Period that it collected substantially all third-party receivables, Defendant Aaron acknowledged that Defendant CHS had no basis, during the Class Period, to claim it understood the collectability of third-party receivables. (*Id.* at ¶¶ 161, 162).

Defendants had some motivation to mischaracterize the $591 million charge as a change in accounting because it was the only way Defendant CHS could avoid triggering a default on its debt covenants. (*Id.* at ¶¶ 163–65). Confidential witnesses (all former CHS employees) state that the $591 million charge was a stealth restatement to correct errors in earlier financial statements. (*Id.* at ¶ 168). One of these confidential witnesses states that the $591 million increase was the

result of an error or change to the accounting around the goodwill and synergies that Defendant CHS thought it would receive from HMA. (*Id.* at ¶¶ 169, 170).

Plaintiffs allege that Defendant CHS has never offered a plausible explanation for the $591 million write-down, which alone is more than 88% of Defendant CHS's bad debt provision for the previous quarter. (*Id.* at ¶ 172). Plaintiffs further allege that had Defendant CHS formally acknowledged its restatement, it would have been required to provide a full explanation of the error(s), the nature of any related correction, and its actual proximity to triggering default under loan covenants to investors. (*Id.* at ¶ 174).

Finally, Plaintiffs include additional allegations specific to Defendants' scienter. Plaintiffs note that Defendants acted with scienter by virtue of:

> (a) their receipt of information reflecting the Company's understatement of bad debt and overstatement of EBITDA; and/or (b) their receipt of information reflecting that lacked adequate internal and financial controls; and/or (c) their intentional or reckless issuance of materially false or misleading statements; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and his reckless failure to do so.

(*Id.* at ¶ 175). Plaintiffs state that this shows that Defendant CHS and the Individual Defendants either knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they disseminated to the public. (*Id.*) Plaintiffs also state that the Individual Defendants knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in Defendant CHS's public statements would affect the integrity of the market for Defendant CHS's securities and would cause the price of those securities to be artificially inflated. (*Id.* at ¶ 176).

Correspondence with the SEC shows that Defendant CHS's executives were actively involved in the budgeting process and were aware of the true financial condition of the bad debts. (*Id.* at ¶¶ 177, 178). A confidential witness also stated that Defendant CHS's management pulled

reports from the revenue cycle stream, confirming that the Individual Defendants had access to the information they excluded from "bad debt" calculations. (*Id.* at ¶ 179). Defendant CHS's revenue and bad debt were of core importance, and Defendant CHS and the Individual Defendants knew that acquiring payment for services performed was vital to the success of Defendant CHS. (*Id.* at ¶ 180). Plaintiffs allege that the Individual Defendants were likely aware that Defendant CHS's bad debt provision was understated, and that even if they were unaware, the Individual Defendants acted in a deliberately reckless manner to ignore adverse information. (*Id.* at ¶ 181). Defendant CHS and the Individual Defendants were also aware of the loan covenants as evidenced by the facts that Defendant CHS is a party to the agreements (and is charged with knowledge thereof) and that Individual Defendants had spoken to investors regarding the covenants and the related "EBITDA cushion." (*Id.* at ¶ 182). Defendant Cash is also a signatory on the 8-k filed on December 6, 2016, disclosing the December 5, 2016 amendment to the covenant ratios. (*Id.*) Therefore, the Defendants understood the covenants and were incentivized to postpone recognition of the bad debt expense until it could be characterized as a "change in accounting" and be exempted from the covenant calculation. (*Id.*)

The SEC was already investigating HMA for similar conduct. HMA, which Defendant CHS acquired prior to the Class Period, is[25] the subject of an ongoing SEC investigation concerning issues related to accounts receivable, billing write-downs, contractual adjustments, reserves for doubtful accounts, accounts receivable aging, and recording of revenue. (*Id.* at ¶ 183). Plaintiffs state that "[t]he fact that its largest acquisition was facing an SEC investigation at the time of Defendants' conduct supports an inference that Defendants were aware of the fraud since it necessarily brought the issues to their attention." (*Id.* at ¶ 184).

---

[25] The allegation in the Amended Complaint of an ongoing investigation concerning HMA was, naturally, an allegation that the investigation was ongoing as of the time the Amended Complaint was filed.

Finally, during the Class Period, the Individual Defendants were given far more compensation than they could obtain at other healthcare competitor-employers. (*Id.* at ¶ 185). The Individual Defendants' compensation was tied to Defendant CHS's Adjusted EBITDA which further incentivized the Individual Defendants to understate Defendant CHS's bad debts. (*Id.*).

The Complaint asserts two claims. Count One alleges violation(s) by all Defendants of section 10(b) of the Exchange Act (codified at 15 U.S.C. § 78j(a)) and Rule 10b-5 promulgated thereunder (codified at 17 C.F.R. § 240.10b-5). (*Id.* at ¶¶ 197–207). Count Two sets forth a claim of so-called "control person" liability with respect to the Individual Defendants—*i.e.*, the theory that the Individual Defendants (even if not otherwise liable for the violations alleged in Count One) are, under section 20(a) of the Exchange Act (codified at 15 U.S.C. § 78t(a)), liable for violations committed by CHS as alleged in Count One because they are so-called controlling persons of CHS. (*Id.* at ¶¶ 208–214). Plaintiffs' requested relief includes certification of the proposed plaintiffs' class, compensatory damages, and reasonable costs and expenses. (*Id.* at 64.).

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 1950. A legal conclusion, including one

couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id.* at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

Additional (heightened) pleading requirements also apply to Plaintiffs' claims by virtue of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), as discussed in more detail below.

## DISCUSSION

Defendants assert that the Amended Complaint is flawed in several ways: 1) it fails to allege facts sufficient to establish that Defendants made misrepresentations; 2) it fails to allege facts sufficient to establish the element of scienter; 3) it fails as a matter of law because the company's estimates of future uncollectible revenue are inherently forward-looking and protected by an applicable safe harbor; and 4) because (according to Defendants) it fails to state a claim of securities fraud against the Company, the claims against the Individual Defendants also fail as a matter of law. (Doc. No. 66 at 9–11).[26] The Court will address each of these arguments in turn.

---

[26] When citing herein to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page — of —") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

A. Overview of relevant law

Section 10(b) of the Act and Rule 10b-5 prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security. *Grae v. Corrections Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at * 13 (M.D. Tenn. Dec. 18, 2017). In particular, to put the matter simply, in pertinent part Section 10(b) makes it illegal to employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations promulgated by the SEC. 15 U.S.C. § 78j(b). Rule 10b-5 is just such a rule, and it is the primary one implicated in this case. Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.[27]

To state a claim under Section 10(b) and Rule 10b–5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant;[28] (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

---

[27] It is clear that subsection (b) would have more precisely articulated its (surely) intended meaning had it provided: "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make **any statements that were made**, in the light of the circumstances under which they were made, not misleading . . . ." By replacing the phrase "the statements made" with the bolded language proposed by the undersigned, the rule would have clarified that liability for omitting material facts can be based upon statements that are not themselves "untrue" (and do not themselves contain any untrue content); without this change, subsection (b) is clear enough, but this change would have made the point clearer still.

[28] "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Jackson Cty.*, 2020 WL 7711378 at *14 (citing *Omnicare I*, 769 F.3d at 470).

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Jackson Cty.*
*Employees' Ret. Sys. v. Ghosn*, 2020 WL 7711378, at *13 (M.D. Tenn. Dec. 29, 2020) (citing *In*
*re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) [hereinafter, "*Omnicare I*"])).
Stated another way, "a plaintiff must allege, in connection with the purchase or sale of securities,
the misstatement or omission of a material fact, made with scienter, upon which the plaintiff
justifiably relied and which proximately caused the plaintiff's injury." *Id.*

Plaintiffs' securities fraud claims implicate the heightened pleading standards of Federal
Rule of Civil Procedure 9(b), *Jackson Cty.*, 2020 WL 7711378, at *5, which requires that a party
"must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.
9(b). Accordingly, the Amended Complaint must "(1) specify the statements that Plaintiffs contend
were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and
(4) explain why the statements were fraudulent." *Jackson Cty.*, 2020 WL 7711378, at *5 (citing
*Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018)). The Private
Securities Litigation Reform Act ("PSLRA")—in particular, 15 U.S.C. § 78u–4(b)(1) and (2),
respectively—requires that a plaintiff's complaint (1) specify each statement alleged to have been
misleading along with the reason(s) why the statement is misleading and (2) state with particularity
facts giving rise to a strong inference that the defendant acted with the required state of mind. *Id.*

Historically, the first two of the six elements have been notoriously difficult to articulate.
As the Sixth Circuit noted a half-dozen years ago:

> Our court has covered the standards for pleading these elements many times, and
> yet for all of our efforts and many pronouncements, the precise requirements for
> sufficiently pleading them, at least in this circuit, remain somewhat hazy and
> muddled. Therefore, before analyzing KBC's actual allegations, we will attempt to
> state the doctrine simply and in a straightforward manner in the hope of clearing
> away any confusion.

*Omnicare I*, 769 F.3d at 469. The Court herein will attempt to do likewise, relying on *Omnicare I* (and whatever clarity it provided) and other extant cases.

B. <u>Material misrepresentation or omission</u>

The Sixth Circuit has explained:

A misrepresentation is an affirmative statement that is misleading or false. When an alleged misrepresentation concerns "hard information"—"typically historical information or other factual information that is objectively verifiable"—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. *Murphy v. Sofamor Danek Grp., Inc.* (*In re Sofamor Danek Grp., Inc.*), 123 F.3d 394, 401 (6th Cir. 1997) (internal quotation marks omitted); *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–70 (6th Cir. 2005). When an alleged misrepresentation concerns "soft information," which "includes predictions and matters of opinion," *id.*, a plaintiff must additionally plead facts showing that the statement was "made with knowledge of its falsity," *[Indiana v. Omnicare]*, 583 F.3d at 945–46.

It is this latter type of alleged misrepresentation that is at issue here and that has given us and other courts such trouble because it adds a subjective inquiry to an otherwise objective element, thus conflating two elements of the six-element cause of action—an actionable misrepresentation and scienter. *See, e.g.*, *Brown v. Credit Suisse First Bos. LLC* (*In re Credit Suisse First Bos. Corp. Sec. Litig.*), 431 F.3d 36, 48 (1st Cir. 2005) (recognizing that "the subjective aspect of the falsity requirement and the scienter requirement essentially merge"), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007); *In re Salomon Analyst AT & T Litig.*, 350 F.Supp.2d 455, 466 (S.D.N.Y. 2004) (recognizing same). Until now, we have ignored this merger of elements and analyzed whether a defendant had actual knowledge under both Elements One and Two. *See, e.g.*, *[Indiana v. Omnicare]*, 583 F.3d at 945–47 (analyzing knowledge of falsity under the material-misrepresentation requirement); *Zaluski*, 527 F.3d at 573 (same); *City of Monroe*, 399 F.3d at 670–76, 684–88 (analyzing knowledge of falsity under both requirements). In doing so, we have muddled the analytical framework, making it more difficult for lower courts and parties to evaluate whether a plaintiff has sufficiently pleaded a cause of action.

In the end, we must choose one way or the other to analyze a defendant's actual knowledge. Whether courts choose to evaluate this subjective component as part of their material-misrepresentation analysis or their scienter analysis makes little difference for the parties. Under either approach, Plaintiffs will need to allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time that they were made. But for the sake of clarity, it makes the most sense to adopt the

First Circuit's approach and conceive of this additional requirement as raising the bar for alleging scienter. *See In re Credit Suisse*, 431 F.3d at 48–49; *see also* Wendy Gerwick Couture, *Opinions Actionable as Securities Fraud*, 73 La. L. Rev. 381, 394–401 (2013). Doing so would allow courts to evaluate materiality and whether the statement was misleading or false—two objective inquiries—under the material-misrepresentation prong and then to save all subjective inquiries for the scienter analysis. In addition, whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind— the general subject of a scienter inquiry.

*Omnicare I*, 769 F.3d at 470–71.

Defendants argue that Plaintiffs fail to plead with particularity facts sufficient to establish a material misrepresentation or omission. Plaintiffs identify the following paragraphs from the Amended Complaint as the ones setting forth the (affirmative) statements that underlie Plaintiffs' claims of material misrepresentations and omissions:[29] ¶¶ 100-101, 102-03, 104, 105-06, 107-08, 109-10, 112-13, 115-16, 117, 118-19, 120, 123, 127, 128-29, 130-32, 133, 134, 135, 136, 139-40, 144, 145-48, 149, 150 (which are discussed in more detail in the Factual Background section, above). (Doc. No. 69 at 19). Defendants raise three (supposed) bases for challenging the sufficiency of Plaintiffs' assertion that their allegations of material misrepresentations and omissions are plausibly grounded on these statements: 1) Plaintiffs' supposed failure to sufficiently plead a lack of a reasonable basis for Defendant CHS's accounting estimates of uncollectible revenue, 2) Defendant CHS's supposed full disclosure of the risks related to uncollectible revenue,

---

[29] Obviously, an affirmative statement can underlie a claim of *misrepresentation* because it can contain a misrepresentation. But one might reasonably ask how affirmative statements can underlie a claim of an *omission*. For purposes of Rule 10b-5, the answer is clear: affirmative statements underlie a claim of an omission (of a material fact) to the extent that the omission of the material fact makes the statements misleading considering the circumstances under which they were made.

and 3) the statements supposedly amounting to mere (non-actionable) subjective statements of opinion, puffery, and characterizations .[30] (Doc. No. 66 at 23, 28).

### 1. *Reasonable basis*

Defendants argue that accounting estimates (such as reserves of uncollectible revenue) are evaluated under a standard of reasonableness and that the Complaint fails to plead facts sufficient for the Court to "infer that CHSI's accounting estimates of uncollectible revenue lacked any reasonable basis." (Doc. No. 66 at 23). Defendants cite Ninth Circuit authority for the proposition that "[a] company's determination of [] reserves, like other types of forecasts, is considered fraudulent only if plaintiffs can show that the company lacked a reasonable basis for the determination." (*Id.*).

Defendants also cite an unreported district court case in which the court held that:

> [W]here a complaint alleges that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, the complaint must state what the unreasonable accounting practices were and how those practices distorted the disclosed data. *In re Burlington*, 114 F.3d at 1417-18. Statements of reserve amounts are "fraudulent only if . . . the responsible parties knew or should have known that [the amounts of reserve] were derived in a manner inconsistent with reasonable accounting practices." *Christidis v. Pa. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983). Accordingly, a complaint must plead with particularity "the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices." *Id.* To do so, the complaint must "include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." *In re Loewen Group, Inc. Sec. Litig.*, Civ. A. No. 98-640, 2004 WL 1853137, at *11 (E.D. Pa. Aug. 18, 2004). In the absence of such allegations, "neither the increase of allowance toward the end of

---

[30] Though Defendants do not expressly assert that the omissions addressed throughout this section are immaterial, Defendants imply that their omissions were immaterial. To the extent that Defendants are making an argument regarding the materiality of statements, Defendants have not explained why the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001), *abrogated on other grounds by Tellabs.*, 551 U.S. 308.

the class period nor the eventual financial ruin of [the defendant corporation] are proof that defendants committed any acts worse than mismanagement." *Id.* at *12.

Here, the Amended Complaint does identify with sufficient particularity which GAAP procedures were allegedly violated. However, the Amended Complaint does not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible. *See id.* Similarly, the Amended Complaint does not identify the data, or source of data, that was used to arrive at its conclusions, the amount by which reserves were distorted, or how much revenue was improperly recognized. *See CHUBB*, 394 F.3d at 153. Accordingly, the Court finds that the Amended Complaint fails to plead facts which would support the inference that Defendants were engaging in accounting fraud with the particularity demanded by the PSLRA.

*Freed v. Universal Health Servs., Inc.*, No. CIV.A.04-1233, 2005 WL 1030195, at *9 (E.D. Pa. May 3, 2005). Defendants argue that like the plaintiffs in *Freed*, Plaintiffs "did not plead with any particularity facts sufficient to show that CHSI's estimates for uncollectible revenue lacked any reasonable basis at the time the estimates were made," "have not pled when the estimates should have been revised, or by how much," have not alleged "what facts were known or readily available to management during the Class Period to conclude that uncollectible revenue was underestimated," and "provide no particularized support for their claim that financial statements for certain unspecified periods should be restated by an unspecified amount," thus failing to plead the "who, what, when, where and how" of the underlying events. (Doc. No. 66 at 26).

Plaintiffs respond that *Freed* is both unreported and out-of-circuit. They deem *Freed* an outlier and claim that it is based on a misinterpretation of *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) (hereinafter "*In re Burlington*"), which Plaintiffs assert (and the Court agrees) articulated not what was *necessary* to state a claim, but rather what was *sufficient* to state a claim. (Doc. No. 69 at 24 n.13). Plaintiffs assert that Defendants applied the wrong standard altogether, with "reasonableness" having no part of the calculus. Instead, Plaintiffs characterize the requisite standard as follows: "once a defendant speaks upon a subject he 'cannot omit material

facts related to that issue so as to make [his] disclosure misleading.' *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019). A speaker must provide '"the whole truth" . . . literal accuracy is not enough.' *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)." (*Id*. at 20). Here, unlike the plaintiffs in *Freed*, Plaintiffs do allege with sufficient particularity under the relevant pleading standards previously described that Defendant CHS "understated its provision for bad debts and overstated its operating revenue and Adjusted EBITDA." (Doc. No. 61 at 2).

Defendants also make several references in their briefing to the so-called "reasonable accountant standard." Under that standard (which would be more accurately dubbed the "not necessarily unreasonable accountant standard"), mere misapplications of accounting principles are insufficient to show the recklessness needed in a securities fraud case. *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). Rather, plaintiffs must prove that "[t]he accounting practices were so deficient that the audit amounted to no audit at all or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (internal citations omitted).

Plaintiffs argue that this standard applies only to auditors (which do not include among their ranks any Defendants), and so this Court should not apply it to the instant case. Case law supports this position. *Compare id.* (applying the standard to an outside auditor), *and in re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (applying the standard to an outside auditor), *with in re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1382 (N.D. Ga. 2000) (applying the standard to company-prepared financials). In the Sixth Circuit, this standard has been applied only to auditors, although the Sixth Circuit has not expressly prohibited giving it a wider scope. *See La. Sch. Emps' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010) (applying the

reasonable accountant standard to an outside auditor); *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2018 WL 3723712, at *4 (E.D. Tenn. Aug. 2, 2018) (describing the reasonable accountant standard as the standard by which to judge an outside auditor). The Court thus declines to apply the "reasonable accountant standard" in the instant context.

But regardless of whether the reasonable accountant standard applies just to auditors or to all accountants (and, therefore, regardless of whether it will ultimately be applicable in the instant case), Plaintiffs are correct that courts treat the issue of whether a defendant has complied with relevant accounting standards as inappropriate to resolve on a motion to dismiss. *See, e.g.*, *In re Burlington*, 114 F.3d at1421 ("[I]t is a factual question whether [a defendant's] accounting practices were consistent with GAAP."); *Wells Fargo Bank, N.A. v. Worldwide Shrimp Co.*, No. 17 CV 4723, 2019 WL 4189480, at *5 (N.D. Ill. Sept. 4, 2019) ("[C]ompliance with GAAP is a fact-specific issue and cannot be resolved as part of a motion to dismiss."); *SEC v. Cotton, No.* SACV 06-0905 AG(ANX), 2006 WL 6382128, at *6 (C.D. Cal. Dec. 21, 2006) (noting that it is not appropriate to resolve a dispute regarding the reasonableness of an accounting practice at the pleading stage); *In re Triton Energy Ltd. Sec. Litig*., No. 5:98-CIV-256, 2001 WL 872019, at *8 (E.D. Tex. Mar. 30, 2001) ("Whether Defendants violated the applicable accounting standards is a question of fact."); *Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002) (noting that whether an accounting practice complies with GAAP is a question of fact best resolved through expert testimony and therefore inappropriate for resolution on a motion to dismiss).

Instead, Plaintiffs need only meet the applicable pleading standards set forth in *Iqbal* and *Twombly*, Fed. R. Civ. P. 9(b), and the PSLRA, described by the Court above. The Court finds that Plaintiffs have done so. Without resolving factual issues as to the reasonableness of the accounting

standards used by Defendants or whether the accounting principles used by Defendants comply with GAAP, Plaintiffs have plausibly alleged that Defendants distorted certain figures disclosed to the public and stated what the practices were and how they allegedly distorted the data. *In re Burlington*, 114 F.3d at 14. At this stage, the Court cannot say—and, as discussed above, need not say—whether Defendants in fact complied with GAAP or whether the alleged misrepresentations can be explained in full (and justified) by a "change from one GAAP-compliant methodology for making accounting estimates to another GAAP-compliant methodology." (Doc. No. 66 at 27). *In re Burlington*, 114 F.3d at 1421.

The Court rejects Defendants' insistence that a "reasonable basis" standard applies when determining whether Plaintiffs have stated a claim for a material representation or omission based on forward-looking accounting estimates. Reasonableness is a question of fact to be decided by the jury, not by the Court on a motion to dismiss. The Court thus will not consider Defendants' proposed "reasonable basis" test when assessing whether Plaintiffs have adequately stated a claim for a material representation or omission.

2. *Disclosed risk*

Defendants include a brief argument for dismissal of Plaintiffs' 10(b) claim on the ground that (according to Defendants) "CHSI fully disclosed the risks related to uncollectible revenue." (Doc. No. 66 at 28). To support this argument, Defendants explain:

> [Defendant CHS] provided fulsome, meaningful cautionary language and disclosed the risks related to potential future uncollectability of revenues. The Company identified its accounting policies for Third-Party Reimbursements and Allowance for Doubtful Accounts as Critical Accounting Policies. [Defendant CHS] informed investors that these estimates involved uncertainty and that actual results could differ from what was estimated. [Defendant CHS] also fully disclosed its methodology for calculating these estimates. The Company disclosed to investors that its adoption of ASC 606 could impact its financial statements.

In sum, [Defendant CHS] provided a reasonable, GAAP-compliant estimate for uncollectible revenue based on its historical experience for all periods, it fully disclosed its methodology for calculating these estimates, and it cautioned investors that actual results could differ. It provided expansive disclosure of its adoption of ASC 606 including the implementation of new processes and methodologies to comply with the new, historic change in GAAP. And [Defendant CHS] detailed its change in estimate in the fourth quarter 2017 based upon new information available with the implementation of those new processes and methodologies.

(*Id.* (footnotes omitted)).

Plaintiffs reply by arguing that "Defendants' naked warnings about 'risks and uncertainties' were insufficient to place investors on notice of the known risks inherent in their investments" because 1) "the supposed cautionary language Defendants cite was so generic that it would apply to any company that had any receivables" and 2) "the long list of potential generic risks contained in the Company's Annual Reports (see Doc. No. 61-1 at 93-95) did not actually put investors on notice that these risks had already materialized." (Doc. No. 69 at 31-32).

As noted above, factual determinations are inappropriate on a motion to dismiss. Whether Defendants provided "fulsome, meaningful" cautionary language is clearly an issue in dispute between the parties, and is not fit for determination at this juncture. Because the issue of whether Defendants adequately disclosed risks related to uncollectable revenue is an issue of fact, the Court is not situated to dismiss Plaintiffs' well-pleaded 10(b) claim based on an argument that Defendants did indeed disclose the risks at issue here.

3. *Opinion, puffery, and characterizations*

Defendants assert that paragraphs 104, 109, 115, 118, 120, 131, 134, and 147 allege mere statements of opinion and are thus "non-actionable." (Doc. No. 66 at 28). The statements contained in these paragraphs are summarized as follows:

- Defendant Smith stated in the Q4 2016 Earnings Call that "we expect one result of our divestiture were [sic] to be a stronger, sustainable group of hospitals in markets where we can invest and grow." (Doc. No. 61 at ¶ 104).

- Defendant Cash, when speaking with an analyst and managing director of health care services at RBC Capital Markets, stated the following concerning Community Health's credit facility: "We're in good shape and we did it with – anybody who wants a little bit of cushion, we got a fair amount of debt and we've got a little bit of cushion for 2017. We're in good shape. At the end of December, we'll be in good shape in the quarters this year and then we should be in good shape going into 2018 on the covenants we have. And then there'd be some refinancing activities along the way." (Doc. No. 61 at ¶ 109).

- The 2017 Q1 10-Q stated in part, "We believe that we collect substantially all of our third-party insured receivables," while failing to disclose certain facts which Plaintiffs allege makes this statement materially false and/or misleading. (Doc. No. 61 at ¶¶ 115-116).

- Defendants stated on a Q1 2017 Earnings Call with investors and analysts that "[w]e're working to not only improve our debt-EBITDA ratio, but also working to reduce the overall amount of our debt[]," "[o]ur EBITDA cushion on the senior secured ratio was 11% and our EBITDA cushion on our interest coverage was 16%[]," "adjusted EBITDA of $527 million was in line with our expectations[]," and, with respect to one of the primary drivers of the Company's bad debt, that "the improvement in AR days more than offset third-party [settlements][]"  (Doc. No. 61 at ¶ 118).

- Defendants stated, regarding Defendants' hospital divestitures "[o]ur current divestiture plan will also allow us to move to a portfolio of hospitals that are better positioned in our markets with better volume growth, higher EBITDA margin, improved cash flow[]" yet

Plaintiffs state that the Company's divestitures "included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger." (Doc. No. 61 at ¶ 120).

- The 2017 Q2 10-Q stated in part that "[t]he Company collects substantially all of its third-party insured receivables . . ." (Doc. No. 61 at ¶ 131).

- During the Q2 2017 Earnings Call, Defendants stated, regarding Community Health's sell-off of hospitals, "As you're aware, we have announced plans to shift our portfolio to a smaller group of hospitals that are better positioned in their respective markets with better demographics and volume growth, higher EBITDA margin and improved cash flow generation profile." Yet, Plaintiffs state that "the Company's divestitures included many of the Company's strongest hospitals, and accordingly, the remaining portfolio of hospitals was weaker, not stronger." (Doc. No. 61 at ¶ 134).

- The "Management's Discussion and Analysis" section of Defendants' Form 10-Q for the third quarter of 2017 stated in part that "[t]he Company collects substantially all of its third-party insured receivables. (Doc. No. 61 at ¶ 147).

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) (hereinafter, "*Omnicare II*"),[31] the Supreme Court distinguished statements of fact (which express certainty about a thing) from statements of opinion (which do not express certainty) in a securities fraud case. 575 U.S. at 182; *see also Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018). An opinion can successfully form the basis for an alleged misrepresentation in a securities fraud claim (that is, it

---

[31] Although *Omnicare II* involved a registration statement that allegedly violated Section 11 of the Securities Act of 1933, other courts have found that the same standards for alleging the falsity of opinion statements apply to Section 10(b) and Rule 10b-5. *See Zwick Partners*, 2018 WL 2933406, at * 5.

is "actionable") if the person stating the opinion does not actually hold the stated belief, or if the opinion contains a materially false embedded statement of fact, or if the opinion is paired with a sufficiently material omission that makes the statement misleading. *Id.* (discussing *Omnicare II*); *see also USM Holding, Inc. v. Simon*, No. 15-14251, 2017 WL4005939, at *4 (E.D. Mich. Sept. 12, 2017).[32] Whether a statement is "misleading" depends on the perspective of a reasonable investor. *Zwick Partners*, 2018 WL 2933406, at *5 (citing *Omnicare II*, 575 U.S. at 186). In *Omnicare II*, the court explained that a reasonable investor expects not just that the company believes the opinion, but also that "it fairly aligns with the information in the company's possession at the time." *Id.* (citing *Omnicare II*, 575 U.S. at 189).

"The Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine whether they convey more than just a generalized optimism." *Grae*, 2017 WL 6442145, at *14 (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671-72 (6th Cir. 2005)). A company's general boasts of quality are typically insufficient to establish liability under Section 10(b). *See St. Clair Cty.*, 2021 WL 195370, at *6. The key is whether the statement at issue can be proven or disproven using standard tools of evidence. *See id.* Thus, vague statements not subject to verification by proof are generally deemed non-actionable puffery. But opinion or puffery, in particular contexts in which it is both factual and material, may be actionable. *See id.* "Material statements [that] contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 562 (6th Cir. 2001) (quoting *Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir. 1993)). *See*

---

[32] If the speaker omits material facts about the inquiry into or knowledge concerning the statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then that omission is actionable. *USM Holdings*, 2017 WL 4005939, at *4.

*also City of Monroe*, 399 F.3d at 672 (citing *Casella v. Webb,* 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.") and *Scritchfield v. Paolo,* 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (*i.e*., by plucking the statements out of their context to determine whether the words, taken *per se,* are sufficiently 'vague' so as to constitute puffery."))).

First, some of the above statements are statements of fact, not of opinion. As pointed out by Plaintiffs, the statement contained in paragraphs 131 and 147 ("[t]he Company collects substantially all of its third-party insured receivables") is not an opinion, but rather an assertion of fact.[33]

The Court finds that for the remaining "opinions," Plaintiffs have sufficiently alleged that Defendants omitted material factual information which would render the statements misleading to a reasonable investor under the *Omnicare II* standard. Plaintiffs describe these material omissions as follows:

> Defendants' statements regarding the Company's financial results, including performance metrics that could trigger defaults on the Company's credit facilities, omitted that there were growing problems with its aged receivables from uninsured "self-pay" patients, debts related to co-pays and deductibles from insured patients, and disputed payments from third-party payors. [. . .] To avoid misleading investors by the plain inference of their statements, Defendants were required to disclose that

---

[33] An argument could be made that the statement as a whole is an opinion inasmuch as the adverb "substantially" is subjective, meaning that the appropriateness of its use in a particular context is a matter of opinion rather than of fact. Ultimately, though, the Court would reject such an argument, believing that it is based on a view of what constitutes a fact that is too narrow—one that would enable speakers too often to deny, based merely on their inclusion of a subjective adjective or adverb, that they made a factual representation. On the other hand, the Court acknowledges that in some situations the use of an adjective or adverb absolutely turns what otherwise would be a statement of fact into a statement of opinion. But in the Court's view, this is not one of those contexts, in part because the notion of "substantially all"—which clearly signifies close to 100 percent, *i.e.*, 100 percent minus a rather immaterial percentage that stands as an outlier—is less subjective than the notion of "substantially" as used in so many other contexts.

they had collectibility [sic] problems with certain types of accounts. Such omitted facts would unquestionably have been material to investors because they "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189.

(Doc. No. 69 at 16-17).

Defendants also argue that these statements include expressions of "optimism, opinion, and subjective characterizations and analyses, and are understood by investors as mere 'puffery.'" (Doc. No. 66 at 28-29).

To arrive at the conclusion that the above-mentioned statements are mere "puffery," Defendants improperly take each statement out of context. When viewed instead in its proper context, each statement is properly viewed as more than mere "puffery." For example, the alleged statement "[w]e're in good shape" was made in the context of Defendant Cash speaking with an RBC Capital Markets analyst about Defendants' credit facility, characterizing the Company in a way that misleads the listener by omitting the fact that the Company "would be in default or close to default even with the covenant changes if it recorded the full amount of its 'bad debt' expense." (Doc. No. 61 at 32). In that context, Defendant Cash's alleged statement regarding the financial status of the Company, made to a financial analyst, certainly would induce reasonable reliance on the health of the Company on the part of a reasonable investor. And, though the facts surrounding this point are disputed by the parties and are not subject to resolution on a motion to dismiss, Plaintiffs' version of the facts would support a reasonable inference that the speaker did not actually believe that the Company was in "good shape" as stated; likewise, the factual allegations in the Complaint (accepting them as true, as required) plausibly suggest that the statement was not well grounded.

Likewise, the statement "[w]e believe that we collect substantially all of our third-party insured receivables" was made in the 2017 Q1 10-Q, a report that Defendants knew investors

would rely upon, in a paragraph which purports to explain how the Company "estimate[s] the allowance for doubtful accounts." (Doc. No. 61 at 34). This "opinion"[34] was specifically tethered to the Company's official statement regarding its financial status and the process by which the Company "estimate[s] the allowance for doubtful accounts." Plaintiffs have set forth sufficient factual matter to demonstrate both that the fact contained within this statement is false and that Defendants had no basis for stating this opinion. (Doc. No. 61 at 49).

The Court's conclusion here is supported by the supplemental authority cited by Plaintiffs. (Doc. No. 76). In *Bond v. Clover Health Investments, Corp. et. Al*, 3:21-cv-00096 (M.D. Tenn. Feb. 28, 2022), the court found that even statements "resembl[ing], on some level, empty corporate self-praise" were sufficient to establish liability under Section 10(b) because the statements were "built around a core contention that was factual and definite in nature." (Doc. No. 76-1 at 40–41). Similarly, Plaintiffs have set forth sufficient factual matter demonstrating that Defendants' statements here, despite some of them resembling "opinions," are all either (a) tied to materially false factual contentions regarding the Company's financial estimates and financial results, or (b) paired with sufficiently material omissions that make the statements misleading, thus rendering them actionable under Section 10(b).

The Court is thus unconvinced that the above statements fall into the category of non-actionable opinion, puffery, or mere characterizations. Therefore, the Court finds that contrary to Defendants' argument, Plaintiffs here have sufficiently alleged statements that plausibly amount to misstatements and omissions and therefore are potentially actionable.

---

[34] It is hard to say whether this statement is even properly characterized as an "opinion." Instead, it is probably most accurate to characterize this statement as an opinion statement that contains an embedded statement of fact—in which case, under *Omnicare II*, it is actionable if the embedded fact is materially false. *Omnicare II*, 575 U.S. at 176 ("In addition, opinion statements can give rise to false-statement liability under § 11 if they contain embedded statements of untrue facts.").

C. <u>Alleging facts sufficient to establish element of scienter</u>

"[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This required state of mind, referred to as "scienter," has been defined as a mental state embracing intent to deceive, manipulate, or defraud. *Jackson Cty.*, 2020 WL 7711378, at *18 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011)). "In the securities fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness."[35] *Id.* (citing *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)); *see also Dougherty v. Esperion Therapeutics, Inc.*, 905 F. 3d 971, 979 (6th Cir. 2018). Whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind, which is the general subject of a scienter inquiry. *Omnicare I*, 769 F.3d at 471.

The Supreme Court has set forth a framework for analyzing the scienter element as follows:

> We establish the following prescriptions: First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .
>
> Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
>
> Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . .

---

[35] Under the general PSLRA standard, a complaint may allege scienter based on "either knowing falsity or recklessness." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020).

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences."...Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007) (citations omitted).

In *Matrixx*, the Court provided a post-*Tellabs* example of how to consider scienter pleadings "holistically" in Section 10(b) cases. *See Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("*Dana II*") (citing *Matrixx*, 563 U.S. at 48). "Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis." *Id.* "This is the only appropriate approach following *Tellabs*'s mandate to review scienter pleadings based on the collective view of the facts, not the facts individually." *Id.*[36] (citing *Tellabs*, 551 U.S. at 322–23 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")).

As part of that analysis, the Sixth Circuit has noted recently, nine non-exhaustive factors ("the *Helwig* factors") should be considered: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later

---

[36] The former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. *Dana II*, 646 F.3d at 961. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency. *Id.*

disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc*., 29 F.4th 802, 813 (6th Cir. 2022) (citing *Helwig*, 251 F.3d at 552).[37]

Thus, the Court will address Plaintiffs' claims holistically, considering the *Helwig* factors, but it also will address the specific arguments in Defendants' Motion. Defendants make several primary arguments to support their position that there is a lack of pled scienter: 1) speculative motive and presumed access to information are not sufficient to raise scienter inference; 2) the size of a change of estimate does not establish scienter; 3) an SEC investigation resulting in no adverse

---

[37] Plaintiffs argue that *Helwig* is altogether inapplicable, quoting *Dana I* for the proposition that "the standard adopted in *Helwig* is no longer good law." (Doc. No. 69 at 25). But *Dana I* does not render *Helwig* inapplicable in its entirety. Plaintiffs take this quotation from *Dana I* out of context; the quoted material from *Dana* is actually referring not to the applicability of the nine factors articulated in *Helwig,* but rather to *Dana*'s holding that the "most plausible of competing inferences" standard from *Helwig* is no longer applicable. *Dana I,* 547 F.3d at 571. In fact, several cases cited by Plaintiffs do consider the nine factors (non-exhaustively, without analyzing each factor in isolation, as directed by *Tellabs*) when analyzing scienter. *See, e.g., In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 at 998 (S.D. Ohio 2008) (recognizing the applicability of the second, third, sixth and eighth *Helwig* factors in the context of the holistic *Tellabs* analysis for scienter); *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 915 (M.D. Tenn. 2019) ("[T]he Court does not read *Franks II* as pretermitting consideration of the *Helwig* factors when determining whether the facts alleged, taken collectively, give rise to a strong inference of scienter that is at least as compelling as any opposing inference. Indeed, post-*Tellabs*, some Sixth Circuit decisions have specifically addressed the *Helwig* factors in securities fraud cases."), *reconsideration denied*, No. 3:17-CV-01469, 2019 WL 2211764 (M.D. Tenn. May 22, 2019). And as noted above, the Sixth Circuit recently stated that the nine *Helwig* factors are to be considered in the scienter analysis. *City of Taylor*, 29 F.4th at 813 (6th Cir. 2022) ("As part of [the scienter analysis], we consult a non-exhaustive list of considerations known as the *Helwig* factors."). But Plaintiffs *are* correct that, as noted above, the scienter inquiry is done "holistically" based on a collective review of all the facts. *Id.*

findings does not raise an inference of scienter; 4) executives receiving salaries does not raise an inference of scienter; 5) Defendant Cash's retirement does not show scienter; 6) individual SOX certifications do not show scienter; and 7) confidential witness statements do not raise scienter inference. Plaintiffs respond that the Amended Complaint creates a strong inference of scienter because the following things demonstrate scienter: 1) Defendants' debt covenant manipulation; 2) company executives' active involvement with and awareness of Defendant CHS's core business; 3) the magnitude of the fraud; 4) post-class period admissions; 5) the Individual Defendants' review and approval of the company's accounting controls; and 6) Defendants' weak competing inference. (Doc. No. 69 at 36-44). The Court will first address each of Defendants' arguments:

1. *Speculative motive and presumed access to information support scienter*

Defendants argue that Plaintiffs' theory of scienter improperly rests on two speculative conclusions of fact: Specifically, according to Defendants, Plaintiffs (i) assume that because the Individual Defendants were high-ranking officers, they necessarily had access to certain financial information, and (ii) speculate that Defendants were motivated to wait to disclose accurate estimates until the fourth quarter of 2018[38] because the Company would violate its credit agreements if it disclosed the estimates during the Class Period. (Doc. No. 66 at 32-33).

a. **Motive**

According to the Sixth Circuit, an allegation that a party had a motive to commit securities fraud is insufficient by itself to establish a strong inference of scienter, but facts demonstrating motive can be part of the scienter analysis. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549

---

[38] The Court understands Defendants to have made a typographical error in writing "2017" rather than "2018" when stating, "Defendants, as the story goes, somehow became convinced that the Company would violate its credit agreements if it disclosed accurate estimates during the Class Period, and so waited until the fourth quarter of 2017 to disclose the accurate estimate." (Doc. No. 66 at 33) (emphasis added). *See* Doc. No. 61 at ¶ 9.

(6th Cir. 1999) ("[W]e conclude that plaintiffs may plead scienter in § 10b or Rule 10b–5 cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud."); *Darby v. Century Bus. Servs., Inc.*, 96 F. App'x 277, 283 (6th Cir. 2004) ("'Whether the facts can be said to establish motive, opportunity, or neither, we are directed only to consider whether they produce a strong inference that the defendant acted at least recklessly.... Accordingly, facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice.'") (quoting *Helwig*, 251 F.3d at 551); *Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 852 (6th Cir. 2007) (holding that merely alleging motive and opportunity to commit securities fraud was insufficient).

Here, Plaintiffs pled a number of facts that present a plausible theory of motive that goes beyond mere conjecture or conclusory labeling:

> The Complaint alleges that the Defendants manipulated Community Health's financials to ensure they did not trigger a default of their debt covenants. The Company, which had a far higher debt burden than its peers (¶31), had a credit facility that required Community Health to keep its "secured net leverage ratio" below a maximum level and its "interest coverage ratio" above a minimum level, both of which related to its consolidated EBIDTA, to avoid default. ¶45. However, a loophole in debt agreements specifically excluded from these calculations expenses classified as related to accounting principle changes. ¶50. Just prior to the Class Period, the Company was barely able to avoid triggering a default by renegotiating with its lenders to exceed the then-specified maximum secured net leverage ratio and minimum interest coverage ratio. ¶52. Thus, Defendants had a strong, unique motive to avoid recognizing the bad debt expense as incurred, instead taking advantage of the loophole by delaying recognition until their end-of-Class-Period shift to a new accounting method.

(Doc. No. 69 at 36).

Because Plaintiffs support their allegations of motive (to engage in securities fraud) with a strong set of alleged facts, the Court rejects Defendants' argument that Plaintiffs' assertion of motive is merely speculative. Maybe Defendants acted on such alleged motive, and maybe they

did not; the Court is well aware that merely because someone had a motive does not mean that the person acted in accordance with that motive (and, for that matter, that merely because a plaintiff has plausibly alleged that a defendant had a motive does not mean that the plaintiff has plausibly alleged that the defendant acted in accordance with that motive, if such allegation were even required). But what matters for present purposes is that Plaintiffs have plausibly alleged that Defendants *had* such a motive. Plaintiffs' allegations regarding Defendants' motive can thus be considered as evidence in the holistic *Tellabs* analysis of scienter.

b. **Access to Information**

Merely having access to information is not sufficient to establish a strong inference of scienter. *See e.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) ("[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."), *abrogated on other grounds by Tellabs,*, 551 U.S. 308; *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.,* 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010) ("Scienter, however, cannot be inferred merely because of the defendants' positions in the company or the fact that they had access to the company's financial information.").

In the Sixth Circuit, "high-level executives can be presumed to be aware of matters central to their business's operation." *PR Diamonds*, 364 F.3d at 688 (emphasizing that only knowledge of "central, day-to-day operational matters," however, may be presumed). Though the Court in *PR Diamonds* acknowledges the applicability of this so-called "core operations doctrine," the Sixth Circuit has not clearly stated whether this doctrine survived the PSLRA. But as the undersigned recently explained:

In *Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020), . . . the court noted that a majority of district courts appear to

have concluded that the doctrine survived, albeit only as a supplementary consideration that may bolster other well-pleaded facts. 2020 WL 3584800, at *39 (concluding that the core-operations theory, even assuming the doctrine survives, provided the plaintiff in that case no support). Although the "core-operations" inference generally will not establish a strong inference of scienter by itself, it can be one relevant part of a complaint supporting that inference. *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021). Thus, the Court considers the "core-operations" allegations, albeit not as an independent means to show scienter, but rather as one possible indicator of scienter under a holistic examination.

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, No. 3:19-CV-00407, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021) (Richardson, J.). Here, too, the Court will treat "core-operations" allegations as relevant in the holistic *Tellabs* scienter analysis, without relying on the doctrine as an independent means of showing scienter.

Plaintiffs argue that Defendant CHS' collection of revenue, and the amount of CHS's "bad debt," were matters so central and critical to CHS' business operations that knowledge thereof can be imputed to the Individual Defendants, making it more likely that they acted with scienter. (Doc. No. 69 at 39). Plaintiffs provide additional alleged facts specific to Individual Defendants Aaron and Smith, who allegedly were directly involved in the calculation and assessment of the Company's finances. (*Id*. at 40). The Court is persuaded that these additional allegations are enough to support an inference of knowledge on the part of Defendants Aaron and Smith.

With respect to the other Individual Defendant (Larry Cash), Plaintiffs do not point in their Response to any additional alleged facts supporting knowledge and instead rely solely on the "core-operations" doctrine. Plaintiffs assert that "[b]ecause the management of receivables was core to its operations, investor sentiment, and avoiding debt default, it would be absurd to infer that its executives were not aware of the actual amount of bad debt" and thus, these Individuals "knew the truth when making inconsistent statements to investors." (*Id*. at 39). This assertion by Plaintiffs is not persuasive. While the core-operations doctrine allows the Court to presume

knowledge, it does not by itself render "absurd" an inference of a lack of knowledge, which conceivably could be drawn from other applicable circumstances. In any event, the question is not whether an inference of lack of knowledge can be drawn; rather, it is whether, as Plaintiffs suggest, the core-operations doctrine by itself enables the Court to draw an inference of knowledge on the part of the Individual Defendants as to Defendant CHS' management of receivables.

The face of the Complaint provides sufficient factual matter regarding Defendant Cash's role and responsibilities at the Company such that the core-operations doctrine is relevant to the scienter inquiry as to this Individual Defendant. The Complaint alleges that Defendant Cash was the Chief Financial Officer from 1997 to 2017, and signed the Company's 2016 annual report and first quarter 2017 quarterly report. From this, it is reasonably inferable that Defendant Cash was particularly situated to be extremely familiar with the Company's financial operations, as well as and especially knowledgeable about the amount of the Company's revenue and receivables and the way in which these figures were calculated and portrayed to investors. Thus, the inference of knowledge under the core-operations doctrine is permissible as to Defendant Cash and will be considered by the Court as part of the overall scienter analysis.

2. *The size of the change of estimate supports scienter*

Defendants argue that because the size of a change in estimate does not raise an inference of scienter, the "0.6 percent increase in total estimated uncollectible revenue on the income statement" at issue here (which "contributed to just a three percent year over year increase in the allowance for doubtful accounts") does not raise a strong inference of scienter. (Doc. No. 66 at 36-37). In their Response, Plaintiffs characterize the magnitude of alleged fraud differently, framing it as "massive and incredibly material to [CHS's] financial prospects," and noting that "the $591 million charge alone [was] more than 88% of Community Health's bad debt provision for the

previous quarter (¶172), and the revelation that Community Health ramped 'bad debt' expense (for the third time in as many quarters) to more than $1 billion in the quarter, amounting to a whopping 25% of revenues (¶9) caused the Company's stock to decrease more than 17%, causing investors to lose tens of millions of dollars. ¶¶12-13." (Doc. No. 69 at 40–41) (internal quotation marks omitted).

The Sixth Circuit distinguishes, for purposes of considering scienter, (a) the magnitude of a false financial statement (or a misapplication of accounting principles or a financial "misstatement") made by a company from (b) the magnitude of a misstatement made by an outside auditor. Regarding misstatements made by an outside auditor, the Sixth Circuit has held that the magnitude of an accounting error cannot give rise to an inference of scienter. *See Ley v. Visteon Corp.*, 543 F.3d 801, 816 (6th Cir. 2008).[39]

However, the Sixth Circuit has considered the magnitude of an error when determining the scienter of non-outside auditor defendants (primarily company officers). *See PR Diamonds*, 364 F.3d 671, 684 (6th Cir. 2004) ("[S]ome courts have recognized that an inference of knowledge or recklessness may be drawn from allegations of [a company's] accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant."), *abrogated on other grounds by Tellabs*, 551 U.S. 308; *Ley*, 543 F.3d 801, 812 (6th Cir. 2008) (considering magnitude of defendant-company's accounting improprieties in the scienter analysis); *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir.

---

[39] *See also Fidel v. Farley,* 392 F.3d 220, 231 (6th Cir. 2004), *abrogated on other grounds by Tellabs*, 551 U.S. 308 (with respect to an outside auditor, "[w]e decline to follow the cases that hold that the magnitude of financial fraud contributes to an inference of scienter on the part of the defendant. Allowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.' *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F.Supp.2d 334, 359 (W.D. Tenn. 2001); *see also In re Comshare*, 183 F.3d at 553 (holding that the failure to follow accounting standards 'is, by itself, insufficient to state a securities fraud claim'). It would also allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates.").

2016) (considering the magnitude of defendant-company's financial misstatements for purposes of determining whether plaintiff's allegations created a strong inference of scienter); *Dana II*, 646 F.3d at 960-61 (considering the magnitude of the defendant-company's false financial statements when finding that plaintiffs had adequately pleaded a strong inference of scienter); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 598 (N.D. Ohio 2004) ("The fact that [non-outside auditor defendants'] accounting practices resulted in such enormous overstatements of revenue for several years further supports an inference of scienter."); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 991 (S.D. Ohio 2008) (considering the magnitude of the company's misstatements when examining whether there is a strong inference of scienter against corporative executives in a securities fraud case).

Additionally, many courts (including the Sixth Circuit) have cited to the following out-of-circuit case for the proposition that the court may consider the magnitude of a misstatement for a non-outside auditor defendant in a scienter analysis:

> To begin with, the fact that a restatement of financials occurred is not sufficient to raise a strong inference of scienter, for it is settled that "scienter requires more than a misapplication of accounting principles," and "[m]ere allegations that statements made in one report should have been made in earlier reports do not make out a claim of securities fraud." This general rule states the sensible and otherwise unremarkable proposition that the inferences that may be drawn for or against scienter from the mere fact that a company misapplied GAAP and accordingly had to restate its financials are in equipoise, and, therefore, that such allegations by themselves cannot give rise to a "strong inference" of scienter.

> But this is not to say that a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus; to the contrary*, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter (or, conversely, in favor of a nonculpable state of mind).* Nor does the rule stand for the proposition that scienter cannot be inferred at all from such allegations and that the allegations are, therefore, irrelevant to the issue of scienter. Such a proposition ignores the value of relevant circumstantial evidence as it relates to a defendant's state of mind. To put it

differently, while it is true that it cannot be strongly inferred from bare allegations of a GAAP violation or a restatement of financials that a defendant acted recklessly, consciously, or intentionally, it is not true that nothing can be inferred from those facts at all or that ***"[s]pecific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter."*** The mere fact that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the nature of such a restatement or violation, however, may ultimately do so.

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 634–35 (E.D. Va. 2000) (emphasis added).

The Sixth Circuit has shed some light on how "extreme" a misstatement must be in order to raise a scienter inference, finding a scienter inference appropriate only where the magnitude of the misstatement is such that it "should have been obvious" to the defendants. *See PR Diamonds*, 364 F.3d at 686 ("It simply cannot be said that [the company's] accounting improprieties, by virtue of their type and size, 'should have been obvious,' *Comshare,* 183 F.3d at 554, to the Individual Defendants. These are not 'in your face facts' that 'cry out' scienter."); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 400 (6th Cir. 2009) ("One cannot determine from the complaint whether the magnitude of Diebold's alleged accounting violations are the type of extreme 'in your face facts' that 'cry out' scienter. . . . The complaint does not specify the total amount of revenue that Diebold allegedly overstated. Nonetheless, Diebold is a multi-billion-dollar company and, as such, the amount of improperly recognized revenue would have to be significant in order to support a finding of scienter.").

The Court first notes that Plaintiffs attribute the fraudulent misstatements to Defendants rather than to outside auditors. Thus, as discussed above, the Sixth Circuit allows an inference of scienter to be drawn (and considered in the holistic *Tellabs* analysis of scienter) if the magnitude of the fraud is such that it should have been obvious to Defendants. As noted by Plaintiffs in their Response and by the Court above, the Complaint alleges that "'the $591 million charge alone [was]

more than 88% of Community Health's bad debt provision for the previous quarter (¶172),' and the revelation 'that Community Health ramped "bad debt" expense (for the third time in as many quarters) to more than $1 billion in the quarter, amounting to a whopping 25% of revenues (¶9)' caused the Company's stock to decrease more than 17%, causing investors to lose tens of millions of dollars. ¶¶12-13." (Doc. No. 69 at 40-41). These are the types of "in your face" (alleged) circumstances that are so extreme that they reasonably should have been obvious to Defendants. And as alleged by Plaintiffs, outside analysts even highlighted the magnitude of the overstatements, an (alleged) fact that adds to the plausibly of Plaintiffs' assertion that such magnitude was large. (Doc. No. 69 at 41). A scienter inference based on the magnitude of the false financial statements is thus appropriate here, and will be considered as part of the larger scienter inquiry.

      3.   *The SEC investigation, which did not result in any adverse findings, does not support scienter*

Courts in this circuit as well as others have taken the view that the existence of an investigation by itself without adverse findings does not support an inference of scienter. *See Dana II*, 649 F. Supp. 2d at 742 (determining that a pending SEC investigation "does not add to the scienter inference"); *see also Halford v. AtriCure, Inc.,* No. 1:08CV867, 2010 WL 8973625, at *15 (S.D. Ohio Mar. 29, 2010) (holding that the mere opening of an investigation by the DOJ, without finding of wrongdoing, "cannot support an inference of scienter"); *see also In re Ceridian Corp. Sec. Litig.,* 542 F.3d 240, 249 (8th Cir. 2008) (holding that an SEC investigation with no adverse findings did not show scienter); *see also Cozzarelli v. Inspire Pharms. Inc*., 549 F.3d 618, 628 n. 2 (4th Cir. 2008) (finding that an ongoing SEC investigation alone is "too speculative to add much, if anything, to an inference of scienter").

Defendants argue that here, "subpoenas issued by the SEC in 2013 (four years before the Class Period) to HMA (a company CHSI acquired)" do not create an inference of scienter, because there were no adverse findings by the SEC. (Doc. No. 66 at 38). The Court agrees. While the SEC investigation may have brought relevant issues to Defendants' attention, Plaintiffs allege no facts establishing that Defendants did in fact investigate any allegedly fraudulent conduct at HMA and gain knowledge of such alleged fraud. Thus, Plaintiffs' bare allegations regarding an inconclusive SEC investigation of one of Defendants' acquisition hospitals cannot be considered as probative of a scienter finding.

4. *Executives receiving salaries does provides little support for scienter*

Plaintiffs allege that another fact supporting scienter and Defendants' incentive to understate the Company's bad debts was that "Defendants were uniquely motivated to preserve artificial executive compensation not available at peer companies." (Doc. No. 61 at 55-56). Defendants argue in their motion that "Plaintiffs allege no particularized or unique facts related to individual salaries and bonuses to create an inference of scienter. Plaintiffs only allege that the Individual Defendants received salaries and bonuses." (Doc. No. 66 at 38).

Plaintiffs' argument here relates to the final *Helwig* factor: "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Helwig*, 251 F.3d at 552.

The Court previously has explained that:

In this Circuit "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud," *PR Diamonds*, 364 F.3d at 690, nor are allegations that Defendants would receive bonuses linked to company performance sufficient for an inference of scienter. *In re Kindred Healthcare*, 299 F. Supp. 2d at 741. Yet, " 'self-interested motivation of defendants in the form of saving their salaries' " can support scienter. *Bridgestone*, 399 F.3d at 687 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)). "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide an inference of improper motive. *Telxon*, 133 F.Supp.2d at 1029. The Court concludes that if regular compensation is commensurate to the executive's

service to the company, then Plaintiffs' allegations that the individual Defendants' had the ability to enhance their compensation by 100% of their regular compensation creates an inference of "unusual pressures to perform" *Id.* In addition, Defendants allegedly engaged in improper practices that allegedly enhanced their compensation.[40]

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 785 (M.D. Tenn. 2013) (footnote omitted) (finding support for inference of scienter where a defendant-company's executives had an "unusual pressure to perform" due to compensation system where regular compensation was commensurate to the defendant's service to the company). *But see PR Diamonds*, 364 F.3d at 690 (stating that "an executive's desire to protect his position within a company or increase his compensation" does not comprise a motive for fraud from which a court could infer a knowing or reckless state of mind); *Kalnit v. Eichler,* 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient [to support scienter] because such a desire can be imputed to all corporate officers.").

Plaintiffs have not alleged any facts that go beyond the executives' general motivation to maintain their level of compensation. Plaintiffs state only that "the Individual Defendants' incentive compensation was tied to Community Health's reported Adjusted EBITDA, which provided them further incentive to understate the Company's bad debts." (Doc. No. 61 at 56). Plaintiffs fail to explain how these individuals' compensation was specifically tethered in any way to Defendants' alleged fraud (nor do Plaintiffs respond to this argument in their Response). As discussed above, fraud must be pled with particularity, and the Court finds that a single statement

---

[40] In the quoted language, the Court spoke in terms an "inference of improper motive" and an inference of "unusual pressures to perform," without specifically mentioning an inference of "scienter," which is the inference ultimately at issue in this context. The undersigned notes that the inferences of which the Court did speak can, in turn, support an inference of scienter.

that alleges, without any supporting factual matter, that the Individual Defendants' incentive compensation was "tied to" CHS's reported Adjusted EBITDA fails to meet the pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA. Thus, Plaintiffs' bare assertion in the Complaint that Individual Defendants Smith, Cash, and Aaron desired to maintain an exorbitant salary provides little support for an inference of scienter.

### 5. *Defendant Cash's retirement does not support scienter*

Defendants argue that the retirement of Larry Cash does not raise a strong inference of scienter. Plaintiffs do not respond to this point, and they do not even assert in the Complaint that Defendant Cash's retirement raises an inference of scienter.[41] The Court addresses this argument nonetheless (and presumes that to the extent that an inference of scienter were to be raised based on the retirement of Defendant Cash, it would be raised only as to Defendant Cash and not as to any other Individual Defendants).

Whatever its timing vis-à-vis relevant underlying events, the retirement of an executive does not typically create a strong inference of scienter. *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007), *aff'd in part, rev'd in part and remanded sub nom. Matrix*

---

[41] Plaintiffs mention Defendant Cash's retirement (only) in the Background section of the Complaint, and state only the following:

> The very next day, February 22, 2017, Community Health announced that one of its Directors and its longtime CFO, Defendant Cash, was resigning effective May 16, 2017. The retirement announcement did not specify why Cash was resigning, or whether the resignation was the result of any disagreement with the Company with respect to its financial and auditing policies, operations, or practices. *Id.* Cash's resignation coincided with the commencement of Defendants' scheme (detailed below) to conceal its revenue misstatements in the second, third, and fourth quarters of 2017 by holding out its revisions as a change in accounting principles, not a restatement of revenue.

(Doc. No. 61 at 10) (footnote omitted). While the Court understands that one could draw a number of conclusions based on the way in which Plaintiffs presented these alleged facts regarding the circumstances of Defendant Cash's retirement, the Court does not read this paragraph as Plaintiffs suggesting a finding of scienter based on Defendant Cash's retirement.

*Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009) ("This Court recently has held that retirements and resignations of executives do not support a strong inference of scienter."). "Even when a resignation closely follows disclosure of improper accounting practices, the mere fact of the resignation and its proximity to the disclosure gives little support to an inference of scienter." *Dana I*, 649 F. Supp. 2d at 741; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), as amended (Feb. 10, 2009) ("Although resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter, the resignations at issue here are not so numerous or suspicious as to raise such an inference. Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself [rather than as a result of a culpable state of mind as to the events that led to the restatement] in order for a resignation to be strongly indicative of scienter.").[42] The Court has previously explained:

> In some situations, courts have found that resignations and related remedial, internal changes were "unusual" and, combined with other evidence, possibly indicative of fraud. *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question"), *cited in In re Am. Serv. Grp., Inc.,* No. 3:06-0323, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009). As with the other alleged indicators of scienter, the Court will consider this factor—not alone, but in combination with other factors—in connection with the holistic *Tellabs* standard.

*Indiana Pub. Ret. Sys.*, 2021 WL 1316705, at *10.

Here, Plaintiffs have not alleged any particularly unusual facts surrounding the circumstances of Defendant Cash's retirement. Defendants articulate a reasonable rationale for the

---

[42] Taking some interpretive license, the Court has added the bracketed language to make more explicit the entire point *Zucco Partners* was making.

retirement decision, completely independent of any fraud allegations. (Doc. No. 66 at 39) ("[T]he sixty-eight-year-old Mr. Cash explained his decision to retire but continue to be a consultant, as he was looking forward to being a husband, dad, papa, and grandpa."). Thus, the Court finds that Defendant Cash's retirement gives no support for a scienter finding.

6. *Individual SOX Certifications support scienter*

Plaintiffs allege in support of a scienter finding that "Individual Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that affirmed that the Company's financial statements fairly presented all material aspects of its financial condition and results of operations, affirmed that the Company's disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. These certifications, which were issued in response to requirements under SOX legislation, provide further support for the inference that defendants were reckless in disregarding the falsity the Company's financial statements." (Doc. No. 69 at 42-43) (citation omitted). Defendants argue that the signed SOX Certifications do not strengthen the inference of scienter. (Doc. No. 66 at 31).

The Sixth Circuit has stated that a Sarbanes–Oxley certification is probative of scienter only if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. *Ley*, 543 F.3d at 812. *See also Indiana Pub. Ret. Sys.*, 2021 WL 1316705, at *9 (Richardson, J.) (allowing consideration of SOX certifications in its scienter analysis where the plaintiffs "alleged facts to suggest that Defendants had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certificates"). One district court (in the Fifth Circuit) has explained that:

> The Fifth Circuit addressed the relationship between SOX certifications and scienter in *Cent. Laborers' Pension Fund,* 497 F.3d 546 [(5th Cir. 2007); *see*

*also* [*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537
F.3d 527, 532–33 (5th Cir. 2008)]. Relying on an Eleventh Circuit decision, the
court "rejected a reading that would permit a strong inference of scienter from the
certification alone." *Cent. Laborers' Pension Fund*, 497 F.3d at 555. [. . .]
[C]onsidering SOX certifications as part of the scienter analysis is proper only "if
the person signing the certification had reason to know, or should have suspected,
due to the presence of glaring accounting irregularities or other 'red flags,' that the
financial statements contained material misstatements or omissions." *Cent.
Laborers' Pension Fund*, 497 F.3d 546 (internal quotation marks omitted); *see also
Horizon Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 765–66 (8th Cir. 2009);
*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).

*Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 693 (S.D. Tex. 2013); *see also Markman v.
Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 WL 10567194, at *12 (W.D. Tex. Aug. 19,
2016).

Here, while the Individual Defendants' signatures on the SOX certifications alone do not
raise a scienter inference, the Amended Complaint alleges fraud implicating Defendants' internal
accounting practices where Defendants "understated [their] provision for bad debts and overstated
[their] operating revenue and Adjusted EBITDA" in order to "to avoid triggering defaults on the
Company's credit facilities." (Doc. No. 61 at ¶ 2). Plaintiffs allege that the Individual Defendants
signed the SOX certifications "in the face of clear, repeated accounting violations" such that a
"strong inference of scienter" is supported. (Doc. No. 69 at 43). The Court agrees that the signed
SOX certifications provide support for an inference of scienter because the Complaint sets forth
with particularity factual matter demonstrating what the Court finds could be characterized as "red
flags." In particular, Plaintiffs have alleged particularized facts supporting their allegations that
Defendant CHS misstated their provision for bad debt and Adjusted EBITDA. Thus, Plaintiffs'
allegations are sufficient for the Court to consider the specific SOX certifications in its holistic
scienter analysis.

7. *Confidential witness statements support scienter*

Defendants argue that the alleged confidential witness statements described in Paragraphs 29, 39-44, 168-170 and 179-180 of the Amended Complaint[43] "add nothing of substance" and do not establish scienter. (Doc. No. 66 at 39-40). Defendants claim that these confidential witnesses did not actually communicate with the Individual Defendants or were not privy to the Individual Defendants' knowledge. (*Id.* at 40). Defendants also indicate that the statements are "nothing more than vague and general assertions that do not establish a prior material misstatement or an inference of knowledge or recklessness." (*Id.*). Plaintiffs respond that the Court should consider the confidential witness statements because the Amended Complaint specifies the title, division, and dates of employment for each, demonstrating that each confidential witness was in a position to have knowledge of their recollections. (Doc. No. 69 at 40 n.33).

The Court has previously analyzed confidential witness statements in ruling on a similar motion to dismiss:

> Plaintiffs cite to statements from "confidential witnesses" concerning financial matters and operational concerns with the spin-off. Defendants argue such witnesses must be discounted. While courts often discount information provided by anonymous sources, plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness' position would possess the information alleged. *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037, n. 2 (6th Cir. 2016).
>
> Confidential sources cannot be used to merely parrot conclusory allegations contained in the complaint, *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539 at * 9 (S.D. N.Y. March 30, 2018), but confidential witnesses may assist securities fraud plaintiffs so long as they are not vague and conclusory. *In re EveryWare Global, Inc. Sec. Litig.*, 175 F.Supp.3d 837, 952 (S.D. Ohio 2016). The complaint must allege that the confidential witnesses were in a position to establish

---

[43] The Court has chosen its terminology here carefully. These paragraphs do not set forth verbatim any "statement," of a confidential witness, and thus these paragraphs cannot be said to quote or even "include" any such statement. Rather, each of these paragraphs merely either paraphrases certain things a confidential witness allegedly stated, or otherwise makes clear the substance of something a confidential witness stated. So the most that can be said about these paragraphs' recounting of alleged statements of confidential witnesses is that they *describe* certain alleged statements of confidential witnesses.

the basis of personal knowledge of the alleged misconduct and they must establish that the defendants were aware of the misconduct. *Id.* Even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants or else that the witness was privy to the individual defendants' knowledge. *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 589 (S.D. N.Y. 2011). Courts, however, will credit confidential source allegations, generally, in two situations. The first is when those sources' position and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations. *Id.* at 590. Second, when independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened. *Id.*

*Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-2475, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018); *Halford v. AtriCure, Inc.*, No. 1:08CV867, 2010 WL 8973625, at *3 (S.D. Ohio Mar. 29, 2010) ("In considering the weight to be given to allegations from confidential witnesses under the PSLRA, this Court has adopted the reasoning and result reached by the Seventh Circuit in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*") and *In re Amgen Inc. Securities Litigation*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008). In doing so, this Court has explained: when deciding whether to consider the statements attributed to confidential or anonymous witnesses in the Amended Complaint, as part of the calculus to be applied to determine whether the Plaintiffs have complied with the pleading requirements contained in the PSLRA, this Court will examine the descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained firsthand knowledge of the facts attributed to him or her, and the detail of the information each is reported to have provided." (internal citations and quotation marks omitted)).

The Amended Complaint describes statements from five confidential witnesses in paragraphs 29, 39-44, 168-70, and 179-80.[44] For each confidential witness, the Amended

---

[44] Each such paragraph describes statements (or at least a statement) from only a single respective confidential informant.

Complaint provides a detailed description of the job of the confidential witness, including the time period(s) and location(s) of employment, specific job titles, and, in some instances, supervisors. Many of the statements made by the confidential witnesses are (at least ostensibly) corroborated by other information alleged in the Amended Complaint. Plaintiffs provided sufficiently detailed allegations for each of these five confidential witnesses to plausibly suggest that each would have been in a position to gain first-hand knowledge of the facts reflected in their described statements. Therefore, though the Court recognizes that the described statements come from anonymous sources, the Court finds that these confidential witness statements—as described and to the extent relevant—can support an inference of scienter. [45]

### 8. *Conclusion*

Plaintiffs have alleged factual matter plausibly suggesting that Defendants knew, or were reckless,[46] in "disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public" and that the Individual Defendants "also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the

---

[45] Plaintiffs do not allege that any particular statement made by any particular confidential witness contained in the Amended Complaint is probative of scienter (other than, in their Response, stating that Confidential Witness 5 confirmed that the Individual Defendants had access to necessary financial information). (Doc. No. 69 at 40). Defendants nonetheless argue that the statements from all confidential witnesses referenced in the Amended Complaint are irrelevant to the scienter analysis because they "do not establish a prior material misstatement or an inference of knowledge or recklessness." (Doc. No. 66 at 40). The Court will not endeavor to seek out and develop any particular arguments cutting in favor or against scienter based on the particular statements made by confidential witnesses; instead, the Court finds only that Plaintiffs have alleged sufficient information such that the Court will not discount confidential witness statements contained in the Amended Complaint by virtue of these statements originating from confidential sources.

[46] Scienter includes recklessness. *Forman v. Meridian Bioscience, Inc.*, 387 F. Supp. 3d 791, 794 (S.D. Ohio 2019). "Recklessness" is defined in this context as highly unreasonable conduct which is an extreme departure from the standards of ordinary care akin to conscious disregard. *Id.* Recklessness requires more than negligence or the mere notice and opportunity to commit fraud, but it is a lower standard than knowing misrepresentation or intent. *Id.*

Company's securities and would cause the price of such securities to be artificially inflated" so as to constitute fraud. (Doc. No. 61 at ¶¶ 175-176). Plaintiffs' allegations of motive to engage in fraud, specific allegations as to Individual Defendants Aaron and Smith's direct involvement in financial calculations and assessments, Defendant Cash's role in the company (and its subsequent core-operations inference), the magnitude of the alleged fraud, and the relevant SOX certifications provide ample support for a scienter finding. Taken together, Plaintiffs have sufficiently alleged facts to show a strong inference of scienter as to Defendant CHS understating its provision for bad debts and overstating its operating revenue and Adjusted EBITDA.

The Court finds that, when the allegations are viewed holistically, Plaintiffs have sufficiently alleged facts giving rise to a strong inference of scienter as required to validly state the securities fraud claims asserted by Plaintiffs.

### D. Safe harbor

The PSLRA contains a "safe-harbor provision" for a forward-looking statement,[47] whereby a defendant is liable for such a statement only if: (i) it was material, (ii) the defendant had actual

---

[47] "Under the PSLRA, protected forward-looking statements include, among others: (1) projections of revenues or other financial items, (2) statements of plans and objectives for future operations, and (3) statements of the assumptions underlying the previous two categories." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) (citing 15 U.S.C. § 78u–5(i)(1)). The determinative factor of whether something is a forward-looking statement is whether the truth or falsity of a statement can only be determined after a statement is made. *See id.* ("In determining whether a statement is truly forward-looking, the determinative factor is not the tense of the statement; instead, the key is whether its 'truth or falsity is discernible only after it is made.'" (quoting *W. Wash. Laborers–Emp'rs Pension Trust v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1093 (E.D. Mo. 2010))); *Doughtery*, 905 F.3d at 983 (adopting the *Julianello* test for the Sixth Circuit). Statements of present or historical facts—those statements whose truth or falsity can be determined presently—are excluded from the safe harbor. *See Doughtery*, 905 F.3d at 983 (providing the example of "[t]ake for instance a man's statement to his friend, 'My girlfriend has agreed to marry me.' That is not a forward-looking statement. Rather, it is a backward-looking statement concerning a future event. When the man spoke to his friend, it was objectively discernable whether his girlfriend had accepted his proposal—either she had, or she had not."); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[T]he safe harbor does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the

knowledge that it was false or misleading, and (iii) the defendant did not identify it as forward-looking or insulate it with meaningful cautionary language. *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 910 (M.D. Tenn. 2019); *Doughtery v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (holding that in a securities-fraud case, a defendant is not liable for a material forward looking statement if either: "(1) the statement is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) 'the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading.'" (quoting 15 U.S.C. § 78u-5(c)(1)(A)-(B))). A company that chooses to speak, therefore, is protected against failed projections, provided that it identifies important factors that could cause actual results to differ materially from those in the forward-looking statements. *Weiner*, 365 F. Supp. 3d at 911. While a company need not list all factors, the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements. *Id.* (finding that the forward-looking statements at issue were provided in the context of cautionary statements that were boilerplate, not meaningful, and inconsistent with the historical facts).[48] Notably, forward-looking statements that are included in a financial statement prepared in accordance with GAAP are excluded from the safe-harbor provision. *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000) ("[T]he clear language of the PSLRA

---

time they are made, simply because the statements are couched as predictions of future events."), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

[48] General cautionary language does not render the omission of specific adverse historical facts immaterial and, moreover, the disclaimer must be meaningful and tailored to the risks the business faces. *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011).

expressly excludes from the safe harbor statements that are 'included in a financial statement prepared in accordance with generally accepted accounting principles.'" (quoting 15 U.S.C. § 78u5(b)(2)(A))).

Defendants contend that the statements mentioned in paragraphs 100, 102, 105, 107, 109, 112, 115, 117, 118, 130, 133, 136, 145, 146, 149 and 150 of the Amended Complaint (Doc. No. 61) are forward-looking.[49] Of these paragraphs, the Court finds that paragraphs 100, 105, 112, 115, 130, 145, and 146 all refer to statements that are contained within financial statements prepared in accordance with GAAP and are therefore excluded from the safe-harbor provision. *See* 15 U.S.C. § 78u5(b)(2)(A); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d at 1032. Paragraphs 107, 117, 133, and 149 refer to the SOX certifications wherein Defendants "affirmed that the [Defendant CHS's] financial statements fairly presented all material aspects of its financial condition and results of operations, and that the [Defendant CHS's] disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP." (Doc. No. 61 at 31). Plaintiffs contend that these statements were materially false and misleading by invoking the SOX Theory.[50]

---

[49] Defendants never identify specific paragraphs which contain allegedly forward-looking statements. Rather, they generally state that the reserve for uncollectible revenue is an estimate and is therefore forward-looking. (Doc. No. 66 at 41). In an earlier portion of Defendants' memorandum in support of their motion to dismiss, they list the paragraphs above as containing Plaintiffs' allegations of false or materially misleading statements and state that all of Plaintiffs' allegations concern the reserve for uncollectible revenue. (*Id.* at 22). The Court, therefore, will assume that Defendants were referring to these same paragraphs when claiming that they were forward-looking statements.

[50] Under the SOX Theory, Plaintiffs state that:

Defendants failed to disclose to investors: (1) that the Company's financial statements did not fairly present its financial condition, particularly with respect to its "bad debt" exposure that the Company excluded from its "bad debt" calculations revenue receivable from "self-pay" patients, especially aged receivables, for which collection was not probable; and (2) that the Company's disclosure controls and procedures were not effective, and did not

The truth or falsity of the affirmations in the SOX certifications—that the statements fairly presented Defendant CHS's financial situation and that the disclosure controls and procedures were effective—could have been determined when the certifications were signed. As such, these paragraphs are also not forward-looking statements. *See Julianello*, 791 F.3d at 921; *Doughtery*, 905 F.3d at 983.

The remaining paragraphs (102, 109, 118, 136 and 150), which refer to statements made during quarterly earnings calls and a conference, primarily involve Defendant CHS's then-current and previous EBITDA cushion. Plaintiffs allege that these statements were materially false and misleading because (according to Plaintiffs) they excluded relevant information and data from their bad-debt calculations (which artificially inflated EBITDA). These statements (and the alleged omissions therefrom) relate to matters of present or historical fact, inasmuch as one could determine, at the time that the statements were spoken, whether relevant evidence was excluded. And "the safe harbor does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events." *In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Therefore, the safe-harbor provision does not apply to these statements.

The Court thus finds that the safe-harbor provision does not shield Defendants from liability for any statements underlying Plaintiffs' claims.

---

provide reasonable assurance regarding the reliability of financial reporting, particularly with respect to the assessment and reporting of "bad debt."

(Doc. No. 61 at 31).

E.  Section 20(a) claim – control person liability

In Count Two, Plaintiffs assert a theory of so-called control person liability under Section 20(a).[51] As background, Count One sets forth the theory that with respect to the alleged violations set forth therein, each of the Individual Defendants is primarily liable, together with the other Individual Defendants and CHS, based on their personal participation (including the required actus reus and mens rea) in these violations. Count Two sets forth an additional (secondary) basis for the Individual Defendants' liability, *i.e.*, the control-person theory, whereby so-called controlling persons may be held jointly and severally liable under Section 20(a) for securities fraud to the same extent as the entity of which they are "controlling." Plaintiffs contend that each of the Individual Defendants has control person liability for the actionable violations of CHS alleged in Count One and thus are jointly and severally liable with CHS for such actionable violations.

Disputing that the Individual Defendants are subject to control person liability, Defendants contend that "[w]ithout a primary violation by CHSI or the Individual Defendants of the securities laws, there can be no secondary violation by the Individual Defendants as controlling persons under Section 20(a)." (Doc. No. 66 at 42). The Court rejects this argument, as Plaintiffs have adequately alleged a primary violation of Section 10(b). Defendants make no other argument as to Count Two. Defendants' motion to dismiss Plaintiffs' Section 20(a) claim will thus be denied.

---

[51] Section 20(a) provides that "[e]very person who. . . controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). The "controlling person" must be an actual participant and in control of the specific activity at issue. *Jackson Cty.*, 2020 WL 7711378, at *20.

**CONCLUSION**

For the reasons discussed above, Defendants' Motion (Doc. No. 65) will be denied.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE