# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CALEB PADILLA, Individually and On Behalf of All Others Similarly Situated, | Case No.: 3:19-cv-00461 |
| Plaintiff, | DISTRICT JUDGE ELI J. RICHARDSON |
| v. | MAGISTRATE JUDGE BARBARA D. HOLMES |
| COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, LARRY CASH, and THOMAS J. AARON, | |
| Defendants. | |

**JOINT DECLARATION OF CASEY E. SADLER AND JOSHUA B. SILVERMAN IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................... 1

II. PROSECUTION OF THE ACTION ................................................................... 3

    A. Purported Wrongdoing.......................................................................... 3

    B. Commencement Of The Instant Action ................................................ 4

    C. The Comprehensive Pre-Filing Investigation And Preparation Of The Complaint ............................................................................................... 5

    D. Defendants' Motion To Dismiss The Complaint And Lead Plaintiffs' Opposition .............................................................................................. 5

    E. Lead Plaintiffs' Discovery Efforts ....................................................... 6

    F. Preparation For Class Certification....................................................... 7

    G. Mediation Efforts And The Negotiation Of The Settlement ................. 7

    H. Preliminary Approval Of The Settlement ............................................. 8

III. THE RISKS OF CONTINUED LITIGATION ................................................... 8

    A. Risks Faced In Obtaining And Maintaining Class Action Status .......... 9

    B. Risks To Proving Liability, Loss Causation And Damages .................. 9

    C. Other Risks, Including Trial And Appeals .......................................... 11

    D. The Settlement Is Reasonable In Light Of Potential Recovery In The Action..... 12

IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE ........................... 13

V. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ........................... 16

VI. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ................................................ 18

    A. The Fee Application............................................................................. 18

        1. The Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action ................................... 19

        2. Significant Risks Borne By Plaintiffs' Counsel....................................... 21

i

3. The Experience And Expertise Of Plaintiffs' Counsel And The Standing And Caliber Of Defendants' Counsel ........................................................ 22

4. Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ....... 22

B. Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable ...................................................................................................... 23

Case 3:19-cv-00461    Document 127    Filed 09/08/23    Page 3 of 32 PageID #: 2040

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Declaration Of Adam D. Walter Regarding: (I) Mailing Of Postcard Notice; (II) Publication Of Summary Notice; (III) Call Center Services; (IV) The Settlement Website; And (V) Requests For Exclusion And Objections Received To Date ("Mailing Declaration") |
| 2 | Notice Of (I) Pendency Of Class Action, Certification Of Settlement Class, And Proposed Settlement; (II) Settlement Hearing; And (III) Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of Arun Bhattacharya In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 4 | Declaration Of Michael Gaviria In Support Of: (1) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 5 | Declaration Of Casey E. Sadler, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Glancy Prongay & Murray LLP |
| 6 | Declaration Of Joshua B. Silverman, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Pomerantz LLP |
| 7 | Declaration Of J. Gerard Stranch, IV, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Stranch, Jennings & Garvey, PLLC |
| 8 | Excerpts From Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, NERA Economic Consulting (January 24, 2023) |
| 9 | *Burges v. Bancorp South, Inc.*, No. 3:14-cv-01564, ECF No. 265 (M.D. Tenn. Sept. 21, 2018) |
| 10 | *In re Sirrom Capital Corp. Sec. Litig.*, No. 3-98-0643 (M.D. Tenn. Feb. 4, 2000) |
| 11 | *Morse v. McWhorter*, No. 3:97-0370 (M.D. Tenn. Mar. 12, 2004) |
| 12 | *In re Foundry Resins Antit. Litig.,* No. 2:04-MDL-1638, ECF No. 247 (S.D. Ohio March 31, 2008) |
| 13 | *In re Community Health Sys., Inc. S'holder Derivative Litig.*, No. 11-cv-00489, ECF Nos. 272-1, 274 (M.D. Tenn. Jan. 17, 2017) |
| 14 | *Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc.*, No. 2:06-cv-00026-WOB-CJS, ECF No. 332 (E.D. Ky. |

| | |
|---|---|
| | June 27, 2019) |
| 15 | *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, No. 3:11-cv-00595, slip op. at 1 (M.D. Tenn. May 12, 2014) (awarding 33.3% of $3.25 million settlement, plus expenses) |
| 16 | Table of Select Sixth Circuit Cases With 33% or Higher Fee Awards |

We, Casey E. Sadler and Joshua B. Silverman, declare, pursuant to 28 U.S.C. § 1746, as follows:

## I. INTRODUCTION

1. We, Casey E. Sadler and Joshua B. Silverman, are partners in the law firms of Glancy Prongay & Murray LLP ("GPM") and Pomerantz LLP ("Pomerantz"), respectively. GPM and Pomerantz are the Court-appointed lead counsel ("Lead Counsel") for the Court-appointed lead plaintiffs, Arun Bhattacharya and Michael Gaviria ("Lead Plaintiffs"), in this matter.[1] We have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2. We respectfully submit this Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $9,500,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated May 30, 2023 (the "Preliminary Approval Order") (ECF No. 118); as well as of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (the "Final Approval Motion").

3. We also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees amount of 33⅓% of the Settlement Fund, which equates to $3,166,667, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $206,752.84; and awards in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred by Lead Plaintiffs Arun

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement, dated May 19, 2023 (the "Stipulation"). ECF No. 117-1.

[2] Plaintiffs' Counsel consists of Lead Counsel as well as Court-appointed Liaison Counsel Stranch, Jennings & Garvey, PLLC ("Stranch Jennings"), which was formally known as Branstetter, Stranch & Jennings, PLLC.

1

Bhattacharya ($10,000) and Michael Gaviria ($15,000), related to their representation of the Settlement Class (the "Fee and Expense Application").

4. The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $9,500,000. As detailed below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class, especially when juxtaposed against the significant risks of continued litigation. In fact, the maximum damages potentially recoverable for the Settlement Class, *if* Lead Plaintiffs fully prevailed on each of their claims at both summary judgment and after a jury trial, and *if* the Court and jury fully accepted Lead Plaintiffs' loss causation and damages arguments—*i.e.*, Lead Plaintiffs' ***best-case scenario***—is approximately $120-126 million for purchasers of Community Health Systems, Inc. ("CHS" or the "Company") common stock during the Settlement Class Period. Under this best-case scenario, the $9.5 million Settlement Amount represents between 7.5% and 7.9% of the total maximum damages potentially recoverable in this Action. Of course, Defendants had advanced, and would continue to advance, serious arguments with respect to liability, loss causation, and damages. If any of these arguments were accepted, the putative class's potential recovery would have been substantially reduced or completely eliminated.

5. As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class, and arm's-length bargaining by experienced and knowledgeable counsel on both sides, under the supervision of a respected mediator, which resulted in a fair and reasonable Settlement for the Settlement Class. The Settlement confers a substantial immediate benefit to the Settlement Class, and we believe it is eminently fair, reasonable, and adequate given the legal hurdles and risks involved in proving liability and damages. The Settlement also avoids the further risk, delay, and expense had this case continued through class certification, discovery, summary judgment, and to trial. Lead Counsel

2

respectfully submits that, under the circumstances, the Settlement is in the best interest of the Settlement Class and should be approved.

6. In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Member who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

7. Lead Counsel, on behalf of all Plaintiffs' Counsel, also seeks approval of the Fee and Expense Application. As discussed in detail in the Fee and Expense Application, the requested 33⅓% fee is well within the range of percentage awards granted by courts in this Circuit in comparable complex litigation, and is a fair and reasonable amount in light of the work performed and the result obtained. Moreover, the out-of-pocket expenses incurred were all reasonable and necessary for the prosecution of the Action and are considerably less than the maximum figure proposed in the Notice available to the Settlement Class.

8. For these reasons and those discussed below, Lead Counsel respectfully submits that the $9.5 million Settlement is a favorable result for the Settlement Class and should be approved as fair, reasonable, and adequate, that the proposed Plan of Allocation is equitable and just, and that the requested attorneys' fees of 33⅓% of the $9.5 million Settlement Fund and reimbursement of Litigation Expenses should be awarded in full.

## II. PROSECUTION OF THE ACTION

### A. Purported Wrongdoing

9. CHS is a Delaware corporation headquartered in Franklin, Tennessee and is one of the country's largest publicly traded hospital companies. *See* Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 61 (the "Complaint").

3

The Company's securities trade on the New York Stock Exchange under the ticker symbol "CYH."

10.     As alleged in the Complaint, prior to the start of the class period, CHS completed two acquisitions principally funded with debt, which resulted in the highest external debt-to-EBITDA ratio among CHS's peers.[3]  Throughout the class period, CHS's credit facilities required the Company to maintain certain financial ratios, including "secured net leverage ratio" and "interest coverage ratio," above defined thresholds.  CHS would default on its loans if the Company's secured net leverage ratio exceeded, or its interest coverage ratio fell below, specified thresholds.  To avoid triggering a default under the Company's debt covenants, CHS understated its bad debt expense from payors, overstated net operating revenues and EBITDA, and misrepresented the calculation of these figures in its periodic reports and related filings and public statements during the class period.

11.     At the end of the class period, the Company revealed that it had to ramp up its "bad debt" expense (for the third time in as many quarters) to more than $1 billion, amounting to 25% of revenues.  Defendants claimed that this growth in bad debt, which included a $591 million charge that the Company says was attributable to a $197 million increase in contractual adjustments and exactly double that figure ($394 million) to an increase in its bad debt allowance, was the result of the change in accounting rules.

### B.     Commencement Of The Instant Action

12.     A class action complaint was filed by plaintiff Caleb Padilla on May 30, 2019 in the United States District Court for the Middle District of Tennessee (the "Court"), styled *Caleb Padilla v. Community Health Systems, Inc. et al.*, Case No. 3:19-cv-00461.

13.     By Order dated November 20, 2019, the Court entered an order appointing Arun Bhattacharya and Michael Gaviria as Lead Plaintiffs for the Action; and approved Lead Plaintiffs' selection of GPM and Pomerantz as Lead Counsel, and Stranch Jennings as Liaison

---

[3] "EBITDA" refers to a company's earnings before interest, taxes, depreciation and amortization.

4

Counsel for the putative class.  ECF No. 52.

**C. The Comprehensive Pre-Filing Investigation And Preparation Of The Complaint**

14. GPM conducted a thorough investigation prior to filing the initial complaint. Following Lead Counsel's appointment, GPM and Pomerantz jointly conducted a comprehensive investigation into CHS's allegedly wrongful acts, which included: (a) a review and analysis of (i) CHS's SEC filings, press releases, investor conference calls, and other public statements; (ii) publicly available documents, announcements, and news articles concerning CHS; and (iii) research reports prepared by securities and financial analysts regarding CHS; (b) interviews with former employees and other potential witnesses with relevant information; and (c) consultation with accounting, loss causation and damages experts.

15. On January 21, 2020, Lead Plaintiffs filed and served their Complaint asserting claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 61.

16. The Complaint alleges, among other things, that Defendants made materially false and misleading statements about CHS's bad debt expense from payors, overstated net operating revenues and EBITDA, and misrepresented the calculation of these figures.  The Complaint further alleges that the price of CHS's common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed to the market through the alleged corrective disclosure made after market hours on February 27, 2028.

**D. Defendants' Motion To Dismiss The Complaint And Lead Plaintiffs' Opposition**

17. On March 23, 2020, Defendants filed a motion to dismiss the Complaint.  ECF Nos. 65-67.  Among other things, Defendants argued that Lead Plaintiffs failed to plead (a) the existence of a materially misleading statement or omissions, and (b) a strong inference of

scienter. Specifically, Defendants argued that Lead Plaintiffs' falsity allegations failed because they did not adequately allege facts demonstrating that the Company's uncollectible revenue estimates lacked a reasonable basis or were materially misstated and the Company provided fulsome, meaningful cautionary language that disclosed the risks related to potential future uncollectability of revenues. Moreover, Lead Plaintiffs failed to adequately plead scienter because the Complaint is devoid of any allegations that (a) the Individual Defendants ever knew that the uncollectible revenue estimates were too low at any point during the class period, and (b) the Individual Defendants had any motive and opportunity to commit securities fraud.

18. On May 22, 2020, Lead Plaintiffs opposed Defendants' motion to dismiss. ECF No. 69. Lead Plaintiffs argued that the Complaint showed that contrary to public statements, Defendants understated its provision for bad debts and overstated certain financial results to avoid triggering defaults on the Company's debt, which was purportedly confirmed by Defendants' own admissions and the analysts' reaction at the end of the class period. Lead Plaintiffs also argued that Defendants' misrepresentations were not protected by the Safe Harbor or Bespeaks Caution Doctrine. And finally, Lead Plaintiffs argued that the Complaint adequately alleged scienter because Defendants had a strong and unique motive to avoid recognizing the bad debt expense as incurred so not to trigger a default on the Company's debt covenants.

19. On June 22, 2020, Defendants filed their reply papers. ECF No. 70. On March 21, 2022, Lead Plaintiffs filed a notice of supplemental authority. ECF No. 76. On August 17, 2022, the Court denied Defendants' motion to dismiss in its entirety. ECF No. 77. On September 6, 2022, Defendants filed an answer to the Complaint. ECF No. 83.

### E. Lead Plaintiffs' Discovery Efforts

20. With the automatic stay of discovery imposed by PSLRA having been lifted following the denial of the motion of dismiss, the Parties submitted a joint status report to the Court. ECF No. 102.

21.     From September 2022 through March 2023, counsel for Lead Plaintiffs and Defendants completed extensive fact discovery.  Lead Plaintiffs and Defendants each propounded one set of requests for production of documents upon the opposing party and Defendants propounded one set of interrogatories upon each Lead Plaintiff.  Lead Plaintiffs also served a third-party subpoena for production of documents on Deloitte & Touche LLP, the Company's auditor. In addition, over the course of the approximately 7-month discovery period, Lead Counsel reviewed and analyzed approximately 450,000 pages of documents produced by Defendants and third parties.  During that same timeframe, and Lead Plaintiffs produced approximately 1,500 pages of documents to Defendants and responded to Defendants' first set of interrogatories.

22.     At the time settlement was reached, Lead Plaintiffs were in the process of preparing to take the depositions of fact witnesses.

### F.      Preparation For Class Certification

23.     While fact discovery was ongoing, Lead Plaintiffs began preparing for class certification.  Among other things, Lead Counsel conducted extensive research, had begun working with market efficiency and damages experts, and substantially drafted their opening motion for class certification.

### G.      Mediation Efforts And The Negotiation Of The Settlement

24.     On March 9, 2023, Lead Counsel and Defendants' Counsel participated in a full day mediation session before Jed Melnick, Esq. of JAMS in New York City.  In advance of that session, the Parties exchanged, and provided to Mr. Melnick, detailed mediation statements and exhibits, which addressed issues of liability and damages.

25.     During the mediation, full and frank discussions took place concerning the merits of the case, including, for example, loss causation issues, and particularly damages.  The negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.  The session culminated in an agreement in principle to resolve the Action for a cash payment of $9.5 million.

26.     Following the agreement to settle in principle, Lead Counsel and Defendants' Counsel then began negotiating the essential non-monetary terms of the Settlement.  The terms of the Settlement were memorialized in a comprehensive and confidential term sheet, which the Parties executed on March 9, 2023 (the "Term Sheet").

27.     The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $9,500,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary stipulation and agreement of settlement and related papers.

28.     Following execution of the Term Sheet, Lead Counsel prepared the initial draft of the Stipulation and supporting document.  Following addition negotiations, during which the Parties exchanged multiple drafts of the settlement papers, on May 19, 2023, the Parties executed the Stipulation.  On May 26, 2023, Lead Plaintiffs submitted their Unopposed Motion for (I) Preliminary Approval of Class Action Settlement, (II) Certification of the Settlement Class and (III) Approval of Notice to the Settlement Class.  ECF Nos. 115-18.

**H.     Preliminary Approval Of The Settlement**

29.     The Court entered an order preliminarily approving the Settlement on May 30, 2023, directing notice of the Settlement to be disseminated to prospective members of the Settlement Class.  ECF No. 118.

## III.     THE RISKS OF CONTINUED LITIGATION

30.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $9,500,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A. Risks Faced In Obtaining And Maintaining Class Action Status

31. Defendants likely would have argued against class certification. While Lead Counsel researched and analyzed class certification and are confident that the Court would have certified the proposed class, Lead Plaintiffs bear the burden of proof on class certification and Defendants would have undoubtedly raised arguments challenging the propriety of class certification. Moreover, even if Lead Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Sixth Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a forgone conclusion.

### B. Risks To Proving Liability, Loss Causation And Damages

32. Lead Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability and damages.

33. Demonstrating liability was certainly not guaranteed. While Lead Plaintiffs had overcome Defendants' motion to dismiss, and were in the process of conducting discovery, there is no telling how it would have ultimately unfolded or how the evidence would be viewed by a jury. Indeed, as the Court ruled in deciding the motion to dismiss, the reasonableness of Defendants' accounting "is a question of fact to be decided by the jury." ECF No. 77 at 35.

34. The liability risk here was even greater than in other actions because of the complex nature of the claims at issue, which hinged on highly technical changes in accounting standards. Defendants would have no doubt hired experts that would have asserted that the Company's interpretation of changes in complex accounting rules was proper. In fact, Defendants would continue to argue that the Company only changed its estimate of uncollectible revenue in the fourth quarter of 2017 as a result of its mandatory implementation of a "historic" change in GAAP accounting principles detailed under ASC 606, which dramatically altered the way that the health care industry must account for revenues, and that they fully disclosed this during the class period.

9

35. Moreover, even if Lead Plaintiffs could demonstrate the falsity of Defendants' statements, Defendants would have continued to argue that there was no intent to deceive investors. Specifically, Defendants would have again argued that they had no intent to mislead the public as their accounting determination complied with GAAP and that its auditor opined that its financial statements were fairly presented in according with GAAP. Further, Defendants would continue to argue that Lead Plaintiffs' scienter theory was fundamentally flawed because its lenders have never claimed that the debt covenants at issue were ever triggered or should have been triggered. Additionally, because the reserves at issue involve complicated estimates and aggregations based on a large amount of data and qualitative judgments, it would be difficult to establish knowledge of fraud simply based on the fact that one or more Defendants had access to some or all of the underlying data.

36. Indeed, despite believing this Action is meritorious, Lead Plaintiffs and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove Defendants acted with the requisite mental state of scienter—*i.e.*, an intent to deceive or extreme recklessness—necessary for liability under the federal securities laws.

37. Assuming Lead Plaintiffs overcame the above risks and established Defendants' liability, Lead Plaintiffs would have also confronted considerable challenges in establishing loss causation and class-wide damages. At a minimum, Defendants would have argued that Lead Plaintiffs' alleged damages were greatly overstated. Indeed, were the litigation to continue, Defendants could put forward several damages and loss causation arguments that, if accepted, could greatly reduce, or even eliminate, recoverable damages.

38. Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is plaintiffs' burden to prove loss causation and damages. This would require Lead Plaintiffs to proffer expert testimony as to: (a) what the "true value" of CHS's common stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which CHS common stock was inflated (or deflated) by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the purported corrective

10

disclosures. Defendants almost certainly would have presented their own damages expert(s) to present conflicting conclusions and theories as to the reasons for the declines in CHS common stock on the alleged disclosure dates.

39. Defendants likely would have argued at summary judgment and trial that the stock price declines after CHS's allegedly corrective disclosures were, in fact, negative reactions to the announcement of generally disappointing financial results, or other adverse news, rather than reactions to the revelation of previously concealed fraud. Were Defendants to prevail on this argument, Lead Plaintiffs could be required to disaggregate non-fraud related price declines from the alleged damages amount, reducing or potentially eliminating damages.

40. At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process. As this Court is no doubt aware, a jury's reaction to complicated expert testimony is highly unpredictable, there is always the possibility that a jury could be swayed by Defendants' expert(s) and award only a fraction of the damages Lead Plaintiffs contended were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.

41. There was no assurance that Lead Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. This would have seriously affected Lead Plaintiffs' ability to successfully prosecute this Action.

42. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery by the Settlement Class.

**C. Other Risks, Including Trial And Appeals**

43. As set forth above, Lead Plaintiffs were in the process of moving for class certification and conducting merits discovery at the time of settlement. Lead Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one. Lead Counsel know from experience that despite

11

the most vigorous and competent efforts, success in complex litigation such as this case is never assured. In fact, GPM recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.). Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

44. Even if Lead Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed the risks faced by Lead Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and further depletion of the Company's already wasting insurance policies. Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

**D.     The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

45. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Lead Plaintiffs fully prevailed on each of their claims at both summary judgment and after a jury trial, if the Court certified the same class as the Settlement Class, and if the jury fully accepted Lead Plaintiffs' loss causation and damages arguments—*i.e.*, Lead Plaintiffs' ***best-case scenario***— maximum estimated total damages are approximately $120-126 million for purchasers of CHS common stock during the Settlement Class Period. Under this best-case scenario, the $9.5 million Settlement Amount represents between 7.5% and 7.9% of the total maximum damages potentially recoverable in this Action. This recovery is ***more than two and a half times*** the typical recovery for cases of a similar magnitude. *See, e.g.,* Ex. 8 (excerpts from Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review*, NERA Economic Consulting NERA Report, at p. 17 (Fig.

18) (median recovery was 2.9% for securities class actions with estimated damages between $100-$199 million that settled between December 2011-December 2022)). If, however, Defendants prevailed on their arguments with respect to liability, loss causation, and/or damages as detailed above, the Settlement Class's recovery would have been substantially reduced or completely eliminated.

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

46. The Preliminary Approval Order (ECF No. 118) directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class. The Preliminary Approval Order also set a deadline of September 22, 2023 (21 calendar days prior to the settlement hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the Settlement Class and set a settlement hearing date of October 13, 2023 (the "Settlement Hearing").

47. Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data Ltd. ("A.B. Data"), the Court-approved Claims Administrator, to disseminate copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice," Ex. 2) and Proof of Claim and Release Form (the "Claim Form") online at www.CommunityHealthSecuritiesSettlement.com (the "Settlement Website"). Upon request, A.B. Data mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

48. The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among

13

other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $300,000 which may include an application for reimbursement of the reasonable costs and expenses incurred by plaintiffs related to their representation of the Settlement Class in an aggregate amount not to exceed $30,000. Ex. 2 (Notice) at ¶¶5, 66.

49. To disseminate the Postcard Notice, on May 25, 2023, A.B. Data received from Defendants' Counsel a list containing the names and addresses of record holders ("Record Holder List") who purchased or otherwise acquired CHS publicly traded common stock during the Settlement Class Period. *See* Ex. 1 (Declaration of Adam D. Walter Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Walter Decl."), at ¶3. Additionally, as in most securities class actions of this nature, the large majority of potential Settlement Class Members are expected to be beneficial purchasers whose securities are held in "street name" – *i.e.*, the securities are purchased by brokerage firms, banks, institutions, and other third-party nominees in the name of the respective nominees, on behalf of the beneficial purchasers. Accordingly, A.B. Data maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees (the "Broker Mailing Database"). *See id.* at ¶4.

50. On June 28, 2023, A.B. Data caused Postcard Notice to be sent by First-Class Mail to the combined 4,978 mailing records contained in the Record Holder List and the Broker Mailing Database. *See id.* at ¶5.

51. Following the mailing to the Master Mailing List, A.B. Data received an additional 13,995 names and addresses of potential Settlement Class Members from individuals

14

or brokerage firms, banks, institutions, and other nominees.  *See id.* at ¶7.  A.B. Data also received requests from brokers and other nominee holders for 12,950 Postcard Notices to be forwarded by the nominees to their customers.  *Id.*

52.    As of August 31, 2023, an aggregate of 31,923 Postcard Notices have been sent to potential Settlement Class Members and their nominees.  *Id.* at ¶8.[4]

53.    On July 10, 2023, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*.  *See id.* at ¶9; Exs. B & C (copies of proof of publication).

54.    Lead Counsel also caused A.B. Data to establish the Settlement Website, which became operational on June 28, 2023, and to maintain a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement.  On the Settlement Website, Settlement Class Members can submit a claim online, download copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the Complaint.  *Id.*  at ¶¶10-12.

55.    The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Fee Memorandum or to request exclusion from the Settlement Class is September 22, 2023.  To date, no requests for exclusion have been received by A.B. Data.  *Id.* at ¶14.  A.B. Data will file a supplemental affidavit after the September 22, 2023, deadline addressing whether any requests for exclusion have been received.  To date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by A.B. Data or Plaintiff's Counsel.  *Id.* at ¶15.  Lead Counsel will file reply papers by October 6, 2023, that will address any objections that may be received.

---

[4] Of the 31,923 Postcard Notices that A.B. Data mailed, 2,341 were returned to A.B. Data by the U.S. Postal Service ("USPS") as undeliverable. A.B. Data re-mailed 783 Postcard Notices to persons whose original mailings were returned by the USPS and for whom updated addresses were either provided to A.B. Data by the USPS or ascertained through a third-party information provider.  Walter Decl., ¶8.

56.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $9.5 million Settlement Amount, plus interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Plaintiffs for their costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than September 22, 2023. *See* Ex. 1 (Notice) at ¶36. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

57.     The proposed Plan of Allocation is detailed in the Notice. *See id.* at pp. 8-12. The long-form Notice is posted online at the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, Company-specific factors or factors unrelated to the alleged violations of law, and takes into consideration when each Authorized Claimant purchased and/or sold shares of CHS common stock. *See id.* at ¶48.

58.     As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶47.

59.     The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiffs contend could have been recovered under the theories of liability and damages asserted

in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiffs' allegation that the price of CHS common stock was artificially inflated during the period from February 21, 2017 through February 27, 2018, inclusive, due to Defendants' alleged materially false and misleading statements and omissions. The Plan of Allocation is based on the premise that the decrease in the price of CHS common stock following the alleged corrective disclosures on July 27, 2017, November 1, 2017, November 2, 2017, and February 28, 2018, may be used to measure the alleged artificial inflation in the price of CHS common stock prior to these disclosures.

60. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* at ¶¶47-48; 62-63.

61. An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of CHS common stock the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the shares. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in CHS stock during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. Lead Counsel believes that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

62. If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶62. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized

17

Claimants whose prorated payments are $10.00 or greater. *Id*. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.

63. In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in CHS common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

64. To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

65. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for an attorneys' fee award of 33⅓% of the Settlement Fund (or $3,166,667), plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of Litigation Expenses in the amount of $231,752.84, which includes $206,752.84 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund, and a total of $25,000 to Lead Plaintiffs for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class. The total Litigation Expenses amount of $231,752.84 is below the maximum expense amount of $300,000 set forth in the Notice. The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A. The Fee Application

66. Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining

18

a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Sixth Circuit for cases of this nature.

67. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

**1.  The Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Action**

68. Attached hereto as Exhibits 5 through 7 are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses. Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the inception of the case through August 18, 2023, a summary of expenses by category, and a firm resume.[5] The following is a chart of lodestar amounts for Plaintiffs' Counsel:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | 918,950.75 |
| Pomerantz LLP | 1,277,533.00 |
| Stranch, Jennings & Garvey, PLLC | 46,549.60 |
| **TOTAL LODESTAR** | **2,243,033.35** |

69. The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation.

---

[5] Time expended in preparing the application for fees and reimbursement of Litigation Expenses has not been included.

70. As set forth above and in detail in Exhibits 5 through 7, Plaintiffs' Counsel have collectively expended a total of 3,573.60 hours in the investigation and prosecution of the Action through and including August 18, 2023. The resulting total lodestar is $2,243,033.35. The requested fee amount of 33⅓% of the Settlement Fund equals $3,166,667 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 1.41 multiplier of Plaintiffs' Counsel's lodestar, and is not only reasonable, but is modest when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

71. Moreover, in addition to drafting the motion for final approval, Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.

72. As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. We personally devoted substantial time to this case and oversaw and/or were personally involved in drafting or reviewing and editing all pleadings, court filings, various discovery-related materials, meditation statements, and other correspondence prepared on behalf of Lead Plaintiffs, communicating with Lead Plaintiffs on a regular basis, engaging with Defendants' counsel on a variety of matters, and were intimately involved in Settlement negotiations. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and the mediation submissions, communicated with Lead Plaintiffs, the mediation process, negotiating the terms of the Stipulation, and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Lead

Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

73. Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 2. Significant Risks Borne By Plaintiffs' Counsel

74. This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the pendency of this Action and incurred $206,752.84 in out-of-pocket litigation-related expenses in prosecuting the Action.

75. Additionally, Lead Plaintiffs and Plaintiffs' Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power and hindered by the PSLRA's automatic discovery stay.

76. Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra*, ¶43. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

21

77. Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 3. The Experience And Expertise Of Plaintiffs' Counsel And The Standing And Caliber Of Defendants' Counsel

78. As demonstrated by the firm resumes, attached to Exhibits 5 through 7, Plaintiffs' Counsel are highly experienced and skilled law firms that focus their practices on class action litigation, with Lead Counsel focusing primarily on securities class actions. Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoy well-deserved reputations for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. We believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

79. Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendant was represented by Riley & Jacobson, PLC, a well-respected law firm that vigorously represented the interests of its clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the Settlement Class.

### 4. Public Policy Interests, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

80. Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private

22

investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a particular securities class action. Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

81. As noted above, as of August 31, 2023, 31,923 Postcard Notices have been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. Walter Decl. ¶8; Ex. A (Postcard Notice). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *Globe Newswire*. *Id*. At ¶9; Exs. B & C (confirmation of Summary Notice publication). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by October 6, 2023.

**B. Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

82. Lead Counsel seeks a total of $231,752.84 in Litigation Expenses to be paid from the Settlement Fund. This amount includes: $206,752.84 in out-of-pocket expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $25,000 to Messrs. Bhattacharya ($10,000) and Gaviria ($15,000), pursuant to 15 U.S.C. § 78u-4(a)(4) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class.

23

83.     Lead Counsel is seeking reimbursement of a total of $206,752.84 in out-of-pocket costs and expenses.   The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| ITEM OF EXPENSE | AMOUNT |
|---|---|
| COURT FILING FEES | 2,016.00 |
| DOCUMENT MANAGEMENT | 10,809.84 |
| EXPERTS | 141,830.50 |
| INVESTIGATORS | 18,195.73 |
| MEDIATION | 8,225.00 |
| ONLINE RESEARCH | 7,120.06 |
| PHOTOIMAGING | 25.02 |
| PRESS RELEASES | 2,297.16 |
| SERVICE OF PROCESS | 248.00 |
| TRAVEL, MEALS, LODGING, TRANSPORTATION | 15,985.53 |
| Grand Total | 206,752.84 |

84.     The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $300,000.   The total amount requested, $231,752.84, falls below the $300,000 that Settlement Class Members were advised could be sought.   To date, no objections have been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice.   If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

85.     From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover their out-of-pocket expenses.   Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.   Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

24

86. The largest component of expenses, $141,830.50, or approximately 61.2% of the total expenses, was expended on the retention of experts—one in the field of accounting; and two in the field of damages and loss causation. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint and a report on market efficiency in anticipation of Lead Plaintiffs' motion for class certification, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

87. Additionally, Lead Counsel paid $8,225.00 in mediation fees owed to Mr. Melnick for the services he provided during the settlement negotiation period, which is approximately 3.55% of the total expenses incurred.

88. The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things, court fees, service of process costs, travel expenses, investigation fees, PSLRA notice costs, photoimaging, postage and delivery expenses, and the cost of on-line legal research.

89. Finally, as stated above, Lead Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the aggregate amount of $25,000. More specifically, Lead Plaintiffs respectfully request reimbursement of costs and expenses in the amount of $10,000 for Mr. Bhattacharya and $15,000 for Mr. Gaviria. *See* Ex. 3 ("Bhattacharya Decl."), ¶13; Ex. 4 ("Gaviria Decl."), ¶13. As set forth in their declarations, Lead Plaintiffs stepped forward to represent the Settlement Class and devoted many hours participating in this litigation, including, *inter alia,* (a) regularly communicating with Lead Counsel regarding the posture and progress of the case; (b) reviewing pleadings and briefs filed in the Action; (c) reviewing the Court's orders; (d) responding to document requests and producing documents in conjunction therewith; (e) responding to interrogatories; (f) communicating with Lead Counsel regarding mediation related topics and making themselves

25

available during the mediation and settlement negotiations; and (g) evaluating and approving the Settlement Amount. *See* Bhattacharya Decl., ¶¶4-5; Gaviria Decl., ¶¶4-5.

90. To date, no objections to the Litigation Expenses have been filed on the Court's docket. In our opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

91. In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, we respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. We further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $231,752.84 in Litigation Expenses, including PSLRA reimbursement for costs in the aggregate amount of $25,000 for Lead Plaintiffs Bhattacharya and Gaviria should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 8th day of September, 2023, at Los Angeles, California.

*s/ Casey E. Sadler*
CASEY E. SADLER

Executed this 8th day of September, 2023, at Chicago, Illinois.

*s/ Joshua B. Silverman*
JOSHUA B. SILVERMAN

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

*s/ Casey E. Sadler*
Casey E. Sadler